## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RICHARD FRANCIS, CHARLES
AIKEN, NEIL AMBROSIO, MICHAEL
BANKS, MARIA BARALLARDOS,
STEVEN BRACK, JAMES PAUL
BROWNE, CLYDE CHENG, GUY
CLARK, TROY COULSON,
KIMBERLY COULSON, NICOLETTE
COVEY, DARRIN DEGRAND,
DANIEL DRAIN, DENNIS DUFFY,
DONALD DYKSHORN, JON ELLARD,
JIMMY FLOWERS, SAMUEL FORD,
KARINA FREDO, WILLIAM FREDO,
RICHARD FREEMAN, CHARLES
GRAFF, LISA MARIE GRAFF,
TIMOTHY GRAFRATH, WILLIAM
GROSSMAN, MARISELLA
GUTIERREZ, JIMMY HARMAN, CHI
KIM HO, PHIL HOUK, JAY HULL,
RANDALL JACOBS, CARL
JOHNSEN, COLTON KELLY, MARK
KIDD, TAURUS KING,
CHRISTOPHER KRULL, CHARLES
LARSEN, BRIAN LLOYD, MARC
MAZZA, ANDRE MCQUADE,
RHIANNA MEYERS, RICHARD
NOONAN, JAMES NORVELL,
MICHAEL PLAFKER, MICHAEL
PONDER, LOUIS RAY, JEFFREY
RICE, ARIF SHAKOOR, KEITH
SHELTON, KAREN SHELTON, CARY
SHERROW, RICHARD "TERRY"
SHOPE, DONALD SICURA, JOSEPH

Civil Action No.

2:19-cv-11044

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Hon. David M. Lawson
Magistrate Judge David R. Grand

SIERCHIO, JASON "KEVIN"
SINCLAIR, DENNIS SPEERLY,
RICHARD SULLIVAN, MICHAEL
SYLVESTER, TAIT THOMAS, PHILIP
WEEKS, KEVIN WESLEY, PHILIP
WHICKER, WESLEY WON, and
HOWARD YOUNG, individually and on
behalf of all others similarly situated,

      Plaintiffs,

      v.

GENERAL MOTORS, LLC,

      Defendant.

## Table of Contents

NATURE OF THE ACTION .................................................................1

JURISDICTION AND VENUE ...........................................................5

THE PARTIES.....................................................................................6

FACTUAL ALLEGATIONS ..............................................................15

  A.  The Defective Eight-Speed Automatic Transmissions (GM 8L90 and 8L45) ……………………………………………………………………...18

  B.  GM's Knowledge of the Transmission Defect.............................21

    1.    GM's 8L90 and 8L45 Transmissions Suffer from Similar Defects as the 6L50 Transmission................................................................22

    2.    GM's Own Service Bulletins Demonstrate Its Knowledge of the Transmission Defect as Early as September 1, 2014........................................23

      a.    Service Bulletin 14628 ................................................23

      b.    Service Bulletin 14-07-30-001 ...................................24

      c.    Service Bulletin 14876 ................................................27

      d.    Service Bulletin 15-NA-007........................................28

      e.    Service Bulletin PIP5337 ............................................28

      f.    Service Bulletin PIE0353 ............................................31

      g.    Service Bulletin 16-NA-014.........................................31

      h.    Service Bulletin 16-NA-019.........................................33

      i.    Service Bulletin 16-NA-175.........................................34

      j.    Service Bulletin PIP5405 ............................................36

      k.    Service Bulletin 16-NA-213.........................................37

      l.    Service Bulletin PIP5437 ............................................38

      m.    Service Bulletin 16-NA-411.........................................38

      n.    Service Bulletin 16-NA-404.........................................39

      o.    Engineering Information PIE0405 ...............................40

      p.    Service Bulletin 16-NA-361.........................................41

      q.    Service Bulletin 18-NA-177.........................................42

r.      Service Bulletin 18-NA-235................................................42

s.      Service Bulletin 18-NA-356................................................43

t.      Other Service Bulletins and Communications Involving the Eight-Speed Transmissions ................................................44

3.      Numerous Consumer Complaints on the NHTSA Demonstrate That GM Was Aware of the Transmission Defect. ..........................................45

a.      2015 Cadillac Escalade ................................................46

b.      2016 Cadillac Escalade ................................................48

c.      2015 Chevrolet Corvette ................................................52

d.      2016 Chevrolet Camaro ................................................56

e.      2017 Chevrolet Camaro ................................................58

f.      2015 Chevrolet Silverado................................................59

g.      2016 Chevrolet Silverado................................................65

h.      2017 Chevrolet Silverado................................................67

i.      2017 Chevrolet Colorado ................................................74

j.      2018 Chevrolet Colorado ................................................82

k.      2015 GMC Sierra ................................................89

l.      2016 GMC Sierra ................................................94

m.      2017 GMC Sierra ................................................100

n.      2015 GMC Yukon Denali ................................................106

o.      2016 GMC Yukon Denali ................................................110

p.      2017 GMC Yukon Denali ................................................112

q.      2017 GMC Canyon ................................................113

r.      2018 GMC Canyon ................................................114

4.      Consumer Complaints on Internet Forums Demonstrate That GM Was Aware of the Transmission Defect................................................115

a.      Complaints on Edmunds.com ................................................116

b.      Complaints on Cars.com ................................................122

c.      Complaints on CarComplaints.com ................................................128

d.      Complaints on gmauthority.com ........................................136

e.      Complaints on gminsidenews.com....................................142

f.      Complaints on gm-trucks.com .........................................142

g.      Complaints on cadillacforums.com...................................153

5.   Well-Publicized Criticism of the Transmission Defect in Trade
Publications Demonstrate GM's Knowledge of the Defect...........................158

C.   Plaintiffs' Experiences ...............................................................160

1.      Charles Aiken ...............................................................160

2.      Neil Ambrosio ..............................................................161

3.      Michael Banks ..............................................................162

4.      Maria Barallardos .........................................................163

5.      Steven Brack.................................................................164

6.      James Paul Browne .......................................................165

7.      Clyde Cheng .................................................................166

8.      Guy Clark .....................................................................167

9.      Troy and Kimberly Coulson..........................................168

10.     Nicolette Covey ............................................................169

11.     Darrin Degrand .............................................................170

12.     Daniel Drain .................................................................171

13.     Dennis Duffy ................................................................172

14.     Donald Dykshorn ..........................................................173

15.     Jon Ellard .....................................................................174

16.     Jimmy Flowers ..............................................................175

17.     Samuel Ford..................................................................176

18.     Richard Francis.............................................................177

19.     Karina and William Fredo .............................................178

20.     Richard Freeman ...........................................................179

21.     Charles and Lisa Marie Graff ........................................180

22.     Timothy Grafrath ..........................................................181

23. William Grossman .................................................................................182

24. Marisella Gutierrez ...............................................................................183

25. Jimmy Harman ......................................................................................184

26. Chi Kim Ho ...........................................................................................185

27. Phil Houk ..............................................................................................186

28. Jay Hull .................................................................................................187

29. Randall Jacobs ......................................................................................188

30. Carl Johnsen .........................................................................................189

31. Colton Kelly ..........................................................................................191

32. Mark Kidd .............................................................................................192

33. Taurus King ..........................................................................................192

34. Christopher Krull ..................................................................................193

35. Charles Larsen ......................................................................................194

36. Brian Lloyd ...........................................................................................195

37. Marc Mazza ..........................................................................................196

38. Andre McQuade ....................................................................................197

39. Rhianna Meyers ....................................................................................199

40. Richard Noonan ....................................................................................200

41. James Norvell ........................................................................................201

42. Michael Plafker .....................................................................................202

43. Michael Ponder .....................................................................................203

44. Louis Ray ..............................................................................................204

45. Jeffrey Rice ...........................................................................................205

46. Arif Shakoor .........................................................................................206

47. Keith and Karen Shelton .......................................................................207

48. Cary Sherrow ........................................................................................208

49. Richard "Terry" Shope ..........................................................................209

50. Donald Sicura ........................................................................................210

51. Joseph Sierchio .....................................................................................211

52.  Jason "Kevin" Sinclair ...................................................................212

53.  Dennis Speerly.............................................................................213

54.  Richard Sullivan ..........................................................................214

55.  Michael Sylvester ........................................................................215

56.  Tait Thomas .................................................................................216

57.  Philip Weeks................................................................................217

58.  Kevin Wesley ...............................................................................218

59.  Philip Whicker .............................................................................219

60.  Wesley Won .................................................................................220

61.  Howard Young .............................................................................221

CLASS ACTION ALLEGATIONS .............................................................222

TOLLING OF THE STATUTES OF LIMITATIONS ...................................228

CAUSES OF ACTION ................................................................................229

1.  COUNT 1 Breach of warranty under the magnuson-moss warranty act 15 U.S.C. . § 2303, *et seq*...................................................................229

2.  COUNT 2 Unjust Enrichment (On Behalf of the Nationwide Class or Alternatively, each of the State Sub-Classes)...................................232

3.  COUNT 3 Fraudulent omission (on behalf of the nationwide class or alternatively each of the state sub-classes) ......................................233

A.  Claims on Behalf of the Alabama Sub-Class .............................................235

4.  COUNT 4 Violation of the Alabama Deceptive Trade Practices Act ALA. CODE § 8-19-1, *et seq.*.....................................................................235

5.  COUNT 5 Breach of Express Warranty ALA. CODE §§ 7-2-313 AND 7-2A-210....................................................................................................238

6.  COUNT 6 Breach of the Implied Warranty of Merchantability ALA. CODE §§ 7-2-314 AND 7-2A-212................................................................242

B.  Claims on Behalf of the Arizona Sub-Class................................................244

7.  COUNT 7 Violation of the Arizona Consumer Fraud Act Ariz. Rev. Stat. § 44-1521, *et seq.* ............................................................................244

8.     COUNT 8 Breach of Express Warranty Ariz. Rev. Stat. §§ 47-2313 AND 47-2A210.............................................................................................247

9.     COUNT 9 Breach of the Implied Warranty of Merchantability Ariz. Rev. Stat. §§ 47-2314 AND 47-2A212 ...................................................251

C.   Claims on Behalf of the Arkansas Sub-Class..............................................253

10.    COUNT 10 Violation of ARKANSAS Deceptive Trade Practices Act Ark. Ann. Code § 4-88-101, *et seq.* ..............................................................253

11.    COUNT 11 Breach of Express Warranty ...............................................256

12.    COUNT 12 Breach of Implied Warranty of Merchantibility.................260

D.   Claims on Behalf of the California Sub-Class .............................................262

13.    COUNT 13 Violation of California Consumer Legal Remedies Act cal. civ. Code § 1750, *et seq.* .................................................................................262

14.    COUNT 14 Violation of California Bus. & Prof. Code  §17200, *et seq.* ……………………………………………………………………265

15.    COUNT 15 Breach of Implied Warranty Pursuant to the Song-Beverly Consumer Warranty Act Cal. Civ. Code §§ 1792 and 1791.1, *et seq.* ...........267

16.    COUNT 16 Breach of Express Warranty Cal. Com. Code §§ 2313 AND 10210..........................................................................................................270

E.   Claims on Behalf of the Colorado Sub-Class..............................................274

17.    COUNT 17 Violation of the Colorado Consumer Protection Act Colo. Rev. Stat. § 6-1-101, *et seq.* ..........................................................................274

18.    COUNT 18 Breach of Express Warranty COLO. REV. STAT. §§ 4-2-313 and 4-2.5-210 ...............................................................................................276

19.    COUNT 19 Breach of the Implied Warranty of Merchantability Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212..............................................................280

F.   Claims on Behalf of the Connecticut Sub-Class .........................................283

20.    COUNT 20 Violation of the Connecticut Unlawful Trade Practices Act Conn. Gen. Stat. § 42-110a, *et seq.*..............................................................283

21.    COUNT 21 Breach of Express Warranty  Conn. Gen. Stat. Ann. § 42A-2-313……………………………………………………………...…...285

22.    COUNT 22 Breach of the Implied Warranty of Merchantability Conn. Gen. Stat. Ann. § 42A-2-314 .........................................................................289

G.  Claims on Behalf of the Delaware Sub-Class ...........................................291

  23.  COUNT 23 Violation of the Delaware Consumer Fraud Act 6 DEL. CODE § 2511(7) ..............................................................................................291

  24.  COUNT 24 Breach of Express Warranty 6 DEL. CODE §§ 2-313 and 2A-210……………………………………………………………………..294

  25.  COUNT 25 Breach of the Implied Warranty of Merchantability 6 DEL. CODE §§ 2-314 and 2A-212 ....................................................................297

H.  Claims on Behalf of the Florida Sub-Class ...............................................300

  26.  COUNT 26 Violation of the Florida Deceptive and Unfair Trade Practices Act F.S.A. §§ 501.201-.213...........................................................300

  27.  COUNT 27 BREACH of Express Warranty F.S.A. §§ 672.313 and 680.21.....................................................................................................302

  28.  COUNT 28 Breach of Implied Warranty F.S.A. §§ 672.314 and 680.212……………………………………………………………………...306

I.  Claims on Behalf of the Georgia Sub-Class...............................................309

  29.  COUNT 29 Violation of the Georgia Uniform Deceptive Trade Practices Act Ga. Code Ann. § 10-1-370, *et seq.*.........................................................309

  30.  COUNT 30 Breach of Express Warranty Ga. Code. Ann. §§ 11-2-313 and 11-2A-210 ...................................................................................311

  31.  COUNT 31 Breach of the Implied Warranty of Merchantability Ga. Code. Ann. §§ 11-2-314 and 11-2A-212 .....................................................315

J.  Claims on Behalf of the Idaho Sub-Class...................................................317

  32.  COUNT 32 Violation of the Idaho Consumer Protection Act Idaho Code § 48-601, *et seq.* .............................................................................317

  33.  COUNT 33 Breach of Express Warranty  Idaho Code §§ 28-2-313 and 28-12-210 .....................................................................................319

  34.  COUNT 34 Breach of the Implied Warranty of Merchantability IDAHO CODE §§ 28-2-314 AND 28-12-212 ..................................................323

K.  Claims on Behalf of the Illinois Sub-Class ...............................................326

  35.  COUNT 35 Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505/1, *ET SEQ*. AND 720 ILCS 295/1A..326

36.   COUNT 36 Breach of Express Warranty 810 Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210 ...................................................................................330

37.   COUNT 37 Breach of the Implied Warranty of Merchantability 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212 ...........................................334

L.   Claims on Behalf of the Indiana Sub-Class.................................................336

38.   COUNT 38 Breach of Express Warranty IND. CODE §§ 26-1-2-313 and 26-1-2.1-210 ...............................................................................336

39.   COUNT 39 Breach of the Implied Warranty of Merchantability IND. CODE §§ 26-1-2-314 AND 26-1-2.1-212 .........................................340

M.   Claims on Behalf of the Kansas Sub-Class.................................................343

40.   COUNT 40 Violation of the Kansas Consumer Protection Act Kan. Stat. Ann. § 50-623, *et seq.* .................................................................343

41.   COUNT 41 Breach of Express Warranty Kan. Stat. Ann. §§ 84-2-314 and 84-2A-210 ..............................................................................347

42.   COUNT 42 Breach of the Implied Warranty of Merchantability Kan. Stat. Ann. §§ 84-2-314 and 84-2A-212 ..........................................351

N.   Claims on Behalf of the Kentucky Sub-Class ............................................354

43.   COUNT 43 Violation of the Kentucky Consumer Protection Act KY. REV. STAT. § 367.110, *et seq.* ....................................................354

44.   COUNT 44 Breach of Express Warranty  KY. REV. STAT. §§ 335.2-313 and 355.2A-210 ........................................................................356

45.   COUNT 45 Breach of the Implied Warranty of Merchantability KY. REV. STAT. §§ 355.2-314 AND 355.2A-312 ....................................360

O.   Claims on Behalf of the Louisiana Sub-Class ............................................362

46.   COUNT 46 Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law LA. Stat. Ann. § 51:1401, *et seq* ..........................362

47.   COUNT 47 Breach of Express Warranty La. Rev. Stat. Ann. §9:2800.52……………………………………………………...…..…...366

48.   COUNT 48 Breach of the Implied Warranty of Merchantability / Warranty Against Redhibitory Defects La. Civ. Code Art. 2520, 2524.......370

P.   Claims on Behalf of the Maine Sub-Class .................................................372

49.   COUNT 49 Violation of the Maine Unfair Trade Practices Act ME. REV. STAT. ANN. tit. 5, § 205-A, *et seq*. .................................................372

50.   COUNT 50 Breach of Express Warranty ME. REV. STAT. ANN. tit. 11 §§ 2-313 and 2-1210 ......................................................................376

51.   COUNT 51 Breach of the Implied Warranty of Merchantability ME. REV. STAT. ANN. tit. 11 §§ 2-314 and 2-1212 .......................................380

Q.   Claims on Behalf of the Michigan Sub-Class ...........................................382

52.   COUNT 52 Violation of the Michigan Consumer Protection Act MICH. COMP. LAWS § 445.903, *et seq*. .....................................................382

53.   COUNT 53 Breach of Express Warranty MICH. COMP. LAWS §§ 440.2313 and 440.2860 ................................................................386

54.   COUNT 54 Breach of the Implied Warranty of Merchantability MICH. COMP. LAWS §§ 440.2314 and 440.2860 .......................................390

R.   Claims on Behalf of the Minnesota Sub-Class............................................393

55.   COUNT 55 Violation of Minnesota Prevention of Consumer Fraud Act MINN. STAT. § 325F.68, *et seq*. .....................................................393

56.   COUNT 56 Violation of Minnesota Uniform Deceptive Trade Practices Act Minn. Stat. § 325d.43-48, *et seq*. ..........................................395

57.   COUNT 57 Breach of Express Warranty MINN. STAT. §336.2-313 and 336.2A-210........................................................... ...398

58.   COUNT 58 Breach of the Implied Warranty of Merchantability  MINN. STAT. §§ 336.2-314 and 336.2A-212 ..........................................402

S.   Claims on Behalf of the Missouri Sub-Class .............................................404

59.   COUNT 59 Violation of the Missouri Merchandising Practices Act MO. REV. STAT. § 407.010, *et seq*. .....................................................404

60.   COUNT 60 Breach of Express Warranty MO. REV. STAT.§§ 400.2-313 and 400.2A-210........................................................................408

61.   COUNT 61 Breach of the Implied Warranty of Merchantability MO. REV. STAT. §§ 400.2-314 and 400.2A-212 ..........................................412

T.   Claims on Behalf of the New Hampshire Sub-Class ..................................414

62.   COUNT 62 Violation of the New Hampshire Consumer Protection Act N.H. Rev. Stat. Ann. § 358-A:1, *et seq*..........................................414

63.   COUNT 63 Breach of Express Warranty N.H. Rev. Stat. §§ 382-A:2-313 and 382-A:2A-210 ...................................................................................418

64.   COUNT 64 Breach of the Implied Warranty of Merchantability N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212................................................422

U.   Claims on Behalf of the New Jersey Sub-Class .........................................425

65.   COUNT 65 Violation of the New Jersey Consumer Fraud Act N.J. Stat. Ann. § 56:8-1, *et seq.* .......................................................................425

66.   COUNT 66 Breach of Express Warranty N.J. Stat. Ann. §§ 12A:2-313 and 2A-210........................................................................................429

67.   COUNT 67 Breach of the Implied Warranty of Merchantability N.J. Stat. Ann. §§ 12A:2-314 and 2A-212 ....................................................432

V.   Claims on Behalf of the New York Sub-Class............................................435

68.   COUNT 68 Violation of the New York General Business Law § 349 N.Y. GEN. BUS. LAW § 349 ............................................................................435

69.   COUNT 69 Violation of the New York General Business Law § 350 N.Y. GEN. BUS. LAW § 350 ............................................................................439

70.   COUNT 70 Breach of Express Warranty N.Y. U.C.C. §§ 2-314 and 2A-210……………………………………………………………………………..443

71.   COUNT 71 Breach of the Implied Warranty of Merchantability N.Y. U.C.C. §§ 2-314 and 2A-212 ..........................................................446

W.   Claims on Behalf of the North Carolina Class..........................................449

72.   COUNT 72 Violation of the North Carolina Unfair and Deceptive Acts and Practices Act N.C. GEN. STAT. § 75-1.1, *et seq*........................................449

73.   COUNT 73 Breach of Express Warranty N.C. GEN. STAT. §§ 25-2-313 and 252A-210................................................................................453

74.   COUNT 74 Breach of the Implied Warranty of Merchantability N.C. GEN. STAT. §§ 25-2-314 AND 252A-212.......................................................457

X.   Claims on Behalf of the Ohio Sub-Class....................................................459

75.   COUNT 75 Violation of the Ohio Consumer Sales Practices Act OHIO REV. CODE ANN. § 1345.01, *et seq.* .......................................................459

76.   COUNT 76 Breach of Express Warranty OHIO REV. CODE ANN. § 1302.26, *et seq*...................................................................................463

77.   COUNT 77 Breach of the Implied Warranty of Merchantability OHIO REV. CODE ANN. §§ 1302.27 and 1310.19..................................................467

Y.   Claims on Behalf of the Oklahoma Class....................................................469

78.   COUNT 78 Violation of the Oklahoma Consumer Protection Act Okla. Stat. tit. 15, § 751, *et seq.*................................................................470

79.   COUNT 79 Breach of Express Warranty Okla. Stat. tit. 12A §§ 2-313 and 2A-210.......................................................................................474

80.   COUNT 80 Breach of the Implied Warranty of Merchantability Okla. Stat. tit. 12A §§ 2-314 and 2A-212................................................478

Z.   Claims on Behalf of the Oregon Sub-Class..................................................480

81.   COUNT 81 Violation of the Oregon Consumer Protection Act Or. Rev. Stat. § 646.605, *et seq.* ..................................................................480

82.   COUNT 82 Breach of Express Warranty  Or. Rev. Stat. §§ 72.3130 and 72A.2100....................................................................................482

83.   COUNT 83 Breach of the Implied Warranty of Merchantability OR. REV. STAT. § 72.3140 AND 72A.2120 .....................................................486

AA.   Claims on Behalf of the Pennsylvania Sub-Class .....................................488

84.   COUNT 84 Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law 73 P.S. § 201-1, *et seq.* .........................................489

85.   COUNT 85 Breach of Express Warranty 13 PA. CONS. STAT. §§ 2313 and 2A210.......................................................................................492

86.   COUNT 86 Breach of the Implied Warranty of Merchantability 13 PA. CONS. STAT. §§ 2314 and 2A212 .....................................................496

BB.   Claims on Behalf of the South Carolina Class..........................................499

87.   COUNT 87 Violation of the South Carolina Unfair Trade Practices Act S.C. Code Ann. § 39-5-10, *et seq.*..................................................499

88.   COUNT 88 Breach of Express Warranty S.C. Code Ann. § §§ 36-2-313 and 36-2A-210 ..................................................................................503

89.   COUNT 89 Breach of the Implied Warranty of Merchantability S.C. Code Ann. § §§ 36-2-314 and 36-2A-212 .....................................................507

CC.   Claims on Behalf of the South Dakota Class ............................................509

90.   COUNT 90 Violation of South Dakota Deceptive Trade Practices and Consumer Protection Law S.D. Codified Laws § 37-24-6 .............................509

91.   COUNT 91 Breach of Express Warranty S.D. Codified Laws §§ 57A-2-313 and 57A-2A-210 ..........................................................................512

92.   COUNT 92 Breach of the Implied Warranty of Merchantability S.D. Codified Laws §§ 57A-2-314 and 57A-2A-212 ............................................516

DD.  Claims on Behalf of the Tennessee Sub-Class..........................................518

93.   COUNT 93 Violation of the Tennessee Consumer Protection Act Tenn. Code Ann. § 47-18-101, *et seq.* ....................................................518

94.   COUNT 94 Breach of Express Warranty Tenn. Code §§ 47-2-313 and 47-2A-210 ........................................................................521

95.   COUNT 95 Breach of the Implied Warranty of Merchantability TENN. CODE §§ 47-2-314 AND 47-2A-212 ................................................525

EE.   Claims on Behalf of the Texas Sub-Class................................................527

96.   COUNT 96 Violation of the Deceptive Trade Practices Act – Consumer Protection Act Texas Bus. & Com. Code § 17.41, *et seq.* ..............................527

97.   COUNT 97 Breach of Express Warranty TEX. BUS. & COM. CODE §§ 2.313 and 2A.210 ..........................................................................531

98.   COUNT 98 Breach of Implied Warranty of Merchantability TEX. BUS. & COM. CODe §§ 2.314 AND 2A.212..........................................................535

FF.   Claims on Behalf of theWashington Sub-Class .......................................537

99.   COUNT 99 Violation Of The Washington Consumer Protection Act Wash Rev. Code § 19.86.010, *Et Seq*. ........................................537

100. COUNT 100 Breach Of Express Warranty Wash. Rev. Code §§ 62a.2-313 And 62a.2a-210 ........................................................................540

101. COUNT 101 Breach Of The Implied Warranty Of Merchantability WASH. REV. CODE §§ 62A.2-314 AND 62A.2A-212……………………………………………………………………………………………..544

GG.  Claims on Behalf of the Wisconsin Sub-Class .........................................546

102. COUNT 102 Violation Of The Wisconsin Deceptive Trade Practices Act Wis. Stat. §§ 110.18 ..........................................................................546

103. COUNT 103 Breach Of Express Warranty WIS. STAT. §§ 402.313 AND 411.210 ................................................................................................ 550

104. COUNT 104 Breach Of Implied Warranty Of Merchantability WIS. STAT. §§ 402.314 AND 411.212 ................................................................... 554

REQUEST FOR RELIEF .................................................................................. 557

JURY TRIAL DEMANDED .............................................................................. 559

1.     Plaintiffs RICHARD FRANCIS, CHARLES AIKEN, NEIL AMBROSIO, MICHAEL BANKS, MARIA BARALLARDOS, STEVEN BRACK, JAMES PAUL BROWNE, CLYDE CHENG, GUY CLARK, TROY COULSON, KIMBERLY COULSON, NICOLETTE COVEY, DARRIN DEGRAND, DANIEL DRAIN, DENNIS DUFFY, DONALD DYKSHORN, JON ELLARD, JIMMY FLOWERS, SAMUEL FORD, KARINA FREDO, WILLIAM FREDO, RICHARD FREEMAN, CHARLES GRAFF, LISA MARIE GRAFF, TIMOTHY GRAFRATH, WILLIAM GROSSMAN, MARISELLA GUTIERREZ, JIMMY HARMAN, CHI KIM HO, PHIL HOUK, JAY HULL, RANDALL JACOBS, CARL JOHNSEN, COLTON KELLY, MARK KIDD, TAURUS KING, CHRISTOPHER KRULL, CHARLES LARSEN, BRIAN LLOYD, MARC MAZZA, ANDRE MCQUADE, RHIANNA MEYERS, RICHARD NOONAN, JAMES NORVELL, MICHAEL PLAFKER, MICHAEL PONDER, LOUIS RAY, JEFFREY RICE, ARIF SHAKOOR,  KEITH SHELTON, KAREN SHELTON, CARY SHERROW, RICHARD "TERRY" SHOPE, DONALD SICURA, JOSEPH SIERCHIO, JASON SINCLAIR, DENNIS SPEERLY, RICHARD SULLIVAN, MICHAEL SYLVESTER, TAIT THOMAS, PHILIP WEEKS, PHILIP WHICKER, KEVIN WESLEY, WESLEY WON, and HOWARD YOUNG ("Plaintiffs"), for themselves and on behalf of all others similarly situated, bring this action against General Motors, LLC ("GM" or "Defendant"). Plaintiffs allege the following based on personal knowledge as to their own acts and on the investigation conducted by their counsel as to all other allegations:

## **NATURE OF THE ACTION**

2.     This proposed class action is brought by new and used purchasers and lessees from across the United States who allege that GM concealed a known defect

from its customers in the United States who purchased or leased any vehicle designed manufactured, marketed, distributed, sold, warranted and serviced by GM and equipped with GM's Hydra-Matic 8L90 transmission or Hydra-Matic 8L45 transmission (collectively, "Class Vehicles"). The 8L90 and 8L45 transmissions are defective, posing serious safety concerns. These include: the 2015-2019 Chevrolet Silverado; the 2017-2019 Chevrolet Colorado; the 2015-2019 Chevrolet Corvette; the 2016-2019 Chevrolet Camaro; the 2015-2019 Cadillac Escalade and Escalade ESV; the 2016-2019 Cadillac ATS, ATS-V, CTS, CT6, and CTS-V; the 2015-2019 GMC Sierra, Yukon, and Yukon XL, and Yukon Denali XL; and the 2017-2019 GMC Canyon.

3.     This action arises from Defendant's failure, despite its longstanding knowledge, to disclose to Plaintiffs and other similarly situated customers that the Class Vehicles have defective transmissions that fail to function in a safe and reliable manner as expected.

4.     As explained below, the Class Vehicles were sold with a defective 8L90 or 8L45 Transmissions that, among other things, slip, buck, kick, jerk and harshly engage, suffer abnormal internal wear, sudden acceleration, delay in downshifts, delayed acceleration, difficulty stopping the vehicle, and eventually require replacement of the transmission or its components (the "Transmission Defect").

5.     This defect, which manifests itself within the limited warranty period or shortly after the limited warranty period expires, can cause unsafe conditions in the Class Vehicles, including but not limited vehicles suddenly lurching forward, sudden loss of forward propulsion, and significant delays in acceleration. These conditions present a safety hazard because they severely affect the driver's ability to control the vehicle's speed, acceleration, and deceleration.

6.     The shuddering, shaking, jerking and hesitation is related to internal issues within the transmission and/or torque converter causing undue friction and

2

impairing proper functioning of hydraulic systems and gears, which in turn results in metal shavings being circulated throughout the transmission. This damage to the transmission and torque converter imposes escalating repairs upon consumers, including the need to flush the metal shavings from the transmission.

7.      GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covers all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. However, when Class Members bring their vehicles to GM's authorized agents for repair, they are either told that their vehicles are behaving normally, given ineffective repairs, or are having their transmissions or components replaced with the same defective parts.

8.      Defendant knew, or should have known, of this critical defect at the time of sale or shortly thereafter when numerous members of the putative class began complaining of the defect at Defendant's authorized dealerships. Yet, notwithstanding this knowledge, GM has routinely failed to repair the Class Vehicles without charge when the defect manifests. Moreover, GM failed to disclose the Transmission Defect to Plaintiff and Class members through its advertising, including on vehicle window stickers or at the point of sale or lease.

9.      GM, an experienced and sophisticated vehicle manufacturer, learned of the Transmission Defect through, *inter alia*, (1) prior issues from its vehicles equipped with 6L transmissions that suffered from similarly problems; (2) records from the National Highway Traffic Safety Administration ("NHTSA"), (3) customer complaints posted on internet forums, (4) its own records of customers' complaints,

3

(5) dealership repair records and requests for technical assistance, (6) warranty and post-warranty claims, (7) pre- and post-release internal durability testing, (8) Service Bulletins, (9) its Customer Satisfaction Program, and (10) other various sources. However, GM failed to notify consumers prior to purchase of the nature and extent of the Transmission Defect plaguing Class Vehicles or provide any adequate post-purchase remedy.

10.     GM's efforts have been entirely inadequate in resolving the Transmission Defect or providing relief to the Class. Moreover, GM has failed to alert the Class Members of the true and unsafe nature of the Transmission Defect.

11.     Despite knowledge conveyed to Defendant by information from its affiliated dealerships, National Highway Traffic Safety Administration ("NHTSA") consumer complaints, and its own internal records, including durability testing, Defendant did not alert purchasers or lessees before their transactions, has not recalled the Class Vehicles to repair the defective transmissions, or offered its customers suitable repairs free of charge, or offered to reimburse consumers forced to pay for the repairs out-of-pocket.

12.     In fact, rather than repairing the defective components and installing non-defective components, GM provides ineffectual or insufficient software updates, part replacements, and other procedures that fail to fully resolve the defects. Further, Class Vehicle owners and lessees incur or will incur out-of-pocket costs for these repairs once the Vehicles are out of warranty. GM thus unfairly shifts the costs to the Class Members, and benefits or will benefit from the revenue generated by repeat repairs. Accordingly, consumers will be required to pay hundreds, if not thousands, of dollars to repair or replace the transmissions, related components, or other parts that become damaged because of the Transmission Defect, and GM is unjustly enriched at their expense.

13.     In many instances, GM has never been able to repair the transmission.

On information and belief, owners have complained of dangerous driving conditions and near-accidents because of the Transmission Defect. However, GM continues to sell the dangerously defective vehicles to consumers.

14.     Because of Defendant's misconduct, Plaintiffs and Class Members have been damaged 1) at the point of sale by overpaying for the purchase or lease of the Subject Vehicles, 2) at the resale value due to diminished resale prices; and 3) eventually if not already, the costs of repairing the Vehicles.

## JURISDICTION AND VENUE

15.     This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than GM, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. 28 U.S.C. § 1332(d)(2)(A).

16.     In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.

17.     This Court has personal jurisdiction over Defendant because it is headquartered in the State of Michigan; has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in Michigan; and otherwise intentionally avails itself of the markets within Michigan through promotion, sale, marketing and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary as GM is "at home" in Michigan.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A

substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiffs may properly sue GM in this District, where GM is headquartered.

## THE PARTIES

19.     Plaintiff Charles Aiken is a citizen and resident of Pennsylvania, over the age of eighteen. Plaintiff Aiken purchased a new 2019 Chevrolet Silverado, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about December 15, 2018.

20.     Plaintiff Neil Ambrosio is a citizen and resident of Florida, over the age of eighteen years. Plaintiff Ambrosio leased a new 2017 GMC Sierra Denali, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about December 30, 2016.

21.     Plaintiff Michael Banks is a citizen and resident of New Hampshire, over the age of eighteen. Plaintiff Banks purchased a new 2017 GMC Sierra Denali, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about March 20, 2017

22.     Plaintiff Maria Barallardos is a citizen and resident of Arizona, over the age of eighteen. Plaintiff Barallardos purchased a used 2015 Cadillac Escalade, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about July 10, 20

23.     Plaintiff Steven Brack is a citizen and resident of North Carolina, over the age of eighteen. Plaintiff Brack purchased a new 2018 Chevrolet Silverado, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about July 31, 2018.

24.     Plaintiff James Paul Browne is a citizen and resident of Illinois, over the age of eighteen. Plaintiff Browne purchased a Used 2017 GMC Sierra manufactured by GM and containing an 8L90 or 8L45 transmission, on or about

November 5, 2018 in Arkansas.

25.    Plaintiff Clyde Cheng is a citizen and resident of California, over the age of eighteen years. Plaintiff Cheng purchased a new 2016 GMC Sierra, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about December 8, 2015.

26.    Plaintiff Guy Clark is a citizen and resident of Kansas, over the age of eighteen. Plaintiff Clark purchased a new 2017 GMC Sierra, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about January 21, 2017.

27.     Plaintiffs Troy and Kimberly Coulson are citizens and residents of Minnesota, over the age of eighteen. Plaintiffs Troy and Kimberly Coulson purchased a new 2017 GMC Sierra 1500, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about June 26, 2017.

28.    Plaintiff Nicolette Covey is a citizen and resident of Montana, over the age of eighteen. Plaintiff Covey purchased a new 2015 Cadillac Escalade, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about February 13, 2015 from an authorized GM dealership in Pasco, Washington.

29.    Plaintiff Darrin Degrand is a citizen and resident of Texas, over the age of eighteen years. Plaintiff Degrand purchased a new 2018 GMC Canyon, manufactured by GM and containing an 8L90 or 8L45 transmission, in July 13,2018.

30.    Plaintiff Daniel Drain is a citizen and resident of Colorado, over the age of eighteen. Plaintiff Drain purchased a new 2018 GMC Sierra, manufactured by GM and containing an 8L90 or 8L45 transmission, on or around June 29, 2018.

31.    Plaintiff Dennis Duffy is a citizen and resident of Florida, over the age of eighteen years. Plaintiff Duffy purchased a new 2016 Yukon Denali, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about August 10, 2016.

32.    Plaintiff Donald Dykshorn is a citizen and resident of Louisiana, over the age of eighteen. Plaintiff Dykshorn purchased a new 2016 Chevrolet Camaro,

7

manufactured by GM and containing an 8L90 or 8L45 transmission, on or about October 8, 2016.

33.     Plaintiff Jon Ellard is a citizen and resident of Oklahoma, over the age of eighteen. Plaintiff Ellard purchased a new 2016 GMC Sierra, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about June 29, 2016.

34.     Plaintiff Jimmy Flowers is a citizen and resident of Georgia, over the age of eighteen. Plaintiff Flowers purchased a new 2018 Chevrolet Colorado, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about September 29, 2018.

35.     Plaintiff Richard Francis is a citizen and resident of Michigan, over the age of eighteen years. Plaintiff Francis purchased a new 2017 Yukon Denali, manufactured by GM and containing an 8L90 or 8L45 transmission, in August 22, 2017.

36.     Plaintiffs Karina and William Fredo are citizens and residents of Pennsylvania, over the age of eighteen. Plaintiffs Karina and William Fredo purchased a new 2015 Cadillac Escalade, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about July 8, 2017.

37.     Plaintiff Richard Freeman is a citizen and resident of Georgia, over the age of eighteen. Plaintiff Freeman purchased a new 2017 GMC Canyon, manufactured by GM and containing an 8L90 or 8L45 transmission, on or around in or around November 2017.

38.     Plaintiff Samuel Ford is a citizen and resident of Indiana, over the age of eighteen. Plaintiff Ford leased a new 2018 Chevrolet Silverado 1500, manufactured by GM and containing an 8L90 or 8L45 transmission, in or around May 2018.

39.     Plaintiffs Charles and Lisa Marie Graff are a citizens and residents of Florida, over the age of eighteen. Plaintiffs Charles and Lisa Marie Graff purchased

a new 2018 Chevrolet Silverado manufactured by GM and containing an 8L90 or 8L45 transmission, on or about November 9, 2018.

40.     Plaintiff Timothy Grafrath is a citizen and resident of Illinois, over the age of eighteen. Plaintiff Grafrath purchased a new 2017 GMC Sierra, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about September 20, 2016.

41.     Plaintiff William Grossman is a citizen and resident of New Jersey, over the age of eighteen. Plaintiff Grossman purchased a new 2016 Chevrolet Camaro, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about December 6, 2016.

42.     Plaintiff Marisella Gutierrez is a citizen and resident of Georgia, over the age of eighteen. Plaintiff Gutierrez purchased a new 2017 Chevrolet Silverado, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about November 2017 from an authorized Chevrolet dealership in San Angelo, Texas.

43.     Plaintiff Jimmy Harman is a citizen and resident of North Carolina, over the age of eighteen. Plaintiff Harman purchased a new 2017 GMC Denali, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about April 2017.

44.     Plaintiff Chi Kim Ho is a citizen and resident of Ohio, over the age of eighteen. Plaintiff Ho purchased a new 2016 Cadillac Escalade ESV, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about March 12, 2016.

45.     Plaintiff Phil Houk is a citizen and resident of Wisconsin, over the age of eighteen. Plaintiff Houk purchased a used 2017 Chevrolet Camaro, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about September 14, 2018.

46.     Plaintiff Jay Hull is a citizen and resident of Michigan, over the age of eighteen. Plaintiff Hull purchased a new 2017 Chevrolet Silverado, manufactured

by GM and containing an 8L90 or 8L45 transmission, on or about February 21, 2017.

47.     Plaintiff Randall Jacobs is a citizen and resident of New Jersey, over the age of eighteen. Plaintiff Jacobs purchased a new 2016 Cadillac CT6, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about August 23, 2016.

48.     Plaintiff Carl Johnsen is a citizen and resident of Maine, over the age of eighteen. Plaintiff Johnson purchased a new 2018 Chevrolet Silverado, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about December 17, 2018.

49.     Plaintiff Colton Kelly is a citizen and resident of Nevada, over the age of eighteen. Plaintiff Kelly purchased a new 2017 Chevrolet Silverado 1500, manufactured by GM and containing an 8L90 or 8L45 transmission, in or around December 2017 from an authorized Chevrolet dealership in Rapid City, South Dakota.

50.     Plaintiff Mark Kidd is a citizen and resident of Tennessee, over the age of eighteen. Plaintiff Kidd purchased a used 2016 GMC Sierra, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about June 2017.

51.     Plaintiff Taurus King is a citizen and resident of Texas, over the age of eighteen. Plaintiff King purchased a new 2019 Chevrolet Silverado, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about September 2, 2019.

52.     Plaintiff Christopher Krull is a citizen and resident of Missouri, over the age of eighteen. Plaintiff Krull purchased a new 2016 Cadillac CT6, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about February 25, 2017.

53.     Plaintiff Charles Larsen is a citizen and resident of New York, over the age of eighteen. Plaintiff Larsen purchased a new 2015 GMC Sierra, manufactured

by GM and containing an 8L90 or 8L45 transmission, on or about June 20, 2015.

54.     Plaintiff Brian Lloyd is a citizen and resident of Alabama, over the age of eighteen. Plaintiff Lloyd purchased a new 2016 Chevrolet Camaro, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about May 11, 2016.

55.     Plaintiff Marc Mazza is a citizen and resident of New York, over the age of eighteen. Plaintiff Mazza purchased a new 2017 GMC Sierra, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about March 27, 2017.

56.     Plaintiff Andre McQuade is a citizen and resident of New York, over the age of eighteen. Plaintiff McQuade purchased a certified pre-owned 2017 Cadillac CTS, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about May 4, 2018.

57.     Plaintiff Rhianna Meyers is a citizen and resident of Florida, over the age of eighteen. Plaintiff Meyers purchased a New 2017 Chevrolet Camaro, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about March 22, 2017.

58.     Plaintiff Richard Noonan is a citizen and resident of Missouri, over the age of eighteen. Plaintiff Noonan purchased a used 2015 Cadillac Escalade, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about January 18, 2018.

59.     Plaintiff James Norvell is a citizen and resident of Kentucky. Plaintiff Norvell purchased a new 2018 Chevrolet Colorado, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about May 2018.

60.     Plaintiff Michael Plafker is a citizen and resident of New York, over the age of eighteen years. Plaintiff Plafker leased a new 2017 GMC Sierra Denali, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about September 8, 2017.

61.     Plaintiff Michael Ponder is a citizen and resident of Florida, over the

11

age of eighteen. Plaintiff Ponder purchased a New 2018 Chevrolet Camaro, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about April 21, 2018.

62.     Plaintiff Louis Ray is a citizen and resident of Michigan, over the age of eighteen. Plaintiff Ray purchased a used 2015 Cadillac Escalade, manufactured by GM and containing an 8L90 or 8L45 transmission, in or around August 14, 2017.

63.     Plaintiff Jeffrey Rice is a citizen and resident of Ohio, over the age of eighteen. Plaintiff Rice purchased a new 2018 Chevrolet Silverado, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about October 25, 2018.

64.     Plaintiff Arif Shakoor is a citizen and resident of Florida, over the age of eighteen. Plaintiff Shakoor purchased a New 2015 GMC Denali, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about May 11, 2015.

65.     Plaintiffs Keith Shelton and Karen Shelton are citizens and residents of Delaware, over the age of eighteen.  Plaintiffs Keith and Karen Shelton purchased a new 2018 Chevrolet Silverado 1500, manufactured by GM and containing an 8L90 or 8L45 transmission, in or around August 2018.

66.     Plaintiff Cary Sherrow is a citizen and resident of Oregon, over the age of eighteen. Plaintiff Sherrow purchased a new 2017 GMC Sierra, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about August 15, 2017 from an authorized GM and Chevrolet dealership in Kellogg, Idaho.

67.     Plaintiff Richard Terry Shope is a citizen and resident of North Carolina, over the age of eighteen. Plaintiff Shope purchased a new 2018 Chevrolet Camaro, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about August 10, 2018.

68.     Plaintiff Donald Sicura is a citizen and resident of South Carolina, over the age of eighteen. Plaintiff Sicura purchased a new 2015 Chevrolet Corvette, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about

12

March 6, 2015.

69.     Plaintiff Joseph Sierchio is a citizen and resident of New Jersey, over the age of eighteen years. Plaintiff Sierchio purchased a new 2016 Chevrolet Camaro, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about July 9, 2016.

70.     Plaintiff Jason "Kevin" Sinclair is a citizen and resident of South Carolina, over the age of eighteen. Plaintiff Sinclair purchased a new 2017 GMC Sierra, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about May 1, 2017 from an authorized GM dealership in Salisbury, North Carolina.

71.     Plaintiff Dennis Speerly is a citizen and resident of Illinois, over the age of eighteen years. Plaintiff Speerly purchased a new 2017 GMC Canyon, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about April 14, 2017.

72.     Plaintiff Richard Sullivan is a citizen and resident of Florida, over the age of eighteen years. Plaintiff Sullivan purchased a new 2015 Chevrolet Corvette Stingray, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about November 1, 2015.

73.     Plaintiff Michael Sylvester is a citizen and resident of New York, over the age of eighteen. Plaintiff Sylvester purchased a new 2018 Cadillac CT6, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about March 5, 2018.

74.     Plaintiff Tait Thomas is a citizen and resident of Florida, over the age of eighteen. Plaintiff Thomas purchased a New 2015 Chevrolet Corvette, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about September 28, 2014.

75.     Plaintiff Philip Weeks is a citizen and resident of Georgia, over the age of eighteen. Plaintiff Weeks purchased a new 2018 Cadillac CT6, manufactured by

13

GM and containing an 8L90 or 8L45 transmission, on or about December 18, 2018.

76. Plaintiff Kevin Wesley is a citizen and resident of Connecticut, over the age of eighteen. Plaintiff Wesley purchased a new 2017 Chevy Colorado, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about November 2018.

77. Plaintiff Philip Whicker is a citizen and resident of Indiana, over the age of eighteen. Plaintiff Whicker purchased a new 2017 Chevrolet Corvette, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about May 15, 2017.

78. Plaintiff Wesley Won is a citizen and resident of California, over the age of eighteen years. Plaintiff purchased a new 2016 Cadillac Escalade, manufactured by GM and containing an 8L90 or 8L45 transmission, on May 11, 2017.

79. Plaintiff Howard Young is a citizen and resident of Texas, over the age of eighteen years. Plaintiff Young purchased a new 2015 Chevrolet Corvette, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about May 12, 2015 from an authorized Chevrolet dealership in Olean, New York.

80. Defendant General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan 48265. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. General Motors Holdings LLC's only member is General Motors Company, a Delaware corporation with its principal place of business in the State of Michigan. General Motors Company has 100% ownership interest in General Motors Holdings LLC.

81. General Motors LLC, itself and through its affiliates, designs,

14

manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide and in Michigan. General Motors LLC is the warrantor and distributor of the Class Vehicles in the United States.

82. At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Michigan and throughout the United States of America.

## FACTUAL ALLEGATIONS

83. GM designs, manufactures, markets, distributes, and warrants automobiles in the United States sold under various brand names, including the Buick, Cadillac, Chevrolet, and GMC brands. In 2018, GM sold 2,954,037 vehicles in the United States alone and "had the number one market share in . . . North America[.]" (*See* Ex. 1, General Motors Company 2018 Annual Report (Form 10-K) at 2).

84. GM has thousands of authorized dealerships across the United States, all of which are under GM's control. GM authorizes these dealerships to sell GM vehicles, parts, and accessories and to service and repair GM vehicles using GM parts. (*Id.* at 3.)

85. Since 2014, GM has designed, manufactured, distributed, sold, and leased the Class Vehicles, which include the 2015-2019 Chevrolet Silverado; the 2017-2019 Chevrolet Colorado; the 2015-2019 Chevrolet Corvette; the 2016-2019 Chevrolet Camaro; the 2015-2019 Cadillac Escalade and Escalade ESV; the 2016-2019 Cadillac ATS, ATS-V, CTS, CT6, and CTS-V; the 2015-2019 GMC Sierra, Yukon, and Yukon XL, and Yukon Denali XL; and the 2017-2019 GMC Canyon. GM has sold, directly or indirectly, through dealers and other retail outlets, hundreds of thousands of Class Vehicles equipped with the 8L90 or 8L45 transmissions.

15

86.     GM provided all purchasers of the Class Vehicles with a New Vehicle Limited Warranty with the purchase or lease of the Class Vehicles.

87.     The New Vehicle Limited Warranty for Cadillac-brand Class Vehicles ("Cadillac Warranty"), which included a "Bumper-to-Bumper" warranty and a Powertrain warranty, stated in relevant part:

**What Is Covered**

**Warranty Applies**

This warranty is for GM vehicles registered in the United States and normally operated in the United States, and is provided to the original and any subsequent owners of the vehicle during the warranty period.

**Repairs Covered**

The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period. Needed repairs will be performed using new, remanufactured, or refurbished parts.

**No Charge**

Warranty repairs, including towing, parts, and labor, will be made at no charge.

**Obtaining Repairs**

To obtain warranty repairs, take the vehicle to a Cadillac dealer facility within the warranty period and request the needed repairs. Reasonable time must be allowed for the dealer to perform necessary repairs.

**Warranty Period**

The warranty period for all coverages begins on the date the vehicle is first delivered or put in use and ends at the expiration of the coverage period.

16

**Bumper-to-Bumper Coverage**

The complete vehicle is covered for 4 years or 50,000 miles, whichever comes first, except for other coverages listed here under "What Is Covered" and those items listed under "What Is Not Covered" later in this section.

**Powertrain Component Warranty Coverage**.

The powertrain is covered for 7 years or 70,000 miles, whichever comes first, except for other coverages listed here under "What Is Covered" and those items listed under "What Is Not Covered" later in this section.

\*\*\*

**Transmission/Transaxle Coverage includes**: All internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle. Also covered are any actuators directly connected to the transmission (slave cylinder, etc.).

*Exclusions*: Excluded from the powertrain coverage are transmission cooling lines, hoses, radiator, sensors, wiring, and electrical connectors. Also excluded are the clutch and pressure plate as well as any Transmission Control Module and/or module programming.

\*\*\*

**Other Terms**: This warranty gives you specific legal rights and you may also have other rights which vary from state to state. GM does not authorize any person to create for it any other obligation or liability in connection with these vehicles. **Any implied warranty of merchantability or fitness for a particular purpose applicable to this vehicle is limited in duration to the duration of this written warranty. Performance of repairs and needed adjustments is the exclusive remedy under this written warranty or any implied warranty. GM shall not be liable for incidental or consequential damages, such as, but not limited to, lost wages or vehicle rental expenses, resulting from breach of**

17

**this written warranty**. (*See* Ex. 2, 2015 Cadillac Limited Warranty and Owner Assistance Information at 2, 4, 12.)

88.     The New Vehicle Limited Warranty for Chevrolet and GM-brand Class Vehicles ("Chevrolet/GM Warranty") included substantially the same terms as the Cadillac Warranty terms excerpted above, except that the Chevrolet/GM Warranty's "Bumper-to-Bumper" coverage period was limited to "the first 3 years or 36,000 miles, whichever comes first," and the Powertrain warranty coverage period was limited to "5 years or 60,000 miles, whichever comes first." (*See, e.g.*, Ex. 3, 2016 Chevrolet Limited Warranty and Owner Assistance Information at 2, 4, 14.)

89.     The warranties and representations contained in the Cadillac Warranty and the Chevrolet/GM Warranty (collectively, the "Warranties") were and are material to Plaintiffs because Plaintiffs would not have purchased their Class Vehicles or would not have paid as much as they did if the transmissions in their Class Vehicles were not covered by a full warranty.

**A.     The Defective Eight-Speed Automatic Transmissions (GM 8L90 and 8L45)**

90.     In January 2014, GM began marketing the release of a new, eight-speed automatic transmission to be included in some of its vehicles for model year 2015. GM-brand vehicles for model years 2014 and older had automatic transmissions of six or fewer speeds.

91.     The engines in the Class Vehicles produce power and then send that power to the 8L90 or 8L45 automatic transmission. The transmission then takes that power and delivers it to the rear drive transmissions of the Class Vehicle, while ensuring the engine stays within predetermined RPMs. The transmission also seeks to maximize the efficiency of the Class Vehicles' engines by balancing fuel consumption and torque.

18

92.    As background, transmissions use toothed gears that interact with each other to produce torque. The term "gear ratio" refers to the relationship between gears. For example, if an input gear has 20 teeth and it interacts with an output gear that has 10 teeth, the 10-tooth gear must spin twice to fully spin the 20-tooth gear. A gear ratio is then calculated by taking the number of teeth on the output gear and dividing it by the input gear. In this example, the gear ratio would be 1:2 (typically expressed as 0.5:1).

93.    Automatic transmissions automate the switching of gears using multi-plate clutches, which adjust according the speed that the vehicle is traveling. Thus, instead of manually operating a clutch, the vehicle's transmission constantly monitors and engages and disengages gears according to the speed at which the vehicle is moving. This is done through the use of fluid pressure, which provides the necessary pressure to activate clutches and bands that in turn determines what gear to engage.

94.    GM marketed and sold its new eight-speed automatic transmissions as having "world-class performance" rivaling top performance vehicles, lightning-fast and smooth shifting, along with improved fuel efficiency, among other representations. (*See* Ex. 4, GM press release, "New 8-Speed Enables Quicker, More Efficient Corvette." August 20, 2014.)

95.    For instance, GM's own press release dated January 13, 2014 introduced the new 8L90 transmission as being "tuned for world-class shift-response times," and "deliver[ing] shift performance that rivals the dual-clutch/semi-automatic transmissions found in many supercars – but with the smoothness and refinement that comes with a conventional automatic fitted with a torque converter." In addition, the technology and design of the new 8L90 transmission "help make the new [Corvette] Z06 surprisingly fuel efficient." (*See* Ex. 5, GM press release, "2015 Chevrolet Corvette Z06 is Most Capable, Ever." January 13, 2014). GM touted

19

similar characteristics for its 8L45 transmission in press releases in 2015. (*See* Ex. 6, GM press release, "2016 Camaro's Driving Fun Rooted in New Powertrains." May 16, 2015; Ex. 7, GM press release, "Cadillac CT6 to Debut Next Generation Powertrain." March 23, 2015).

96.    In another GM press release, GM continued to represent the high quality of the new eight-speed automatic transmission:

> In fact, in the 2015 Corvette Stingray, [8L90 transmission] enables a class-leading 29-mpg EPA highway estimate – a 3.5-percent increase in fuel economy over the previous six-speed automatic – and a quicker 0-60 time of 3.7 seconds, all while delivering wide-open-throttle upshifts quicker than those of the dual-clutch transmission offered in the Porsche 911.

> "GM's new 8L90 eight-speed automatic represents a rare win-win-win scenario for customers," said Kavoos Kaveh, global chief engineer for eight-speed automatic transmissions. "It offers greater performance and efficiency, while weighing less than the transmission it replaces. That's a rare accomplishment in the industry today – and one for which GM has been awarded more than two dozen patents."

> ****

> The lower engine speed reduces fuel consumption, while a new torque converter design enhances refinement, particularly during low-speed gear changes. "The Corvette's new eight-speed automatic delivers the comfort and drivability of a true automatic transmission, as well as lightning-fast shifts and the manual control that enhance the performance-driving experience," said Kaveh. "It was designed to enhance the driving experience, with performance on par with dual-clutch designs, but without sacrificing refinement. . . . Additionally, a torque converter design with a turbine damper complements performance with excellent refinement at low engine speeds."

97.    In actuality, however, the 8L90 and 8L45 transmissions deliver

20

anything but "comfort and drivability[,]" "lightning-fast shifts[,]" and "enhanc[ed] refinement, particularly during low-speed gear changes." In fact, the Transmission Defect in the 8L90 and 8L45 transmissions causes unsafe conditions, including, but not limited to, Class Vehicles suddenly lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion. These conditions present a safety hazard because they severely affect the driver's ability to control the car's speed, acceleration, and deceleration. As an example, these conditions may make it difficult to safely merge into traffic, and drivers have reported sudden lurching into intersections when attempting to gradually accelerate from a stopped position and other dangerous driving conditions. Even more troubling, the Transmission Defect can cause the vehicle to delay downshifting and decelerating when the brakes are depressed.

98.     On information and belief, the Transmission Defect also causes premature wear to the 8L90 and 8L45 Transmissions' components and other vehicle parts, which can require repeated and/or expensive repairs, including replacement of the transmission and its related components.

## B.     GM's Knowledge of the Transmission Defect

99.     As early as September 2014, GM knew or should have known that the 8L90 and 8L45 transmissions were defective and that the Transmission Defect would adversely affect the drivability of the Class Vehicles and cause safety hazards.

100.    Plaintiffs are informed and believe and based thereon allege that prior to the sale of the Class Vehicles, GM knew, or should have known, about the Transmission Defect: (1) because the 6L transmission on which the 8L transmission is based suffered from similar defects, which GM knew from consumer complaints that formed the basis for *McKee v. General Motors, LLC,* Case No. 18-11303 (E.D. Mich.), and from the litigation itself; and (2) through GM's exclusive knowledge of

21

non-public, internal data about the Transmission Defect, including: pre-release testing data; (3) early consumer complaints about the Transmission Defect to GM's dealers who are their agents for vehicle repairs; warranty claim data related to the defect; (4) aggregate data from GM's dealers; consumer complaints to the National Highway Traffic Safety Administration ("NHTSA") and resulting notice from NHTSA; (5) dealership repair orders; (6) testing conducted in response to owner or lessee complaints; (7) GM service bulletins applicable to the Class Vehicles that acknowledge the Transmission Defect; and (8) other internal sources of aggregate information about the problem. Nevertheless, Defendant has actively concealed and failed to disclose this defect to Plaintiffs and Class Members at the time of purchase or lease and thereafter.

*1.*    ***GM's 8L90 and 8L45 Transmissions Suffer from Similar Defects as the 6L50 Transmission***

101.   GM's 8L90 and 8L45 ("8L") transmissions succeeded GM's 6L50 ("6L") transmission, and the two generations of transmissions are similar.

102.   Consumers who purchased or leased vehicles with the 6L transmission lodged complaints with NHTSA going back as far as 2008, complaining of transmission defects like those later seen in the 8L, including lurching forward and delayed acceleration. Among these, were: "acceleration lag" (NHTSA/ODI ID: 10234780), that "when the vehicle is searching for the correct gear the accelerator pedal is numb for at least 2 seconds requiring at least 90 percent throttle  then it finally picks a low gear and violently throws the driver and passengers back and roars to life" (NHTSA/ODI ID: 10922934), "terrible grinding/howling noise at low speed" (NHTSA/ODI ID: 10861242), "rough shifts" (NHTSA/ODI ID: 10883211); instances in which a vehicle will "misfire or be very unresponsive and then clunk and jerk forward once it decides to change gears" (NHTSA/ODI ID: 10910936),

22

shaking "uncontrollably without warning" (NHTSA/ODI ID: 10946712), "sluggish shifting" (NHTSA/ODI ID: 10995572), and erratic jerking (NHTSA/ODI ID: 10779723). *Id.* at 15, 20, 22, 28, 30, 31, 35.

103.   The complaints about the 6L transmission defect were so overwhelming that on April 26, 2018 a class action was filed against GM: *McKee v. General Motors, LLC,* Case No. 18-11303 (E.D. Mich.). Among other things, the lawsuit alleged that the 6L transmission caused vehicles to slip, buck, kick, jerk, harshly engage, and delay acceleration. *Id.*, ECF No. 18 at 13.

104.   It is unknown whether the defect in GM's 6L transmission was caused by issues with the design or with workmanship and materials. However, based on consumer complaints and the ensuing litigation, GM knew or should have known that as successors to the 6L transmission, the 8L transmissions were likely to suffer from a similar defect, or at least monitored the 8L's for similar problems.

## 2.   *GM's Own Service Bulletins Demonstrate Its Knowledge of the Transmission Defect as Early as September 1, 2014.*

105.   From September 2014 to at least  February 2019, GM issued at least *60* service bulletins and service bulletin updates ("Service Bulletins," "Technical Service Bulletins," or "TSBs") to its dealers in the United States, but not its customers, acknowledging problems of harsh shifting, shuddering, jerking, clunking, and delays in acceleration or deceleration relating to the 8L90 and 8L45 transmissions.

## a.   Service Bulletin 14628

106.   On or around September 1, 2014, GM issued Service Bulletin 14628 directing technicians "to perform a drive audit on **all** 2015 model year Corvette vehicles in inventory that are equipped with an 8 speed automatic transmission

(M5U)" (emphasis in original). GM's service bulletins refer to the 8L90 transmission at issue by name (8L90), by RPO code (M5U, M5X, or M5E), or by both name and RPO code(s). RPO stands for Regular Production Option and is General Motors' standard coding for vehicle configuration options. GM's service bulletins refer to the 8L45 transmission at issue by name (8L45), by RPO code (M5T or M5N), or by both name and RPO code(s).

107.   In the bulletin's section titled "Purpose," GM stated:

> A small number of transmissions may develop a crack in the triple clutch housing internal to the transmission, leading to noise, loss of reverse gear, and limiting the driver to 3rd and 4th forward gears. The drive audit must be completed before vehicle delivery (and in addition to normal predelivery inspection activities) to identify vehicles with the condition. If the condition is found, dealers are to replace the transmission under the existing exchange program, see PIP5200A for details.

### b.   Service Bulletin 14-07-30-001

108.   On or around September 1, 2014, GM issued Service Bulletin 14-07-30-001 with the subject "Information on Transmission Adaptive Functions." This bulletin applied to the following vehicle models equipped with 8L90 transmissions (RPO M5U): 2015 Cadillac Escalade, 2015 Cadillac Escalade ESV, 2015 Chevrolet Corvette, and 2015 GMC Yukon. In the bulletin, GM stated that "[s]ome customers may comment on low mileage vehicles with automatic transmission that shift feel to be too firm (harsh) or may slip or flare. Customers should be advised that the transmission makes use of an adaptive function that will help to refine the shift feel while driving and improve shift quality." The bulletin also included description of transmission's adaptive learning functions and a section titled "How to Adapt Your Transmission" containing GM's instructions to train the adaptive learn process "for a concern with a 1-2 upshift" and "for a concern with a 3-1 coastdown (closed

24

throttle) shift."

109.  From October 2014 to October 2018, GM subsequently issued seven updates to Service Bulletin 14-07-30-001, numbered 14-07-30-001A through 14-07-30-001G.

110.  On or around October 8, 2014, GM issued Service Bulletin 14-07-30-001A with the same subject and covered vehicles listed on the previous version. In this bulletin, GM again noted that "[s]ome customers may comment on low mileage vehicles with automatic transmission that shift feel to be too firm (harsh) or may slip or flare." This revised bulletin was issued to provide updated information in the "How to Adapt Your Transmission" section, including a chart of shifts and their corresponding clutches, along with new, more detailed instructions to train the adaptive learn process for each of these clutches.

111.  On or around December 1, 2014, GM issued Service Bulletin 14-07-30-001B with the subject "Information on Transmission Adaptive Functions and Correcting Low Mileage HarshShift." In addition to the vehicles listed on the previous versions of this bulletin, the following models equipped with 8L90 transmissions were added: 2015 Chevrolet Silverado, 2015 GMC Sierras, and 2015 GMC Yukon XLs. The revised bulletin also included instructions for resetting and "relearning" transmission adapts using diagnostic software ("Transmission Adaptive Values Learn procedure through GDS 2") instead of performing the adaptive instructions while driving the vehicle but noted that the software function would not resolve the issue in 2015 Corvettes built before September 29, 2014, which "must be driven to learn the adapts."

112.  On or about January 27, 2015, GM issued Service Bulletin 14-07-30-001C with the same subject, the same covered vehicles, and substantially the same information included in the previous version. However, this revised version added a note to the "How to Adapt Your Transmission" section stating that "[t]he

25

transmission fluid temperature must be between 75°C (167°F) and 85°C (185°F) during the drive procedure or adapts will not be learned."

113.   On or about May 7, 2015, GM issued Service Bulletin 14-07-30-001D with the same subject and covered vehicles listed on the previous version. In this revised bulletin, GM provided updated instructions for resetting and "relearning" transmission adapts using different diagnostic software, the Transmission Service Fast Learn procedure through GDS 2, as opposed to the Transmission Adaptive Values Learn procedure in previous bulletins.

114.   On or about July 27, 2015, GM issued Service Bulletin 14-07-30-001E with the same subject and covered vehicles listed on the previous version. It also included substantially the same instructions for resetting and "relearning" transmission adapts. However, this revised bulletin included new information explicitly acknowledging that the Warranty applied to the transmission repair, stating: "Warranty Information. For vehicles repaired under the Powertrain coverage, use the following labor operation. Reference the Applicable Warranties section of Investigate Vehicle History (IVH) for coverage information," and listing the applicable labor code as 8480318.

115.   On or about March 4, 2016, GM issued Service Bulletin 14-07-30-001F with the same subject and covered vehicles listed on the previous version. This revised bulletin repeated that "[s]ome customers may comment on low mileage vehicles with automatic transmission that shift feel to be too firm (harsh) or may slip or flare" but added that "[c]learing the shift adapts without performing a Service Fast Learn should not be considered a repair procedure as the transmission will simply relearn the previous settings." The bulletin then proceeded to outline more detailed instructions "to determine what steps should be followed" to diagnose and perform the recommended "relearn" functions to adapt the clutches. However, like the previous version, this bulletin explicitly acknowledged that the Warranty applied to

26

the transmission repair, stating: "Warranty Information. For vehicles repaired under the Powertrain coverage, use the following labor operation. Reference the Applicable Warranties section of Investigate Vehicle History (IVH) for coverage information," and listing the applicable labor code as 8480318.

116.   On or about March 3, 2017, GM issued Service Bulletin 14-07-30-001G with the same subject as the previous version. However, this revised bulletin applied only to 2015 Chevrolet Corvettes equipped with 8L90 transmissions (RPO M5U) and instructed GM technicians, "For all truck and utility applications with the 8L90 automatic transmission, refer to 16-NA-411 for the latest information for correcting low mileage harsh shifts." This revised bulletin's substantive information, including the service instructions and warranty information, otherwise remained the same as the previous version.

### c.   <u>Service Bulletin 14876</u>

117.   In or around December 2014, GM Issued Service Bulletin 14876 with the subject "Service Update for Inventory Vehicles Only 8-speed Transmission Harsh Shift." Under the section titled "Purpose," GM stated that "[o]n certain 2015 model year Cadillac Escalade, Cadillac Escalade ESV, Chevrolet Corvette, Chevrolet Silverado Double Cab and Crew Cab, GMC Sierra Double Cab and Crew Cab, GMC Yukon and GMC Yukon XL vehicles equipped with 8-speed automatic transmission (M5U), the customer may complain about harsh shifting. This can occur if the vehicle experienced multiple transmission reprogramming events during manufacturing, causing the calibration to over-adjust the shift parameters. This bulletin provides a service adaptive learn procedure that should be run to reset the calibration to the baseline parameters."

### d. Service Bulletin 15-NA-007

118.  On or around September 15, 2015, GM issued Service Bulletin 15-NA-007 in response to customer complaints reporting conditions such as delayed engagement, "Firm garage shifts, Park to Drive or Park to Reverse after the vehicle has be [sic] sitting for several hours with the engine off," a clunking noise when the engine starts, and/or an illuminated malfunction lamp relating to diagnostic transmission code P16F3. This bulletin applied to the following vehicle models equipped with 8L90 transmissions (RPO M5U): 2015 Cadillac Escalade, 2015 Chevrolet Silverado, 2015 GMC Sierra, 2015 GMC Yukon and included directions regarding a software update and programming the transmission control module ("TCM").

119.  GM re-issued three updates to this service bulletin. On or around September 30, 2015, "delayed engagement" was removed from the subject. On or around October 21, 2015, the bulletin was expanded to cover the 2015 Chevrolet Corvette. On or around January 22, 2016, the bulletin was expanded to cover the 2016 model years for the vehicles listed in the original bulletin.

### e. Service Bulletin PIP5337

120.  On or around October 13, 2015, GM issued Service Bulletin PIP5337 with the subject "Shake Or Shudder On Acceleration Excessive Engine RPM Fluctuation." This bulletin applied to the following vehicle models equipped with 8L90 transmissions (RPO M5U): 2015-2016 Cadillac Escalade, 2015-2016 Cadillac Escalade ESV, 2015-2016 Chevrolet Silverado, 2015-2016 GMC Sierra, 2015-2016 GMC Yukon, and 2015-2016 GMC Yukon XL. In the bulletin, GM advised its service technicians that customers may report "[e]xcessive engine RPM fluctuation" and "[a] shudder feeling that may be described as driving over rumble strips or rough pavement." GM's bulletin stated that the complained of conditions do not occur 1)

28

"during vehicle launch from a stop," 2) "when the transmission is shifting gears," 3) "when the vehicle is decelerating," 4)or "when TCC slip speed is zero." GM's bulletin included no diagnostic or repair procedures, but merely stated, "These conditions may be caused by an internal torque converter issue. A revised torque converter that addresses these conditions will be available soon."

121.   From January 20, 2016 to October 2018, GM subsequently issued 11 updates to Service Bulletin PIP5337, numbered PIP5337A through PIP5337K.

122.   On or around January 20, 2016, GM issued PIP5337A to include more vehicles and to recommend procedures to diagnose and evaluate the shudder issue. Among the step-by-step evaluation procedures, GM also advised its service technicians to flush the transmission twice, replace the transmission fluid using Dexron HP (Part No.19300536), clean the transmission pan, and replace the pan and the filter.

123.   On or around February 22, 2016, GM issued PIP5337B to update procedures to evaluate and service the shudder issue. GM included more specific and different instructions to its service technicians regarding flushing of the transmission, cooler lines, and cooler; replacement of the transmission fluid using Dexron HP, the transmission pan, and transmission filter. However, GM continued advise that "[i]f the condition is not resolved after completion of the second transmission flush procedure the condition may be caused by an internal torque converter issue. These conditions may be caused by an internal torque converter issue. A revised torque converter that addresses these conditions will be available soon." Similar to PIE0353 and later versions of 14-07-30-001, this bulletin update included a "Warranty Information" section with a specific Labor Operation code.

124.   In March through October 2016, GM issued the four updates to PIP5337 with minor changes: GM issued PIP5337C or around March 8, 2016 to update the transmission fluid part numbers. GM issued PIP5337D on or around June

29

3, 2016 to update the build dates for the applicable vehicles covered by the update; GM issued PIP5337E on or around August 15, 2016 to update labor time under the "Warranty Information" section. GM issued PIP5337F on or around October 19, 2016 to update fluid part numbers and ordering process.

125.   GM issued PIP5337G on or around November 16, 2016 with updates to its diagnostic recommendations. The bulletin also directed technicians to "refer to bulletin 16-NA-175 for all other vehicles [i.e., not listed in PIP5337] equipped with the 8L90 automatic transmission RPO (M5U) with shudder concerns." Notably, unlike prior versions, GM removed its statement that the complained of conditions do not occur 1) "during vehicle launch from a stop," 2) "when the transmission is shifting gears," 3) "when the vehicle is decelerating," 4) or "when TCC slip speed is zero." Instead, it listed the following complaints without the above qualifications:

- A shake and/or shudder during light throttle acceleration between 48 and 104 km/h (30 and 65 mph) steady state driving when transmission is not actively shifting gears.
- A shudder feeling that may be described as driving over rumble strips or rough pavement.
- A shudder feeling that is evident in both Drive and M7 mode.

126.   GM issued two additional updates, containing minor changes, that are available online: GM issued PIP5337H on or around December 21, 2016 to remove part numbers, and issued PIP5337J on or around November 29, 2017 to update fluid information.

127.   On or about October 4, 2018, GM issued PIP5337J, which only listed the same applicable vehicles, but contained no reported conditions or recommendations. Instead, the bulletin directed technicians to "refer to bulletin 16-NA-175 for vehicles equipped with the 8L90 automatic transmission RPO (M5U) with shudder concerns." GM further directed, "Please follow this diagnostic or repair process in Bulletin 16-NA-175, [sic] thoroughly and complete each step If the

30

condition exhibited is resolved without completing every step, the remaining steps do not need to be performed."

### f.     Service Bulletin PIE0353

128.   On or around February 11, 2016, GM issued Service Bulletin PIE0353 to address consumer complaints reporting "a shake or shudder on light acceleration or steady state cruise." This bulletin applied to the following vehicle models equipped "with 8-Speed Automatic Transmission 8L90 (RPO M5U) and 5.3 Engine (RPO L83)": "2016 Chevrolet Silverado Models" and "2016 GMC Sierra Models." The bulletin contained instructions to perform different procedures enabling technicians to observe the torque converter clutch slip during the shudder and explicitly directed the technicians to contact GM engineers listed on the bulletin. In the bulletin, GM stated that "GM Engineering is attempting to determine the root cause of the above condition. Engineering has a need to gather information on vehicles PRIOR to repair that may exhibit this condition. As a result, this information will be used to 'root cause' the customer's concern and develop/validate a field fix." Again, the bulletin included a "Warranty Information" section with Labor Operation code 8480428.

### g.     Service Bulletin 16-NA-014

129.   On or around January 21, 2016, GM issued Service Bulletin 16-NA-014 with the subject "Delayed Engagement After Sitting With Engine Off." This bulletin applied to the following vehicle models equipped with an 8L45 or 8L90 transmission: 2015-2016 Cadillac Escalade, 2016 Cadillac Escalade ESV, 2016 Cadillac ATS, 2016 Cadillac CTS, 2015-2016 Chevrolet Corvette, 2015-2016 Chevrolet Silverado, 2015-2016 GMC Sierra, 2015-2016 GMC Yukon and 2015-2016 GMC Yukon XL. In the bulletin, GM stated that "[s]ome customers may

31

comment on a condition of delayed engagement when the transmission is shifted from Park to Reverse or Park to Drive after the vehicle has been sitting with the engine off. This condition may typically occur after several hours or more commonly overnight." GM's recommended correction was to "[i]nstall a new stator shaft support assembly.

130.   GM issued an update on or around April 22, 2016 to update part numbers.

131.   On or around June 16, 2016, GM issued an update to clarify the reported condition, to identify the cause of the reported condition, and to add diagnostic procedures for the C5 clutch and torque converter. Specifically, GM stated that "[t]his condition may be caused by the torque converter draining the transmission fluid back into the transmission pan." Additionally, GM advised that customers may describe the reported condition as follows:

- Vehicle delaying into gear.
- Not wanting to move.
- Feeling like the transmission is slipping.
- Delayed engagement followed by a harsh engagement.

132.   On or around November 17, 2016, GM issued an update to clarify the applicable vehicle models and provide more detailed repair or diagnostic procedures. The updated bulletin applied to the following vehicle models within the VIN range identified in the bulletin: vehicles equipped with an 8L45 or 8L90 transmission: 2015-2016 Cadillac ATS, 2015-2016 Cadillac CTS; vehicles equipped with an 8L45 transmission: 2015-2016 Chevrolet Camaros with a 3.6L engine and VIN on or before September 28, 2015, 2015-2016 Chevrolet Camaros with a 2.0L engine and VIN on or before November 9, 2019; vehicles equipped with an 8L90 transmission: 2015-2016 Cadillac Escalade, 2015-2016 Cadillac Escalade ESV, 2015-2016 Chevrolet Camaro, 2015-2016 Chevrolet Corvette, 2015-2016 Chevrolet Silverado,

32

2015-2016 GMC Sierra, 2015-2016 GMC Yukon, and 2015-2016 GMC Yukon XL. GM's recommended correction was to replace parts of the transmission and/or the transmission pan, depending on the symptoms described by the customer. Like PIE0353 and later versions of 14-07-30-001, this bulletin update included a "Warranty Information" section with a specific Labor Operation code.

### h.   Service Bulletin 16-NA-019

133.   On or around January 25, 2016, GM issued Service Bulletin 16-NA-019 with the subject "Information on Transmission Adaptive Functions and Correcting Low Mileage Harsh Shifts, Slips, or Flares." This bulletin applied to all 2016 passenger cars and trucks under the Buick, Cadillac, Chevrolet, or GMC brands equipped with 8L90 or 8L45 automatic transmissions (RPOs M5U, M5T, M5N, M5X). Under the "Condition" section of this bulletin, GM stated, "[s]ome may comment on low mileage vehicles with an automatic transmissions [sic] that they shifting may feel too firm (harsh), slips, or flares. Customers should be advised that the transmission makes use of an adaptive function that will help to refine the shift feel while driving and improve shift quality." The bulletin also included description of transmission's adaptive learning functions and instructions for resetting and "relearning" transmission adapts. Like PIE0353 and later versions of 14-07-30-001, this bulletin update included a "Warranty Information" section with a specific Labor Operation code.

134.   On or around August 19, 2016, GM issued an update to Service Bulletin 16-NA-019 as 16-NA-019A with "[a]dded 2017 Model Year and updated information." Specifically, the bulletin directed GM technicians to "check the ECM/TCM Software/Calibrations against what's currently in the vehicle and if the description of the update is relevant to the customer concern please perform the update prior to proceeding with the learns" outlined in the revised bulletin. The

revised bulletin included the same "Warranty Information" section as the original bulletin.

### i.    Service Bulletin 16-NA-175

135.   On or around May 31, 2016, GM issued Service Bulletin 16-NA-175 with the subject "Shake and/or Shudder During Light Throttle Acceleration Between 48 and 104 KM/H (30 and 65 MPH) at a Steady State." This bulletin applied to the following vehicle models built after November 1, 2015 equipped with a 5.3L or 6.2L engine and equipped with 8L90 transmissions (RPO M5U): 2016 Cadillac Escalade models; 2016 Chevrolet Silverado, 2016 GMC Sierra, and 2016 GMC Yukon models. In the bulletin, GM advised its service technicians that customers may report:

- A shake and/or shudder during light throttle acceleration between 48 and 104 km/h (30 and 65 mph) steady state driving when transmission is not actively shifting gears.
- A shudder feeling that may be described as driving over rumble strips or rough pavement.
- A shudder feeling that is evident in both Drive and M7 mode.

136.   GM included procedures to diagnose and service the shudder issue, including detailed instructions for flushing the transmission several times and cleaning "the pan/magnet if any metallic particles present and replac[ing] filter if debris is found[.]" Similar to PIE0353 and later versions of 14-07-30-001, this bulletin update included a "Warranty Information" section with a specific Labor Operation code.

137.   From June 2016 to February 2019, GM subsequently issued 13 updates to Service Bulletin 16-NA-175.

138.   GM issued an update on or around June 1, 2016, adding a breakpoint date, and again on or around November 29, 2016 to add the 2017 model years and

updated information to service personnel, including graphics, in the diagnosis instructions.

139.   On or around February 27, 2017, GM issued another update to Service Bulletin 16-NA-175. This version applied to the following vehicles containing 8L90 (M5U, M5X) or 8L45 (M5T, M5N) transmissions: all GM passenger cars and trucks for model years 2015-2017 and Cadillac, Chevrolet, and GMC brands. GM also provided detailed instructions for diagnosing the shudder as a TCC (torque converter clutch) shudder using picoscope and NVH software.

140.   GM issued an update on or around April 18, 2017 to update the information on the chart specifying, for each model year, the conditions under which the shudder was observed. Another update was issued on or around August 24, 2017 to expand the miles per hour ranges where the shudder occurred and to include more detailed information on diagnostics. Another update was issued on or around October 4, 2017 to update VIN breakpoints. On or around December 1, 2017, another update was issued to include the 2018 model years and updated Service Procedure sections. On or about December 14, 2017, the bulletin was again revised to remove the "Note" statement regarding the use of DEXRON VI to flow and flush transmission cooling system. On or about June 5, 2018, another revised bulletin was released to remove the Colorado/Canyon Models and update a note regarding Canadian dealer orders. On or around September 4, 2018, a revised bulletin was issued to include a "Parts Information" section.

141.   On or around October 10, 2018, GM issued yet another revised bulletin to update the vehicle models section and the models in shudder conditions test table, to remove VIN Breakpoint information, to add the 2019 Model Year, to remove the Transmission Filter Replacement information and to change the fluid quantity in the Parts Information section. This bulletin applied to the following vehicle models equipped with 8 speed automatic transmissions: 2016-2019 Cadillac ATS (M5N,

35

M5U); 2016-2018 Cadillac CT6 (M5N, M5U); 2016-2019 Cadillac CTS 9M5N, M5U); 2015-2017 Cadillac Escalades (M5U); 2016-2019 Chevrolet Camaros (M5T); 2016-2018 Chevrolet Camaros (M5U); 2019 Chevrolet Colorado (M5T); 2015-2019 Chevrolet Corvettes (M5U); 2015-2018 Chevrolet Silverado (M5U, M5X); 2015-2017 GMC Yukon (M5U); 2019 GMC Canyons (M5T); 2015-2018 GMC Sierras (M5U, M5X). Importantly, GMC stated:

> Important: Do NOT replace the torque converter or transmission assembly for this condition. Engineer reviews have proven that replacing the torque converter does not provide a long-term solution to TCC shudder. A revised service procedure will be released in Q1 of 2019. If the vehicle experiences a repeat shudder condition, this document should be followed again.

142.   On or around February 08, 2019, GMC issued the fourteenth version of Service Bulletin 16-NA-175. This bulletin removed all the diagnostic and service procedure information and instead directed technicians to "[f]ollow the service procedures outlined in TSB 18-NA-355."

## j.   Service Bulletin PIP5405

143.   On or around June 2, 2016, GM issued Service Bulletin PIP5405 with the subject "Surge Misfire Feeling Sensation During Highway Steady State Driving." This bulletin applied to the following vehicle models equipped with 8L90 transmissions (RPO M5U): 2015-2016 Cadillac Escalade, 2016 Cadillac CTS-V, 2014-2016 Chevrolet Corvette, 2014-2016 Chevrolet Silverado, 2016 Chevrolet Camaro, 2015-2016 Chevrolet Tahoe, 2015-2016 Chevrolet Suburban, 2014-2016 GMC Sierra, 2015-2016 GMC Yukon, and 2015-2016 GMC Yukon XL. In the bulletin, GM advised its service technicians that customers may report: "[a] concern of surge misfire feeling sensation during highway steady state driving in manual

36

mode or automatic, typically 6th, 7th, 8th gear accelerating 1000 to 2500 rpm under load. TCC engaged, no misfire data or P0300 codes present." However, GM stated that if these symptoms are presented, the vehicle "is operating as [d]esigned." GM further advised:

> The normal operation of engines and transmissions generate various vibrations and engine and transmission mounts try to isolate those vibrations from the rest of the vehicle. While the mounts do a great job of isolating most vibrations there may still be certain engine loads and rpm's that generate vibrations that customers may feel in the vehicle. Changes in engine load or rpm will change the vibrations produced making it more or less apparent to occupants in the vehicle. When issues of this nature are encountered, like equipped vehicles should be compared, and if consistent results are identified, this should be considered a "normal" characteristic of the vehicle.

144.   On or around June 6, 2016, GM issued a revised Service Bulletin, PIP5405A to update the applicable vehicle models. PIP5405A applied to 2014-2016 Chevrolet Corvette, 2016 Chevrolet Camaro, and 2016 Cadillac CTS-V. On or around December 12, 2016, GM issued a revised Service Bulletin, PIP5405B, to include model year 2017 for these vehicles, making the bulletin applicable to 2014-2017 Chevrolet Corvette, 2016-2017 Chevrolet Camaro, and 2016-2017 Cadillac CTS-V.

### k.   Service Bulletin 16-NA-213

145.   On or around June 28, 2016, GM issued yet another Service Bulletin to address consumer comments "that the transmission has developed a harsh shift." This bulletin, 16-NA-213, applied to the following vehicle models equipped with an 8L90 or 8L45 transmission (RPOs M5U, M5T, M5N) built between July 1, 2015 to

September 14, 2015: 2015-2016 Cadillac Escalade, 2015-2016 Cadillac ATS, ATS V, CTS, CTS V, 2015-2016 Chevrolet Corvette, 2015-2016 Chevrolet Silverado, and 2015-2016 GMC Sierra. The bulletin specifically noted that "there may be more than one shift that is harsh" and that some transmissions, those with "a suspect Clutch Control Solenoid," should have the valve body replaced.

### l.       Service Bulletin PIP5437

146.    On or around November 8, 2016, GM issued another service bulletin to address the ongoing, unremedied Transmission Defect. This bulletin, PIP5437, was titled "8L45 8L90 Diagnostic Tips for Harsh Shifts" to address consumer comments that "the transmission in their vehicle is not shifting correctly." The bulletin applied to the following vehicle models equipped with an 8L90 or 8L45 transmission: 2015-2016 Cadillac Escalade, 2016 Cadillac Escalade ESV, 2016 Cadillac ATS, ATS-V, CTS, and CTS-V, 2015-2017 Chevrolet Corvette, 2015-2017 Chevrolet Silverado, 2016-2017 Chevrolet Camaro, 2015-2017 GMC Sierra, and 2015-2017 GMC Yukon. The bulletin directed technicians to use software to identify the shift problems and to perform a drive learn procedure on low-mileage vehicles. On higher mileage vehicles, the bulletin instructed technicians to remove the transmission fluid pan and inspect for debris. Technicians were further instructed, "if debris is found the transmission should be disassembled for root cause and repairs. If excessive debris is not found the valve body should be replaced." This bulletin was updated on or around November 14, 2016 to cover additional vehicle models equipped with an 8L90 or 8L45 transmission, namely 2017 Cadillac Escalade, 2017 Cadillac Escalade ESV, and 2017 Cadillac ATS, ATS-V, CTS, and CTS-V.

### m.       Service Bulletin 16-NA-411

147.    On or around January 20, 2017, GM issued Service Bulletin 16-NA-

411 to provide GM technicians with yet another a procedure to reprogram the ECM and TCM to correct ongoing complaints relating to the Transmission Defect. This bulletin applied to the following vehicle models equipped with an 8L90 transmission: 2015-2016 Cadillac Escalade models; 2015-2016 Chevrolet Silverado, 2015-2016 GMC Sierra, and 2015-2016 GMC Yukon models. Specifically, the bulletin addressed the following consumer comments on the following conditions:

- Harsh 1-2 upshift (except for the first 1-2 upshift of the day)
- Harsh 3-1 downshift when de-accelerating to a stop
- Harsh downshift under heavy throttle apply
- Active Fuel Management (AFM) V4 to V8 transition harshness
- Coast down downshifts

148.   Notably, the bulletin specifically acknowledged that:

> The new ECM and TCM software will not improve the following conditions and should not be installed for any of the following conditions:
>
> •   Shift quality of the first 1-2 shift of the day
> •   Power-On lift foot upshifts (Heavy throttle application followed by a closed throttle application which results in a transmission up shift)
> •   Delayed/slow engagement (Refer to Bulletins 16-NA-014 and 16-NA-364)
> •   TCC Shudder (Refer to PIP5337 and Bulletin 16-NA-175)
> •   Engine or Chassis induced vibrations
> •   Fuel Economy

**n.   Service Bulletin 16-NA-404**

149.   On or around April 7, 2017, GM issued Service Bulletin 16-NA-404 to provide GM technicians with another procedure to reprogram the TCM to correct the diagnostic transmission code set relating to the same complaints reiterated above arising from the Transmission Defect. This bulletin applied to the following vehicle

39

models equipped with an 8L45 and 8L90 transmissions (M5T, M5N, M5U, M5X): 2017 Cadillacs ATS and CTS built before December 6, 2016; 2017 Cadillacs CT6 (Excluding RPO I16) built before November 17, 2016; 2017 Cadillacs Escalade built before December 16, 2016; 2017 Chevrolet Camaro built before December 6, 2016; 2017 Chevrolet Corvette built before December 8, 2016; 2017 Chevrolet Silverado built before December 16, 2016; 2017 Chevrolet Suburban (excluding RPO I16) built before December 16, 2016; 2017 Chevrolet Tahoe (Excluding RPO I16) built before December 16, 2016. It also applied the following vehicles built before December 16, 2016 and equipped with automatic 8L90 transmissions (M5U, M5X): 2017 GMC Sierra and 2017 GMC Yukon (excluding RPO I16). The bulletin addressed the following consumer complaints reporting:

- Harsh shift
- Delayed shift
- Unwanted downshift
- Transmission stuck in one gear
- Erratic shifting
- Hesitation between shifts
- MIL illuminated

150.   Bulletin 16-NA-404 contained instructions to dealers to reprogram the Transmission Control Module with another software update.

## o.   Engineering Information PIE0405

151.   On or around April 7, 2017, GM issued PIE0405 to address consumer complaints reporting "a shake or shudder while driving." This bulletin applied to the following vehicle models equipped with transmissions 8L90 (M5U, M5X) and 8L45 (M5T, M5N), model years 2017 with VINs beginning on March 1, 2017: Cadillac ATS, CT6, CTS, Cadillac Escalade; Chevrolet Camaro, Chevrolet Colorado, Chevrolet Corvette, Chevrolet Silverado, GMC Canyon, GMC Sierra, and GMC

40

Yukon. The bulletin contained instructions to perform different procedures enabling technicians to observe the torque converter clutch slip during the shudder and explicitly directed the technicians to contact GM engineers listed on the bulletin. In the bulletin, GM stated that "GM Engineering is attempting to determine the root cause of the above condition. Engineering has a need to gather information on vehicles PRIOR to repair that may exhibit this condition. As a result, this information will be used to 'root cause' the customer's concern and develop/validate a field fix." The bulletin included a "Warranty Information" section with Labor Operation code 8480428.

152.   GM issued an update, PIE0405A, on or around September 21, 2017 to include model years 2018. GM issued an update, PIE0405B, on or around October 4, 2017 to highlight that it applied to vehicles built after March 1, 2017 and to direct technicians to use bulletin 16-NA-175 for vehicles built before that date. GM issued an update, PIE0405C, on or around January 29, 2018, which removed the diagnostic instructions and instead referred technicians to refer to 16-NA-175 to service any covered vehicles exhibiting the reported problems.

**p.**   **Service Bulletin 16-NA-361**

153.   On or around July 21, 2017, GM issued Service Bulletin 16-NA-361 with the subject, "Information on Transmission Harsh 1-2 Shift Upon First Start Up/Shift of the Day Under Light Throttle." This bulletin applied to the following vehicle models equipped with an 8L45 and 8L90 transmissions (M5T, M5N, M5U, M5X): 2016-2017 Cadillac ATS and CTS, 2016-2017 Cadillac CT6, 2016-2017 Cadillacs Escalade models, 2016-2017 Chevrolet Camaro, 2016-2017 Chevrolet Colorado (VIN S, T), 2015-2017 Chevrolet Corvette, 2017 Chevrolet Silverado, 2017 Chevrolet Express, 2017 GMC Canyon, 2017 GMC Savana, 2015-2017 GMC Sierra and 2015-2017 GMC Yukon. The bulletin addressed the following consumer

41

complaints reporting "that the transmission exhibits a harsh 1-2 shift on the first shift of the day, typically under light throttle."

154. GM identified the cause of these reported conditions as "due to the initial clutch fill time of the 2-3-4-6-8 (C4) clutch." GM's bulletin included no diagnostic or repair procedures. Instead, it stated that "the first 1-2 shift of the day may be harsh[.]" Notably, it advised: "Important: Replacing transmission components or complete assemblies will not improve the condition." GM claimed, "This condition will not impact the designed performance or reliability of the vehicle."

### q.   Service Bulletin 18-NA-177

155. However, consumer complaints persisted and GM's ineffectual fixes allowed the Transmission Defect to go uncorrected. On or around June 5, 2018, GM issued yet another Service Bulletin, 18-NA-177, addressing the shaking and/or shuddering during light throttle acceleration at moderate to high speeds at a steady speed. This bulletin applied to the following vehicle models built before June 1, 2018 equipped with 8L45 transmissions (M5T): 2017-2018 Chevrolet Colorado and 2017-2018 GMC Canyon. GM directed its technicians to determine whether the vibration was "TCC [torque converter clutch] Shudder" using picoscope and NVH software. If the cause of the vibration was TCC shudder, technicians were directed to replace the torque converter assembly and the transmission pan and filter. Like PIE0353 and later versions of 14-07-30-001, this bulletin update included a "Warranty Information" section with a specific Labor Operation code.

### r.   Service Bulletin 18-NA-235

156. On or around September 11, 2018, GM issued Service Bulletin 18-NA-235 regarding information on surge, chuggle, misfire, fishbite, and shudder during

driving maneuvers. This bulletin applied to the following vehicle models: 2015-2017 Cadillac Escalade with 6.2L engines and 8L90 (M5U) transmissions; 2015-2018 Chevrolet Silverado with 5.3 (L83) and 6.2 (L86) engines and 8L90 (M5U, M5X) transmissions; 2019 Silverado 1500 (new models) with 5.3 (L84) engines and 8L90 (MQE) transmissions; 2019 Chevrolet Suburban with 5.3 (L83) and 6.2 (L86) engines and 8L90 (M5U) transmissions; 2018-2019 Chevrolet Tahoe with 5.3 (L83) and 6.2 (L86) engines and 8L90 (M5U) transmissions; 2015-2018 GMC Sierra with 5.3 (L83, L84) and 6.2 (L86) engines and 8L90 (M5U, M5X, MQE) transmissions; 2019 GMC Sierra 1500s (new models) with 5.3 (L84) engines and 8L90 (MQE) transmissions; and 2015-2017 GMC Yukon with 6.2 (L86) engines and 8L90 (M5U) transmissions. Although the bulletin specifically was issued to address customer complaints of a surge, chuggle, misfire, fishbite, and shudder while driving at a steady speed between 35 and 55 MPH with light steady throttle conditions, GM stated that "[i]f TCC slip is steady and there are no misfires, the condition should be considered characteristic of the vehicle and no repairs should be attempted."

### s.  Service Bulletin 18-NA-356

157.  On or around November 20, 2018, GM issued Service Bulletin 18-NA-356 regarding customer complaints of a "vibration and/or noise heard during hard acceleration at speeds of 77 km/h (48 mph) to 83 km/h (52 mph)." This bulletin applied to the following vehicle models: 2015-2018 Chevrolet Colorado and 2015-2018 GMC Canyon with 3.6L (RPO LGZ) engines and 8L45 (RPO M5T) transmissions. GM's recommended correction was to "install a tapered shim between the axle and leaf spring to adjust the angle" using the procedure in the bulletin.

43

### t.   Other Service Bulletins and Communications Involving the Eight-Speed Transmissions

158.   In addition to the service bulletins described above, GM issued at least 13 service bulletins regarding part restrictions.

159.   For instance, from July 21, 2014 to April 7, 2016, GM issued PIP5200 and 11 updates through PIP5200K "The 8L90 8 Speed Automatic Transmission is on restriction through GM PQC as part of our ongoing quality improvement efforts to assist Engineering with product concern identification effective on 07/01/2014."

160.   On or around October 16, 2017, PIP5526 was issued to institute a part restriction on the 8L45 and 8L90 8 Speed Transmission Park Pawl Actuator Rod. On or around March 15, 2016, PIP5526A was issued to end the part restriction.

161.   In addition to the above bulletins, GM issued a number of bulletins and Customer Satisfaction Program documents relating to other issues arising from the Transmission Defect. For instance, the following bulletins were issued regarding Malfunction Indicator Lamps illuminating upon shifts or shudders, when shifting, or refusing to turn off without explanation. *See, e.g.* Service Bulletin 15-07-30-002 and 15-07-30-002A released in early 2019; PIP5274 issued on or around March 4, 2015; PIP5425 and PIP5425A issued in or around September 2016; Service Bulletin 16-NA-194 issued in or around June 2016.

162.   Additionally, Service Bulletin 15178 was issued in or around April 2015 to direct dealers to perform service updates for inventory vehicles equipped with the 8-speed transmission (M5U) to address a transmission gear whine noise.

163.   In or around May 2015, GM issued Program Bulletin 15216 announcing a Customer Satisfaction Program "to replace two u-joint retainers and four u-joint retainer bolts with new bolts that include an adhesive patch" This bulletin covered the following vehicles equipped with 6.2L Engine (RPO L86) and 8-speed Automatic Transmission (RPO M5U): 2015 Cadillac Escalade, Escalade

44

ESV; 2015 Chevrolet Silverado LD Crew and Double Cab; 2015 GMC Sierra LD Crew and Double Cab, Yukon, Yukon XL.

164.    In or around in June 2016, GM issued communication number N16204447 announcing a Customer Satisfaction Program. The program was expected to apply to approximately 80 vehicles that "may have been built with an incorrectly machined torque converter pressure plate." GM offered to replace the 8-Speed Automatic Transmissions (M5N and M5T) in eligible vehicles and acknowledged that "[o]ver time, this condition could result in a shudder or vibration, fluctuations on the tachometer and possible torque converter failure.

### 3.    *Numerous Consumer Complaints on the NHTSA Demonstrate That GM Was Aware of the Transmission Defect.*

165.    Federal law requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

166.    Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. Id. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. Id. Thus, GM knew or should have known of the many complaints about the Transmission Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, GM to the Transmission Defect.

167.    Hundreds, if not thousands, of purchasers of the Class Vehicles have

experienced problems with the transmission. Complaints that owners filed with the NHTSA demonstrate that the defect is widespread and dangerous and that it manifests without warning. The complaints also indicate GM's awareness of the problems with the transmission and how potentially dangerous the defective condition is for consumers. The following is just a small sampling of the over hundreds of safety-related complaints describing the Transmission Defect (spelling and grammar mistakes remain as found in the original) (Safecar.gov, Search for Complaints (May 7, 2019), http://www-odi.nhtsa.dot.gov/complaints/):

### a.    2015 Cadillac Escalade

168.    On the NHTSA website, there are at least 40 consumer complaints for "2015 Cadillac Escalade." As one example, on May 13, 2015, the following incident was reported:

> ACCELERATION FOR NO REASON. I WAS
> BACKING OUT OF A PARKING SPOT AND I PUT
> THE CAR IN REVERSE. I WAS NEARING THE
> EDGE OF THE CURB ON MY RIGHT FRONT
> WHEEL SO I STEPPED ON THE BRAKE, STOPPED
> THE CAR, AND SHIFTED INTO DRIVE SO I COULD
> MOVE THE VEHICLE FORWARD TO AVOID
> HITTING THE CURB WHILE BACKING OUT .
> ONCE I SHIFTED INTO DRIVE, THE CAR WENT TO
> FULL ACCELERATION FOR NO REASON AND HIT
> A POLE AT FULL ACCELERATION
> APPROXIMATELY 5 FEET AWAY.

169.    Another incident involving a 2015 Cadillac Escalade was reported on November 23, 2015:

> MY 2015 CADILLAC ESCALADE HAS BEEN IN
> THE SHOP FOR 130+ DAYS IN THE FIRST
> CALENDAR YEAR FOR DEFECTIVE BRAKES,
> TRANSMISSION, SUSPENSION, ELECTRICAL,

46

AND HVAC. I HAVE CONTACTED GM AND THEY
DON'T WANT TO REPURCHASE THE VEHICLE.
THE VEHICLE IS CONSTANTLY IN THE SHOP FOR
PROBLEMS AND IT IS NOT A VEHICLE THAT
SHOULD BE OPERATED ON PUBLIC ROADWAYS.
THE TRANSMISSION HAS BEEN REPLACED ONCE
BEFORE DUE TO DEFECTS IN DESIGN AND
BUILD QUALITY. THE TRANSMISSION NOW
CAUSES THE CAR TO TAKE OFF IN 4TH GEAR
RATHER THAN IN 1ST GEAR WHICH MEANS THE
CAR FEELS AS IF THERE IS NO POWER TO
PROPEL THE VEHICLE. THE TRANSMISSION
SLIPS AND FEELS AS IF IT IS BROKEN. I HAVE
TAKEN IT TO THE DEALER AT LEAST 5 TIMES
AND GM NOW DOES NOT WANT TO REPLACE
THE TRANSMISSION EVEN THOUGH THE
DEALER HAS VERIFIED THE CONCERN AND
DOCUMENTED IT. I FEEL THAT GM IS NOT
DOING ENOUGH TO ENSURE SAFE VEHICLES
ARE ON THE ROAD. THIS TRANSMISSION ISSUE
IS GOING TO CAUSE AN ACCIDENT ONE DAY. I
HAVE ALREADY PUT GM ON NOTICE ALL THE
WAY UP TO THE EXECUTIVE LEVEL AND THEY
DON'T WANT TO DO ANYTHING ABOUT IT. I
FEEL THAT NHTSA SHOULD INVESTIGATE THE
ISSUES THAT PLAGUE 2015 FULL SIZE GM SUV
OWNERS. THERE ARE A LOT OF US OUT THERE
ACCORDING TO MY RESEARCH.

170. Another incident involving a 2015 Cadillac Escalade was reported on

January 5, 2016:

ENGINE NOISE AND VIBRATION ON COLD
START. VERY LOUD GRINDING NOISE COMING
FROM ENGINE. HAD IT LOOKED AT 2 TIMES.
DEALER SERVICE MANGER JIMMIE STATES ITS
NORMAL. THEY ALL MAKE THAT NOISE. I AM 54
YEARS OLD OWNED MORE THAN 15 CARS IN MY

47

LIFE . THIS IS NOT NORMAL. THEY DO NOT
WANT TO FIX IT.

### b.    2016 Cadillac Escalade

171.    On the NHTSA website, there are at least 29 consumer complaints for
"2016 Cadillac Escalade." As one example, on January 30, 2016, the following
incident was reported:

> CAR VIBRATES FROM 35MPH UP TO 80 PLUS.
> HAD IT TO DEALER 5 TIMES AND THEY KNOW
> THAT THERE IS A VIBRATION. THEY SAID GM
> SAID THE TORQUE CONVERTER WAS OUT OF
> BALANCE AND GM WAS DESIGNING A FIX .
> ABOUT 5 CALLS AND THREE WEEK LATER THEY
> RECEIVED A NEW SPECIAL TORQUE
> CONVERTER AND AFTER IT WAS INSTALLED
> THE VIBRATION WAS STILL THERE. YOU CAN
> FEEL THE VIBRATION IN THE STEERING WHEEL,
> THROTTLE, CENTER CONSOLE, FLOOR, AND THE
> SEAT. THE SERVICE MANAGER HAS BEEN VERY
> POLITE AND HAS GONE OUT OF HIS WAY TO
> HELP. A GM FIELD SERVICE REP HAS LOOKED
> AT THE CAR AND SAID IT IS WITHIN GM SPEC,S.
> I AM READING ALL OVER THE INTERNET OF
> THE SAME PROBLEM AND GM HAS REPLACED
> DRIVELINES, TRANSMISSIONS, TIRES, TORQUE
> CONVERTERS, SHOCKS, REAR AXLES, ENGINE
> MOUNTS, ETC. AND STILL HAVE A VIBRATION
> PROBLEM. THEY HAVE EVEN BOUGHT SOME OF
> THE 2015 AND 2016 BACK. THIS IS HAPPENING
> ON ALL GM FULL SIZE SUV'S. CHEVROLET, GMC,
> AND CADILLAC.

172.    Another incident involving a 2016 Cadillac Escalade was reported on
February 2, 2016:

> THE CONTACT OWNS A 2016 CADILLAC
> ESCALADE. THE CONTACT STATED THAT WHILE

48

DRIVING AT 35 MPH, THE VEHICLE BEGAN TO
VIBRATE AS THE SPEED INCREASED. THE
VEHICLE WAS TAKEN TO BE REPAIRED BUT THE
DEALER COULD NOT REMEDY THE FAILURE.
THE MANUFACTURER WAS MADE AWARE OF
THE FAILURE. THE FAILURE MILEAGE WAS
4,000.

173.   Another incident involving a 2016 Cadillac Escalade was reported on
June 27, 2016:

VEHICLE EXHIBITS A CONSTANT VIBRATION AT
SPEEDS BETWEEN 35 MPH AND 75 MPH.
VIBRATION IS NOT ROAD RELATED, IT IS A
CONSTANT, STEADY VIBRATION REGARDLESS
OF ROAD CONDITIONS, BEST DESCRIBED AS IF
THE VEHICLE WAS DRIVING OVER CORDUROY.
THERE IS ALSO A STEADY "BUFFETING" NOISE
COMING FROM THE CABIN OF THE VEHICLE AT
SPEEDS BETWEEN 55 MPH AND 70MPH.

VEHICLE WAS BROUGHT TO INDEPENDENT TIRE
SHOP (BY ME) TO HAVE TRANSMISSIONS AND
TIRES ROAD FORCE BALANCED. REPORT WAS
PROVIDED, ALL IN SPEC AND VIBRATION IS
STILL PRESENT.

CURRENTLY, THERE IS A "OPEN TICKET" ON
THE VEHICLE AT THE CADILLAC DEALERSHIP
AWAITING A "GM ENGINEER" TO VERIFY THE
VIBRATION. AS A RESULT, I DO NOT HAVE A
COPY OF THE LATEST INVOICE VERIFYING THE
SERVICE VISIT. THE VEHICLE CURRENTLY HAS
2000 MILES ON IT, THE VIBRATIONS WERE
PRESENT SINE NEW AND SEEM TO BE GETTING
WORSE.

174.   Another incident involving a 2016 Cadillac Escalade was reported on
February 25, 2017:

THE GEARS SHIFT ABRUPTLY. WHEN TAKING
OFF THE GEARS WILL SHIFT HARD THAT IT
FEELS AS IF SOMETHING HEAVY IS DROPPING
IN THE ENGINE. TOOK VEHICLE TO DEALERSHIP
THREE TIMES WITH SAME PROBLEM.
TOMORROW WILL BE FOURTH TIME WITH SAME
ABRUPT SHIFTING PROBLEM FOR A TOTAL OF 4
TIMES. AFTER DEALERSHIP TRIES TO FIX IT IT
OPERATES WELL FOR ABOUT TWO TO THREE
MONTHS AND THEN THE PROBLEM STARTS
AGAIN. ALSO, THE VEHICLE HAS LOST ALL
POWER TWICE NOW, BATTERY DEAD, DEAD,
DEAD. WHEN ATTEMPTING TO TURN ON THE
LIGHTS BLINK QUICKLY, MULTIPLE TIMES BUT
IT DOES NOT HAVE ENOUGH POWER TO TURN
ON. THIS ESCALADE WAS 94,000 TOTAL AND IT
IS NOT A QUALITY VEHICLE! ROUGH RIDE WITH
TRANSMISSION KICKING IN SO ROUGH!!!

175.    Another incident involving a 2016 Cadillac Escalade was reported on
September 13, 2018:

KNOWN TRANSMISSION ISSUE WHICH CAUSES
THE VEHICLE TO TO BUCK AND SURGE WHEN
YOU PULL UP TO TA STOP LIGHT, STOP SIGN, ON
HIGHWAY,OR IN TRAFFIC. EXTREMELY
DANGEROUS. DEALER STATES THAT THIS IS A
KNOWN CONDITION WITH NO FIX. DEALER
DESCRIBES ISSUES WITH SOME VEHICLES
WORSE THAN OTHERS. GENERAL MANAGER OF
COLONIAL CADILLAC WOBURN MA 781-935-7000
(BRET DOUGLAS) STATES THAT HE HAS DRIVEN
VEHICLES WITH SAME ISSUES AND THERE IS NO
FIX. IT WAS CORRECTED IN THE 2018 VEHICLES
BY GOING TO A 10 SPEED TRANSMISSION. OUR
VEHICLE HAS BEEN IN FOR SERVICE MULTIPLE
TIMES WITHOUT ANY SUCCESS IN A REPAIR. WE
ARE AFRAID TO DRIVE THE VEHICLE AS IT
SURGES FORWARD AT ANY GIVEN MOMENT.

50

> CONTACTED CADILLAC AND THEY ARE
> UNWILLING TO DO ANYTHING TO HELP WITH
> THE ISSUE. THEY ARE CONCERNED THAT THIS
> WOULD START THEM DOWN A SLIPPERY SLOPE
> FOR REPAIRING MANY 2015,16,17'S THAT HAVE
> THE SAME ISSUE. YOU ONLY HAVE TO GOOGLE
> THE ISSUE TO SEE THAT MANY GM OWNERS
> ARE DEALING WITH THIS SAME ISSUE. THIS IS A
> SAFETY ISSUE THAT NEEDS TO HAVE A
> RESOLUTION. SOMEONE IS GOING TO GET
> SERIOUSLY INJURED OR KILLED AS A RESULT
> OF THIS TRANSMISSION ISSUE. PLEASE HELP

176. Another incident involving a 2016 Cadillac Escalade was reported on September 27, 2018:

> FROM A COLD START, WHEN TAKING VEHICLE
> OUT OF PARK AND INTO REVERSE, THE
> VEHICLE WILL SURGE OR BUCK PRIOR TO
> APPLYING THE ACCELERATOR. THIS HAPPENS
> ABOUT 1/4 OF THE DRIVE TIME. WHEN
> ACCELERATING AND THEN COMING TO A
> COAST AND BACK TO ACCELERATING, THE CAR
> WILL BUCK. THIS HAPPENS ABOUT 1/2 OF THE
> DRIVE TIME. FROM A COLD START, REVERSE,
> DRIVE, ACCELERATE TO 1MPH WHILE MAKING
> A SLIGHT RIGHT TURN OUT OF MY DRIVEWAY,
> THE VEHICLE BUCKS. THIS HAPPENS ABOUT 3/4
> OF THE DRIVE TIME.

177. Another incident involving a 2016 Cadillac Escalade was reported on October 5, 2018:

> SHUDDER / VIBRATION BETWEEN 45 - 65 MPH.
> CAUSE WAS TORQUE CONVERTER. 85 - 90% OF
> VIBRATION WAS MITIGATED. CONTINUE TO
> HAVE STEADY VIBRATIONS 65 -70MPH AND
> ABOVE. DEALER ALSO INSTALLED NEW TIRES /

> TRANSMISSIONS AND I HAVE HAD A ROAD
> FORCE BALANCE.

178.   Another incident involving a 2016 Cadillac Escalade was reported on February 9, 2019:

> TRANSMISSION STARTED SLIPPING AT 50K
> MILES.
>
> SINCE I AM IN THE TRANSPORTATION SERVICE
> INDUSTRY, I KNOW MANY PEOPLE THAT HAVE
> TRANSMISSION ISSUES ON ESCALADES.

### c.   2015 Chevrolet Corvette

179.   On the NHTSA website, there are at least 27 consumer complaints for "2015 Chevrolet Corvette." As one example, on October 12, 2014 the following incident was reported:

> AT ANY SPEED THE CAR JERKS LIKE ONE OR
> MORE SPARK PLUG WIRES ARE NOT
> FIRING(PULLED OFF) IN ALL MODES, IT IS
> WORSE IN (E ECONOMY MODE) PUSH THE GAS
> DOWN IT GETS WORSE IN ALL MODES.
>
> I REPLACED THE PLUGS AND WIRES I STILL
> HAVE THIS PROBLEM, I WAS HOPING IT WAS A
> BAD PLUG OR WIRE, THAT HAPPENS.
>
> I TOOK IT TO THE DEALER WHEN THE CHECK
> ENGINE LIGHT CAME ON I PULLED THE FUSE
> FOR THE EXHAUST VALVES TO KEEP THEM
> OPEN THEY CHECKED THEN TESTED THE CAR
> AND TOLD ME IT WAS FINE NO OTHER CODES
> WERE FOUND.
>
> I HAVE 1800 MILES ON THE CAR NOW I TRIED
> EVERY 93 OCTANE FUEL AVAILABLE IN THIS
> AREA AND OTHER AREAS, HOPING IT WAS JUST

BAD FUEL THAT MANY STATIONS CAN'T HAVE
BAD FUEL FOR IT TO BE FUEL RELATED. *TR

180.   Another incident involving a 2015 Chevrolet Corvette was reported on October 27, 2015:

8 SPEED AUTOMATIC TRANSMISSION DOWN
SHIFTS AT A STOP WITH SUCH FORCE IT FEELS
AS YOU HAVE BEEN HIT FROM BEHIND BY
ANOTHER CAR WHILE COMING TO A STOP.
TRANSMISSION ALSO WILL NOT ALWAYS
ENGAGE PROPERLY AND WILL OVER REV AND
SLAM INTO GEAR POSSIBLY CAUSING AN
ACCIDENT. TRANSMISSION AT TIMES WILL
DISENGAGE WHILE GOING FORWARD THEN
SLAM INTO GEAR WITH GREAT FORCE. I WAS
TOLD BY A GM INSIDER THAT GM IS AWARE
SOME TRANSMISSIONS ARE DEFECTIVE AND IS
WORKING ON A KIT TO FIX THE FLUID
STARVATION PROBLEM INTERNALLY BUT HAS
DONE NOTHING TO INFORM OWNERS OF THE
POTENTIAL DANGERS OF ERRATIC SHIFTING
THAT IT'S CAUSING WHILE DRIVING. THIS ALSO
CAUSES THE TRANSMISSION TO OVER HEAT
AND TO ILLUMINATE A WARNING LAMP.

181.   Another incident involving a 2015 Chevrolet Corvette was reported on February 27, 2016:

8-SPEED AUTOMATIC TRANSMISSION ALWAYS
SHIFTS ERRATICALLY WHEN STARTING OUT
COLD (LAZY SHIFT, SLOW SHIFT, ETC.) AND
OCCASIONALLY DOES NOT DOWNSHIFT WHEN
CAR COMES TO A STOP, ONLY TO SLAM HARD
INTO 1ST WHEN GAS PEDAL IS PRESSED TO
RESUME TRAVEL. DEALER SAYS GM CLAIMS
THIS IS "NORMAL," BUT NO CAR I'VE EVER
OWNED BEHAVES LIKE THIS. APPEARS TO BE
FLUID STARVATION INTERNALLY. ANY

53

> FIX/REPLACEMENT WOULD BE COSTLY FOR GM,
> SO GIVEN THEIR HISTORY W/FAULTY IGNITION
> SWITCHES, NOT SURPRISED THEY'RE TRYING
> TO AVOID IT. TRANSMISSION IS DEFINITELY
> NOT NORMAL AND BEHAVIOR IS
> UNPREDICTABLE + UNACCEPTABLE --
> ESPECIALLY AT THIS PRICE. WHEN CAR IS
> MOVING & TRANSMISSION IS IN DRIVE AND
> TRYING TO LAZILY SHIFT GEARS, YOU
> TEMPORARILY LOSE ABILITY TO APPLY POWER,
> WHICH IS BOTH DANGEROUS AND UNNERVING.
> CLEARLY, THIS TRANSMISSION WAS PUT INTO
> PRODUCTION W/INADEQUATE TESTING &
> DEVELOPMENT. A RECALL IS NECESSARY TO
> FIX PROPERLY.

182. On May 17, 2016, the following incident involving a 2015 Chevrolet Corvette was reported:

> AUTOMATIC 8 SPEED TRANSMISSION HAD TO
> BE REPLACED AT 2000 MILES ON THE
> ODOMETER DUE TO HARD SHIFTS AND
> SHIFTING AUTOMATICALLY TO LOW GEAR AT
> HIGHWAY SPEEDS NEARLY BRINGING THE CAR
> TO A STOP IN INTERSTATE TRAFFIC, NOW 700
> MILES AND 4 MONTHS LATER THE
> TRANSMISSION IS STUCK IN SECOND GEAR AND
> YOU CANT DRIVE FAST ENOUGH TO GET OUT
> OF THE WAY OF TRAFFIC. AND I KNOW OF
> SEVERAL OTHER CARS LIKE IT THAT HAVE
> SIMILAR PROBLEMS. THIS IS A REAL SAFETY
> PROBLEM AND GM SEEMS TO IGNORE IT,
> PROBABLY UNTIL SOMEONE GETS HURT OR
> KILLED.

183. On August 8, 2016, the following incident involving a 2015 Chevrolet Corvette was reported:

AUTOMATIC A8 TRANSMISSION HAS THE
FOLLOWING ISSUES: 1)MORNING SHIFT FROM
REVERSE TO DRIVE SEVERELY DELAYED,
BANGS IN EVENTUALLY. 2) ERRATIC SHIFTING
IN NORMAL TRAFFIC 3) THE 2-1 DOWNSHIFT
WHEN COMING TO A STOP RESULTS IN SEVERE
BANG, LURCHES FORWARD AND IS VERY
UNSAFE IN A PARKING LOT SITUATION. ALSO IN
STOP AND GO TRAFFIC, SAME LURCHING
FORWARD. FEELS AS IF SOMEONE HIT YOU
FROM BEHIND 4) TORQUE CONVERTER LOCKUP
IN 5TH AND 6TH GEAR. DEALER TORE APART
THE CAR TO REPLACE THE STATOR,
PERFORMED SOFTWARE UPDATE - NEITHER
SOLUTION WORKED.

184.   On August 8, 2016, another incident involving a 2015 Chevrolet
Corvette was reported:

THE A8 AUTOMATIC TRANSMISSION IN THE 2015
CORVETTE IS PRONE TO OCCASIONAL HARD
DOWNSHIFTS FROM 2ND TO 1ST GEAR WHEN
DRIVING AT SLOW SPEEDS (LESS THAN 10 MPH).
SOMETIMES THE DOWNSHIFTS ARE SO VIOLENT
THAT THE CAR JERKS FORWARD SEVERAL
FEET. THE FIRST TIME IT HAPPENED I THOUGHT
I HAD BEEN REAR ENDED BY ANOTHER CAR.
THE UNPREDICTABLE BEHAVIOR OF THE
TRANSMISSION IS ESPECIALLY DANGEROUS IN
PROXIMITY TO PEDESTRIANS OR OTHER
VEHICLES.

185.   On September 25, 2016, the following incident involving a 2015
Chevrolet Corvette was reported:

JUST AS YOU ACCELERATE, AROUND 1200 TO
1500 RPM, WITH A LIGHT TOUCH, YOU HEAR
WANT IS BEING DESCRIBED AS A "WARBLE"

55

SOUND. IT HAS A METALLIC RING AND LASTS A
FEW SECONDS.

LOADING THE ENGINE ON A HILL MAKES THE
SOUND MORE INTENSE. IT IS HAPPENING TO A
STOCK 2015 STINGRAY COUPE. THOUGHT THIS
WAS ONLY HAPPENING TO ME BECAUSE
OTHERS DO NO HAVE THIS ISSUE BUT FOUND A
GROUP OF CORVETTE OWNERS ON THE
CORVETTE FORUM WITH THE SAME ISSUE.

### d.    2016 Chevrolet Camaro

186.    On the NHTSA website, there are at least 53 consumer complaints for
"2016 Chevrolet Camaro." As one example, on July 5, 2016, the following incident
was reported:

> PURCHASED 2016 CHEVROLET CAMARO ON
> 6/18/2016 FEW DAYS AFTER THE ENGINE WAS
> RUNNING VERY ROUGH, GRINDING NOISE,
> TRANSMISSION SHIFTING HARD, THE CHECK
> ENGINE LIGHT ILLUMINATED AND SPEED
> REDUCED TO 5 MPH SHOWED ON DISPLAY. THIS
> HAS BEEN GOING ON SINCE THEN, I BROUGHT
> TO DEALER ON 7/1/2016 AND THE SERVICE
> MECHANIC TOOK BACK TO CHECK CODES AND
> INFORMED ME THAT NUMEROUS ERROR CODES
> WERE DETECTED AND TOLD ME TO GO AHEAD
> AND TAKE VEHICLE HOME BECAUSE IT WAS A
> HOLIDAY WEEKEND AND TO RETURN ON
> TUESDAY 7/5/2016 TO BE INSPECTED FOR
> REPAIR.

187.    Another incident involving a 2016 Chevrolet Camaro was reported on
March 19, 2018:

> I BOUGHT MY CAR IN SEPT. 2016 AFTER THE
> FIRST COUPLE OF MONTHS AT RANDOM TIMES
> THE TRANSMISSION MAKES A BOOM SOUND

56

> WHEN SLOWING DOWN FROM SPEEDS OVER 55
> MPH OR DURING ACCELERATION FROM STOP
> AND GO RUSH HOUR TRAFFIC IT'S AS IF THE
> TRANSMISSION HAS TO CATCH UP WITH THE
> ACCELERATOR. I GET MONTHLY DIAGNOSTICS
> AND NOTHING SHOWS UP AS AN ISSUE.

188.    Another incident involving a 2016 Chevrolet Camaro was reported on
August 25, 2018:

> WHEN YOU GOING DOWN THE ROAD
> TRANSMISSION 7/8 GEAR SHUTTERS LIKE IT'S
> SLIPPING

189.    Another incident involving a 2016 Chevrolet Camaro was reported on
November 20, 2018:

> THE 8 SPEED AUTOMATIC TRANSMISSION HAS A
> SHUTTER AT LOW ENGINE RPM BETWEEN 1200
> TO 1500 RPM. THE SHUTTER WILL OCCUR IN
> 2ND, 3RD, 4TH, 5TH, AND 6TH GEAR WHEN
> ENGINE RPM IS 1200 TO 1500. THE VEHICLE HAS
> 10,000 MILES ON IT. THIS HAPPENS ON OPEN
> ROADS IN ALL CONDITIONS AND AT VARIOUS
> SPEEDS + GEAR.

190.    Another incident involving a 2016 Chevrolet Camaro was reported on
February 27, 2019:

> WHEN DRIVING, THE VEHICLE WILL
> VIBRATE/SHUDDER PERIODICALLY. WHEN
> PULLING INTO TRAFFIC, SOMETIMES IT DOES
> NOT SHIFT PROPERLY AND PRESENTS A
> DANGER. THE DEALER FLUSHED THE
> TRANSMISSION FLUID RECENTLY, BUT IT IS
> STARTING TO HAPPEN AGAIN.

191.    Another incident involving a 2016 Chevrolet Camaro was reported on

January 17, 2019:

> ISSUE 1 - 8 SPEED AUTOMATIC TRANSMISION IS
> SHIFTING HARD BETWEEN GEARS AND ALSO
> HAS A SHUTTER AT LOW ENGINE RPM
> BETWEEN 1200 TO 1500 RPM. THE SHUTTER
> WILL OCCUR IN MOST GEARS. ESPECIALLY
> NOTICEABLE WHEN USING CRUISE CONTROL. IT
> HAPPENS IN ALL ROADS IN ALL CONDITIONS
> AND AT VARIOUS SPEEDS + GEAR...

### e.    2017 Chevrolet Camaro

192.    On the NHTSA website, there are at least 43 consumer complaints for "2017 Chevrolet Camaro." As one example, on November 1, 2018, the following incident was reported:

> MY CAR HAS BEEN HAVING A LOT OF
> VIBRATIONS, SPUTTERING, RUMBLING WHILE
> DRIVING. ESPECIALLY WHEN SPEEDING UP. IT
> HAPPENS WHILE IN CRUISE CONTROL ALSO. I
> TOOK IT TO BE SERVICED AND THEY SAID IT
> WAS THE TORQUE CONVERTER. THEY FLUSHED
> THE SYSTEM AND SAID IT SHOULD CLEAR UP
> AFTER 200 MILES WITH THE NEW FLUID THEY
> REPLACED. I TOOK IT BACK BECAUSE IT HAS
> BEEN OVER 500 MILES AND IS STILL
> HAPPENING. I WAS TOLD ALL THEY CAN DO IS
> REPLACE THE FLUID AGAIN FOR NOW UNTIL
> THEY FIX THE PROBLEM. WHY ARE THEY NOT
> ABLE TO REPLACE THE TORQUE CONVERTER
> NOW BEFORE IT CAUSES MORE INTENSIVE
> DAMAGE? I AM AFRAID AS IT GETS WORSE I
> WILL BE BROKEN DOWN ON THE SIDE OF THE
> ROAD WITH A CAR THAT IS IN WORSE REPAIR
> THAN IT SHOULD BE.

193.    Another incident involving a 2017 Chevrolet Camaro was reported on

February 2, 2019 as follows:

> HARD SHIFTS BETWEEN 1ST & 2ND GEAR
> VIBRATION BETWEEN 1500 & 1800 RPM. THIS
> CAR HAS ACTIVE FUEL MANAGEMENT
> VIBRATION SEEMS TO HAPPEN WORSE WHEN IN
> 4 CYLINDER MODE. GM IS AWARE OF THE ISSUE
> AND KEEPS PROMISING A FIX WHICH HAS YET
> TO BE RELEASED. BLAME IT ON FLUID IN
> TRANSMISSION.

### f.    2015 Chevrolet Silverado

194.    On the NHTSA website, there are at least 485 consumer complaints for "2015 Chevrolet Silverado." As one example, on November 20, 2015, the following incident was reported:

> TRANSMISSION CANNOT FIND GEARS WHEN
> COASTING OR SLOWING DOWN AND THEN
> HITTING ACCELERATOR. VERY DANGEROUS
> WHEN IT HESITATES FOR SECONDS BEFORE
> FINDING THE RIGHT GEAR AND GOING, OR IT
> STAYS IN TOO HIGH OF A GEAR INSTEAD OF
> DOWNSHIFTING TO ACCELERATE AND
> RATTLES. HAPPENS EVERY TIME I DRIVE THE
> TRUCK, AND MANY OTHER PEOPLE HAVE THE
> SAME ISSUE. GM DOESN'T CARE!

195.    Another incident involving a 2015 Chevrolet Silverado was reported on April 6, 2016:

> HAD BEEN COMPLAINING SINCE 2 DAYS AFTER
> PURCHASE THAT TRANSMISSION WAS
> SHAKING/SHIMMYING/SPUTTERING. WAS
> PULLING ONTO A COUNTY HIGHWAY OFF OF A
> RESIDENTIAL TYPE ROAD (AFTER PICKING UP
> GRANDDAUGHTER FROM SCHOOL - SHE WAS IN
> TRUCK) AND TRUCK BOGGED DOWN &

WOULDN'T GO. INTERSECTION IS AT TOP OF
HILL AND AROUND A CORNER. WAS CLEAR
WHEN I STARTED PULLING OUT, BUT WAS
ALMOST HIT BY ONCOMING TRUCK BEFORE I
GOT MY TRUCK TO GET ON ACROSS THE
INTERSECTION. HAS BEEN IN SHOP TWICE TO
FIX IT. FIRST TIME TO DOUBLE TRANSMISSION
FLUSH. THAT DIDN'T WORK. NEXT TIME A FEW
WEEKS LATER, A TECHNICIAN HOOKED UP A
COMPUTER TO MY TRUCK SO HE COULD
MANUALLY SHIFT GEARS WHILE RIDING WITH
ME. HE FELT THE ISSUES AND SAID HE SAW
SEVERAL PROBLEMS. DEALERSHIP ENDED UP
REPLACING TORQUE CONVERTER. ALSO
REPLACED VLOM MANIFOLD - WHATEVER
THAT IS? THAT'S WHAT IT SAYS ON WORK
ORDER. THE PROBLEM STILL EXISTS. I BELIEVE
THERE ARE BULLETINS OUT ON THIS TRUCK'S
TRANSMISSION ALREADY. I HAVE TALKED TO
OTHERS WHO HAVE HAD THE SAME PROBLEM.

196. Another incident involving a 2015 Chevrolet Silverado was reported on
May 12, 2016:

TL* THE CONTACT OWNS A 2015 CHEVROLET
SILVERADO 1500. WHILE DRIVING 30 MPH, THE
VEHICLE DOWNSHIFTED UNCONTROLLABLY
WITHOUT WARNING. ALSO, WHILE IN THE PARK
POSITION, THE VEHICLE SUDDENLY LUNGED
FORWARD AND HAD TO BE RESTARTED. THE
CONTACT STATED THAT THE TRANSMISSION
INDEPENDENTLY ENGAGED INTO FIRST GEAR
WITHOUT WARNING AND CAUSED THE VEHICLE
TO SHIFT FORWARD ON MORE THAN ONE
OCCASION. THE VEHICLE RECEIVED AN
UNKNOWN REPAIR, BUT THE FAILURE
RECURRED. THE MANUFACTURER WAS MADE
AWARE OF THE FAILURE. THE FAILURE
MILEAGE WAS 14,000. ....UPDATED 0711/16 *BF

60

197.   Another incident involving a 2015 Chevrolet Silverado was reported on

June 8, 2016:

> THE TRUCK HAS A CONSTANT VIBRATION AT
> HIGHWAY SPEEDS. TWO DIFFERENT DEALERS
> HAVE VERIFIED THE PROBLEM, GM FIELD
> ENGINEERS VERIFIED THERE IS AN ISSUE, AND
> THE ENGINEER RECOMMENDED THE DEALER
> CHANGE REAR END PARTS, STILL NO FIX. TWO
> DIFFERENT DEALERS FELT ROADFORCE
> BALANCING THE TIRES WOULD HELP; IT HAS
> NOT. THE TRUCK ALSO MAKES A CHIRPING
> NOISE WHEN TRANSITIONING FROM 4
> CYLINDERS BACK TO 8 CYLINDERS.

198.   Another incident involving a 2015 Chevrolet Silverado was reported on

July 14, 2016:

> I AM CONCERNED ABOUT THE EXCESSIVE
> SHAKING/VIBRATION IN THIS 2015 CHEVY
> SILVERADO AND, THUS FAR, GM CUSTOMER
> SERVICE AND THE DEALERSHIP HAVE NO
> RESOLUTION IN SIGHT. THE PROBLEM HAS
> BEEN OCCURING AT HIGHWAY SPEEDS (MOST
> NOTABLE ABOVE 73 MPH) SINCE THE TRUCK
> WAS PURCHASED AUG 2015. AS THEY CAN'T
> IDENTIFY THE CAUSE OF THE PROBLEM, I CAN'T
> BE SURE THE ORIGIN IS OR IS NOT A SAFETY-
> REATED CONCERN. THE DEALERSHIP HAS
> BALANCED, RE-BALANCED, ROTATED, AND
> ROAD PRESSURE TESTED TIRES TO NO AVAIL.
> EVEN TRIED A NEW SET OF TIRES OFF OF A 2016
> MODEL TO NO AVAIL. AS THIS MATTER
> CONTINUES AND DOESN'T APPEAR TO BE TIRE-
> RELATED, I'M WORRIED THAT THE ISSUE MAY
> BE IN THE SUSPENSION AND WILL, AT SOME
> POINT, CAUSE OR CREATE A CATASTROPHIC
> FAILURE.

199.   Another incident involving a 2015 Chevrolet Silverado was reported on
August 8, 2016:

> TL* THE CONTACT OWNS A 2015 CHEVROLET
> SILVERADO 1500. UPON DEPRESSING THE
> ACCELERATOR PEDAL, THE VEHICLE WAS
> EXTREMELY SLOW TO ACCELERATE WITH A
> DRASTIC REDUCTION IN SPEED WITHOUT
> WARNING. THE VEHICLE WAS TAKEN TO TWO
> DEALERS WHO WERE UNABLE TO REPLICATE
> AND DIAGNOSE THE FAILURE. THE
> MANUFACTURER WAS NOTIFIED OF THE
> FAILURE AND PROVIDED NO
> RECOMMENDATION OR REPAIR SOLUTION. THE
> FAILURE MILEAGE WAS NOT AVAILABLE.

200.   Another incident involving a 2015 Chevrolet Silverado was reported on
August 20, 2016:

> THE TRANSMISSION HESITATES WHEN
> SHIFTING IN AUTOMATIC BUT WHEN IN
> MANUAL MODE IT SHIFTS FINE WITH NO
> ISSUES. THIS HAS BEEN A ON GOING ISSUE AND
> PROBLEM THE SERVICE CENTER FOR A LOCAL
> DEALERSHIP CAN NOT FIND THE ISSUE. BUT
> THERE IS SOMETHING GOING ON WITH THE
> TRANSMISSION.

201.   Another incident involving a 2015 Chevrolet Silverado was reported on
September 14, 2016:

> TL* THE CONTACT OWNS A 2015 CHEVROLET
> SILVERADO 1500. WHILE DRIVING 10 MPH, THE
> ACCELERATOR PEDAL WAS DEPRESSED AND
> THE VEHICLE ACCELERATED IN EXCESS. THE
> VEHICLE WAS TAKEN TO A DEALER WHERE IT
> WAS DIAGNOSED THAT THE WIRING HARNESS,
> PART OF THE TRANSMISSION, AND MULTIPLE

62

OTHER PARTS NEEDED TO BE REPLACED. THE
VEHICLE WAS REPAIRED; HOWEVER, THE
FAILURE RECURRED. IN ADDITION, WHILE
DRIVING AT A VERY LOW SPEED, "HAUL
GEARS" DISPLAYED ON THE MESSAGE BOARD
AS THE VEHICLE SWITCHED INTO A LOW GEAR
INDEPENDENTLY. THE MANUFACTURER WAS
NOTIFIED OF THE FAILURES. THE FAILURE
MILEAGE WAS 3,000. THE VIN WAS
UNAVAILABLE.

202.   Another incident involving a 2015 Chevrolet Silverado was reported on

September 26, 2016:

I PARK IN A 5 LEVEL PARKING GARAGE.
SEVERAL MONTHS AGO, I WAS LEAVING WHEN
I CAME UP TO THE RAMP TO THE NEXT LOWER
LEVEL. I LET OFF ON THE ACCELERATOR
BEFORE I WENT FROM FLAT TO LOWERING
RAMP. THE TRUCK SHIFTED UP TO SECOND
GEAR, ACCELERATED AND THROUGH ME
TOWARD THE VEHICLE IN FRONT. THE TRUCK
WENT OUT OF MY CONTROL. IF I WERE NOT A
SAFE DRIVER I WOULD HAVE STRUCK THE
VEHICLE. THIS ISSUE HAS OCCURRED ANOTHER
TIME AS WELL. THERE HAVE BEEN OTHER
PROBLEMS WHICH ARE NUMEROUS. I WILL
ADDRESS THEM INDIVIDUAL IN FURTHER
COMPLAINTS.

203.   Another incident involving a 2015 Chevrolet Silverado was reported on

September 27, 2016:

ON SEPT 21 2016 I ARRIVED AT MY HOME.
I DROVE UP MY GRAVEL DRIVEWAY IN
D(DRIVE) AND SLOWED TO A STOP AND MY
TRUCK BEGAN TO ROLL BACKWARD UNDER
MY CONTROL. I WAS CHECKING ON THE
GROUND FOR LAWN DAMAGE. THE TRUCK

63

SHUTTERED TWICE, SHUT OFF AND STARTED
TO ROLL BACKWARD TOWARD A TREE. I
QUICKLY REGAINED CONTROL WITH A PANIC
STOP. I WAS ABLE TO PLACE THE TRUCK IN
PARK AND RESTART THE TRUCK. I HAD LOST
CONTROL OF THE TRUCK.

204.   Another incident involving a 2015 Chevrolet Silverado was reported on

November 9, 2016:

TRANSMISSION IS LURCHING IF DRIVING 50
MPH THEN SLOW DOWN TO 35 MPH WHEN YOU
GO TO SPEED BACK UP IT LURCHES.
COMPLAINED TO CHEVROLET SEVERAL TIMES
THEY SAY CANNOT FIND ANYTHING WRONG.

205.   Another incident involving a 2015 Chevrolet Silverado was reported on

December 12, 2016:

TL* THE CONTACT OWNS A 2015
CHEVROLET SILVERADO 1500. WHILE DRIVING
APPROXIMATELY 45 MPH, THE CHECK ENGINE
INDICATOR ILLUMINATED. THE VEHICLE
STARTED TO DECELERATE WHEN DEPRESSING
THE ACCELERATOR PEDAL. THE VEHICLE WAS
TAKEN TO THE DEALER, BUT WAS NOT
DIAGNOSED OR REPAIRED. THE
MANUFACTURER WAS MADE AWARE OF THE
FAILURE. THE APPROXIMATE FAILURE
MILEAGE WAS 33,000.

206.   Another incident involving a 2015 Chevrolet Silverado was reported on

December 13, 2016:

TL* THE CONTACT OWNS A 2015 CHEVROLET
SILVERADO 1500. THE CONTACT STATED THAT
WHILE DRIVING AT VARIOUS SPEEDS, THERE
WAS A LOUD CLUNKING NOISE COMING FROM

64

THE REAR OF THE VEHICLE. THE CONTACT
STATED THAT THE FAILURE OCCURRED AFTER
SHIFTING GEARS. THE VEHICLE WAS NOT
REPAIRED. THE MANUFACTURER WAS MADE
AWARE OF THE FAILURE. THE FAILURE
MILEAGE WAS 17,000.

### g. 2016 Chevrolet Silverado

207.    On the NHTSA website, there are at least 250 consumer complaints for
"2016 Chevrolet Silverado." As one example, on May 11, 2016, the following
incident was reported:

I BOUGHT A 2016 CHEVY SILVERADO 1500
LTZ Z71 AND IT VIBRATES AT IDLE AND THE
TRANSMISSION IS SLIPPING. I HAD ALREADY
TOOK IT TO THE DEALERSHIP TO GET IT FIX,
BUT NO LUCK. GM TOLD ME THAT IS HOW THE
TRUCK IS DESIGNED TO OPERATE, WHICH IS
HARD TO BELIEVE. THERE IS ABSOLUTELY
ZERO HELP FROM GM TO HELP ME RESOLVE
THE PROBLEM. I WAS GIVEN AN OPTION TO
TRADE IT IN FOR A NEW ONE AT MY OWN
EXPENSES OR DEAL WITH THE PROBLEM. FORD
WOULD NOT TAKE MY TRUCK AS A TRADE IN
NOR WILL GMC. THIS VEHICLE CAN
POTENTIALLY BY DANGEROUS AND A
LIABILITY AS THE TRANSMISSION SEEM TO
HAVE A MIND OF ITS OWN AND THE CONSTANT
VIBRATION CANNOT POSSIBLY HE GOOD FOR
ANYONE.

208.    Another incident involving a 2016 Chevrolet Silverado was reported on
October 3, 2016:

THE ISSUE(S) THAT I AM EXPERIENCING
ALL APPEAR TO BE WITH THE TRUCKS 8 SPEED
TRANSMISSION. THE FIRST TWO OCCUR
DURING BREAKING AND THE THIRD HAPPENS

65

WHEN ACCELERATING FROM A "COLD" START. A DESCRIPTION OF EACH OF THE THREE MAJOR ISSUES ARE OUTLINED BELOW:

1)      DURING INITIAL BREAKING THE TRUCK WILL BEGIN TO SLOW DOWN AS INTENDED AND WITHOUT WARNING IT ABRUPTLY ACCELERATES/SLIDES FORWARD (SEE BREAKING PROFILES). THIS TYPICALLY HAPPENS BETWEEN 10-20 MPH.

2)      DURING BREAKING JUST BEFORE COMING TO A STOP I EXPERIENCE A HARD JERK OR SHUDDER (SEE BREAKING PROFILES).

3)      DURING A "COLD" START, IN THE MORNING OR AFTER WORK, THE TRANSMISSION WILL SOMETIMES SLIP AND SHIFT HARD WHILE PULLING OUT OF MY DRIVEWAY/PARKING LOT.

THE ISSUES ARE ALL INTERMITTENT.

209.   Another incident involving a 2016 Chevrolet Silverado was reported on October 16, 2016:

I HAD TWO EPISODES OF SUDDEN UNINTENDED ACCELERATION WHILE DRIVING HIGHWAY SPEEDS ON A HIGHWAY. TRUCK IS WEEKS OLD-1500MILES ONLY. BRAKES STILL WORKED SO I WAS ABLE TO STOP. RPMS CONTINUED TO ESCALATE IN NEUTRAL AND PARK. HAD TO TURN OFF ENGINE QUICKLY TO ABORT THE PROBLEM. I'M TAKING THE TRUCK IN FOR EVALUATION TOMORROW. MY WIFE AND TWO OLDEST SONS WERE IN THE VEHICLE. *TR

210.   Another incident involving a 2016 Chevrolet Silverado was reported on November 15, 2016:

66

> TL* THE CONTACT OWNS A 2016 CHEVROLET SILVERADO 1500. WHILE ATTEMPTING TO ACCELERATE FROM A STOP, THE VEHICLE FAILED TO ACCELERATE. THE CONTACT COASTED INTO A PARKING LOT AND NOTICED THAT THE FRONT PASSENGER SIDE AXLE INDEPENDENTLY SHIFTED TO THE REAR OF THE CHASSIS, WHICH POTENTIALLY CAUSED A SPARK TO THE TIRES. THE VEHICLE WAS TAKEN TO THE DEALER, BUT WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 4,000.

### h.  2017 Chevrolet Silverado

211.    On the NHTSA website, there are at least 140 consumer complaints for "2017 Chevrolet Silverado." As one example, on July 20, 2018, the following incident was reported:

> 8 SPEED TRANSMISSION CLUNKS WHEN SHIFTING INTO 2 GEAR AND AT TIMES FEELS LIKE YOU GOT REAR ENDED. WHEN IT DOWN SHIFTS INTO THE LOWER GEARS ITS ALSO CLUNKS AND IS NOT SMOOTH. THIS IS HAPPENING WHEN GOING AT SLOW SPEEDS AND IS WORSE AFTER A COLD START. THE VEHICLE SHIFTS FINE AT HWY SPEEDS. I HAVE ALREADY BROUGHT IT TO THE DEALERSHIP TWICE AND PROBLEM IS STILL THERE. TALKING TO OTHER PEOPLE WITH GM 8 SPEED TRANSMISSION AND THEY ARE HAVING THE SAME ISSUE. 8 SPEED TRANSMISSION NEEDS RECALL.POSSIBLY TORQUE CONVERTER.

212.    Another incident involving a 2017 Chevrolet Silverado was reported on July 18, 2018:

ENGINE HESITATION, OR MISFIRING.
JERKING, OR TRANSMISSION SHUTTERING
WHEN ENGINE IS AT LOW RPM AND ON
INCLINE. (I.E. WHEN TRAVELING ABOUT 45MPH
AND START UP A HILL, THE RPM'S ARE ABOUT
1300 AND THE TRANSMISSION DOESN'T GEAR
DOWN, SO IT STARTS SHUTTERING UNTIL YOU
GIVE IT MORE ACCELERATION THAN USUAL.)
AFTER DEALING WITH THIS ISSUE FOR NEARLY
8 MONTHS AND 15K MILES, I BELIEVE THIS
SAFETY ISSUE SHOULD BE RECALLED. DEALER
ORIGINALLY ACKNOWLEDGE THE PROBLEM
BUT WAS UNSURE OF THE CAUSE. AFTER 5
REPAIR ATTEMPTS THE DEALER SAY THEY
CAN'T DUPLICATE AND THE VEHICLE
PERFORMS AS DESIGNED.

213.    Another incident involving a 2017 Chevrolet Silverado was reported on
May 9, 2018:

TRANSMISSION ABRUPTLY SHIFTING.
FEEL LIKE THE TRUCK IS BEING HIT BY
ANOTHER VEHICLE. I DON'T KNOW WHEN IT'S
GONNA DO IT BUT WHEN IT DOES, ITS SCARY.
THE OTHER DAY WHILE TRYING TO BACK UP
INTO MY DRIVE WAY, THE WOULD NOT MOVE
WHEN I PUSHED ON THE PEDAL. THEN ON IT'S
OWN, THE TRUCK BURNED RUBBER
BACKWARDS WHEN I TOOK MY FOOT OFF OF
THE GAS PEDAL. I ALMOST DROVE INTO MY
GARAGE! THIS TRUCK IS NOT SAFE AND NEEDS
TO BE REMOVED FROM SERVICE! THIS IS AN
ONGOING PROBLEM THAT YOU NEVER KNOW
WHEN IT'S GOING TO HAPPEN DURING YOU
DRIVE.

214.    Another incident involving a 2017 Chevrolet Silverado was reported on
March 27, 2018:

68

> VEHICLE HESITATION AND SURGES IN
> ACCELERATION. THIS CONDITION IS A SAFETY
> ISSUE AS IT HESISTATES PULLING INTO
> TRAFFIC, SURGES IN ACCELERATION HAVE
> CAUSED LOSS OF TIRE TRACTION ON ICE
> COVERED ROADWAYS NEARLY RESULTING IN A
> COLLISION. DEALERS HAVE ACKNOWLEDGED
> AN ISSUE BUT ADVISE THEY ARE STILL
> WAITING ON A FIX FROM GM.

215.   Another incident involving a 2017 Chevrolet Silverado was reported on

March 22, 2018:

> PURCHASED MY 17 CHEVROLET
> SILVERADO 1500 ON 11/28/17 AND RETURNED IT
> TO THE DEALERSHIP ON 12/1/17. THIS WAS DUE
> TO A SEVERE SHUDDERING & SHIFTING IN THE
> TRANSMISSION & SEVERE SHAKE IN THE FRONT
> END AT 70-90MPH. THEY BALANCED &
> ROTATED THE TIRES, SAYING THE ISSUE WAS
> FIXED, I PICKED THE VEHICLE BACK UP ON
> 12/4/17 BUT THE ISSUE WAS NOT FIXED & AN
> ELECTRICAL ISSUE HAD ALSO OCCURRED. I
> TOOK THE VEHICLE BACK ON 12/7 /18 WITH THE
> SAME COMPLAINTS REGARDING THE
> TRANSMISSION & SHAKING IN THE FRONT END,
> AS WELL AS THE ELECTRICAL ISSUE. THE
> DEALERSHIP CALLED ME ON 12/8/17, TOLD ME
> THEY HAD BEEN UNABLE TO DUPLICATE THE
> ISSUES, FINDING NOTHING WRONG. I LEFT IT
> OVER THE WEEKEND, WENT IN MONDAY
> MORNING & SPOKE TO THE SERVICE MANAGER
> DIRECTLY. HE TOLD ME HE HAD PURCHASED
> THE SAME VEHICLE WITH THE SAME
> TRANSMISSION ISSUES. SAID THERE WAS A
> POSSIBLE FIX BY EXCHANGING THE
> TRANSMISSION FLUID & THEY WOULD USE A
> NEW MACHINE PICO TO CHECK IT OUT. THEY
> HAD TO REPLACE THE TORQUE CONVERTER

69

DUE TO MALFUNCTIONING & PERFORM A
PROGRAMMING MODULE UPDATE ON RADIO, I
PICKED IT UP ON 12/22/17, ISSUE WITH THE
TRANSMISSION WAS STILL NOT RESOLVED. I
TOOK IT TO A DIFFERENT DEALERSHIP FOR
TRANSMISSION SHUDDER, SHIFT & SHAKE
ISSUE MOST NOTICEABLE AT 70-90MPH, &
RADIO ISSUE. THEY WERE ADVISED TO
PERFORM A MODULE UPDATE ON THE
TRANSMISSION & GIVEN 2 OPTIONS ON THE
RADIO, THEY CHOSE TO REPLACE THE SCREEN.
I TOOK IT BACK TO THAT SAME DEALERSHIP,
MODULE UPDATE MADE TRANSMISSION/FRONT
END ISSUE WORSE, ESPECIALLY COMING OUT
OF A CURVE. THEY'VE REPLACED MY 2 BACK
TIRES SAID THEY WERE BAD & SHOULD FIX THE
SHAKING ISSUE IN THE FRONT END. UNABLE TO
DUPLICATE TRANSMISSION ISSUES THUS THEY
CANNOT REPAIR IT. OWNERS WITH THE SAME
ISSUES ARE BEING TOLD GM KNOWS BUT CAN'T
FIX TRANSMISSION ISSUE.

216.    Another incident involving a 2017 Chevrolet Silverado was reported on

February 27, 2018:

TRUCK EXHIBITS A ROUGH IDLE AFTER
TRUCK IS DRIVEN AND WARM. IDLE CAUSES
TEH TRUCK TO SHAKE AND FEELS LIKE IT WILL
DIE AT STOPS. RPM DROPS BELOW 300 RPM
THEN GOES BACK TO 490 RPM. IN ADDITION THE
TRUCK WILL START TO SHAKE AND VIBRATE
AT HIGHWAY SPEEDS OF 75-80 MPH. GMC
SERVICE PERFORMED TSB CHANGING OUR
ENGINE MOUNTS BUT THAT HAS NOT FIXED
THE ISSUE. THIS IS A KNOWN ISSUE ON
SILVERADOS AND NO FIX IN SITE. CONCERNED
WITH SEAT VIBRATION THIS IS A SAFETY ISSUE
DUE TO POTENTIAL DRIVE TRAIN PART
FAILURE.

217.   Another incident involving a 2017 Chevrolet Silverado was reported on February 26, 2018:

> 8 SPEED TRANSMISSION SHIFT VERY ROUGH FROM 1-2 AND 2-1 GEARS, FREQUENTLY HESITATES, MAKES CLUNKING SOUND. HAVE TAKEN IT TO GM DEALER AND AM INFORMED THAT YES, THAT'S THE WAY THE 8 SPEEDS ARE. THIS IS A $50K+ TRUCK. THIS TRANSMISSION ISSUE CAUSES AND CAN CAUSE HESITATION WHEN NEEDING TO ACCELERATE, THUS CREATING A SAFETY HAZARD.

218.   Another incident involving a 2017 Chevrolet Silverado was reported on February 13, 2018:

> TRANSMISSION SHIFTS HARD AND VEHICLE SURGES AT LOW SPEED WITH ACCOMPANING "CLUNK". PROBLEM OCCURS IN BOTH UPSHIFT AND DOWN SHIFT. DEALER INFORMS ME THAT IS A "LEARNING" CURVE FOR VEHICLE TO UNDERSTAND MY DRIVING HABITS. HOWEVER I SEE ON SEVERAL AUTOMOTIVE FORUMS THAT THIS HAS BEEN AN ISSUE FOR SOME TIME AND HAS YET TO BE RESOLVED.

219.   Another incident involving a 2017 Chevrolet Silverado was reported on February 1, 2018:

> THE CONTACT OWNS A 2017 CHEVROLET SILVERADO 1500. WHILE DRIVING 25 MPH, THE VEHICLE SHIFTED HARD FROM FIRST TO SECOND GEAR. THE FAILURE OCCURRED EVERYDAY SINCE THE VEHICLE WAS PURCHASED IN APRIL OF 2017. THE VEHICLE WAS TAKEN TO O'REILLY CHEVROLET (6160 E BROADWAY BLVD, TUCSON, AZ 85711) WHERE

71

IT WAS DIAGNOSED THAT THE TRANSMISSION
CONTROL MODULE FAILED. THE DEALER
REPROGRAMMED THE TRANSMISSION, WHICH
FAILED TO REMEDY THE FAILURE. THE
VEHICLE WAS BROUGHT BACK TO THE DEALER
AND THE VALVE BODY FOR THE TRANSMISSION
WAS REPLACED AND THE TRANSMISSION FLUID
WAS CHANGED. THE FAILURE RECURRED. THE
MANUFACTURER WAS NOTIFIED OF THE
FAILURES. THE FAILURE MILEAGE WAS 16,000.

220.    Another incident involving a 2017 Chevrolet Silverado was reported on

January 6, 2018:

NOTICED AFTER PURCHASE THAT THERE
IS VIBRATION LIKE A BAD TIRE 35-42 MPH.

VIBRATION FELT IN SEAT, CONSOLE AND
STEERING WHEEL 58-65 MPH. TRANSMISSION
DOWN SHIFTS HARD SOMETIMES FEELS LIKE
BEING BUMPED FROM BEHIND, IT ALSO
HESITATES AND JERKS AFTER LETTING OFF THE
ACCELERATOR AND ACCELERATING AGAIN
BETWEEN 25-45 MPH.

WHEN ACCELERATING IT SURGES, JERKS
AND STUMBLES. SOMETIMES WHEN
ACCELERATING THE TRANSMISSION
DOWNSHIFTS AND HANGS IN THAT GEAR UNTIL
YOU LET OFF THE ACCELERATOR.

UNDER HEAVY ACCELERATION THERE IS
VIBRATION IN THE POWER TRAIN AND THE
TRANSMISSION SEEM NOISY. AT 25 MPH IT
SHUTTERS LIKE THE TRANSMISSION IS IN TO
HIGH OF A GEAR UNDER LIGHT ACCELERATION.

RETURNED TO WALDORF CHEVROLET
WHERE I PURCHASED IT AND WAS TOLD THEY
BALANCED 2 TIRES AND RESET THE ROAD

72

FORCE.SCANNED TRANSMISSION NO CODES
TRANSMISSION OK AFTER SHOP FOREMAN
ROAD TESTED FOR 21 MILES NO OTHER REPAIRS
NEEDED.

PICKED IT UP DRIVING HOME NOTICED
ALL THE PROBLEMS WERE STILL THERE AND
AFTER INSPECTION OF MY TRANSMISSIONS
NOTICED THAT THE TRANSMISSIONS WERE
BALANCED STILL HAD THE OLD WEIGHTS STILL
ON THE TRANSMISSIONS WITH NEW WEIGHTS
ALSO.

MADE ANOTHER APPOINTMENT THIS TIME
TO HAVE SHOP FOREMAN (RICK) RIDE WITH ME
TO SHOW HIM WHAT IT WAS DOING WHICH WE
DID AND LEFT MY TRUCK AGAIN.

AFTER 8 DAYS I AM TOLD IT WAS READY I
WAS TOLD THEY DID A PICO SCOPE TEST AND
THE DRIVESHAFT WAS BEING REPLACED THEN
ONLY TESTED IT WAS OK. CHECKED RUN OUT
ON FLANGES ALL WITHIN SPECS. FOUND THE
RIGHT REAR TIRE BAD. THEY PUT STEEL WHEEL
FROM ANOTHER TRUCK ON AND ROAD TESTED
WITH NO CHANGE. THEY DROVE ANOTHER
TRUCK AND IT RIDES THE SAME. EVEN HAS THE
SHUTTERS ON HARD ACCELERATION. SAID
THEY CALLED GM TAC BACK AND THEY DONT
SEE A PROBLEM WITH THIS.

WRITTEN DOCUMENTS BE SENT VIA MAIL.

MADE ANOTHER APPOINTMENT

221.    Another incident involving a 2017 Chevrolet Silverado was reported on

October 27, 2017:

TRANSMISSION ON MY NEW 2016 Z71 LT 4X4
JUMPS INTO LOW GEAR WHEN SLOWING DOWN.
I TOOK IT TO THE DEALERSHIP MULTIPLE

73

TIMES, BUT KEEP GETTING TOLD IT SHIFTS
FINE. TOOK IT AGAIN AND HAD A MANAGER
DRIVE THE TRUCK WITH ME INSIDE AND
AGREED THE TRANSMISSION WAS NOT GETTIN
INTO GEAR IN A NORMAL WAY. TOON IT BACK
TO GET IT FIXED AND WAS TOLD
TRANSMISSION IS FINE. I NEED THIS FIXED OR I
WILL BE RETURNING HE TRUCK AS A LEMON
TITLE.

222.    Another incident involving a 2017 Chevrolet Silverado was reported on

April 5, 2017:

THE CONTACT OWNS A 2017 CHEVROLET
SILVERADO 1500. WHILE DRIVING 45 MPH, THE
TRANSMISSION FAILED TO SHIFT PROPERLY
AND MADE A CLUNKING SOUND. THE FAILURE
RECURRED MULTIPLE TIMES. THE VEHICLE
WAS TAKEN TO A DEALER WHERE IT WAS
DIAGNOSED THAT THE TRANSMISSION FAILED
AND NEEDED TO BE REPROGRAMMED. THE
VEHICLE WAS REPAIRED, BUT THE FAILURE
RECURRED. THE MANUFACTURER WAS MADE
AWARE OF THE ISSUE. THE APPROXIMATE
FAILURE MILEAGE WAS 30.

### i.    2017 Chevrolet Colorado

223.    On the NHTSA website, there are at least 46 consumer complaints for

"2017 Chevrolet Colorado." As one example, on September 1, 2017, the following

incident was reported:

AIR CONDITIONING IS INTERMITTENT/BLOWS
WARM/EMITS FOG FROM VENTS. THE DEALER
SAYS NO FIX AVAILABLE YET CITES PER DOC
ID:5125499.SAYS ENGINEERING IS STUDYING
PROBLEM. MINE STOPS WORKING-BLOWS
WARM WITH IN 1/2 HOUR. ALSO IN STOP/GO
TRAFFIC THE TRANSMISSION DOWNSHIFTS

74

ABRUPTLY AND CAUSES TRUCK TO
ACCELERATE FORWARD-HAVE TO APPLY
BRAKES HARD TO AVOID COLLISION. DEALER
SAYS CAN NOT REPEAT BUT SHIFTING IS
CONSISTENTLY ABRUPT AND I HAVE ASKED
ABOUT SOFTWARE UPDATES TO ALLIEVIATE
THIS SAFTY CONCERN TO NO AVAIL

224. Another incident involving a 2017 Chevrolet Colorado was reported on

September 13, 2017:

THE CONTACT OWNS A 2017 CHEVROLET
COLORADO. WHILE DRIVING AT AN UNKNOWN
SPEED, THE VEHICLE ACCELERATED AND
JERKED. ADDITIONALLY, THE BRAKES WERE
APPLIED, BUT FAILED TO RESPOND AND THE
BRAKE PEDAL TRAVELED TO THE
FLOORBOARD. IN ADDITION, THE CONTACT
HEARD AN ABNORMAL SCRATCHING NOISE.
THERE WERE NO WARNING INDICATORS
ILLUMINATED. THE VEHICLE WAS TAKEN
SEVERAL TIMES TO GILROY CHEVROLET (6720
AUTOMALL CT, GILROY, CA 95020, 408-842-9301),
BUT THEY WERE UNABLE TO DUPLICATE THE
BRAKE FAILURE. THE DEALER DIAGNOSED THE
ACCELERATION FAILURE AS THE FOUR WHEEL
DRIVE BEING ENGAGED. THE VEHICLE WAS
NOT REPAIRED. THE MANUFACTURER WAS
NOTIFIED AND PROVIDED CASE NUMBER: 8-
4000-730943. NO FURTHER ASSISTANCE WAS
PROVIDED. THE FAILURE MILEAGE WAS
APPROXIMATELY 17,759.

225. Another incident involving a 2017 Chevrolet Colorado was reported on

November 1, 2017:

WHEN AUTOMATIC TRANSMISSION
DOWNSHIFTS INTO 1ST GEAR COMING TO A
STOP, IT LUNGES FORWARD. IF WHEN NOSING

75

INTO A PARKING SPACE WITH ANY KIND OF
POLE OR VEHICLE DIRECTLY IN FRONT OF MY
TRUCK, NOT LEAVING ENOUGH SPACE MY
TRUCK WOULD HIT WHATEVER. WHEN DRIVING
SLOWLY WITH MY 8 SPEED AUTOMATIC
TRANSMISSION SOMETIMES IT RATTLES AS IF I
AM ON A RUMBLE STRIP AND SOMETIMES IT
JUST CLUNKS OR THUDS. THIS AND OTHER
SHIFT ISSUES MAKE ME EVEN MORE HYPER
VIGILANT WHEN DRIVING. 6 MONTHS AFTER I
PURCHASED MY BRAND NEW 2017 COLORADO,
DURING A SPELL OF NEGATIVE DEGREE
WEATHER I LOST THE FOLLOWING: MY CRUISE
CONTROL, TRACTION CONTROL, FOUR-WHEEL
DRIVE; MY ENGINE LIGHT CAME, OIL LIGHT
ALL LIGHTS CAME ON AND MY RADIO STOPPED
WORKING. I WAS TOLD BY MY CHEVY DEALER
THAT THIS WAS NORMAL IN COLD WEATHER.
NEXT, I WAS INFORMED IT MUST BE BECAUSE I
WASHED MY VEHICLE THE DAY BEFORE. THIS
WENT ON FOR A FEW MONTHS, WITH ME
SHOWING THEM VIDEOS AND THEM TELLING
ME THEY COULD NOT DUPLICATE THE ISSUE.
OCTOBER OF 2018 THEY REPLACED MY RADIO
BECAUSE EVIDENTLY THE RADIO HAD A
BULLETIN THAT SHOWED ALL OF THE THINGS I
HAD COMPLAINED ABOUT. I WANT TO SAY THIS
HAPPENED IN EXCESS OF 10 OR MORE TIMES.
DRIVING TO MY MOTHERS ONE EVENING IN
THE DARK MY DASH LIGHTS WERE NOT
DIMMING CORRECTLY AND THEN WENT OUT.
AS I GOT TO A FOUR WAY INTERSECTION WITH
CARS COMING THEY CAME ON SO BRIGHTLY I
ALMOST GOT IN AN ACCIDENT WHICH
PROMPTED ME TO MAKE AN APPOINTMENT
AND I WASN'T WILLING TO HEAR SILLY
EXCUSES.

226.   Another incident involving a 2017 Chevrolet Colorado was reported on

April 9, 2018:

> 8 SPEED AUTOMATIC TRANSMISSION - ROUGH
> SHIFTING, USUALLY WHEN DRIVING BETWEEN
> 40 AND 60 MILES PER HOUR. TRUCK
> INTERMITTENTLY FEELS LIKE IT IS RIDING
> OVER RUMBLE STRIPS. TRANSMISSION SEEMS
> TO BE HUNTING. POSSIBLE ISSUE WITH TORQUE
> CONVERTER.

227.   Another incident involving a 2017 Chevrolet Colorado was reported on April 30, 2018:

> 8-SPEED AUTOMATIC TRANSMISSION IN
> INDECISIVE WHEN IT COMES TO SHIFTING
> BETWEEN LOWER GEARS WHILE DRIVING.
> TRANSMISSION MAKING CLUNKING "THUD"
> SOUND WHEN SHIFTING OUT OF PARK AND
> INTO REVERSE. GEAR HUNTING EXPERIENCED
> AT LOWER SPEEDS AND GEARS WHILE VEHICLE
> ATTEMPTS SHIFTING.

228.   Another incident involving a 2017 Chevrolet Colorado was reported on May 15, 2018:

> I HAVE HAD REPEATED ISSUES WITH THE
> TRANSMISSION AND THE TRANSMISSION WILL
> NOT SHIFT OUT OF 5TH GEAR WHEN IN TOW
> MODE AND WHEN TOWING LOAD UNDER
> SPECIFICATIONS. I HAVE STARTED THE LEMON
> LAW PROCESS BUT THE MANUFACTURER HAS
> DENIED MY CLAIM AS OF TODAY.

229.   Another incident involving a 2017 Chevrolet Colorado was reported on May 15, 2018:

> AT 21000 MILES FELT LIKE DRIVING OVER
> RUMBLE STRIPS AND TACH WOULD MOVE IN

77

CRUISE. DEALER FLUSHED TRANS. 4 MONTHS
LATER AT 29000 MILES SAME PROBLEM BUT
NOW SHIFTING HARD NOTICED DURING
ACCELERATION AND DECELERATION.
CHANGED OUT CONVERTER AND FLUSH. NOW 3
MONTHS LATER AND ONLY 2500 MILES LATER
IT HAS STARTED ALL OVER AGAIN. SO BACK TO
THE DEALER I WILL GO. AM STARTING TO
REGRET BUYING A CHEVY INSTEAD OF
STAYING WITH MY TRUSTY FORD

230.   Another incident involving a 2017 Chevrolet Colorado was reported on
June 21, 2018:

8 SPEED TRANSMISSION HAS HARD SHIFT WHEN AT
LOW SPEEDS AND WHEN GOING INTO REVERSE

231.   Another incident involving a 2017 Chevrolet Colorado was reported on
June 19, 2018:

WHEN DRIVING AT LOW SPEEDS MY 8
SPEED AUTO TRANSMISSION - CLUNKS OR
THUDS - SPECIALLY FROM 1ST - 2ND - ITS
SOUNDS LIKE A BANG - TOOK IT TO DEALER -
SAID CHEVY KNOWS ABOUT IT - BUT THERE IS
NO FIX YET.....GREAT!

232.   Another incident involving a 2017 Chevrolet Colorado was reported on
June 30, 2018:

WHEN AUTOMATIC TRANSMISSION
DOWNSHIFTS INTO 1ST GEAR COMING TO A
STOP, IT DOES SO HARSHLY AND LUNGES
FORWARD. WHEN NOSING INTO A PARKING
SPACE WITH A CONCRETE WALL AT THE FRONT
OF THE PARKING SPACE, IF I HAD NOT
ALLOWED ENOUGH SPACE FOR THE LUNGE,
THE VEHICLE WOULD HAVE IMPACTED THE

78

> WALL. THIS CONDITION, ALONG WITH OTHER
> TRANSMISSION SHIFT IRREGULARITIES,
> HAPPENS PERIODICALLY AND I MUST REMAIN
> AWARE, ESPECIALLY COMING TO A STOP NEAR
> A CROSS WALK.

233. Another incident involving a 2017 Chevrolet Colorado was reported on July 7, 2018:

> EXPERIENCING ELECTRICAL PROBLEMS
> CAUSING STARTING ISSUES, WHILE DRIVING
> FAILURES IN DASH INDICATOR LIGHS,
> SPEEDOMETER, TACHOMETER, SHIFT CONTROL
> INDICATOR LIGHTS, AND TRANSMISSION
> CONTROL. LOSS OF POWER TO THE POINT
> TRUCK ALMOST COMES TO A STOP AND THEN
> SURGES, TWICE IT HAS ACCELERATED
> TRAVELING UP TO 50FT ESTIMATED.

234. Another incident involving a 2017 Chevrolet Colorado was reported on July 11, 2018:

> TRUCK BOGS DOWN, LOOSES POWER WHEN
> TAKING OFF FROM A STOP. FRONT TIRES FEEL
> LIKE THEY ARE SKIPPING EVEN THOUGH
> TRUCK IS IN 2 WHEEL DRIVE ESPECIALLY UP
> HILL. ONCE TRUCK GETS GOING IT RUMBLES
> AND VIBRATES SO MUCH IT BOTHERS YOUR
> EARS, CONSTANTLY LOOSING POWER AND
> SPEED AS YOUR DRIVING. WAS TOLD IT WAS
> THE TORQUE CONVERTER AND IT WAS
> REPLACED. TRUCK CONTINUED TO HAVE SAME
> ISSUE. TRUCK THEN "BLEW UP" (DEALERSHIP
> WORDS) WHILE I WAS DRIVING 75 MPH DOWN
> THE HIGHWAY. DEALERSHIP STATED "IT WAS
> LIKE YOUR TRUCK WENT INTO LOW GEAR
> WHILE YOU WERE DRIVING AND IT SHOULD
> NEVER BE ABLE TO DO THAT". HAD FLUID

79

FLUSH AND REPLACED AGAIN AND RUMBLING
AND POWER LOSE STILL OCCURRING.

235.   Another incident involving a 2017 Chevrolet Colorado was reported on

August 19, 2018:

> THE VEHICLE HAS A SHUDDER IN THE
> TRANSMISSION UNDER LIGHT THROTTLE
> ACCELERATION BETWEEN ABOUT 50 AND 80
> MPH ON THE HIGHWAY. IT FEELS AS IF I'M
> DRIVING OVER RUMBLE STRIPS ON THE ROAD
> FOR ABOUT A SECOND. THEN IT WILL STOP FOR
> A SECOND OR TWO, AND THEN SHAKE AGAIN
> FOR A SECOND. WITHOUT THROTTLE, NO
> SHAKING OCCURS. THIS HAS BEEN OCCURRING
> FOR ABOUT TWO WEEKS, OR PERHAPS THE
> LAST 500 MILES. IT MIGHT BE DESCRIBED BY
> BULLETIN 18-NA-177.

236.   Another incident involving a 2017 Chevrolet Colorado was reported on

September 18, 2018:

> SEPT 2018 HAVE NOTICED THAT TRUCK SEEMS
> TO VIBRATE, SHUDDER AT 50-60MPH.
> VIBRATION, SHUDDERING GOT WORSE, EVEN
> AT 25MPT. OCTOBER, I CONTACT SERVICE
> ADVISOR WHO BELIEVES MIGHT BE TORQUE
> CONVERTER NEED APPT TO VERIFY NOVEMBER
> FINALLY GOT APPT WITH SERVICE DEPT. THEY
> VERIFY IT IS TORQUE CONVERTOR AND ORDER
> PARTS. DECEMBER PARTS IN & TRUCK IN FOR 3
> DAYS AS PARTS INSTALLED. TOLD THIS
> SHOULD SOLVE ISSUE, BUT CHEVROLET
> WORKING OF ANOTHER FIX FOR 1ST QUARTER
> OF 2019. TO DATE, I HAVE NOT NOTICED ANY
> ISSUES OF VIBRATION.DATE.

237.   Another incident involving a 2017 Chevrolet Colorado was reported on

October 25, 2018:

> TRANSMISSION SHUDDER. FELLS LIKE
> DRIVING OVER RUMBLE STRIPS. GM KNOWS OF
> THIS ISSUE BUT KEEPS PUTTING THESE 8 SPEED
> TRANSMISSIONS ON THE ROAD.

238.   Another incident involving a 2017 Chevrolet Colorado was reported on
November 1, 2018:

> TL THE CONTACT OWNS A 2017 CHEVROLET
> COLORADO. WHILE DRIVING AT HIGH SPEEDS,
> THE VEHICLE STARTED TO VIOLENTLY
> VIBRATE. THE FAILURE ALSO OCCURRED WHEN
> ACCELERATING FROM A STOP. THE VEHICLE
> WAS TAKEN TO DYER CHEVROLET FORT PIERCE
> (4200 US HIGHWAY 1, FORT PIERCE, FL 34982,
> (772) 242-3116) MULTIPLE TIMES FOR THE
> FAILURE WHERE THE TRANSMISSION WAS
> SERVICED AND FLUSHED; HOWEVER, THE
> FAILURE RECURRED. THE VEHICLE WAS NOT
> REPAIRED. THE MANUFACTURER WAS MADE
> AWARE OF THE FAILURE AND THE CONTACT
> RECEIVED A CASE NUMBER. THE FAILURE
> MILEAGE WAS 17,000.

239.   Another incident involving a 2017 Chevrolet Colorado was reported on
January 5, 2019:

> THE CONTACT OWNS A 2017 CHEVROLET
> COLORADO. WHILE DRIVING HIGHWAY SPEEDS,
> THE CONTACT NOTICED THAT THE
> TACHOMETER FLUCTUATED AND THE
> TRANSMISSION SHUDDERED. THE VEHICLE WAS
> TAKEN TO AN UNKNOWN DEALER WHERE IT
> WAS DIAGNOSED THAT THE TRANSMISSION
> TORQUE CONVERTER FAILED. THE DEALER
> REPLACED THE TORQUE CONVERTER AND THE
> TRANSMISSION WAS FLUSHED. THE DEALER

81

> ALSO REPROGRAMMED THE TRANSMISSION
> COMPUTER. THE MANUFACTURER WAS
> CONTACTED AND PROVIDED CASE NUMBER:
> 94982753540. THE MANUFACTURER ISSUED
> TECHNICAL SERVICE BULLETIN NUMBER:
> 4942742 PIE0405C (ENGINEERING INFORMATION
> TORQUE CONVERTER SHUDDER). THE
> APPROXIMATE FAILURE MILEAGE WAS 13,500.

240.   Another incident involving a 2017 Chevrolet Colorado was reported on January 17, 2019:

> AT SPEEDS 45 MPH TRANSMISSION MAKES
> A LOAD THUMBING SOUND AND START
> SWITCHING BACK AND FORTH FOR GEAR. AT
> SPEEDS 60 UP TO 70 MPH A SHUDDERING
> STARTS MOSTLY UP GRADES AND DOWN
> GRADES. FROM REVIEW THERE IS A BULLETIN
> GM 16-NA-175. FROM WHAT I READ THIS
> DOESN'T FIX THE PROBLEM. THERE ARE
> NUMEROUS OF COMPLAINTS.

### j.   <u>2018 Chevrolet Colorado</u>

241.   On the NHTSA website, there are at least 29 consumer complaints for "2018 Chevrolet Colorado." As one example, on April 27, 2018, the following incident was reported:

> IN MAY 2018 I PURCHASED A NEW CHEVY
> SILVERADO LT Z71 PU. I LIVE IN COLORADO
> AND WHEN I DRIVE THE TRUCK DOWN THE I-70
> MOUNTAIN PASS THE TRANSMISSION IS
> DOWNSHIFTED BEYOND WHAT IO WOULD CALL
> A SAFE DOWN SHIFT. IM TRAVELING DOWN THE
> PASS, JUST COASTING, DOWN HILL ASSIST
> MODE IS OFF @ ROUGHLY 55 MPH THE
> TRANSMISSION DOWN SHIFT HARD. THE RPM
> GOES FROM ~1850 TO ~3800 RPM. THE ENGINE
> AND TRANSMISSION AND ENGINE BOTH MAKE

A LOT OF NOISE WHEN THIS HAPPENS. I
TRAVELED THE PASS ABOUT 8 TIME NOW AND
THE TRUCK DOES THIS FUNNY SHIFT
EVERYTIME AND I HAVE PICTURE SHOWING 4
EVENTS. I'VE TAKING THE DRIVE INTO THE
DEALER AND SINCE THE COMPUTER DOESN'T
LOG A ERROR CODE THE DEALER DOESN'T
KNOW WHAT TO DO. THIS PAST WEEK THEY
GAVE ANOTHER 2018 P/U WITH THE SAME
TRANNY AND ENGINE AND THAT TRUCK DID
NOT DO THE SAME DOWNSHIFT. I BELIEVE
THERE IS SOMETHING WRONG WITH MY TRUCK
AND ALSO IF THIS EVENT HAPPENED IN THE
WINTER ON A SNOWY ROAD THE TRUCK
WOULD SPIN OUT OF CONTROL AND CAUSE A
ACCIDENT AND IS A HUGE SAFETY CONCERN. I
ALSO FILED A COMPLAINT WITH GM BUT THEY
ARE REALLY NOT HELP TO RESOLVE THIS
PROBLEM. THE DEALER LOOKED AT THE TRUCK
AGAIN TODAY, NO CODES RECORDED, THE
RESET THE TRANSMISSION MEMORY TODAY TO
TRY AND SATISFY MY NEED TO DO
SOMETHING. I NOW WAITING TO HEAR BACK
FROM THE DEALER ON THE NEXT STEPS. I WILL
ALSO CALL GM AGAIN TO GIVE THEM THIS
INFORMATION. I AM ATTACHING PICTURE THAT
CLEARLY SHOW THIS PROBLEM. I ALSO GIVEN
THE DEALER THE SAME PICTURES.

242. Another incident involving a 2018 Chevrolet Colorado was reported on

July 27, 2018:

CONSTANT VIBRATION/SHAKE COMING
FROM THE VEHICLE AT ANY SPEED ABOVE 65
MPH. THE TRUCK HAS BEEN LIKE THIS SINCE
THE DAY IT LEFT THE DEALERSHIP. WHEN ON
HIGHWAY AND VIBRATION IS FELT, PUTTING
THE TRUCK IN NEUTRAL DOES NOT CHANGE
THE VIBRATION, SLOWING DOWN MAKES IT

83

> SLIGHTLY WORSE, SPEEDING IT MAKES IT
> SLIGHTLY BETTER. FEELS LIKE THERE IS
> SOMETHING SERIOUSLY WRONG WITH THE
> GEOMETRY OF THE TRUCK MAKING IT UNSAFE
> TO DRIVE AT HIGHWAY SPEEDS. ROAD FORCE
> BALANCE WAS ALREADY DONE AND THE
> PROBLEM PERSISTS ON A BRAND NEW TRUCK.

243.    Another incident involving a 2018 Chevrolet Colorado was reported on
September 17, 2018:

> CHEVY COLORADO A BAD VIBRATION IN
> DRIVETRAIN. TOOK TRUCK TO DEALER WHO
> SAID IT WAS TORQUE CONVERTER PROBLEM. IT
> HAS BEEN AT DEALER FOR 9 DAYS BECAUSE
> THEY ARE DOING 9 VEHICLES A DAY FOR THIS
> PROBLEM. SUPPOSEDLY THEY ARE GOING TO
> CHANGE TORQUE CONVERTOR, OTHERS THEY
> JUST CHANGE THE OIL IN TORQUE CONVERTOR.
> THIS IS DONE APPROXMATELY 9 TIMES A WEEK
> AT THIS ONE DEALER, ROSS DOWNING IN
> HAMMOND, LA. THIS IS THE 8SP TRANS. THAT IS
> USED IN SEVERAL GM REAR DRIVE CARS AND
> TRUCKS. MY TRUCK ONLY HAS 6300 MILES ON
> IT. WHEN TRYING TO PASS VEHICLES ON
> INTERSTATE IT VIBRATES SO BAD OVER 70 MPH
> I AM AFRAID TO WRECK. OTHERS I HAVE
> TALKED TO AT DEALERSHIP CLAIM THERE
> VEHICLE VIBRATES AT LOWER SPEEDS, SURGES
> AND MAKING NOISE. THIS DEALERSHIP DOING 9
> A WEEK, THAT PROBABLY IS SEVERAL
> THOUSAND A WEEK STATEWIDE. THIS IS A
> TERRIBLE PROBLEM THAT NEEDS FIXIN. MANY
> THANKS.

244.    Another incident involving a 2018 Chevrolet Colorado was reported on
October 1, 2018:

84

> VEHICLE DEVELOPED A VIBRATION AT
> 80MPH WHICH FADES IN AND OUT. TIRES WERE
> ROAD FORCED BALANCED, AND ALIGNMENT
> WAS DONE. TRANSMISSION FLUID WAS
> CHANGED. THE SHACKING AT 80MPH
> CONTINUED. ON A 30 MILE COMMUTE AT 80MPH
> THE VIBRATION IS EXTREME 25% OF THE TIME
> (LIKE DRIVING OVER A RUMBLE STRIP),
> MODERATE ANOTHER 25% OF THE TIME, AND
> THE OTHER 50% THE VIBRATION IS NOT
> NOTICEABLE.

245. Another incident involving a 2018 Chevrolet Colorado was reported on October 3, 2018:

> MY VEHICLE SHAKES AND SHUTTERS
> WHEN ACCELERATING. I HAVE BROUGHT IT TO
> CHEVROLET OF WESLEY CHAPEL FL 3 TIMES
> FOR THE SAME PROBLEM. THE PROCEEDED TO
> DO A "FLUSH" AND HAVE REPLACED THE
> TORQUE CONVERTER.

246. Another incident involving a 2018 Chevrolet Colorado was reported on October 3, 2018:

> SEVERAL TIMES, WHILE DRIVING RIGHT
> AROUND 55 MPH, THE TRANSMISSION
> DOWNSHIFTED FOR NO REASON ON THRUWAY
> CONDITIONS. WHEN THIS HAPPENED, IT WAS
> ALMOST LIKE SLAMMING ON THE BRAKES
> QUICKLY. ON ALL OCCASIONS, MY BODY
> LURCHED FORWARD. IF SOMEONE WAS BEHIND
> ME, I PROBABLY WOULD HAVE BEEN REAR
> ENDED. ON ANOTHER OCCASION, WITH MY SON
> IN THE TRUCK, WE STOPPED AT A RED LIGHT
> AND THE TRANSMISSION CLUNKED SO
> VIOLENTLY, THAT WE BOTH THOUGHT WE
> WERE REAR ENDED AT FIRST. I DESCRIBED THE
> ISSUE TO MY GM SERVICE SHOP WHO SAID

85

THAT THEY COULDN'T FIND AN ISSUE AND
THAT THE CODES WERE ALL NORMAL. I WAS
ADVISED THAT THE CLUNK AT THE RED LIGHT
WAS COMMON, AS THE TRANSMISSION HAS TO
RELIEVE PRESSURE. NO WAY IS THIS NORMAL! I
GOT ON LINE TO REVIEW FORUMS AND IT
APPEARS THIS IS A VERY PREVALENT ISSUE.
YESTERDAY, I LOST MY TRANSMISSION
COMPLETELY ON A THRUWAY. I HEARD A
LOUD CLUNK AND THE RPMS SPIKED. I LEFT
THE HIGHWAY ASAP BUT COULD NOT GO OVER
30 MPH OR THE RPMS WOULD JUST SPIKE
WITHOUT MOTION RESPONSE. EXITING THE
THRUWAY AT THIS SPEED WAS VERY
DANGEROUS! EVEN WITH HAZARDS ON,
DRIVERS SELDOM SLOW DOWN OR MOVE OVER,
ESPECIALLY 18 WHEELERS. THESE
TRANSMISSIONS ARE CLEARLY A SAFETY
HAZARD.

247.    Another incident involving a 2018 Chevrolet Colorado was reported on

November 2, 2018:

THE EIGHT SPEED AUTOMATIC
TRANSMISSION STUTTERS AND ACTS LIKE IT
DOESN'T KNOW WHAT GEAR TO GO INTO
UNDER LIGHT TO NORMAL ACCELERATION.
THIS OCCURS WHILE COLD AND DURING THE
WARMING PERIOD, (NORMALLY UP TO AROUND
180 DEGREES), BUT TENDS TO RESOLVE AFTER
THE ENGINE IS COMPLETELY WARMED UP. THIS
TRANSMISSION PROBLEM IS CONTINUOUS AND
HAPPENS EVERY TIME AFTER THE VEHICLE
SITS ALL NIGHT OR IF IT HAS SIMPLY SIT FOR A
FEW HOURS. IT IS VERY APPARENT, OTHER
PASSENGERS ASK WHAT IS WRONG WITH THE
VEHICLE WHEN THEY RIDE IN IT. I BOUGHT THE
VEHICLE NEW, BUT WHEN I TOOK THE TEST
DRIVE IT WAS ALREADY WARMED UP.

THEREFORE I WAS UNAWARE OF THE ISSUES
PRESENT. I WENT BACK TO THE SALESMAN TO
DESCRIBE THE PROBLEM AND WAS INFORMED
THIS HAPPENS WITH ALL THE 2018 EIGHT SPEED
SILVERADO'S HE HAS DRIVEN ON THEIR LOT. I
LOOKED ON THE INTERNET AND FOUND THESE
TRANSMISSIONS HAVE A LEARN CYCLE, SO I
DECIDED TO GIVE IT SOME TIME TO SEE IF WAS
A LEARNING CURVE WITH THE COMPUTER. IT
NEVER CLEARED UP. I LATER BROUGHT THE
VEHICLE INTO THE DEALERSHIP FOR THE
INITIAL SERVICE AND DESCRIBED WHAT HAD
BEEN HAPPENING WITH IT TO THE SERVICE
DEPARTMENT. I LEFT THE VEHICLE OVERNIGHT
SO THE TECHNICIAN COULD DRIVE FIRST
THING IN THE MORNING AND PERFORM AN
SERVICES. THE NEXT DAY I WAS CALLED AND
TOLD MY VEHICLE WAS READY. UPON ARRIVAL
I WAS INFORMED THE TECHNICIAN WAS ABLE
TO DUPLICATE THE PROBLEMS I DESCRIBED,
BUT IT WAS NORMAL FOR THE EIGHT SPEED
TRANSMISSION. HOWEVER, IT BECOMES WORSE
TO BRING IT BACK IN FOR FURTHER DIAGNOSIS.
I CALLED GM, THEY ALSO LOOKED INTO THE
CASE FOR ABOUT A WEEK, THEN CALLED BACK
AND STATED THAT IS NORMAL FOR THE
TRANSMISSION. I BOUGHT THE VEHICLE NEW
WITH ABOUT 2,500 MILES ON IT, (DEMO), AND
HAVE HAD IT ONLY A FEW MONTHS. IT
CURRENTLY HAS LESS THAN 10,000 MILES ON
IT.

248. Another incident involving a 2018 Chevrolet Colorado was reported on
November 16, 2018:

I HAVE A 2018 CHEVROLET COLORADO LT
4WD CREW CAB. MULTIPLE TIMES ON A COLD
START THE ENGINE IS MISFIRING. THE CHECK
ENGINE LIKE COMES ON, THE VSA, AND T/C

87

LIGHTS ALL COME ON AND A NOTIFICATION ON
THE DASH SAYING STABILITRAK IS DISABLED.
THE VEHICLE SHAKES TERRIBLY. THE CHECK
ENGINE LIGHT WILL FLASH AND THEN GO
SOLID. I AM AN AUTOMOTIVE TECHNICIAN. I
KNOW THAT A MISFIRE SHOULD SET A HARD
DTC. WHEN THE VEHICLE IS TURNED OFF AND
STARTED SEVERAL HOURS LATER THERE IS NO
CHECK ENGINE LIGHT OR ANY OTHER LIGHT
ON. THE DEALERSHIP IN MARYSVILLE, OH HAD
MY TRUCK FOR 3 DAYS AND TOLD ME THEY
CLEANED A BUNCH OF TERMINALS AT
SEVERAL CONNECTORS. WHATEVER THAT IS
SUPPOSED TO DO. THEY SAID THEY STARTED
THE VEHICLE SEVERAL TIMES AFTER AND
EVERYTHING WAS GOOD. THE NEXT DAY
AFTER I PICKED THE TRUCK UP, IT DID THE
SAME EXACT THING! EXTREMELY
FRUSTRATING! I KNOW A CONTINUOUS MISFIRE
LET'S UNBURNED FUEL INTO THE CATALYTIC
CONVERTER WHICH LEADS TO PREMATURE
BREAKDOWN OF THE CATALYST. SO MY
QUESTION IS WHAT IS BEING DONE ABOUT
THESE ISSUES? ANOTHER ISSUE IS WITH THE
TRANSMISSION. ON A COLD START THERE IS A
CLUNK NOISE. THEN WHEN YOU ARE DRIVING
AT CRUISING SPEED AND YOU LET OFF THE
THROTTLE AND DEPRESS THROTTLE AGAIN
THERE IS A SHUDDER. ALSO, WHEN YOU COME
TO A COMPLETE STOP THE VEHICLE TRIES TO
JOLT FORWARD. THIS IS EXTREMELY
CONCERNING ESPECIALLY ON A VEHICLE WITH
ROUGHLY 18,000 MILES ON IT. THIS NEEDS TO
BE ADDRESSED PROMPTLY!!

249.    Another incident involving a 2018 Chevrolet Colorado was reported on

January 28, 2019:

NOTICED A "SHUDDERING" IN THE
TRANSMISSION DURING LIGHT ACCELERATION
BETWEEN 40-60MPH AROUND 1500RPM. WHOLE
TRUCK VIBRATES LIKE YOU ARE DRIVING
OVER RUMBLE STRIPS. ONLY 4150 MILES ON
THE TRUCK!

### k.     2015 GMC Sierra

250.    On the NHTSA website, there are at least 385 consumer complaints for
"2015 GMC Sierra." As one example, on January 28, 2015, the following incident
was reported:

I HAD MADE A COMPLAINT TO
CHAPDELAINE BUICK- GMC THAT MY BRAND
NEW TRUCK DID NOT SEEM TO GO INTO FOUR
WHEEL DRIVE. I WAS TOLD TO BRING THE
TRUCK TO THE DEALERSHIP AND THEY WOULD
CHECK IT FOR ME. I WAS TOLD BY THE SERVICE
DEPARTMENT THAT THE TRUCK WORKED JUST
FINE IN FOUR WHEEL DRIVE. I THEN NOTICED
THAT THE TRUCK SEEM TO SHIFT VERY ROUGH
AND I CALLED THE SERVICE DEPARTMENT AND
TOLD THEM THAT SOMETHING HAD TO BE
WRONG. THE SERVICE DEPARTMENT ASKED ME
TO BRING THE TRUCK BACK DOWN TO THEM
THE NEXT DAY AND THEY WOULD TAKE IT FOR
A TEST DRIVE. WHILE I WAS DRIVING THE
TRUCK TO THE DEALERSHIP IT SHIFTED FROM
DRIVE INTO NEUTRAL.I COASTED TO A STOP
PUT THE VEHICLE INTO PARK SHUT OFF AND
RESTARTED THE ENGINE AND THEN SHIFTED
BACK INTO DRIVE AND TRIED TO DRIVE AGAIN.
THIS TIME THE VEHICLE SERVICE ENGINE
LIGHT CAME ON AND THE VEHICLE STAYED IN
LOW GEAR AND WOULD NOT SHIFT INTO A
HIGHER GEAR. THE BEST SPEED I COULD MAKE
WAS 10 MPH. I STOPPED THE VEHICLE AND
RESTARTED TWO MORE TIMES. ON THE SECOND

89

TRY THE VEHICLE DID GO INTO DRIVE. I MADE
IT TO THE DEALERSHIP AND THEY TOOK IT FOR
A TEST DRIVE AND UPON THEIR RETURN GAVE
ME A LOANER VEHICLE. THEY HAD TO REBUILD
THE TRANSMISSION ON MY BRAND NEW TRUCK
WHICH TOOK ABOUT THREE DAYS.
THANKFULLY THIS EVENT TOOK PLACE ON A
BACK ROAD WITH LITTLE TRAFFIC. IF IT HAD
HAPPENED ON A BUSY ROAD AN ACCIDENT
MIGHT HAVE OCCURRED. *TR

251.   Another incident involving a 2015 GMC Sierra was reported on August

7, 2015:

THE CONTACT OWNS A 2015 GMC SIERRA.
THE CONTACT STATED THAT WHILE DRIVING
AT VARIOUS SPEEDS, THE TRANSMISSION
VIBRATED CAUSING A HESITATION WHEN THE
GEARS SHIFTED. THE CONTACT MENTIONED
THAT THE FAILURE WAS MOST SEVERE WHILE
DRIVING AT SPEEDS BETWEEN 40-50 MPH. THE
VEHICLE WAS TAKEN TO A DEALER WHO
CHANGED THE GEAR RATIO AND ADJUSTED
THE REAR END. THE VEHICLE WAS REPAIRED,
BUT THE FAILURE RECURRED. THE
MANUFACTURER WAS NOTIFIED OF THE
FAILURE. THE FAILURE MILEAGE WAS 250.

252.   Another incident involving a 2015 GMC Sierra was reported on

September 21, 2015:

VEHICLE RANDOMLY AND REPEATEDLY
SHIFTS INTO NEUTRAL FROM DRIVE, WITOUT
ANY INPUT FROM DRIVER, DURING NORMAL
DRIVING CONDITIONS. VEHICLE RANDOMLY
AND REPEATEDLY LOSES ACCELERATOR
PEDAL CONTROL AND FUNCTIONALITY DURING
NORMAL DRIVING CONDITIONS.

90

253.    Another incident involving a 2015 GMC Sierra was reported on November 3, 2015:

> THE TRANSMISSION SEEMS TO SLIP OR HESITATE AT TAKEOFF. THE RUNNING LIGHTS ARE TOO DIM TO SEE DOWN THE ROAD.

254.    Another incident involving a 2015 GMC Sierra was reported on November 5, 2015:

> HEADLIGHTS ARE VERY POOR (WHEN WET ROAD OR IN TOWN) CANNOT TELL THEY BURNING...I HAVE
>
> 20/20 VISION......ON SLOW DOWN DOES NOT DOWN SHIFT....CANNOT ACCELERATE....THE STARTER
>
> HANGS UP ON START AS IF DOES NOT FIRE OR NO FUEL PUMP

255.    Another incident involving a 2015 GMC Sierra was reported on May 27, 2016:

> TL* THE CONTACT OWNS A 2015 GMC SIERRA 1500. WHILE DRIVING 60 MPH, THE VEHICLE BEGAN TO DECELERATE AND THE ENGINE WARNING LIGHT ILLUMINATED. THE VEHICLE WAS TOWED TO A DEALER WHERE IT WAS DIAGNOSED THAT A GEAR CYLINDER FRACTURED. THE VEHICLE WAS REPAIRED, BUT WAS UNABLE TO BE DRIVEN. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 4,000.

256.    Another incident involving a 2015 GMC Sierra was reported on July 22, 2016:

91

> 2015 GMC SIERRA HAS A DELAY
> THROTTLE RESPONSE. DOES IT AT ALL SPEEDS
> AND FROM TAKE OFF. TOOK TO DEALER AND
> SERVICE ADVISOR PULLED TRUCK IN SHOP.
> GOT OUT AND SAID IT DOES HAVE A DELAY.
> THE RAN VIN NUMBER THROUGH GMC DATA
> BASE AND TOLD ME. MANUFACTURE SAID IT
> WAS A NORMAL THING. IT'S NOT NORMAL AND
> NEVER HAD A VEHICLE WITH A THROTTLE
> DELAY.

257.   Another incident involving a 2015 GMC Sierra was reported on July 25, 2016:

> DELAYED ENGAGEMENT IN DRIVE,
> TRANSMISSION, RPM FLARES AND
> TRUCK QUITS MOVING UNEXPECTEDLY.
> SHUDDER AT 3- 50 MPH, VIBRATES STEERING
> WHEEL AND LEAVES AN UNEASY FEELING THE
> TRUCK IS GOING TO QUIT MOVING.

258.   Another incident involving a 2015 GMC Sierra was reported on September 10, 2016:

> FIRST OF ALL THE HEADLIGHTS ARE VERY
> DIM AND AT NIGHT CANNOT SEE
> NOTHING.DEALER SAID IT IS WHAT IS .VERY
> BAD !! ALSO MY SIERRA ON WINDOW STICKER
> STATES COMES WITH ALL TERRAIN TIRES IT
> DOES NOT HAVE ALL TERRAIN TIRES . THEY
> ARE 265/65/R18 GOODYEAR WRANGLER SRA .I
> WORKED FOR GOODYEAR AND THOSE TIRES
> ARE ALL SEASON !!! NOT ALL TERRAIN AS
> SPECIFIED ON WINDOW STICKER !! I TALKED TO
> DEALER AND CALLED CUSTOMER SERVICE AT
> GM THEY NEVER CALL BACK AND THEY SAID
> THOSE ARE THE RIGHT TIRES.THEY ARE NOT
> ACCORDING TO MY ATTORNEY WHO STATES
> THE WINDOW STICKER IS TOTALLY INCORRECT

92

AND IS FRAUDULENT CHECK YOUR TIRES AND
WINDOW STICKERS AND COMPARE AND LOOK
ON GOODYEARS WEBSITE YOU WILL SEE.ALSO
MY TRANSMISSION CLUNKS AND KNOCKS AND
SHIFTS INCORRECTLY DEALER STATES ITS
NORMAL I SPEND 40K ON A NEW TRUCK AND
ALL I HAVE ARE PROBLEMS AND GM DOES
NOTHING. IT DOWNSHIFTS HORRIBLE WHAT
CAN I DO???

259.   Another incident involving a 2015 GMC Sierra was reported on
December 2, 2016:

TL* THE CONTACT OWNS A 2015 GMC
SIERRA 1500. WHILE DRIVING VARIOUS SPEEDS,
THE TRANSMISSION VIBRATED AND CAUSED A
HESITATION WHEN THE GEARS SHIFTED
WITHOUT WARNING. THE VEHICLE WAS TAKEN
TO THE DEALER AND REPAIRED; HOWEVER,
THE FAILURE RECURRED SEVERAL TIMES. THE
MANUFACTURER WAS MADE AWARE OF THE
FAILURE. THE FAILURE MILEAGE WAS 50.

260.   Another incident involving a 2015 GMC Sierra was reported on
December 8, 2016:

EXTREME LAG/DELAY- HARSH
ENGAGEMENT WHEN SHIFTING FROM PARK TO
REVERSE. ITS LIKE YOU ARE BACKING INTO
SOMETHING? WHEN CRUISING 28-32 MPH AND
RELEASING ACCELERATOR(AS IF YOU WERE
COASTING INTO A TURN) WHEN SLOWING THE
VEHICLE SEEMS TO SHIFT UP AND LUNGE
ENTERING THE TURN.

CLUNKS AND SHIFTS HARD WHEN
CRUISING NORMALLY WHEN YOU HAVE TO
RELEASE THE GAS PEDAL AND SLIGHTLY

93

REACCELERATE, CAUSING THE DRIVER TO
HESITATE.

VEHICLE SHUTTERS AND HARD ACCEL
10X WORSE WHEN TOWING A 7000 # TRAILER
(TRUCK IS RATED OVER 12,000 LBS. TOWING).

**l.** **2016 GMC Sierra**

261.   On the NHTSA website, there are at least 108 consumer complaints for

"2016 GMC Sierra." As one example, the following incident was reported on March

21, 2016:

WHILE DRIVING MY TRUCK, IT HAS HAD 3
ALERTS ON DASH FOR "SERVICE STABILITRAK,
POWER STEERING USE CAUTION AND TRAILER
BRAKE." VEHICLE GAUGES ALL DROP TO ZERO
WHILE OPERATING VEHICLE AND GO ON AND
OFF. THE VEHICLE WHEN THIS OCCURS ALSO
DISENGAGES FROM GEAR, VEHICLE IS AN
AUTOMATIC. THEN ENGINE REVS UP WHEN IT
SLIPS OUT OF GEAR AND GENERALLY GOES
BACK IN GEAR AS GAUGES COME BACK ON.
THE POWER STEERING SEEMS TO ALSO LOSE
SOME POWER. WHEN THIS OCCURS, IF YOU
DEPRESS THE GAS PEDAL, YOU DO NOT GET
ANY MORE POWER. THIS IS TECHNICALLY THE
6TH OCCURRENCE. IT HAS BEEN BACK TO
DEALER (GRIFFIN GMC OF MONROE, NC) AND
COMPUTER CODES WERE CLEARED AND
NOTHING REPORTED IE...TECHNICALLY FOUND
THAT WOULD CAUSE THIS ISSUE PER THE
DEALERSHIP AS UNABLE TO RE-PRODUCE THE
CAUSE. I RETURNED THE TRUCK TODAY AFTER
THIS 6TH OCCURRENCE DUE TO MY FEAR OF
DRIVING THE VEHICLE WITH MY CHILDREN
AND GETTING INVOLVED IN AN ACCIDENT. I
HAVE VIDEO OF THIS LAST OCCURRENCE OF
DASHBOARD GAUGES AND SHARED THEM WITH

94

THE DEALERSHIP. FIRST OCCURRENCE
PICTURES ARE FEB 29, 2016 AND SUNDAY,
MARCH 20, 2016. VEHICLE HAS APPROXIMATELY
2000 MILES ON ODOMETER. ENTIRE TIME,
VEHICLE HAS BEEN RUNNING ON LOCAL ROAD,
EITHER AT STOP OR DRIVING BELOW 45MPH
MOVING STRAIGHT AHEAD. I COULD NOT
REPLICATE OR CAUSE THE ISSUE TO HAPPEN
AGAIN ON PURPOSE, VERY RANDOM.

262. Another incident involving a 2016 GMC Sierra was reported on
September 8, 2016:

TL* THE CONTACT OWNS A 2016 GMC
SIERRA 1500. WHEN THE SHIFTER WAS
ENGAGED, THE VEHICLE DID NOT REGISTER
THE CORRECT GEAR AND FAILED TO MOVE.
WHEN THE VEHICLE DID RECOGNIZE THE
CORRECT GEAR, IT ACCELERATED
UNINTENTIONALLY. THE VEHICLE WAS TAKEN
TO THE DEALER WHERE IT WAS DIAGNOSED
THAT THE TRANSMISSION WAS DEFECTIVE AND
PARTS IN THE TRANSMISSION NEEDED TO BE
REPLACED. THE VEHICLE WAS REPAIRED;
HOWEVER, THE FAILURE RECURRED. THE
VEHICLE WAS RETURNED TO THE DEALER
WHERE IT WAS DIAGNOSED THAT THE
TRANSMISSION NEEDED TO BE REPLACED. THE
VEHICLE WAS NOT REPAIRED. THE
MANUFACTURER WAS NOTIFIED OF THE
FAILURE. THE FAILURE MILEAGE WAS
APPROXIMATELY 150. UPDATED 10/18/16*LJ

263. Another incident involving a 2016 GMC Sierra was reported on May
3, 2017:

GM 8 SPEED TRANSMISSION IS FULL OF
PROBLEM. IT CONSTANTLY HESITATES, HANG
GEARS, BUCKS, AND POSES VARIOUS SAFETY

95

CONCERNS. FOR INSTANCE IF MERGING ONTO
THE HIGHWAY THE TRANSMISSION WILL
HESITATE AND THE TRUCK WILL BE
UNRESPONSIVE TO GAS PEDAL INPUT FOR A
PERIOD OF TIME SOMETIMES UP TO 12 SECS.
THIS HESITATION CAUSES A SAFETY CONCERN
WHEN ATTEMPTING TO MERGE INTO TRAFFIC.
GM ACKNOWLEDGES THESE CONCERNS BUT
STATES THAT IT IS OPERATING AS DESIGNED
BUT ARE WORKING ON SOFTWARE UPDATES TO
IMPROVE TRANSMISSION PERFORMANCE. THIS
HAS BEEN A CONSTANT ISSUE SINCE I
PURCHASED THE TRUCK.

264. Another incident involving a 2016 GMC Sierra was reported on May

4, 2017:

8 SPEED TRANSMISSION BUCKS,
HESITATES, LURCHES FORWARD, CLUNKS,
WHILE IN DRIVE. THE CONTINENTAL TIRES ARE
CUPPING, WHICH GM SAYS IS CHARACTERISTIC
OF THE BRAND. THE TRUCK VIBRATES WHILE
AT 25MPH, AROUND 50MPHM AND 65-75MPH.
WHILE IN AWD/4WD AT 30 AND 50MPH, THE
DRIVELINE MAKES A WHINING NOISE AND
VIBRATES SOMETIMES.

265. Another incident involving a 2016 GMC Sierra was reported on

September 15, 2017:

THIS ISSUE STARTED A FEW MONTHS
AFTER I PURCHASED THE TRUCK TOOK IT TO
TWO DEALERS THEY SAY ITS NORMAL. CALLED
GMC & THEY HAVE NO RECALL. WHEN DRIVING
THE TRUCK & HAVE TO SLOW DOWN IN
TRAFFIC THE AUTOMATIC TRANSMISSION
DOWN SHIFTS & HAS A VERY NOTICABLE JERK.
WILL ACTUALLY JERK THE HOLE TRUCK.
PEOPLE WHO HAVE RODE WITH ME TELL ME I

96

HAVE A TRANSMISSION PROBLEM. WHAT CAN I
DO

266.   Another incident involving a 2016 GMC Sierra was reported on March

20, 2018:

> PLEASE MAKE GM RESOLVE THE ISSUES
> WITH THE 8 SPEED TRANSMISSIONS IN THE
> TRUCKS. 2016 SL T Z71. I PURCHASED THE
> TRUCK NEW. IT'S NEVER SHIFTED PROPERLY.
> HESITATIONS, CLUNKING, JERKING, SHUTTER,
> HARD DOWN SHIFTS .... EVERYTIME I TAKE IT
> IN, THEY SAY IT'S DUE FOR AN UPDATE. THE
> TRUCK HAS HAD 4 UPDATES AND NONE OF
> THEM HAVE FIXED A THING. I HAD IT IN
> BEFORE THE 36,000 MILE BUMPER TO BUMPER
> WARRANTY WAS UP AND WAS TOLD IT WAS UP
> TO DATE. THEN LAST WEEK, I TOOK IT IN AND
> WAS TOLD IT WAS "SEVERAL UPDATES
> BEHIND." (54,XXX) MILES. TO TOP IT OFF,
> GENERAL MOTORS WOULDN'T PAY FOR THE
> $400 UPDATE, WHICH DIDN'T FIX ANYTHING AT
> ALL!!! THE TRUCK JERKED BEFORE WE GOT A
> BLOCK FROM THE DEALERSHIP. GM SAYS
> THAT EVEN THOUGH THE TRUCK IS STILL
> UNDER A FACTORY 60,000 MILE POWERTRAIN
> WARRANTY, TRANSMISSION UPDATES ARENT
> COVERED. THE 120,000 EXTENDED WARRANTY
> WOULDN'T COVER IT BECAUSE THEY SAY IT
> SHOULD BE COVERED UNDER THE FACTORY
> POWERTRAIN WARRANTY! I ABSOLUTELY
> LOVE THE TRUCK OTHER THAN THE JUNK
> TRANSMISSION IN IT. I DON'T THINK IT'S SAFE
> OR MUCH FUN HAVING A VEHICLE THAT
> STARTS TO GO THEN FALLS FLAT ON ITS FACE
> FOR A FEW SECONDS BEFORE SLAMMING INTO
> THE NEXT GEAR. THIS IS A MAJOR PROBLEM
> WITH A HUGE NUMBER OF TRUCKS. DON'T
> BELIEVE ME? GOOGLE "2016 SIERRA

97

TRANSMISSION ISSUE" OR ANYTHING OF THE
SORT. YOU'LL SEE. I'M REALLY NOT ASKING
FOR MUCH. I DIDN'T WANT TO PUT MY FAMILY
IN A POTENTIALLY UNSAFE VEHICLE ..... YET
HERE WE ARE. LIKE I SAID, I'M NOT ASKING
FOR MUCH. ALL I WANT IS FOR MY TRUCK TO
SHIFT NORMAL. TO GO WHEN IT NEEDS OR HAS
TO. MY TRUCK HAS HAD 4 UPDATES AND WAS
SEVERAL UPDATES BEHIND LAST TIME, THAT'S
ROUGHLY AN UPDATE EVERY 10,000 MILES
AND NOW THEY'RE NOT COVERED? ON TWO
SEPARATE OCCASIONS, IT'S SHIFTED SO HARD
THAT IT JARRED MY NECK AND MADE IT SORE
FOR A FEW DAYS IVE EVEN PULLED OVER ON
THE SIDE OF THE ROAD THINKING WE WERE
REAR-ENDED. SO HAS MY WIFE. NOT SAFE-NOT
NECESSARY!

267.   Another incident involving a 2016 GMC Sierra was reported on July

30, 2018:

TRUCK SHIFTS REALLY HARD AND IS
UNPREDICTABLE. I ALMOST DROVE THROUGH MY
GARAGE DOOR THE OTHER DAY SHIFTING TO DRIVE FROM
REVERSE. TRUCK WILL LUNGE FORWARD OR DELAY IN
SHIFTING. THERE HAVE BEEN A FEW TIMES IVE HAD TO
SLAM ON THE BRAKES BEFORE I BACKED INTO
SOMETHING. I HAVE BROUGHT IT IN 3-4 TIMES FOR THE
ISSUE AND GMC WONT REMEDY THE PROBLEM.

268.   Another incident involving a 2016 GMC Sierra was reported on August

8, 2018:

8 SPEED TRANSMISSION BUCKS, HESITATES,
LURCHES FORWARD, CLUNKS, WHILE STARTUNG
ACCELERATION OR COMING TO A STOP. I TRY TO KEEP A
BIG GAP BETWEEN MY TRUCK AND CARS IN FRONT OF ME
AT STOP SIGNS BECAUSE IT RANDOMLY LURCHES
FORWARD AND I ALMOST HAVE BUMPED CARS IN FRONT

98

OF ME. I HAVE HAD THE TRUCK INTO THE DEALER SO
MANU TIMES TO FIX THE VIBRATION ISSUES AS WELL,
THEY SAID 3 TIRES THAT CAME IN THE BRAND NEW
TRUCK WERE DEFECTIVE SO I HAD TO REPLACE THEM ALL
AND THE SHAKE IS STILL THERE, THE BALANCED,
REBALANCED, ROAD FORCE BALANCE AND NOTHING
WORKS. LAST TIME AT THE DEALER SAID IT IS PROBABLY
THE TIRES, HE SAID DON'T ROTATE THEM AGAIN AND
WHEN THEY WEAR OUT HE WILL PUT ME IN A BETTER
TIRE. I AM PAST MY WARRANTY SO THE DEALER SAYS
ANY COSTS ARE MY RESPONSIBILITT, IF THE NHTSA
COULD PLEASE STEP IN TO ASSIST US TO MAKE GM FIC
THEAE VEHICLES WHICH ARE A SAFETY HAZARD.

269. Another incident involving a 2016 GMC Sierra was reported on
September 21, 2018:

> TRANSMISSION - WHEN DRIVING THE
> VEHICLE IT DOES A HARD SHIFT WHEN
> ACCELERATING AND DECELERATING. I HAVE
> TAKEN THE VEHICLE INTO THE DEALER TWICE.
> THEY ARE SAYING THAT IS A "STATE OF THE
> ART" COMPUTER THAT NEEDS TO BE RESET!!! I
> AM TAKING IT BACK IN FOR A 3RD TIME. THE
> CARE IS 2 YEARS OLD WITH 31 K MILES.

270. Another incident involving a 2016 GMC Sierra was reported on
October 27, 2018:

> TRANSMISSION SHIFTS ABRUPTLY AND
> TORQUE CONVERTER CAUSES SHUDDER AT
> HIGHWAY SPEEDS. TRUCK HAS BEEN SERVICED
> TWICE FOR THE SAME ISSUE BY DEALER AND
> DEALER RECENTLY TOLD ME PROBLEM IS
> UNRESOLVABLE.

271. Another incident involving a 2016 GMC Sierra was reported on
November 6, 2018:

THE CONTACT OWNS A 2016 GMC SIERRA 1500. WHILE DRIVING 65 MPH IN STOP AND GO TRAFFIC, THE CONTACT DETECTED A SHUTTER AND HEARD AN ABNORMAL NOISE WHEN SHIFTING GEARS. THE VEHICLE WAS TAKEN TO MARTY'S BUICK GMC … WHERE THE TRANSMISSION WAS REPROGRAMMED AND FLUSHED. THE VEHICLE WAS THEN TAKEN TO BEST CHEVROLET . . . WHERE THE CONTACT WAS INFORMED THAT THE CAUSE OF THE FAILURE COULD NOT BE DETERMINED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 96,794.

### m.   2017 GMC Sierra

272.    On the NHTSA website, there are at least 58 consumer complaints for "2017 GMC Sierra." As one example, on April 15, 2017, the following incident was reported:

HEAVY VIBRATION BETWEEN 1200 RPM AND 1500 RPM ANYWHERE BELOW 45 MPH AND ABOVE 70 MPH

273.    Another incident involving a 2017 GMC Sierra was reported on July 20, 2017:

THE CONTACT OWNS A 2017 GMC SIERRA 1500. WHILE DRIVING 30 MPH, THE TRANSMISSION FAILED AFTER A COMPLETE STOP. WHEN THE ACCELERATOR PEDAL WAS DEPRESSED, THE RPMS INCREASED. WHEN SHIFTING FROM SECOND TO FIRST GEAR, THE TRANSMISSION SHIFTED INTO FIRST GEAR WITH EXTREME FORCE AND CAUSED THE VEHICLE TO ABRUPTLY ACCELERATE. THE CONTACT HAD TO ENGAGE THE BRAKE PEDAL WITH FORCE TO AVOID A CRASH. THE FAILURE

100

WAS EXPERIENCED NUMEROUS TIMES. THE
VEHICLE WAS TAKEN TO WALSH CHEVY BUICK
GMC (2330 NORTH BLOOMINGTON STREET,
STREATOR, IL, 61364 815-673-4333) WHERE THE
TRANSMISSION SYSTEM WAS REPROGRAMMED
TWICE AND THE ELECTRONIC CONTROL
MODULE WAS REPLACED. HOWEVER, THE
FAILURE WAS NOT CORRECTED. THE
MANUFACTURER WAS NOTIFIED. THE FAILURE
MILEAGE WAS 112. UPDATED 08/30/17*LJ

274. Another incident involving a 2017 GMC Sierra was reported on July 27, 2017:

THE CONTACT OWNS A 2017 GMC SIERRA.
WHILE DRIVING APPROXIMATELY 5 MPH, THE
VEHICLE FAILED TO SHIFT OUT OF GEAR AND
THERE WAS A DELAY OF THREE TO FOUR
SECONDS BEFORE SHIFTING INTO SECOND
GEAR. THE FAILURE RECURRED EVERY
MORNING. THE VEHICLE WAS TAKEN TO THE
DEALER (JIM CAUSLEY, LOCATED AT 38111
GRATIOT AVE, CLINTON TOWNSHIP, MI 48036)
WHERE IT WAS CONFIRMED THAT GM WAS
AWARE OF THE ISSUE. THE VEHICLE WAS NOT
DIAGNOSED OR REPAIRED. THE
MANUFACTURER WAS NOTIFIED OF THE
FAILURE AND INFORMED THE CONTACT THAT
THERE WAS NO RECALL ON HIS VIN. NO
FURTHER ASSISTANCE WAS OFFERED. THE
APPROXIMATE FAILURE MILEAGE WAS 4,500.
UPDATED 11/13/17 *BF

275. Another incident involving a 2017 GMC Sierra was reported on October 17, 2017:

UNINTENDED ACCELERATION – WHEN
SLOWING DOWN TO COME TO A STOP THE
VEHICLE WILL OCCASIONALLY ENGAGE A

101

LOWER GEAR VERY SUDDENLY AND LURCH FORWARD. THE RESULTING FORCE IS ENOUGH TO OVERPOWER THE BRAKING EFFORT BEING PROVIDED BY THE DRIVER AND THE VEHICLE WILL MOVE FORWARD SEVERAL FEET BEFORE THE DRIVER CAN REACT AND APPLY MORE BRAKING FORCE TO STOP THE VEHICLE. THE ISSUE OCCURS RANDOMLY AND INFREQUENTLY AT VERY SLOW SPEEDS (5-10MPH). THERE HAVE BEEN SEVERAL OCCASIONS WHERE I'VE BEEN BRAKING TO STOP AT A STOP LIGHT AND BEEN FORCED INTO THE MIDDLE OF AN INTERSECTION. I'M CONCERNED THE ISSUE COULD CAUSE THE VEHICLE TO STRIKE THE CAR IN FRONT OF IT OR A PEDESTRIAN CROSSING IN FRONT OF THE VEHICLE AS IT STOPS FOR A CROSSWALK. MULTIPLE UNSUCCESSFUL REPAIR ATTEMPTS HAVE BEEN MADE BY THE DEALER. I ATTEMPTED TO FORCE THE MANUFACTURER TO BUY THE VEHICLE BACK FROM ME THROUGH THE MASSACHUSETTS LEMON LAW AND SINCE THAT TIME THEY HAVE DENIED THE EXISTENCE OF A PROBLEM. I HAVE SEEN SEVERAL INSTANCES ONLINE WHERE CONSUMERS WITH THE IDENTICAL VEHICLE (ALL WITH THE 8 SPEED TRANSMISSION) COMPLAINED OF THE SAME PROBLEM.

276. Another incident involving a 2017 GMC Sierra was reported on October 25, 2017:

VIBRATION 65+ MPH, FELT IN STEERING WHEEL AND SEAT.

STEERING TRANSMISSIONS QUIVERS AT 65+ MPH.

TRUCK FEELS VERY UNSTABLE AT HIGHWAY SPEEDS.

102

DEALER STATES IT'S NORMAL.

277.   Another incident involving a 2017 GMC Sierra was reported on February 23, 2018:

> TRANSMISSION HARSH 1-2 SHIFT WHEN IT
> IS UNDER LIGHT THROTTLE AND SOMETIME
> DOES NOT SHIFT OR MAKE NOSE. GMC DEALER
> ARE AWARE ABOUT THIS ISSUES ON ALL GM
> TRUCK MODEL OF 2015 TO 2017 WITH 8SPED
> TRANSMISSION SINCE APRIL 2017. I HAVE
> ATTACHED DOCUMENTS GIVEN BY DEALER.

278.   Another incident involving a 2017 GMC Sierra was reported on June 1, 2018:

> WHEN DRIVING AT SLOW PARKING LOT
> SPEEDS OR WHEN COMING TO A COMPLETE
> STOP THE VEHICLE INTERMITTENTLY LUNGES,
> SURGES OR JOLTS, CAUSING THE VEHICLE TO
> MOVE FORWARD OR BACKWARDS
> UNANTICIPATED. SOMETIMES THE JOLT FEELS
> LIKE ANOTHER VEHICLE HAS HIT THIS VEHICLE
> FROM THE REAR, AGAIN CAUSING IT TO LUNGE
> FORWARD.

279.   Another incident involving a 2017 GMC Sierra was reported on June 15, 2018:

> I BOUGHT THIS TRUCK USED WITH 12,918
> MILES ON IT, APRIL 2018. WHEN
> DRIVING(ESPECIALLY ON HIGHWAY), AND
> CHANGING SPEEDS, TRANSMISSION CLUNKS
> AND LURCHES-AUTOMATIC TRANSMISSION. IT
> SOUNDS AND FEELS AS IF DRIVE TRAIN WILL
> FALL OUT. I HAVE TAKEN IT TO DEALER TWICE.
> THE FIRST TIME, THEY KEPT IT FOR 3 DAYS, THE
> SECOND TIME, FOR ONE. THE MECHANIC IS

103

ABLE TO REPLICATE THE NOISE/LURCHING,
BUT THEY ARE UNABLE TO FIND A CAUSE OR
CORRECTION. THEY TELL ME IT IS NOT
DANGEROUS, BUT I AM CONCERNED THAT THE
NOISE/MOVEMENT, COULD CAUSE MYSELF OR
ANOTHER FAMILY MEMBER TO SWERVE OR
BRAKE HARD AND CAUSE AN ACCIDENT. THE
MECHANIC HAS TRIED "UPDATING THE
SOFTWARE" BUT THAT DID NOT FIX IT.
SEVERAL OTHER GMC SIERRA OWNERS TELL
ME THEY HAVE HAD SAME PROBLEM.

280. Another incident involving a 2017 GMC Sierra was reported on August
28, 2018:

THE "CHEVY SAKE". AT SPEEDS OVER 70MPH
EXCESSIVE VIBRATION INSIDE THE VEHICLE. THIS IS
WELL DOCUMENTED ON-LINE, PARTICULARLY
VARIOUS GM FORUMS AND YOU TUBE VIDEOS. IT IS
MY UNDERSTANDING THAT GM DENIES IT IS A
PROBLEM, BUT THEY HAVE BEEN DOING SOME BUY
BACKS AND IF YOU READ SOME OF THE DEALER
BLOGS IT IS EVIDENT THAT GM KNOWS IT IS A
PROBLEM.

281. Another incident involving a 2017 GMC Sierra was reported on
December 6, 2018:

THE TRANSMISSION SHIFTS EXTREMELY ROUGH
FROM 1ST TO 2ND GEAR IN PARKING LOTS AT A SLOW
SPEED AND ON NORMAL HIGHWAY OR STREET
DRIVING AND EXPERIENCES THE SAME THING WHILE
SLOWING DOWN TO STOP 2. THE ENGINE HAS
RECENTLY BEEN HAVING A AWKWARD SHAKE TO IT
WHILE IN IDEAL AFTER IT HAS BEEN RUNNING AND
WARM 3. WHILE BACKING UP AND TURNING THE
WHEEL, THE FRONT SUSPENSION WILL LET OUT A
LOUD CLUNK SOUND AND THE SOUND WILL RETURN

104

WHEN TURNING THE TRANSMISSIONS BACK
FORWARD AFTER PUTTING IT INTO DRIVE.

282.   Another incident involving a 2017 GMC Sierra was reported on

December 18, 2018:

I HAVE HAD SEVERAL INSTANCES WHERE
YOU PUSH THE ACCELERATOR AND YOU START
TO GO AND THEN IT JUST STOPS MOVING LIKE
THE TRANSMISSION HAS DISENGAGED.
STARTED TO TURN INTO ONCOMING TRAFFIC
THIS MORNING AND HAD TO STOP AS AS IT DID
THIS AND I WAS GOING TO GET HIT!!! IT DOES IT
A LOT, FIRST TIME I WOULD HAVE BEEN HIT!!!
GM SAYS THEY KNOW IT'S A PROBLEM, AT
SHOP NOW AGAIN FOR IT! GOING TO GET
SOMEONE KILLED!!!!

283.   Another incident involving a 2017 GMC Sierra was reported on

January 10, 2019:

TRANSMISSION HAS SURGING AND
HESITATION. DEALER CANNOT FIX.

284.   Another incident involving a 2017 GMC Sierra was reported on

February 4, 2019:

TRUCK LAGS POWER WHEN PRESSING THE
GAS PEDAL AT TIMES AFTER PUTTING
TRANSMISSION INTO DRIVE FROM REVERSE.
TRANSMISSION SHIFTS HARD INTO AND OUT OF
FIRST GEAR AND AT TIMES FEELS LIKE IT IS
SKIPPING 2ND GEAR DURING A DOWNSHIFT.

285.   Another incident involving a 2017 GMC Sierra was reported on March

12, 2019:

105

> TRANSMISSION SHIFT FROM 1ST GEAR.
> THERE IS A PROBLEM IN THE GEAR SHIFT FROM
> 1ST TO 2ND IT SLAMS THE TRANSMISSION
> WHEN YOU STOP AND START. THERE IS A
> HEATER IN THE TRANSMISSION THAT PUTS
> EXTRA DEGRADATION ON THE OIL CAUSING IT
> TO NEED REPLACEMENT VERY EARLY. DEALER
> KNOWS OF THE ISSUE BUT HAS NO FIX FOR IT
> ONLY STATED THEY NOTED THE FILE IN CASE
> IT FAILS. UNACCEPATABLE FOR A 55,000.
> PLEASE LOOK INTO THIS.

### n.  2015 GMC Yukon Denali

286.   On the NHTSA website, there are at least 292 consumer complaints for "2015 GMC Yukon Denali." As one example, on June 14, 2015, the following incident was reported:

> VERY CONCERNED ABOUT MY 2015
> YUKON XLT. THE VEHICLE'S GEAR SHIFTED TO
> A NEUTRAL OF VERY LOW GEAR (NOT VERY
> SURE) AS I WAS DRIVING DOWN A LONG HILL
> NEAR BIRMINGHAM, AL. IT FELT LIKE IT WENT
> TO FIRST GEAR, BUT AT THE SAME TIME IT DID
> NOT SLOW THE VEHICLE DOWN, ALMOST FELT
> LIKE THE GEAR WAS GRINDING. THE TRUCK
> DID NOT CATCH BACK INTO NORMAL GEAR
> UNTIL THE VEHICLE LEVELED BACK AT THE
> BOTTOM OF THE HILL. (IT WAS EXTREMELY
> SCARY AND WORRISOME EVER SINCE THEN,
> THE TRANSMISSION WILL NOT SHIFT
> SMOOTHLY.

287.   Another incident involving a 2015 GMC Yukon Denali was reported on June 29, 2016:

> I AM WRITING TO NOTIFY YOU ABOUT A
> PROBLEM WITH THE TRANSMISSION IN 2015
> GMC YUKON XL.

106

GM IS AWARE OF A PROBLEM. THEY ISSUED AN INTERNAL NOTICE TO DEALERS IN FEBRUARY 2016. HOWEVER, THEY HAVE NOT NOTIFIED TO OWNERS IN THE FORM OF A RECALL.

ON SEVERAL OCCASIONS, MY VEHICLE JUMPED FORWARD, WHILE DRIVING IN THE CITY, WHEN IT WAS STOPPED, IN DRIVE, WITH BRAKE ENGAGED. I REPORTED TRANSMISSION PROBLEMS TO MY LOCAL DEALER BUT THEY REPEATEDLY IGNORED MY CONCERNS. THEY KEPT GIVING EXCUSES THAT DIDN'T MAKE SENSE. I FINALLY PRESSED ON, REFUSED TO TAKE MY VEHICLE BACK AND REPORTED THE PROBLEM TO SEVERAL EXECUTIVES. THE PROBLEM WAS FINALLY DIAGNOSED UNDER DIFFERENT CONDITIONS AS STATED IN THE FIRST INTERNAL DOCUMENT IN MARCH 2016. THERE WAS A PROBLEM WITH THE TRANSMISSION. THEY FINALLY REPLACED THE TRANSMISSION FOR "ONE THAT DIDN'T HAVE A PROBLEM".

GM ADMITTED THERE ARE PROBLEMS WITH TRANSMISSIONS AND THE PROBLEM HAS BEEN CORRECTED IN NEWER VEHICLES. THEY HAVE YET TO ISSUE A NOTICE TO CURRENT OWNERS THAT THEIR VEHICLES ARE AT RISK.

I OWNED A 2015 GMC YUKON XL BUT CHOSE TO SELL IT OVER SAFETY CONCERNS AND LACK OF APPROPRIATE RESPONSE FROM GM CORPORATE. WITH 2 YOUNG CHILDREN, I SPEND A LOT OF TIME AROUND SCHOOLS (LIKE MOST OWNERS OF LARGE GM VEHICLES). I COULD HAVE INJURED OR KILLED SOMEONE. I FEEL IT IS MY OBLIGATION TO BRING THIS SITUATION TO YOUR ATTENTION. IF YOU INTERVENE, YOU CAN HELP TO AVOID ANY INJURIES IN THE FUTURE. IT IS CLEAR THAT GM

107

WILL NOT VOLUNTARILY PROTECT THE
PUBLIC.

288.   Another incident involving a 2015 GMC Yukon Denali was reported
on July 19, 2016:

> OUR VEHICLE HAS A SIGNIFICANT
> VIBRATION IN V4 MODE WHEN TRAVELING
> BETWEEN 45-65 MPH AND ABOVE. THE
> VIBRATION IS ALSO ACCOMPANIED BY
> INCREASED CABIN PRESSURE. THESE ISSUES
> ARE CAUSING HEADACHES, NAUSEA,
> DIZZINESS, AND ARE FURTHER EXACERBATING
> MY WIFE'S MULTIPLE SCLEROSIS. WE ALSO
> HAVE A POPPING SOUND COMING FROM THE
> REAR OF THE VEHICLE'S SUSPENSION WHEN
> TURNING THAT MAKES US FEEL UNSAFE. THE
> VIBRATION STARTED RIGHT AFTER WE TOOK
> DELIVERY OF THE CAR AND HAS ONLY GOTTEN
> WORSE. WE BOUGHT THE CAR IN APRIL 2015
> AND THE ISSUE CONTINUES UNFIXED TO THIS
> DAY. THE POPPING NOISE STARTED ABOUT 3-4
> WEEKS AGO AND IT SOUNDS LIKE A
> SUSPENSION COMPONENT. OUR AC
> RECIRCULATING FEATURE ALSO DOES NOT
> WORK AND IT ALLOWS HARMFUL EXHAUST
> SMOKE IN.

289.   Another incident involving a 2015 GMC Yukon Denali was reported
on August 1, 2016:

> WHEN APPROACHING A TOLL BOOTH ON
> THE MASS TURNPIKE,WITH SEVERAL LANES
> MERGING,
>
> WITH THE VEHICLE ALMOST STOPPED,IT
> DOWNSHIFTED TO 1ST GEAR AND IN THE
> PROCESS

108

> LURCHED FORWARD EXTREMELY
> VIOLENTLY TO THE POINT I ALMOST CRASHED
> INTO THE CAR
>
> MERGING IN FRONT OF ME-PROBABLY
> STOPPED SHORT BY SIX INCHES OR LESS !!!

290.   Another incident involving a 2015 GMC Yukon Denali was reported on August 30, 2016:

> TRANSMISSION HAS BEEN CLUNKY AND
> JERKY FROM FROM PURCHASE. THE VEHICLE
> VIBRATES BETWEEN 30 - 35 MILES PER HOUR
> WHEN SHIFTING. THE VEHICLE LURCHES
> FORWARD WHEN ACCELERATING AS IF IT HAS
> DIFFICULTY DOWN-SHIFTING. THE PROBLEM IS
> PRESENT FROM SIMPLY BACKING UP OUT OF
> THE DRIVEWAY, MODEST SPEEDS ON CITY
> STREETS, OR ON THE HIGHWAY. WHEN
> BROUGHT BACK TO THE DEALER, THEY
> CLAIMED IT WAS A SOFTWARE ISSUE AND
> "REFRESHED" THE SOFTWARE. THE PROBLEM
> HAS NOT GONE AWAY AND DID NOT IMPROVE
> BY THIS SOFTWARE CORRECTION. MY
> INTERNET RESEARCH INDICATES THAT THIS IS
> A COMMON PROBLEM WITH THE NEW 8-SPEED
> TRANSMISSION FOR THE 2015 YUKON DENALI
> AND CADILLAC ESCALADE.

291.   Another incident involving a 2015 GMC Yukon Denali was reported on September 18, 2018:

> VEHICLE CLUNKS OR HARD SHIFT WHILE
> SHIFTING VEHICLE FROM PARK TO DRIVE, OR
> PARK TO REVERSE. HAPPENS EVERY MORNING
> OR WHILE TRANSMISSION HAS COOLED DOWN.
> DEALER INDICATES THERE'S NO FIX FOR THIS
> CONDITION, NOT EVEN A UPDATE TO
> TRANSMISSION SOFTWARE.

109

**o.   2016 GMC Yukon Denali**

292.   On the NHTSA website, there are at least 73 consumer complaints for "2016 GMC Yukon Denali." As one example, on January 5, 2016, the following incident was reported:

> WHEN THE VEHICLE REACHES 40-60 MILES
> PER HOUR A VIBRATION OCCURS... OFTEN
> SOUNDS LIKE A WINDOW IS DOWN AND CAN
> CAUSE NAUSEA AND HEADACHE...

293.   Another incident involving a 2016 GMC Yukon Denali was reported on May 25, 2016:

> THE VEHICLE'S TRANSMISSION
> UNEXPECTEDLY SLIPS OUT OF GEAR BETWEEN
> 20 AND 35 MPH. WHEN THIS OCCURS, PRESSING
> THE ACCELERATOR MERELY REVS THE ENGINE,
> WITHOUT FORWARD MOTION. THIS OCCURRED
> 4 TIMES IN THE FIRST 600 MILES OF OPERATION.
> WITHOUT POWER, I CAN'T NAVIGATE OUT OF A
> DANGEROUS SITUATION.

294.   Another incident involving a 2016 GMC Yukon Denali was reported on June 2, 2016:

> VEHICLE HAS VIBRATION & NOISE WIHEN
> IN 4 CYLINDER MODE OF OPERATION. GIVES
> HEADACHE ON LONG DRIVES. GM SAYS THAT
> THE VEHICLE IS OPERATING AS DESIGNED.
> MOST AGRIVATING.

295.   Another incident involving a 2016 GMC Yukon Denali was reported on July 6, 2016:

> MY 2016 YUKON DENALI HAS A
> VIBRATION PROBLEM, WHICH I BELIEVE IS

110

CAUSED BY THE MAGNETIC RIDE CONTROL.
THE VIBRATION DOES NOT SPEED UP, NOR
SLOW DOWN, DEPENDING ON SPEED. IT IS,
HOWEVER, MORE NOTICEABLE WHEN THERE IS
ANY ROAD IMPERFECTION.

THE GMC SERVICE DEPT. HAS BALANCED
AND ROTATED TIRES, EVEN SENT IT TO TWO
OTHER BUSINESSES TO TRY AND FIX --
ALIGNMENT, ETC. VIBRATION CONTINUES. I'VE
HAD PASSENGERS WHO ASK "WHY DOES YOUR
CAR HAVE THE SHIVERS?" GM DEALER DID GET
AHOLD OF A GMC TECHNICIAN WHO FLEW IN,
AND DROVE THE CAR AND SAID -- YES IT HAS A
VIBRATION, BUT IT IS IN ACCEPTABLE
PARAMETERS.

MY DEALER HAS PROVIDED ME 3
DIFFERENT RENTAL CARS WHILE WORKING TO
TRY AND FIX THE "SHIVERS" ... ALL THREE
WERE FAIRLY NEW, SMALL BUICKS, AND ALL 3
RODE BETTER THAN THIS NEW $75,000 DENALI.

I LOVE THE VEHICLE, HATE THE
VIBRATION. GMC ITSELF HAS NOW TOLD ME --
YOUR CASE IS CLOSED! THE VIBRATION IS
WITHIN ACCEPTABLE LIMITS.

THE DEALER HAS LET ME DRIVE TWO
OTHER YUKON DENALI'S ... BOTH HAVE
SIMILAR VIBRATIONS... JUST NOT AS BAD AS
THIS VEHICLE.

VIBRATION IS NOTICEABLE AT 25 MPH, AS
WELL AS AT 80 MPH; ALTHOUGH IT IS MORE
NOTICEABLE ON ROUGHER ROADS.

I AM HAPPY TO SHARE THE REPORTS
FROM MY LOCAL GM DEALER, WHO
COMPLETELY AGREES THAT THE CAR
SHIMMIES. WE TRIED THE GMC BUYBACK

111

PROGRAM, AND I WAS TOLD BY GMC THAT
PROGRAM IS NOT AVAILABLE TO ME, EVEN
THOUGH I TOOK THE CAR BACK TO THE
DEALER WHEN I HAD LESS THAN 100 MILES ON
IT. AND HAVE BEEN TAKING IT BACK
REGULARLY SINCE.

296.   Another incident involving a 2016 GMC Yukon Denali was reported

on October 27, 2016:

SINCE THE DAY I PURCHASED THIS 2016
GMC YUKON XL DENALI THERE HAS BEEN A
VIBRATION IN WHAT I THINK IS THE
PASSENGER REAR END. I'VE TAKEN IT IN 3
TIMES AND EACH TIME THE DEALER AND THE
GM REPRESENTATIVE SAY IT IS "WITHIN SPEC."
THIS PROBLEM HAS PERSISTED. THE VEHICLE IS
NOW ALMOST UN-DRIVABLE DUE TO THE
SHAKING. IT AFFECTS THE STEERING WHEEL AT
ALL SPEEDS. THIS HAPPENS AT ALL SPEEDS ON
ALL TERRAINS. THIS HAPPENS WHEN THE
VEHICLE IS COLD AS WELL AS WARM/HOT. THE
VEHICLE WILL SOMETIMES JERK TO THE LEFT
OR RIGHT WHEN THE SHAKING GETS REAL BAD.
THIS VEHICLE IS BECOMING DANGEROUS TO
DRIVE BUT I HAVE TO USE IT. I AM NOT THE
ONLY ONE WITH THIS ISSUE AND WOULD
APPRECIATE SOME HELP.

### p.   2017 GMC Yukon Denali

297.   On the NHTSA website, there are at least 7 consumer complaints for

"2017 Yukon Denali." As one example, on September 22, 2018, the following

incident was reported:

SHUDDER UNDER LIGHT, CONSTANT
ACCELERATION AT 35MPH TO 55MPH, RPM
UNDER 1,500. UPHILL GRADE IT IS
ACCENTUATED. SHUDDER OCCURS FOR 1

112

SECOND ACROSS WHOLE VEHICLE, REOCCURS
EVERY FEW SECONDS AT A CONSTANT
INTERVAL. SEEMS TO BE SAME ISSUE WITH ALL
8L90 TRANSMISSIONS FROM GM/CHEVY/CADI.

### q.    **2017 GMC Canyon**

298.   On the NHTSA website, there are at least 15 consumer complaints for
"2017 GMC Canyon." As one example, on February 5, 2018, the following incident
was reported:

> THE GMC 2017 CANYON VIBRATES AT
> HIGHWAY SPEED 60MPH TO 70MPH. THE 2ND
> DAY AFTER I BOUGHT IT TOOK IT ON LONG TRIP
> FOUND IT HAD VIBRATION PROBLEMS. AFTER
> TAKING IT TO THE DEALERSHIP FOR TIRE
> BALANCE TWICE REPLACED FRONT WHEEL
> BEARING THEN TRANSMISSION FLUSH. THEN
> AFTER TRANSMISSION FLUSH HAD VIBRATION
> BETWEEN 40-45 THEY SAID IT WAS NORMAL
> THAT THERE WAS NOTHING ELSE THEY COULD
> DO. DUE TO VIBRATIONS OVER TIME THIS
> CONCERNS ME. FOR BEING STRANDED OR
> WORSE CAUSING AN ACCIDENT FROM
> SOMETHING COMING LOOSE. I`VE ALREADY
> HAD TO TIGHTEN UP MY SPARE TIRE. I BOUGHT
> THIS PICKUP FOR LONG TRIPS SINCE I`VE
> RETIRED. LIKE THE ONE MY WIFE AND I ARE
> GOING ON IN JUNE OF THIS YEAR. I ALSO FEEL
> IF THERE GOING TO SELL CRAP LIKE THIS THEY
> NEED TO PUT THE VIBRATION ISSUES ON THE
> ACCESSORY `LIST SO BUYERS WILL HAVE THE
> OPTION WHETHER TO BUY OR NOT. I WOULD
> HAVE NOT BOUGHT A $40,000.00 VIBRATOR!!

299.   Another incident involving a 2017 GMC Canyon was reported on
August 1, 2018:

113

> TRANSMISSION BEGAN SHIFTING HARD.
> BEFORE LONG WHOLE TRUCK RATTLED WHEN
> SHIFTING. ALMOST A GRINDING SOUND. CHEVY
> DIAGNOSED TORQUE CONVERTER HAS GONE
> BAD. BACK ORDERED FOR 2 WEEKS.

300.   Another incident involving a 2017 GMC Canyon was reported on December 31, 2018:

> TORQUE CONVERTER FAILS AT 12000
> MILES FOR MANY. THERE IS A GMC NOTICE OUT
> SINCE 2016. MINE FAILED AT 16000 MILES AND
> THE ONE THEY REPLACED WILL LIKELY FAIL
> AGAIN IN ANOTHER 16K MILES. THIS IS BAD. I
> NOTICED IT WHEN I PRESSED ON THE
> ACCELERATOR AND AS I INCREASED SPEED UP
> TO 45 MPH. IT RATTLED AND ROCKED BADLY.
> THE GMC REPAIRMAN SAID, "YEAP.....EVER
> SINCE 2016 ALL THESE DAMN TORQUE
> CONVERTERS HAVE BEEN FAILING IN THE
> CANYONS AND COLORADOS BECAUSE GM AND
> CHEVY CHANGED THE SIZE AND STRENGTH OF
> THE METAL USED IN ORDER TO REDUCE THE
> WEIGHT OF TRHE VEHICLE. WE WILL REPLACE
> IT, BUT I CAN ASSURE YOU IT WILL FAIL AGAIN
> AND YOU'LL HAVE TO BRING IT BACK TO USE
> FOR CHANGE OUT AGAIN." WOW....WHAT A
> BUNCH OF CRAP.

### r.      2018 GMC Canyon

301.   On the NHTSA website, there are at least 5 consumer complaints for "2018 GMC Canyon." As one example, on August 28, 2018, the following incident was reported:

> TRANSMISSION JERKS FROM 4TH TO 5TH.
> SOMETIMES FEELS LIKE SOMEONE HIT YOU IN
> THE REAR ENDED.

114

302. Another incident involving a 2018 GMC Canyon was reported on September 7, 2018:

> TRANSMISSION CLUNKS FEELS LIKE YOUR HIT IN THE REAR END. I THOUGHT I WAS REAR ENDED 3 TIMES SO FAR. MY TRANSMISSION SURGES FORWARD FROM 4TH TO 5TH GEAR. VERY DANGEROUS TO WEAR I DON'T WANT TO DRIVE THE TRUCK.

303. Another incident involving a 2018 GMC Canyon was reported on September 7, 2018:

> THE AUTOMATIC TRANSMISSION SHIFTS AGGRESSIVELY THE FIRST GEARS FROM A COLD STARTED ENGINE AFTER ENGAGING FROM PARK TO DRIVE. SLUGGISH SHIFTING AND ACCELERATION.

304. Another incident involving a 2018 GMC Canyon was reported on December 14, 2018:

> RUMBLING OF TRANSMISSION. CLUCKY START. GM DEALER ACKNOWLEDGES THE PROBLEM AND HAS TRIED TO REPAIR VEHICLE. GM SAYS AT THIS TIME THE TRUCK 8 SPEED TRANSMISSIONS ARE NOT FIXABLE

### 4. *Consumer Complaints on Internet Forums Demonstrate That GM Was Aware of the Transmission Defect*

305. Similarly, complaints posted by consumers in internet forums demonstrate that the defect is widespread and dangerous and that it can manifest without warning and/or suitable repair. The complaints also indicate GM's awareness of the problems with the transmission and how potentially dangerous the defect is for consumers. The following are some safety complaints specifically

115

relating to GM's eight-speed transmissions (spelling and grammar mistakes remain as found in the original) (gm-trucks.com (May 7, 2019), Edmunds.com (May 7, 2019), http://www.edmunds.com/; Cars.com (May 7, 2019), http://cars.com/; CarComplaints.com (May 7, 2019), http://www.carcomplaints.com/; http://gm-trucks.com (May 7, 2019), and http://cadillacforums.com (May 7, 2019)):

### a.    <u>Complaints on Edmunds.com</u>

306.   On Edmunds.com, a consumer of the 2015 Cadillac Escalade wrote on September 29, 2016:

> We have owned our vehicle since August 2015. We have had problems since the first day. Bad airbags, steering wheel had to be replaced 3 times, steering column replaced, torque converter replaced, front camera replaced. The MAIN issue is still not fixed after many many trips to Service. There is a rough idle at any stop. The engine idle is so rough that the RPM's bar is moving up and down while the car is stopped. At times it feels like the car is going to shut off. Cadillac is not accepting responsibility and is saying this is NORMAL. So...if you like a rough idle in a $100,000 Luxury vehicle go ahead and buy this SUV. Otherwise, I would suggest you go down the road and find a different luxury vehicle.

307.   On Edmunds.com, a consumer of the 2016 Cadillac Escalade wrote on July 22, 2016:

This is our third Escalade to own. I couldn't be more disappointed in the quality of the car this time. They really cut corners in the interior and it shows from parts coming unglued to the interior leather peeling. On the outside of the car the Chrome transmission on the door popped off and all four doors transmission work between the doors had to be replaced. My car had less than 8k miles and they replaced the transmission. For a vehicle costing almost 100k very disappointed Cadillac. This will be our last.

116

308.   On Edmunds.com, a consumer of the 2016 Cadillac Escalade ESV wrote on January 12, 2016:

Having owned the 2007 ESV I thought long and hard about buying a new 2016.  Keeping in context we have owned Lexus since 1990, total of five LS models over the years. Best single auto manufacturer in the world for quality, value, cost of ownership. Unless you need the size of the ESV for family, road travel, don't buy one.  Your hard earned $80K+ needs to go elsewhere because of the workmanship, quality issues.  It LOOKS awesome, rides great, it is the fitment, vibration, flutter of plastic parts rubbing against each other that will drive you crazy. The center CUE had a vibration as if a wiring harness had been flopping around. The sunroof decided just this morning that something up in there, needed to be jostling around, and these things happen only when they want to.  We have only owned her 3 weeks, she has 735 miles on her.  We got her for the room, size to accommodate family.  If LEXUS ever decides to make one similar in size, we are in.

Nothing in my review changes except that I will never own another.  It is GM junk at the highest level.  Last May 22, 2016 we finally got help from the BBB in Washington DC to help replace the original 2016 we bought in Dec. 2015.  It took us 6 months to get rid of that pile of junk, replaced it with another pile of junk.  Folks other than the dealer experience being so stealor and supportive, I will never own another.  PERIOD.  From problems with transmission shifting at times I cant understand, to the dye color of the leather already wearing away.  Plastic parts look like wood and yet vibrate into a frenzy at times.  Listen carefully, you do what you want.  If you want to toss money into a pit loaded with stress and problems, then buy this thing. If you want to save yourself the grief, buy Lexus or something else. UPDATE:  JUNK it is OVERPRICED JUNK   Would love to sell it if you know of anyone interested.  DO NOT BUY ANYTHING CADILLAC

309.   On Edmunds.com, a consumer of the 2017 Cadillac Escalade wrote on September 25, 2017:

117

Transmission is horrible. I feel unsafe in this car. It jerks or lunges on me at a stop or slow speed at least once a day. The dealership has had my car 7 times and has not fixed it yet. I filed a lemon law complaint.

310.   On Edmunds.com, a consumer of the 2016 Cadillac ATS wrote on August 21, 2016:

When I got the got a few months ago, I was more excited about the electronics than the feel of the car.  A few weeks into driving I discovered how erratic  the transmission shifting was--you can actually feel the car going into gear and ,in some instances, the engine downshifts, which I consider unsafe.  Even with disabling the "stop engine" mode, you can feel the noticeable changes in shifting.  It is an unsatisfactory ride and I have owned or leased over 40 GM cars.

311.   On Edmunds.com, a consumer of the 2016 Cadillac CTS wrote on July 23, 2016:

Complex cue system, maybe need. Cd tutorial for visual learners, engine designed to stop when brakes applied to stop. Explanation of no spare tire!

Passenger door hard to close due to handles too far forward. Transmission seems to shift hard at times, has refused to change when accelerating hard into traffic

312.   On Edmunds.com, a consumer of the 2016 Chevrolet Corvette wrote on October 21, 2016:

Many owners of 2016 Chevrolet Corvettes (some 2015's) are reporting on various internet sites IE: Corvette Forum. Stingray Forum, that their new Corvettes, primarily base models with automatic transmissions produce a 'WARBLE' type noise at exactly 1500 RPM under light throttle load , as when going up a slight grade. I am one of said owners. Go to these internet sites and look up 'WARBLE' and even view the video / audio of the issue / complaint. Currently I understand that owners are invoking the lemon law process; GM 'supposedly' has taken back vehicle (s). Basically there is

118

no proven correction at this time. I too have contacted GM and like many others, I was given a "case number". It's been awhile; GM has been involved deeply; taken cars back in exchange...under pretense of studying them. However; GM IS REMAINING VERY QUIET about this serious issue. WHY ? Dealing with this corporation; their possibly covert approach to this serious matter will make GM owners uncomfortable...if they care to listen. Meanwhile, my C7 Stingray, auto has had the differential changed; a improvement is noted but the "WARBLE" goes on.................. and on....................!

313.   On Edmunds.com, a consumer of the 2016 Chevrolet Silverado 1500 wrote on May 18, 2016:

For 43K, and purchased brand spanking new, at 3k miles i should not have vibration issues, hard downshifting, and terrible dealer denial.  I am so fed up with the lack of quality, and attention to detail.  All the bells and whistles don't mean a thing if the vehicle shifts poorly, lunges when placed in gear, and makes terrible noises when it downshifts.  The dealer was helpless (i kinda feel for the dealer, they are not the manufacturer. This is an engineering and quality issue).

I DO NOT recommend you waste your money on the 2016 chevy silverado crew, 5.3l.  Chevy CANNOT get the basic functionality of what a vehicle is supposed to be correct.  Don't buy into the look, or the commercials, these vehicles are nothing but polished poop.  purchasing this chevy truck was a major mistake and i hope you learn from my mistake, but at my cost.   God bless.

314.   On Edmunds.com, another consumer of the 2016 Chevrolet Silverado 1500 wrote on June 5, 2016:

Vibration problems started within two weeks of owning the truck. The dealer knows there are vibration problems but there is not a fix. I was told that's the way they are, deal with it. The transmission is sluggish and slow to keep up with the driving situations. The electronics crash frequently. The dealership said it was due to subpar and cheap Chinese made memory chips and control boards. Please do not waist your money on this truck. I traded the truck for a Dodge

119

Ram after only 2200 mile. Worst of all the dealership fully understands the problems but will not mention them during the sales process. They will gladly take your money and give you a piece of junk in return.

315.   On Edmunds.com, another consumer of the 2016 Chevrolet Silverado 1500 wrote on November 23, 2016:

Have owned two Chevy Vans last 18 years never an issue. Wanted a truck to pull my boat.  Chose to stay with Chevy given the track record. Truck shifts hard in the low gears.  Cold starting the truck jerks into gear and when down shifting it is harder than it should be.  Should not feel it down shift.  Took it to the dealer and their mechanic got it to down shift hard in parking lot but he said thinks it will smooth out over time.  Otherwise I love the truck, comfortable, smooth ride on both highway and around town. Gas mileage is

316.   On Edmunds.com, another consumer of the 2016 Chevrolet Silverado 1500 wrote on December 13, 2016:

2016 truck has 2400 miles on it. Is the roughest  ride I have ever had in a chevy pickup. Cant travel it because wife feels the truck is going to break  down due to the vibration. Had it in the shop 7 times for shimmy(vibration) at medium and highway speeds. Shop changed tires , balanced several times. Nothing they did helped. Dealer told me it was the best they could do. I had several friends drive it and they came to the same conclusion.  We all agreed to never purchase a Silverado and pass that statement on to others.

317.   On Edmunds.com, a consumer of the 2016 GMC Sierra 1500 wrote on June 9, 2016:

I have had this truck into the dealer twice and I have 6500 miles on the truck. They have done a reprogramming both times  and it is fine for a week or two and then starts shifting hard again.   I purchased the truck with the larger engine so that I can tow my 22 foot Airstream. When the AS is in tow it is great but not when you have to daily drive. This should not happen for the money paid for the truck.

120

318.   On Edmunds.com, a consumer of the 2016 GMC Sierra 1500 wrote on December 28, 2016:

I've owned my sierra for roughly 8 months now and am very happy with the truck overall. Classy interior, quiet and comfortable ride, strong acceleration and great mpg's (for a truck). One complaint that I do have is with the transmission. From time to time, the tranny will seemingly slip. Other times, shifting is very rough. These issues aren't consistent, but when they do occur, they seem to occur when shifting from 1st to 2nd gear. These issues seem to be common and I've read that they are less about the transmission itself and more about the programming that determines shift points and other transmission related operations. Apparently these things have been programmed for max gas mileage and the result is less than desirable shifting. This is a tough pill to swallow considering I paid 50,000+ for the truck. I'd gladly give up 1mpg for a transmission that doesn't act like its about to fall out of the truck.

319.   On Edmunds.com, a consumer of the 2015 GMC Yukon Denali wrote on January 18, 2015:

Almost all 2015 Yukons/Denalis with AWD are having severe problems with the transmission.

Basically,  if you used the AUTO setting on the drive selector the trans will lock into 4WD and never come out.  GM has no fix for this problem yet.  Driving the vehicle like this is unsafe and makes a horrible racket.  It might also damage the vehicle.

Avoid any Yukon or Tahoe until the fix is found.

You can google this problem to read more about it

320.   On Edmunds.com, another consumer of the 2015 GMC Yukon Denali wrote on August 9, 2016:

Bought the 2015 Denali w/ all the bells and whistles in October 2014.  At that time, the new body style was very hard to find, because it was so new.  I have owned for over 2 years & have 49,000 miles on

121

it.  Have major problems when going 65 to 70-75 mph on freeway with the transmission-- while driving and increasing the speed on highway, it feels like the car "jerks" as it accelerates.  Its horrible! Have taken to dealership 3X's complaining about it & they look @ me like I am crazy.  I am getting ready to trade it in due to high mileage...other complaint is the usb ports--always tearing up my iphone cords.  Miserable!  When you plug your phone in into the usb, it automatically connects phone to vehicle...if you aren't paying attention, end up missing texts, phone calls, directions.  I do love that you can use OnStar w/ directions, & remote start from your iphone...great little perk.  Love the 3rd row seats and cargo...haul kids & dogs

321.   On Edmunds.com, a consumer of the 2016 GMC Yukon Denali wrote on September 26, 2016:

I am so disappointed with my purchase of the 2016 Yukon XL Denali. The issues with this vehicle in just 1 month are endless. The main one being the brakes are sooo bad. I got in an accident after 1 week, because the brakes on the car just dont work. The quality of the seats are so poor, you can feel the springs in the seats. The transmission keeps slipping. I hate this vehicle. DO NOT BUY.

## b.   **Complaints on Cars.com**

322.   On Cars.com, a consumer of the 2016 Cadillac ATS wrote a review titled "One week after I bought my new ATS 2016" on September 8, 2016:

The transmission control module was faulty, I purchased the vehicle for piece of mind now I worry about more problems arising. So disappointed in the quality

323.   On Cars.com, a consumer of the 2015 Chevrolet Corvette wrote a review titled "Automatic sucks" on July 2, 2017:

Happy to get rid of car!! Car stumbled like had bad gas. 93 octane same problem. CHEVROLET would not return my call

324.   On Cars.com, a consumer of the 2016 Chevrolet Camaro wrote a review titled "Rear diff and trans issues TSB" on September 28, 2017:

I have less than 6k miles on my Camaro 2ss and it has had the transmission flushed 3 times, the rear diff flushed 9 times and the shudder is back. There is a TSB for this issue and for some reason Chevy can't get it worked out. Other then that I love the car! It is a beast it has good seating, explosive power with 455 hp 455 tq, the interior is much better than my 2010 2ss. Overall I would buy this car again it is a great handling car, with more tech features than I need.

325.   On Cars.com, another consumer of the 2016 Chevrolet Camaro wrote on August 16, 2018:

THE CAR LOOKS FANTASTIC INSIDE AND OUT. INTERIOR IN THE 2LT/2SS IS AWESOME. THE V6 IS FASTER THAN MOST PEOPLE THINK IT ALSO HAS GREAT HANDELING. HOWEVER IF YOU ARE A CAR ENTHUSIAST THIS PROBABLY ISNT THE CAR FOR YOU. THE STEERING IS NUMB, SEATS ARE MORE FOR COMFORT RATHER THAN SUPPORT, 8 SPEED AUTO CAN BE A BIT DIMWITTED AND SLOW, AND THE DRIVE MODE SALECTOR CHANGES ABSOLUTLY NOTHING EXCEPT THE STEERING WEIGHT (BUT ITS STILL NOT HEAVY ENOUGH) AS A STYLISH COMFORTABLE COUPE IT IS FANTASTIC, BUT AS A SPORTS CAR ITS A BIT TOO NUMB AND DIALED DOWN. I ALSO HAD ISSUES WITH BUILD QUALITY. THE INTERIOR HAD SEVERAL RATTLES MAKING IT ALMOST IMPOSSIBLE TO DRIVE WITHOUT MUSIC ON. THE EXTERIOR ALSO HAD A FEW PANNEL GAPS. ALSO IF YOU WANT SOMETHING UNIQUE THIS IS NOT THE CAR FOR YOU!

326.   On Cars.com, another consumer of the 2016 Chevrolet Camaro wrote on March 22, 2019:

I love the style inside and out, but only owned a month and had problem with 8 speed automatic. It started slipping in and out of gear and felt like running over a wash board. The dealer did a transmission

123

flush and added special fluid and told to drive 200 miles to see if
fixes. If not bring back. I understand chevy has a problem with this
tranny and trying to correct short of a new transmission. What a bad
situation for the owner and feeling of realiabilty when driving.

327.   On Cars.com, a consumer of the 2015 Chevrolet Silverado 1500 wrote

on August 14, 2017:

There seemed to be something wrong with this truck from the
time we bought it till we got rid of it. It had really funny sounds, it
wouldn't go when we tried accelerating, it was almost like a putt putt
truck. Was So Happy we traded it in on a New Ram!

328.   On Cars.com, another consumer of the 2015 Chevrolet Silverado 1500

wrote on November 24, 2017:

we feel we decided wrong to select the dealer they do not check
the vehicles.I do not trust anymore, this vehicle presents problem with
the transmission...., think so it's a shame

329.   On Cars.com, another consumer of the 2015 Chevrolet Silverado 1500

wrote on January 31, 2018:

2015 Z71 standard cab 4x4. This is the worst shifting truck I
ever owned it also had a 308 rear axle made for highway not towing. I
bought a 2017 with same motor 5.3 but with a 342 rear axle, What a
major difference! The 2015 also had Goodyear tires and major
vibrations, The 2017 has Bridgestones and it rides and shifts awesome
like a truck should, So if your looking for a New truck definitely
check the difference on 308 vs 342. With the 308 it shifts and bangs
and gets confused when to shift.... 342 imo is the only way to go!!

330.   On Cars.com, another consumer of the 2015 Chevrolet Silverado 1500

wrote on August 28, 2018:

I but a brand new 2015 crew cab Silverado from the 2 months I
have problems I never buy another one is my last one first all the
lights in the dashboard at 25000 miles the transmission went out And

now at 94000 miles my engine making all this noises is not a safe
truck to drive I talk to couple of my friends they're having problems
too '

331.   On Cars.com, a consumer of the 2016 Chevrolet Silverado 1500 wrote
on December 16, 2017:

Nice extirier and intirier but engine knock and problom with
vibation when driveing down the road take it to dealer to be repair and
thay said its normal

332.   On Cars.com, a consumer of the 2016 Chevrolet Silverado 1500 wrote
on April 28, 2019:

The transmission is shuttering and slamming into gear it's just
over its 41,000 Chevy said they know that there is a problem they
have tried to fix it at 980 dollar bill and it is still doing it. It doesn't
matter shifting up or slowing down it feels like it's going to fall out.
They won't stand behind the transmission, even though it a known
problem.

333.   On Cars.com, a consumer of the 2015 GMC Sierra 1500 wrote on
December 14, 2018:

I got a lemon. Roof leaking, received damaged spare
tire/equipment, transmission is slipping, heated seats failed already,
the dealerships/service are awful. I will never buy another GMC ever.
Not to mention, second model from top Denali... no heat to the
backseat!!!

334.   On Cars.com, a consumer of the 2016 GMC Sierra 1500 wrote on
October 1, 2017:

61000 for a old tractor like ride. They can't fix it. They tried.
Don't think even manufacture knows the cure. Poor quality. Better
drive one at freeway speeds before buying cause they can't fix if it
shakes or vibrates

335.   On Cars.com, a consumer of the 2015 GMC Yukon wrote on January 17, 2019:

My 2015 Yukon Denali is 4 whl drive, the transmission when put in reverse seems to have a second engagment a couple second after putting in reverse which is troublesome. Anyone else have this issue?

336.   On Cars.com, a consumer of the 2015 GMC Yukon wrote on February 7, 2019:

DO NOT BUY THIS VEHICLE NOTHING BUT TROUBLE ONE THING AFTER ANOTHER $70,000 pcs of junk AIR COND COMPRESSER FRONT REAR STRUTS TRANSMISSION PARKING SENSOR ALL KINDS OF RATTLES BUY SOMETHING ELSE YOU WILL BE THANKFUL

337.   On Cars.com, a consumer of the 2017 GMC Canyon wrote on September 13, 2018:

Save your money and buy something else. The seriously flawed 8 speed transmission will leave shuddering and vibrating due to a faulty torque convertor design. It feels like you are driving over rumble strips. Worse yet, when you accelerate the transmission bogs down and is a serious safety issue. GM is clueless. I understand they may have a new design torque convertor but you are put on a waiting list. Meanwhile, makes you wonder what all in the transmission is being damaged as they will not pay for a loaner vehicle until the parts come in, even under their own warranty. So you simply drive the piece of junk and hope for the best.

338.   On Cars.com, another consumer of the 2017 GMC Canyon wrote on June 23, 2018:

This 2017 slt vehicle is a disappointment. Bought it new April 26 2017, today is June 22, 2018. I have 4500 miles on it. Had it in the shop 2 times for a total of 43 days for transmission problems. It would down shift very hard from 3 rd to first. Felt like something was

126

grabbing the rear rend. 1st visit the dealer had for 3 days and , after 'tweaking the software' , said the hard shifting was normal. Second time I requested a ride along. That dealer employee happened to have a 2018 canyon, which was good because he could make a legitimate comparison. When the problem demonstrated itself, he said ' whoa, mine does that but not THAT bad'. Then the wait started. Service mgr had to discuss with GMC big boys. They wanted to keep 'tweaking the software'. Then they wanted technician to 'tear it down' . Fortunately the tech said was stupid and the Gmc big boys finally authorized a new transmission. Then it took 14 days to 'find' a transmission and install. Total of 43 days. In January 2018 I started to experience a feeling/sound like going over rumble strips. I waited until it finally got so frequent and pronounced that when I took it in the dealership could not deny experiencing it. Or say 'that is normal'. I took it in June 11. It is now June 22. Decision is that it is the torque converter. But they haven't even started to replace it because there are no torque converters available. But, I should be glad to know that I am first on the list. Whoopee!! 55 days total in the shop for transmission and torque converter and counting. And this is assuming they will not find any other problems once they start. After this is resolved then they have to address the suspension. The ride has progressively gotten worse. It is like riding over cobblestones regardless of speed or road surface. This is already on my problem list at the dealership. Very much regret giving up my 2005 midsized foreign truck. I am making payments but cannot use my truck. I will say the service mgr did give me a compensation after my transmission saga. Soothes the pocketbook a little, But sure hasn't taken away the frustration, irritation, disappointment, aggravation we are experiencing. Don't know if I will every feel comfortable with this vehicle b [review cut off]

339. On Cars.com, a consumer of the 2017 GMC Yukon XL wrote on February 5, 2019:

The 8-speed transmission is horrible and doesn't drive smoothly. I've never spent so much money on a car and been so unhappy with a car. We are in the process of trying to get it bought back...

127

## c.   Complaints on CarComplaints.com

340.   On CarComplaints.com, a consumer of the 2017 Chevrolet Silverado 1500 High Countrys V8 with and automatic transmission wrote on September 1, 2017:

I found hundreds of complaints about a transmission slip, bump feeling when starting to drive or slowing to a stop with no solutions or suggestions. Took it in last week for the third time and after hearing the previous 2 times that it was a "programming issue" they told me it might be the drive shaft.

When I went to pick it up at Chevy they told me the drive shaft was fine and gave me the following bulletin (#PIT5161F). Basically states that if you do not have a full or empty tank - the shifting in fuel can cause these characteristics. So here I am thinking that I have a $56,000 truck (high country 4x4) with no rear a/c and now I have to deal with a feeling of getting rear ended if I do not have a full tank of gas. Rear AC - my fault for not noticing...but not sure how GM thinks this gas tank issue is acceptable. Its a truck that weighs over 5,000 lbs and a couple hundred pounds of gas "shifting" can make it feel like it has transmission issues. Owned it about a year and has 15,000 miles on it. Wish I could just return it at this point.

341.   Also on CarComplaints.com, consumers commenting on the 2015 Chevrolet Corvette repeated their Transmission Defect issues, including one at https://www.carcomplaints.com/Chevrolet/Silverado_1500/2017/transmission/surg es_and_jerks.shtml (last accessed May 7, 2019). It stated:

a) On May 1, 2015:

8 speed automatic transmission down shifts at a stop with such force it feels as you have been hit from behind by another car while coming to a stop. Transmission also will not always engage properly and will over rev and slam into gear possibly causing an accident. Transmission at times will disengage while going forward then slam into gear with great force. I was told by a GM insider that GM is aware some transmissions are defective and is working on a kit to fix

128

the fluid starvation problem internally but has done nothing to inform owners of the potential dangers of erratic shifting that it's causing while driving. This also causes the transmission to over heat and to illuminate a warning lamp.

- Downers Grove, IL, USA

b) On February 27, 2016:

8-speed automatic transmission always shifts erratically when starting out cold (lazy shift, slow shift, etc.) and occasionally does not downshift when car comes to a stop, only to slam hard into 1st when gas pedal is pressed to resume travel. Dealer says GM claims this is "normal, " but no car I've ever owned behaves like this. Appears to be fluid starvation internally. Any fix/replacement would be costly for GM, so given their history w/faulty ignition switches, not surprised they're trying to avoid it. Transmission is definitely not normal and behavior is unpredictable + unacceptable -- especially at this price. When car is moving & transmission is in drive and trying to lazily shift gears, you temporarily lose ability to apply power, which is both dangerous and unnerving. Clearly, this transmission was put into production w/inadequate testing & development. A recall is necessary to fix properly.

- Kansas City, MO, USA

c) On November 22, 2015:

Automatic 8 speed transmission had to be replaced at 2000 miles on the odometer due to hard shifts and shifting automatically to low gear at highway speeds nearly bringing the car to a stop in interstate traffic, now 700 miles and 4 months later the transmission is stuck in second gear and you cant drive fast enough to get out of the way of traffic. And I know of several other cars like it that have similar problems. This is a real safety problem and GM seems to ignore it, probably until someone gets hurt or killed.

- Lexington, KY, USA

d) The A8 automatic transmission in the 2015 Corvette is prone to occasional hard downshifts from 2nd to 1st gear when driving at slow speeds (less than 10 mph). Sometimes the downshifts are so

129

violent that the car jerks forward several feet. The first time it happened I thought I had been rear ended by another car. The unpredictable behavior of the transmission is especially dangerous in proximity to pedestrians or other vehicles.

- Salado, TX, USA

e) On January 7, 2016:

Automatic A8 transmission has the following issues: 1) morning shift from reverse to drive severely delayed, bangs in eventually. 2) erratic shifting in normal traffic 3) the 2-1 downshift when coming to a stop results in severe bang, lurches forward and is very unsafe in a parking lot situation. Also in stop and go traffic, same lurching forward. Feels as if someone hit you from behind 4) torque converter lockup in 5th and 6th gear. Dealer tore apart the car to replace the stator, performed software update - neither solution worked.

-Murphy, TX, USA

f) On October 16, 2017:

I had my vehicle serviced at dan vaden Chevrolet in savannah, ga on 16 Oct 2017 at (12,200 miles). My main concern was a shudder and jerky motion the car starts demonstrating while in motion, accompanied by fluctuating engine rpms. After researching on the internet there are 1000's of issues with these torque converters and who knows what accidents these failures have caused. There should be a total recall on these transmissions. A service department technician test drove my vehicle and confirmed and documented my concerns and stated it was okay to drive ? I am scheduling another service at (13000 miles). A search of the internet will fill you full of facts on these failures. Problems with the torque converters with these high end vehicles are well on the way to become another Corvette issue of epidemic proportions. Please assist.

- Hinesville, GA, USA

g) On March 22, 2016:

130

2015 Corvette stingray Z51 - 8 speed automatic transmission torque converter. With only 7,500 miles on the car it started to run jerky and rpms would fluctuate for no reason (especially at highway speeds when fully warmed up). Often felt like driving on a washboard dirt road. After a cold start, there was a delay after shifting into drive. When it engaged after several seconds it would do so violently, lurching the car forward suddenly. Dealer diagnosed faulty torque converter as defective and a known problem with these transmissions. After less than 2,000 miles the symptoms returned and the dealer again replaced the torque converter. So now I'm on my 3rd defective tc. After 1,700 miles, symptoms returned again! dealer said that Chevrolet and GM have ordered a stop on replacing the tc's since no fix was available. GM advised to drain and flush tranny, refilling with mobil1 transmission fluid. This seemed to work (only for a little longer) but is worrisome because in the future service, a technician will likely refill with GM fluid, not mobil1. Especially if a second owner. Now at 16,100 miles the symptoms are returning! jerkiness, slamming into gear after a delay on cold starts. GM seems to have turned their back on stingray owners by kicking the can down the road beyond warrantee (with the mobil1 "band-aid fix"). on the forums there are so many owner complaining about this same issue. I am amazed that there is no official investigation resulting in a recall. This Z51 LT3 stingray was $75,000 otd! for this cost we should be able to expect a quality vehicle and a motor company that stands behind it! can somebody please help us with this serious and potentially dangerious problem?

- Wellington, FL, USA

342. Also on CarComplaints.com, a consumer of the 2015 Chevrolet Silverado commented on November 1, 2015. https://www.carcomplaints.com/Chevrolet/Silverado_1500/2015/transmission/transmission_shifts_poorly.shtml (last accessed May 7, 2019). The complaint stated:

I've been researching hoping to find a solution to the 8 speed transmission in my 2015 Silverado LTZ Custom Sport Z71 with 6.2 l. It does the same as many others have described on here. The shifting is horrible, feels like its going to rip the drive line out at times. I've taken it back to the dealer at least 5-6 times, I've been told it needed to

131

be reprogrammed, that it needs to get used to the way I drive, and poor gas. Finally the dealership replaced the transmission and this was great, my truck was driving and shifting like it should and then after a couple of months it went right back to doing the same thing, it even surges at times when you first put it in gear so you best have a good foot on the brake.

I'm at a loss now, I don't know what to do. I got a price to trade it in but it was going to cost me a great deal more and I honestly don't see why I should have to spend more to get a vehicle that is mechanically sound when my truck only has 15,000 miles on it. I love my truck, the 6.2 has excellent power but what happens when my warranty runs out.

I've watched and hoped someone would start a class action lawsuit against GM for knowingly selling vehicles with problems. Or have they fix the problem in the 2017's. I know some of the corvettes have the 6.2 motor do they have the 8 speed transmission also? If so do they have the same problems?

As for the lemon law, I'm in Louisiana and honestly not sure if that would work here. I just know when you pay 56,000 dollars for a vehicle you expect to have zero trouble out of it.

If anyone finds a solution please post it here for us all to see.

- Lando S., Anacoco, LA, USA

343. Also on CarComplaints.com, consumers of the 2017 Chevrolet Silverado commented on their Transmission Defect issues, including the following complaint at https://www.carcomplaints.com/Chevrolet/Silverado_ 1500/2017/transmission/surges_and_jerks.shtml (last accessed May 7, 2019).

a) On November 22, 2016:

My problem is like a lot of the other complaints that I've been reading. I purchased my 2017 LTZ Z71 with a 5.3 and 8 speed transmission in late 2016 and after driving it for a month or so I really started to notice surges and jerks mostly at low speeds and sometimes

132

slowing down coming to a stop. The jerks sometimes feels like I got hit from behind. After several visits to the dealer and long discussions with service management, I was first told it had to learn my driving habits. Then I was told it is a characteristic of the transmission. I recently took it back and they replaced the transmission fluid and told me they were going to replace the torque converter early next year when the new design came out. So I guess have to just put up with it, I just don't know for how long.

> - Rudy D., Corpus Christi, US

> b) On January 3, 2018:

Purchased 2017 Silverado 5.3 w/8 speed auto on Dec 20 2017. At approx 535 miles, transmission began shifting hard at speed under 15 miles per hour, included a "clunk" similar to a universal joint going bad. Problem exists with both up shift and down shift. At 2066 miles truck started to surge as I slowed to stop. A heavy clunk and surge gave me the impression I was hit from behind. I stopped at selling dealer and service advisor assured me that this transmission had a "learning" curve that adjusted to my driving habits and i should drive for 10,000 miles to allow the system to "learn" my habits. Deciding that sounded like a great story I Googled for Silverado's with 8 speed transmission issues and found more than I cared to.

I have seen all the complaints and concerns but no solution from GM. I fear I have invested a bunch of money into a disaster. Having owned over 7 GM products over 57 years I am disappointed with this one.That said I'm heading back to dealer today.

Any GM service people monitoring this or anyone that has a definitive solution I'd appreciate a reply.

> - Gary L., Cumming, US

> c) On February 4, 2018:

$62,000.00 truck including the new CORSA 3.5" exhaust and COLD AIR INDUCTIONS sealed cold air intake box. This truck shifts horribly throughout the 1-2 shift and especially the 2-3 shift. How can these 8 speed transmissions function this poorly. I had a 2012 AUDI Q7 S-LINE with over 110K miles on it. The 8 speed

133

transmission worked flawlessly the entire time I owned it. Every single shift whether flooring it or accelerating as slowly as humanly possible, were seamless and exuded quality engineering and workmanship. How can this transmission shift as poorly as it does with only 4637 miles on my truck. GM big wigs need to start taking some pride and responsibility in their most profitable and best selling vehicle that they sell.

- 98supra6spd, YPSILANTI, Michigan, United States

344. In another comments page on CarComplaints.com for the 2017 GMC Sierra, consumers stated at https://www.carcomplaints.com/GMC/Sierra_1500/2017/transmission/hard_shift_in_and_out_of_first_gear.shtml (last accessed May 7, 2019).

a) On April 3, 2017:

When going slow it will shift hard and clunks sometime worse then others when shifting from 1st to 2nd and other times it works right. I have had it to the dealer at least 3 times. 1st time they said it was too new and had to learn my driving habits. At about 3500 miles they did a adaptive relearn. The third time they found an update and did a relearn, no change. Now there is around 7500 miles on it and I was told there is nothing else they can do and this normal for this 8 speed transmission. At 58000 dollars it is ridiculous to think this is OK. They need to come up with a fix for this. I'm not the only one with this problem go on GMC trucks.com. There are 9 pages of complaints for this problem. I would be afraid to buy the new 2019 truck coming out, as they can't even get the current model right.

b) In January 2019:

January 4, 2019: I dropped my truck off at the dealership service department and informed the sales staff that I was having a significant engine/transmission related problem that I did not feel comfortable driving the vehicle. I made an appointment and left the vehicle. It is current being troubleshot; the mechanic informed me that an ejector must be replaced and the transmission must be further analyzed to determine what is going on with the vehicle. I was

134

informed that a loaner vehicle may be provided if they can not repair my truck in the near term. I am currently renting a car for getting to/from work. This problem was noticed on the first day of purchase but I was informed that it was normal, but the problem has gotten worse and more intense.

Update from Jan 9, 2019 I purchased the 2017 GMC Sierra, Crew Cab, SLT 1, truck from Sam Taylor Buick/GMC/Cadillac in Fort Walton Beach FL. I noticed a faint shifting problem immediately, but was told it was normal and it would go away eventually. The problem has become extremely noticeable and severe at times. I do not feel that the vehicle is reliable to drive outside my immediate commuting area until it is repaired by certified GMC mechanics. Sam Taylor Buick, GMC, Cadillac is now under new ownership and they are trying to resolve the mechanical issues with my vehicle. I will give the a fair opportunity to do right by their GM product. I will update this post as more information comes to light.

Update from Jan 14, 2019 Step One Buick GMC of Fort Walton Beach, FL has been working on my 2017 GMC Sierra 1500, 6.2 L truck for almost 1 week now. I rented a car during the first week and now waiting to get a loaner. The Service Department says its put back together but requires a road test; its now 1:52 pm --apparently the road test must be a length process. No calls yet. Why hasn't the State of Florida, Texas, and other Consumer Affairs agencies gotten involved with this GMC Sierra vehicle issue? (Rhetorical) The public always get lip service and NO ACTION but when it comes to enforcing product standards and laws to protect the public. These vehicles should be classified as lemons after Big GMC fails to correct the defects!

Update from Jan 15, 2019 Step One Automotive Group, aka Sam Taylor Buick Cadillac, returned my 2017 Sierra after 1 week of troubleshooting the check engine light, vibrating steering column, as well as the shuddering and knocking in low gears. The remedy was to replace an ejector, clean the trans pan, and replace the transmission fluid. I still feel the shifts during the transition through the lower gears, but its a bit smoother....no banging from the rear differential. The Service staff could have followed through with providing the loaner vehicle once I returned my rental car. The good part is that I was not charged for the repairs. The Service Department staff was on

135

point and the mechanic work acceptable, however, I do not believe the issues have been permanently resolved. Time will tell. If there is a recurrence of the same issues, I will likely trade the GMC Sierra for another brand that is more reliable.

### d.   Complaints on gmauthority.com

345.   Similar comments have been posted in threads on gmauthority.com, including the following comments discussing the 2016 GMC Sierra at http://gmauthority.com/blog/topic/2016-sierra-8-spd-issue/ (last accessed May 7, 2019). One commenter began the thread on February 1, 2016 as follows:

I took delivery of a 2016 Sierra Denali (5.3 V8, 8-Spd, 3.42) in November and had to take it into the dealer a week later for a transmission issue (coming to a stop the truck would shudder as though the transmission was shifting hard into first gear or as though the engine was about to stall). 3 weeks after taking it into the shop, GMC engineers determined that there was a torque converter problem that was staying engaged too long causing the engine to nearly stalling out when coming to a stop. They okay'd replacing the entire transmission for a new one. I finally got the truck back (a MONTH after first taking it into the shop – and yes, the truck spent 30 days of its first 39 days of ownership in the hands of my dealer) and figured that would be the last of my problems. Since then, I've noticed that when yielding – or in traffic/congestion – when I'm slowing down almost to a stop (around 5 mph or lower), then stepping on the accelerator, there will be a long (1 to 2 seconds) delay between me stepping on the accelerator to move and the truck shifting into first and beginning to accelerate. I took it to the dealer again, and they claimed the delay and even "hard" little shifts are normal for this transmission because it is "adaptive" and constantly learning… What? I at first bought it (they are the pros), but I'm beginning to hate not having the confidence of pulling out of a driveway, side street, etc. and being able to immediately get the power and acceleration I need to get out of the way (or better yet to get on my way). Is anyone else here having similar issues with their new GM 8-spd?

(a)   A consumer responded on this thread on February 11, 2016:

First post. Hate to see you are having problems. Thought I might be the only one after hearing what service department is telling me. I just bought a 2016 Silverado LTZ with an eight speed and it shifts horrible. Love the truck but not fun to drive while taking off and stopping. Truck has 1400 miles on it because according to service department I have to get my truck to learn my driving habits. I am either a bad driver or have a truck with a learning disability. When truck sits over night or going home from work it always jerks a couple times taking off. Never fails. When I first bought, every time I would stop it would do something that felt like it was still shifting down when I should be stopped and actually feel like a double stop or surge forward. May sound crazy but really is the only way I can explain. There has been a couple times when I pulled into a parking spot to where it felt like I hit a curb because of the way it would stop. I have never experienced anything like this with any vehicle I have ever had. Seems like the computer is not in sync with the transmission at all. I will make turns and vehicle don't seem to downshift when it should. I truly feel like I am driving a manual shift truck without using clutch. Love the truck and hope enough people speak up so this problem can be fixed. According to my service department vehicle runs as it should. If this is the case I wish I would have kept my perfect running 2013 Ford F-150 4×4.

(b)     A consumer responded on this thread on November 15, 2016:

I purchased a 2015 Sierra SLT with 6.2l and 8 Speed in August 2015 and when it is cold meaning its been setting a day or so, you will almost always get a slip in the transmission causing a several second delay. I had went to a show for my company in Atlanta GA and almost got hit because, I backed out onto the street and when I put it in forward it would not go for several seconds because it just revs up the stairs shudders going forward. I have taken it back to my dealer twice and they cannot recreate the problem so, they have done nothing. I ran into a man at my dealership who was in the process of describing the exact same problem and gave him my business card to see if they fixed his issue. The dealership told him the same thing and he called me yesterday to let me know he and his wife got hit in the Highland NC because, he backed out and could not go forward just like I do weekly in mine. I now have a couple phone videos of mine

137

doing it to show my dealer again but, I am wondering what to do as they have not done anything yet.

(c)     A consumer responded on this thread on December 5, 2016:

I just bought a 2017 silverado ltz 6.2/8-speed and I'm experiencing similar issues! If I'm driving 35-55mph every once in a while I get a shudder in the wheel for a brief 1-3sec on and off while I'm at these speeds it's so frustrating!! The truck has 500 miles on it and my old 1995 silverado with 185k drove with no shudder or vibration issues.

(d)     A consumer responded on this thread on December 5, 2016:

I purchased a 2017 GMC Sierra 5.3 with the 8 speed transmission two weeks ago. (This is my 5th GMC truck) no previous problems.

I now have 1000 miles on this truck.

I noticed the truck shudders and seems to have a hesitation between gears, especially at low end. I went in on Dec 2nd 2016 and talked with the dealer who said it takes a while for the transmission to learn my driving habits. What? . It also clunks when taking off. Was told the clunk is normal. This morning Dec 5th i warmed the truck up for ten minutes put it in reverse and the truck would not move. just revved up. 10 seconds later it slowly starts to back up onto the street. I put it in drive and it still won't go ,just reeves up for another 10 seconds before it finally jumps into gear. Made an appointment to bring it back to the dealer.

This can not be normal for a commercial grade pickup.

(e)     A consumer responded on this thread on December 19, 2016:

I bought it brand new Dec 2015 (2015 High Country 4×4, 6.2ltr V-8) with the new eight-speed Hydra-Matic 8L90 transmission. So I've had it a year now and have put 19k + miles it. I noticed about a month ago when the engine was cold and I went from park to drive it felt as if I was parked on a hill and the trans was in a bind, taken 1-2 seconds before roughly engaging in gear. Then it started doing it more

138

often even when the transmission fluid temp was above 130. Well last week it began to shudder almost like driving over road strips before a stop sign. I also noticed that if I had it on cruise control between 40-60mph the tachometer would rev up every time it shuttered/vibrated. It took it back to the dealership as it is still under warranty and had the mechanic ride with me so he could see for himself what my Chevrolet was doing. He knew immediately as to what he thought was causing the vibration…torque converter he says! So as of right now it is in the shop to replace the torque converter with an upgraded one per this bulletin 15389 which provides a service procedure to reprogram the transmission control module (TCM) on certain 2015 model year Cadillac Escalade, Escalade ESV, Chevrolet Silverado, GMC Sierra, Yukon Denali and Yukon Denali XL vehicles equipped with an 8L90 8-Speed (M5U) transmission and 6.2L (L86) engine. These vehicles may have a condition in which transmission calibration allows a higher than target energy input to the torque converter clutch (TCC) under certain conditions. This may lead to faster than expected torque converter clutch material wear, and a shudder feeling.

(f)    A consumer responded on this thread on November 15, 2017:

Good day to you all. I have a 2016 Sierra with the 8 speed transmission. At 18300 miles I took the local dealer because of a vibration at low RPM throughout the gear range; rough idle; and jerking gear changes from 1st to 2nd at low speeds.

The dealer had the truck for 5 days. They had to await the back-ordered tranny flush juice. They did the "triple flush" of the tranny and also replaced all 4 engine mounts. They claimed they updated the software on the truck engine management control and they also updated the software on the infotainment system.

I now have 19300 miles on the truck, and it is now going back for the exact same reasons – rough idle (not as bad as the first time), and the start of the vibrations.

I expect them to keep the truck for a week, as I dont wish to continue going back there every 6-8 weeks.

139

I was advised that they are short handed WRT transmission specialists. This is a common excuse in Fort Lauderdale, with at least 5 dealers all "sharing" the same transmission specialists.

My humble advise is to have them do the tranny flush and confirm there is a warranty on these services. I assume the flush is good for +- 1500 miles MAXIMUM.

As soon as I have my truck back, i shall report the dealers explanation.

(g)     A consumer responded on this thread on December 12, 2017:

bought a 17 Denali 6.2 w/ 8-spd in march of 17. I finally got around to taking to the dealer for a shifting issue from first to second gear (19k miles). If I was accelerating slowly it would shift very hard into second. It appeared as though the RPMs would go too high before shifting, then slam in to second. They replaced my transmission, and now I have a whole new set of problems. Its sluggish and hesitant between gear 1-3 or maybe 1-4 when accelerating, and sometimes clunks into first coming from second upon stopping. Needless to say I'm on the verge of trading it in.

(h)     A consumer responded on this thread on August 16, 2018 and on August 21, 2018:

I purchased a pre-owned 2017 GMC Z71 with the 6.2 and 8spd in April this year. It had 10,500 miles on it at the time and I really like/liked the truck. Great power, fuel economy and very comfortable. Last moth while traveling on the interstate (on vacation 250 miles from home) it started exhibiting the same problems mentioned above (like someone flipped a switch). At first I thought I was riding on rumble strips and tried swapping lanes, no change. Next I noticed the engine RPM's were fluctuating and it felt like it was hunting for the right gear. It also exhibited the same problem mentioned in another post above when going uphill. We were not towing anything, the hitch had never been used when I purchased the truck and I have not pulled anything heavier then our 16ft boat. The truck had 16,700 miles on it when this started. Once we arrived at our vacation destination I did a search to see if other people had been experiencing problems with

140

these transmissions and after viewing all the post I wished I had done more research before purchasing this truck.

I was finally able to get it to the dealership and left it with them on August 6th. They still have it and can not correct the problem. They did the flush and replaced the engine mounts. They also commented that they know there are problems with this transmission. I was told yesterday that they are trying to contact GM to see what to do next. I have purchased 6 new GM vehicles over the years and 7 pre-owned GM vehicles and never experienced anything like this before with them where the problem couldn't be corrected. If they don't get this corrected I will be done with GM.

[August 21, 2018:]
The dealership called Friday (August 17th) and stated they had the problems resolved. I picked the truck up around noon and initially it performed great. After about 40 miles of driving I made a stop and upon starting the truck the shudder came back while idling as well as the rpm fluctuations. At highway speeds the shudder comes and goes and a couple of times it acted like it was hunting for the right gear which was one of the problems it had before the repair attempt. I contacted the dealership and they stated they would look further into the issue. If the TCM is really "learning" my driving habits then I will have to agree with an earlier post that the computer has a learning disability.

After a couple more days of driving the truck it is starting to look like all of the original issues may be returning.

I will say the dealership has been very cooperative and wants to resolve the problem. They even picked up the extra cost of the rental beyond what GM covers.

I have also contacted GM priority care. Below is their response and I will keep posting updates.

"We understand how you like to have this issue resolved and we would like to work closely with you along with the GMC dealership in resolving this issue. Due to the nature of your concern we will endorse your case to a Senior Advisor who will continue to work directly with you and your dealership to review your vehicle and

concerns. Please know that all the information you have provided will be available to both your dealer and Senior Advisor as well. We will forward your case to them and the Advisor and Dealer will review your case and vehicle details, and one of them will be in contact you within 2 business days to assist you further."

### e.      Complaints on gminsidenews.com

346.   On gminsidenews.com, a consumer posted on September 12, 2017:

2018 8 speed transmissions

Does anybody know if the 2018 model GMC 1500 trucks have upgraded -improved the 8 speed transmissions? My 2016 has only 10000 miles and at the lower speeds it has always shifted funny and sometimes hard. Out on the highway it shifts good in the higher gears. I have to let it warm up alittle or it jumps into gear. I was going up the driveway the other day and the transmission just quit for a second and jumped back into gear. I have contacted the dealer but he says that all the 8 speed trans act that way. Wish now that I would have stayed with the 6 speed trans as my 2014 Tahoe has never given me a problem and shifts smooth.

### f.      Complaints on gm-trucks.com

347.   Similar comments have been posted in threads on gm-trucks.com.  See https://www.gminsidenews.com/forums/f22/2018-8-speed-transmissions-278401 (last accessed May 7, 2019). One commenter began a thread titled "My own 8 speed problems & resolution" on March 1, 2016 as follows:

**I wanted to post up my own experience with my 8 speed transmission in my 2015 SILVERADO HIGH COUNTRY 6.2L 8 SPEED 8L90**

I bought the truck brand new in July 2015. Manufactured date of April 2015. I purchased it from a dealer in NH and they have been great to deal with.

So here is the story-->

142

July 2015 --> At first the truck was flawless. It shifted butter smooth and on a very rare occasion (once a week maybe) it would clunk slightly when downshifting. It was totally negligible.

***As time went on and the mileage increased it got worse. Here is a list and description of what it was doing once I hit about 3500~ miles. It didn't clunk and act sloppy all the time. HOWEVER, there is a good 65% chance the truck was going to shift poorly.

• It clunks (HARD) into lower gears when slowing down/downshifting. This is the biggest issue and has continued to happen up to now.

• Taking off from a stop with smooth, consistent acceleration, it has trouble deciding the correct gear and vibrates.

• Same scenario as above, the rpm's fluctuate.

• It makes clicking noises constantly when shifting. If you manually shift it, you can hear clicks in almost every gear.

• I can MAKE it clunk hard if I coast in gear 7 and manually shift it into gear 6. **NO RELATION TO AFM/DoD WITH THIS.**

• For some reason, turning into another road or turning in a slight corner and accelerating will make it downshift and clunk hard.

• Going from Park to Reverse either cold or after driving it would slight clunk, then engage a second or two after the initial clunk is heard/felt.

December 2015 --> I took it to my dealer at the 5000 mile oil change/scheduled maintenance and I had the service manager ride with me to hear the clunking. The truck was really acting up that day, and it was clunking like crazy. The service manager said he heard the noises clear as day. He told me the 8 speeds have some clunks, and because they are so new people need to get used to them. He gave me the whole they need to learn and EPA demands greater fuel mileage talk. I disagreed with him and we had a long conversation. I mentioned to him when the truck was new it did not do this.

143

When we returned to the dealership, this is exactly what he told me: "this is normal operation, we are not going to do anything about this issue"

I asked him to at least check for updates and go over the truck top to toe and check motor mounts, transmission mounts, spring shackles, etc. Just to rule out any possible 'looseness' that could cause the clunks. The work order said they checked for updates and looked the truck over. They found nothing out of place and no updates available.

Around two weeks later, with 7200~ miles on the truck, I was talking to my uncle about the transmission issues and he called his local Chevy dealer on my behalf. The service manager said the 8 speeds have a couple updates available, and to bring my truck up to see if they apply to it. He said the update had really helped a couple 8 speeds they had recently sold. So I drove up to their dealer (an hour in the opposite direction of MY dealer) and they hooked my truck up. I figured MY dealer had done the updates, but there was an available update. They updated it and it really didn't help much. It seemed to make the truck hold a little higher RPM cruising, but I didn't notice anything besides that.

March 2016 --> Just yesterday I dropped my truck off at my purchasing dealership with 9800~ miles. I asked them to do the scheduled maintenance, and look into the transmission one more time. Especially considering it hasn't gotten better, it got worse. I specifically asked them to drop the pan and look at the fluid, valve body, etc. They called me Monday afternoon and told me they took an extensive look at my transmission and they are going to put a new transmission in it. They said after driving it/taking a look that it is "A GM candidate for a new transmission" because of the "symptoms it exhibits"

In 5-8 days the transmission will arrive from Detroit and then they will put in a new transmission.

I will keep you all posted on the results and we will see if over the next 10k miles the new transmission stays smooth.

…

144

I am giving GM a chance to fix the problem. Out of all the 8 speeds they have manufactured, they can't ALL be bad.

If this doesn't fix it I will ask them to buy it back. If they wont buy it back, then I will trade it in. Lesson learned.

**On March 22, 2016**

I just dropped the truck off at the dealer this evening. I just hit 10000 miles. The tech wanted to hear it. I drove, and I got it clunking quite a bit. He told me the way my transmission was clunking was NOT normal. He also said they have had a lot of concerns with 8 speeds. He said most of the 8 speeds have slight clunking that is due to tolerances/backlash which is understandable. He also mentioned the torque converters have been known to 'shred' themselves and create a lot of debris. Either way the 8 speed is not doing so hot. GM is working on it a permanent fix, but no absolute fix yet.

I can't say enough good things about my dealer though. They told me if it can't be fixed, or it comes back from GM I 'have to live with the clunk' that they will help with either trade assistance or buy it back. I really hope they can figure out a fix. It's a damn nice truck.

To those of you having any kind of doubt, bring it in to the dealer and at least have them document it. I live an hour away from the dealer, so I know how much of a pain it is going to the dealer. These trucks cost too much to settle for these transmission issues.

**On March 24, 2016**

[In response to the question "Are people with 2016 models and the 8 speed transmission having the same issues?"] Not sure if the 2016 8 Speeds are quite as bad. The tech told me the transmissions currently being put into the trucks have an updated torque converter. That was one problem. My tech was very friendly and did say they have had a 'slew' of problems with the 8 Speed.

HERE IS ANOTHER UPDATE:

I picked the truck up last night after a 24hr turn around from my dealership. They took the truck for a four hour drive as they called it

145

and did the relearn adapt while driving around. They had one guy drive, and another with the computer monitoring the transmission.

\*\*\*

The drive home seemed to be much smoother. I will let you all know how it goes. I have spoken with the service manager, my sales man, and the manager of my dealer and if this doesn't meet my satisfaction they have agreed to buy it back. I have been ultra patient with this whole thing, and they have been more than willing to help me this. At least there are some dealers out there that care about the customer. Believe me, I have had my fair share of different dealerships treat you like crap.

I hope this fixes it because I do enjoy driving this truck around.

**On April 12, 2016**

Alright everybody. Here is the verdict.

I have an appointment tomorrow morning to bring the truck back to my dealer. The 'reprogram' did not help at all. They told me to drive 500 miles after the program to help it 'learn' further. I drove it 1000 and it still does the same clunks. All low speed clunks. I know exactly when it will clunk now, so riding with my dealer should show them my issues.

At this point I am planning on getting rid of the truck. I tried multiple times to have GM fix this damn 8 speed/clunk fiasco and they have failed so far. Really disappointing as this was my first new truck.

I know I am not the only one with this issue, and I know not every truck built has this issue. I wish all of you luck with your trucks moving forward.

(a)     A consumer responded on this thread on March 14, 2016:

I'm having problems with my 8 speed as well. Tranny doesn't engage well especially going from park to reverse and if you give it gas before it's ready, it will hammer into reverse and jerk the whole truck violently. Makes you look like an idiot driver when it happens.

146

Truck just lurches backwards. Also clunks when stopping or starting from stop. Also clanks between most shifts. This tranny was definitely not ready for pTransmissione time. If it had done this when I test drove it.. I would not have bought the truck.

(b)     Another consumer responded on April 16, 2016 and April 20, 2016:

Well I'm another victim of GM's great 8sp. trans. Actually mine wasn't really giving me too much trouble until I took it in for the TCS update and my truck went crazy. I think they corrupted my computer. Drivers assist back up and all went bad. My RPM's were jumping 1500 to 2000 rpms at 45 mph with the cruise. Not 5 miles down the road it shuttered so bad it jerked the steering wheel out of my hand.

Now my truck has been in the shop all week with no reply except they tried to blame it on me for putting Denali 22in transmissions on the truck. Said it would change the dynamics of the transmission. Needless to say my words weren't that great. Its a 4 wheel drive what the hell has happened. Wanted to know if I had a programmer for changing the tire size. I know what they are trying too pull on me, and told them so. They are really reaching for any excuse.

I could be another lemon victim. Really sucks I love the truck. I have a 30ft off shore racing boat and the 6.2 pulls it with ease.

I know now my truck will never be the same. I'm getting too old for this crap.

Also heard the Dodge 8sp was having issues also. An older gentleman I work with told me they are cramming too many gears in a small case and it won't work. Kinda makes since. I will keep updates if or when I get my $60,000 rolling turd back.

…

Lets face it all lie's and deception. My dealer is trying everything in the book to blame me. Its really pathetic they would stoop so low for GM.

They still have my truck, this is week 2. So lets think about that, truly how long does it take to program the computer. That just

147

tells me that there is NOT a cure for our transmissions. It's going to take us the consumer to stand up for our rights and make GM figure something out. I smell a recall but the only one's suffering is us. Who knows how long it will take. Folks don't settle push it to the end, they expect us to give up and walk away. Lets face it the easy solution is to trade it in on something else but that's not the cure. I will ride my dealers ass till something is done. I don't give up.

I have no clue when I'm getting my truck back, but I told the service manager I want my truck shifting like it was right off the lot, that's what I paid for not a test machine. I'm 6' 6" and they gave me a regular cab with no gas at all. I'm so glad their on my side. The 2016 truck I'm driving around in shutters, not sure the tranny size but its a v6. So that tells me there's no fix in sight. My dealer says its a software problem and not the trans. Humm!!!!!!

I will let everyone know what happens if I ever get my truck back.

(c)     Another consumer responded on May 13, 2016:

I'm taking my truck in for the second time with 8 speed transmission issues. I took it in about 2 weeks ago and the performed all of the TSB updates for the programming and it shifted worse than ever. Clunking on upshifts like it was a 1980 Camaro with a stage 25,839,874,329,876,443 shift kit.

The last straw which made me call in for a second service appointment was me starting from a stop on a 3% decline at less than 5mph it felt like I was rear ended hard. I looked back behind me and there was no car. I'm guessing there was no pre-load on the pinion gear and it was between shifts when I started to roll forward and then locked up with some backlash. This is strike #2. If I get it back next Tuesday and I have one more tranny fart, I'm going to be looking to do the same as the OP.

(d)     Another consumer responded on November 2, 2016:

2016 gmc sierra 6.2 8 speed. I too am big gm fan. Have had many. This truck with the exception to the power of 6.2 is a p.o.s ... transmission is garbage. Engine is very noisy and idles like it wants to

148

stall. Rides like a hosre. All for almost 60 grand. I'm sure it's not all of them but too many where there is a big problem here. On my second converter. Many relearns. I too would rather drive my old car than this new one. Headed for lemon law. Gm has had their shot.

(e)     Another consumer responded on July 25, 2017:

OK truck has been at dealership (not from where truck was purchased) for about a week now because of steering wheel vibration and clunky transmission and also when left over night you start up in the morning it takes a few seconds for the reverse to grab. The dealership allowed me to drive a brand spanking new Tahoe Platinum so guess I cant complain. So the first time me and service personal talked he said the Torque Converter would be replaced and that GM wanted them to empty out the transmission fluid and refill with different type. I will let him know about the 16-NA-014 Bulletin. I am sure he knows about it. Since I'm not going to mention the dealership at this point the technician told me they were have alot of issues with the 8 speeds. I love my truck and the power of the 6.2.

(f)     Another consumer responded on September 1, 2017:

I just had my torque converter replaced for shutter for the 2nd time. Both time they lasted roughly 16k miles. Does anyone have high miles on their 8sp as i am very concerned about long term reliability. I see now why they decreased the powertrain warranty.

(g)     Another consumer responded on October 20, 2016:

My 2017 GMC sierra 1500 6.2/ 8 speed with 4k miles just had TSB done on relearn of C3 return spring, i took it in because of the clunky noise on downshifts when coming to a stop. At first i thought it was fixed only to discover it wasn't, still clunky. It seems to downshift normally half the time and clunky the other half UNDER THE SAME EXACT DRIVING CONDITIONS. Also took in for rough idle, they adjusted the motor mounts then replaced them, no fix either, giving the truck some more time then I'm trading it in and never buying a GM truck again, what a damn joke this is for the amount i paid for this truck. Also forgot to mention they had my truck 14 days, i got lucky and they gave me a little Buick car for loaner, talked with others who

149

had to endure longer times without getting a loaner. i hope eventually
a class action lawsuit against GM is created for this transmission mess
and the way they are handling it.

348.   Another thread on gmtrucks.com titled "2017 Canyon 8 Speed
Absolutely Horrible" began with a post by a consumer named Ron on June 27, 2018
at            https://www.gm-trucks.com/forums/topic/213033-2017-canyon-8-speed-
absolutely-horrible (last accessed May 7, 2019).

It shifts way to quick into high gears, press on the gas its like
you have a standard trans and forgot to down shift, its starts doing the
chug a lug.

Press a little more and you get the dreaded torque convertor
shudder. Press a little more on throttle and it drops 3 or 4 gears and is
screaming!

Then there is the slow reverse engagement in the morning after
it sits over night. And the next reverse engagement is so hard it shakes
the whole drivetrain! I bought a new truck so I wouldn't have any
issues. I dread going to the dealer for transmission issues at 7
thousand miles. I would trade it but ill loose thousands. I am really
amazed GM would let this transmission out the door with all these
problems.There are a few bulletins out with the issues I have. Anyone
have any fixes done that solved the problem? One of the bulletins
involves a transmission flush with mobil 1 trans fluid,im not buying
that. The shudder is slowly getting worse,has to be wrecking the
torque convertor clutch!

(a)    A consumer responded on this thread on June 27, 2018:

Welcome to the 8 speed world. It's the land of confusion for
sure. No one knows how to fix them and if you're lucky enough to get
one issue fixed another pops up.

When it works right it's a great transmission...or so I hear.

(b)    Another consumer responded on June 27, 2018:

150

No one can fix it because it is a pisspoor design that should never have been released to the public in the condition it was. Rushed out to keep up with other 8 speeds out there already. I am the guy who gets to try and fix the unfixable. I am the transmission guy at a GMC Buick dealer and I can tell you from experience in dealing with this piece of shit since 2014- cut your losses and get rid of it now.You will never be happy with it. Fast adapts, calibration update after update, valve body replacements and the triple flush on Canyon and Colorado and the one time flush on everything else.Band aid at best.Hopefully the ten speeds will be better. Haven't had one complaint yet and they have been out for a while now and the eight speeds were bad from day one.

(c)     Another consumer responded on July 19, 2018:

Gary, lots of the same issues in the forum with the 8 spd. My 'shudder' issues started around 8 thousand miles and got worse up until they found the technical service bulletin detailing the trans flush. The flush fixes the shudder, temporarily. My shudder is back with a vengeance at 23K miles. Taking it in again for an oil change and the transmission issue will be brought up again. It's under warranty.. yeah... but like you, I think there is probably some long term damage being done to the transmission and torque converter. I'll address that in my next visit with the service manager. All the other issues you listed with the transmisison... lazy gear changes, quick to find the top gear, slow to downshift when you need power are all characteristics of a transmission built to get high mileage at the expense of performance. All cars and trucks are going that way I think. That's the world we live in. You're on the right track knowing about the TSB on the trans flush. Let us know how your service visit turns out. Good luck.

(d)     Another consumer responded on March 12, 2019:

It is well known, and even acknowledged by GM, that the problems with this transmission cannot be fixed. Therefore, as soon as possible and with as few miles on the vehicle as possible, take it back to a dealer and request the defect be repaired. Do this several times, keeping all records of when, where, action taken (even if none), any advice or comments made by dealer persons, and if possible, record

151

everything on video with sound. Remember it's not the dealers fault you bought a vehicle with a problem that cannot be fixed by any means, but the dealer is the one that's stuck with trying to fix it. Obtain all the information you can find on this problem, and even similar problems in other models (because the same transmission is used in multiple other vehicles), obtain all applicable GM TCB's (such as TCB 18-NA-177 and TCB 18-NA-355) that have any bearing on the problem, and then after a "reasonable number" of repair attempts apply for Arbitration according to the requirements applicable in your state. In Arbitration, which is free to the vehicle purchaser, present all evidence regarding nature of the problem, past history and the manufacturers inability to correct these serious defects, evidence that the issue exists in the vehicle you purchased, and the history of repeated attempts by dealer(s) to fix the problem but that the problem still exists. When is all is said and done, you may be given a refund of the vehicle purchase price, a replacement vehicle having the same configuration and options, a decision to return to a dealer for further repair attempts, or no other action or remedy. In the case of the 8L45 / 8L90 transmission issues, arbitration in many states has already ordered refunds and replacement vehicles, as the problems with this model transmission have been around for so long and are so well documented. In any event, Good Luck.

349.   In yet another thread on gmtrucks.com, a consumer explained his issues with the Transmission Defect on May 10, 2018 at https://www.gm-trucks.com/forums/topic/211930-8l90-can-it-ever-be-fixed/ (last accessed May 7, 2019) as follows:

I have a 2015 6.2 with the 8 speed with 58k miles I have had a new transmission put in then a stator shaft recall done then a new torque converter and now once again the shutter is coming back seams like they just throw parts at it until the warranty runs out. Also wen the engine is in V4 mode around 40 mph the valves sound like there about to come apart but no problems yet with that. Has anyone had this much trouble and any luck with a fix I read on another form that they went to a mobile 1 fluid and it helped a lot. I wonder what a new converter and flush is going to cost me after the warranty runs out?

152

### g.   Complaints on cadillacforums.com

350.   Another set of consumers of the Cadillac-brand vehicles discussed their issues in a thread titled "GM's 8L45 Cadillac Automatic Transmission" on cadillacforums.com.   (https://www.cadillacforums.com/forums/cadillac-forum/t-974121.html (last accessed May 7, 2019).) One consumer began the thread on June 19, 2017 as follows:

GM's 8L45 Eight-Speed Cadillac CT6 Automatic Transmission: Recall, Replace, Re-tune or Deny

GM's 8L45 Eight Automatic Transmission is a clunker. GM's customer assistance center acknowledges that the reviews are 'mixed' and one service bulletin has been issued. The 'mixed' aspect of the feedback shows that this 8L45 works normally for a while for some owners. Internet forums are heating up with discussions about otherwise fine cars cursed with this crude, confused and embarrassingly bad 8 speed lemon.

General Motors has managed to take its customers back several decades to an unpleasant time in the early development of the automatic transmission. The GM 8L45 Hydramatic Transmission is part of the powertrain in the Cadillac CT6, CTS, ATS, Chevrolet Camaro and perhaps more vehicles under a different name. This questionable feat of backwards design and engineering was accomplished with variable force solenoid technology, speed sensors and a processor executing hundreds of calculations and commands every 6.25 milliseconds. Clearly, this is not often enough, as evidenced by the ride experience inflicted on the driver and passengers when the thing desperately hunts for the proper gear and any gear will do … to lurch forward. With all that technology it performs far worse than the bands and torque converters of that our grandparents enjoyed in the 1960's and later. In 2016, General Motors was simply not ready to evolve past the 6 speed transmission but that didn't stop it from going ahead and cursing entire fleets of its new vehicles with the crudest powertrain component in its history. And yes indeed, it weighs over 30 lbs. less than its predecessor (one that actually works, though evidently grossly overweight). Perhaps the

153

elusive 2nd, 3rd and 4th gears each weigh 10 lbs., accounting for both the weight loss and crude performance.

The 8L45 is a mess. Its crude state of performance sometimes rears its ugly head on a new GM vehicle on its way home from the dealership, or lurks deep inside its innards for a later outbreak of hard shifts, flares, thunks, and head jerking downshifts at random times in the early lives of the fleet. GM's confidence with this clunker drove it to install it in the Cadillac CT6, CTS and ATS models. Dealerships are forced to appease customers with such phrases as 'performs as designed' and 'performed adaptive fast learn' as a way to force owners to get used to it. The other line of defense is that the transmission is learning and adapting to the driver's style. Enduring the explanations and excuses of GM service technicians and service managers can be tiring. Confidentially, they'll admit that the thing is a disaster.

Other than a single service bulletin, GM is ignoring this failure as of Spring 2017. To admit there's a problem would be a devastating blow to the marketability of its current unsold inventory. There is also a lot of ego at stake here. GM promoted the 8L45 in its literature in a series of puffed up articles with statements like this:

"The 8L45 was designed to enhance the CT6's driving experience, offering a strong balance between performance and efficiency," said Bill Goodrich, GM's assistant chief engineer for eight-speed automatic transmissions "Perhaps its best attribute will be that customers really won't notice it – they'll simply enjoy the CT6's seamless, smooth driving experience and on-demand performance."

Read more: http://gmauthority.com/blog/2015/03/new-8l45-eight-speed-automatic-to-debut-in-2016-ct6/#ixzz4k4cZAecM

The owner of a vehicle cursed with this clunker will know there's a problem when passengers ask why the brakes are being pumped when coasting to a stop. That's the 8L45's attempt at downshifting. When the driver gingerly feathers the accelerator to coax the thing into gear after an auto-stop shutdown it may skip several gears and slam into 4th or 5th with a violent shutter. The driver and passengers all feel it as the entire vehicle shutters. At times it may seem like the driveshaft is going to come up through the

154

cupholder and cellphone battery charger. Its performance is indefensible. If it's shifting like an average GM vehicle and it hasn't yet slipped into this confused state, it soon will. No amount of learning, adaptive fast learns or software tunes can apparently help it find the right gears, other than reverse or park, which, luckily seem to work. Dealer lots are filling up with unsold inventory and returned vehicles, many with less than 2000 troubled miles on the odometer. Apparently, frustrated owners were not able to adapt and learn along with the car's stuttering, clunking, and confused transmission.

So, what is the future of the 8L45? Maybe a software tune can bring it under control. If this is not possible, and clearly, GM is in no hurry to resolve this issue, the fate of the 8L45 has these possible futures:

1. It will quietly disappear in 2018, leaving the current fleet in an abyss of wildly unpopular clunkers. The CT6 is becoming known as the shimmying, stuttering, lurching flagship that looks nice.

2. It can finally break in at 40,000 miles or so and can then find the correct gears at appropriate times after a few years of learning and adapting.

3. Third party after-market companies will offer a way to replace and retrofit it with a nicely functioning transmission, like the 6L45, thus salvaging the resale value of the CT6 and others.

Corporate denial doesn't help the brand. Blaming the customer for expecting better shifting insults the brand loyalists. It's clear that the 8L45 was rushed into production without quality engineering and design. Hopefully, GM and its Cadillac division can conjure up a solution that can make its attractive CT6 flagship drive as nicely as it looks parked.

(a)    A consumer responded on this thread on June 21, 2017:

The 8L90 is not any better. My 8L90 in my CT6 with turbo 3.0 is terrible. Worst transmission I have ever had. The 1-2 shift is hard. It also depends on outside temperature whether it acts up to a greater extent. I think the 8L90 could use better fluid or better pressure sensors. . . .

155

(b)     The original poster added to this thread on June 25, 2017:

To be clear, my article is not about those barely perceptible quivers and shift sequences experienced with most of the 8 speed transmissions in the market. What I am addressing are the violent shifts, head lurching downshifts and abysmal performance of GM's 8L45 transmission that is the curse of the Cadillac CT6.

The perspective formed, as presented in my post is based on two 8L45's, one exhibiting all of its faults on the day of delivery and the second one performing relatively normally until mile number 2435, when all hell broke loose. Again, this pertains to the 8L45 in two Cadillac CT6's that I have owned. Additionally, an internet search of other GM discussion forums brings up similar complaints wherever the same transmission is part of the powertrain. Following through with Cadillac customer support and GM corporate discussions it's clear that the customer base is not universally pleased with this crude transmission. As one would expect, the people in these two GM areas are very polite, helpful and proactive and admit there are concerns. It's not about customers who not quite ready for fuel saving technology that needs to shift constantly. My issue with GM is its slowness in dealing with the CT6's problems and the pompous pre-sale promotion of a transmission that 'makes the driver unaware that it's shifting.' Believe me, when your CT6 issues loud thunks, can barely get through a busy intersection after an auto start/stop lurch as it searches for a gear, you'll want to get rid of the thing. The CT6, with its eye-catching edgy design, can be an extremely unpleasant car to drive when its transmission can't shift correctly, in a violent fashion.

The notion that these things are highly sophisticated and require a long break-in period is silly. Some arrive from the factory in a confused state while others don't lapse into their failure mode until much later. And again, it's not about those common 8 speed transmissions' slight quivers and shakes. Apparently 8, 9 and 10 speed transmission technology is driven by fuel economy and acceptable performance from a piddly little 4 or 6 cylinder engine. I realize that the current fleet of Cadillacs are budget luxury cars and expectations have to be adjusted to these price points, but can you imagine telling this to customers in the real luxury car market? 'Get used to it! or

156

You're not driving it right', 'Performs as designed' or 'You're expecting too much' and other arguments would not set well with affluent owners. . . .

     (c)     Another consumer responded on June 27, 2017:

My 2016 CTS now has 20K miles on it, and the transmission is totally unpredictable. At times, especially first thing in the morning, the car drives great - quick smooth shifts and excellent acceleration. However, after the car sits for a few hours, most of the time the transmission is terrible. Harsh shifts and a bogged down feeling like the car is in too high of a gear. Give it some gas, and it lurches forward to the point that the car is hard to control. Usually I will then put the car in manual mode and use the shift paddles, and this helps a bit. I recently drove 2 Malibus with the 2.0L turbo and 9 speed transmission, and these cars drove MUCH better than the CTS (with a sticker price of $20K less). I will never buy a GM vehicle with the 8 speed again...

     (d)     The original poster added on October 15, 2017:

So at this time there has not been a complete resolution to this problem?

Well, GM is still in the 'Deny' stage. There's no word on any recalls, unit re-design, or retuning. This poorly designed cheap piece of crap called a transmission is providing headaches for service departments and owners. I've been told that service departments are giving up on the 'performs as designed' excuse, along with the 'relearning shift adapts' attempts and complete fluid changes. The current solution is a complete transmission replacement, which is an extensive gut of these relatively new vehicles. It's a $4,300 (dealer cost) warranty claim. The problem is that when the trauma is complete, this otherwise nice vehicle is cursed with another 8L45 transmission. I have now owned three (yes, 3) of these transmissions over the past 10 months and the most recent replacement is shifting the best it can. Transmissions #1 and #2 failed at 1480 and 2500 miles respectively, with harsh flares, clunky 1-2 upshifts and NO gear after coasting through turns and intersections. When in that state, it's an unsafe vehicle. . . .

157

(e)     Another consumer responded on April 1, 2018 and July 4, 2018:

Today the shift was so hard I actually thought I had been rear ended. This is the first time that I have ever experience the shift being this hard and yes it was so rough that it jerked my body. Cadillac really needs to address this issue in the 8L45 8 Speed before they venture off into a 10 Speed as my guess is at this rate it will be no better.

…

[W]hat may come back to haunt GM/Cadillac is how this transmission was promoted and advertised. There are also Cadillac models that cost less than the CT6 whose transmission to not exhibit this sometimes harsh shift issue. The last word I received from the Cadillac Customer service rep is that Cadillac Quality Brand is pursuing this issue and something still may yet get done. My advice to all who are reporting this issue is to keep the pressure on and do not back off. IMO Cadillac/GM needs to find a permanent fix, replace with a better transmission or consider financial compensation, to do other wise IMO is not acceptable

> 5.     ***Well-Publicized Criticism of the Transmission Defect in Trade Publications Demonstrate GM's Knowledge of the Defect.***

351.   GM was also made aware of the Transmission Defect through criticisms of automotive journalists, who identified the problems described above in online trade publications. In an article on gmauthority.com describing updates to its 2019 transmission, the publication emphasizes:

In prior-generation, K2 platform Silverado and Sierra, the GM 8-speed was often criticized for its jerky and unexpected shifting behavior that ultimately worsened the satisfaction of driving and/or riding in the pickup. Whether the improvements made to the 8-speed gearbox in the all-new T1 platform 2019 Sierra and Silverado will address these issues is unknown.(See Alex Luft, "GM 8-Speed Automatic Enhanced For 2019 Silverado, Sierra" dated July 18, 2018, available at http://gmauthority.com/blog/2018/07/gm-8-speed-

Case 2:19-cv-11044-DML-DRG   ECF No. 41, PageID.2408   Filed 09/30/19   Page 174 of 576

automatic-enhanced-for-2019-silverado-sierra/ (last accessed May 7, 2019).)

352.   And a January 11, 2018 article on the trutheaboutcars.com described the ongoing problems associated with the Transmission Defect, reporting:

The 1-2 shift sounds and feels like it's going to rip the diff out of the axle, which is a common complaint about the eight-speed transmission in these vehicles. The AWD mode, which lives between 2WD and 4-High and which is basically the "4WD" in the Escalade/Denali, is laughably slow to respond to spinning rear transmissions. (See Jack Baruth, "2017 Silverado LTZ Long-term Test – 10,000 Miles and Counting" dated January 11, 2018, available at https://www.thetruthaboutcars.com/2018/01/long-term-test-2017-silverado-ltz-10000-miles/ (last accessed May 7, 2019).)

353.   Finally, the automotive journalists at motortrend.com highlighted the flaws GM's eight-speed transmission in comparison with its new 10-speed transmissions:

Simply put, . . . . we were unimpressed by how the Silverado's volume 5.3-liter DFM V-8 and its eight-speed automatic performed. We're disappointed to find that GM didn't fix the old 5.3's biggest flaws: its sloppy throttle response at low speeds and its transmission's over eagerness to get to its top gear. The truck feels powerful enough once it's moving, but getting there is frustrating. 'The engine has power, but it's being tag-teamed by the unholy GM duo of a lazy throttle pedal and a transmission that hates to downshift,' features editor Scott Evans said. 'Every time you want to move, you've got to get deep into the throttle before anything useful happens. The shifts aren't as smooth as the 10-speed automatic, either, so you notice every time it's forced to drop two gears to maintain speed up a hill.'

The 6.2-liter V-8 and its 10-speed auto, which is only available as an option on the top-level Silverado LTZ and Silverado High Country, improves things immensely. The big V-8 has plenty of power on tap, and it sounds especially great when you bury your foot into the throttle. The 10-speed automatic is worlds better than the eight-speed, too. It feels modern and well sorted—basically the polar

159

opposite of the eight-speed automatic. Its shifts are seamless and nearly unnoticeable, and it doesn't display the hunting behavior of the other transmission, either. (See Christian Seabaugh, "2019 CHEVROLET SILVERADO FIRST TEST: PENCILS DOWN" dated September 14, 2018 available at https://www.motortrend.com/cars/chevrolet/silverado-1500/2019/2019-chevrolet-silverado-first-test-review/ (last accessed May 7, 2019).)

354.   These well-publicized criticisms disclosing the Transmission Defect, in addition to GM's own documents and hundreds of consumer complaints, show GM's awareness of the Transmission Defect.

### C.   Plaintiffs' Experiences

#### 1.   Charles Aiken

355.   Plaintiff Charles Aiken purchased a new 2019 Chevrolet Silverado from New Valley Chevrolet in Wilkes Barre, Pennsylvania. The vehicle was equipped with an 8L90 or 8L45 transmission.

356.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

357.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

358.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

359.   Plaintiff relied on the materials he reviewed before making his purchase.

360.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

160

361.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about January 11, 2019 and in March of 2019. At that time, Plaintiff had, respectively, only 545 and approximately 1,000 to 1,600 miles on the vehicle.

362.   Despite these attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

363.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 2.   *Neil Ambrosio*

364.   Plaintiff, Neil Ambrosio, leased a new 2017 GMC Sierra from Sheehan Buick GMC in Lighthouse Point, Florida.  The vehicle was equipped with an 8L90 or 8L45 transmission.

365.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

366.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

367.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

368.   Plaintiff relied on the materials he reviewed before making his purchase.

369.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also

161

raises a safety concern.

370.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about November 26, 2018. At that time, Plaintiff had only 25,525 miles on the vehicle.

371.   Despite three (3) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

372.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 3.    *Michael Banks*

373.   Plaintiff Michael Banks purchased a new 2017 GMC Sierra Denali from Holloway Buick GMC in Portsmouth, New Hampshire. The vehicle was equipped with an 8L90 or 8L45 transmission.

374.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

375.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

376.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

377.   Plaintiff relied on the materials he reviewed before making his purchase.

378.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also

162

raises a safety concern.

379.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about April 4, 2018 and October 18, 2018. At that time, Plaintiff had, respectively, only 15,945 and 20,507 miles on the vehicle.

380.   Despite these attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

381.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 4.   *Maria Barallardos*

382.   Plaintiff Maria Barallardos purchased a used 2015 Cadillac Escalade ESV from Coulter Cadillac in Phoenix, Arizona. The vehicle was equipped with an 8L90 or 8L45 transmission.

383.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

384.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

385.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

386.   Plaintiff relied on the materials she reviewed before making her purchase.

387.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating.

This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

388.   Plaintiff provided notice to GM about the Transmission Defect when she informed the dealership about the transmission problem on or about August 24, 2017, September 27, 2018, and December 13, 2018. At that time, Plaintiff had, respectively, only 63,435, 79,403, and 82,159 miles on the vehicle.

389.   Despite these attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

390.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price she paid for it.

5.   *Steven Brack*

391.   Plaintiff, Steven Brack, purchased a new 2018 Chevrolet Silverado from Parks Chevrolet in Charlotte, North Carolina.  The vehicle was equipped with an 8L90 or 8L45 transmission.

392.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

393.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

394.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

395.   Plaintiff relied on the materials he reviewed before making his purchase.

396.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking,

164

and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

397.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about March 22, 2019.  At that time, Plaintiff had only 12,840 miles on the vehicle.

398.   Despite four (4) attempted repairs at two (2) different GM dealerships, GM's authorized dealerships have failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

399.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 6.   *James Paul Browne*

400.   Plaintiff, James Paul Browne, purchased a Used 2017 GMC Sierra from Central Buick GMC in Jonesboro, AR on or about November 5, 2018. The vehicle was equipped with an 8L90 or 8L45 transmission.

401.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

402.   At all times, Plaintiff, has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

403.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

404.   Plaintiff relied on the materials he reviewed before making his purchase.

405.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking,

165

and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

406.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about December 21, 2018.  At that time, Plaintiff had only 34,219 miles on the vehicle.

407.   Despite two (2) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

408.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 7.   *Clyde Cheng*

409.   Plaintiff, Clyde Cheng, purchased a new 2016 GMC Sierra from Pearson Buick GMC in Sunnyvale, California. The vehicle was equipped with an 8L90 or 8L45 transmission.

410.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

411.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

412.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

413.   Plaintiff relied on the materials he reviewed before making his purchase.

414.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking,

166

and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

415. Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about January 6, 2016. At that time, Plaintiff had only 813 miles on the vehicle.

416. Despite five (5) attempted repairs, GM's authorized dealerships have failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

417. GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 8. *Guy Clark*

418. Plaintiff, Guy Clark, purchased a new 2017 GMC Sierra from Robert Brogden Buick GMC in Olathe, Kansans.  The vehicle was equipped with an 8L90 or 8L45 transmission.

419. Plaintiff purchased the vehicle primarily for personal, family, or household use.

420. At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

421. At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

422. Plaintiff relied on the materials he reviewed before making his purchase.

423. Shortly after purchase, Plaintiff's transmission was shuddering, jerking,

167

and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

424.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about September 11, 2017. At that time, Plaintiff had only 10,001 miles on the vehicle.

425.   Despite approximately four (4) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

426.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 9.   *Troy and Kimberly Coulson*

427.   Plaintiffs Troy and Kimberly Coulson purchased a new 2017 GMC Sierra 1500 from Luther Brookdale Chevrolet Buick GMC in Brooklyn Center, Minnesota on or around June 16, 2017. The vehicle was equipped with an 8L90 or 8L45 transmission.

428.   Plaintiffs Troy and Kimberly Coulson purchased the vehicle primarily for personal, family, or household use.

429.   At all times, the Coulsons have driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

430.   At the time of the purchase, the Coulsons had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

431.   The Coulsons relied on the materials they reviewed before making their purchase.

432.   Shortly after purchase, the Coulsons' transmission would drop a gear unexpectedly and lurch when the vehicle was moving slowly.  The transmission would also clunk and downshift hard.  This Transmission Defect reduces the Coulsons' satisfaction with the vehicle and also raises a safety concern.

433.   The Coulsons provided notice to GM about the Transmission Defect when they informed Luther Brookdale Chevrolet Buick GMC about the transmission problem and presented their vehicle for repair on or about October 23, 2017, June 14, 2018, and April 11, 2019. At those times, the Coulsons had only 5,678, 14,909, and 27,194 miles on the vehicle, respectively.

434.   Despite this attempted repair on two occasions, GM's authorized dealership has failed to adequately repair the Coulsons' vehicle, and it continues to exhibit a Transmission Defect.

435.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, the Coulsons would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

## 10.   *Nicolette Covey*

436.   Plaintiff, Nicolette Covey, purchased a new 2015 Cadillac Escalade from McCurley Integrity Chevrolet Cadillac in Pasco, Washington. The vehicle was equipped with an 8L90 or 8L45 transmission.

437.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

438.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

439.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

169

440.    Plaintiff relied on the materials she reviewed before making her purchase.

441.    Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

442.    Plaintiff provided notice to GM about the Transmission Defect when she informed the dealership about the transmission problem in or about July 25, 2016.  At that time, Plaintiff had only 17,293 miles on the vehicle.

443.    Despite approximately five (5) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

444.    GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price she paid for it.

### 11.    *Darrin Degrand*

445.    Plaintiff, Darrin Degrand, purchased a new 2018 GMC Canyon from James Wood Chevrolet in Denton, Texas.  The vehicle was equipped with an 8L90 or 8L45 transmission.

446.    Plaintiff purchased the vehicle primarily for personal, family, or household use.

447.    At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

448.    At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

170

449. Plaintiff relied on the materials he reviewed before making his purchase.

450. Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

451. Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about October 2018. At that time, Plaintiff had only approximately 5,000 miles on the vehicle.

452. Despite approximately three (3) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

453. GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 12. *Daniel Drain*

454. Plaintiff Daniel Drain purchased a new 2018 GMC Sierra from Alpine Buick GMC in Denver, Colorado on or about June 29, 2018. The vehicle was equipped with an 8L90 or 8L45 transmission.

455. Plaintiff purchased the vehicle primarily for personal, family, or household use.

456. At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

457. At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

458.   Plaintiff relied on the materials he reviewed before making his purchase.

459.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

460.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about August 10, 2018 and August 14, 2018. At that time, Plaintiff had, respectively, only 3,395 and 3,789 miles on the vehicle.

461.   Despite this attempted repair on two (2) occasions, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

462.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 13.   *Dennis Duffy*

463.   Plaintiff, Dennis Duffy, purchased a new 2016 GMC Yukon/Denali from Delray Buick GMC in Delray Beach, Florida.  The vehicle was equipped with an 8L90 or 8L45 transmission.

464.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

465.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

466.   At the time of the purchase, Plaintiff had reviewed marketing materials

172

for the vehicle and also discussed the purchase with an authorized dealer.

467. Plaintiff relied on the materials he reviewed before making his purchase

468. Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

469. Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about February 14, 2018. At that time, Plaintiff had only 59,645 miles on the vehicle.

470. Despite approximately two (2) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

471. GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 14. *Donald Dykshorn*

472. Plaintiff Donald Dykshorn purchased a new 2016 Chevrolet Camaro SS from Bryan Chevrolet in Kenner, Louisiana. The vehicle was equipped with an 8L90 or 8L45 transmission.

473. Plaintiff purchased the vehicle primarily for personal, family, or household use.

474. At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

475. At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

173

476. Plaintiff relied on the materials he reviewed before making his purchase.

477. Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

478. Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about July 31, 2017 and March 11, 2019. At that time, Plaintiff had, respectively, only 7,263 and approximately 27,000 miles on the vehicle.

479. Despite these attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

480. GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 15. *Jon Ellard*

481. Plaintiff Jon Ellard, purchased a new 2016 GMC Sierra from Bob Moore Auto Group in Oklahoma City, Oklahoma. The vehicle was equipped with an 8L90 or 8L45 transmission.

482. Plaintiff purchased the vehicle primarily for personal, family, or household use.

483. At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

484. At the time of the purchase, Plaintiff had reviewed marketing materials

174

for the vehicle and also discussed the purchase with an authorized dealer.

485.   Plaintiff relied on the materials he reviewed before making his purchase.

486.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

487.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about September 30, 2016. At that time, Plaintiff had only 8,594  miles on the vehicle.

488.   Despite this attempted repair, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

489.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 16.   *Jimmy Flowers*

490.   Plaintiff, Jimmy Flower, purchased a new 2018 Chevrolet Colorado from Paul Thigpen Chevrolet Buick GMC in Vidalia, Georgia. The vehicle was equipped with an 8L90 or 8L45 transmission.

491.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

492.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

493.   At the time of the purchase, Plaintiff had reviewed marketing materials

for the vehicle and also discussed the purchase with an authorized dealer.

494.   Plaintiff relied on the materials he reviewed before making his purchase.

495.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

496.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about October 23, 2018.  At that time, Plaintiff had only 5,431 miles on the vehicle.

497.   Despite three (3) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

498.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 17.   *Samuel Ford*

499.   Plaintiff Samuel Ford leased a 2018 Chevrolet Silverado 1500 from Andy Mohr Chevrolet in Plainfield, Indiana. The vehicle was equipped with an 8L90 or 8L45 transmission.

500.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

501.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

502.   At the time of the purchase, Plaintiff had reviewed marketing materials

for the vehicle and also discussed the purchase with an authorized dealer.

503. Plaintiff relied on the materials he reviewed before making his purchase.

504. Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

505. Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about October 3, 2018. At that time, Plaintiff had only 5,965 miles on the vehicle.

506. Despite this attempted repair, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

507. GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 18. *Richard Francis*

508. Plaintiff, Richard Francis, purchased a new 2017 GMC Yukon/Denali from Glenn Buege Buick GMC in Lansing, Michigan. The vehicle was equipped with an 8L90 or 8L45 transmission.

509. Plaintiff purchased the vehicle primarily for personal, family, or household use.

510. At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

511. At the time of the purchase, Plaintiff had reviewed marketing materials

177

for the vehicle and also discussed the purchase with an authorized dealer.

512.    Plaintiff relied on the materials he reviewed before making his purchase.

513.    Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

514.    Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about September 2017. At that time, Plaintiff had only approximately 100 miles on the vehicle.

515.    Despite two (2) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

516.    GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 19.    *Karina and William Fredo*

517.    Plaintiffs, Karina and William Fredo, purchased a used 2015 Cadillac Escalade from Faulkner Cadillac in Trevose, Pennsylvania. The vehicle was equipped with an 8L90 or 8L45 transmission.

518.    Plaintiffs purchased the vehicle primarily for personal, family, or household use.

519.    At all times, Plaintiffs, have driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

520.    At the time of the purchase, Plaintiffs have reviewed marketing

materials for the vehicle and also discussed the purchase with an authorized dealer.

521.   Plaintiffs relied on the materials they reviewed before making their purchase.

522.   Shortly after purchase, Plaintiffs' transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiffs' satisfaction with the vehicle and also raises a safety concern.

523.   Plaintiffs provided notice to GM about the Transmission Defect when they informed the dealership about the transmission problem in or about July 24, 2018.  At that time, Plaintiffs had 68,819 miles on the vehicle.

524.   Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiffs' vehicle, and it continues to exhibit a Transmission Defect.

525.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiffs would have learned of that material information, and would not have purchased the vehicle or paid the price they paid for it.

### 20.   *Richard Freeman*

526.   Plaintiff Richard Freeman purchased a new 2017 GMC Canyon from Walker Cadillac Buick GMC (now known John Thornton Buick GMC) in Carrollton, Georgia. The vehicle was equipped with an 8L90 or 8L45 transmission.

527.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

528.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

529.   At the time of the purchase, Plaintiff had reviewed marketing materials

for the vehicle and also discussed the purchase with an authorized dealer.

530. Plaintiff relied on the materials he reviewed before making his purchase.

531. Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

532. Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about February 13, 2018, September 17, 2018, and November 20, 2018. At that time, Plaintiff had, respectively only 3,970, 8,105 and 10,996 miles on the vehicle.

533. Despite this attempted repair on three (3) occasions GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

534. GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 21. *Charles and Lisa Marie Graff*

535. Plaintiffs Charles and Lisa Marie Graff purchased a new 2018 Chevrolet Silverado from Dyer Chevrolet in Ft. Pierce, Florida on or about November 9, 2018. The vehicle was equipped with an 8L90 or 8L45 transmission.

536. Plaintiffs Charles and Lisa Marie Graff purchased the vehicle primarily for personal, family, or household use.

537. At all times, the Graffs have driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

538.   At the time of the purchase, the Graffs had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

539.   The Graffs relied on the materials they reviewed before making their purchase.

540.   Shortly after purchase, the Graffs' transmission has experienced banging, slipping and shaking, as well as chattering and slipping when accelerating and banging and clunking when slowing. This Transmission Defect reduces the Graffs' satisfaction with the vehicle and also raises a safety concern.

541.   The Graffs provided notice to GM about the Transmission Defect when they informed the dealership about the transmission problem and presented their 2018 Silverado for repair on or about February 11, 2019 and April 17, 2019. At those times, the Graffs had only 6,911 and 12,146 miles on the vehicle, respectively.  The Graffs also called GM's customer service line directly to complain about the transmission problem in on or about late May 2019. A letter notice was also sent to GM directly on August 16, 2019.

542.   Despite this attempted repair on two occasions, GM's authorized dealership has failed to adequately repair the Graff's vehicle, and it continues to exhibit a Transmission Defect.

543.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, the Graffs would have learned of that material information, and would not have purchased the vehicle or paid the price they paid for it.

## 22.   *Timothy Grafrath*

544.   Plaintiff Timothy Grafrath purchased a new 2017 GMC Sierra from Sullivan Buick GMC in Arlington Heights, Illinois. The vehicle was equipped with an 8L90 or 8L45 transmission.

181

545.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

546.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

547.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

548.   Plaintiff relied on the materials he reviewed before making his purchase.

549.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

550.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about January 12, 2017.  At that time, Plaintiff had only 5,816 miles on the vehicle.

551.  Despite approximately twelve (12) attempted repairs authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

552.  GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 23.   *William Grossman*

553.   Plaintiff William Grossman purchased a new 2016 Chevrolet Camaro from Lester Glenn Chevrolet in Toms River, New Jersey.  The vehicle was equipped with an 8L90 or 8L45 transmission.

554.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

555.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

556.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

557.   Plaintiff relied on the materials he reviewed before making his purchase.

558.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

559.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about June 20, 2018. At that time, Plaintiff had only 20,375 miles on the vehicle.

560.   Despite three (3) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

561.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 24.   *Marisella Gutierrez*

562.   Plaintiff Gutierrez, a resident of Marietta, Georgia, purchased a new 2017 Chevrolet Silverado from All American Chevrolet in San Angelo, Texas. The vehicle was equipped with an 8L90 or 8L45 transmission.

183

563.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

564.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

565.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

566.   Plaintiff relied on the materials she reviewed before making her purchase.

567.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

568.   Plaintiff provided notice to GM about the Transmission Defect when she informed the dealership about the transmission problem on or about March 11, 2019, May 13, 2019, and July 17, 2019. At that time, Plaintiff had, respectively, 25,377, 27,760, and 30,674, miles on the vehicle.

569.   Despite three attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

570.  GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price she paid for it.

### 25.   *Jimmy Harman*

571.   Plaintiff Harman purchased a new 2017 GMC Denali from Vann York Auto Group in High Point, North Carolina. The vehicle was equipped with an 8L90

or 8L45 transmission.

572.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

573.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

574.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

575.   Plaintiff relied on the materials he reviewed before making his purchase.

576.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

577.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem during his first week of ownership. At that time, Plaintiff had fewer than 500 miles on the vehicle.

578.   Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

579.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 26.   *Chi Kim Ho*

580.   Plaintiff Chi Kim Ho purchased a new 2016 Cadillac Escalade ESV from Joseph Cadillac of Dublin in Dublin, Ohio. The vehicle was equipped with an

185

8L90 or 8L45 transmission.

581.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

582.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

583.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

584.   Plaintiff relied on the materials he reviewed before making his purchase.

585.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

586.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about June 19, 2019. At that time, Plaintiff had only 18,433 miles on the vehicle.

587.   Despite this attempted repair GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

588.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 27.   *Phil Houk*

589.   Plaintiff Phil Houk purchased a used 2017 Chevrolet Camaro SS from Boucher Cadillac in Waukesha, Wisconsin. The vehicle was equipped with an 8L90

186

or 8L45 transmission.

590.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

591.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

592.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

593.   Plaintiff relied on the materials he reviewed before making his purchase.

594.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

595.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about July 9, 2019. At that time, Plaintiff had only 19,882 miles on the vehicle.

596.   Despite this attempted repair, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

597.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 28.   *Jay Hull*

598.   Plaintiff, Jay Hull, purchased a new 2017 Chevrolet Silverado 1500 from Young Chevrolet Cadillac in Owosso, Michigan.  The vehicle was equipped

with an 8L90 or 8L45 transmission.

599.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

600.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

601.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

602.   Plaintiff relied on the materials he reviewed before making his purchase.

603.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

604.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about April 21, 2017.  At that time, Plaintiff had only 5,845 miles on the vehicle.

605.   Despite six (6) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

606.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 29.   *Randall Jacobs*

607.   Plaintiff, Randall Jacobs, purchased a new 2016 Cadillac CT6 from Brogan Cadillac in Totowa, New Jersey. The vehicle was equipped with an 8L90 or

188

8L45 transmission.

608.    Plaintiff purchased the vehicle primarily for personal, family, or household use.

609.    At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

610.    At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

611.    Plaintiff relied on the materials he reviewed before making his purchase.

612.    Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

613.    Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about November 28, 2016. At that time, Plaintiff had only 3,136 miles on the vehicle.

614.    Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

615.    GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 30.    *Carl Johnsen*

616.    Plaintiff, Carl Johnsen, purchased a new 2018 Chevrolet Silverado from Pape Chevrolet in South Portland, Maine. The vehicle was equipped with an

189

8L90 or 8L45 transmission.

617.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

618.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

619.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

620.   Plaintiff relied on the materials he reviewed before making his purchase.

621.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

622.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about December 2018.  At that time, Plaintiff had only 450 miles on the vehicle.  Plaintiff was advised on that date that he had to make an appointment for his vehicle to be inspected, and said appointment took place on January 14, 2019 at 1,064 miles.

623.   Despite two (2) attempted repair, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

624.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 31. *Colton Kelly*

625. Plaintiff Colton Kelly purchased a new 2017 Chevrolet Silverado 1500 from Denny Menholt Rapid Chevrolet in Rapid City, South Dakota. The vehicle was equipped with an 8L90 or 8L45 transmission.

626. Plaintiff purchased the vehicle primarily for personal, family, or household use.

627. At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

628. At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

629. Plaintiff relied on the materials he reviewed before making his purchase.

630. Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

631. Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about March 13, 2018, August 14, 2018, and February 11, 2019. At that time, Plaintiff had, respectively, only 4,341, 9,525, 13,732, and 15,013 miles on the vehicle.

632. Despite this attempted repair on four (4) occasions, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

633. GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or

paid the price he paid for it.

### 32. *Mark Kidd*

634.   Plaintiff Kidd purchased a used 2016 GMC Sierra from Rusty Wallace Cadillac, GMC and Kia in Morristown, Tennessee. The vehicle was equipped with an 8L90 or 8L45 transmission.

635.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

636.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

637.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

638.   Plaintiff relied on the materials he reviewed before making his purchase.

639.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

640.   Plaintiff has not provided notice to GM or taken the vehicle to an authorized dealership as he lives over an hour from the nearest dealership

641.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 33. *Taurus King*

642.   Plaintiff King purchased a new 2019 Chevrolet Silverado from

Freedom Chevrolet Buick GMC by Ed Morse in Dallas, Texas. The vehicle was equipped with an 8L90 or 8L45 transmission.

643. Plaintiff purchased the vehicle primarily for personal, family, or household use.

644. At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

645. At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

646. Plaintiff relied on the materials he reviewed before making his purchase.

647. Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

648. Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about September 5, 2019—three days after purchasing the new truck.

649. Plaintiff's brand new truck is still being serviced by GM's authorized dealership as of the time of the filing of this complaint.

GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 34. *Christopher Krull*

650. Plaintiff Christopher Krull purchased a new 2016 Cadillac CT6 from Elco Cadillac in Ballwin, Missouri. The vehicle was equipped with an 8L90 or 8L45

193

2581313 v1

transmission.

651.    Plaintiff purchased the vehicle primarily for personal, family, or household use.

652.    At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

653.    At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

654.    Plaintiff relied on the materials he reviewed before making his purchase.

655.    Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

656.    Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about December 7, 2017, December 18, 2017, February 12, 2019, and May 7, 2019. At those times, Plaintiff had, respectively, 14,829, 28,196, 29,865, and 31,696 miles on the vehicle.

657.    Despite these attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

658.    GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 35.    *Charles Larsen*

659.    Plaintiff, Charles Larsen, purchased a new 2015 GMC Sierra from

194

Romeo Chevrolet Buick GMC in Kingston, New York. The vehicle was equipped with an 8L90 or 8L45 transmission.

660.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

661.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

662.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

663.   Plaintiff relied on the materials he reviewed before making his purchase.

664.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

665.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about September 11, 2015. At that time, Plaintiff had only 4,481 miles on the vehicle.

666.   Despite three (3) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

667.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 36.   *Brian Lloyd*

668.   Plaintiff Brian Lloyd purchased a new 2016 Chevrolet Camaro from

2581313 v1

Chevrolet of Boaz in Boaz, Alabama. The vehicle was equipped with an 8L90 or 8L45 transmission.

669.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

670.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

671.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

672.   Plaintiff relied on the materials he reviewed before making his purchase.

673.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

674.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about June 5, 2017. At that time, Plaintiff had only 10,292 miles on the vehicle.

675.   Despite three (3)) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

676.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 37.   *Marc Mazza*

677.   Plaintiff Marc Mazza purchased a new 2017 GMC Sierra from King

196

O'Rourke Cadillac Buick GMC in Smithtown, New York. The vehicle was equipped with an 8L90 or 8L45 transmission.

678.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

679.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

680.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

681.   Plaintiff relied on the materials he reviewed before making his purchase.

682.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

683.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about October 25, 2017. At that time, Plaintiff had only 5,107 miles on the vehicle.

684.   Despite four (4) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

685.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 38.   *Andre McQuade*

686.   Plaintiff Andre McQuade purchased a certified pre-owned 2017

Cadillac CTS from Bob Johnson Chevrolet Cadillac Buick GMC in Rochester, New York on or around May 4, 2018. The vehicle was equipped with an 8L90 or 8L45 transmission.

687.   Plaintiff McQuade purchased the vehicle primarily for personal, family, or household use.

688.   At all times, Plaintiff McQuade has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

689.   At the time of the purchase, Plaintiff McQuade had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

690.   Plaintiff McQuade relied on the materials he reviewed before making his purchase.

691.   Shortly after purchase, Plaintiff McQuade's transmission made lumbering sounds when driving at highway speeds, lurched when accelerating from a slow speed, and experienced shuddering and high-pitched whining. The vehicle has also gone into manual mode spontaneously when he accelerated quickly from a stop and refused to downshift when pulling into his driveway.  This Transmission Defect reduces Plaintiff McQuade's satisfaction with the vehicle and also raises a safety concern.

692.   Plaintiff McQuade provided notice to GM about the Transmission Defect when he informed Randall Buick GMC Cadillac in Canandaigua, New York about the transmission problem and presented his vehicle for repair on or about October 17, 2018 and June 24, 2019. At that time, Plaintiff McQuade had only 30,732 and 36,230 miles on the vehicle, respectively.  Plaintiff McQuade also called Bob Johnson Chevrolet to complain in or around October 17, 2018.

693.   Despite this attempted repair on two occasions, GM's authorized dealership has failed to adequately repair Plaintiff McQuade's vehicle, and it continues to exhibit a Transmission Defect.

198

694.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff McQuade would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 39.   *Rhianna Meyers*

695.   Plaintiff Rhianna Meyers purchased a New 2017 Chevrolet Camaro from Castriota Chevrolet in Hudson, FL. The vehicle was equipped with an 8L90 or 8L45 transmission.

696.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

697.   At all times, Plaintiff, has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

698.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

699.   Plaintiff relied on the materials she reviewed before making his purchase.

700.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

701.   Plaintiff provided notice to GM about the Transmission Defect when she informed the dealership about the transmission problem on or about October 31, 2017.  At that time, Plaintiff had only 14,171 miles on the vehicle.

702.   Despite five (5) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

703.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 40.   *Richard Noonan*

704.   Plaintiff, Richard Noonan, purchased a certified pre-owned 2015 Cadillac Escalade from Elco Chevrolet in Ballwin, MO. The vehicle was equipped with an 8L90 or 8L45 transmission.

705.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

706.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

707.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

708.   Plaintiff relied on the materials he reviewed before making his purchase.

709.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

710.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about February 23, 2018.  At that time, Plaintiff had only 35,511 miles on the vehicle.

711.   Despite three (3) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

2581313 v1

712.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 41.   *James Norvell*

713.   Plaintiff Norvell purchased a new 2018 Chevrolet Colorado from Patriot Chevrolet in Hopkinsville, Kentucky.  The vehicle was equipped with an 8L90 or 8L45 transmission.

714.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

715.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

716.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

717.   Plaintiff relied on the materials he reviewed before making his purchase.

718.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

719.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about June 26, 2019. At that time, Plaintiff had only 6,112 miles on the vehicle.

720.   Despite this repair, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

721.   GM did not disclose the Transmission Defect in its advertising

materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 42.   *Michael Plafker*

722.   Plaintiff Michael Plafker leased a new 2017 GMC Sierra/Denali from Van Buren Buick GMC in Garden City, New York. The vehicle was equipped with an 8L90 or 8L45 transmission.

723.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

724.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

725.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

726.   Plaintiff relied on the materials he reviewed before making his purchase.

727.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, vibrating, exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

728.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about February 22, 2018. At that time, Plaintiff had only 7,972 miles on the vehicle.

729.   Despite two (2) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

730.   GM did not disclose the Transmission Defect in its advertising

202

materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 43.  *Michael Ponder*

731.  Plaintiff Michael Ponder purchased a New 2018 Chevrolet Camaro from Jack Wilson Chevrolet in St. Augustine FL. The vehicle was equipped with an 8L90 or 8L45 transmission.

732.  Plaintiff purchased the vehicle primarily for personal, family, or household use.

733.  At all times, Plaintiff, has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

734.  At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

735.  Plaintiff relied on the materials he reviewed before making his purchase.

736.  Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

737.  Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about October 18, 2018. At that time, Plaintiff had only 5,340 miles on the vehicle.

738.  Despite this attempted repair, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

739.  GM did not disclose the Transmission Defect in its advertising

materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 44.    *Louis Ray*

740.    Plaintiff Louis Ray purchased a used 2015 Cadillac Escalade from Vyletel Buick GMC in Sterling Heights, Michigan on or around August 14, 2017. The vehicle was equipped with an 8L90 or 8L45 transmission.

741.    Plaintiff Ray purchased the vehicle primarily for personal, family, or household use.

742.    At all times, Plaintiff Ray has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

743.    At the time of the purchase, Plaintiff Ray had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

744.    Plaintiff relied on the materials Ray reviewed before making his purchase.

745.    Shortly after purchase, Plaintiff Ray's transmission experienced hesitation, shaking, kicking, and lunching when driving his vehicle. This Transmission Defect reduces Plaintiff Ray's satisfaction with the vehicle and also raises a safety concern.

746.    Plaintiff Ray provided notice to GM about the Transmission Defect when he informed the Genesis Cadillac in St. Clair Shores, Michigan about the transmission problem and presented his vehicle for repair on or about November 1, 2018. At that time, Plaintiff had only 44,284 miles on the vehicle.

747.    Despite this attempted repair, GM's authorized dealership has failed to adequately repair Plaintiff Ray's vehicle, and it continues to exhibit a Transmission Defect.

748.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff Ray would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 45.   *Jeffrey Rice*

749.   Plaintiff, Jeffrey Rice, purchased a new 2018 Chevrolet Silverado from Whiteside GM in St. Clairsville, Ohio.  The vehicle was equipped with an 8L90 or 8L45 transmission.

750.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

751.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

752.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

753.   Plaintiff relied on the materials he reviewed before making his purchase.

754.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

755.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about December 21, 2018. At that time, Plaintiff had only 5,258 miles on the vehicle.

756.   Despite three (3) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

757.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 46.   *Arif Shakoor*

758.   Plaintiff, Arif Shakoor, purchased a New 2015 GMC Denali from Lane Buick GMC in Melbourne, FL. The vehicle was equipped with an 8L90 or 8L45 transmission.

759.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

760.   At all times, Plaintiff, has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

761.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

762.   Plaintiff relied on the materials he reviewed before making his purchase.

763.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

764.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about July 28, 2016.  At that time, Plaintiff had only 36,159 miles on the vehicle.

765.   Despite two (2) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

766.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 47.   *Keith and Karen Shelton*

767.   Plaintiffs Keith and Karen Shelton purchased a new 2018 Chevrolet Silverado 1500 from I.G. Burton Lewes Chevrolet Buick GMC in Lewes, Delaware. The vehicle was equipped with an 8L90 or 8L45 transmission.

768.   Plaintiffs purchased the vehicle primarily for personal, family, or household use.

769.   At all times, Plaintiffs have driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

770.   At the time of the purchase, Plaintiffs had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

771.   Plaintiffs relied on the materials they reviewed before making their purchase.

772.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

773.   Plaintiff provided notice to GM about the Transmission Defect when they informed the dealership about the transmission problem on or about January 9, 2019, February 20, 2019, April 1, 2019, and April 25, 2019. At that time, Plaintiff had, respectively, only 10,195, 12,837, 13,933, and 15,724 miles on the vehicle.

774.   Despite this attempted repair on four (4) occasions, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to

207

exhibit a Transmission Defect.

775.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price they paid for it.

### 48.   *Cary Sherrow*

776.   Plaintiff Sherrow, a resident of Hermiston, Oregon, purchased a new 2017 GMC Sierra from Dave Smith Motors in Kellogg, Idaho. The vehicle was equipped with an 8L90 or 8L45 transmission.

777.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

778.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

779.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

780.   Plaintiff relied on the materials he reviewed before making his purchase.

781.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

782.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about April 4, 2018, as well as on subsequent visits to his dealership when he brought in his vehicle for routine maintenance. Dealership staff have repeatedly informed formed Plaintiff Sherrow that GM is aware of the transmission issues, but a remedy is unavailable.

783.    Despite this contact, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

784.    GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 49.    Richard "Terry" Shope

785.    Plaintiff Richard Shope purchased a new 2018 Chevrolet Camaro from Everett Morganton Buick GMC in Morganton, North Carolina. The vehicle was equipped with an 8L90 or 8L45 transmission.

786.    Plaintiff purchased the vehicle primarily for personal, family, or household use.

787.    At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

788.    At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

789.    Plaintiff relied on the materials he reviewed before making his purchase.

790.    Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

791.    Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about February 23, 2019. At that time, Plaintiff had only 3,083 miles on the vehicle.

209

792.   Despite this attempted repair, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

793.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 50.   *Donald Sicura*

794.   Plaintiff Donald Sicura purchased a new 2015 Chevrolet Corvette from Palmetto Chevrolet in Conway, South Carolina. The vehicle was equipped with an 8L90 or 8L45 transmission.

795.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

796.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

797.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

798.   Plaintiff relied on the materials he reviewed before making his purchase.

799.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

800.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about September 7, 2016, September 20, 2016, and April 25, 2019. At that time, Plaintiff had,

respectively, 7,056, 7,068, and 12,379, only miles on the vehicle.

801.   Despite these attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

802.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 51.   *Joseph Sierchio*

803.   Plaintiff Joseph Sierchio purchased a new 2016 Chevrolet Camaro from Schumacher Chevrolet in Little Falls, New Jersey. The vehicle was equipped with an 8L90 or 8L45 transmission.

804.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

805.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

806.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

807.   Plaintiff relied on the materials he reviewed before making his purchase.

808.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

809.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about October 4,

2018. At that time, Plaintiff had only 23,847 miles on the vehicle.

810.   Despite three (3) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

811.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 52.   *Jason "Kevin" Sinclair*

812.   Plaintiff Jason Kevin Sinclair purchased a new 2017 GMC Sierra from Team Chevrolet Buick GMC Cadillac in Salisbury, North Carolina.  The vehicle was equipped with an 8L90 or 8L45 transmission.

813.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

814.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

815.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

816.   Plaintiff relied on the materials he reviewed before making his purchase.

817.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

818.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about May 22, 2017.

At that time, Plaintiff had only 960 miles on the vehicle.

819.   Despite five (5) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

820.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 53.   *Dennis Speerly*

821.   Plaintiff, Dennis Speerly, purchased a new 2017 GMC Canyon from Dekalb Sycamore Chevrolet Cadillac GMC in Sycamore, Illinois. The vehicle was equipped with an 8L90 or 8L45 transmission.

822.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

823.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

824.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

825.   Plaintiff relied on the materials he reviewed before making his purchase.

826.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

827.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about December

19, 2017. At that time, Plaintiff had only 12,484 miles on the vehicle.

828.   Despite five (5) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

829.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 54.   *Richard Sullivan*

830.   Plaintiff Richard Sullivan purchased a new 2015 Chevrolet Corvette from Schumacher Chevrolet in Lake Worth, Florida. The vehicle was equipped with an 8L90 or 8L45 transmission.

831.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

832.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

833.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

834.   Plaintiff relied on the materials he reviewed before making his purchase.

835.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

836.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about July 12,

2016. At that time, Plaintiff had only 8,704 miles on the vehicle.

837.    Despite the five (5) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

838.    GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 55.    *Michael Sylvester*

839.    Plaintiff Michael Sylvester purchased a new 2018 Cadillac CT6 Sierra from King O'Rourke Cadillac Buick GMC in Smithtown, New York. The vehicle was equipped with an 8L90 or 8L45 transmission.

840.    Plaintiff purchased the vehicle primarily for personal, family, or household use.

841.    At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

842.    At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

843.    Plaintiff relied on the materials he reviewed before making his purchase.

844.    Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

845.    Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about August 11,

2018.  At that time, Plaintiff had only 12,766 miles on the vehicle.

846.   Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

847.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 56.   *Tait Thomas*

848.   Plaintiff Tait Thomas purchased a New 2015 Chevrolet Corvette from Lorenzo Bomnin Chevrolet in Miami, FL on September 28, 2014. The vehicle was equipped with an 8L90 or 8L45 transmission.

849.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

850.   At all times, Plaintiff, has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

851.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

852.   Plaintiff relied on the material she reviewed before making his purchase.

853.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

854.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about April 29,

2017.  At that time, Plaintiff had only 6,314 miles on the vehicle.

855.   Despite this attempted repair, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

856.  GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 57.   *Philip Weeks*

857.   Plaintiff Philip Weeks purchased a new 2018 Cadillac CT6 from Hennessy Cadillac in Duluth, Georgia on or around December 18, 2018. The vehicle was equipped with an 8L90 or 8L45 transmission.

858.   Plaintiff Weeks purchased the vehicle primarily for personal, family, or household use.

859.   At all times, Plaintiff Weeks has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

860.   At the time of the purchase, Plaintiff Weeks had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

861.   Plaintiff Weeks relied on the materials he reviewed before making his purchase.

862.   Shortly after purchase, Plaintiff Weeks's transmission began to shift so heavily from first to second gear and from second gear to first that it feels like the vehicle has been rear-ended.  This Transmission Defect reduces Plaintiff Weeks's satisfaction with the vehicle and also raises a safety concern.

863.   Plaintiff Weeks provided notice to GM about the Transmission Defect when he informed Hennessy Cadillac about the transmission problem and presented

217

his vehicle for repair on or about January 2019 and August 8, 2019. At that time of the latter visit, Plaintiff Weeks had 5,608 miles on the vehicle. Plaintiff Weeks also filled out a Customer Satisfaction Survey for GM in which he reported the Transmission Defect, who directly contacted him about his dissatisfaction in or around February 2019.

864. Despite this attempted repair on two occasions, GM's authorized dealership has failed to adequately repair Plaintiff Weeks's vehicle, and it continues to exhibit a Transmission Defect.

865. GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff Weeks would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 58. *Kevin Wesley*

866. Plaintiff Wesley purchased a new 2017 Chevy Colorado from Chevrolet of Milford in Milford, Connecticut. The vehicle was equipped with an 8L90 or 8L45 transmission.

867. Plaintiff purchased the vehicle primarily for personal, family, or household use.

868. At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

869. At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

870. Plaintiff relied on the materials he reviewed before making his purchase.

871. Shortly after purchase, Plaintiff's transmission was shuddering, jerking,

218

and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

872.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about December 8, 2018, December 19, 2018, April 3, 2019, and June 10, 2019. At these times, Plaintiff had, respectively, only 865, 1,125, 4,325, and 6,391 miles on the vehicle.

873.   Despite four (4) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

874.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 59.   *Philip Whicker*

875.   Plaintiff Philip Whicker purchased a new 2017 Chevrolet Corvette Grand Sport from Champion Chevrolet in Avon, Indiana. The vehicle was equipped with an 8L90 or 8L45 transmission.

876.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

877.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

878.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

879.   Plaintiff relied on the materials he reviewed before making his purchase.

880.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

881.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about July 17, 2017. At that time, Plaintiff had only 3,272 miles on the vehicle.

882.   Despite this attempted repair, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

883.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 60.   *Wesley Won*

884.   Plaintiff Wesley Won purchased a new 2016 Cadillac Escalade from Stewart Chevrolet in Colma, California. The vehicle was equipped with an 8L90 or 8L45 transmission.

885.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

886.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

887.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

888.   Plaintiff relied on the materials he reviewed before making his purchase.

889.    Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

890.    Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem on or about March 27, 2018. At that time, Plaintiff had only 7,224 miles on the vehicle.

891.    Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

892.    GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 61.    *Howard Young*

893.    Plaintiff, Howard Young, purchased a new 2015 Chevrolet Corvette from Team Chevrolet in Olean, New York.  The vehicle was equipped with an 8L90 or 8L45 transmission.

894.    Plaintiff purchased the vehicle primarily for personal, family, or household use.

895.    At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

896.    At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

897.    Plaintiff relied on the materials he reviewed before making his purchase.

221

898.   Shortly after purchase, Plaintiff's transmission was shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating. This Transmission Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

899.   Plaintiff provided notice to GM about the Transmission Defect when he informed the dealership about the transmission problem in or about December 21, 2016. At that time, Plaintiff had only 35,171 miles on the vehicle.

900.   Despite two (2) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit a Transmission Defect.

901.   GM did not disclose the Transmission Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

## CLASS ACTION ALLEGATIONS

902.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), (b)(3) and (c)(4). As described below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rules 23(a) and 23(b)(3). This action also satisfies the requirements of Rules 23(b)(2) and (c)(4).

903.   Pursuant to Fed. R. Civ. Proc. 23(a) and (b)(2), (b)(3) and/or (c)(4), Plaintiffs assert classes based on the applicable state law of the plaintiffs. The Class and Sub-Classes are defined as:

904.   **Nationwide Class**: All individuals in the United States who purchased or leased any GM passenger vehicle equipped with a GM 8L45 or 8L90 transmission

2581313 v1

(the "Nationwide Class" or "Class"). These vehicles include the 2015-2019 Chevrolet Silverado; the 2017-2019 Chevrolet Colorado; the 2015-2019 Chevrolet Corvette; the 2016-2019 Chevrolet Camaro; the 2015-2019 Cadillac Escalade and Escalade ESV; the 2016-2019 Cadillac ATS, ATS-V, CTS, CT6, and CTS-V; the 2015-2019 GMC Sierra, Yukon, and Yukon XL, and Yukon Denali XL; and the 2017-2019 GMC Canyon. ("Subject Vehicles").

905. **Alabama Sub-Class**: All those who purchased or leased a Subject Vehicle in Alabama.

906. **Arkansas Sub-Class**: All those who purchased or leased a Subject Vehicle in Arkansas.

907. **Arizona Sub-Class**: All those who purchased or leased a Subject Vehicle in Arizona.

908. **California Sub-Class**: All those who purchased or leased a Subject Vehicle in California.

909. **Colorado Sub-Class**: All those who purchased or leased a Subject Vehicle in Colorado.

910. **Connecticut Sub-Class**: All those who purchased or leased a Subject Vehicle in Connecticut.

911. **Delaware Sub-Class**: All those who purchased or leased a Subject Vehicle in Delaware.

912. **Florida Sub-Class**: All those who purchased or leased a Subject Vehicle in Florida.

913. **Georgia Sub-Class**: All those who purchased or leased a Subject Vehicle in Georgia.

914. **Idaho Sub-Class**: All those who purchased or leased a Subject Vehicle in Idaho.

915. **Illinois Sub-Class**: All those who purchased or leased a Subject

223

Vehicle in Illinois.

916. **Indiana Sub-Class**: All those who purchased or leased a Subject Vehicle in Indiana.

917. **Kansas Sub-Class**: All those who purchased or leased a Subject Vehicle in Kansas.

918. **Kentucky Sub-Class**: All those who purchased or leased a Subject Vehicle in Kentucky.

919. **Louisiana Sub-Class**: All those who purchased or leased a Subject Vehicle in Louisiana.

920. **Maine Sub-Class**: All those who purchased or leased a Subject Vehicle in Maine.

921. **Michigan Sub-Class**: All those who purchased or leased a Subject Vehicle in Michigan.

922. **Minnesota Sub-Class**: All those who purchased or leased a Subject Vehicle in Minnesota.

923. **Missouri Sub-Class**: All those who purchased or leased a Subject Vehicle in Missouri.

924. **New Hampshire Sub-Class**: All those who purchased or leased a Subject Vehicle in New Hampshire.

925. **New Jersey Sub-Class**: All those who purchased or leased a Subject Vehicle in New Jersey.

926. **New York Sub-Class**: All those who purchased or leased a Subject Vehicle in New York.

927. **North Carolina Sub-Class**: All those who purchased or leased a Subject Vehicle in North Carolina.

928. **Ohio Sub-Class**: All those who purchased or leased a Subject Vehicle in Ohio.

224

929. **Oklahoma Sub-Class**: All those who purchased or leased a Subject Vehicle in Oklahoma.

930. **Pennsylvania Sub-Class**: All those who purchased or leased a Subject Vehicle in Pennsylvania.

931. **South Carolina Sub-Class**: All those who purchased or leased a Subject Vehicle in South Carolina.

932. **South Dakota Sub-Class**: All those who purchased or leased a Subject Vehicle in South Dakota.

933. **Tennessee Sub-Class**: All those who purchased or leased a Subject Vehicle in Tennessee.

934. **Texas Sub-Class**: All those who purchased or leased a Subject Vehicle in Texas.

935. **Washington Sub-Class**: All those who purchased or leased a Subject Vehicle in Washington.

936. **Wisconsin Sub-Class**: All those who purchased or leased a  Subject Vehicle in Wisconsin.

937. Excluded from the Class and Sub-Classes are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class or any Sub-Class should be expanded or otherwise modified.

938. **Numerosity**: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is

2581313 v1

great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in GM's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

939.  **Typicality**:  Plaintiffs' claims are typical of the claims of the Class and Sub-Classes in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by GM, and equipped with the defective GM 8L45 or 8L90 transmissions. The representative Plaintiffs, like all Class Members, have been damaged by GM's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective GM 8L45 or 8L90 transmission components. Furthermore, the factual bases of GM's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class as a whole.

940.  **Commonality**:  There are numerous questions of law and fact common to Plaintiffs, the Class and Sub-Classes that predominate over any question affecting only individual Class Members. These common legal and factual issues include the following:

(a)    Whether Class Vehicles contain defects relating to the GM 8L45 or 8L90 Transmission;

(b)    Whether the defects relating to the GM 8L45 or 8L90 Transmission constitute an unreasonable safety risk;

(c)    Whether the defective nature of the GM 8L45 or 8L90 Transmission constitutes a material fact;

(d)    Whether Defendant has a duty to disclose the defective nature of the GM 8L45 or 8L90 Transmission to Plaintiffs and Class Members;

(e)    Whether Plaintiffs and the other Class Members are entitled to

226

equitable relief, including but not limited to a preliminary and/or permanent injunction;

(f)     Whether Defendant knew or reasonably should have known of the defects relating to the GM 8L45 or 8L90 Transmission before it sold and leased Class Vehicles to Plaintiffs and Class Members and, if so, how long Defendant has known of the defect;

(g)     Whether Defendant should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective GM 8L45 or 8L90 Transmission;

(h)     Whether Defendant is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective GM 8L45 or 8L90 Transmission; and

(i)     Whether Defendant breached the implied warranty of merchantability pursuant to the laws governing each of the Sub-Class jurisdictions; and

(j)     Whether Defendant breached express warranties pursuant to the laws governing each of the Sub-Class jurisdictions.

941.   **Adequate Representation**:   Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

942.   **Predominance and Superiority**:   Plaintiffs and the Class Members have all suffered and will continue to suffer harm and damages as a result of GM's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small

227

size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for GM's misconduct. Absent a class action, Class Members will continue to incur damages, and GM's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

943.    This action is also certifiable under the provisions of Fed. R. Civ. Proc. 23(b)(2) because GM has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

944.    In the alternative, the common issues regarding GM's liability and the existence of the Transmission Defect can be decided class-wide under Rule 23(c)(4).

945.    Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

## TOLLING OF THE STATUTES OF LIMITATIONS

946.    Because the defect is undetectable until it manifests and GM failed to disclose or intentionally concealed the Transmission Defect, Plaintiffs and Class Members were not reasonably able to discover the problem until after purchasing the Class Vehicles, despite exercise of due diligence.

947.    Additionally, on information and belief, GM instructed its authorized dealership employees and technicians to inform Class Members that the manifestations of the Transmission Defect in the GM 8L45 and 8L90 Transmission were normal, and therefore not a defect as alleged herein.

228

948.    Plaintiffs and the Class Members had no realistic ability to discern that the GM 8L45 and 8L90 Transmissions in Class Vehicles were defective. Therefore, the discovery rule is applicable to the claims asserted by Plaintiffs and the Class Members.

949.    Plaintiffs are informed and believe and based thereon allege that GM has known of the Transmission Defect since at least 2014 and has concealed from or failed to alert owners and lessees of the Class Vehicles of the defective nature of the GM 8L45 and 8L90 Transmissions.

950.    Any applicable statute of limitations has therefore been tolled by GM's knowledge, active concealment, and denial of the facts alleged herein. Defendant is further estopped from relying on any statute of limitations because of its concealment of the Transmission Defect.

## CAUSES OF ACTION

### 1.  COUNT 1
### BREACH OF WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT 15 U.S.C. . § 2303, *ET SEQ*

951.    Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

952.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of all Class Members.

953.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

954.    Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

955.    GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

956.    GM's express warranty is a "written warranty" within the meaning of

229

the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

957.   GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

958.   GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

959.   Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

960.   Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

961.   On information and belief, GM breached the express warranty by:

(a)    Extending the Bumper-to-Bumper Limited Warranties and the Powertrain Warranties with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship, including the subject transmission, at no cost to the owner or lessee;

(b)    Selling and leasing Class Vehicles with transmissions that were defective in material and workmanship, requiring repair or replacement within the warranty period;

(c)    Refusing to honor the express warranty by repairing or replacing, free of charge, the transmission or any of its component parts or programming and instead charging for repair and replacement parts; and

(d)    Purporting to repair the Class Vehicles and/or performing inadequate, illusory repairs, including by falsely informing Class Members that there was no problem with their Class Vehicles, performing ineffective procedures including software updates, and/or replacing defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

962.   Furthermore, GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

963.   Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable,

231

durable, and safe transportation. Instead, the Class Vehicles are defective.

964.   GM's breach of express and implied warranties has deprived Plaintiffs and Class Members of the benefit of their bargain.

965.   The amount in controversy of the individual claims of each Plaintiff and Class member meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

966.   GM has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the transmission.

967.   As a direct and proximate cause of GM's breach of express and implied warranties, Plaintiffs and Class Members sustained damages and other losses in an amount to be determined at trial. GM's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

968.   As a result of GM's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class Members have incurred damages.

## 2.  COUNT 2
### UNJUST ENRICHMENT (ON BEHALF OF THE NATIONWIDE CLASS OR ALTERNATIVELY, EACH OF THE STATE SUB-CLASSES)

969.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

970.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Nationwide Class, or, in the alternative, on behalf of each of the State Sub-Classes, against Defendant.

232

971.   As a direct and proximate result of Defendant's failure to disclose known defects and material misrepresentations regarding known defects, Defendant has profited through the sale and lease of said vehicles. Although these vehicles are purchased through Defendant's agents, the money from the vehicle sales flows directly back to Defendant.

972.   Additionally, as a direct and proximate result of Defendant's failure to disclose known defects and material misrepresentations regarding known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

973.   Defendant has therefore been unjustly enriched due to the known defects in the Class Vehicles through the use of funds that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiffs and Class Members.

974.   As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

### 3.  COUNT 3
### FRAUDULENT OMISSION (ON BEHALF OF THE NATIONWIDE CLASS OR ALTERNATIVELY EACH OF THE STATE SUB-CLASSES)

975.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

976.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Nationwide Class, or, in the alternative, on behalf of each of the State Sub-Classes, against Defendant.

977.   GM omitted material facts concerning the Class Vehicles.

978.   As described above, GM made material omissions and affirmative

misrepresentations regarding the Class Vehicles.

979.   GM knew these representations were false when made.

980.   The vehicles purchased or leased by Plaintiffs were, in fact, defective, unsafe and unreliable, because the Transmission Defect in the 8L90 and 8L45 transmissions causes unsafe conditions, including, but not limited to, Class Vehicles suddenly lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion. These conditions present a safety hazard because they severely affect the driver's ability to control the car's speed, acceleration, and deceleration.

981.   GM had a duty to disclose that these vehicles were defective, unsafe and unreliable, in that the Transmission Defect in the 8L90 and 8L45 transmissions causes unsafe conditions, because Plaintiffs relied on GM's representations that the vehicles they were purchasing and retaining were safe and free from defects.

982.   The aforementioned omission was material, because if it had been disclosed Plaintiffs would not have bought, leased or retained their vehicles.

983.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. GM intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

984.   Plaintiffs relied on GM's reputation-along with their failure to disclose the Transmission Defect and GM's affirmative assurances that their vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Class Vehicles.

985.   GM had a duty to disclose the true facts about the Class Vehicles because they were known and/or accessible only to GM who had superior knowledge and access to the facts, and the facts were not known to or reasonably discoverable

234

by Plaintiffs and the Sub-Classes. As stated above, these omitted and concealed facts were material because they directly impact the safety, reliability and value of the Class Vehicles. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, is of material concern to a reasonable consumer.

### A.    Claims on Behalf of the Alabama Sub-Class

### 4.  COUNT 4
### VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT
### ALA. CODE § 8-19-1, *ET SEQ.*

986.  Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

987.  Plaintiffs Brian Lloyd ("Alabama Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Alabama Sub-Class.

988.  GM, Alabama Plaintiff, and the Alabama Sub-Class Members are "persons" within the meaning of the Alabama Deceptive Trade Practices Act ("Alabama DTPA") Ala. Code § 8-19-3(5).

989.  Alabama Plaintiff and the Alabama Sub-Class Members "persons" within the meaning of Ala. Code § 8-19-3(2).

990.  The Class Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

991.  Defendant was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

992.  The Alabama DTPA declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or

that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

993.    GM participated in unfair or deceptive trade practices that violated the Alabama DTPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

994.    GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

995.    GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

996.    GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

997.    GM knew or should have known that its conduct violated the Alabama DTPA.

998.   Alabama Plaintiff and the Alabama Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

999.   Had Alabama Plaintiff and the Alabama Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

1000.  Alabama Plaintiff and the Alabama Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Alabama Plaintiff and the Alabama Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

1001. As a result of GM's conduct, Alabama Plaintiff and the Alabama Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

1002. As a direct and proximate result of GM's unfair or deceptive acts or practices, Alabama Plaintiff and the Alabama Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1003. Alabama Plaintiff and the Alabama Sub-Class Members seek an order enjoining GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the under the Alabama DTPA.

1004. Plaintiffs intend to assert a claim under the Alabama DTPA. Plaintiffs will make a demand in satisfaction of Ala. Code § 8-19-3 and may amend this Complaint to assert claims under the Alabama DTPA once the required 15 days have elapsed. This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Alabama DTPA.

### 5.  COUNT 5
### BREACH OF EXPRESS WARRANTY
### ALA. CODE §§ 7-2-313 AND 7-2A-210

1005. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1006. Alabama Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Alabama Sub-Class.

1007. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of motor vehicles under § 7-2-103(1)(d).

1008. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ala. Code § 7-2A-103(1)(p).

1009. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

1010. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1011. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

1012. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs

"including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1013. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1014. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1015. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Alabama Plaintiff and the Alabama Sub-Class Members.

1016. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1017. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Alabama Plaintiff and the Alabama Sub-Class Members.

239

1018. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1019. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Alabama Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1020. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1021. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1022. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Alabama Plaintiff and the Alabama Sub-Class Members. Among other things, Alabama Plaintiff and the Alabama Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1023. Alabama Plaintiff and the Alabama Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1024. Alabama Plaintiff and the Alabama Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

1025. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

1026. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1027. As a direct and proximate cause of GM's breach, Alabama Plaintiff and the Alabama Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Alabama Plaintiff and the Alabama Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1028. As a direct and proximate result of GM's breach of express warranties, Alabama Plaintiff and the Alabama Sub-Class Members have been damaged in an amount to be determined at trial.

2581313 v1

## 6.  COUNT 6
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## ALA. CODE §§ 7-2-314 AND 7-2A-212

1029.  Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1030.  Alabama Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Alabama Sub-Class.

1031.  GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of motor vehicles under § 7-2-103(1)(d).

1032.  With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under ALA. CODE § 7-2A-103(1)(p).

1033.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

1034.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ala. Code §§ 7-2-314 and 7-2A-212.

1035.  GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Alabama Plaintiff and the Alabama Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Alabama Plaintiff and the Alabama Sub-Class Members, with no modification to the defective transmissions.

242

1036. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1037. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1038. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1039. As a result of GM's breach of the applicable implied warranties, Alabama Plaintiff and the Alabama Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Alabama Plaintiff and the Alabama Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1040. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Ala. Code §§ 7-2-314 and 7-2A-212.

1041. Alabama Plaintiff and the Alabama Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1042. Alabama Plaintiff and the Alabama Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1043. As a direct and proximate cause of GM's breach, Alabama Plaintiff and the Alabama Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Alabama Plaintiff and the Alabama Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1044. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Alabama Plaintiff and the Alabama Sub-Class Members have been damaged in an amount to be proven at trial.

**B.      Claims on Behalf of the Arizona Sub-Class**

**7.  COUNT 7**
**VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT**
**ARIZ. REV. STAT. § 44-1521, *ET SEQ.***

1045. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1046. Plaintiff Maria Barallardos ("Arizona Plaintiff") brings this cause of action on her own behalf and on behalf of the members of the Arizona Sub-Class.

1047. The Arizona Consumer Fraud Act ("Arizona CFA") provides that

244

"[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

1048. GM participated in deceptive trade practices that violated the Arizona CFA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

1049. By systematically devaluing safety and concealing a plethora of defects in the 8L90 and 8L45 Transmissions and the Class Vehicles, GM engaged in unfair or deceptive practices prohibited by the Arizona CFA, including: (1) representing that the 8L90 and 8L45 Transmissions and the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the 8L90 and 8L45 Transmissions and the Class Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the 8L90 and 8L45 Transmissions and the Class Vehicles with the intent not to sell them as advertised.

1050. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment,

245

suppression or omission, in connection with the sale of the Class Vehicles.

1051. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1052. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1053. GM knew or should have known that its conduct violated the Arizona CFA.

1054. Arizona Plaintiff and the Arizona Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1055. Had Arizona Plaintiff and the Arizona Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

1056. Arizona Plaintiff and the Arizona Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Arizona Plaintiff and the Arizona Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

1057. As a result of GM's conduct, Arizona Plaintiff and the Arizona Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

1058. As a direct and proximate result of GM's unfair or deceptive acts or practices, Arizona Plaintiff and the Arizona Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

246

1059. Arizona Plaintiff and the Arizona Sub-Class Members seek monetary relief against GM in an amount to be determined at trial.

1060. Arizona Plaintiff and the Arizona Sub-Class Members also seek punitive damages because GM engaged in aggravated and outrageous conduct with an evil mind.

1061. Arizona Plaintiff and the Arizona Sub-Class Members also seek an order enjoining GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## 8. COUNT 8
## BREACH OF EXPRESS WARRANTY
## ARIZ. REV. STAT. §§ 47-2313 AND 47-2A210

1062. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1063. Arizona Plaintiff brings this cause of action on her own behalf and on behalf of the members of the Arizona Sub-Class.

1064. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c); and a "seller" of motor vehicles under Ariz. Rev. Stat. § 47-2103(A)(4).

1065. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

1066. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

1067. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1068. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

247

1069. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1070. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1071. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1072. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Arizona Plaintiff and the Arizona Sub-Class Members.

1073. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1074. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Arizona Plaintiff and the Arizona Sub-Class Members.

1075. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1076. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Arizona Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1077. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1078. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1079. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Arizona Plaintiff and the Arizona Sub-

249

Class Members. Among other things, Arizona Plaintiff and the Arizona Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1080. Arizona Plaintiff and the Arizona Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1081. Arizona Plaintiff and the Arizona Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

1082. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

1083. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1084. As a direct and proximate cause of GM's breach, Arizona Plaintiff and the Arizona Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Arizona Plaintiff and the Arizona Sub-Class

Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1085. As a direct and proximate result of GM's breach of express warranties, Arizona Plaintiff and the Arizona Sub-Class Members have been damaged in an amount to be determined at trial.

### 9.  COUNT 9
### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### ARIZ. REV. STAT. §§ 47-2314 AND 47-2A212

1086. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1087. Arizona Plaintiff brings this cause of action on her own behalf and on behalf of the members of the Arizona Sub-Class.

1088. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c); and a "seller" of motor vehicles under Ariz. Rev. Stat. § 47-2103(A)(4).

1089. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

1090. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

1091. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ariz. Rev. Stat. §§ 47-2314 and 47-2A212.

1092. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Arizona Plaintiff and the Arizona Sub-Class Members

bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Arizona Plaintiff and the Arizona Sub-Class Members, with no modification to the defective transmissions.

1093. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1094. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1095. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1096. As a result of GM's breach of the applicable implied warranties, Arizona Plaintiff and the Arizona Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Arizona Plaintiff and the Arizona Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1097. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Ariz. Rev. Stat. §§ 47-2314 and 47-2A212.

1098. Arizona Plaintiff and the Arizona Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1099. Arizona Plaintiff and the Arizona Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1100. As a direct and proximate cause of GM's breach, Arizona Plaintiff and the Arizona Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Arizona Plaintiff and the Arizona Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1101. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Arizona Plaintiff and the Arizona Sub-Class Members have been damaged in an amount to be proven at trial.

### C.    Claims on Behalf of the Arkansas Sub-Class

### 10. COUNT 10
### VIOLATION OF ARKANSAS DECEPTIVE TRADE
### PRACTICES ACT ARK. ANN. CODE § 4-88-101, *ET SEQ.*

1102. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1103. Plaintiff James Paul Browne ("Arkansas Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Arkansas Sub-Class.

1104. The Arkansas Deceptive Trade Practices Act ("Arkansas DTPA") prohibits "deceptive and unconscionable trade practices," including "knowingly making a false representation as to the characteristics . . . of goods or services." Ark. Code. Ann. § 4-88-107(a).

1105. GM participated in deceptive trade practices that violated the Arkansas DTPA described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

1106. By systematically devaluing safety and concealing a plethora of defects in the 8L90 and 8L45 Transmissions and the Class Vehicles, GM engaged in unfair or deceptive practices prohibited by the Arkansas DTPA, including: (1) representing that the 8L90 and 8L45 Transmissions and the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the 8L90 and 8L45 Transmissions and the Class Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the 8L90 and 8L45 Transmissions and the Class Vehicles with the intent not to sell them as advertised.

1107. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment,

suppression or omission, in connection with the sale of the Class Vehicles.

1108. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1109. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1110. GM knew or should have known that its conduct violated the Arkansas DTPA.

1111. Arkansas Plaintiff and the Arkansas Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1112. Had Arkansas Plaintiff and the Arkansas Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

1113. Arkansas Plaintiff and the Arkansas Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Arkansas Plaintiff and the Arkansas Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

1114. As a result of GM's conduct, Arkansas Plaintiff and the Arkansas Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

1115. As a direct and proximate result of GM's unfair or deceptive acts or practices, Arkansas Plaintiff and the Arkansas Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

255

1116.  Arkansas Plaintiff and the Arkansas Sub-Class Members seek monetary relief against GM in an amount to be determined at trial.

1117.  Arkansas Plaintiff and the Arkansas Sub-Class Members also seek punitive damages because GM engaged in aggravated and outrageous conduct with an evil mind.

1118.  Arkansas Plaintiff and the Arkansas Sub-Class Members also seek an order enjoining GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

## 11. COUNT 11
## BREACH OF EXPRESS WARRANTY
## ARK. CODE ANN. §4-2-313

1119.  Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1120.  Arkansas Plaintiff Browne brings this cause of action on his own behalf and on behalf of the members of the Arkansas Sub-Class.

1121.  GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ark. Code Ann. § 4-2-104(1); and a "seller" of motor vehicles under Ark. Code Ann. § 4-2-103(1)(d).

1122.  With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ark. Code Ann. § 4-90-403(9).

1123.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code Ann. § 4-2-105.

1124.  GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1125.  GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

256

1126. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1127. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1128. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1129. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Arkansas Plaintiff and the Arkansas Sub-Class Members.

1130. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1131. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Arkansas Plaintiff and the Arkansas Sub-Class Members.

1132. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1133. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Arkansas Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1134. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1135. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1136. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Arkansas Plaintiff and the Arkansas Sub-

258

Class Members. Among other things, Arkansas Plaintiff and the Arkansas Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1137. Arkansas Plaintiff and the Arkansas Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1138. Arkansas Plaintiff and the Arkansas Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

1139. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

1140. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1141. As a direct and proximate cause of GM's breach, Arkansas Plaintiff and the Arkansas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Arkansas Plaintiff and the Arkansas Sub-Class

Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1142. As a direct and proximate result of GM's breach of express warranties, Arkansas Plaintiff and the Arkansas Sub-Class Members have been damaged in an amount to be determined at trial.

### 12. COUNT 12
### BREACH OF IMPLIED WARRANTY OF MERCHANTIBILITY
### ARK. CODE ANN. §4-2-314

1143. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1144. Arkansas Plaintiff brings this cause of action on her own behalf and on behalf of the members of the Arkansas Sub-Class.

1145. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ark. Code Ann. § 4-2-104(1); and a "seller" of motor vehicles under Ark. Code Ann. § 4-2-103(1)(d).

1146. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ark. Code Ann. § 4-90-403(9).

1147. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code Ann. §4-2-105.

1148. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ark. Code Ann. § 4-2-314.

1149. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Arkansas Plaintiff and the Arkansas Sub-Class

260

Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Arkansas Plaintiff and the Arkansas Sub-Class Members, with no modification to the defective transmissions.

1150. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1151. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1152. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1153. As a result of GM's breach of the applicable implied warranties, Arkansas Plaintiff and the Arkansas Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Arkansas Plaintiff and the Arkansas Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1154. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Ark. Code Ann. § 4-2-314.

1155. Arkansas Plaintiff and the Arkansas Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1156. Arkansas Plaintiff and the Arkansas Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1157. As a direct and proximate cause of GM's breach, Arkansas Plaintiff and the Arkansas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Arkansas Plaintiff and the Arkansas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1158. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Arkansas Plaintiff and the Arkansas Sub-Class Members have been damaged in an amount to be proven at trial.

D.     **Claims on Behalf of the California Sub-Class**

### 13. COUNT 13
### VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT
### CAL. CIV. CODE § 1750, *ET SEQ.*

1159. Plaintiffs incorporate by reference and re-allege the allegations

262

contained in paragraphs 1-950 of this Complaint.

1160. Plaintiffs Clyde Cheng and Wesley Won ("California Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the California Sub-Class.

1161. Defendant is a "person" as defined by California Civil Code § 1761(c).

1162. California Plaintiffs and California Sub-class Members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

1163. By failing to disclose and concealing the defective nature of the transmissions from California Plaintiffs and California Sub-class Members, Defendant violated California Civil Code § 1770(a), as it represented that the Class Vehicles and their transmissions had characteristics and benefits that they do not have and represented that the Class Vehicles and their transmissions were of a particular standard, quality, or grade when they were of another. *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

1164. Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1165. Defendant knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1166. Because of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including California Plaintiffs and California Sub-class Members, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Transmission Defect California Plaintiffs and California Sub-class Members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail

263

before their expected useful life has run.

1167. Defendant was under a duty to California Plaintiffs and California Sub-class Members to disclose the defective nature of the transmissions and/or the associated repair costs because:

(a) Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' transmissions;

(b) California Plaintiffs and California Sub-class Members could not reasonably have been expected to learn or discover that their transmissions had a dangerous safety defect until it manifested; and

(c) Defendant knew that California Plaintiffs and California Sub-class Members could not reasonably have been expected to learn of or discover the safety defect.

1168. In failing to disclose the defective nature of transmissions, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1169. The facts Defendant concealed from or failed to disclose to California Plaintiffs and California Sub-class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less. Had California Plaintiffs and California Sub-class Members known that the Class Vehicles' transmissions were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1170. California Plaintiffs and California Sub-class Members are reasonable consumers who do not expect the transmissions installed in their vehicles to exhibit problems such as the Transmission Defect. This is the reasonable and objective consumer expectation relating to a vehicle's transmissions.

1171. Because of Defendant's conduct, California Plaintiffs and California

264

Sub-class Members were harmed and suffered actual damages in that, on information and belief, the Class Vehicles experienced and will continue to experience problems such as the Transmission Defect.

1172. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, California Plaintiffs and California Sub-class Members suffered and will continue to suffer actual damages.

1173. California Plaintiffs and California Sub-class Members are entitled to equitable relief.

1174. California Plaintiffs and California Sub-class Members provided Defendant with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a). Defendant has failed to provide appropriate relief for its violations of the CLRA within 30 days, Plaintiffs now seek monetary, compensatory, and punitive damages.

## 14. COUNT 14
## VIOLATION OF CALIFORNIA BUS. & PROF. CODE
## §17200, *ET SEQ.*

1175. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1176. California Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the California Sub-Class.

1177. Because of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including California Plaintiffs and California Sub-class Members, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Transmission Defect, California Plaintiffs and California Sub-class Members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

265

1178. California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

1179. California Plaintiffs and California Sub-class Members are reasonable consumers who do not expect their transmissions to be defective.

1180. Defendant knew the Class Vehicles and their transmissions were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

1181. In failing to disclose the Transmission Defect, Defendant has knowingly and intentionally concealed material facts and breached its duty not to do so.

1182. Defendant was under a duty to California Plaintiffs and California Sub-class Members to disclose the defective nature of the Class Vehicles and their transmissions because:

(a)    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' transmissions; and

(b)    Defendant actively concealed the defective nature of the Class Vehicles and their transmissions from California Plaintiffs and California Sub-class Members.

1183. The facts Defendant concealed from or failed to disclose to California Plaintiffs and California Sub-class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Class Vehicles.  Had they known of the Transmission Defect, California Plaintiffs and California Sub-class Members would have paid less for Class Vehicles equipped with the subject transmissions or would not have purchased or leased them at all.

1184. Defendant continued to conceal the defective nature of the Class Vehicles and their transmissions even after Class Members began to report

266

problems.

1185. Defendant's conduct was and is likely to deceive consumers.

1186. Defendant's acts, conduct, and practices were unlawful, in that they constituted:

(a)     Violations of California's Consumers Legal Remedies Act;

(b)     Violations of the Song-Beverly Consumer Warranty Act;

(c)     Violations of the Magnuson-Moss Warranty Act; and

(d)     Breach of Express Warranty under California Commercial Code section 2313.

1187. By its conduct, Defendant has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

1188. Defendant's unfair or deceptive acts or practices occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

1189. As a direct and proximate result of Defendant's unfair and deceptive practices, California Plaintiffs and California Sub-class Members have suffered and will continue to suffer actual damages.

1190. Defendant has been unjustly enriched and should be required to make restitution to California Plaintiffs and California Sub-class Members to §§ 17203 and 17204 of the Business & Professions Code.

**15. COUNT 15**
**BREACH OF IMPLIED WARRANTY PURSUANT TO THE**
**SONG-BEVERLY CONSUMER WARRANTY ACT**
**CAL. CIV. CODE §§ 1792 AND 1791.1, *ET SEQ.***

1191. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

267

1192. California Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the California Sub-Class.

1193. California Plaintiffs and the California Sub-Class Members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

1194. GM is and was at all relevant times a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

1195. The Class Vehicles are and were at all relevant times "are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

1196. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Cal. Civ. Code §§ 1791.1(a) & 1792.

1197. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom California Plaintiffs and the California Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to California Plaintiffs and the California Sub-Class Members, with no modification to the defective transmissions.

1198. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1199. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1200. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1201. As a result of GM's breach of the applicable implied warranties, California Plaintiffs and the California Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, California Plaintiffs and the California Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1202. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of violation of California Civil Code §§ 1792 and 1791.1.

1203. California Plaintiffs and the California Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1204. California Plaintiffs and the California Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1205. As a direct and proximate cause of GM's breach, California Plaintiffs and the California Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, California Plaintiffs and the California Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1206. As a direct and proximate result of GM's breach of the implied warranty of merchantability, California Plaintiffs and the California Sub-Class Members have been damaged in an amount to be proven at trial.

### 16. COUNT 16
### BREACH OF EXPRESS WARRANTY
### CAL. COM. CODE §§ 2313 AND 10210

1207. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1208. California Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the California Sub-Class.

1209. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

1210. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

1211. The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

1212. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1213. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

1214. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1215. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1216. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and

271

8L45 transmissions and their component parts are covered by the express Warranties.

1217. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to California Plaintiffs and the California Sub-Class Members.

1218. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1219. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by California Plaintiffs and the California Sub-Class Members.

1220. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1221. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed California Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1222. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1223. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

272

1224. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect California Plaintiffs and the California Sub-Class Members. Among other things, California Plaintiffs and the California Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1225. California Plaintiffs and the California Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1226. California Plaintiffs and the California Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

1227. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

1228. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1229. As a direct and proximate cause of GM's breach, California Plaintiffs and the California Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution

273

of value of their Class Vehicles. Additionally, California Plaintiffs and the California Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1230. California Plaintiffs and the California Sub-Class Members have been damaged in an amount to be determined at trial. Plaintiffs and the other Class Members are entitled to legal and equitable relief against GM, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

### E. Claims on Behalf of the Colorado Sub-Class

### 17. COUNT 17
### Violation OF THE COLORADO CONSUMER PROTECTION ACT
### COLO. REV. STAT. § 6-1-101, *ET SEQ.*

1231. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1232. Plaintiff Daniel Drain ("Colorado Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Colorado Sub-Class.

1233. GM is a "person" within the meaning of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-102.

1234. The CCPA prohibits a person from engaging in a "deceptive trade practice," including "knowingly mak[ing] a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods […];" "represent[ing] that goods, good, services, or property are of a particular standard, quality, or grade, […] if he knows or should know that they are of another;" and "advertis[ing] goods, services, or property with intent not to sell them as advertised." Colo. Rev. Stat. § 6-1-105(1)(e), (g), and (i).

1235. GM participated in deceptive trade practices that violated the CCPA as

274

described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

1236. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1237. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1238. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1239. GM knew or should have known that its conduct violated the CCPA.

1240. Colorado Plaintiff and the Colorado Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1241. Had Colorado Plaintiff and the Colorado Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

275

1242. Colorado Plaintiff and the Colorado Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Colorado Plaintiff and the Colorado Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

1243. As a result of GM's conduct, Colorado Plaintiff and the Colorado Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

1244. As a direct and proximate result of GM's unfair or deceptive acts or practices, Colorado Plaintiff and the Colorado Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1245. Colorado Plaintiff and the Colorado Sub-Class Members seek damages in an amount to be proven at trial, including but not limited to actual damages, under the CCPA.

## 18. COUNT 18
## BREACH OF EXPRESS WARRANTY
## COLO. REV. STAT. §§ 4-2-313 AND 4-2.5-210

1246. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1247. Colorado Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Colorado Sub-Class.

1248. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

1249. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

1250. The Class Vehicles are and were at all relevant times "goods" within

276

the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

1251. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1252. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

1253. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1254. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1255. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1256. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Colorado Plaintiff and the Colorado Sub-Class Members.

1257. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1258. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Colorado Plaintiff and the Colorado Sub-Class Members.

1259. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1260. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Colorado Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1261. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1262. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances

278

here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1263. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Colorado Plaintiff and the Colorado Sub-Class Members. Among other things, Colorado Plaintiff and the Colorado Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1264. Colorado Plaintiff and the Colorado Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1265. Colorado Plaintiff and the Colorado Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

1266. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

1267. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1268. As a direct and proximate cause of GM's breach, Colorado Plaintiff and

279

the Colorado Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Colorado Plaintiff and the Colorado Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1269.  As a direct and proximate result of GM's breach of express warranties, Colorado Plaintiff and the Colorado Sub-Class Members have been damaged in an amount to be determined at trial.

### 19. COUNT 19
### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### COLO. REV. STAT. §§ 4-2-313 AND 4-2.5-212

1270. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1271. Colorado Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Colorado Sub-Class.

1272. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

1273. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

1274. The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

1275. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212.

1276. GM knew or had reason to know of the specific use for which the Class

Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Colorado Plaintiff and the Colorado Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Colorado Plaintiff and the Colorado Sub-Class Members, with no modification to the defective transmissions.

1277. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1278. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1279. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1280. As a result of GM's breach of the applicable implied warranties, Colorado Plaintiff and the Colorado Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Colorado Plaintiff and the Colorado Sub-Class Members were harmed and suffered actual damages in

that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1281. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212.

1282. Colorado Plaintiff and the Colorado Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1283. Colorado Plaintiff and the Colorado Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1284. As a direct and proximate cause of GM's breach, Colorado Plaintiff and the Colorado Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Colorado Plaintiff and the Colorado Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1285. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Colorado Plaintiff and the Colorado Sub-Class Members have been damaged in an amount to be proven at trial.

### F. Claims on Behalf of the Connecticut Sub-Class

### 20. COUNT 20
### VIOLATION OF THE CONNECTICUT UNLAWFUL TRADE PRACTICES ACT
### CONN. GEN. STAT. § 42-110A, *ET SEQ.*

1286. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1287. Plaintiff Kevin Wesley ("Connecticut Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Connecticut Sub-Class.

1288. GM, Connecticut Plaintiff, and Connecticut Class members are "persons" within the meaning of Conn. Gen. Stat. § 42-110a(3) of the Connecticut Unfair Trade Practices Act ("Connecticut UTPA").

1289. GM engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

1290. The Connecticut UTPA provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

1291. GM concealed the fact that Class Vehicles had defective transmissions that made them unsafe to drive and told various GM dealers and service technicians that the vehicles were operating "as [d]esigned" and that the symptoms were "normal" (if widespread enough). These GM dealers and service technicians passed this misinformation onto Class Members, as evidenced by the various consumer complaints alleging that someone—such as a GM "dealer" or "service manager"— told them that the defect's symptoms were "normal."

1292. GM violated the Connecticut UTPA by, at minimum, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as

283

advertised; and omitting material facts in describing the Class Vehicles.

1293. GM's acts and practices, as described throughout this Complaint, constitute "unfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce" by GM, that are unlawful, as enumerated in Conn. Gen. Stat. § 42-110b(a)

1294. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the Connecticut Plaintiff and the Connecticut Sub-Class.

1295. GM knew or should have known that its conducted violated the Connecticut UTPA.

1296. GM's fraudulent concealment of the true characteristics of the defective transmissions in the Class Vehicles were material to the Connecticut Plaintiff and Class members.

1297. GM's violations present a continuing risk to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1298. GM had an ongoing duty to its customers to refrain from unfair and deceptive practices under the Connecticut UTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of GM's deceptive and unfair acts and practices made in the course of GM's business.

1299. As a direct and proximate result of GM's violations of the Connecticut UTPA, the Connecticut Plaintiff and the Class have suffered injury-in-fact and/or actual damage.

1300. Pursuant to Conn. Gen. Stat. § 42-110g, Connecticut Plaintiff and the Connecticut Sub-Class seek an order enjoining GM's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, attorneys' fees and costs, and

any other just and proper relief available under the Connecticut UTPA.

## 21. COUNT 21
## BREACH OF EXPRESS WARRANTY
## CONN. GEN. STAT. ANN. § 42A-2-313

1301. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1302. Connecticut Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Connecticut Sub-Class.

1303. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. §42a-2-104(1).

1304. The Class Vehicles are "goods" within the meaning of Conn. Gen. Stat. Ann. §42a-2-105(1).

1305. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1306. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

1307. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for

up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1308. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1309. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1310. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Connecticut Plaintiff and the Connecticut Sub-Class Members.

1311. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1312. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Connecticut Plaintiff and Connecticut the Sub-Class Members.

1313. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1314. GM breached the express Warranties by performing illusory repairs.

286

Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Connecticut Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1315. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1316. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1317. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Connecticut Plaintiff and the Connecticut Sub-Class Members. Among other things, Connecticut Plaintiff and the Connecticut Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1318. Connecticut Plaintiff and the Connecticut Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1319. Connecticut Plaintiff and the Connecticut Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from

287

Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

1320. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

1321. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering these limitations null and void.

1322. Due to GM's breach of warranty as set forth herein, Connecticut Plaintiff and the Connecticut Sub-Class assert as an additional and/or alternative remedy, as set forth in Conn. Gen. Stat. Ann. § 42a-2-711, for a revocation of acceptance of the goods and for a return to Plaintiff and the Connecticut State Class of the purchase price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed under Conn. Gen. Stat. Ann. §§ 42a-2-711 and 42a-2-608.

1323. As a direct and proximate cause of GM's breach, Connecticut Plaintiff and the Connecticut Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Connecticut Plaintiff and the Connecticut Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1324. As a direct and proximate result of GM's breach of express warranties, Connecticut Plaintiff and the Connecticut Sub-Class Members have been damaged in an amount to be determined at trial.

**22. COUNT 22**
**BREACH OF THE IMPLIED WARRANTY OF**
**MERCHANTABILITY**
**CONN. GEN. STAT. ANN. § 42A-2-314**

1325. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1326. Connecticut Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Connecticut Sub-Class.

1327. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

1328. The Class Vehicles are "goods" within the meaning of Conn. Gen. Stat. Ann. §42a-2-105(1).

1329. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Conn. Gen. Stat. Ann. § 42a-2-314.

1330. GM sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.

1331. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Connecticut Plaintiff and the Connecticut Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Connecticut Plaintiff and the Connecticut Sub-Class Members, with no modification to the defective transmissions.

1332. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

289

1333. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1334. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Connecticut Plaintiff and Connecticut Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1335. As a result of GM's breach of the applicable implied warranties, Connecticut Plaintiff and the Connecticut Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Connecticut Plaintiff and the Connecticut Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1336. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Conn. Gen. Stat. Ann. § 42a-2-314.

1337. Connecticut Plaintiff and the Connecticut Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1338. Connecticut Plaintiff and the Connecticut Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1339. As a direct and proximate cause of GM's breach, Connecticut Plaintiff and the Connecticut Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Connecticut Plaintiff and the Connecticut Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1340. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Connecticut Plaintiff and the Connecticut Sub-Class Members have been damaged in an amount to be proven at trial.

### G.   Claims on Behalf of the Delaware Sub-Class

### 23. COUNT 23
### VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
### 6 DEL. CODE § 2511(7)

1341. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1342. Plaintiffs Keith Shelton and Karen Shelton (collectively, the "Delaware Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the Delaware Sub-Class.

1343. GM is a "person" within the meaning of 6 Del. Code § 2511(7).

1344. The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false

291

promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 Del. Code § 2513(a).

1345. GM participated in deceptive trade practices that violated the Delaware CFA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

1346. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1347. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1348. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1349. GM knew or should have known that its conduct violated the Delaware CFA.

1350. Delaware Plaintiffs and Delaware Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1351. Had Delaware Plaintiffs and Delaware Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

1352. Delaware Plaintiffs and Delaware Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Delaware Plaintiffs and Delaware Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

1353. As a result of GM's conduct,  Delaware Plaintiffs and Delaware Sub-Class Members were harmed and suffered ascertainable loss of money or property as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

1354. As a direct and proximate result of GM's unfair or deceptive acts or practices, Delaware Plaintiffs and Delaware Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1355. Delaware Plaintiffs and Delaware Sub-Class Members seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of GM's unlawful conduct. *See, e.g., Stephenson v. Capano Dev., Inc*., 462 A.2d 1069, 1077 (Del. 1983).

1356. GM engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

### 24. COUNT 24
### BREACH OF EXPRESS WARRANTY
### 6 DEL. CODE §§ 2-313 AND 2A-210

1357. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1358. Delaware Plaintiffs Keith Shelton and Karen Shelton bring this cause of action on their own behalf and on behalf of the members of the Delaware Sub-Class.

1359. GM is and was at all relevant times a "merchant" with respect to motor vehicles under 6 Del. Code §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

1360. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under 6 Del. Code § 2A-103(1)(p).

1361. The Class Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. Code §§ 2-105(1) and 2A-103(1)(h).

1362. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1363. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

1364. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is

294

covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1365.  Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1366.  GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1367.  The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Delaware Plaintiffs and Delaware Sub-Class Members.

1368.  Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1369.  Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Delaware Plaintiffs and Delaware Sub-Class Members.

1370.  Although GM was obligated to correct the Transmission Defect, none

295

of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1371. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Delaware Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1372. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1373. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1374. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Delaware Plaintiffs and Delaware Sub-Class Members. Among other things, Delaware Plaintiffs and Delaware Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1375. Delaware Plaintiffs and Delaware Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1376. Delaware Plaintiffs and Delaware Sub-Class Members were not

required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

1377. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

1378. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1379. As a direct and proximate cause of GM's breach, Delaware Plaintiffs and Delaware Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Delaware Plaintiffs and Delaware Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1380. As a direct and proximate result of GM's breach of express warranties, Delaware Plaintiffs and Delaware Sub-Class Members have been damaged in an amount to be determined at trial.

### 25. COUNT 25
### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### 6 DEL. CODE §§ 2-314 AND 2A-212

1381. Plaintiffs incorporate by reference and re-allege the allegations

contained in paragraphs 1-950 of this Complaint.

1382. Delaware Plaintiffs Keith Shelton and Karen Shelton bring this cause of action on their own behalf and on behalf of the members of the Delaware Sub-Class.

1383. GM is and was at all relevant times a "merchant" with respect to motor vehicles under 6 Del. Code §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

1384. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under 6 Del. Code § 2A-103(1)(p).

1385. The Class Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. Code §§ 2-105(1) and 2A-103(1)(h).

1386. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 6 Del. Code §§ 2-314 and 2A-212.

1387. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Delaware Plaintiffs and the Delaware Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Delaware Plaintiffs and the Delaware Sub-Class Members, with no modification to the defective transmissions.

1388. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1389. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied,

298

distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1390. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1391. As a result of GM's breach of the applicable implied warranties, Delaware Plaintiffs and the Delaware Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Delaware Plaintiffs and the Delaware Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1392. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of 6 Del. Code §§ 2-314 and 2A-212.

1393. Delaware Plaintiffs and Delaware Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1394. Delaware Plaintiffs and Delaware Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from

299

Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1395. As a direct and proximate cause of GM's breach, Delaware Plaintiffs and Delaware Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Delaware Plaintiffs and Delaware Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1396. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Delaware Plaintiffs and Delaware Sub-Class Members have been damaged in an amount to be proven at trial.

### H.     Claims on Behalf of the Florida Sub-Class
### 26. COUNT 26
### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### F.S.A. §§ 501.201-.213

1397. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1398. Plaintiffs Neil Ambrosio, Dennis Duffy, Charles Graff, Lisa Marie Graff, Rhianna Meyers, Michael Ponder, Arif Shakoor, Richard Sullivan and Tait Thomas ("Florida Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the Florida Sub-Class.

1399. GM's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Florida Deceptive and Unfair Trade Practices Act, § 501.201, *et seq*., Florida Statutes ("FDUTPA").

1400. At all relevant times, Florida Plaintiffs and the Florida Sub-Class

Members were "consumers" within the meaning of the FDUTPA. F.S.A. § 501.203(7).

1401. GM's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FDUTPA. F.S.A. § 501.203(8).

1402. The practices of GM, described above, violate the FDUTPA for, *inter alia*, one or more of the following reasons:

(a)    GM represented that goods or services have sponsorship, approval, characteristics, uses, and benefits that they do not have;

(b)    GM provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the performance, reliability, quality and nature of the 8L45 and 8L90 transmissions;

(c)    GM represented that goods or services were of a particular standard, quality, or grade, when they were of another;

(d)    GM engaged in unconscionable commercial practices in failing to reveal material facts and information about the 8L45 and 8L90 transmissions, which did, or tended to, mislead Florida Plaintiffs and the Florida Sub-Class Members about facts that could not reasonably be known by the consumer;

(e)    GM failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

(f)    GM caused Florida Plaintiffs and the Florida Sub-Class Members to suffer a probability of confusion and a misunderstanding of legal rights, obligations, and/or remedies by and through its conduct;

(g)    GM failed to reveal material facts to Florida Plaintiffs and the Florida Class with the intent that Florida Plaintiffs and the Florida Sub-Class Members rely upon the omission;

(h)    GM made material representations and statements of fact to Florida

301

Plaintiffs and the Florida Sub-Class Members that resulted in Florida Plaintiffs and the Florida Sub-Class Members reasonably believing the represented or suggested state of affairs to be other than what they actually were;

(i)GM intended that Florida Plaintiffs and the Florida Sub-Class Members rely on their misrepresentations and omissions, so that Florida Plaintiffs and the Florida Sub-Class Members would purchase vehicles equipped with the 8L45 and 8L90 transmissions.

1403. GM's actions impact the public interest because Florida Plaintiffs and the Florida Sub-Class Members were injured in exactly the same way as thousands of others purchasing and/or leasing the vehicles with 8L45 and 8L90 transmissions as a result of and pursuant to GM's generalized course of deception.

1404. Had Florida Plaintiffs and the Florida Sub-Class Members known of the defective nature of the 8L45 and 8L90 transmissions, they would not have purchased or leased vehicles equipped with the 8L45 and 8L90 transmissions or would have paid less for them.

1405. The foregoing acts, omissions and practices proximately caused Florida Plaintiffs and the Florida Sub-Class Members to suffer actual damages in the form of, *inter alia*, overpaying for the vehicles, as well as diminution in value of the vehicles equipped with 8L45 and 8L90 transmissions, and they are entitled to recover such damages, together with all other appropriate damages, attorneys' fees and costs of suit.

### 27. COUNT 27
### BREACH OF EXPRESS WARRANTY
### F.S.A. §§ 672.313 AND 680.21

1406. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1407. Florida Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the Florida Sub-Class.

1408. GM is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

1409. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

1410. The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

1411. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1412. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

1413. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1414. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1415. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1416. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Florida Plaintiffs and the Florida Sub-Class Members.

1417. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1418. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Florida Plaintiffs and the Florida Sub-Class Members.

1419. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1420. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Florida Sub-Class Members that there was no problem with their Class

304

Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1421. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1422. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1423. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Florida Plaintiffs and the Florida Sub-Class Members. Among other things, Florida Plaintiffs and the Florida Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1424. Florida Plaintiffs and the Florida Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1425. Florida Plaintiffs and the Florida Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the

305

transmissions or components thereof, and through other internal and external sources.

1426. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

1427. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1428. As a direct and proximate cause of GM's breach, Florida Plaintiffs and the Florida Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Florida Plaintiffs and the Florida Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1429. As a direct and proximate result of GM's breach of express warranties, Florida Plaintiffs and the Florida Sub-Class Members have been damaged in an amount to be determined at trial.

## 28. COUNT 28
## BREACH OF IMPLIED WARRANTY
### F.S.A. § § 672.314 AND 680.212

1430. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1431. Florida Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the Florida Sub-Class.

1432. GM is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor

306

vehicles under § 672.103(1)(d).

1433. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

1434. The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

1435. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under F.S.A. §§ 672.314 and 680.212.

1436. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Florida Plaintiffs and the Florida Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Florida Plaintiffs and the Florida Sub-Class Members, with no modification to the defective transmissions.

1437. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1438. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1439. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable,

307

durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1440. As a result of GM's breach of the applicable implied warranties, Florida Plaintiffs and the Florida Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Florida Plaintiffs and the Florida Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1441. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of F.S.A. §§ 672.314 and 680.212.

1442. Florida Plaintiffs and the Florida Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1443. Florida Plaintiffs and the Florida Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1444. As a direct and proximate cause of GM's breach, Florida Plaintiffs and the Florida Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Florida Plaintiffs and the Florida Sub-Class

308

Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1445. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Florida Plaintiffs and the Florida Sub-Class Members have been damaged in an amount to be proven at trial.

### I. Claims on Behalf of the Georgia Sub-Class

### 29. COUNT 29
### VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### GA. CODE ANN. § 10-1-370, *ET SEQ.*

1446. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1447. Plaintiffs Jimmy Flowers, Richard Freeman, and Philip Weeks ("Georgia Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the Georgia Sub-Class.

1448. GM, Georgia Plaintiffs, and the Georgia Sub-Class Members "persons" within the meaning of the Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code. Ann. § 10-1-371(5).

1449. The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-372(a).

1450. GM participated in unfair or deceptive trade practices that violated the Georgia UDTPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety,

309

cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

1451. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1452. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1453. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1454. GM knew or should have known that its conduct violated the Georgia UDTPA.

1455. Georgia Plaintiffs and the Georgia Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1456. Had Georgia Plaintiffs and the Georgia Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

1457. Georgia Plaintiffs and the Georgia Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Georgia Plaintiffs and the Georgia Sub-Class Members were harmed and suffered actual damages in

310

the form of the diminished value of their vehicles.

1458. As a result of GM's conduct, Georgia Plaintiffs and the Georgia Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

1459. As a direct and proximate result of GM's unfair or deceptive acts or practices, Georgia Plaintiffs and the Georgia Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1460. Georgia Plaintiffs and the Georgia Sub-Class Members seek an order enjoining GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the under the Georgia UDTPA.

### 30. COUNT 30
### BREACH OF EXPRESS WARRANTY
### GA. CODE. ANN. §§ 11-2-313 AND 11-2A-210

1461. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1462. Georgia Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the Georgia Sub-Class.

1463. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

1464. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

1465. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

1466. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

311

1467. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

1468. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1469. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1470. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express

312

Warranties.

1471. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Georgia Plaintiffs and the Georgia Sub-Class Members.

1472. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1473. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Georgia Plaintiffs and the Georgia Sub-Class Members.

1474. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1475. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Georgia Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1476. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1477. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1478. The time limits contained in GM's warranty period were also

313

unconscionable and inadequate to protect Georgia Plaintiffs and the Georgia Sub-Class Members. Among other things, Georgia Plaintiffs and the Georgia Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1479. Georgia Plaintiffs and the Georgia Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1480. Georgia Plaintiffs and the Georgia Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

1481. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

1482. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1483. As a direct and proximate cause of GM's breach, Georgia Plaintiffs and the Georgia Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Georgia Plaintiffs and the Georgia Sub-Class

Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1484. As a direct and proximate result of GM's breach of express warranties, Georgia Plaintiffs and the Georgia Sub-Class Members have been damaged in an amount to be determined at trial.

### 31. COUNT 31
### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### GA. CODE. ANN. §§ 11-2-314 AND 11-2A-212

1485. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1486. Georgia Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the Georgia Sub-Class.

1487. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

1488. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

1489. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

1490. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ga. Code. Ann. §§ 11-2-314 and 11-2A-212.

1491. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Georgia Plaintiffs and the Georgia Sub-Class

Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Georgia Plaintiffs and the Georgia Sub-Class Members, with no modification to the defective transmissions.

1492. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1493. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1494. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1495. As a result of GM's breach of the applicable implied warranties, Georgia Plaintiffs and the Georgia Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Georgia Plaintiffs and the Georgia Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1496. GM's actions, as complained of herein, breached the implied warranty

316

that the Class Vehicles were of merchantable quality and fit for such use in violation of Ga. Code. Ann. §§ 11-2-314 and 11-2A-212.

1497. Georgia Plaintiffs and the Georgia Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1498. Georgia Plaintiffs and the Georgia Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1499. As a direct and proximate cause of GM's breach, Georgia Plaintiffs and the Georgia Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Georgia Plaintiffs and the Georgia Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1500. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Georgia Plaintiffs and the Georgia Sub-Class Members have been damaged in an amount to be proven at trial.

### J. Claims on Behalf of the Idaho Sub-Class

### 32. COUNT 32
### VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
### IDAHO CODE § 48-601, *ET SEQ.*

1501. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

317

1502. Plaintiff Cary Sherrow ("Idaho Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Idaho Sub-Class.

1503. GM, Idaho Plaintiff, and Idaho Sub-Class members are "persons" within the meaning of Idaho Code § 48-602(1).

1504. GM is engaged in "trade" or "commerce" within the meaning of Idaho Code § 48-602(2).

1505. The Idaho Consumer Credit and Protection Act ("CPA") makes unlawful misleading, false, or deceptive acts.

1506. In the course of its business, Defendant GM, through their agents, employees and/or subsidiaries, violated the Idaho CPA.

1507. GM concealed the fact that Class Vehicles had defective transmissions that made them unsafe to drive and told various GM dealers and service technicians that the vehicles were operating "as [d]esigned" and that the symptoms were "normal" (if widespread enough). These GM dealers and service technicians passed this mis-information onto Class Members, as evidenced by the various consumer complaints alleging that someone—such as a GM "dealer" or "service manager"—told them the defect's symptoms were "normal." Additionally, Idaho Plaintiff was told that his vehicle's jolting, lurching, and jerking were "normal" and that the problem would "resolve itself" after a break-in period.

1508. GM violated the Idaho CPA by, at minimum, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

1509. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the Idaho Plaintiff and the Class.

1510. GM knew or should have known that its conducted violated the Idaho CPA.

1511. GM's fraudulent concealment of the true characteristics of the defective transmissions in the Class Vehicles were material to the Idaho Plaintiff and Class members.

1512. GM's violations present a continuing risk to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1513. GM had an ongoing duty to its customers to refrain from unfair and deceptive practices under the Idaho CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of GM's deceptive and unfair acts and practices made in the course of GM's business.

1514. As a direct and proximate result of GM's violations of the Idaho CPA, the Idaho Plaintiff and the Class have suffered injury-in-fact and/or actual damage.

1515. Pursuant to Idaho Code § 48-608, Plaintiffs seek to recover actual damages in an amount to be determined at trial; an order enjoining GM's unfair, unlawful, and/or deceptive practices; declaratory relief; restitution; punitive dames; attorneys' fees and costs; and any other relief available under the Idaho CPA that the Court deems just and proper.

### 33. COUNT 33
### BREACH OF EXPRESS WARRANTY
### IDAHO CODE §§ 28-2-313 AND 28-12-210

1516. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1517. Idaho Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Idaho Sub-Class.

1518. GM is and was at all relevant times a "merchant" with respect to motor

319

vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and a "seller" of motor vehicles under § 28-2-103(1)(d).

1519. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Idaho Code § 28-12-103(1)(p).

1520. The Class Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

1521. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1522. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

1523. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1524. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/

320

transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1525. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1526. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Idaho Plaintiff and the Idaho Sub-Class Members.

1527. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1528. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Idaho Plaintiff and the Idaho Sub-Class Members.

1529. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1530. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Idaho Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1531. GM and its agent dealers have failed and refused to conform the 8L90

321

and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1532. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1533. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Idaho Plaintiff and the Idaho Sub-Class Members. Among other things, Idaho Plaintiff and the Idaho Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1534. Idaho Plaintiff and the Idaho Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1535. Idaho Plaintiff and the Idaho Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

1536. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that

the Warranties cover the Transmission Defect.

1537. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering these limitations null and void.

1538. As a direct and proximate cause of GM's breach, Idaho Plaintiff and the Idaho Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Idaho Plaintiff and the Idaho Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1539. As a direct and proximate result of GM's breach of express warranties, Idaho Plaintiff and the Idaho Sub-Class Members have been damaged in an amount to be determined at trial.

### 34. COUNT 34
### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### IDAHO CODE §§ 28-2-314 AND 28-12-212

1540. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1541. Idaho Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Idaho Sub-Class.

1542. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and a "seller" of motor vehicles under § 28-2-103(1)(d).

1543. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Idaho Code § 28-12-103(1)(p).

323

1544. The Class Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

1545. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Idaho Code §§ 28-2-314 and 28-12-212.

1546. GM sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.

1547. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Idaho Plaintiff and the Idaho Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Idaho Plaintiff and the Idaho Sub-Class Members, with no modification to the defective transmissions.

1548. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1549. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1550. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including,

but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1551. As a result of GM's breach of the applicable implied warranties, Idaho Plaintiff and the Idaho Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Idaho Plaintiff and the Idaho Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1552. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Idaho Code §§ 28-2-314 and 28-12-212.

1553. Idaho Plaintiff and the Idaho Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1554. Idaho Plaintiff and the Idaho Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1555. As a direct and proximate cause of GM's breach, Idaho Plaintiff and the Idaho Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Idaho Plaintiff and the Idaho Sub-Class Members

have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1556. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Idaho Plaintiff and the Idaho Sub-Class Members have been damaged in an amount to be proven at trial.

### K.    Claims on Behalf of the Illinois Sub-Class

### 35. COUNT 35
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS 505/1, *ET SEQ.* AND 720 ILCS 295/1A

1557. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1558. Plaintiffs Timothy Grafrath, and Dennis Speerly ("Illinois Plaintiffs") brings this cause of action on his own behalf and on behalf of the members of the Illinois Sub-Class.

1559. Defendant is a "person" as that term is defined in 815 ILCS 505/1(c).

1560. Illinois Plaintiff and the Illinois Sub-Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

1561. The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") is to enjoin trade practices which confuse or deceive the consumer. The Illinois CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby."  815 ILCS 505/2.

1562. GM participated in deceptive trade practices that violated the Illinois CFA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

1563. By systematically devaluing safety and concealing a plethora of defects in the 8L90 and 8L45 Transmissions and the Class Vehicles, GM engaged in unfair or deceptive practices prohibited by the Illinois CFA, including: (1) representing that the 8L90 and 8L45 Transmissions and the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the 8L90 and 8L45 Transmissions and the Class Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the 8L90 and 8L45 Transmissions and the Class Vehicles with the intent not to sell them as advertised.

1564. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1565. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1566. GM's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

327

1567. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1568. GM knew or should have known that its conduct violated the Illinois CFA.

1569. Illinois Plaintiff and the Illinois Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1570. Had Illinois Plaintiff and the Illinois Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

1571. GM owed Illinois Plaintiff and the Illinois Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission Defect; (b) intentionally concealed the foregoing from Illinois Plaintiff and the Illinois Sub-Class Members; and/or (c)  made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Illinois Plaintiff and the Illinois Sub-Class Members that contradicted these representations.

1572. Due to GM's specific and superior knowledge that the transmissions in the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Illinois Plaintiff and the Illinois Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor

328

transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Illinois Plaintiff and the Illinois Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Illinois Plaintiff and the Illinois Sub-Class Members. Longevity, durability, performance, and safety are material concerns to GM truck consumers. GM represented to Illinois Plaintiff and the Illinois Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

1573. Illinois Plaintiff and the Illinois Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Illinois Plaintiff and the Illinois Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

1574. As a result of GM's conduct, Illinois Plaintiff and the Illinois Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

1575. As a direct and proximate result of GM's unfair or deceptive acts or practices, Illinois Plaintiff and the Illinois Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1576. GM's violations present a continuing risk to Illinois Plaintiff and the Illinois Sub-Class Members as well as to the general public. GM's unlawful acts and

329

practices complained of herein affect the public interest.

1577. Pursuant to 815 ILCS 505/10a(a), Illinois Plaintiff and the Illinois Sub-Class Members seek monetary relief against GM in the amount of actual damages, as well as punitive damages because GM acted with fraud and/or malice and/or was grossly negligent.

1578. Illinois Plaintiff and the Illinois Sub-Class Members also seeks attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq*.

## 36. COUNT 36
## BREACH OF EXPRESS WARRANTY
## 810 ILL. COMP. STAT. §§ 5/2-313 AND 5/2A-210

1579. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1580. Illinois Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Illinois Sub-Class.

1581. GM is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

1582. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

1583. The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

1584. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1585. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

330

1586. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1587. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1588. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

331

1589. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Illinois Plaintiff and the Illinois Sub-Class Members.

1590. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1591. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Illinois Plaintiff and the Illinois Sub-Class Members.

1592. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1593. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Illinois Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1594. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1595. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1596. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Illinois Plaintiff and the Illinois Sub-Class

332

Members. Among other things, Illinois Plaintiff and the Illinois Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1597. Illinois Plaintiff and the Illinois Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1598. Illinois Plaintiff and the Illinois Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

1599. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

1600. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1601. As a direct and proximate cause of GM's breach, Illinois Plaintiff and the Illinois Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Illinois Plaintiff and the Illinois Sub-Class

Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1602. As a direct and proximate result of GM's breach of express warranties, Illinois Plaintiff and the Illinois Sub-Class Members have been damaged in an amount to be determined at trial.

### 37. COUNT 37
### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### 810 ILL. COMP. STAT. §§ 5/2-314 AND 5/2A-212

1603. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1604. Illinois Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Illinois Sub-Class.

1605. GM is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

1606. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

1607. The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

1608. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

1609. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Illinois Plaintiff and the Illinois Sub-Class Members

bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Illinois Plaintiff and the Illinois Sub-Class Members, with no modification to the defective transmissions.

1610. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1611. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1612. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1613. As a result of GM's breach of the applicable implied warranties, Illinois Plaintiff and the Illinois Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Illinois Plaintiff and the Illinois Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1614. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

1615. Illinois Plaintiff and the Illinois Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1616. Illinois Plaintiff and the Illinois Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1617. As a direct and proximate cause of GM's breach, Illinois Plaintiff and the Illinois Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Illinois Plaintiff and the Illinois Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1618. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Illinois Plaintiff and the Illinois Sub-Class Members have been damaged in an amount to be proven at trial.

### L. Claims on Behalf of the Indiana Sub-Class

**38. COUNT 38**
**BREACH OF EXPRESS WARRANTY**
**IND. CODE §§ 26-1-2-313 AND 26-1-2.1-210**

1619. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

336

1620. Plaintiffs Samuel Ford and Philip Whicker bring this cause of action on their own behalf and on behalf of the members of the Indiana Sub-Class.

1621. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and a "seller" of motor vehicles under § 26-1-2-103(1)(d).

1622. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

1623. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

1624. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1625. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

1626. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1627. Furthermore, under the Powertrain Component of the Warranties, GMC

337

expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1628. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1629. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Indiana Plaintiff and the Indiana Sub-Class Members.

1630. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1631. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Indiana Plaintiff and the Indiana Sub-Class Members.

1632. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1633. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Indiana Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or

338

replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1634. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1635. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1636. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Indiana Plaintiff and the Indiana Sub-Class Members. Among other things, Indiana Plaintiff and the Indiana Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1637. Indiana Plaintiff and the Indiana Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1638. Indiana Plaintiff and the Indiana Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

339

1639. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

1640. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1641. As a direct and proximate cause of GM's breach, Indiana Plaintiff and the Indiana Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Indiana Plaintiff and the Indiana Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1642. As a direct and proximate result of GM's breach of express warranties, Indiana Plaintiff and the Indiana Sub-Class Members have been damaged in an amount to be determined at trial.

## 39. COUNT 39
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## IND. CODE §§ 26-1-2-314 AND 26-1-2.1-212

1643. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1644. Indiana Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Indiana Sub-Class.

1645. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and a "seller" of motor vehicles under § 26-1-2-103(1)(d).

340

1646. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under IND. CODE § 26-1-2.1-103(1)(p).

1647. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

1648. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ind. Code § 26-1-2-314 and 26-1-2.1-212.

1649. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Indiana Plaintiff and the Indiana Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Indiana Plaintiff and the Indiana Sub-Class Members, with no modification to the defective transmissions.

1650. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1651. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1652. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including,

341

but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1653. As a result of GM's breach of the applicable implied warranties, Indiana Plaintiff and the Indiana Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Indiana Plaintiff and the Indiana Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1654. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Ind. Code § 26-1-2-314 and 26-1-2.1-212.

1655. Indiana Plaintiff and the Indiana Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1656. Indiana Plaintiff and the Indiana Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1657. As a direct and proximate cause of GM's breach, Indiana Plaintiff and the Indiana Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Indiana Plaintiff and the Indiana Sub-Class Members have incurred or will incur economic damages at the point of repair in the

form of the cost of repair.

1658. As a direct and proximate result of GM's breach of the implied warranties of merchantability and that the Class Vehicles were fit for ordinary use, Indiana Plaintiff and the Indiana Sub-Class are entitled to either rescission or damages in an amount to be proven at trial.

### M.    Claims on Behalf of the Kansas Sub-Class

### 40. COUNT 40
### VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT
### KAN. STAT. ANN. § 50-623, *ET SEQ.*

1659. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1660. Plaintiff Guy Clark ("Kansas Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Kansas Sub-Class.

1661. GM is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

1662. Kansas Class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or leased one or more Class Vehicles.

1663. The sale or lease of the Class Vehicles to the Kansas Class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

1664. The Kansas CPA states that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs

343

materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression, or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).

1665. GM participated in misleading, false, or deceptive acts that violated the Kansas CPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

1666. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1667. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1668. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1669. GM knew or should have known that its conduct violated the Kansas

344

CPA.

1670. Kansas Plaintiff and the Kansas Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1671. Had Kansas Plaintiff and the Kansas Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

1672. GM owed Kansas Plaintiff and the Kansas Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission Defect; (b) intentionally concealed the foregoing from Kansas Plaintiff and the Kansas Sub-Class Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Kansas Plaintiff and the Kansas Sub-Class Members that contradicted these representations.

1673. Due to GM's specific and superior knowledge that the transmissions in the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Kansas Plaintiff and the Kansas Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Kansas Plaintiff and the Kansas Sub-Class Members, GM

345

had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Kansas Plaintiff and the Kansas Sub-Class Members. Longevity, durability, performance, and safety are material concerns to GM truck consumers. GM represented to Kansas Plaintiff and the Kansas Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

1674. Kansas Plaintiff and the Kansas Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Kansas Plaintiff and the Kansas Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

1675. As a result of GM's conduct, Kansas Plaintiff and the Kansas Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

1676. As a direct and proximate result of GM's unfair or deceptive acts or practices, Kansas Plaintiff and the Kansas Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1677. GM's violations present a continuing risk to Kansas Plaintiff and the Kansas Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by GM's deceptive practices are in the hundreds of thousands nation-wide; (2) GM has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual

346

Class members; and (3) so long as the Class Vehicles continue to be sold and distributed with the defective transmissions, the likelihood of continued impact on other consumers is significant.

1678. Pursuant to Kan. Stat. Ann. § 50-634, Kansas Plaintiff and the Kansas Sub-Class Members seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for Kansas Plaintiff and each Kansas Sub-Class Member. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

1679. Kansas Plaintiff and the Kansas Sub-Class Members also seek an order enjoining GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623, *et seq*.

### 41. COUNT 41
### BREACH OF EXPRESS WARRANTY
### KAN. STAT. ANN. §§ 84-2-314 AND 84-2A-210

1680. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1681. Kansas Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Kansas Sub-Class.

1682. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. Ann. §§ 84-2-104(1) and 84-2A-103(3), and a "seller" of motor vehicles under § 84-2-103(1)(d).

1683. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Kan. Stat. Ann. § 84-2A-103(1)(p).

347

1684. The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. Ann. §§ 84-2-105(1) and 84-2A-103(1)(h).

1685. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1686. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

1687. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1688. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or

348

70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1689. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1690. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Kansas Plaintiff and the Kansas Sub-Class Members.

1691. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1692. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Kansas Plaintiff and the Kansas Sub-Class Members.

1693. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1694. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Kansas Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1695. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

349

1696. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1697. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Kansas Plaintiff and the Kansas Sub-Class Members. Among other things, Kansas Plaintiff and the Kansas Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1698. Kansas Plaintiff and the Kansas Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1699. Kansas Plaintiff and the Kansas Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

1700. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2581313 v1

1701. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1702. As a direct and proximate cause of GM's breach, Kansas Plaintiff and the Kansas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Kansas Plaintiff and the Kansas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1703. As a direct and proximate result of GM's breach of express warranties, Kansas Plaintiff and the Kansas Sub-Class Members have been damaged in an amount to be determined at trial.

## 42. COUNT 42
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## KAN. STAT. ANN. §§ 84-2-314 AND 84-2A-212

1704. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1705. Kansas Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Kansas Sub-Class.

1706. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. Ann. §§ 84-2-104(1) and 84-2A-103(3), and a "seller" of motor vehicles under § 84-2-103(1)(d).

1707. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Kan. Stat. Ann. § 84-2A-103(1)(p).

1708. The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. Ann. §§ 84-2-105(1) and 84-2A-103(1)(h).

1709. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Kan. Stat. Ann. §§ 84-2-314 and 84-2A-212.

1710. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Kansas Plaintiff and the Kansas Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Kansas Plaintiff and the Kansas Sub-Class Members, with no modification to the defective transmissions.

1711. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1712. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1713. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1714. As a result of GM's breach of the applicable implied warranties, Kansas Plaintiff and the Kansas Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Kansas Plaintiff and the Kansas Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1715. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Kan. Stat. Ann. §§ 84-2-314 and 84-2A-212.

1716. Kansas Plaintiff and the Kansas Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1717. Kansas Plaintiff and the Kansas Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1718. As a direct and proximate cause of GM's breach, Kansas Plaintiff and the Kansas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Kansas Plaintiff and the Kansas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1719. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Kansas Plaintiff and the Kansas Sub-Class Members

353

have been damaged in an amount to be proven at trial.

### N.    Claims on Behalf of the Kentucky Sub-Class

### 43. COUNT 43
### VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT
### KY. REV. STAT. § 367.110, *ET SEQ.*

1720. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1721. Plaintiff James Norvell ("Kentucky Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Kentucky Sub-Class.

1722. The Kentucky Plaintiff and Kentucky Sub-Class members are "persons" within the meaning of Ky. Rev. Stat. § 367.110(1).

1723. GM is engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. § 367.110(2).

1724. The Kentucky Consumer Protection Act ("CPA") prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce . . . ." Ky. Rev. Stat. § 367.170(1). The Kentucky CPA has defined "unfair" to "be construed to mean unconscionable." Ky. Rev. Stat. § 367.170(2).

1725. GM concealed the fact that Class Vehicles had defective transmissions that made them unsafe to drive and told various GM dealers and service technicians that the vehicles were operating "as [d]esigned" and that the symptoms were "normal" (if widespread enough). These GM dealers and service technicians passed this mis-information onto Class Members, as evidenced by the various consumer complaints alleging that someone—such as a GM "dealer" or "service manager"—told them the defect's symptoms were "normal." Additionally, Kentucky Plaintiff was told that his vehicle's jolting, lurching, and jerking were "normal" and that the problem would "resolve itself" after a break-in period.

354

1726. GM violated the Kentucky CPA by, at minimum, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

1727. GM's acts and practices, as described throughout this Complaint, constitute "unfair, false, misleading, or deceptive acts or practices in the conduct of trade or commerce" that are unlawful, as enumerated in Ky. Rev. Stat. § 367.170(2).

1728. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the Kentucky Plaintiff and the Class.

1729. GM knew or should have known that its conducted violated the Kentucky CPA.

1730. GM's fraudulent concealment of the true characteristics of the defective transmissions in the Class Vehicles were material to the Kentucky Plaintiff and Class members.

1731. GM's violations present a continuing risk to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1732. GM had an ongoing duty to its customers to refrain from unfair and deceptive practices under the Kentucky CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of GM's deceptive and unfair acts and practices made in the course of GM's business.

1733. As a direct and proximate result of GM's violations of the Kentucky CPA, the Kentucky Plaintiff and the Class have suffered injury-in-fact and/or actual damage.

1734. Pursuant to Ky. Rev. Stat.  § 367.220, Plaintiffs seek to recover actual

355

damages in an amount to be determined at trial; an order enjoining GM's unfair, unlawful, and/or deceptive practices; declaratory relief; punitive damages; attorneys' fees and costs; and any other relief available under Ky. Rev. Stat. § 367.220 that the Court deems just and proper.

## 44. COUNT 44
## BREACH OF EXPRESS WARRANTY
## KY. REV. STAT. §§ 355.2-313 AND 355.2A-210

1735. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1736. Kentucky Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Kentucky Sub-Class.

1737. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and a "seller" of motor vehicles under § 355.2-103(1)(d).

1738. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

1739. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

1740. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1741. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

1742. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects

356

except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1743. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1744. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1745. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Kentucky Plaintiff and the Kentucky Sub-Class Members.

1746. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1747. Under the express Warranties, GM was obligated to correct the

357

Transmission Defect in the vehicles owned or leased by Kentucky Plaintiff and the Kentucky Sub-Class Members.

1748. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1749. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Kentucky Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1750. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1751. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1752. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Kentucky Plaintiff and the Kentucky Sub-Class Members. Among other things, Kentucky Plaintiff and the Kentucky Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1753. Kentucky Plaintiff and the Kentucky Sub-Class Members have

358

complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1754. Kentucky Plaintiff and the Kentucky Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

1755. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

1756. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering these limitations null and void.

1757. As a direct and proximate cause of GM's breach, Kentucky Plaintiff and the Kentucky Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Kentucky Plaintiff and the Kentucky Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1758. As a direct and proximate result of GM's breach of express warranties, Kentucky Plaintiff and the Kentucky Sub-Class Members have been damaged in an amount to be determined at trial.

359

**45. COUNT 45**
**BREACH OF THE IMPLIED WARRANTY OF**
**MERCHANTABILITY**
**KY. REV. STAT. §§ 355.2-314 AND 355.2A-312**

1759. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1760. Kentucky Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Kentucky Sub-Class.

1761. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and a "seller" of motor vehicles under Ky Rev. Stat. § 355.2-103(1)(d).

1762. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

1763. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

1764. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212.

1765. GM sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.

1766. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Kentucky Plaintiff and the Kentucky Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Kentucky Plaintiff and the Kentucky Sub-Class Members, with no modification to the defective transmissions.

360

1767. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1768. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1769. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1770. As a result of GM's breach of the applicable implied warranties, Kentucky Plaintiff and the Kentucky Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Kentucky Plaintiff and the Kentucky Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1771. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212.

1772. Kentucky Plaintiff and the Kentucky Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1773. Kentucky Plaintiff and the Kentucky Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1774. As a direct and proximate cause of GM's breach, Kentucky Plaintiff and the Kentucky Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Kentucky Plaintiff and the Kentucky Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1775. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Kentucky Plaintiff and the Kentucky Sub-Class Members have been damaged in an amount to be proven at trial.

### O.    Claims on Behalf of the Louisiana Sub-Class

**46. COUNT 46**
**VIOLATION OF THE LOUISIANA UNFAIR TRADE**
**PRACTICES AND CONSUMER PROTECTION LAW**
**LA. STAT. ANN. § 51:1401, *ET SEQ.***

1776. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1777. Plaintiff Donald Dykshorn ("Louisiana Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Louisiana Sub-Class.

362

1778. GM, Plaintiffs, and Louisiana Class members are "persons" within the meaning of the La. Stat. Ann. § 51:1402(8).

1779. Plaintiffs and Louisiana Class members are "consumers" within the meaning of La. Stat. Ann. § 51:1402(1).

1780. GM engaged in "trade" or "commerce" within the meaning of La. Stat. Ann. § 51:1402(9).

1781. The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Stat. Ann. § 51:1405(A).

1782. GM participated in misleading, false, or deceptive acts that violated the Louisiana CPL as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

1783. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1784. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1785. GM knew that the Class Vehicles and their transmissions suffered from

363

an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1786. GM knew or should have known that its conduct violated the Louisiana CPL.

1787. Louisiana Plaintiff and the Louisiana Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1788. GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1789. Had Louisiana Plaintiff and the Louisiana Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

1790. GM owed Louisiana Plaintiff and the Louisiana Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission Defect; (b) intentionally concealed the foregoing from Louisiana Plaintiff and the Louisiana Sub-Class Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Louisiana Plaintiff and the Louisiana Sub-Class Members that contradicted these representations.

1791. Due to GM's specific and superior knowledge that the transmissions in the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Louisiana Plaintiff and the Louisiana Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected

364

durability, reliability, and/or safety over other vehicles or of their predecessor transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Louisiana Plaintiff and the Louisiana Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Louisiana Plaintiff and the Louisiana Sub-Class Members. Longevity, durability, performance, and safety are material concerns to GM truck consumers. GM represented to Louisiana Plaintiff and the Louisiana Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

1792. Louisiana Plaintiff and the Louisiana Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Louisiana Plaintiff and the Louisiana Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

1793. As a result of GM's conduct, Louisiana Plaintiff and the Louisiana Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

1794. As a direct and proximate result of GM's unfair or deceptive acts or practices, Louisiana Plaintiff and the Louisiana Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1795. GM's violations present a continuing risk to Louisiana Plaintiff and the

365

Louisiana Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by GM's deceptive practices are in the hundreds of thousands nation-wide; (2) GM has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed with the defective transmissions, the likelihood of continued impact on other consumers is significant.

1796. Pursuant to La. Stat. Ann. § 51:1409, Louisiana Plaintiff and the Louisiana Sub-Class Members seek to recover actual damages in an amount to be determined at trial; treble damages for GM's knowing violations of the Louisiana CPL; an order enjoining GM's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Stat. Ann. § 51:1409.

## 47. COUNT 47
## BREACH OF EXPRESS WARRANTY
## LA. REV. STAT. ANN. § 9:2800.52

1797. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1798. Louisiana Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Louisiana Sub-Class.

1799. GM is and was at all relevant times a ""manufacturer" within the meaning of La. Rev. Stat. Ann. § 9:2800.53.

1800. The Class Vehicles are and were at all relevant times are "Products" within the meaning of La. Rev. Stat. Ann. § 9:2800.53.

1801. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

366

1802. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

1803. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1804. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1805. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and

8L45 transmissions and their component parts are covered by the express Warranties.

1806. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Louisiana Plaintiff and the Louisiana Sub-Class Members.

1807. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1808. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Louisiana Plaintiff and the Louisiana Sub-Class Members.

1809. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1810. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Louisiana Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1811. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1812. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

368

1813. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Louisiana Plaintiff and the Louisiana Sub-Class Members. Among other things, Louisiana Plaintiff and the Louisiana Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1814. Louisiana Plaintiff and the Louisiana Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1815. Louisiana Plaintiff and the Louisiana Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

1816. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

1817. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1818. As a direct and proximate cause of GM's breach, Louisiana Plaintiff and the Louisiana Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution

369

of value of their Class Vehicles. Additionally, Louisiana Plaintiff and the Louisiana Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1819. As a direct and proximate result of GM's breach of express warranties, Louisiana Plaintiff and the Louisiana Sub-Class Members have been damaged in an amount to be determined at trial.

### 48. COUNT 48
### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY / WARRANTY AGAINST REDHIBITORY DEFECTS LA. CIV. CODE ART. 2520, 2524

1820. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1821. Louisiana Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Louisiana Sub-Class.

1822. GM was a merchant with respect to motor vehicles within the meaning of the La. Civ. Code Art. 2520, 2524.

1823. Under La. Civ. Code Art. 2520 and 2524, a warranty that the Class Vehicles did not have redhibitory defects was implied by law in the transactions when Louisiana Plaintiff and the Louisiana Sub-Class Members purchased or leased their Class Vehicles from GM.

1824. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Louisiana Plaintiff and the Louisiana Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass

370

unchanged from the authorized dealers to Louisiana Plaintiff and the Louisiana Sub-Class Members, with no modification to the defective transmissions.

1825. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1826. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1827. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1828. As a result of GM's breach of the applicable implied warranties, Louisiana Plaintiff and the Louisiana Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Louisiana Plaintiff and the Louisiana Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1829. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of La. Civ. Code Art. 2520 and 2524.

371

1830. Louisiana Plaintiff and the Louisiana Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1831. Louisiana Plaintiff and the Louisiana Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1832. As a direct and proximate cause of GM's breach, Louisiana Plaintiff and the Louisiana Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Louisiana Plaintiff and the Louisiana Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1833. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Louisiana Plaintiff and the Louisiana Sub-Class Members have been damaged in an amount to be proven at trial.

## P. Claims on Behalf of the Maine Sub-Class

### 49. COUNT 49
### VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT
### ME. REV. STAT. ANN. TIT. 5, § 205-A, *ET SEQ.*

1834. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1835. Plaintiff Carl Johnsen ("Maine Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Maine Sub-Class.

1836. The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Me. Rev. Stat. Ann. tit. 5, § 207.

1837. GM, Maine Plaintiff and the Maine Sub-Class Members are "persons" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(2).

1838. GM was and is engaged in "trade" or "commerce" within the meaning Me. Rev. Stat. Ann. tit. § 5, 206(3).

1839. GM participated in misleading, false, or deceptive acts that violated the Maine UTPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

1840. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1841. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1842. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

373

1843. GM knew or should have known that its conduct violated the Maine UTPA.

1844. Maine Plaintiff and the Maine Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1845. Had Maine Plaintiff and the Maine Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

1846. GM owed Maine Plaintiff and the Maine Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission Defect; (b) intentionally concealed the foregoing from Maine Plaintiff and the Maine Sub-Class Members; and/or (c)  made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Maine Plaintiff and the Maine Sub-Class Members that contradicted these representations.

1847. Due to GM's specific and superior knowledge that the transmissions in the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Maine Plaintiff and the Maine Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to

374

provide information to Maine Plaintiff and the Maine Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Maine Plaintiff and the Maine Sub-Class Members. Longevity, durability, performance, and safety are material concerns to GM truck consumers. GM represented to Maine Plaintiff and the Maine Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

1848. Maine Plaintiff and the Maine Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Maine Plaintiff and the Maine Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

1849. As a result of GM's conduct,  Maine Plaintiff and the Maine Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

1850. As a direct and proximate result of GM's unfair or deceptive acts or practices, Maine Plaintiff and the Maine Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1851. Defendant's violations present a continuing risk to Maine Plaintiff and the Maine Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1852. Pursuant to Me. Rev. Stat. Ann. tit. 5 § 213, Maine Plaintiff and the Maine Sub-Class Members seek an order enjoining GM's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any

2581313 v1

other just and proper relief available under the Maine UTPA.

### 50. COUNT 50
### BREACH OF EXPRESS WARRANTY
### ME. REV. STAT. ANN. TIT. 11 §§ 2-313 AND 2-1210

1853. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1854. Maine Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Maine Sub-Class.

1855. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Me. Rev. Stat. Ann. tit. 11, §§ 2-104(1) and 2-1103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

1856. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Me. Rev. Stat. Ann. tit. 11,§ 2-1103(1)(p).

1857. The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. tit. 11,§§ 2-105(1), and 2-1103(1)(h).

1858. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1859. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

1860. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is

376

covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1861. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1862. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1863. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Maine Plaintiff and the Maine Sub-Class Members.

1864. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1865. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Maine Plaintiff and the Maine Sub-Class Members.

377

1866. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1867. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Maine Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1868. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1869. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1870. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Maine Plaintiff and the Maine Sub-Class Members. Among other things, Maine Plaintiff and the Maine Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1871. Maine Plaintiff and the Maine Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

378

1872. Maine Plaintiff and the Maine Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

1873. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

1874. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1875. As a direct and proximate cause of GM's breach, Maine Plaintiff and the Maine Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Maine Plaintiff and the Maine Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1876. As a direct and proximate result of GM's breach of express warranties, Maine Plaintiff and the Maine Sub-Class Members have been damaged in an amount to be determined at trial.

**51. COUNT 51**
**BREACH OF THE IMPLIED WARRANTY OF**
**MERCHANTABILITY**
**ME. REV. STAT. ANN. TIT. 11 §§ 2-314 AND 2-1212**

1877. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1878. Maine Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Maine Sub-Class.

1879. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Me. Rev. Stat. Ann. tit. 11, §§ 2-104(1) and 2-1103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

1880. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Me. Rev. Stat. Ann. tit. 11,§ 2-1103(1)(p).

1881. The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. tit. 11,§§ 2-105(1), and 2-1103(1)(h).

1882. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Me. Rev. Stat. Ann. tit. 11, §§ 2-314 and 2-1212.

1883. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Maine Plaintiff and the Maine Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Maine Plaintiff and the Maine Sub-Class Members, with no modification to the defective transmissions.

1884. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1885. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1886. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1887. As a result of GM's breach of the applicable implied warranties, Maine Plaintiff and the Maine Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Maine Plaintiff and the Maine Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1888. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation Me. Rev. Stat. Ann. tit. 11, §§ 2-314 and 2-1212.

1889. Maine Plaintiff and the Maine Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1890. Maine Plaintiff and the Maine Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1891. As a direct and proximate cause of GM's breach, Maine Plaintiff and the Maine Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Maine Plaintiff and the Maine Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1892. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Maine Plaintiff and the Maine Sub-Class Members have been damaged in an amount to be proven at trial.

Q.    **Claims on Behalf of the Michigan Sub-Class**

**52. COUNT 52**
**VIOLATION OF THE MICHIGAN CONSUMER**
**PROTECTION ACT**
**MICH. COMP. LAWS § 445.903, *ET SEQ.***

1893. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1894. Plaintiffs Richard Francis, Jay Hull, and Louis Ray ("Michigan Plaintiffs") brings this cause of action on his own behalf and on behalf of the

382

members of the Michigan Sub-Class.

1895. Michigan Plaintiff and the Michigan Sub-Class Members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

1896. GM is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

1897. The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including: "(c) Representing that goods or services have . . . characteristics . . . that they do not have;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

1898. GM participated in misleading, false, or deceptive acts that violated the Michigan CPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

1899. GM also engaged in unlawful trade practices by employing deception,

deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1900. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1901. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1902. GM knew or should have known that its conduct violated the Michigan CPA.

1903. Michigan Plaintiff and the Michigan Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1904. Had Michigan Plaintiff and the Michigan Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

1905. GM owed Michigan Plaintiff and the Michigan Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission Defect; (b) intentionally concealed the foregoing from Michigan Plaintiff and the Michigan Sub-Class Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Michigan Plaintiff and the Michigan Sub-Class Members that contradicted these representations.

1906. Due to GM's specific and superior knowledge that the transmissions in

the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Michigan Plaintiff and the Michigan Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Michigan Plaintiff and the Michigan Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Michigan Plaintiff and the Michigan Sub-Class Members and could not reasonably be known by the consumer. Longevity, durability, performance, and safety are material concerns to GM truck consumers. GM represented to Michigan Plaintiff and the Michigan Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

1907. Michigan Plaintiff and the Michigan Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Michigan Plaintiff and the Michigan Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

1908. As a result of GM's conduct, Michigan Plaintiff and the Michigan Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions

385

because they purchased vehicles which do not perform as advertised.

1909. As a direct and proximate result of GM's unfair or deceptive acts or practices, Michigan Plaintiff and the Michigan Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1910. Defendant's violations present a continuing risk to Michigan Plaintiff and the Michigan Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1911. Michigan Plaintiff and the Michigan Sub-Class Members seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 per each Plaintiff; and reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws MICH. COMP. LAWS damages against GM because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others. GM's conduct constitutes malice, oppression, and fraud warranting punitive damages.

## 53. COUNT 53
## BREACH OF EXPRESS WARRANTY
## MICH. COMP. LAWS §§ 440.2313 AND 440.2860

1912. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1913. Michigan Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Michigan Sub-Class.

1914. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws §§ 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

1915. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

386

1916. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

1917. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1918. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

1919. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1920. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or

387

70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1921. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1922. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Michigan Plaintiff and the Michigan Sub-Class Members.

1923. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1924. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Michigan Plaintiff and the Michigan Sub-Class Members.

1925. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1926. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Michigan Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1927. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

388

1928. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1929. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Michigan Plaintiff and the Michigan Sub-Class Members. Among other things, Michigan Plaintiff and the Michigan Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

1930. Michigan Plaintiff and the Michigan Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1931. Michigan Plaintiff and the Michigan Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

1932. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

389

1933. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1934. As a direct and proximate cause of GM's breach, Michigan Plaintiff and the Michigan Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Michigan Plaintiff and the Michigan Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1935. As a direct and proximate result of GM's breach of express warranties, Michigan Plaintiff and the Michigan Sub-Class Members have been damaged in an amount to be determined at trial.

## 54. COUNT 54
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## MICH. COMP. LAWS §§ 440.2314 AND 440.2860

1936. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1937. Michigan Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Michigan Sub-Class.

1938. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws §§ 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

1939. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under MICH. COMP. LAWS § 440.2803(1)(p).

1940. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

1941. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Mich. Comp. Laws §§ 440.2314 and 440.2862.

1942. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Michigan Plaintiff and the Michigan Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Michigan Plaintiff and the Michigan Sub-Class Members, with no modification to the defective transmissions.

1943. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1944. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

1945. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

1946. As a result of GM's breach of the applicable implied warranties, Michigan Plaintiff and the Michigan Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Michigan Plaintiff and the Michigan Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

1947. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Mich. Comp. Laws §§ 440.2314 and 440.2862.

1948. Michigan Plaintiff and the Michigan Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1949. Michigan Plaintiff and the Michigan Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1950. As a direct and proximate cause of GM's breach, Michigan Plaintiff and the Michigan Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Michigan Plaintiff and the Michigan Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1951. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Michigan Plaintiff and the Michigan Sub-Class Members have been damaged in an amount to be proven at trial.

### R.    Claims on Behalf of the Minnesota Sub-Class

### 55. COUNT 55
### VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
### MINN. STAT.  § 325F.68, *ET SEQ.*

1952. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1953. Plaintiffs Troy and Kimberly Coulson ("Minnesota Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the Minnesota Sub-Class.

1954. The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68.

1955. The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby …." Minn. Stat. § 3 25F.69(1).

1956. GM participated in misleading, false, or deceptive acts that violated the Minnesota CFA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they

2581313 v1

were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

1957. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1958. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1959. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1960. GM knew or should have known that its conduct violated the Minnesota CFA.

1961. Minnesota Plaintiffs and the Minnesota Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1962. Had Minnesota Plaintiffs and the Minnesota Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

1963. Minnesota Plaintiffs and the Minnesota Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Minnesota Plaintiffs and the Minnesota Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

394

1964. As a result of GM's conduct,  Minnesota Plaintiffs and the Minnesota Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

1965. As a direct and proximate result of GM's unfair or deceptive acts or practices, Minnesota Plaintiffs and the Minnesota Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1966. Pursuant to Minn. Stat.  § 8.31(3a), Minnesota Plaintiffs and the Minnesota Sub-Class Members seek damages in an amount to be proven at trial, including but not limited to actual damages and attorneys' fees, under the Minnesota CFA.

1967. Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that GM's acts show deliberate disregard for the rights or safety of others.

## 56. COUNT 56
## VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT
## MINN. STAT. § 325D.43-48, *ET SEQ.*

1968. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1969. Minnesota Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Minnesota Sub-Class.

1970. The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68.

1971. The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses,

benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44.

1972. GM participated in deceptive trade practices that violated the Minnesota DTPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

1973. By systematically devaluing safety and concealing a plethora of defects in the 8L90 and 8L45 Transmissions and the Class Vehicles, GM engaged in unfair or deceptive practices prohibited by the Minnesota DTPA, including: (1) representing that the 8L90 and 8L45 Transmissions and the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the 8L90 and 8L45 Transmissions and the Class Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the 8L90 and 8L45 Transmissions and the Class Vehicles with the intent not to sell them as advertised.

1974. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

396

or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1975. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1976. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1977. GM knew or should have known that its conduct violated the Minnesota DTPA.

1978. Minnesota Plaintiffs and the Minnesota Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1979. Had Minnesota Plaintiffs and the Minnesota Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

1980. Minnesota Plaintiffs and the Minnesota Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Minnesota Plaintiffs and the Minnesota Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

1981. As a result of GM's conduct,  Minnesota Plaintiffs and the Minnesota Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

1982. As a direct and proximate result of GM's unfair or deceptive acts or practices, Minnesota Plaintiffs and the Minnesota Sub-Class Members suffered and

397

will continue to suffer injury in fact and/or actual damages.

1983. Pursuant to Minn. Stat. §§ 8.31(3a) and 325D.45, Minnesota Plaintiffs and the Minnesota Sub-Class Members seek damages in an amount to be proven at trial, including but not limited to actual damages and attorneys' fees, under the Minnesota DTPA.

1984. Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that GM's acts show deliberate disregard for the rights or safety of others.

## 57. COUNT 57
## BREACH OF EXPRESS WARRANTY
## MINN. STAT. §336.2-313 AND 336.2A-210

1985. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

1986. Minnesota Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the Minnesota Sub-Class.

1987. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Minn. Stat. §§ 336.2-104(1) and a "seller" of motor vehicles under § 336.2-103(1)(d).

1988. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

1989. The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

1990. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1991. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

398

1992. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1993. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1994. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1995. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Minnesota Plaintiffs and the

Minnesota Sub-Class Members.

1996. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1997. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Minnesota Plaintiffs and the Minnesota Sub-Class Members.

1998. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

1999. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Minnesota Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

2000. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

2001. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

2002. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Minnesota Plaintiffs and the Minnesota Sub-Class Members. Among other things, Minnesota Plaintiffs and the Minnesota Sub-Class Members had no meaningful choice in determining these time limitations,

400

the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

2003. Minnesota Plaintiffs and the Minnesota Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2004. Minnesota Plaintiffs and the Minnesota Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

2005. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2006. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

2007. As a direct and proximate cause of GM's breach, Minnesota Plaintiffs and the Minnesota Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Minnesota Plaintiffs and the Minnesota Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2008. As a direct and proximate result of GM's breach of express warranties,

401

Minnesota Plaintiffs and the Minnesota Sub-Class Members have been damaged in an amount to be determined at trial.

## 58. COUNT 58
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## MINN. STAT. §§ 336.2-314 AND 336.2A-212

2009. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2010. Minnesota Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the Minnesota Sub-Class.

2011. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Minn. Stat. §§ 336.2-104(1) and a "seller" of motor vehicles under § 336.2-103(1)(d)

2012. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

2013. The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

2014. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Minn. Stat. §§ 336.2-314 and 336.2A-212.

2015. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Minnesota Plaintiff and the Minnesota Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Minnesota Plaintiff and the Minnesota

402

Sub-Class Members, with no modification to the defective transmissions.

2016. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

2017. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

2018. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

2019. As a result of GM's breach of the applicable implied warranties, Minnesota Plaintiffs and the Minnesota Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Minnesota Plaintiffs and the Minnesota Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

2020. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Minn. Stat. §§ 336.2-314 and 336.2A-212.

2021. Minnesota Plaintiffs and the Minnesota Sub-Class Members have

403

complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2022. Minnesota Plaintiffs and the Minnesota Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

2023. As a direct and proximate cause of GM's breach, Minnesota Plaintiffs and the Minnesota Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Minnesota Plaintiffs and the Minnesota Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2024. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Minnesota Plaintiffs and the Minnesota Sub-Class Members have been damaged in an amount to be proven at trial.

### S. Claims on Behalf of the Missouri Sub-Class

### 59. COUNT 59
### VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
### MO. REV. STAT. § 407.010, *ET SEQ.*

2025. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2026. Plaintiffs Christopher Krull and Richard Noonan ("Missouri Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the Missouri Sub-Class.

404

2027. GM, Missouri Plaintiffs and the Missouri Sub-Class Members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

2028. GM engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

2029. The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020. GM used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce, in violation of the Missouri MPA.

2030. GM participated in unfair or deceptive trade practices that violated the Missouri MPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

2031. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

405

2032. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

2033. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

2034. GM knew or should have known that its conduct violated the Missouri MPA.

2035. Missouri Plaintiffs and the Missouri Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

2036. Had Missouri Plaintiffs and the Missouri Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

2037. GM owed Missouri Plaintiffs and the Missouri Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission Defect; (b) intentionally concealed the foregoing from Missouri Plaintiffs and the Missouri Sub-Class Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Missouri Plaintiffs and the Missouri Sub-Class Members that contradicted these representations.

2038. Due to GM's specific and superior knowledge that the transmissions in the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Missouri Plaintiffs and the Missouri Sub-Class Members on these material representations,

406

GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Missouri Plaintiffs and the Missouri Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Missouri Plaintiffs and the Missouri Sub-Class Members. Longevity, durability, performance, and safety are material concerns to GM truck consumers. GM represented to Missouri Plaintiffs and the Missouri Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

2039. Missouri Plaintiffs and the Missouri Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Missouri Plaintiffs and the Missouri Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

2040. As a result of GM's conduct, Missouri Plaintiffs and the Missouri Sub-Class Members were harmed and suffered an ascertainable loss of money or property as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised impacting the value of the vehicle.

2041. As a direct and proximate result of GM's unfair or deceptive acts or

407

practices, Missouri Plaintiffs and the Missouri Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

2042. Defendant's violations present a continuing risk to Missouri Plaintiffs and the Missouri Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

2043. GM is liable to Missouri Plaintiffs and the Missouri Sub-Class Members for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining GM's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## 60. COUNT 60
## BREACH OF EXPRESS WARRANTY
## MO. REV. STAT.§§ 400.2-313 AND 400.2A-210

2044. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2045. Missouri Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Missouri Sub-Class.

2046. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Rev. Stat. § 400.2-104(1), and a "seller" of motor vehicles under § 400.2-103(1)(d).

2047. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p).

2048. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

2049. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

2050. GM provided all purchasers and lessees of Cadillac-branded Class

408

Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

2051. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

2052. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

2053. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

409

2054. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Missouri Plaintiffs and the Missouri Sub-Class Members.

2055. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

2056. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Missouri Plaintiffs and the Missouri Sub-Class Members.

2057. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

2058. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Missouri Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

2059. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

2060. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

2061. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Missouri Plaintiffs and the Missouri Sub-

410

Class Members. Among other things, Missouri Plaintiffs and the Missouri Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

2062. Missouri Plaintiffs and the Missouri Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2063. Missouri Plaintiffs and the Missouri Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

2064. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2065. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

2066. As a direct and proximate cause of GM's breach, Missouri Plaintiffs and the Missouri Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Missouri Plaintiffs and the Missouri Sub-Class Members have incurred or will incur economic damages at the point of

411

repair in the form of the cost of repair.

2067.  As a direct and proximate result of GM's breach of express warranties, Missouri Plaintiffs and the Missouri Sub-Class Members have been damaged in an amount to be determined at trial.

## 61. COUNT 61
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## MO. REV. STAT. §§ 400.2-314 AND 400.2A-212

2068.  Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2069.  Missouri Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Missouri Sub-Class.

2070.  GM is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Rev. Stat. § 400.2-104(1), and a "seller" of motor vehicles under § 400.2-103(1)(d).

2071.  With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p).

2072.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. § 400.2-105(1) and Mo. Rev. Stat. § 400.2A-103(1)(h).

2073.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Mo. Rev. Stat. § 400.2-314 and Mo. Rev. Stat. § 400.2A-212.

2074.  GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Missouri Plaintiffs and the Missouri Sub-Class

412

Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Missouri Plaintiffs and the Missouri Sub-Class Members, with no modification to the defective transmissions.

2075. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

2076. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

2077. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

2078. As a result of GM's breach of the applicable implied warranties, Missouri Plaintiffs and the Missouri Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Missouri Plaintiffs and the Missouri Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

2079. GM's actions, as complained of herein, breached the implied warranty

413

that the Class Vehicles were of merchantable quality and fit for such use in violation of Mo. Rev. Stat. § 400.2-314 and Mo. Rev. Stat. § 400.2A-212.

2080. Missouri Plaintiffs and the Missouri Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2081. Missouri Plaintiffs and the Missouri Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

2082. As a direct and proximate cause of GM's breach, Missouri Plaintiffs and the Missouri Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Missouri Plaintiffs and the Missouri Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2083. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Missouri Plaintiffs and the Missouri Sub-Class Members have been damaged in an amount to be proven at trial.

### T. Claims on Behalf of the New Hampshire Sub-Class

### 62. COUNT 62
### VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT
### N.H. REV. STAT. ANN. § 358-A:1, *ET SEQ.*

2084. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

414

2085. Plaintiff Michael Banks ("New Hampshire Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the New Hampshire Sub-Class.

2086. New Hampshire Plaintiff, the New Hampshire Sub-Class Members, and GM are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"). N.H. Rev. Stat. § 358-A:1.

2087. GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. § 358-A:1.

2088. The New Hampshire CPA prohibits a person in the conduct of any trade or commerce from using "any unfair or deceptive act or practice," including "but . . . not limited to the following: . . . (V) Representing that goods or services have . . . characteristics, . . . uses, benefits, or quantities that they do not have," "(VII) Representing that goods or services are of a particular standard, quality, or grade, . . . if they are of another," and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. Rev. Stat. § 358-A:2.

2089. GM participated in unfair methods of competition or unfair or deceptive acts or practices that violated the New Hampshire CPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business. The facts concerning the inherently defective nature of the Class Vehicles would be material to a reasonable consumer.

415

2090. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

2091. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

2092. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

2093. GM knew or should have known that its conduct violated the New Hampshire CPA

2094. New Hampshire Plaintiff and the New Hampshire Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

2095. Had New Hampshire Plaintiff and the New Hampshire Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

2096. GM owed New Hampshire Plaintiff and the New Hampshire Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission Defect; (b) intentionally concealed the foregoing from New Hampshire Plaintiff and the New Hampshire Sub-Class Members; and/or (c)  made incomplete representations regarding the quality and durability of the Class Vehicles, while

416

purposefully withholding material facts from New Hampshire Plaintiff and the New Hampshire Sub-Class Members that contradicted these representations.

2097. Due to GM's specific and superior knowledge that the transmissions in the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by New Hampshire Plaintiff and the New Hampshire Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to New Hampshire Plaintiff and the New Hampshire Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by New Hampshire Plaintiff and the New Hampshire Sub-Class Members. Longevity, durability, performance, and safety are material concerns to GM truck consumers. GM represented to New Hampshire Plaintiff and the New Hampshire Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

2098. New Hampshire Plaintiff and the New Hampshire Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, New Hampshire Plaintiff and the New Hampshire Sub-Class Members were harmed

417

and suffered actual damages in the form of the diminished value of their vehicles.

2099. As a result of GM's conduct,  New Hampshire Plaintiff and the New Hampshire Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

2100. As a direct and proximate result of GM's unfair or deceptive acts or practices, New Hampshire Plaintiff and the New Hampshire Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

2101. Defendant's violations present a continuing risk to New Hampshire Plaintiff and the New Hampshire Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest, and its practices are immoral, unethical, oppressive, and/or unscrupulous.

2102. Pursuant to N.H. Rev. Stat. § 358-A:10, New Hampshire Plaintiff and the New Hampshire Sub-Class Members seek recovery of actual damages or $1,000, whichever is greater, treble damages, costs and reasonable attorneys' fees, and any other just and proper relief available under N.H. Rev. Stat. § 358-A:10.

### 63. COUNT 63
### BREACH OF EXPRESS WARRANTY
### N.H. REV. STAT. §§ 382-A:2-313 AND 382-A:2A-210

2103. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2104. New Hampshire Plaintiff brings this cause of action on his own behalf and on behalf of the members of the New Hampshire Sub-Class.

2105. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1), and a "seller" of motor vehicles under 382-A:2-103(1)(d).

2106. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

2107. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 2A-103(1)(h).

2108. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

2109. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

2110. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

2111. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever

419

comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

2112. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

2113. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to New Hampshire Plaintiff and the New Hampshire Sub-Class Members.

2114. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

2115. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by New Hampshire Plaintiff and the New Hampshire Sub-Class Members.

2116. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

2117. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed New Hampshire Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

2118. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed

throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

2119. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

2120. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect New Hampshire Plaintiff and the New Hampshire Sub-Class Members. Among other things, New Hampshire Plaintiff and the New Hampshire Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

2121. New Hampshire Plaintiff and the New Hampshire Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2122. New Hampshire Plaintiff and the New Hampshire Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

2123. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the

421

repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2124. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

2125. As a direct and proximate cause of GM's breach, New Hampshire Plaintiff and the New Hampshire Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New Hampshire Plaintiff and the New Hampshire Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2126. As a direct and proximate result of GM's breach of express warranties, New Hampshire Plaintiff and the New Hampshire Sub-Class Members have been damaged in an amount to be determined at trial.

## 64. COUNT 64
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## N.H. REV. STAT. §§ 382-A:2-314 AND 382-A:2A-212

2127. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2128. New Hampshire Plaintiff brings this cause of action on his own behalf and on behalf of the members of the New Hampshire Sub-Class.

2129. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1), and a "seller" of motor vehicles under 382-A:2-103(1)(d).

2130. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

2131. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 2A-103(1)(h).

2132. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212.

2133. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom New Hampshire Plaintiff and the New Hampshire Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to New Hampshire Plaintiff and the New Hampshire Sub-Class Members, with no modification to the defective transmissions.

2134. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

2135. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

2136. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the

existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

2137. As a result of GM's breach of the applicable implied warranties, New Hampshire Plaintiff and the New Hampshire Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, New Hampshire Plaintiff and the New Hampshire Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

2138. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212.

2139. New Hampshire Plaintiff and the New Hampshire Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2140. New Hampshire Plaintiff and the New Hampshire Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

2141. As a direct and proximate cause of GM's breach, New Hampshire Plaintiff and the New Hampshire Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New Hampshire Plaintiff and the New Hampshire Sub-Class Members have incurred or will incur

424

economic damages at the point of repair in the form of the cost of repair.

2142. As a direct and proximate result of GM's breach of the implied warranty of merchantability, New Hampshire Plaintiff and the New Hampshire Sub-Class Members have been damaged in an amount to be proven at trial.

### U.    Claims on Behalf of the New Jersey Sub-Class

### 65. COUNT 65
### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### N.J. STAT. ANN. § 56:8-1, *ET SEQ.*

2143. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2144. Plaintiffs William Grossman, Randall Jacobs, and Joseph Sierchio ("New Jersey Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the New Jersey Sub-Class.

2145. GM, New Jersey Plaintiffs, and the New Jersey Sub-Class Members "persons" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J. Stat. Ann. § 56:8-1(d).

2146. GM engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

2147. The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentations, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. GM engaged in unconscionable commercial practice or deceptive acts or practices that violated the New Jersey CFA as described

425

above and below, and did so with the intent that Plaintiffs rely upon their acts of concealment, suppression and/or omission.

2148. GM participated in unfair or deceptive trade practices that violated the New Jersey CFA, including by failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

2149. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

2150. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

2151. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

2152. GM knew or should have known that its conduct violated the New Jersey CFA.

2153. New Jersey Plaintiffs and the New Jersey Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

426

2154. Had New Jersey Plaintiffs and the New Jersey Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

2155. GM owed New Jersey Plaintiffs and the New Jersey Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission Defect; (b) intentionally concealed the foregoing from New Jersey Plaintiffs and the New Jersey Sub-Class Members; and/or (c)  made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from New Jersey Plaintiffs and the New Jersey Sub-Class Members that contradicted these representations.

2156. Due to GM's specific and superior knowledge that the transmissions in the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by New Jersey Plaintiffs and the New Jersey Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to New Jersey Plaintiffs and the New Jersey Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by New Jersey Plaintiffs and the New Jersey Sub-Class Members. Longevity, durability, performance, and safety are

427

material concerns to GM truck consumers. GM represented to New Jersey Plaintiffs and the New Jersey Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

2157. New Jersey Plaintiffs and the New Jersey Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, New Jersey Plaintiffs and the New Jersey Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

2158. As a result of GM's conduct, New Jersey Plaintiffs and the New Jersey Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

2159. As a direct and proximate result of GM's unfair or deceptive acts or practices, New Jersey Plaintiffs and the New Jersey Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

2160. Defendant's violations present a continuing risk to New Jersey Plaintiffs and the New Jersey Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

2161. Pursuant to N.J. Stat. Ann. § 56:8-19, New Jersey Plaintiffs and the New Jersey Sub-Class Members seek an order enjoining GM's unlawful conduct, actual damages, treble damages, attorneys' fees, costs, and any other just and proper relief available under the New Jersey CFA

## 66. COUNT 66
## BREACH OF EXPRESS WARRANTY
### N.J. STAT. ANN. §§ 12A:2-313 AND 2A-210

2162. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2163. New Jersey Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the New Jersey Sub-Class.

2164. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

2165. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.J. Stat. Ann.§ 12A:2A-103(1)(p).

2166. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann.§§ 12A:2-105(1) and 2A-103(1)(h).

2167. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

2168. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

2169. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs

429

"including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

2170. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

2171. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

2172. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to New Jersey Plaintiffs and the New Jersey Sub-Class Members.

2173. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

2174. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by New Jersey Plaintiffs and the New Jersey Sub-Class Members.

2175. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the

Warranties, as they did not cure the defect.

2176. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed New Jersey Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

2177. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

2178. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

2179. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect New Jersey Plaintiffs and the New Jersey Sub-Class Members. Among other things, New Jersey Plaintiffs and the New Jersey Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

2180. New Jersey Plaintiffs and the New Jersey Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2181. New Jersey Plaintiffs and the New Jersey Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity

431

to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

2182. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2183. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

2184. As a direct and proximate cause of GM's breach, New Jersey Plaintiffs and the New Jersey Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New Jersey Plaintiffs and the New Jersey Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2185. As a direct and proximate result of GM's breach of express warranties, New Jersey Plaintiffs and the New Jersey Sub-Class Members have been damaged in an amount to be determined at trial.

### 67. COUNT 67
### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### N.J. STAT. ANN. §§ 12A:2-314 AND 2A-212

2186. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

432

2187. New Jersey Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the New Jersey Sub-Class.

2188. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

2189. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.J. Stat. Ann.§ 12A:2A-103(1)(p).

2190. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. §§ 12A:2-105(1) and 2A-103(1)(h).

2191. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.J. Stat. Ann. §§ 12A:2-314 and 2A-212.

2192. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom New Jersey Plaintiffs and the New Jersey Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to New Jersey Plaintiffs and the New Jersey Sub-Class Members, with no modification to the defective transmissions.

2193. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

2194. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for

433

their intended use while the Class Vehicles were being operated.

2195. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

2196. As a result of GM's breach of the applicable implied warranties, New Jersey Plaintiffs and the New Jersey Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, New Jersey Plaintiffs and the New Jersey Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

2197. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of N.J. Stat. Ann. §§ 12A:2-314 and 2A-212.

2198. New Jersey Plaintiffs and the New Jersey Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2199. New Jersey Plaintiffs and the New Jersey Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

2200. As a direct and proximate cause of GM's breach, New Jersey Plaintiffs and the New Jersey Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New Jersey Plaintiffs and the New Jersey Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2201. As a direct and proximate result of GM's breach of the implied warranty of merchantability, New Jersey Plaintiffs and the New Jersey Sub-Class Members have been damaged in an amount to be proven at trial.

## V.    Claims on Behalf of the New York Sub-Class

### 68. COUNT 68
### VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW § 349
### N.Y. GEN. BUS. LAW § 349

2202. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2203. Plaintiffs Charles Larsen, Marc Mazza, Andre McQuade, Michael Plafker, and Michael Sylvester ("New York Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the New York Sub-Class.

2204. New York Plaintiffs and the New York Sub-Class Members are "persons" within the meaning of New York General Business Law ("New York GBL"). N.Y. Gen. Bus. Law § 349(h).

2205. GM is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

2206. New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. GM's conduct, as described in this Complaint, constitutes "deceptive

435

acts or practices" within the meaning of the New York GBL. All of GM's deceptive acts and practices, which were intended to mislead consumers in a material way in the process of purchasing or leasing Class Vehicles, constitute conduct directed at consumers and "consumer-oriented." Further, New York Plaintiffs and the New York Sub-Class Members suffered injury as a result of the deceptive acts or practice.

2207. GM's actions, as set forth above, occurred in the conduct of business, trade or commerce.

2208. GM participated in unfair or deceptive trade practices that violated the New York GBL as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

2209. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

2210. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

2211. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

2212. GM knew or should have known that its conduct violated the New York GBL.

2213. New York Plaintiffs and the New York Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

2214. Had New York Plaintiffs and the New York Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

2215. GM owed New York Plaintiffs and the New York Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission Defect; (b) intentionally concealed the foregoing from New York Plaintiffs and the New York Sub-Class Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from New York Plaintiffs and the New York Sub-Class Members that contradicted these representations.

2216. Due to GM's specific and superior knowledge that the transmissions in the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by New York Plaintiffs and the New York Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to

437

provide information to New York Plaintiffs and the New York Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they are likely to mislead a reasonable consumer and directly impact the value of the Class Vehicles purchased or leased by New York Plaintiffs and the New York Sub-Class Members. Longevity, durability, performance, and safety are material concerns to GM truck consumers. GM represented to New York Plaintiffs and the New York Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

2217. New York Plaintiffs and the New York Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, New York Plaintiffs and the New York Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

2218. As a result of GM's conduct, New York Plaintiffs and the New York Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

2219. As a direct and proximate result of GM's unfair or deceptive acts or practices, New York Plaintiffs and the New York Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

2220. GM's violations present a continuing risk to New York Plaintiffs and the New York Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by GM's deceptive practices are in the hundreds of thousands nation-wide; (2) GM has significantly high sophistication and

438

bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed with the defective transmissions, the likelihood of continued impact on other consumers is significant.

2221. Pursuant to N.Y. Gen. Bus. Law § 349(h), New York Plaintiffs and each New York Sub-Class Member seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Defendant's willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiffs and New York Class members also seek attorneys' fees, an order enjoining GM's deceptive conduct, and any other just and proper relief available under the New York GBL.

## 69. COUNT 69
## VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW § 350
## N.Y. GEN. BUS. LAW § 350

2222. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2223. New York Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the New York Sub-Class.

2224. New York's General Business Law § 350, the New York False Advertising Act ("NY FAA"), makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

2225. GM caused to be made or disseminated throughout New York, through

439

advertising, marketing, and other publications, representations that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to GM, to be untrue and misleading to consumers, including New York Plaintiffs and the New York Sub-Class Members.

2226. GM violated the NY FAA because of the misrepresentations and omissions alleged herein, including, but not limited to, GM's failure to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

2227. In purchasing or leasing the Class Vehicles, New York Plaintiffs and the New York Sub-Class Members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes the Transmission Defect to manifest and result in failure of the Class Vehicles' normal operations.

2228. New York Plaintiffs and the New York Sub-Class Members had no way of knowing that GM's representations and omissions were false and misleading, that an internal component part of the Class Vehicles is devastatingly defective to the entire system, that the normal and intended use of the Class Vehicles will cause the transmissions to fail, or that GM would refuse to repair, replace, or compensate New York Plaintiffs and the New York Sub-Class Members for the failure of the defective transmissions and the known consequences of that failure to the Class Vehicles.

2229. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive

reasonable consumers.

2230. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead New York Plaintiffs and the New York Sub-Class Members.

2231. GM knew or should have known that its conduct violated the NY FAA.

2232. New York Plaintiffs and the New York Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

2233. Had New York Plaintiffs and the New York Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

2234. GM owed New York Plaintiffs and the New York Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission Defect; (b) intentionally concealed the foregoing from New York Plaintiffs and the New York Sub-Class Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from New York Plaintiffs and the New York Sub-Class Members that contradicted these representations.

2235. Due to GM's specific and superior knowledge that the transmissions in the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by New York Plaintiffs and the New York Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor

441

transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to New York Plaintiffs and the New York Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased New York Plaintiffs and the New York Sub-Class Members. Longevity, durability, performance, and safety are material concerns to GM truck consumers. GM represented to New York Plaintiffs and the New York Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

2236. New York Plaintiffs and the New York Sub-Class Members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that they overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

2237. New York Plaintiffs and the New York Sub-Class Members are entitled to recover their actual damages or $500, whichever is greater. Because GM acted willfully or knowingly, New York Plaintiffs and the New York Sub-Class Members are entitled to recover three times actual damages, up to $10,000.

442

## 70. COUNT 70
## BREACH OF EXPRESS WARRANTY
### N.Y. U.C.C. §§ 2-314 AND 2A-210

2238. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2239. New York Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the New York Sub-Class.

2240. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law §§ 11-2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

2241. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

2242. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

2243. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

2244. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

2245. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs

443

"including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

2246. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

2247. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

2248. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to New York Plaintiffs and the New York Sub-Class Members.

2249. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

2250. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by New York Plaintiffs and the New York Sub-Class Members.

2251. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the

Warranties, as they did not cure the defect.

2252. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed New York Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

2253. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

2254. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

2255. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect New York Plaintiffs and the New York Sub-Class Members. Among other things, New York Plaintiffs and the New York Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

2256. New York Plaintiffs and the New York Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2257. New York Plaintiffs and the New York Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity

445

to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

2258. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2259. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

2260. As a direct and proximate cause of GM's breach, New York Plaintiffs and the New York Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New York Plaintiffs and the New York Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2261. As a direct and proximate result of GM's breach of express warranties, New York Plaintiffs and the New York Sub-Class Members have been damaged in an amount to be determined at trial.

## 71. COUNT 71
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## N.Y. U.C.C. §§ 2-314 AND 2A-212

2262. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

446

2263. New York Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the New York Sub-Class.

2264. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law §§ 11-2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

2265. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

2266. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

2267. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.Y. UCC Law §§ 2-314 and 2A-212.

2268. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom New York Plaintiffs and the New York Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to New York Plaintiffs and the New York Sub-Class Members, with no modification to the defective transmissions.

2269. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

2270. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for

447

their intended use while the Class Vehicles were being operated.

2271. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

2272. As a result of GM's breach of the applicable implied warranties, New York Plaintiffs and the New York Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, New York Plaintiffs and the New York Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

2273. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of N.Y. UCC Law §§ 2-314 and 2A-212.

2274. New York Plaintiffs and the New York Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2275. New York Plaintiffs and the New York Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

2276. As a direct and proximate cause of GM's breach, New York Plaintiffs and the New York Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New York Plaintiffs and the New York Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2277. As a direct and proximate result of GM's breach of the implied warranty of merchantability, New York Plaintiffs and the New York Sub-Class Members have been damaged in an amount to be proven at trial.

### W.    Claims on Behalf of the North Carolina Class

### 72. COUNT 72
### VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT
### N.C. GEN. STAT. § 75-1.1, *ET SEQ.*

2278. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2279. Plaintiffs Steven Brack, Jimmy Harman, and Richard "Terry" Shope, ("North Carolina Plaintiffs") brings this cause of action on his own behalf and on behalf of the members of the North Carolina Sub-Class.

2280. GM engaged in "commerce" within the meaning of the North Carolina Unfair and Deceptive Acts and Practices Act ("North Carolina UDTPA"), N.C. Gen. Stat. § 75-1.1(b).

2281. The North Carolina UDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). GM willfully committed unfair or deceptive acts or practices in violation of North Carolina UDTPA.

2282. GM participated in misleading, false, or deceptive acts that violated the

449

North Carolina UDTPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

2283. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

2284. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

2285. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

2286. GM knew or should have known that its conduct violated the North Carolina UDTPA.

2287. North Carolina Plaintiff and the North Carolina Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

2288. Had North Carolina Plaintiff and the North Carolina Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less

for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

2289. GM owed North Carolina Plaintiff and the North Carolina Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission Defect; (b) intentionally concealed the foregoing from North Carolina Plaintiff and the North Carolina Sub-Class Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from North Carolina Plaintiff and the North Carolina Sub-Class Members that contradicted these representations.

2290. Due to GM's specific and superior knowledge that the transmissions in the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by North Carolina Plaintiff and the North Carolina Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to North Carolina Plaintiff and the North Carolina Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by North Carolina Plaintiff and the North Carolina Sub-Class Members. Longevity, durability, performance, and safety are material concerns to GM truck consumers. GM represented to North Carolina Plaintiff and the North Carolina Sub-Class

451

Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

2291. North Carolina Plaintiff and the North Carolina Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, North Carolina Plaintiff and the North Carolina Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

2292. As a result of GM's conduct,  North Carolina Plaintiff and the North Carolina Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

2293. As a direct and proximate result of GM's unfair or deceptive acts or practices, North Carolina Plaintiff and the North Carolina Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

2294. Defendant's violations present a continuing risk to North Carolina Plaintiff and the North Carolina Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

2295. Because GM's actions and conduct were willful, Plaintiffs seek an order for treble their actual damages, an order enjoining GM's unlawful acts, court costs, attorneys' fees, and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat.§ 75-16.

452

### 73. COUNT 73
### BREACH OF EXPRESS WARRANTY
### N.C. GEN. STAT. §§ 25-2-313 AND 252A-210

2296. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2297. North Carolina Plaintiff brings this cause of action on his own behalf and on behalf of the members of the North Carolina Sub-Class.

2298. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and a "seller" of motor vehicles under § 25-2-103(1)(d).

2299. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.C. Gen. Stat.§ 25-2A-103(1)(p).

2300. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).

2301. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

2302. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

2303. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs

"including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

2304. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

2305. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

2306. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to North Carolina Plaintiff and the North Carolina Sub-Class Members.

2307. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

2308. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by North Carolina Plaintiff and the North Carolina Sub-Class Members.

2309. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

2310. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed North Carolina Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

2311. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

2312. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

2313. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect North Carolina Plaintiff and the North Carolina Sub-Class Members. Among other things, North Carolina Plaintiff and the North Carolina Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

2314. North Carolina Plaintiff and the North Carolina Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been

excused from performance of said obligations as a result of GM's conduct described herein.

2315. North Carolina Plaintiff and the North Carolina Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

2316. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2317. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

2318. As a direct and proximate cause of GM's breach, North Carolina Plaintiff and the North Carolina Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, North Carolina Plaintiff and the North Carolina Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2319. As a direct and proximate result of GM's breach of express warranties, North Carolina Plaintiff and the North Carolina Sub-Class Members have been damaged in an amount to be determined at trial.

**74. COUNT 74**
**BREACH OF THE IMPLIED WARRANTY OF**
**MERCHANTABILITY**
**N.C. GEN. STAT. §§ 25-2-314 AND 252A-212**

2320. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2321. North Carolina Plaintiff brings this cause of action on his own behalf and on behalf of the members of the North Carolina Sub-Class.

2322. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and a "seller" of motor vehicles under § 25-2-103(1)(d).

2323. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

2324. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. § 25-2-105(1) and § 25-2A-103(1)(h).

2325. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.C. Gen. Stat. §§ 25-2-314 and 252A-212.

2326. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom North Carolina Plaintiff and the North Carolina Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to North Carolina Plaintiff and the North Carolina Sub-Class Members, with no modification to the defective transmissions.

457

2327. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

2328. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

2329. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

2330. As a result of GM's breach of the applicable implied warranties, North Carolina Plaintiff and the North Carolina Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, North Carolina Plaintiff and the North Carolina Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

2331. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of N.C. Gen. Stat. §§ 25-2-314 and 252A-212.

2332. North Carolina Plaintiff and the North Carolina Sub-Class Members have complied with all obligations under the warranty, or otherwise have been

458

excused from performance of said obligations as a result of GM's conduct described herein.

2333. North Carolina Plaintiff and the North Carolina Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

2334. As a direct and proximate cause of GM's breach, North Carolina Plaintiff and the North Carolina Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, North Carolina Plaintiff and the North Carolina Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2335. As a direct and proximate result of GM's breach of the implied warranty of merchantability, North Carolina Plaintiff and the North Carolina Sub-Class Members have been damaged in an amount to be proven at trial.

## X.    Claims on Behalf of the Ohio Sub-Class

### 75. COUNT 75
### VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT
### OHIO REV. CODE ANN. § 1345.01, *ET SEQ.*

2336. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2337. Plaintiffs Chi Kim Ho and Jeffrey Rice ("Ohio Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the Ohio Sub-Class.

2338. Ohio Plaintiffs and the Ohio Sub-Class Members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01 ("Ohio CSPA").

2339. GM is a "supplier" as defined by the Ohio CSPA.

2340. Ohio Plaintiffs' and the Ohio Sub-Class Members' purchases or leases of Class Vehicles were "consumer transactions" as defined by the Ohio CSPA.

2341. The Ohio CSPA, Ohio Rev. Code Ann. § 1345.02, broadly prohibits "an unconscionable act or practice in connection with a consumer transaction." Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have; [and] (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not." Ohio Rev. Code Ann. § 1345.02. Defendant's conduct as alleged above and below constitutes unfair and unconscionable acts or practices in consumer sales transactions in violation of Ohio Rev. Code Ann. § 1345.02. By concealing the known defects in the Class Vehicles, GM participated in unconscionable acts and practices that violated the Ohio CSPA.

2342. GM participated in misleading, false, or deceptive acts that violated the Ohio CSPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and

Transmission Defect in the course of its business.

2343. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

2344. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

2345. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

2346. GM knew or should have known that its conduct violated the Ohio CSPA.

2347. Ohio Plaintiffs and the Ohio Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

2348. Had Ohio Plaintiffs and the Ohio Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

2349. GM owed Ohio Plaintiffs and the Ohio Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission Defect; (b) intentionally concealed the foregoing from Ohio Plaintiffs and the Ohio Sub-Class Members; and/or (c)  made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from

461

Ohio Plaintiffs and the Ohio Sub-Class Members that contradicted these representations.

2350. Due to GM's specific and superior knowledge that the transmissions in the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Ohio Plaintiff and the Ohio Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Ohio Plaintiffs and the Ohio Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Ohio Plaintiffs and the Ohio Sub-Class Members. Longevity, durability, performance, and safety are material concerns to GM truck consumers. GM represented to Ohio Plaintiff and the Ohio Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

2351. Ohio Plaintiffs and the Ohio Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Ohio Plaintiffs and the Ohio Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

2352. As a result of GM's conduct,  Ohio Plaintiffs and the Ohio Sub-Class

462

Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

2353. As a direct and proximate result of GM's unfair or deceptive acts or practices, Ohio Plaintiffs and the Ohio Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

2354. Defendant's violations present a continuing risk to Ohio Plaintiffs and the Ohio Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

2355. Plaintiffs seek actual damages, plus an amount not exceeding $5,000 in noneconomic damages, an order enjoining GM's deceptive and unfair conduct, court costs and attorneys' fees as a result of Defendant's violations of the Ohio CSPA as provided in Ohio Rev. Code Ann. § 1345.09.

### 76. COUNT 76
### BREACH OF EXPRESS WARRANTY
### OHIO REV. CODE ANN. § 1302.26, *ET SEQ.*

2356. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2357. Ohio Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Ohio Sub-Class.

2358. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ohio Rev. Code Ann. §§ 1302.01(5) and 1310.01(A)(20), and a "seller" of motor vehicles under § 1302.01(4).

2359. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ohio Rev. Code Ann. § 1310.01(A)(20).

2360. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code Ann. §§ 1302.01(8) and 1310.01(A)(8).

463

2361. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

2362. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

2363. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

2364. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

2365. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

2366. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Ohio Plaintiff and the Ohio Sub-Class Members.

2367. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

2368. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Ohio Plaintiffs and the Ohio Sub-Class Members.

2369. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

2370. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Ohio Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

2371. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

2372. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances

465

here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

2373. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Ohio Plaintiff and the Ohio Sub-Class Members. Among other things, Ohio Plaintiffs and the Ohio Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

2374. Ohio Plaintiffs and the Ohio Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2375. Ohio Plaintiffs and the Ohio Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

2376. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2377. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

2378. As a direct and proximate cause of GM's breach, Ohio Plaintiffs and the Ohio Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Ohio Plaintiffs and the Ohio Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2379. As a direct and proximate result of GM's breach of express warranties, Ohio Plaintiffs and the Ohio Sub-Class Members have been damaged in an amount to be determined at trial.

### 77. COUNT 77
### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### OHIO REV. CODE ANN. §§ 1302.27 AND 1310.19.

2380. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2381. Ohio Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Ohio Sub-Class.

2382. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ohio Rev. Code Ann. §§ 1302.01(5) and 1310.01(A)(20), and a "seller" of motor vehicles under § 1302.01(4).

2383. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ohio Rev. Code Ann. § 1310.01(A)(20).

2384. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code Ann. §§ 1302.01(8) and 1310.01(A)(8).

2385. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ohio Rev. Code Ann. §§ 1302.27 and 1310.19.

2386. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Ohio Plaintiffs and the Ohio Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Ohio Plaintiffs and the Ohio Sub-Class Members, with no modification to the defective transmissions.

2387. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

2388. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

2389. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

2390. As a result of GM's breach of the applicable implied warranties, Ohio Plaintiff and the Ohio Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Ohio Plaintiff and the Ohio

Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

2391. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Ohio Rev. Code Ann. §§ 1302.27 and 1310.19.

2392. Ohio Plaintiffs and the Ohio Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2393. Ohio Plaintiffs and the Ohio Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

2394. As a direct and proximate cause of GM's breach, Ohio Plaintiffs and the Ohio Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Ohio Plaintiffs and the Ohio Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2395. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Ohio Plaintiffs and the Ohio Sub-Class Members have been damaged in an amount to be proven at trial.

## Y.    Claims on Behalf of the Oklahoma Class

469

## 78. COUNT 78
## VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT
## OKLA. STAT. TIT. 15, § 751, *ET SEQ.*

2396. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2397. Plaintiff Jon Ellard ("Oklahoma Plaintiff") bring this cause of action on their own behalf and on behalf of the members of the Oklahoma Sub-Class.

2398. Oklahoma Plaintiffs and the Oklahoma Sub-Class Members are "persons" within the meaning of the Oklahoma Consumer Protection Act ("Oklahoma CPA"), Okla. Stat. tit. 15, § 752.

2399. Defendant is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15, § 15-751(1).

2400. The sale or lease of the Class Vehicles to Oklahoma Plaintiffs and the Oklahoma Sub-Class members was a "consumer transaction" within the meaning of Okla. Stat. tit. 15, § 752, and GM's actions as set forth herein occurred in the conduct of trade or commerce.

2401. The Oklahoma CPA declares unlawful, inter alia, the following acts or practices when committed in the course of business: (1) "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics, . . . uses, [or] benefits, of the subject of a consumer transaction;" (2) making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another;" (3) "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and (4) otherwise committing "an unfair or deceptive trade practice." Okla. Stat. tit. 15, § 753. GM participated in misleading, false, or deceptive acts that violated the Oklahoma CPA.

2402. GM participated in unfair or deceptive trade practices that violated the

470

Oklahoma CPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

2403. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

2404. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

2405. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

2406. GM knew or should have known that its conduct violated the Oklahoma CPA.

2407. Oklahoma Plaintiffs and the Oklahoma Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

2408. Had Oklahoma Plaintiffs and the Oklahoma Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them.

471

Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

2409. GM owed Oklahoma Plaintiffs and the Oklahoma Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission Defect; (b) intentionally concealed the foregoing from Oklahoma Plaintiffs and the Oklahoma Sub-Class Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Oklahoma Plaintiffs and the Oklahoma Sub-Class Members that contradicted these representations.

2410. Due to GM's specific and superior knowledge that the transmissions in the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Oklahoma Plaintiffs and the Oklahoma Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Oklahoma Plaintiffs and the Oklahoma Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Oklahoma Plaintiffs and the Oklahoma Sub-Class Members. Longevity, durability, performance, and safety are material concerns to GM truck consumers. GM represented to Oklahoma Plaintiffs and the Oklahoma Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions

472

of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

2411. Oklahoma Plaintiffs and the Oklahoma Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Oklahoma Plaintiffs and the Oklahoma Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

2412. As a result of GM's conduct, Oklahoma Plaintiffs and the Oklahoma Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

2413. As a direct and proximate result of GM's unfair or deceptive acts or practices, Oklahoma Plaintiffs and the Oklahoma Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

2414. GM's violations present a continuing risk to Oklahoma Plaintiffs and the Oklahoma Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by GM's deceptive practices are in the hundreds of thousands nation-wide; (2) GM has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed with the defective transmissions, the likelihood of continued impact on other consumers is significant.

2415. Because GM's unconscionable conduct caused injury to Oklahoma Plaintiffs and the Oklahoma Sub-Class Members, Oklahoma Plaintiffs and the Oklahoma Sub-Class Members seek recovery of actual damages, discretionary penalties up to $2,000 per violation, punitive damages, and reasonable attorneys'

473

fees, under Okla. Stat. tit. 15, § 761.1. Oklahoma Plaintiffs and the Oklahoma Sub-Class Members further seek an order enjoining GM's unfair and/or deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

## 79. COUNT 79
## BREACH OF EXPRESS WARRANTY
## OKLA. STAT. TIT. 12A §§ 2-313 AND 2A-210

2416. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2417. Oklahoma Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the Oklahoma Sub-Class.

2418. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Okla. Stat. tit. 12A §§ 2-104(1) and 2-1103(3), and a "seller" of motor vehicles under § 2A-103(1)(t).

2419. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Okla. Stat. tit. 12A § 2A-103(1)(p).

2420. The Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. tit. 12A §§ 2-105(1) and 2A-103(1)(h).

2421. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

2422. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

2423. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due

474

to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

2424. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

2425. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

2426. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Oklahoma Plaintiffs and the Oklahoma Sub-Class Members.

2427. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

2428. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Oklahoma Plaintiffs and the

475

Oklahoma Sub-Class Members.

2429. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

2430. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Oklahoma Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

2431. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

2432. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

2433. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Oklahoma Plaintiffs and the Oklahoma Sub-Class Members. Among other things, Oklahoma Plaintiffs and the Oklahoma Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

2434. Oklahoma Plaintiffs and the Oklahoma Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused

476

from performance of said obligations as a result of GM's conduct described herein.

2435. Oklahoma Plaintiffs and the Oklahoma Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

2436. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2437. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

2438. As a direct and proximate cause of GM's breach, Oklahoma Plaintiffs and the Oklahoma Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Oklahoma Plaintiffs and the Oklahoma Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2439. As a direct and proximate result of GM's breach of express warranties, Oklahoma Plaintiffs and the Oklahoma Sub-Class Members have been damaged in an amount to be determined at trial

**80. COUNT 80**
**BREACH OF THE IMPLIED WARRANTY OF**
**MERCHANTABILITY**
**OKLA. STAT. TIT. 12A §§ 2-314 AND 2A-212**

2440. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2441. Oklahoma Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the Oklahoma Sub-Class.

2442. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Okla. Stat. tit. 12A §§ 2-104(1) and 2-1103(3), and a "seller" of motor vehicles under § 2A-103(1)(t).

2443. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Okla. Stat. tit. 12A § 2A-103(1)(p).

2444. The Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. tit. 12A §§ 2-105(1) and 2A-103(1)(h).

2445. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Okla. Stat. tit. 12A §§ 2-314 and 2A-212.

2446. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Oklahoma Plaintiffs and the Oklahoma Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Oklahoma Plaintiffs and the Oklahoma Sub-Class Members, with no modification to the defective transmissions.

2447. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for

478

the ordinary purposes for which they were sold.

2448. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

2449. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

2450. As a result of GM's breach of the applicable implied warranties, Oklahoma Plaintiffs and the Oklahoma Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Oklahoma Plaintiffs and the Oklahoma Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

2451. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Okla. Stat. tit. 12A §§ 2-314 and 2A-212.

2452. Oklahoma Plaintiffs and the Oklahoma Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2453. Oklahoma Plaintiffs and the Oklahoma Sub-Class Members were not

479

required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

2454. As a direct and proximate cause of GM's breach, Oklahoma Plaintiffs and the Oklahoma Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Oklahoma Plaintiffs and the Oklahoma Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2455. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Oklahoma Plaintiffs and the Oklahoma Sub-Class Members have been damaged in an amount to be proven at trial.

**Z. Claims on Behalf of the Oregon Sub-Class**

### 81. COUNT 81
### VIOLATION OF THE OREGON CONSUMER PROTECTION ACT
### OR. REV. STAT. § 646.605, *ET SEQ.*

2456. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2457. Plaintiff Cary Sherrow ("Oregon Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Oregon Sub-Class.

2458. GM, Oregon Plaintiff, and Oregon Sub-Class members are "persons" within the meaning of Or. Rev. Stat. § 646.605(4).

2459. GM is engaged in "trade" or "commerce" within the meaning of Or. Rev. Stat. § 646.605(8).

2460. The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits "unlawful practice . . . in the course of . . . business." Or. Rev. Stat. § Ann. 646.608(1).

2461. In the course of its business, GM, through its agents, employees, and/or subsidiaries, violated the Oregon UTPA.

2462. GM concealed the fact that Class Vehicles had defective transmissions that made them unsafe to drive and told various GM dealers and service technicians that the vehicles were operating "as [d]esigned" and that the symptoms were "normal" (if widespread enough). These GM dealers and service technicians passed this mis-information onto Class Members, as evidenced by the various consumer complaints alleging that someone—such as a GM "dealer" or "service manager"—told them the defect's symptoms were "normal."

2463. GM violated the Oregon CPA by, at minimum, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

2464. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the Oregon Plaintiff and the Class.

2465. GM knew or should have known that its conducted violated the Oregon CPA.

2466. GM's fraudulent concealment of the true characteristics of the defective transmissions in the Class Vehicles were material to the Oregon Plaintiff and Class members.

2467. GM's violations present a continuing risk to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the

481

public interest.

2468. GM had an ongoing duty to its customers to refrain from unfair and deceptive practices under the Oregon CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of GM's deceptive and unfair acts and practices made in the course of GM's business.

2469. As a direct and proximate result of GM's violations of the Oregon CPA, the Oregon Plaintiff and the Class have suffered injury-in-fact and/or actual damage.

2470. Pursuant to Or. Rev. Stat. § 646.638, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding actual damages or statutory damages in the amount of $200 for each class member, whichever is greater, punitive damages, attorneys' fees and costs, and any other just and proper relief available under the Oregon UTPA.

## 82. COUNT 82
## BREACH OF EXPRESS WARRANTY
## OR. REV. STAT. §§ 72.3130 AND 72A.2100

2471. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2472. Oregon Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Oregon Sub-Class.

2473. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and a "seller" of motor vehicles under Or. Rev. Stat. § 72.1030(1)(d).

2474. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

2475. The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

2476. GM provided all purchasers and lessees of the Class Vehicles with the

482

express warranty described herein, which became a material part of the bargain.

2477. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

2478. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

2479. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

2480. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and

8L45 transmissions and their component parts are covered by the express Warranties.

2481. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Oregon Plaintiff and the Oregon Sub-Class Members.

2482. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

2483. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Oregon Plaintiff and the Oregon Sub-Class Members.

2484. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

2485. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Oregon Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

2486. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

2487. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

484

2488. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Oregon Plaintiff and the Oregon Sub-Class Members. Among other things, Oregon Plaintiff and the Oregon Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

2489. Oregon Plaintiff and the Oregon Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2490. Oregon Plaintiff and the Oregon Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

2491. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2492. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering these limitations null and void.

2493. As a direct and proximate cause of GM's breach, Oregon Plaintiff and the Oregon Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of

485

their Class Vehicles. Additionally, Oregon Plaintiff and the Oregon Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2494. As a direct and proximate result of GM's breach of express warranties, Oregon Plaintiff and the Oregon Sub-Class Members have been damaged in an amount to be determined at trial.

**83. COUNT 83**
**BREACH OF THE IMPLIED WARRANTY OF**
**MERCHANTABILITY**
**OR. REV. STAT. §§ 72.3140 AND 72A.2120**

2495. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2496. Oregon Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Oregon Sub-Class.

2497. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and a "seller" of motor vehicles under Or. Rev. Stat. § 72.1030(1)(d).

2498. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

2499. The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

2500. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Or. Rev. Stat. §§ 72.3140 and 72A-2120.

2501. GM sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.

486

2502. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Oregon Plaintiff and the Oregon Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Oregon Plaintiff and the Oregon Sub-Class Members, with no modification to the defective transmissions.

2503. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

2504. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

2505. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

2506. As a result of GM's breach of the applicable implied warranties, Oregon Plaintiff and the Oregon Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Oregon Plaintiff and the Oregon Sub-Class Members were

harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

2507. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Or. Rev. Stat. §§ 72.3140 and 72A-2120.

2508. Oregon Plaintiff and the Oregon Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2509. Oregon Plaintiff and the Oregon Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

2510. As a direct and proximate cause of GM's breach, Oregon Plaintiff and the Oregon Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Oregon Plaintiff and the Oregon Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2511. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Oregon Plaintiff and the Oregon Sub-Class Members have been damaged in an amount to be proven at trial.

## AA.  Claims on Behalf of the Pennsylvania Sub-Class

## 84. COUNT 84
## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
## 73 P.S. § 201-1, *ET SEQ.*

2512. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2513. Plaintiffs Charles Aiken, Karina Fredo and William Fredo ("Pennsylvania Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the Pennsylvania Sub-Class.

2514. Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

2515. All of the acts complained of herein were perpetrated by GM in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

2516. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (a) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (b) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (c) "Advertising goods or services with intent not to sell them as advertised;" and (d) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4). GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated Pennsylvania CPL.

2517. GM participated in unfair or deceptive trade practices that violated the Pennsylvania CPL as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety,

cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

2518. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

2519. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

2520. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

2521. GM knew or should have known that its conduct violated the Pennsylvania CPL.

2522. Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

2523. Had Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

2524. GM owed Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission

490

Defect; (b) intentionally concealed the foregoing from Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members that contradicted these representations.

2525. Due to GM's specific and superior knowledge that the transmissions in the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members. Longevity, durability, performance, and safety are material concerns to GM truck consumers. GM represented to Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

2526. Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members

491

suffered injury in fact to a legally protected interest. As a result of GM's conduct, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

2527. As a result of GM's conduct, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

2528. As a direct and proximate result of GM's unfair or deceptive acts or practices, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

2529. Defendant's violations present a continuing risk to Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

2530. GM is liable to Plaintiffs and the Pennsylvania Class members for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs under 73 P.S. § 201-9.2(a). Pennsylvania Plaintiffs and the Pennsylvania Sub-Class members are also entitled to an award of punitive damages given that Defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## 85. COUNT 85
## BREACH OF EXPRESS WARRANTY
## 13 PA. CONS. STAT. §§ 2313 AND 2A210

2531. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2532. Pennsylvania Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the Pennsylvania Sub-Class.

492

2533. GM is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

2534. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

2535. The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

2536. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

2537. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

2538. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

2539. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts,

seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

2540. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

2541. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members.

2542. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

2543. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members.

2544. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

2545. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Pennsylvania Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

494

2546. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

2547. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

2548. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members. Among other things, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

2549. Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2550. Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

2551. Because GM, through its conduct and exemplified by its own service

495

bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2552. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

2553. As a direct and proximate cause of GM's breach, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2554. As a direct and proximate result of GM's breach of express warranties, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members have been damaged in an amount to be determined at trial.

### 86. COUNT 86
### BREACH OF THE IMPLIED WARRANTY OF
### MERCHANTABILITY
### 13 PA. CONS. STAT. §§ 2314 AND 2A212

2555. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2556. GM is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

2557. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

2558. The Class Vehicles are and were at all relevant times "goods" within

the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

2559. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 13 Pa. Cons. Stat. §§ 2314 and 2A212.

2560. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members, with no modification to the defective transmissions.

2561. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

2562. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

2563. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM

497

knew of this defect at the time these sale or lease transactions occurred.

2564. As a result of GM's breach of the applicable implied warranties, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

2565. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of 13 Pa. Cons. Stat. §§ 2314 and 2A212.

2566. Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2567. Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

2568. As a direct and proximate cause of GM's breach, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2569. As a direct and proximate result of GM's breach of the implied

498

warranty of merchantability, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members have been damaged in an amount to be proven at trial.

### BB.   Claims on Behalf of the South Carolina Class

### 87. COUNT 87
### VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### S.C. CODE ANN. § 39-5-10, *ET SEQ.*

2570. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2571. Plaintiffs Donald Sicura and Jason Sinclair ("South Carolina Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the South Carolina Sub-Class.

2572. GM is a "person" under S.C. Code Ann. § 39-5-10.

2573. The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § § 39-5-20(a). GM's conduct and acts were offensive to public policy or immoral, unethical, or oppressive, thus unfair; indeed, to manufacture, distribute, and promote the Class Vehicles with a Transmission Defect known to cause failure while the Class Vehicle is in motion is surely detrimental to the public at large. GM's unfair or deceptive acts or practices were prohibited by the South Carolina UTPA.

2574. GM participated in unfair or deceptive trade practices that violated the South Carolina UTPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they

were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

2575. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

2576. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

2577. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

2578. GM knew or should have known that its conduct violated the South Carolina UTPA

2579. South Carolina Plaintiffs and the South Carolina Sub-Class Members justifiably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

2580. Had South Carolina Plaintiffs and the South Carolina Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

2581. GM owed South Carolina Plaintiffs and the South Carolina Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission

500

Defect; (b) intentionally concealed the foregoing from South Carolina Plaintiffs and the South Carolina Sub-Class Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from South Carolina Plaintiffs and the South Carolina Sub-Class Members that contradicted these representations.

2582. Due to GM's specific and superior knowledge that the transmissions in the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by South Carolina Plaintiffs and the South Carolina Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to South Carolina Plaintiffs and the South Carolina Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by South Carolina Plaintiffs and the South Carolina Sub-Class Members. Longevity, durability, performance, and safety are material concerns to GM truck consumers. GM represented to South Carolina Plaintiffs and the South Carolina Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

2581313 v1

2583. South Carolina Plaintiffs and the South Carolina Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, South Carolina Plaintiffs and the South Carolina Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

2584. As a result of GM's conduct, South Carolina Plaintiffs and the South Carolina Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

2585. As a direct and proximate result of GM's unfair or deceptive acts or practices, South Carolina Plaintiffs and the South Carolina Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

2586. GM's violations present a continuing risk to South Carolina Plaintiffs and the South Carolina Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by GM's deceptive practices are in the hundreds of thousands nation-wide; (2) GM has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed with the defective transmissions, the likelihood of continued impact on other consumers is significant.

2587. Pursuant to S.C. Code Ann. § 39-5-140(a), South Carolina Plaintiffs and the South Carolina Sub-Class Members seek monetary relief against Defendant to recover for economic losses, reasonable attorney's fees and costs. Because Defendant's actions were willful and knowing, Plaintiffs' damages should be trebled.

2588. South Carolina Plaintiffs and the South Carolina Sub-Class Members further allege that Defendant's malicious and deliberate conduct warrants an

502

assessment of punitive damages because Defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the Class to cruel and unjust hardship as a result.

## 88. COUNT 88
## BREACH OF EXPRESS WARRANTY
## S.C. CODE ANN. § §§ 36-2-313 AND 36-2A-210

2589. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2590. South Carolina Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the South Carolina Sub-Class.

2591. GM is and was at all relevant times a "merchant" with respect to motor vehicles under S.C. Code Ann. § §§ 36-2-104(1) and 36-2A-103(1)(t), and a "seller" of motor vehicles under § 36-2-103(1)(d).

2592. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under S.C. Code Ann. § § 36-2A-103(1)(p).

2593. The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code Ann. § §§ 36-2-105(1) and 36-2A-103(1)(h).

2594. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

2595. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

2596. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due

503

to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

2597. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

2598. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

2599. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to South Carolina Plaintiffs and the South Carolina Sub-Class Members.

2600. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

2601. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by South Carolina Plaintiffs

504

and the South Carolina Sub-Class Members.

2602. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

2603. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed South Carolina Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

2604. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

2605. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

2606. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect South Carolina Plaintiffs and the South Carolina Sub-Class Members. Among other things, South Carolina Plaintiffs and the South Carolina Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

2607. South Carolina Plaintiffs and the South Carolina Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been

505

excused from performance of said obligations as a result of GM's conduct described herein.

2608. South Carolina Plaintiffs and the South Carolina Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

2609. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2610. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

2611. As a direct and proximate cause of GM's breach, South Carolina Plaintiffs and the South Carolina Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, South Carolina Plaintiffs and the South Carolina Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2612. As a direct and proximate result of GM's breach of express warranties, South Carolina Plaintiffs and the South Carolina Sub-Class Members have been damaged in an amount to be determined at trial.

**89. COUNT 89**
**BREACH OF THE IMPLIED WARRANTY OF**
**MERCHANTABILITY**
**S.C. CODE ANN. § §§ 36-2-314 AND 36-2A-212**

2613. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2614. South Carolina Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the South Carolina Sub-Class.

2615. GM is and was at all relevant times a "merchant" with respect to motor vehicles under S.C. Code Ann. §§ 36-2-104(1) and 36-2A-103(1)(t), and a "seller" of motor vehicles under § 36-2-103(1)(d).

2616. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under S.C. Code Ann. § § 36-2A-103(1)(p).

2617. The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code Ann. §§ 36-2-105(1) and 36-2A-103(1)(h).

2618. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under S.C. Code Ann. §§ 36-2-314 and 36-2A-212.

2619. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom South Carolina Plaintiffs and the South Carolina Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to South Carolina Plaintiffs and the South Carolina Sub-Class Members, with no modification to the defective transmissions.

2620. GM provided Plaintiffs and Class Members with an implied warranty

507

that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

2621. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

2622. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

2623. As a result of GM's breach of the applicable implied warranties, South Carolina Plaintiffs and the South Carolina Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, South Carolina Plaintiffs and the South Carolina Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

2624. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of S.C. Code Ann. §§ 36-2-314 and 36-2A-212.

2625. South Carolina Plaintiffs and the South Carolina Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described

508

herein.

2626. South Carolina Plaintiffs and the South Carolina Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

2627. As a direct and proximate cause of GM's breach, South Carolina Plaintiffs and the South Carolina Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, South Carolina Plaintiffs and the South Carolina Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2628. As a direct and proximate result of GM's breach of the implied warranty of merchantability, South Carolina Plaintiffs and the South Carolina Sub-Class Members have been damaged in an amount to be proven at trial.

**CC.   Claims on Behalf of the South Dakota Class**

## 90. COUNT 90
## VIOLATION OF SOUTH DAKOTA DECEPTIVE TRADE
## PRACTICES AND CONSUMER PROTECTION LAW
## S.D. CODIFIED LAWS § 37-24-6

2629. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2630. Plaintiff Colton Kelly ("South Dakota Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the South Dakota Sub-Class.

2631. South Dakota Plaintiff brings this cause of action on his own behalf and

509

on behalf of the members of the South Dakota Sub-Class.

2632. South Dakota Plaintiff, the South Dakota Sub-Class Members, and GM are "persons" within the meaning of S.D. Codified Laws § 37-24-1(8).

2633. The South Dakota Deceptive Trade Practices and Consumer Protection ("South Dakota CPA") prohibits "deceptive acts or practices, which are defined to include "[k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby." S.D. Codified Laws § 37-24-6(1).

2634. GM participated in deceptive trade practices that violated the South Dakota CPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

2635. By systematically devaluing safety and concealing a plethora of defects in the 8L90 and 8L45 Transmissions and the Class Vehicles, GM engaged in unfair or deceptive practices prohibited by the South Dakota CPA, including: (1) representing that the 8L90 and 8L45 Transmissions and the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the 8L90 and 8L45 Transmissions and the Class Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the 8L90 and

510

8L45 Transmissions and the Class Vehicles with the intent not to sell them as advertised.

2636. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

2637. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

2638. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

2639. GM knew or should have known that its conduct violated the South Dakota CPA.

2640. South Dakota Plaintiff and the South Dakota Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

2641. Had South Dakota Plaintiff and the South Dakota Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

2642. South Dakota Plaintiff and the South Dakota Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, South Dakota Plaintiff and the South Dakota Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

2643. As a result of GM's conduct, South Dakota Plaintiff and the South Dakota Sub-Class Members were harmed and suffered actual damages as a result of

511

GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

2644. As a direct and proximate result of GM's unfair or deceptive acts or practices, South Dakota Plaintiff and the South Dakota Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

2645. South Dakota Plaintiff and the South Dakota Sub-Class Members seek damages in an amount to be proven at trial, including but not limited to actual damages, under the South Dakota CPA.

## 91. COUNT 91
## BREACH OF EXPRESS WARRANTY
## S.D. CODIFIED LAWS §§ 57A-2-313 AND 57A-2A-210

2646. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2647. South Dakota Plaintiff brings this cause of action on his own behalf and on behalf of the members of the South Dakota Sub-Class.

2648. GM is and was at all relevant times a "merchant" with respect to motor vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and a "seller" of motor vehicles under § 57A-104(1)(d).

2649. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

2650. The Class Vehicles are and were at all relevant times "goods" within the meaning of S.D. Codified Laws §§ 4-2-105(1) and 4-2.5-103(1)(h).

2651. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

2652. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

512

2653. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

2654. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

2655. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

2656. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to South Dakota Plaintiff and the South

513

Dakota Sub-Class Members.

2657. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

2658. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by South Dakota Plaintiff and the South Dakota Sub-Class Members.

2659. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

2660. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed South Dakota Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

2661. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

2662. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

2663. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect South Dakota Plaintiff and the South Dakota Sub-Class Members. Among other things, South Dakota Plaintiff and the South Dakota Sub-Class Members had no meaningful choice in determining these

514

time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

2664.  South Dakota Plaintiff and the South Dakota Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2665.  South Dakota Plaintiff and the South Dakota Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

2666.  Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2667.  Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

2668.  As a direct and proximate cause of GM's breach, South Dakota Plaintiff and the South Dakota Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, South Dakota Plaintiff and the South Dakota Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2669.  As a direct and proximate result of GM's breach of express warranties,

515

South Dakota Plaintiff and the South Dakota Sub-Class Members have been damaged in an amount to be determined at trial.

## 92. COUNT 92
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## S.D. CODIFIED LAWS §§ 57A-2-314 AND 57A-2A-212

2670. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2671. South Dakota Plaintiff brings this cause of action on his own behalf and on behalf of the members of the South Dakota Sub-Class.

2672. GM is and was at all relevant times a "merchant" with respect to motor vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and a "seller" of motor vehicles under § 57A-104(1)(d).

2673. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

2674. The Class Vehicles are and were at all relevant times "goods" within the meaning of S S.D. Codified Laws §§ 4-2-105(1) and 4-2.5-103(1)(h).

2675. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under S S.D. Codified Laws §§ 57A-2-314 and 57A-2A-212.

2676. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom South Dakota Plaintiff and the South Dakota Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to South Dakota Plaintiff and the South

Dakota Sub-Class Members, with no modification to the defective transmissions.

2677. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

2678. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

2679. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

2680. As a result of GM's breach of the applicable implied warranties, South Dakota Plaintiff and the South Dakota Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, South Dakota Plaintiff and the South Dakota Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

2681. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of S.D. Codified Laws §§ 57A-2-314 and 57A-2A-212.

2682. South Dakota Plaintiff and the South Dakota Sub-Class Members have

517

complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2683. South Dakota Plaintiff and the South Dakota Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

2684. As a direct and proximate cause of GM's breach, South Dakota Plaintiff and the South Dakota Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, South Dakota Plaintiff and the South Dakota Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2685. As a direct and proximate result of GM's breach of the implied warranty of merchantability, South Dakota Plaintiff and the South Dakota Sub-Class Members have been damaged in an amount to be proven at trial.

### DD.   Claims on Behalf of the Tennessee Sub-Class

### 93. COUNT 93
### VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT
### TENN. CODE ANN. § 47-18-101, *ET SEQ.*

2686. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2687. Plaintiff Mark Kidd ("Tennessee Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Tennessee Sub-Class.

2688. The Tennessee Plaintiff and Class members are "consumer[s]" within

the meaning of Tenn. Code Ann. § 47-18-103(2).

2689. The Tennessee Plaintiff, Class members, and GM are "person[s]" within the meaning of Tenn. Code Ann. § 47-18-103(9).

2690. The Class Vehicles constitute "goods" within the meaning of Tenn. Code Ann. § 47-18-103(5).

2691. GM engaged in "trade," "commerce," and/or "consumer transaction[s]" within the meaning of Tenn. Code Ann. § 47-18-103(11).

2692. The Tennessee Consumer Protection Act ("CPA") provides that, "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices", including but not limited to, "(2) causing likelihood of confusion or misunderstanding as to the certification of goods . . . ;" "(5) representing that goods . . . have . . . characteristics . . . uses, benefits . . . that they do not have;" "(7) representing that goods . . . are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;" "(9) advertising goods or services with intent not to sell them as advertised;" "(22) using any advertisement containing an offer to sell goods . . . when the offer is not a bona fide effort to sell the advertised goods . . . ;" "(27) engaging in any other act or practice which is deceptive to the consumer or any other person…" Tenn. Code Ann. § 47-18-104(a), (b).

2693. GM concealed the fact that Class Vehicles had defective transmissions that made them unsafe to drive and told various GM dealers and service technicians that the vehicles were operating "as [d]esigned" and that the symptoms were "normal" (if widespread enough). These GM dealers and service technicians passed this misinformation onto Class Members, as evidenced by the various consumer complaints alleging that someone—such as a GM "dealer" or "service manager"— told them that the defect's symptoms were "normal."

2694. GM violated the Tennessee CPA by, at minimum, representing that the

519

Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

2695. GM's acts and practices, as described throughout this Complaint, constitute "unfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices" by GM, that are unlawful, as enumerated in Tenn. Code Ann. § 47-18-104.

2696. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the Tennessee Plaintiff and the Class.

2697. GM knew or should have known that its conducted violated the Tennessee CPA.

2698. GM's fraudulent concealment of the true characteristics of the defective transmissions in the Class Vehicles were material to the Tennessee Plaintiff and Class members.

2699. GM's violations present a continuing risk to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

2700. GM had an ongoing duty to its customers to refrain from unfair and deceptive practices under the Tennessee CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of GM's deceptive and unfair acts and practices made in the course of GM's business.

2701. As a direct and proximate result of GM's violations of the Tennessee CPA, the Tennessee Plaintiff and the Class have suffered injury-in-fact and/or actual damage.

2702. Pursuant to Tenn. Code Ann. § 47-18-109, Tennessee Plaintiff seeks an

520

order enjoining GM's unfair and/or deceptive acts or practices, damages, treble damages for willful and knowing violations, pursuant to § 47-18-109(a)(3), punitive damages, attorneys' fees, costs, and any relief available under the Tennessee CPA that the Court deems just and proper.

### 94. COUNT 94
### BREACH OF EXPRESS WARRANTY
### TENN. CODE §§ 47-2-313 AND 47-2A-210

2703. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2704. Tennessee Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Tennessee Sub-Class.

2705. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "seller" of motor vehicles under § 47-2-103(1)(d).

2706. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

2707. The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

2708. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

2709. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

2710. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects

except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

2711.  Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

2712.  GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

2713.  The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Tennessee Plaintiff and the Tennessee Sub-Class Members.

2714.  Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

2715.  Under the express Warranties, GM was obligated to correct the

Transmission Defect in the vehicles owned or leased by Tennessee Plaintiff and the Tennessee Sub-Class Members.

2716. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

2717. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Tennessee Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

2718. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

2719. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

2720. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Tennessee Plaintiff and the Tennessee Sub-Class Members. Among other things, Tennessee Plaintiff and the Tennessee Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

2721. Tennessee Plaintiff and the Tennessee Sub-Class Members have

complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2722. Tennessee Plaintiff and the Tennessee Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

2723. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2724. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering these limitations null and void.

2725. As a direct and proximate cause of GM's breach, Tennessee Plaintiff and the Tennessee Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Tennessee Plaintiff and the Tennessee Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2726. As a direct and proximate result of GM's breach of express warranties, Tennessee Plaintiff and the Tennessee Sub-Class Members have been damaged in an amount to be determined at trial.

## 95. COUNT 95
## BREACH OF THE IMPLIED WARRANTY OF
## MERCHANTABILITY TENN. CODE §§ 47-2-314 AND 47-2A-
## 212

2727. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2728. Tennessee Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Tennessee Sub-Class.

2729. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "seller" of motor vehicles under § 47-2-103(1)(d).

2730. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

2731. The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) AND 47-2A-103(1)(h).

2732. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tenn. Code §§ 47-2-314 and 47-2A-212.

2733. GM sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.

2734. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Tennessee Plaintiff and the Tennessee Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Tennessee Plaintiff and the Tennessee Sub-Class Members, with no modification to the defective transmissions.

2735. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold pursuant to Tenn. Code §§ 47-2-314 and 47-2A-212.

2736. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

2737. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

2738. As a result of GM's breach of the applicable implied warranties, Tennessee Plaintiff and the Tennessee Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Tennessee Plaintiff and the Tennessee Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

2739. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Tenn. Code §§ 47-2- 314 and 47-2A-212.

2740. Tennessee Plaintiff and the Tennessee Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2741. Tennessee Plaintiff and the Tennessee Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

2742. As a direct and proximate cause of GM's breach, Tennessee Plaintiff and the Tennessee Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Tennessee Plaintiff and the Tennessee Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2743. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Tennessee Plaintiff and the Tennessee Sub-Class Members have been damaged in an amount to be proven at trial.

### EE.   Claims on Behalf of the Texas Sub-Class

**96. COUNT 96**
**VIOLATION OF THE DECEPTIVE TRADE PRACTICES ACT**
**– CONSUMER PROTECTION ACT TEXAS BUS. & COM.**
**CODE § 17.41, *ET SEQ.***

2744. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2745. Plaintiffs Darrin Degrand, Marisella Gutierrez, Taurus King, and Howard Young ("Texas Plaintiffs") bring this cause of action on their own behalf

527

and on behalf of the members of the Texas Sub-Class.

2746. Texas Plaintiffs and the Texas Sub-Class Members are individuals, partnerships or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

2747. GM is a "person[s]" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

2748. GM is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

2749. The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA")  prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

2750. GM participated in unfair or deceptive trade practices that violated the Texas DTPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

2751. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

2752. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

2753. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

2754. GM knew or should have known that its conduct violated the Texas DTPA.

2755. Texas Plaintiffs and the Texas Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

2756. Had Texas Plaintiffs and the Texas Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

2757. GM owed Texas Plaintiffs and the Texas Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission Defect; (b) intentionally concealed the foregoing from Texas Plaintiffs and the Texas Sub-Class Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Texas Plaintiffs and the Texas Sub-Class Members that contradicted these representations.

2758. Due to GM's specific and superior knowledge that the transmissions in the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Texas Plaintiffs and the Texas Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Texas Plaintiffs and the Texas Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Texas Plaintiffs and the Texas Sub-Class Members. Longevity, durability, performance, and safety are material concerns to GM truck consumers. GM represented to Texas Plaintiffs and the Texas Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

2759. Texas Plaintiffs and the Texas Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Texas Plaintiffs and the Texas Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

2760. As a result of GM's conduct, Texas Plaintiffs and the Texas Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions

530

because they purchased vehicles which do not perform as advertised.

2761. As a direct and proximate result of GM's unfair or deceptive acts or practices, Texas Plaintiffs and the Texas Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

2762. Defendant's violations present a continuing risk to Texas Plaintiffs and the Texas Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

2763. Pursuant to Tex. Bus. & Com. Code § 17.50, Texas Plaintiffs and the Texas Sub-Class Members seek an order enjoining GM unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

## 97. COUNT 97
## BREACH OF EXPRESS WARRANTY TEX. BUS. & COM. CODE §§ 2.313 AND 2A.210

2764. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2765. Texas Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the Texas Sub-Class.

2766. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

2767. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

2768. The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

2769. GM provided all purchasers and lessees of the Class Vehicles with the

express warranty described herein, which became a material part of the bargain.

2770. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

2771. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

2772. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

2773. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and

532

8L45 transmissions and their component parts are covered by the express Warranties.

2774. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Texas Plaintiffs and the Texas Sub-Class Members.

2775. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

2776. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Texas Plaintiffs and the Texas Sub-Class Members.

2777. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

2778. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Texas Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

2779. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

2780. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

533

2781. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Texas Plaintiffs and the Texas Sub-Class Members. Among other things, Texas Plaintiffs and the Texas Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

2782. Texas Plaintiffs and the Texas Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2783. Texas Plaintiffs and the Texas Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

2784. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2785. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

2786. As a direct and proximate cause of GM's breach, Texas Plaintiffs and the Texas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of

534

their Class Vehicles. Additionally, Texas Plaintiffs and the Texas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2787. As a direct and proximate result of GM's breach of express warranties, Texas Plaintiffs and the Texas Sub-Class Members have been damaged in an amount to be determined at trial.

## 98. COUNT 98
## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY TEX. BUS. & COM. CODE §§ 2.314
## AND 2A.212

2788. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2789. Texas Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the Texas Sub-Class.

2790. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

2791. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

2792. The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

2793. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Texas Bus. & Com. Code §§ 2.314 and 2A.212

2794. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized

535

dealers, like those from whom Texas Plaintiffs and the Texas Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Texas Plaintiffs and the Texas Sub-Class Members, with no modification to the defective transmissions.

2795. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

2796. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

2797. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

2798. As a result of GM's breach of the applicable implied warranties, Texas Plaintiffs and the Texas Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Texas Plaintiffs and the Texas Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

2799. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Texas Bus. & Com. Code §§ 2.314 and 2A.212

2800. Texas Plaintiffs and the Texas Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2801. Texas Plaintiffs and the Texas Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

2802. As a direct and proximate cause of GM's breach, Texas Plaintiffs and the Texas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Texas Plaintiffs and the Texas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2803. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Texas Plaintiffs and the Texas Sub-Class Members have been damaged in an amount to be proven at trial.

### FF.   Claims on Behalf of theWashington Sub-Class

### 99. COUNT 99
### VIOLATION OF THE WASHINGTON CONSUMER
### PROTECTION ACT WASH REV. CODE § 19.86.010, *ET SEQ.*

2804. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2805. Plaintiff Nicollette Covey ("Washington Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Washington Sub-Class.

2806. Washington Plaintiff, the Washington Sub-Class Members, and GM are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

2807. GM committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.96.010.

2808. The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

2809. GM participated in deceptive trade practices that violated the Washington CPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

2810. By systematically devaluing safety and concealing a plethora of defects in the 8L90 and 8L45 Transmissions and the Class Vehicles, GM engaged in unfair or deceptive practices prohibited by the Washington CPA, including: (1) representing that the 8L90 and 8L45 Transmissions and the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the 8L90 and 8L45 Transmissions and the Class Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the 8L90 and 8L45 Transmissions and the Class Vehicles with the intent not to sell them as

advertised.

2811. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

2812. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

2813. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

2814. GM knew or should have known that its conduct violated the Washington CPA.

2815. Washington Plaintiff and the Washington Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

2816. Had Washington Plaintiff and the Washington Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

2817. Washington Plaintiff and the Washington Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Washington Plaintiff and the Washington Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

2818. As a result of GM's conduct, Washington Plaintiff and the Washington Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions

539

because they purchased vehicles which do not perform as advertised.

2819. As a direct and proximate result of GM's unfair or deceptive acts or practices, Washington Plaintiff and the Washington Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

2820. GM is liable to Washington Plaintiff and the Washington Sub-Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and any other remedies the Court may deem appropriate under Wash. Rev. Code § 19.86.090. Because GM's actions were willful and knowing, Plaintiffs' damages should be trebled.

## 100. COUNT 100
## BREACH OF EXPRESS WARRANTY
## WASH. REV. CODE §§ 62A.2-313 AND 62A.2A-210

2821. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2822. Washington Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Washington Sub-Class.

2823. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Wash. Rev. Code §§ 62A.2-104(1) and 62A.2A-103(1)(t), and a "seller" of motor vehicles under § 2.103(a)(4).

2824. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

2825. The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

2826. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

2827. GM provided all purchasers and lessees of Cadillac-branded Class

Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

2828. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

2829. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

2830. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

2831. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Washington Plaintiff and the Washington Sub-Class Members.

2832. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

2833. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Washington Plaintiff and the Washington Sub-Class Members.

2834. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

2835. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Washington Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

2836. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

2837. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

2838. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Washington Plaintiff and the Washington

542

Sub-Class Members. Among other things, Washington Plaintiff and the Washington Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

2839. Washington Plaintiff and the Washington Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2840. Washington Plaintiff and the Washington Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

2841. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2842. Because GM has not been able remedyable to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

2843. As a direct and proximate cause of GM's breach, Washington Plaintiff and the Washington Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Washington Plaintiff and the Washington Sub-Class Members have incurred or will incur economic damages at

543

the point of repair in the form of the cost of repair.

2844. As a direct and proximate result of GM's breach of express warranties, Washington Plaintiff and the Washington Sub-Class Members have been damaged in an amount to be determined at trial.

## 101. COUNT 101
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## WASH. REV. CODE §§ 62A.2-314 AND 62A.2A-212

2845. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2846. Washington Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Washington Sub-Class.

2847. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Wash. Rev. Code §§ 62A.2-104(1) and 62A.2A-103(1)(t), and a "seller" of motor vehicles under § 2.103(a)(4).

2848. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

2849. The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

2850. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

2851. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Washington Plaintiff and the Washington Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers

purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Washington Plaintiff and the Washington Sub-Class Members, with no modification to the defective transmissions.

2852. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

2853. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

2854. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

2855. As a result of GM's breach of the applicable implied warranties, Washington Plaintiff and the Washington Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Washington Plaintiff and the Washington Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

2856. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation

545

of Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

2857. Washington Plaintiff and the Washington Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2858. Washington Plaintiff and the Washington Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

2859. As a direct and proximate cause of GM's breach, Washington Plaintiff and the Washington Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Washington Plaintiff and the Washington Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2860. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Washington Plaintiff and the Washington Sub-Class Members have been damaged in an amount to be proven at trial.

### GG. Claims on Behalf of the Wisconsin Sub-Class

### 102. COUNT 102
### VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT
### WIS. STAT. §§ 110.18

2861. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2862. Plaintiff Phil Houk ("Wisconsin Plaintiff") brings this cause of action

on his own behalf and on behalf of the members of the Wisconsin Sub-Class.

2863. GM is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

2864. Wisconsin Plaintiff and the Wisconsin Sub-Class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1). Wisconsin Plaintiff and the Wisconsin Sub-Class purchased or leased one or more Class Vehicles in Wisconsin.

2865. The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits an "assertion, representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1). By systematically concealing the defects in the Class Vehicles, GM's conduct, acts, and practices violated the Wisconsin DTPA.

2866. GM participated in misleading, false, or deceptive acts that violated the Wisconsin DTPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

2867. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

2868. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the

547

purchasing public, and imposed a serious safety risk on the public.

2869. GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

2870. GM knew or should have known that its conduct violated the Wisconsin DTPA.

2871. Wisconsin Plaintiff and the Wisconsin Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

2872. Had Wisconsin Plaintiff and the Wisconsin Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

2873. GM owed Wisconsin Plaintiff and the Wisconsin Sub-Class Members a duty to disclose the truth about the Transmission Defect because GM: (a) possessed exclusive knowledge of the Class Vehicles and the Transmission Defect; (b) intentionally concealed the foregoing from Wisconsin Plaintiff and the Wisconsin Sub-Class Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Wisconsin Plaintiff and the Wisconsin Sub-Class Members that contradicted these representations.

2874. Due to GM's specific and superior knowledge that the transmissions in the Class Vehicles will fail due to the Transmission Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Wisconsin Plaintiff and the Wisconsin Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the 8L90 and 8L45 transmissions will cause failure in Class Vehicles, that Class Vehicles do not have the expected

548

durability, reliability, and/or safety over other vehicles or of their predecessor transmissions, that failure of the 8L90 and 8L45 transmissions will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Wisconsin Plaintiff and the Wisconsin Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Wisconsin Plaintiff and the Wisconsin Sub-Class Members. Longevity, durability, performance, and safety are material concerns to GM truck consumers. GM represented to Wisconsin Plaintiff and the Wisconsin Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing transmissions of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the transmissions fail due to the Transmission Defect.

2875. Wisconsin Plaintiff and the Wisconsin Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Wisconsin Plaintiff and the Wisconsin Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

2876. As a result of GM's conduct Wisconsin Plaintiff and the Wisconsin Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

2877. As a direct and proximate result of GM's unfair or deceptive acts or practices, Wisconsin Plaintiff and the Wisconsin Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

2878. Defendant's violations present a continuing risk to Wisconsin Plaintiff

549

and the Wisconsin Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

2879.  The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits an "assertion, representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1). By systematically concealing the defects in the Class Vehicles, GM's conduct, acts, and practices violated the Wisconsin DTPA.

2880.  Plaintiffs and Wisconsin Class members seek actual damages, court costs, attorneys' fees, and other relief provided for under Wis. Stat. § 100.18(11)(b)(2). Because GM's conduct was committed knowingly and/or intentionally, Plaintiffs and Wisconsin Class members are entitled to treble damages and any other such relief necessary to deter GM's unlawful conduct in the future.

### 103. COUNT 103
### BREACH OF EXPRESS WARRANTY
### WIS. STAT. §§ 402.313 AND 411.210

2881. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2882. Wisconsin Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Wisconsin Sub-Class.

2883. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Wis. Stat. §§ 402.104(3) and 411.103(1)(t), and a "seller" of motor vehicles under § 402.103(1)(d).

2884.  With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Wis. Stat. § 411.103(1)(p).

2885. The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

2886. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

2887. GM provided all purchasers and lessees of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

2888. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

2889. Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

2890. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

2891. The Transmission Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Wisconsin Plaintiff and the Wisconsin Sub-Class Members.

2892. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

2893. Under the express Warranties, GM was obligated to correct the Transmission Defect in the vehicles owned or leased by Wisconsin Plaintiff and the Wisconsin Sub-Class Members.

2894. Although GM was obligated to correct the Transmission Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

2895. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Wisconsin Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

2896. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

2897. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances

552

here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

2898. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Wisconsin Plaintiff and the Wisconsin Sub-Class Members. Among other things, Wisconsin Plaintiff and the Wisconsin Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

2899. Wisconsin Plaintiff and the Wisconsin Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2900. Wisconsin Plaintiff and the Wisconsin Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

2901. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defect.

2902. Because GM has not been able to remedy the Transmission Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

2903. As a direct and proximate cause of GM's breach, Wisconsin Plaintiff and the Wisconsin Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Wisconsin Plaintiff and the Wisconsin Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2904. As a direct and proximate result of GM's breach of express warranties, Wisconsin Plaintiff and the Wisconsin Sub-Class Members have been damaged in an amount to be determined at trial.

## 104. COUNT 104
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## WIS. STAT. §§ 402.314 AND 411.212

2905. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-950 of this Complaint.

2906. Wisconsin Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Wisconsin Sub-Class.

2907. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Wis. Stat. §§ 402.104(3) and 411.103(1)(t), and a "seller" of motor vehicles under § 402.103(1)(d).

2908. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Wis. Stat. § 411.103(1)(p).

2909. The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

2910. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Wis. Stat. §§ 402.314 and 411.212

2911. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Wisconsin Plaintiff and the Wisconsin Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Wisconsin Plaintiff and the Wisconsin Sub-Class Members, with no modification to the defective transmissions.

2912. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

2913. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

2914. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Transmission Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

2915. As a result of GM's breach of the applicable implied warranties, Wisconsin Plaintiff and the Wisconsin Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Wisconsin Plaintiff

555

and the Wisconsin Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

2916. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Wis. Stat. §§ 402.314 and 411.21.

2917. Wisconsin Plaintiff and the Wisconsin Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

2918. Wisconsin Plaintiff and the Wisconsin Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

2919. As a direct and proximate cause of GM's breach, Wisconsin Plaintiff and the Wisconsin Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Wisconsin Plaintiff and the Wisconsin Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

2920. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Wisconsin Plaintiff and the Wisconsin Sub-Class Members have been damaged in an amount to be proven at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves, and all others similarly situated, requests the Court to enter judgment against GM, as follows:

A. An order certifying the proposed Class and Sub-Classes pursuant to Federal Rule of Civil Procedure 23, designating Plaintiffs as named representatives of the Class and their representative Sub-Classes, and designating the undersigned as Class Counsel for the Class and Sub-Classes;

B. A declaration that Defendant is financially responsible for notifying all members of the Classes about the defective nature of the GM 8L45 and 8L90 transmission, any repair or replacement available to remedy the defect and/or the need for periodic maintenance

C. A declaration that Defendant is financially responsible for all Class notice and the administration of Class relief.

D. An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and to remove and replace Plaintiffs and Class Members' transmissions with a suitable alternative product; enjoining Defendant from selling the Class Vehicles with the misleading information and defective transmissions; compelling Defendant to provide members of the Classes with a replacement transmission that does not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged at no cost to members of the Classes and to notify all members of the Classes that such warranty has been reformed

E. A declaration requiring Defendant to comply with the various provisions of the state and federal consumer protection statutes herein alleged and to make all the required disclosures;

557

F.    A declaration that Defendant is required to engage in corrective advertising, including notifying all members of the Classes not to drive Class Vehicles until they have been repaired and providing information regarding the timeline for repair or replacement of the defective transmissions in all Class Vehicles

G.    An award to Plaintiffs and members of the Classes for actual, compensatory, exemplary, and statutory damages, including interest, including damages for economic loss including loss of the benefit of the bargain, overpayment damages, diminished value and out-of-pocket losses, and including the additional purchase cost of the GM 8L45 or 8L90 Transmission option, in an amount to be proven at trial

H.    Any and all remedies provided pursuant to the state and federal consumer protection statutes herein alleged, including any applicable statutory and civil penalties;

I.    A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and members of the Classes;

J.    An award of attorneys' fees and costs, as allowed by law;

K.    An award of pre-judgment and post-judgment interest on any amounts awarded, as provided by law;

L.    Leave to amend the Complaint to conform to the evidence produced at trial;

M.    Plaintiffs demand that GM perform a recall, and repair all Class Vehicles at no expense to Plaintiffs and members of the Classes; and

N.    Granting such other and further relief as the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Federal Rule of Civil Procedure 38(c), Plaintiffs demand a trial by jury of any and all issues in this action so triable.

Dated:  September 30, 2019                    Respectfully submitted,


/s/ Theodore Leopold

Theodore J. Leopold
**COHEN MILSTEIN**
**SELLERS & TOLL PLLC**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone: (561) 515-1400
Facsimile: (561) 515-1401
tleopold@cohenmilstein.com
*Interim Lead Counsel*

Douglas J. McNamara
Julia A. Horwitz
Karina G. Puttieva
**COHEN MILSTEIN**
   **SELLERS & TOLL PLLC**
1100 New York Ave. NW East Tower, 5th Floor
Washington, DC  20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
dmcnamara@cohenmilstein.com
jhorwitz@cohenmilstein.com
kputtieva@cohenmilstein.com

Robert Gordon, Esq.
Steven Calamusa, Esq.
**GORDON & PARTNERS, P.A.**
4114 Northlake Blvd.,
Palm Beach Gardens, FL 33410

559

2581313 v1

Telephone: (561) 799-5070
Facsimile: (561) 799-4050
rgordon@fortheinjured.com
scalamusa@fortheinjured.com


Russell D. Paul
Amey J. Park
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone:   (215) 875-3000
Facsimile:   (215) 875-4604
rpaul@bm.net
apark@bm.net

Mark A. Ozzello
Tarek H. Zohdy
Cody R. Padgett
Trisha K. Monesi
**CAPSTONE LAW APC**
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:   (310) 556-4811
Facsimile: (310) 943-0396
Tarek.Zohdy@capstonelawyers.com
Trisha.Monesi@capstonelawyers.com
Cody.Padgett@capstonelawyers.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
William Kalas (P82113)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
wk@millerlawpc.com

560

Joseph H. Meltzer
Melissa L. Troutner
Natalie Lesser
**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel.: (610) 667-7706
Fax: (610) 667-7056
jmeltzer@ktmc.com
mtroutner@ktmc.com
nlesser@ktmc.com

Lynn Lincoln Sarko
Gretchen Freeman Cappio
Ryan McDevitt
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Fax: (206) 623-3384
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
rmcdevitt@kellerrohrback.com

*Plaintiffs' Steering Committee*

Michael L. Pitt (P24429)
Beth Rivers (P33614)
**PITT McGEHEE PALMER**
**    AND RIVERS, P.C.**
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
Telephone: (248) 398-9800
Facsimile: (248) 398-9804
mpitt@pittlawpc.com
brivers@pittlawpc.com
*Plaintiffs' Liaison Counsel*

561