UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD FRANCIS, WESLEY WON,
DENNIS SPEERLY, JOSEPH SIERCIO,
MICHAEL PLAFKER, HOWARD YOUNG,                    Case Number 19-11044
and DARRIN DEGRAND,                              Honorable David M. Lawson

                    Plaintiffs,
v.


GENERAL MOTORS, LLC,

                    Defendant.
_____/

MARISELLA GUTIERREZ, JIMMY
HARMAN, MARK KIDD, and JAMES
NORVELL,                                         Case Number 19-12371

                    Plaintiffs,
v.

GENERAL MOTORS, LLC,

                    Defendant.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

Driving a vehicle whose automatic transmission occasionally will "slip, buck, kick, jerk and harshly engage" can be an unpleasant experience at best. When the transmission causes the vehicle to perform erratically, such as with sudden or delayed acceleration, the vehicle may be unsafe to drive. So says a group of plaintiffs who purchased cars and trucks manufactured by defendant General Motors, LLC. They filed cases that have been consolidated in this Court on behalf of a putative class of the owners of thousands of vehicles that, they claim, have defective transmissions, which GM has refused to fix or replace under its express warranty.

The cases presently are before the Court on GM's motion to dismiss the consolidated amended class action complaint alleging claims for economic losses under a variety of legal theories. GM contends that the plaintiffs have failed to plead viable causes of action for the alleged defects in its transmission design. For reason discussed below, the motion will be granted in part and denied in part.

## I. Facts

Because the defendant has challenged the adequacy of the pleading in its motion under Federal Rule of Civil Procedure 12(b)(6), the facts discussed below are taken from the 104-count, 2,920-paragraph consolidated amended class action complaint (CACAC), which spans 901 pages, including the attached exhibits. In that document, the plaintiffs attempt to set forth causes of action sounding in breaches of express and implied warranties; common law fraudulent omissions and statutory consumer fraud; violations of various state laws governing consumer sales, deceptive marketing, and unfair trade practices; and unjust enrichment under the laws of 32 states.

### A. The Plaintiffs

The putative class consists of domestic buyers and lessors of GM cars and trucks equipped with its Hydra-Matic 8L90 and 8L45 transmissions. The class vehicles include the 2015 through 2019 model year Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2019 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac ATS, ATS-V, CTS, CT6, and CTS-V; 2015-2019 GMC Sierra, Yukon, Yukon XL, and Yukon Denali XL; and 2017-2019 GMC Canyon.

The consolidated amended complaint aggregates claims brought by 62 individuals in five separately filed civil actions (file numbers 19-11044, 19-11802, 19-11808, 19-11875, and 19-

12371), which were assigned or reassigned to this Court and consolidated for all pretrial proceedings.  The plaintiffs who remain in the action hail from the following 33 states:

- Alabama (Brian Lloyd)
- Arizona (Maria Barallardos)
- Arkansas (James Browne)
- California (Clyde Cheng, Wesley Won)
- Colorado (Daniel Drain)
- Connecticut (Kevin Wesley)
- Delaware (Keith and Karen Shelton)
- Florida (Neil Ambrosio, Dennis Duffy, Rhianna Meyers, Michael Ponder, Arif Shakoor, Richard Sullivan, Tait Thomas)
- Georgia (Jimmy Flowers, Richard Freeman, Philip Weeks, Marisella Gutierrez) (*)
- Idaho (Cary Sherrow) (**)
- Illinois (Timothy Grafrath, Dennis Speerly)
- Indiana (Samuel Ford, Philip Whicker)
- Kansas (Guy Clark)
- Kentucky (James Norvell)
- Louisiana (Donald Dykshorn)
- Maine (Carl Johnsen)
- Michigan (Richard Francis, Jay Hull, Louis Ray)
- Minnesota (Troy and Kimberly Coulson)
- Missouri (Christopher Krull, Richard Noonan)
- New Hampshire (Michael Banks)
- New Jersey (William Grossman, Randall Jacobs, Joseph Sierchio)
- New York (Charles Larsen, Marc Mazza, Andre McQuade, Michael Plafker, Michael Sylvester)
- North Carolina (Richard Shope, Steven Brack, Jimmy Harman)
- Ohio (Chi Kim Ho, Jeffrey Rice)
- Oklahoma (Jon Ellard)
- Oregon (Cary Sherrow) (**)
- Pennsylvania (Charles Aiken, Karina and William Fredo)
- South Carolina (Donald Sicura, Jason Sinclair)
- South Dakota (Colton Kelly)
- Tennessee (Mark Kidd)
- Texas (Darrin Degrand, Taurus King, Howard Young, Marisella Gutierrez) (*)
- Washington (Nicolette Covey)
- Wisconsin (Phil Houk)

Two plaintiffs, Cary Sherrow and Marisella Gutierrez, were identified as leading parties and class representatives for claims and classes in more than one jurisdiction; Sherrow for both Idaho (where

she bought her vehicle) and Oregon (where she presently resides); Gutierrez for both Georgia (where she lives) and Texas (where she bought her car).

All of the plaintiffs allege that their vehicles were equipped with defective transmissions. They seek legal and equitable relief under the legal theories discussed below.

## B.  Vehicle Sales

All the class vehicles were sold with an express limited warranty that GM issued, which in several materially identical iterations describes the scope of coverage as follows:

> The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period. Needed repairs will be performed using new, remanufactured, or refurbished parts.

Am. Compl. ¶ 87, ECF No. 41, PageID.2265.  The warranty covers "the complete vehicle" for four years or 50,000 miles, and the powertrain for seven years or 70,000 miles.  The powertrain includes the transmission or transaxle and "[a]ll internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission [or] transaxle," as well as "any actuators directly connected to the transmission (slave cylinder, etc.)." *Id.* at PageID.2265-66.  Chevrolet and GM-branded vehicles were subject to the same coverage, but with shorter periods of three years or 36,000 miles for the "bumper-to-bumper" warranty, and five years or 60,000 miles on the powertrain.  *Id.* ¶ 88.

## C. Transmission Problems

In January 2014, GM began selling class vehicles with its then-new eight-speed 8L90 and 8L45 automatic transmissions, which it marketed as offering improvements over prior transmission designs having six or fewer gears.  Am. Compl. ¶ 90.  Its marketing materials promoted the eight-speed designs as delivering "world class," "lightning fast" and "smooth" shifting, along with improved fuel efficiency.  *Id.* ¶¶ 95-96.

- 4 -

The plaintiffs allege that the class vehicle transmissions are defectively designed and cause their cars during gear changes to "slip, buck, kick, jerk and harshly engage" gear settings; that the transmissions also "suffer abnormal internal wear" and that the shifting problems result in "sudden acceleration, delay in downshifts, delayed acceleration, [and] difficulty stopping the vehicle." *Id.* ¶ 4. The plaintiffs contend that the problems can only be cured permanently by "replacement of the transmission or its components." *Ibid.* The plaintiffs assert that the shifting malfunctions may result in the cars "suddenly lurching forward, sudden loss of forward propulsion, and significant delays in acceleration," which "present a safety hazard because they severely affect the driver's ability to control the vehicle's speed, acceleration, and deceleration." *Id.* ¶ 5. Numerous drivers reported dangerous driving incidents such as having their vehicles suddenly lurch into intersections while the driver was attempting to proceed slowly through, unpredictable sudden or delayed acceleration that made smooth merging with highway traffic difficult and risky, and sporadic refusal to downshift properly when braking, resulting in unexpected and delayed deceleration. *Id.* ¶ 97.

The plaintiffs posit that the problematic shifting develops due to "internal issues within the transmission [and] torque converter causing undue friction and impairing proper functioning of hydraulic systems and gears, which in turn results in metal shavings being circulated throughout the transmission." *Id.* ¶ 6. They report that the resulting "damage to the transmission and torque converter imposes escalating repairs upon consumers, including the need to flush the metal shavings from the transmission." *Ibid.* However, plaintiffs who have submitted their vehicles to GM dealers for repairs have been told that their cars are "operating normally," and that they have no warranty-covered defect, because GM's limited warranty states that while it "covers repairs to

correct any vehicle defect," the term "defect" does not include "slight noise, vibrations, or other normal characteristics of the vehicle." *Id.* ¶ 7.

The plaintiffs allege that GM knew about the defect even before the class vehicles went to market, and that its awareness was reinforced by customer complaints logged by dealers after the cars were sold, but it has refused to perform repairs at no cost to buyers, and took no steps to warn prospective buyers. *Id.* ¶ 8. The plaintiffs also contend that GM should have anticipated problems with the class vehicle transmissions before the cars went to market, because similar issues had plagued its predecessor 6L transmission design. *Ibid.* Those problems with the 6L50 transmission design prompted litigation in *McKee v. General Motors, LLC*, Case No. 18-11303 (E.D. Mich.). *Id.* ¶ 100. The plaintiffs also allege that GM knew about problems in the new designs from internal testing reports, early driver complaints, service calls at GM dealers, and reports of consumer complaints gathered by NHTSA. *Ibid.*

C. Service Bulletins

Over the five-year period from 2014 through 2019, GM issued more than 60 service bulletins to its dealer service departments acknowledging a variety of shifting problems with the 8L45 and 8L90 transmissions; GM allegedly never provided notice of any shifting issues to current owners or prospective buyers. Am. Compl. ¶ 105.

In October 2015, a service bulletin was issued acknowledging complaints of vehicles "shuddering" like "driving over rumble strips" and "excessive RPM fluctuations," and advising dealers that the problems could be caused by a torque converter defect, for which a "revised" replacement part would soon be available. *Id.* ¶ 120. GM subsequently issued multiple updates to that bulletin advising technicians to address the problem by flushing the transmission and cooler and replacing the transmission fluid. *Id.* ¶ 122-23. In a November 2016 bulletin, GM also acknowledged complaints about "shake" and "shudder" during "light acceleration" between 30

and 65 mph, as well as a "shudder feeling" like "driving over rumble strips" that could be felt in both "drive" and "M7" modes.  *Id.* ¶ 125.  In a separate January 2016 bulletin covering certain class vehicles, GM acknowledged complaints of cars "delaying [shifting] into gear," "not wanting to move," and "feeling like the transmission is slipping," with a recommended fix of replacing a "stator shaft" in the transmission.  *Id.* ¶ 131.

Through 2016 and 2017, GM issued similar service bulletins expanding the manifest of affected vehicle models and offering revised guidance on the fluid flush and part replacement recommendations.  *Id.* ¶¶ 135-140.  In April 2017, GM issued a service bulletin acknowledging customer complaints of class vehicle problems such as "harsh shift, delayed shift, unwanted downshift, transmission stuck in one gear, erratic shifting, [and] hesitation between shifts," and providing instructions for service departments to install a software fix to reprogram shifting behavior.  *Id.* ¶ 149.  Also in April 2017, GM issued an "engineering information bulletin" with instructions for technicians to observe clutch activation in the subject vehicle torque converters, to be reported to engineers at GM, so they could "root cause" the problem and develop a "field fix" that could be applied to resolve the shuddering.  *Id.* ¶ 151.

In September 2018, GM issued a service bulletin addressing complaints with certain class models of "surge, chuggle, misfire, fishbite, and shudder while driving at a steady speed between 35 and 55 MPH with light steady throttle conditions," but instructing service technicians that "[i]f TCC slip is steady and there are no misfires, the condition should be considered characteristic of the vehicle and no repairs should be attempted."  *Id.* ¶ 156.  In October 2018, GM issued another service bulletin further expanding the list of vehicles affected, but expressly advising service departments not to replace transmission parts, and instead directing them to perform only the fluid flush procedures.  *Id.* ¶ 141.  In another series of bulletins issued during the same period, GM

advised dealers that complaints of "noise" and "vibration" should be regarded as "normal operation" as long as other similarly equipped vehicles produced the same symptoms under the same driving conditions (i.e., that the problem was not a problem as long as all affected vehicles manifested the problem to the same extent). *Id.* ¶ 143.

### D. NHTSA Complaints

The plaintiffs allege that more than 1,000 customer complaints about shifting problems with the various class models have been logged by the National Highway Traffic and Safety Administration (NHTSA). Examples of the hazards associated with unexpected, sudden and harsh shifts include reports of cars suddenly "going to full acceleration" and hitting a pole after being shifted to drive, Am. Compl. ¶ 168; "taking off in 4th gear instead of 1st gear," resulting in a feeling of the car having "no power" when accelerating from a stop, *id.* ¶ 169; "surging forward at any moment," *id.* ¶ 175; "disengaging [gear] when going forward . . . and then slam[ming] into gear with great force," *id.* ¶ 180; "temporarily losing ability to apply power," *id.* ¶ 181; "shifting automatically to low gear at highway speeds nearly bringing the car to a stop in interstate traffic," *id.* ¶ 182; "erratic shifting" in traffic and "lurching" during parking, *id.* ¶ 183; "downshifts . . . so violent that the car jerks forward several feet," *id.* ¶ 184; and delayed acceleration while entering travel lanes, resulting in near misses with oncoming traffic, despite the road being clear when pulling out, *id.* ¶ 195. The amended complaint recites many other incidents where consumers reported losing control of vehicles and nearly colliding with other vehicles, fixed objects, or pedestrians, due to sudden violent acceleration or deceleration caused by unexpected abrupt gear changes. *See* id. ¶¶ 201-304.

### E. Damages

The plaintiffs allege that GM has failed to provide replacements or any permanently effective fix for the shifting problems, instead repeatedly applying "band aid" software fixes, fluid

flushes, and other temporary measures, knowing that those repairs will soon need to be repeated when the problems recur, and also knowing that once the cars are out of warranty future ineffective and temporary repairs will be paid for by customers, thus providing it with an ongoing stream of service revenue.  Am. Compl. ¶¶ 11-12.  They individually report experiencing "shuddering," "jerking," "vibrating," "slipping," and "hesitation" with their cars during gear changes, acceleration, or deceleration.  *E.g.*, *id.* ¶ 360, PageID.2409.  Despite repeated returns of their vehicles to GM dealers for repair, the problems persist.  *E.g.*, *id.* ¶ 398 (alleging that transmission problems recur despite four attempted repairs by two GM dealers); *id.* ¶ 443 (five attempted repairs with no resolution); *id.* ¶ 551 (12 attempted repairs).

The plaintiffs contend that they suffered damages in the form of (1) overpayment at initial purchase for their defective cars, (2) reduced resale value, and (3) sunk costs of repair services that have not fixed the problem and will recur in the future.

## II.  Motion to Dismiss

GM poses several arguments insisting that none of the theories of liability set out in the CACAC can survive a pleading challenge.  GM brings its motion under Rule 12(b)(6), although it has included arguments against class certification, an issue that will await another day.  For present purposes, the Court "must 'construe the complaint in the light most favorable to the plaintiff[] [and] accept all well-pleaded factual allegations as true.'"  *Matthew N. Fulton, DDS, P.C. v. Enclarity, Inc.*, 907 F.3d 948, 951 (6th Cir. 2018) (quoting *Hill v. Snyder*, 878 F.3d 193, 203 (6th Cir. 2017)).  For each of the legal theories advanced, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  A "claim is facially plausible when a plaintiff 'pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"
*Matthew N. Fulton, DDS, P.C.*, 907 F.3d at 951-52 (6th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678).

With one exception, all of the plaintiffs' claims are state-law based, and the elements of the causes of action vary somewhat from state to state. However, except for the instances specifically discussed below, those distinctions are largely immaterial, and the rules of decision among the states align in a way that permits a general discussion of the claims in all of the jurisdictions from which they emerge.

## A. Express Warranty

GM argues that because the complaint alleges that "all" 8L45 and 8L90 transmissions suffer from the same defect, the claims asserted are for malfunction due to a "design defect," and other federal courts have held that GM's express warranty covering defects in "materials and workmanship" does not cover design defects.

The Uniform Commercial Code governs this claim. The Pennsylvania enactment of U.C.C. § 2-313 is typical of this uniformly adopted statute and states: "an express warranty [is] '(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. (2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.'" *Allen-Myland, Inc. v. Garmin Int'l, Inc.*, 140 A.3d 677, 692-93 (Pa. Super. 2016) (quoting 13 Pa. Stat. § 2313). "A written express warranty that is part of the sales contract is the seller's promise which relates to goods, and it is part of the basis of the bargain." *Samuel-Bassett v. Kia Motors America, Inc.*, 412, 613 Pa. 371, 34 A.3d 1, 25 (2011) (citing 13 Pa. Stat. § 2313(a)(1)). "To

prevail on [a] breach of express warranty claim [the plaintiff must] establish that [the defendant] breached or failed to meet its warranty promise . . ., that the breach was the proximate cause of the harm [to the plaintiff], and the amount of the ensuing damages."  34 A.3d at 35.

There is no dispute here that the express limited warranty, which was delivered in writing to the plaintiffs upon their purchases of class vehicles, contains a "promise made by the seller to the buyer," whereby the defendant assured buyers that it would "cover[] repairs to correct any vehicle defect, [but] not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period."  The plaintiffs point out that in *McKee v. General Motors LLC*, 376 F. Supp. 3d 751 (E.D. Mich. 2019), another judge in this district examined GM's nearly identical vehicle warranty language and found that it assured the repair of "any vehicle defect" without limitation as to cause, whether by design or manufacture. The *McKee* court concluded that the grammatical structure of the operative clause had the phrase "due to materials or workmanship" modifying only the immediate precedent "slight noise, vibrations, or other normal characteristics of the vehicle," rather than the more remote term "any vehicle defect."  The defendant's construction, the court concluded, demanded a virtual comma where none appeared in the original.  *Id.* at 57-58.

That is a plausible view of the warranty language, but the issue need not be resolved at the pleading stage of this case, because the amended complaint does not commit to either theory on the origin of the defect, and it states facts consistent with a defect that could be due either to poor design, or to poor materials and workmanship.  The revelation of which may be the culprit here must await development of the record.

The amended complaint expressly disclaims any theory of origin for the transmission defect, which the plaintiffs say causes premature wear, shedding and accumulation of metal filings

within the gear works, and consequent unpredictable and dangerously abrupt engagement of (or failure to engage) driving gears.  The defendant insists that if "all" of its transmissions are affected, then the defect necessarily must be one caused by design and not method of manufacture.  But it is logically possible that either could be the case; perhaps the transmissions work badly even though built as designed; or maybe they *all* were badly built, even though well-patterned.  Either way, the plaintiffs do not suppose, but instead expressly disclaim, any attempt at "root cause" diagnosis for the shifting issues, at least at the outset of their case.  *E.g.*, Am. Compl. ¶ 104, ECF No. 41, PageID.2272 ("*It is unknown whether the defect in GM's 6L transmission was caused by issues with the design or with workmanship and materials.* However, based on consumer complaints and the ensuing litigation, GM knew or should have known that as successors to the 6L transmission, *the 8L transmissions were likely to suffer from a similar defect*, or at least monitored the [8LXX models] for similar problems."); *id.* ¶ 995, PageID.2485 ("GM knew that the Class Vehicles and their transmissions suffered from an inherent defect, *were defectively designed or manufactured*, and were not suitable for their intended use.") (Count 4, alleging breach of express warranty under Alabama law) (emphases added).

Moreover, the amended complaint alleges that GM acknowledged hard shifting issues in certain other transmission models and initiated a program to replace improperly manufactured torque converters in the affected vehicles, which further plausibly suggests that defective manufacture rather than flawed design could be a culprit in similar problems with the class models of transmissions.  *See* Am. Compl. ¶ 164, ECF No. 41, PageID.2294 ("In or around in June 2016, GM issued communication number N16204447 announcing a Customer Satisfaction Program. The program was expected to apply to approximately 80 vehicles that 'may have been built with an incorrectly machined torque converter pressure plate.'  GM offered to replace the 8-Speed

Automatic Transmissions (M5N and M5T) in eligible vehicles and acknowledged that '[o]ver time, this condition could result in a shudder or vibration, fluctuations on the tachometer and possible torque converter failure.'").

Confronted with strikingly similar allegations of hard shifting problems in the litigation over the 6L50 design, the *McKee* court found that the pleadings sufficiently suggested the possibility of defects due to materials or workmanship, and the defendant here does not dispute that such defects are covered expressly by its limited warranty. *McKee*, 376 F. Supp. 3d at 759 ("Even if Plaintiff did not plead a design defect, he pleaded an abnormal characteristic of the vehicle related to materials or workmanship. To find otherwise would require GM to adopt the argument that it intended for the 6L50 transmission to slip, buck, kick, jerk, and harshly engage; to prematurely wear internally; to suddenly accelerate, delay in downshifts, delay acceleration; or to stop with difficulty.  Under either interpretation, Plaintiff states a claim for breach of an express warranty.").  Other federal courts, considering similar allegations, have found that speculation about the precise origin of a defect is imprudent at the pleading stage and warranty limitations therefore do not supply good grounds for early dismissal.  *In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig.*, 2015 WL 4591236, at *19 (D.N.J. July 29, 2015) ("[I]t is premature at this stage to dismiss Plaintiffs' express warranty claim on the grounds that it is based on defective design as opposed to defects in material or workmanship.") (collecting cases; citations omitted); *see also id.* at *19 n. 30 ("Although Plaintiffs do not allege that Caterpillar explicitly represented that the Engine Warranty covered design defects, the brunt of their Complaint is that Caterpillar made certain repairs during the warranty period which Caterpillar said would repair the defect, despite knowing that the repairs could and would not remedy the defects. As noted above, the Court declines to speculate at this stage whether Plaintiffs sought repair for a defect of design as

opposed to a defect of material and workmanship."). Moreover, this Court previously rejected the same arguments and reached the same result on a materially indistinguishable record in the multidistrict litigation against GM's competitor, FCA US, LLC. *In re FCA US LLC Monostable Electronic Gearshift Litigation*, 280 F. Supp. 3d 975, 1011 (E.D. Mich. 2017) ("At this early stage of the case, without the benefit of any factual development as to the cause and origin of the alleged defect, dismissal of the express warranty claims is not justified by a premature and uninformed classification of the alleged defect as being categorically in the realm of 'design' or 'manufacturing.'").

The defendant's characterization of the alleged defect as solely due to the "design" of the 8L45 and 8L90 transmissions is contrary to the description of the defect in the pleadings and does not warrant dismissal of the express warranty claims at this stage of the case.

## B.  Implied Warranty

New Jersey's enactment of U.C.C. § 2-314 governing implied warranties is typical of this uniform law, and its rule of decision is exemplary of the cause of action for breach. Under New Jersey law, "'[t]o state a claim for breach of the implied warranty of merchantability. . ., a plaintiff must allege (1) that a merchant sold goods, (2) which were not "merchantable" at the time of sale, (3) injury and damages to the plaintiff or its property, (4) which was caused proximately and in fact by the defective nature of the goods, and (5) notice to the seller of injury.'" *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 601 n.8 (3d Cir. 2012) (quoting *In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, 66 UCC Rep. Serv. 2d 726, 2008 WL 4126264, at *19 (D.N.J. Sept. 2, 2008) (citing N.J. Stat. § 12-A:2-314)).

### 1. Ordinary Purpose

The defendant contends that all of the implied warranty claims must be dismissed because the plaintiffs have not sufficiently alleged that their vehicles were unfit for the intended purpose

of "providing transportation," and none allege that they stopped driving their cars due to the malfunctioning transmissions.  But for an automobile to be merchantable in the usual sense, the law requires more than that it simply move from point to point under its own power.  Ordinary car buyers reasonably expect, and the law allows that they should expect, cars not only to "provide transportation," but also do so in a reasonably safe and reliable manner.

The parties agree that in every subject jurisdiction the implied warranty cause of action (identified under other labels in some states) requires the plaintiffs to prove that a product is not "merchantable," meaning that it is unsuitable for its ordinary or intended use.  *E.g.*, California: *Gutierrez v. Carmax Auto Superstores California*, 19 Cal. App. 5th 1234, 1246, 248 Cal. Rptr. 3d 61, 74 (2018) ("the [item] was not fit for ordinary purposes for which the goods are used."); Colorado: *Simon v. Coppola*, 876 P.2d 10, 15 (Colo. App. 1993) ("the product was not suitable for the purpose warranted"); Illinois: *Walker v. Macy's Merchandising Group, Inc.*, 288 F. Supp. 3d 840, 868 (N.D. Ill. 2017) ("Goods are not of merchantable quality if they are unfit for their intended purpose."); Louisiana: *Justiss Oil Co., Inc. v. Oil Country Tubular Corp.*, 216 So. 3d 346, 361 (La. App. 3 Cir. 2017) ("In a suit for redhibition, the plaintiff must prove [that the product] is either absolutely useless for its intended purpose or its use is so inconvenient or imperfect that judged by the reasonable person standard, had he known of the defect, he would never have purchased it.") (redhibitory defect); New Jersey: *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 601 n.8 (3d Cir. 2012) ("goods . . . were not 'merchantable' at the time of sale"); Pennsylvania: *Visual Communications, Inc. v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 611 F. Supp. 2d 465, 470 (E.D. Pa. 2009) ("[t]his requires showing [] that the product malfunctioned [and] that the plaintiff used the product as intended or reasonably expected by the manufacturer").

However, "merchantability" for an automobile means that it must do more than merely provide transportation.  "[T]he decisions on point in implied warranty cases concerning defective cars have recognized that merchantability implies not only that a vehicle can provide transportation, but that it can do so in a reasonably safe and controlled manner.  In order to plead a viable claim for breach of the implied warranty, the plaintiff must allege that the defect rendered the car 'unfit for its intended purpose [by] compromis[ing] the vehicle's safety, render[ing] it inoperable, or drastically reduc[ing] its mileage range.'"  *In re FCA US LLC Monostable Electronic Gearshift Litigation*, 280 F. Supp. 3d at 1015 (quoting *Troup v. Toyota Motor Corp.*, 545 F. App'x 668, 669 (9th Cir. 2013)).

Federal courts considering implied warranty claims in auto defect litigation consistently have held that an automobile is merchantable or fit for its intended purpose only where it is able reliably to operate in a "safe condition" or to provide "safe transportation."  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 112 (E.D. Mich. 2019) (surveying laws of California, Louisiana, Maryland, Michigan, New Jersey, Ohio, Pennsylvania, and Texas); *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 786 (E.D. Mich. 2019) (finding that the plaintiffs' allegations "that their cars have overheated, lost engine power, and/or gone into Limp Mode on public roadways during a variety of conditions . . . undermines the reliability of the Z06 and raises serious safety concerns as to its suitability for use on public roads . . . [and] plausibly allege their cars are not fit for the ordinary purpose of providing safe and reliable transportation on public roads.") (denying motion to dismiss implied warranty claims under California, Colorado, Georgia, Kansas, Michigan, Missouri, New Hampshire, Pennsylvania, and South Carolina law); *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 946-47 (N.D. Cal. 2018) ("[C]ourts reject the notion that a vehicle is fit for its ordinary purpose merely because it provides

transportation from point A to point B . . . . In contrast, courts have recognized that vehicles may be unmerchantable even if they can be used to provide basic transportation when a defect presents symptoms in a persistent manner that can be said to impair safety, reliability, or operability over an extended period of time.") (denying motion for summary judgment on implied warranty claims under California, New Jersey, North Carolina, Ohio, and Washington law).

GM has not identified any decisions hewing to a contrary rule in any of the states at issue, and it does not argue that dismissal of the claims is warranted based on peculiarities of the rule of decision in any particular jurisdiction.  The allegations of the CACAC here include reports of numerous dangerous incidents where drivers lost control of class vehicles and struck or nearly collided with other cars, objects, or pedestrians, or had harrowing near-miss incidents with oncoming or overtaking traffic due to abrupt, unpredictable, and uncontrollable acceleration or deceleration caused by the transmissions' failure to engage or maintain appropriate drive gear settings.  Those numerous incident reports support the concerns stated by all of the individual plaintiffs that similar gearing issues experienced in their own vehicles have caused them to be worried for their safety while driving the cars.  Those pleaded facts taken together suffice to support an inference that the class vehicles were not fit for the intended purpose of providing safe and reliable transportation on public roadways.

## 2. Privity

GM argues that the implied warranty claims under the laws of Alabama, Arizona, Connecticut, Idaho, Illinois, Kentucky, Michigan, New York, North Carolina, Ohio, Tennessee, Washington, and Wisconsin (Counts 6, 9, 22, 34, 37, 45, 54, 71, 74, 77, 95, 101, 104), all must be dismissed because the plaintiffs cannot establish contractual privity with the defendant, having affirmatively alleged that they bought their cars from independent dealers.  GM is correct as to the implied warranty claims under the laws of Alabama, Arizona, Connecticut, Idaho, Kentucky,

North Carolina, Washington, and Wisconsin, but not as to the implied warranty claims under the laws of the other states.

"Under Michigan law, plaintiffs 'are not required to allege privity to successfully state a claim' for breach of the implied warranty of merchantability." *Yachera v. Westminster Pharm., LLC*, No. 18-2463, 2020 WL 6481980, at *9 (M.D. Fla. June 15, 2020) (quoting *Travelers Indem. Co. v. Air King Am., Inc.*, No. 08-12263, 2009 WL 10680607, at *4 (E.D. Mich. Mar. 26, 2009)); *see also Montgomery v. Kraft Foods Glob., Inc.*, 822 F.3d 304, 309 (6th Cir. 2016) ("Montgomery's claim for breach of the implied warranty of merchantability [under Michigan law] survives the . . . lack of contractual privity."). The Michigan claims therefore are not subject to dismissal for failure to allege privity.

In several other jurisdictions, fact questions, which cannot be resolved at the pleading stage, preclude early disposition of the privity defense. Under Illinois law, fact questions arise where a manufacturer has issued an express limited warranty extending to all buyers or owners which preclude adjudication of a privity defense at the pleading stage. *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 355 F. Supp. 3d 582, 595 (E.D. Mich. 2018) ("Under the circumstances, the question whether the provisions of [the] limited warranty put the parties in privity sufficiently for the implied warranty claims to proceed is a question of fact not amenable to disposition on the pleadings." (citing *Flynn v. FCA US, LLC*, 327 F.R.D. 206, 217 (S.D. Ill. 2018)). In Ohio, privity may be established similarly upon proof of the issuance of an express limited warranty. 355 F. Supp. 3d at 596 ("Although privity is required for a contract-based implied warranty claim, federal courts applying Ohio law readily have found the privity requirement to be satisfied where the manufacturer issued a written warranty covering the vehicle in question and the claims are based on warranty-covered defects." (citing *Roxy Home*

*Improvement, LLC v. Mercedes-Benz USA, LLC*, No. 17-01817, 2018 WL 1705800, at *5 (N.D. Ohio Apr. 9, 2018)). The same showing also may be made to overcome a privity defense under Tennessee law. *Bishop v. DeLaval Inc.*, 466 F. Supp. 3d 1016 (W.D. Mo. 2020) ("Defendant DeLaval Inc. Plaintiffs argue privity exists because Defendants made binding express warranties, forming a unilateral contract. Defendant DeLaval Inc. does not deny that the purchase agreements contain a limited warranty [issued by the defendant, and it] cites no binding precedent under the relevant states' laws that would mandate a finding under these facts that Plaintiffs have not sufficiently alleged Defendants are in privity with [the ultimate purchasers].").

New York recognizes a third-party beneficiary exception to the privity requirement, which is particularly apposite in the context of cases involving a manufacturer with an extensive established network of authorized dealers that sell its cars. Resolving the applicability of that exception also is a fact-intensive exercise not amenable to resolution at the pleading stage. *See Morales v. Toyota Motor Sales, U.S.A., Inc.*, No. 19-01611, 2020 WL 6440486, at *6 (C.D. Cal. Oct. 14, 2020) ("Plaintiff claims that Toyota has contracts with its dealerships that were designed for and intended to benefit the ultimate customers only. These allegations, which concern the existence of a contract as well as a sufficiently immediate benefit intended for Plaintiff, are sufficient to establish that Plaintiff is an intended third-party.") (citations omitted).

However, absence of privity is an insurmountable bar to implied warranty claims under Washington law. *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 355 F. Supp. 3d at 596 ("Washington law requires privity for viable claims of breach of an implied warranty of merchantability against a car maker, and the plaintiffs concede that they are not in vertical privity with FCA US, LLC." (citing *Johnson v. Metro-Goldwyn-Mayer Studios Inc.*, No. 17-541, 2017 WL 3313963, at *6 (W.D. Wash. Aug. 3, 2017); *Tex Enterprises, Inc. v. Brockway Standard, Inc.*,

149 Wash. 2d 204, 66 P.3d 625, 627-28 (2003)).  The same applies in Kentucky.  *Corder v. Ethicon, Inc.*, No. 19-273, 2020 WL 4194986, at *11 (E.D. Ky. July 21, 2020) (citing *Compex Int'l Co. v. Taylor*, 209 S.W.3d 462, 464 (Ky. 2006)).  Also in Wisconsin.  *T&M Farms v. CNH Indus. Am., LLC*, No. 19-0085, 2020 WL 1082768, at *5 (E.D. Wis. Mar. 5, 2020) ("In Wisconsin, the only contract claim that a buyer can pursue against a non-seller manufacturer of goods is a claim for breach of the manufacturer's express warranty." (citing *Lamont v. Winnebago Indus., Inc.*, 569 F. Supp. 2d 806, 816 (E.D. Wis. 2008); *Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.*, 148 Wis. 2d 910, 437 N.W.2d 213 (1989)).  Likewise in Alabama.  *Weidman v. Ford Motor Co.*, No. 18-12719, 2019 WL 3003693, at *3 (E.D. Mich. July 10, 2019) ("Plaintiffs Weidman [Alabama], Burton and Naasz allege that they purchased their trucks from independent Ford dealers, thus these Plaintiffs are not in privity with Ford and their implied warranty claims must fail." (citing *Rampey v. Novartis Consumer Health, Inc.*, 867 So. 2d 1079, 1087 (Ala. 2003)).

Similarly, under Arizona, Connecticut, and North Carolina law, the lack of privity is fatal to implied warranty claims.  *Lessin v. Ford Motor Co.*, No. 19-01082, 2020 WL 6544705, at *8 (S.D. Cal. Nov. 6, 2020) ("Plaintiffs do not dispute that Plaintiff Farlekas (CT) and Plaintiff Jensen (FL) lack privity required for their implied warranty claims because they did not purchase their Vehicles from Ford." (citing *Kahn v. Volkswagen of Am., Inc.*, 45 Conn. L. Rptr. 31, 2008 WL 590469, at *8 (Super. Ct. Feb. 13, 2008)); *Short v. Hyundai Motor Co.*, No. 19-0318, 2020 WL 6132214, at *9 (W.D. Wash. Oct. 19, 2020) (Plaintiffs bring new implied warranty claims under Arizona, Connecticut, and North Carolina law. All three states require vertical privity." (citing *Chaurasia v. Gen. Motors Corp.*, 212 Ariz. 18, 24, 126 P.3d 165, 171 (Ct. App. 2006); *Sharrard, McGee & Co., P.A. v. Suz's Software, Inc.*, 100 N.C. App. 428, 432, 396 S.E.2d 815, 818 (1990)).  Privity also is an insurmountable bar in Idaho.  *Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d

601, 612 (E.D. Mich. 2017) ("Both Idaho and Florida law require privity between a buyer and a seller to prevail on an implied-warranty claim." (citing *Am. W. Enterprises, Inc. v. CNH, LLC*, 155 Idaho 746, 316 P.3d 662 (2013)).

### 3. Pre-Suit Notice

GM argues that the implied warranty claims under the laws of Arizona, Illinois, Indiana, Michigan, Minnesota, New York, North Carolina, Ohio, Pennsylvania, and South Dakota (Counts 9, 37, 39, 54, 58, 71, 74, 77, 86, 92), all must be dismissed because the plaintiffs failed to provide required "pre-suit notice" of those claims to the defendant. That argument, however, flies in the face of the plain facts alleged in the CACAC, where the plaintiffs in each of those states alleged that they presented their vehicles to the defendant's dealerships for repairs, complaining of the same transmission problems that form the basis of this suit, and most of them did so more than once (some as many as a dozen times). GM's position that it was deprived of a commercially reasonable opportunity to remedy the defect flatly is contradicted by those allegations of repeatedly frustrated efforts by the plaintiffs to seek repairs.

The parties agree that U.C.C. 2-607, as uniformly enacted by the various states, requires that the aggrieved buyer of a product "'must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.'" *Reid v. Gen. Motors LLC*, No. 19-13018, 2020 WL 5819579, at *4 (E.D. Mich. Sept. 30, 2020) (quoting Michigan Compiled Laws § 440.2607(3)(a)). "Two policies underlie this notice requirement. 'First, express notice opens the way for settlement through negotiation between the parties. . . . Second, proper notice minimizes the possibility of prejudice to the seller by giving him ample opportunity to cure the defect, inspect the goods, investigate the claim or do whatever may be necessary to properly defend himself or minimize his damages while the facts are fresh in the

minds of the parties.'"  *Ibid.* (quoting *Standard All. Indus., Inc. v. Black Clawson Co.*, 587 F.2d 813, 826 (6th Cir. 1978)).

Under Arizona, North Carolina, Ohio, and Pennsylvania law, the filing of a civil action is deemed to satisfy the notice requirement.  *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 975-976 (N.D. Cal. 2014) (citing *Hearn v. R.J. Reynolds Tobacco Co.*, 279 F. Supp. 2d 1096 (D. Ariz. 2003); *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St. 3d 40, 54, 537 N.E.2d 624, 638 (1989)); *Horne v. Novartis Pharm. Corp.*, 541 F. Supp. 2d 768, 786 (W.D.N.C. 2008) (citing *Maybank v. S. S. Kresge Co.*, 302 N.C. 129, 135, 273 S.E.2d 681, 685 (1981)); *In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, No. 03-4558, 2010 WL 2813788, at *39 (D.N.J. July 9, 2010) (citing *Bednarski v. Hideout Homes & Realty, Inc.*, 709 F. Supp. 90 (M.D. Pa. 1988); *Yates v. Clifford Motors, Inc.*, 283 Pa. Super. 293, 423 A.2d 1262 (1980)).

Presentation of a defective vehicle to an authorized dealer for repair is deemed sufficient notice to the manufacturer under Illinois law.  *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 494, 675 N.E.2d 584, 590 (1996) (citing *Overland Bond & Inv. Corp. v. Howard*, 9 Ill. App. 3d 348, 292 N.E.2d 168 (1972)).  Likewise in Indiana.  *Paper Mfrs. Co. v. Rescuers, Inc.*, 60 F. Supp. 2d 869, 881 (N.D. Ind. 1999) ("A buyer's verbal notice of defects in a machine to the selling agent, who, acting for the seller, undertook to remedy them, was sufficient, under a contract requiring written notice to seller, not to selling agent." (citing *Port Huron Engine & Thresher Co. v. Smith*, 21 Ind. App. 233, 52 N.E. 106 (1898)).

Moreover, as other courts aptly have noted, "[t]he purpose of the notification requirement is 'to defeat commercial bad faith, not to deprive a good faith consumer of his remedy.'"  *City of Wyoming v. Procter & Gamble Co.*, 210 F. Supp. 3d 1137, 1157-58 (D. Minn. 2016) (quoting Minn. Stat. § 336.2-607, UCC cmt. 4).  Thus, the Minnesota courts, among others, have held that

dismissal for want of notice is inappropriate where, as here, the defendant has made no showing that it was prejudiced by being deprived of a seasonable opportunity to remedy the problem. *Ibid.* The same reasoning applies with equal force to the claims brought under the laws of the other various jurisdictions.

As this Court previously has observed, upon surveying the law of Michigan and other states, some jurisdictions have construed the notice requirement more strictly. *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 446 F. Supp. 3d 218, 226 (E.D. Mich. 2020) ("Plaintiffs' argument is inconsistent with case law in which courts in both Michigan and Florida, applying their respective state laws, have dismissed breach-of-warranty claims for failure to comply with the pre-suit notice requirement.") (quotations and citations omitted). The South Dakota courts likewise hold to a stricter view. *In re Polaris Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 18-0939, 2020 WL 919259, at *5 (D. Minn. Feb. 26, 2020) ("Courts in [South Dakota and similar jurisdictions] applying their respective laws, require plaintiffs to provide defendants pre-suit notice, and those courts dismiss breach-of-warranty claims when plaintiffs fail to comply with the pre-suit notice requirement.").

Nevertheless, "[o]rdinarily, '[w]here the buyer gives some notice of the breach, the issues of timeliness and sufficiency are questions of fact.'" *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 446 F. Supp. 3d at 227 (citing *Iron Bridge Tools, Inc. v. Meridian Int'l Co., USA*, No. 13-61289, 2016 WL 8716673, at *13 n.4 (S.D. Fla. Feb. 2, 2016)). The amended complaint here amply alleges facts suggesting that all of the named plaintiffs gave "some notice" of the breach by presenting their vehicles for repair (in most cases, repeatedly), and adjudication of the notice defense therefore is inappropriate at this early stage, without the benefit of a fuller record to show whether the notice given was sufficient to alert the defendant to the problems with their

particular vehicles.  Particularly in the absence of any showing by the defendant that it was not afforded a commercially reasonable opportunity to address the alleged defect, dismissal on the pleadings is disfavored.  *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d at 1013 ("[T]he defendant has not pointed to any pleaded fact that shows that it has been deprived of a commercially reasonable opportunity to resolve the plaintiffs' claims of breach by any delay in the filing of this case, and the pendency of the litigation certainly does not foreclose any further timely efforts to cure. There is no basis to find that the express warranty claims are defectively pleaded for want of reasonable notice.").

### 4. Tennessee Plaintiff (Mark Kidd) (Count 95)

The defendant argues that Tennessee plaintiff Mark Kidd's implied warranty claim must be dismissed because he affirmatively alleges that he never conveyed any notice of the alleged defect to the defendant.  Am. Compl. ¶ 640 ("Plaintiff has not provided notice to GM or taken the vehicle to an authorized dealership as he lives over an hour from the nearest dealership.").  The law is not well developed on this point, but the Sixth Circuit has taken the view that Tennessee courts generally apply the notice requirement strictly.  *Bunn v. Navistar, Inc.*, 797 F. App'x 247, 254 (6th Cir. 2020) ("Tennessee courts have not recently spoken to this issue. And, although Tennessee may eventually articulate a different interpretation of its notice statute, at this time, we think it appropriate to assume that Tennessee courts would adhere to the traditional view that plaintiffs must allege that they provided notice of a breach (i.e., that the defendant will be asked to meet a claim for damages) in commercial cases such as this.").  Other federal courts have dismissed implied warranty claims under Tennessee law for failure to provide pre-suit notice.  *Cadena v. Am. Honda Motor Co.*, No. 18-4007, 2019 WL 3059931, at *10 (C.D. Cal. May 29, 2019) (citing *Smith v. Pfizer Inc.*, 688 F. Supp. 2d 735, 749-51 (M.D. Tenn. 2010)).  Although, as noted above, the sufficiency of notice may be a question of fact where some notice was given, this

Court previously has dismissed warranty claims where, as here, it is affirmatively alleged or admitted that no notice at all was given.  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 446 F. Supp. 3d at 225 (dismissing express warranty claim under Florida law).

The plaintiffs raise additional objections to the dismissal, contending that the lack of notice should be excused because (1) GM allegedly already had actual knowledge of the transmission defect, (2) any effort to seek repair would have been futile because the provided solutions for the persistent transmission problems have been ineffective, (3) the failure to make any effective repairs to any class vehicles shows that the warranty has failed of its essential purpose, and (4) enforcement of the warranty limitations, including the mileage and time limits, would be unconscionable.  However, those positions are undeveloped and unsupported by any pertinent legal authority or specific factual basis.

Kidd's implied warranty claim under Tennessee law will be dismissed.

### D.  Magnuson-Moss Warranty Act

GM argues that the Magnuson-Moss claim under federal law fails because it is well settled that the federal claim rises or falls with the underlying state law warranty claims, and here there are no viably pleaded claims under state law.

"The Magnuson-Moss Warranty Act provides a federal cause of action for a 'consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation . . . under a written warranty [or] implied warranty.'"  *Bennett v. CMH Homes, Inc.*, 770 F.3d 511, 512 n.1 (6th Cir. 2014) (quoting 15 U.S.C. § 2310(d)).  And, as GM contends, "[c]laims under the Magnuson-Moss Warranty Act 'stand or fall with . . . express and implied warranty claims under state law.'"  *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1227 (9th Cir. 2015) (quoting *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008)).

For the reasons stated above, GM's arguments for dismissal of all but a handful of the express and implied warranty claims are without merit.  Accordingly, its suggested basis for dismissal of the derivative federal claim also is unsound.

### E.  Fraud

Perhaps the plaintiffs' most serious allegation is that GM acted fraudulently by selling to consumers cars that it knew were defective — even dangerous — because of the faulty transmissions, while concealing the defects from the buying public.  GM attacks the fraud counts on several fronts.

### 1.  Fraudulent Omission (Common Law Fraud)

The elements of Michigan's tort of "silent fraud" are exemplary for the rule of decision on the common law claims of fraudulent omissions.  "Under Michigan law, the elements of fraudulent misrepresentation are: '(1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.'" *In re Korn*, 567 B.R. 280, 307 (Bankr. E.D. Mich. 2017) (quoting *Titan Ins. Co. v. Hyten*, 491 Mich. 547, 555, 817 N.W.2d 562, 567-68 (2012)).  "The elements of a silent fraud claim are similar, except that they also include the elements that there was a duty to disclose, and a failure to disclose." *Ibid.* (citing *Hord v. Envtl. Research Inst. of Michigan*, 463 Mich. 399, 412, 617 N.W.2d 543, 550 (2000) ("Turning to the question of silent fraud, we agree [that] [t]here must be circumstances that establish a legal duty to make a disclosure.")).

a. Particularity

As with any cause of action sounding in fraud, the pleader in federal court must comply with the heightened pleading requirements under Federal Rule of Civil Procedure 9(b).  Thus, "a plaintiff pleading a fraudulent omission must allege '(1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [the defendant] obtained as a consequence of the alleged fraud.'"  *Wozniak v. Ford Motor Co.*, No. 17-12794, 2019 WL 108845, at *3 (E.D. Mich. Jan. 4, 2019) (quoting indirectly *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012)).  The pleading will "suffice under the [Rule 9(b)] standard if it alleges that a manufacturer knew of a defect before sale, the various venues the manufacturer used to sell the product failed to disclose the defect, and that the plaintiffs would not have purchased the product or would have paid less for it had they known of the defect."  *Ibid.* (citing *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 751-52 (E.D. Mich. 2017)).  GM contends that the CACAC does not satisfy these requirements.  The Court disagrees.

The defendant professes to be unable to discern any concise description of a "defect" in the pleadings, but the allegations are plain.  The plaintiffs identify two specific model numbers of the defendants' transmissions that allegedly are defective, the 8L45 and 8L90.  They stated the models of cars and years of production in which those transmissions were used.  The CACAC alleges that the transmissions have a defect (whether by design or manufacture, allegedly is unknown), that causes them to experience premature wear, resulting in the mechanisms becoming clogged with metal filings, which presumably have no good effect on the functioning of the electrical, mechanical, and hydraulic mechanisms within.  As a result of the wear and contamination, the transmissions abruptly downshift or upshift to inappropriate drive gear settings for the elected

mode of travel, resulting in dangerous encounters where the vehicles abruptly surge, lurch, accelerate, decelerate, or fail to accelerate or decelerate in response to the drivers' control inputs. The resulting sudden excursions, they say, have led to numerous incidents of collisions or near misses with persons and objects in the immediate surroundings.  The plaintiffs, unsurprisingly, do not profess to understand fully the root cause of the abnormal wear or malfunctions, but they allege that the issues have been experienced by at least thousands of vehicles of the specified models.

The plaintiffs plainly alleged "who" knew about the defect: GM.  They also allege "what" it knew, which is that the transmissions have a persistent and widespread tendency to abnormally wear and malfunction as described above.  They back up that allegation with specific assertions that GM knew about the problems from (1) experience with a materially similar predecessor transmission design in the 6L50 model, (2) results of internal pre-production testing on the new models, (3) complaints by test drivers and early buyers when the cars first went to market, and (4) complaints submitted through the defendant's dealer network and via public authorities such as NHTSA.  They point to further evidence of GM's knowledge about the defect based on its issuance of more than 60 technical service bulletins (TSBs) over the span of five years advising dealers of potential customer complaints and promoting a variety of (allegedly ineffective) means to cure the hard shifting, hesitation, surging, and unexpected acceleration or deceleration.  Those TSBs consistently describe the symptoms of the defect in similar terms to the accounts in the CACAC, thus adequately alleging that GM was aware of and attempting to cope with the same defect that the plaintiffs have described.

The plaintiffs also specifically have alleged "what" was omitted from any public communication by the defendant about the class vehicles: all of GM's knowledge about the extent and severity of the issue affecting the class vehicle models equipped with the 8L45 and 8L90

transmissions. They allege that the full knowledge of how widespread the problem is, and what the root cause of the defect may be, still is within the exclusive possession of GM, because it never publicly has admitted the existence of any defect, and it never disclosed to potential customers the information that it alone had received evidencing the same.

Finally, the plaintiffs also sufficiently allege "when" GM failed to disclose material information, because they state that it never publicly did so before this suit was filed. The plaintiffs allege that if the information had been disclosed to them at the point of sale, they either would not have bought their cars, or would have paid much lower prices for them.

Those pleaded facts fully satisfy Rule 9(b)'s requirements mandating the plaintiffs to plead "that a manufacturer knew of a defect before sale, the various venues the manufacturer used to sell the product failed to disclose the defect, and that the plaintiffs would not have purchased the product or would have paid less for it had they known of the defect." *Wozniak*, 2019 WL 108845, at *3; *see also BK Trucking Co. v. Paccar, Inc.*, No. 15-2282, 2016 WL 3566723, at *8 (D.N.J. June 30, 2016) ("Plaintiffs have adequately alleged the existence of a defect in their vehicles, at least at this stage of the litigation: the ATS causes the Engine to shut down in a way that makes their trucks unfit for regular use, and the precise details of those systems are in the exclusive control of Defendants. Plaintiffs have further alleged that, if Defendants had disclosed to them the nature of the ATS and its impact on the Engine, they would not have bought vehicles equipped with the Engine or would not have paid over $100,000 for them.").

GM attempts to parse the allegations regarding the various sources of its alleged knowledge and consign each to immateriality, but that is not how pleadings are read by federal courts. The allegations are construed as a whole and read in a light most favorable to the plaintiffs, not piecemeal and in a vacuum as the defendant would take them.

The cases on which GM principally relies are distinguishable because they featured little or no coherent description of the defect or how it impacted the products at issue, beyond unsupported allegations that the devices were "defective."  *E.g.*, *DeCoteau v. FCA US LLC*, No. 15-00020, 2015 WL 6951296, at *1 (E.D. Cal. Nov. 10, 2015) (holding that whether the pleadings met the Rule 9(b) standard was a "close question" where the two named plaintiffs pleaded only that one had "experienced a problem in which the vehicle stopped moving while she was driving, as though it was stuck in park or neutral, although the engine continued to run," and another "experienced rough and jerking transmission shifts," and alleged that "when she stopped her Dart, the vehicle would automatically move backward," but the complaint only vaguely posited that "one or more design and/or manufacturing defects" contained in the DDCT caused these and a host of other problems," without suggesting any explanation for how the supposed defect could have caused the symptoms); *McQueen v. BMW of N. Am., LLC*, No. 12-6674, 2013 WL 4607353, at *7 (D.N.J. Aug. 29, 2013) ("Throughout her Complaint, Plaintiff merely identifies the effects of the alleged defect: namely that the Vehicle shifts into neutral contrary to operator command. There is no identification as to what precisely the defect is, other than a conclusory allegation that the transmission system is defective."); *Callaghan v. BMW of N. Am., LLC*, No. 13-CV-04794-JD, 2014 WL 6629254, at *3 (N.D. Cal. Nov. 21, 2014) ("The most that plaintiffs have said about the alleged 'defect' upon which their case is built is that the Mini Cooper S model vehicles' automatic transmissions are 'prone to premature failure.' While plaintiffs also say this premature failure is 'unavoidable,' and 'dangerous,' their allegations never descend below this 10,000 foot level of generality, and it is impossible to discern from the allegations the specific nature of this supposedly unavoidable, classwide 'defect.'").

Those cases have been distinguished easily by other federal courts from cases like this one, where expansive allegations of specific technical problems identified in TSBs were cataloged, and where the bulletins described the same symptoms of which the plaintiffs complained, and the plaintiffs also advanced at least a preliminary mechanical theory of how the defect caused the problems. *Loo v. Toyota Motor Sales, USA, Inc.*, No. 19-00750, 2019 WL 7753448, at *5 (C.D. Cal. Dec. 20, 2019) ("[T]he facts are readily distinguishable from those in *DeCoteau*, *Callaghan*, and *Eisen*. Unlike *DeCoteau*, in which plaintiffs merely alleged 'that [a] Transmission Defect exist[ed] and [was] responsible' for their vehicles' erratic movements, Plaintiffs here plead the 'mechanical details' of the alleged defect, explaining how Defendant's transmission system functions and why Plaintiffs believe the transmission systems in their vehicles are faulty. Plaintiffs further allege facts that plausibly suggest the existence of a PCM miscalibration in Defendant's transmission systems, including Defendant's own technical service bulletins and many third-party consumer complaints.").

GM also contends that the CACAC suffers from insufficient facts suggesting that it was aware of the defect before the class vehicles were sold. However, federal courts have found the allegations sufficient to suggest knowledge where technical issues were identified in far fewer TSBs than the number issued here; in some cases only one or two TSBs on point were found to suffice. *E.G.*, *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1093 (N.D. Cal. 2014). Here, GM allegedly issued more than 60 TSBs over a span of five years of production acknowledging issues with hard shifting, shuddering, hesitation, surging, and unexpected acceleration or deceleration by the class vehicles.

Other courts have recognized that the issuance of TSBs plausibly suggests that a defendant knew about a defect for some time preceding their promulgation, because it is reasonable to infer

that such technical guidance would be prompted by "an accretion of knowledge" that would take some time to gather persuasive weight, and more time necessarily would be taken up by investigating likely causes of a problem and formulating a remedy. *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 958, 2014 WL 2451291 (N.D. Cal. 2014). Here, the earliest service bulletin was issued in October 2015, and numerous related bulletins were issued thereafter over the years. Most of the plaintiffs allegedly bought their cars in late 2015 through 2018, although two were notably earlier (by the Washington plaintiff, Nicolette Covey, in February 2015, and by one Florida plaintiff, Tait Thomas, in September 2014). Even though a handful of the named plaintiffs allegedly bought their cars before the first TSB was issued, most were bought well after that first clue of the defendant's knowledge about the defect emerged. Moreover, the CACAC also alleges that experience with problems in a prior similar design (the 6L50), and internal testing of the new transmissions, significantly contributed to the "accretion of knowledge" that led to the October 2015 bulletin during a time period well before that advisory was issued, and allegedly even before any class vehicles were sold to the public.

At this early pleading stage, based on all of the facts noted above, plaintiff-favorable plausible inferences may be drawn that GM had substantial knowledge about the looming problems with its new transmissions before any of the plaintiffs' purchases were made. *Reniger v. Hyundai Motor Am.*, 122 F. Supp. 3d 888, 900 (N.D. Cal. 2015) ("[I]n addition to alleging Defendants had exclusive access to information about the stalling defect sooner, Plaintiffs allege a connection between pre-2014 TSBs aimed at the Santa Fes' throttle and Engine Control Module, the use of both (as documented in NHTSA complaints and the named plaintiffs' own allegations) to address stalling, and Hyundai's resulting knowledge (through monitoring the NHTSA database). Thus, even though Hyundai's most recent TSB post-dates Plaintiffs' Santa Fe purchases by at least

22 months, the knowledge Plaintiffs allege came significantly earlier. Defendants' arguments to the contrary stressing that there is no connection between these early TSBs and the stalling defect may (or may not) prove superior at a later stage of litigation. But at this stage, where the Court is bound to accept the pleadings as true, the pleadings form a plausible basis for belief that Defendants knew or reasonably should have known of a defect.").

### b. Exclusive Knowledge

GM argues that the plaintiffs have failed to allege that it had "exclusive" or "superior" knowledge of the supposed defect, particularly because many of the reports of transmission problems were collated by public authorities such as NHTSA or culled from internet forums that are accessible to the general public.  But the plaintiffs here have alleged much more than that. They also allege that GM had internal engineering experience with the 6L50 model and its similar issues, which should have alerted it to the potential for recurring issues in the 8L45 and 8L90 designs.  In addition, they allege that GM's internal testing uncovered problems with the new models before the class vehicles went to market.  Further, they allege that data recorded by class vehicles' electronic control modules, which was retrieved by dealer technicians during service visits and reported to GM under directions included in the service bulletins that GM issued, provided further information exclusively to the defendant about operational failures in the transmissions.  Am. Compl. ¶ 134.  Moreover, the evidence of the many TSBs advising of specific transmission issues supports a fair inference that GM relied on an "accretion of knowledge" collated from its own internal testing and engineering reports and complaints and data received exclusively by it through its dealer channels, which prompted it to issue those repair bulletins. None of that information regarding the full extent of the defect allegedly was disclosed to the plaintiffs or the general public at any time before they bought their cars.

c. Duty to Disclose

GM contends that under the laws of Illinois, Michigan, New York, Ohio, and Pennsylvania, it could not have had any duty to disclose any knowledge of the defect because it did not engage in any sales transaction directly with the plaintiffs.  It also argues that under Maine, Missouri, New Jersey, and South Carolina law, a duty to disclose only arises in the context of certain specific types of "fiduciary" relationships.  The cases on point have held to the contrary, where the plaintiffs plausibly alleged that the defendant either had exclusive knowledge of a defect, or the defect allegedly implicates vehicle safety.  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d at 1003 (applying Missouri, New York and Pennsylvania law); *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *19-20 (D.N.J. May 8, 2017) ("[T]he Court concludes that the New York, California, Colorado, Connecticut, Florida, Indiana, Kansas, Michigan, Minnesota, New Hampshire, Maryland, North Carolina, Pennsylvania, Washington and Nevada Plaintiffs have sufficiently pled a duty to disclose [based on exclusive and superior knowledge of the defect] and the Court will not dismiss their common law fraud claims.  The Court comes to the same conclusion as to the Georgia, Illinois, Ohio, South Carolina, and Texas Plaintiffs. In those jurisdictions, Defendant owed a duty to disclose safety defects."); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 960 (N.D. Cal. 2014) ("As for Ford's contention that a safety risk from a broken rearview camera is not that significant because there are many cars today and during the relevant period that do not have such camera, that argument is also unpersuasive.  Ford's position fails to take into account that a safety risk can arise by virtue of the fact that there is a safety feature in a product that a consumer comes to depend upon (or at least a reasonable jury could so find).  Accordingly, for 12(b)(6) purposes, the Court concludes that a reasonable jury could find a safety concern here with respect to MFT that gives rise to a duty to

disclose.") (applying California, Alabama, Arizona, Colorado, Connecticut, Florida, New Jersey, New York, North Carolina, Ohio, Pennsylvania, and Texas law); *see also Granillo v. FCA US LLC*, No. 16-153, 2016 WL 9405772, at *7 (D.N.J. Aug. 29, 2016) ("Plaintiffs allege that they would not have purchased their Jeep Cherokees, or would have paid less for them, had they known that their vehicles would experience the symptoms of the Transmission Defect. Indeed, any reasonable consumer would find the alleged symptoms material, especially because such symptoms raise safety concerns — they purportedly caused Plaintiffs' vehicles to behave erratically and the Granillos' vehicle to shut down on the freeway.").

### d. Economic Loss Doctrine

GM argues that the common law and statutory consumer fraud claims are barred by the so-called "economic loss doctrine" adopted in some jurisdictions, which bars plaintiffs from recovering in tort for losses consisting merely of an impairment of the benefit in a contractual bargain with the defendant (i.e., having overpaid for a substandard product). GM contends that this rule of law applies to bar claims brought by plaintiffs from Kentucky, Maine, Minnesota, Missouri, New Jersey, New York, North Carolina, Pennsylvania, and South Carolina. As the plaintiffs point out, federal courts have recognized that significant public policy concerns weigh heavily against the overextension of this limiting doctrine. *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 435-36 (S.D.N.Y. 2017) ("'[T]he economic loss doctrine is premised on the notion that parties to a contract may protect themselves from negligence or defective products by negotiating the liability terms of the contract. We believe that in both theory and practice, it is impracticable, if not impossible, for parties to negotiate terms regarding what happens if one of them is intentionally deceiving the other. . . . The notion that parties are free to allocate risks of negligence or defect fails when one party is intentionally deceiving the other.'") (quoting

*O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 278 (E.D. Pa. 2003)).  It is unsurprising, therefore, that in almost all of the jurisdictions in question, the evolution of the case law through the decisions on point has resulted in the doctrine being cabined to bar only actions sounding in negligence and other unintentional torts, not intentional fraud.  And in other cases exceptions have been recognized where a defendant deliberately conceals information to induce the plaintiff to conclude a bargain, or to obfuscate product safety concerns.

Federal and state decisions on point have recognized that in Maine, Kentucky, New Jersey, North Carolina, and Pennsylvania, the economic loss doctrine has not been extended beyond embracing specific causes of action that are not analogous to fraudulent omission, or relevant exceptions have been recognized for fraud in the nature of an inducement to enter into a contract (i.e., deceptively to persuade a customer to buy or overpay for a defective car), or in cases where the information withheld concerns a safety-related defect.  *New London Tobacco Mkt., Inc. v. Kentucky Fuel Corp.*, No. 12-91, 2019 WL 5107105, at *15 (E.D. Ky. June 26, 2019), *report and recommendation adopted*, 2019 WL 4597500 (E.D. Ky. Sept. 23, 2019), *reconsideration denied*, 2020 WL 1970606 (E.D. Ky. Apr. 24, 2020) ("Although the Kentucky Supreme Court in *Nami* adopted the economic loss rule for fraud claims associated with breach-of-contract actions, *Nami* did not address fraudulent inducement claims like this one. *See Nami Res. Co., LLC v. Asher Land & Mineral, Ltd.*, 554 S.W.3d 323, 335-36 (Ky. 2018).  Both compensatory and punitive damages remain available on Plaintiffs' fraudulent inducement claim."); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 355 F. Supp. 3d at 589-93 (denying motion to dismiss consumer fraud claims under Michigan, New Jersey, and North Carolina law); *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *18 (D.N.J. May 8, 2017) ("New York law does not apply the economic loss doctrine to claims of misrepresentation and fraud. New Jersey, Florida, North

Carolina, Pennsylvania, New Hampshire, and South Carolina law also do not apply the economic loss doctrine to fraud based claims when a plaintiff alleges fraudulent inducement or that the defendant violated an extrinsic duty."); *id.* at *23 ("[T]he economic loss doctrine does not bar Plaintiffs' fraud based claims. Th[e] [inducement and safety] exceptions to the doctrine's applicability extend to statutory fraud and/or consumer protection claims as well. Accordingly, based on this Court's analysis above, as well as the relevant case law, the Court concludes that the economic loss doctrine does not bar the Michigan, New Jersey, North Carolina, and Pennsylvania Plaintiffs' statutory fraud and/or violation of consumer protection law claims."); *Coastal Grp., Inc. v. Dryvit Sys., Inc.*, 274 N.J. Super. 171, 177, 643 A.2d 649, 652 (App. Div. 1994) ("Although the trial court correctly relied upon *Spring Motors Distributors, Inc. v. Ford Motor Co.*, 98 N.J. 555, 489 A.2d 660 (1985), in dismissing plaintiff's negligence claim, a ruling which plaintiff does not challenge, the court erred in precluding plaintiff from pursuing its claim for fraud and misrepresentation. *Spring Motors* only precludes claims brought under tort principles which are inconsistent with the remedies authorized under the UCC; however, the UCC expressly preserves a buyer's right to maintain an action for fraud and misrepresentation."); *Debbie Elliot, Inc. v. Hancock*, No. 05-280, 2005 WL 3340067, at *2 (Me. Super. Oct. 27, 2005) ("Hancock argues that Maine adopted the economic loss doctrine in *Oceanside at Pine Point Condominium Owners Association v. Peachtree Doors, Inc.*, 659 A.2d 267, 270 (Me. 1995), to broadly prohibit tort recovery for pure economic losses when the relationship between the parties is governed by a contract.  Although *Oceanside* does recognize the economic loss doctrine, it does so in the context of product liability when a defective product does not cause personal injury or damage to other property. Furthermore, Hancock's contention that tort recovery cannot be had for a breach of contract is inconsistent with Restatement (Second) of Torts § 768. This section provides tort

recovery for intentional and improper interference with prospective contractual relations between a third party and another who is a competitor.").

The decisions principally cited by the defendant applying New Jersey and Missouri law are inapposite because they involved claims of negligent misrepresentation, strict product liability (absent personal injury), and ordinary negligence, not, as pleaded here, intentional fraudulent omissions.  *Graham Const. Servs. v. Hammer & Steel Inc.*, 755 F.3d 611, 616 (8th Cir. 2014) (negligent misrepresentation); *Noble v. Porsche Cars N. Am., Inc.*, 694 F. Supp. 2d 333, 336 (D.N.J. 2010) (strict liability); *Jacobson Warehouse Co., Inc. v. Schnuck Markets, Inc.*, No. 17-00764, 2017 WL 5885669, at *4 (E.D. Mo. Nov. 29, 2017) (ordinary negligence).  Those decisions do not support the proposition that the doctrine would be applied in those jurisdictions to bar statutory or common law consumer fraud claims.  Likewise, more recent decisions by North Carolina courts than those cited by GM have cabined the application of the rule to negligence claims.  *Bradley Woodcraft, Inc. v. Bodden*, 251 N.C. App. 27, 32, 795 S.E.2d 253, 258, (2016) ("Significantly, however, *North Carolina State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 240 S.E.2d 345 (1978) and its progeny — despite the use of the broad term 'tort' in Ports Authority's discussion of the economic loss rule — have been limited in their application to merely barring negligence claims.").  The Third Circuit's anticipatory interpretation of Pennsylvania law espoused in *Werwinski v. Ford Motor Co.,* 286 F.3d 661 (3d Cir. 2002), which GM cited, has been expressly disclaimed and abandoned as erroneous based on subsequent definitive rulings by the state's appellate courts.  *Kantor v. Hiko Energy, LLC*, 100 F. Supp. 3d 421, 427 (E.D. Pa. 2015) ("*Werwinski* no longer has any vitality. When it was decided, there was no guidance from Pennsylvania courts, leading the Third Circuit to predict how Pennsylvania's highest court would rule. The Pennsylvania courts, the highest court and the intermediate appellate courts, had not yet

addressed the issue. Since *Werwinski* issued, the Pennsylvania courts have spoken. They have held that the economic loss doctrine does not apply to UTPCPL claims.").

That leaves Minnesota as the only jurisdiction in question.   That state's iteration of the economic loss rule has been codified by Minnesota Statutes § 604.101, which states: "A buyer may not bring a common law misrepresentation claim against a seller relating to the goods sold or leased unless the misrepresentation was made intentionally or recklessly. The economic loss doctrine applies to claims only as stated in this section. This section does not alter the elements of a product defect tort claim or a common law claim for misrepresentation."   Minn. Stat. § 604.101(4), (5).   Recent decisions on point have construed the plain language of this statute as exempting claims of intentional fraud from the doctrinal bar.   *Woods v. K.R. Komarek, Inc.*, No. 15-4155, 2017 WL 2312868, at *5 (D. Minn. May 26, 2017) (citing *Johnson v. Bobcat Co.*, 175 F. Supp. 3d 1130, 1144-45 (D. Minn. 2016)).   Thus, the doctrine does not bar the intentional omission claims here.

## 2.  Statutory Fraud Claims

The parties do not identify any material distinctions among the various state statutes regulating consumer fraud.  Arizona's Consumer Fraud Act is a typical specimen.  "[T]o succeed on a claim of consumer fraud, [under Arizona's Consumer Fraud Act] a plaintiff must show (1) a false promise or misrepresentation made in connection with the sale or advertisement of 'merchandise,' and (2) consequent and proximate injury resulting from the misrepresentation." *Watts v. Medicis Pharm. Corp.*, 239 Ariz. 19, 28, 365 P.3d 944, 953 (2016) (quoting Ariz. Rev. Stat. § 44-1522(A)).

GM's arguments for dismissal of the statutory consumer fraud claims fixate on the same alleged defects in particularity of the pleadings discussed above, relating to adequate allegations

describing the nature of the defect and the defendant's possession of pre-sale knowledge that was not disclosed.  All of those arguments for dismissal of the statutory fraud claims are without merit for the same reasons already noted.

### F.  Consumer Protection Act Claims

State statutes creating a private right of action for consumers alleging unfair trade practices generally require allegations of a false statement or material omission by a seller that tends to deceive a consumer.  *E.g.*, Mich. Comp. Laws § 445.903(1)(s); Ohio Rev. Code § 1345, *et seq.*; Cal. Civ. Code § 1770(a)(5), (7).  GM argues generally that the counts of the CACAC alleging violations of these state laws must be dismissed for want of particularity of the fraud allegations. That argument lacks merit for the reasons discussed above.

GM also brings specific challenges based on the particulars of various state law requirements concerning pre-suit notice, forms of action, available remedies and discrete features of certain states' laws.

### 1.  Class Claims

The defendant argues that the "class claims" asserted under Georgia's Fair Business Practices Act, Louisiana's Unfair Trade Practices and Consumer Protection Law, South Carolina's Unfair Trade Practices Act, and Tennessee's Consumer Protection Act (Counts 29, 46, 87, 93), all must be dismissed because those state laws forbid class proceedings.

The Court disagrees.  Georgia's class action prohibition is a procedural rule that does not affect the viability of class claims brought in a federal forum.  "The handful of federal courts that have confronted the issue have held that Georgia's statutory class action prohibition for consumer suits falls on the 'procedural' side of the line drawn by Justice Stevens [in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010),] and therefore does not run afoul of the

Rules Enabling Act."  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 355 F. Supp. 3d at 600 (citing *Amin v. Mercedes-Benz USA, LLC*, 301 F. Supp. 3d at 1292) ("Federal Rule 23 does not 'abridge, enlarge or modify any substantive right' of the parties under the GFBPA."); *see also Andren v. Alere, Inc.*, No. 16-1255, 2017 WL 6509550, at *22 (S.D. Cal. Dec. 20, 2017) ("[A] representative action for monetary relief is not barred under Georgia or Colorado law.").  Other federal courts have reached the same conclusion and held that the class proceeding bars of the other states in question pose no obstacle to a Rule 23 proceeding in federal court.  *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 92 UCC Rep. Serv. 2d 754, 2017 WL 1902160, at *24 (D.N.J. May 8, 2017) ("Defendant's argument that the Colorado, Georgia, and South Carolina Plaintiffs' claims must be dismissed because those states do not recognize classwide claims for damages is unpersuasive . . . . [T]he Supreme Court has addressed this issue and has held that matters may proceed as putative class actions, regardless of whether state statutes prohibit such claims, so long as the application of Fed. R. Civ. P. 23 does not 'abridge, enlarge or modify any substantive right.'" (quoting *Shady Grove*, 559 U.S. at 407 (2010); 28 U.S.C. § 2072(b)) (allowing class claims under South Carolina law to proceed); *Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090, 1107, 2019 WL 4777891, at *10 (S.D. Fla. 2019) (Tennessee); *Reed v. Dynamic Pet Products*, No. 15-0987, 2016 WL 3996715, at *6 (S.D. Cal. July 21, 2016) (Louisiana).

## 2. Money Damages

GM argues that the Colorado Consumer Protection Act and Kansas Consumer Protection Act (Counts 17, 40) prohibit class actions to recover money damages.  The plaintiffs concede that their claims for class-wide money damages under the Colorado Consumer Protection Act (Count 17) are not viable.  That count will be dismissed in part.

The decisions on point applying Kansas law, however, have recognized that the consumer protection laws of that state expressly permit class actions for recovery of damages incurred as a

result of deceptive trade practices.  *Nieberding v. Barrette Outdoor Living, Inc.*, 302 F.R.D. 600, 614 (D. Kan. 2014) ("The [Kansas Consumer Protection Act (KCPA)] explicitly endorses the use of class actions to recover for violations of § 50-626 [prohibiting 'deceptive acts and practices']. K.S.A. § 50-634(d) provides that 'a consumer who suffers loss as a result of a violation of [the KCPA] may bring a class action for damages caused by an act or practice . . . Violating any of the acts or practices specifically proscribed in K.S.A. 50-626.'").  GM's argument for dismissal of the KCPA claim on that basis is without merit.  Moreover, for the same reasons noted above, the interposition of this state law procedural bar is inapposite in the context of prospective class claims brought in a federal forum.

### 3. Economic Loss Doctrine

GM argues that the economic loss doctrine bars claims under North Carolina's Unfair and Deceptive Trade Practices Act and Pennsylvania's Unfair Trade Practices and Consumer Protection Law.  For all of the same reasons and based on the same authorities cited in the preceding discussion of the common law and statutory consumer fraud claims, this argument is without merit and the consumer protection claims likewise are not barred.

### 4. Michigan Consumer Protection Act (Count 52)

GM argues that the claims under Michigan's Consumer Protection Act (MCPA) are barred by a statutory exception providing that the Act "does not apply to [any] transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States."  Mich. Comp. Laws § 445.904(1)(a). However, GM asserts this position without elaboration, and it merely posits, without citing any statutory authority, that car sales in Michigan "are 'specifically authorized under' the Michigan Vehicle code."  The plaintiffs concede that the case law is somewhat unsettled on this point. However, the most recent and carefully reasoned decision considering this argument expressed

- 42 -

skepticism when the same defendant urged application of the exception because, as here, it had not identified any supposedly operative statutory provision "authorizing" motor vehicle sales; historically, application of the exception by Michigan courts has involved careful parsing of the "authorizing" statute's language to ensure that it covers the transaction at issue. *In re Gen. Motors Air Conditioning Mktg. & Sales Practices Litig.*, 406 F. Supp. 3d 618, 642-43 (E.D. Mich. 2019), *reconsideration denied*, 2019 WL 5696697 (E.D. Mich. Nov. 4, 2019) (citing *Liss v. Lewiston-Richards, Inc.*, 478 Mich. 203, 732 N.W.2d 514 (2007)). Similar caution is called for in addressing the same undeveloped argument here, notwithstanding some persuasive authority supporting the defendant's position. The Court will not dismiss the MCPA claim as insufficiently pleaded, but GM may revisit the question on summary judgment with a properly developed argument.

### 5. Ohio Consumer Sales Practices Act (Count 75)

The defendant argues that the claims under Ohio's Consumer Sales Practices Act must be dismissed because that act "precludes class actions except for specific conduct previously deemed a violation under an Ohio Attorney General rule or state court proceeding." The plaintiffs assert that they can, if need be, replead the claim to allege that the defendant's conduct did contravene a prior authoritative pronouncement of its unlawfulness. However, the issue is premature at this stage of the case where class certification has not yet been sought, and the only issue properly before the Court today is whether the Ohio plaintiffs adequately have pleaded their individual claims. *See Raymond v. Avectus Healthcare Sols., LLC*, No. 15-559, 2020 WL 3470461, at *9 (S.D. Ohio Mar. 27, 2020). No argument has been made that the claims are defective as individually pleaded.

The defendant also argues that Ohio plaintiff Chi Kim Ho's claims must be dismissed as time barred. However, it is well settled that, "[t]he statute of limitations is an affirmative defense, and a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim."

*Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (citing Fed. R. Civ. P. 8(a), (c)). Moreover, as this Court previously has held, adjudication of a limitations defense at the pleading stage is particularly inappropriate where, as here, factual issues relating to concealment of the defect by the defendant potentially could impact whether it is estopped from asserting the limitations defense, or whether other exceptions to the defense could apply. *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-02744, 2018 WL 4352702, at *7 (E.D. Mich. Sept. 12, 2018).

### 6. California Claims

### a. Consumers Legal Remedies Act (Count 13)

The defendant argues that the claims under California's Consumers Legal Remedies Act (CLRA) must be dismissed because the plaintiffs failed to allege that they provided the defendant with written notice of their complaint as that statute requires.  However, in the CACAC, the California plaintiffs stated that they did provide the required notice, and that the statutory 30-day cure period had expired.  Am. Compl. ¶ 1174, ECF No. 41, PageID.2514 ("California Plaintiffs and California Sub-class Members provided Defendant with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a).  Defendant has failed to provide appropriate relief for its violations of the CLRA within 30 days.").  Because conditions precedent to suit need only be alleged in a general fashion, *see* Fed R. Civ. P. 9(c), "the Court is obligated at this stage of the pleadings to accept the summary allegation that notice sufficient to satisfy the statute was sent." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d at 1004.  "Moreover, the defendant has not cited any authority holding that the pre-suit notice required by section 1782 (which is a specific provision of the CLRA) is mandated before filing suit under [other California consumer protection or warranty laws]," and "[t]hose claims, therefore, do not implicate any pre-suit notice requirement."  *Ibid.*

b. Unfair Competition Law (Count 14)

The defendant contends that the claims for injunctive relief under California's Unfair Competition Law must be dismissed because the plaintiffs have "adequate remedies at law" in their claims under the CLRA and U.C.C.  But the cases on point have held otherwise and found that alternative pleading of UCL and legal claims is permissible.  *Aberin v. Am. Honda Motor Co., Inc.*, No. 16-04384, 2018 WL 1473085, at *9 (N.D. Cal. Mar. 26, 2018) ("AHM argues that plaintiffs cannot obtain equitable relief under the UCL because they have an adequate remedy at law. AHM is correct that some federal courts have so held. This Court joins the many other courts, however, that have reached the opposite conclusion, finding no bar to the pursuit of alternative remedies at the pleadings stage.") (citations omitted; collecting cases).

7. Injunctive Relief

a. Certain States

GM argues that the prayers for injunctive relief under Louisiana's Unfair Trade Practices and Consumer Protection Law and Oklahoma's Consumer Protection Act (Counts 46, 78), must be dismissed because there is "no private right of action" for injunctive relief under those enactments.  As to Oklahoma, the lone case cited by the defendant is inapposite because there the state court merely held that attorney fees allowed by the statute could not be awarded where the plaintiffs had sought only money damages, but had recovered nothing in their verdict, notwithstanding a jury finding nominally affirming that "some violation" of the statute had occurred.  *Tibbetts v. Sight 'n Sound Appliance Centers, Inc.*, 2003 OK 72, ¶ 15, 77 P.3d 1042, 1050 (Sept. 30, 2003).  That decision does not support GM's argument that injunctive relief categorically is disallowed by the statute.

The Louisiana decision that GM cited does support its position.  *Hurricane Fence Co. v. Jensen Metal Prod., Inc.*, 119 So. 3d 683, 688 (La. App. 5 Cir. 2013) ("[T]he right to injunctive

relief under LUTPA is available solely to the state through the Attorney General. *See* La. R.S. 51:1407.").   However, the question of what ultimate remedy may be awarded is not before the Court at this preliminary pleading stage, and the defendant has not advanced any argument suggesting that the claims under Louisiana law are defectively pleaded.

### b. Standing (All States)

GM argues that the plaintiffs lack "standing" to seek injunctive relief under the law of any jurisdiction because they have not plausibly alleged that they face any risk of prospective harm, e.g., by contemplating future purchases of the class vehicles.   But the CACAC plainly alleges the prospect of future harm where the plaintiffs assert that GM has met their demands for repairs only with temporary "band aid" fixes that will need to be repeated on future occasions, at the plaintiffs' expense, to maintain even a temporary semblance of normal operation in their vehicles.   As the Court has held on similar facts, "[t]he plaintiffs here adequately have alleged ongoing future harm based on their assertions that the class vehicles contain a serious safety defect rendering them unsafe to drive, which has not been remedied by the defendant's repeated failed attempts at repairs."   *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 355 F. Supp. 3d at 597 (citing *Amin v. Mercedes-Benz USA, LLC*, 301 F. Supp. 3d 1277, 1294 (N.D. Ga. 2018) ("[The plaintiffs allege] that they must periodically take their vehicles for service regarding the defect and that Mercedes (1) denies the existence of the defect and (2) charges Plaintiffs for non-permanent solutions.")).   "As the *Amin* court aptly held, the existence of an alleged defect, coupled with failed attempts at repairs, or 'band aid' fixes only, along with representations made after each repair that the vehicles are free from the defect, is sufficient to establish likely future harm resulting from similar unsatisfactory efforts by the defendant to skirt liability for the problem without an effective fix."   *Ibid.*

### G.  Unjust Enrichment

The parties do not identify any material distinctions in the rules of decision on this cause of action among the various states.  "[T]he typical elements of a cause of action for unjust enrichment are: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant accepted and retained the benefit; and (3) it would be unjust for the defendant not to pay the plaintiff the value of the benefit."  *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 671 (E.D. Mich. 2000) (applying *inter alia* California, New York, and Wisconsin law).  GM argues that one element common to the claims in every jurisdiction is not adequately pleaded, namely, that the plaintiffs cannot show that they conferred any benefit on the defendant where all of them bought their cars from third-party dealers.

In this case, as the Court has held in prior similar consumer auto defect suits, "[t]he plaintiffs adequately have pleaded that the defendant received a benefit (the inflated prices paid by them for their cars), that it knew it received it, and that it would be unfair for the defendant to retain it (because of its wrongful concealment of the defective [transmission] design, which all of the plaintiffs alleged would have led them to reconsider the purchase of their car, or to have paid less for it)."  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d at 1008.  That is all that they are required to allege in order to sustain a typical unjust enrichment claim at the pleading stage.

GM also "argues that all of the unjust enrichment claims must be dismissed because the plaintiffs cannot plausibly allege that any benefit was conferred on the defendant by their purchases of the vehicles where all of those purchases were from third-party dealers and not the defendant."  But, as this Court noted when rejecting the same argument in the *Monostable Gearshift* litigation, "'the courts dismiss such claims only where the plaintiffs fail to allege facts showing that they

have bestowed some sort of benefit upon the defendant that the defendant ought not keep in equity and good conscience.'"  280 F. Supp. 3d at 1008-09 (quoting *Cardizem*, 105 F. Supp. 2d at 671); *see also In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 869, 897 (E.D. Mich. 2014) ("[A]s indirect purchasers, any benefit conferred by the IPPs was to others in the chain of distribution, not Defendants, and the parties dispute whether the lack of direct contact dooms the unjust enrichment claims. The Court holds that it does not.") (applying the law of New York and other states); *Cardizem*, 105 F. Supp. 2d at 671 ("Whether or not the benefit is directly conferred on the defendant is not the critical inquiry; rather, the plaintiff must show that his detriment and the defendant's benefit are related and flow from the challenged conduct.").

GM also argues that the plaintiffs cannot proceed on an unjust enrichment theory where they affirmatively plead the existence of an express contract (the limited warranty) governing the parties' relationships.  But alternative pleading of contract and quasi-contract claims routinely is permitted, and particularly is appropriate, where the defendant explicitly disclaims the availability of a contractual remedy, as it has done here by vigorously asserting its warranty coverage defense. *Solo v. UPS Co.*, 819 F.3d 788, 797 (6th Cir. 2016); *see also Johnston v. PhD Fitness, LLC*, 2018 WL 646683, at *6 (E.D. Mich. Jan. 31, 2018) ("Even after dismissing the warranty claims, it might remain an open question whether an express agreement governs the parties' conduct.").

Finally, GM contends that "the plaintiffs cannot proceed on an unjust enrichment theory where their consumer fraud and breach of warranty claims offer them an adequate remedy at law for any losses produced by the alleged defect."  However, "unjust enrichment claims routinely are allowed to proceed when pleaded in the alternative to other viable claims for relief."  *Id.* at 1009 (citing *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) ("Defendants contend that equitable remedies such as unjust enrichment will not be granted where an adequate remedy

at law exists," but the plaintiffs "are clearly permitted to plead alternative theories of recovery," and "[c]onsequently, it would be premature at this stage of the proceedings to dismiss the . . . unjust enrichment claims on this basis.") (denying motion to dismiss unjust enrichment claims pleaded under the laws of 50 states)).

### G. Class Claims

GM's arguments premised on potential issues with class certification are procedurally premature where no motion to certify a class has yet been filed, and the Court has not received or invited complete briefing on all of the pertinent factors under Rule 23.  Those arguments may be well taken in due course, but they implicate issues that are not yet properly before the Court.  *Yang v. Somchai & Co.*, No. 19-12742, 2020 WL 6689759, at *4 (D.N.J. Nov. 13, 2020) ("[T]he Court agrees with Plaintiff that Defendants' arguments regarding class certification are premature at this time and have little bearing on whether the Amended Complaint should be dismissed. Accordingly, the Court declines to dismiss the Amended Complaint on the basis that its class action claims fail to meet the requirements of Rule 23 of the Federal Rules of Civil Procedure.") (citing *Neuss v. Rubi Rose, LLC*, No. 16-2339, 2017 WL 2367056, at *10 (D.N.J. May 31, 2017) ("Motions to strike . . . are generally disfavored . . . at the motion to dismiss stage, and the Third Circuit has acknowledged that there are rare few cases where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met."); *Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d 698, 707 (D.N.J. 2013) ("[N]umerous cases in this District have emphatically denied requests to strike class allegations at the motion to dismiss stage as procedurally premature.")).

### III.  Conclusion

The plaintiffs adequately have pleaded all of their claims, with the exceptions noted above.

Accordingly, it is **ORDERED** that the defendant's motion to dismiss (ECF No. 53) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the following claims are **DISMISSED WITH PREJUDICE**: (1) the claims for class-wide money damages under the Colorado Consumer Protection Act (Count 17); (2) the implied warranty claims of all plaintiffs under the laws of Alabama, Arizona, Connecticut, Idaho, Kentucky, North Carolina, Washington, and Wisconsin (Counts 6, 9, 22, 34, 45, 74, 101, 104); and (3) Tennessee plaintiff Mark Kidd's implied warranty claim (Count 95).

It is further **ORDERED** that the motion is **DENIED** in all other respects.

It is further **ORDERED** that the parties appear for a status teleconference **on December 14, 2020 at 10:00 a.m.** to re-establish case management benchmarks.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  November 30, 2020