# Exhibit A

# Tab 7



Deposition of:
# Lorin Hitt, Ph.D.

*December 22, 2021*

In the Matter of:

# Won, Wesley et al. v. General Motors, LLC

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

Page 1

1                    IN THE UNITED STATES DISTRICT COURT

2                    FOR THE EASTERN DISTRICT OF MICHIGAN

3                              SOUTHERN DIVISION

4

5       WESLEY WON, et al., individually   ) Civil Action No.

        and on behalf of all others       ) 2:19-cv-11044

6       similarly situated,                )

                                           )

7                    Plaintiffs,           )

                                           )

8            v.                            )

                                           )

9       GENERAL MOTORS, LLC,               )

                                           )

10                   Defendant.            )

        -----------------------------------)

11

12                    REMOTE PROCEEDINGS OF THE

13      VIDEOTAPED DEPOSITION OF LORIN MOULTRIE HITT, PH.D.

14                    WEDNESDAY, DECEMBER 22, 2021

15

16          ***CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER***

17

18

19

20

21

22

23      REPORTED BY NANCY J. MARTIN

24      CSR. NO. 9504, RPR, RMR

25

Page 2

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF MICHIGAN

3                     SOUTHERN DIVISION

4

5    WESLEY WON, et al., individually  ) Civil Action No.

     and on behalf of all others       ) 2:19-cv-11044

6    similarly situated,                )

                                        )

7              Plaintiffs,              )

                                        )

8         v.                            )

                                        )

9    GENERAL MOTORS, LLC,               )

                                        )

10             Defendant.               )

     ----------------------------------)

11

12                     - - -

13              WEDNESDAY, DECEMBER 22, 2021

14                     - - -

15

16      ***CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER***

17

18       Videotaped Remote Deposition of LORIN MOULTRIE

19    HITT, PH.D., beginning at 10:10 a.m., before Nancy J.

20    Martin, a Registered Merit Reporter, Certified

21    Shorthand Reporter.

22

23

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 8

1          Q.   And what counsel?

2          A.   Kirkland & Ellis counsel, Mr. Pixton

3     Mr. Ribot.

4          Q.   And when you said "research team," who is

5     that?

6          A.   Those are folks at Cornerstone Research.

7          Q.   And who are those folks at Cornerstone

8     Research?

9          A.   So the -- it would be Samid Hussain, Anna

10    Shakatko, Collin Shanks, Fang Guo were the core team,

11    and there may have been others involved at various

12    times.

13         Q.   Okay.  Before I go further, let me make sure

14    I understand all the spellings of their names.

15              I think I got Collin Shanks.  Is it S-c-h

16    or S-h?

17         A.   S-h, I believe.

18         Q.   Okay.  And is Samid Hussain S-a-m-i-d,

19    H-u-s-s-e-i-n?

20         A.   a-i-n, I believe.

21         Q.   Okay.  S-a-m-i-d?

22         A.   S-a-m-i-d.

23         Q.   Okay.  I missed the third name that you

24    mentioned.

25         A.   Anna Shakatko I believe was the third one.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 9

1          Q.   Can you spell her name.

2          A.   A-n-n-a, S-h-a-k-a-t-k-o, I believe.  I may

3     be getting that wrong.

4          Q.   And I think the third -- or the last name was

5     Fang Guo.

6          A.   Fang, F-a-n-g, G-u-o.

7          Q.   Okay.  And they are all folks at Cornerstone?

8          A.   Yes.

9          Q.   And when you said "research team," did they

10    work with you on your report in this case?

11         A.   They performed analysis and research tasks at

12    my direction, yes.

13         Q.   So they did work with you on your report on

14    this case?

15         A.   Yes.  As I described, they performed research

16    at my direction.

17         Q.   Okay.  What -- do you know the educational

18    background of Samid Hussain?

19         A.   I think he's a Ph.D. economist.

20         Q.   And what about Collin Shanks?

21         A.   That, I don't know.

22         Q.   What about Fang Guo?

23         A.   I also don't know.

24         Q.   What about Anna Shakatko?

25         A.   I believe she's an M.B.A., but I'm not sure.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 12

1     Q.  Okay.  Did you in this case load up in Our

2    Studio and run the code?

3     A.  Yeah.  I ran one of the modules, but it was

4    the research team that was primarily responsible for

5    executing the code and doing the various research

6    tasks related to the code.

7     Q.  Okay.  So who at the research team

8    specifically worked on this code?  Because as we all

9    kind of know already, there's some questions about the

10   code for the simulation.  I'd like to know who was

11   doing that work so I can ascertain what their

12   background was and the time they spent on this

13   project.

14       Can you give me that person's name?

15       MR. PIXTON:  Object to the form.

16       THE WITNESS:  So as I described earlier, the

17   person who was -- at least I would identify as most

18   responsible for the simulation code would be Collin

19   Shanks who was working on that.  He likely had other

20   people assisting that I did not interact with.  So I

21   don't know for certain.

22   BY MR. MCNAMARA:

23     Q.  Do you know how many likely people he had

24   interacting with him on that?

25       MR. PIXTON:  Object to form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 13

1              THE WITNESS:  I don't know.

2       BY MR. MCNAMARA:

3          Q.  Do you know what their educational

4       backgrounds were?

5              MR. PIXTON:  Object to form.

6              THE WITNESS:  I don't know.

7       BY MR. MCNAMARA:

8          Q.  Do you know how much time he spent working on

9       the market simulation code?

10         A.  I don't know.

11         Q.  Do you know how much time he spent working on

12      the market simulation that Mr. Eichmann did in this

13      report?

14         A.  No, I don't know.  I generally don't know how

15      Cornerstone allocates their time.

16         Q.  With regards to hedonic analysis, I think you

17      think -- let me try that again.

18             With regards to hedonic analysis and Fang

19      Guo, do you know if Fang Guo had anyone supporting on

20      that analysis?

21             MR. PIXTON:  Objection.  Form.

22             THE WITNESS:  So I would believe so, but I

23      don't know for certain.

24      BY MR. MCNAMARA:

25         Q.  Okay.  Do you know how much time Fang Guo

Page 14

1    spent on the hedonic analysis part of Mr. Eichmann's

2    report?

3         A.   No.  As I said earlier, I generally don't

4    know Cornerstone's time allocation.

5         Q.   Okay.  What, if anything, did Samid Hussain

6    do with respect to supporting you in your expert

7    report in this case?

8         A.   He participated in discussions with the team.

9         Q.   Any specific part of your report you can

10   point to Mr. Hussain's contribution on?

11             MR. PIXTON:  Object to the form.

12             THE WITNESS:  I think I characterized it

13   broadly, which is that he was involved in discussing

14   the report at a high level.

15   BY MR. MCNAMARA:

16        Q.   You did characterize it broadly, that's why I

17   went more specifically.

18             What specifically, if anything, did Samid

19   Hussain, who is a Ph.D. in economics and the only one

20   whose background you really understood, what did he do

21   on this case?

22             MR. PIXTON:  Object to the form.

23             THE WITNESS:  I believe I answered that

24   question, which is he participated in discussions

25   about the -- regarding the report across all the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 15

1    areas.

2    BY MR. MCNAMARA:

3        Q.   Okay.   And I think you said Anna Shakatko was

4    an M.B.A.?

5        A.   I believe so.

6        Q.   So what -- can you tell me how Anna supported

7    you in your report in this case?

8        A.   She was also involved in broader discussions

9    of the case and involved in managing some of the other

10   folks.

11       Q.   Anything else than broader discussions?

12   Discussions as to what?   Where was her M.B.A. at all

13   used?

14            MR. PIXTON:   Object to the form.

15            THE WITNESS:   So when working with the

16   research team, there are certain people who are

17   working on specific tasks and certain people who are

18   responsible at a higher level.   Anna is one of the

19   folks responsible at a high level that would have

20   participated in discussion, probably more related to

21   the market simulation, but also more broadly.

22   BY MR. MCNAMARA:

23       Q.   Do you know how much time Ms. Shakatko worked

24   on the case?

25       A.   No.   As I said before, I generally don't know

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 16

1    Cornerstone's time allocations.

2         Q.  Okay.  And aside from the folks you named --

3    Samid, Collin, Fang, and Anna -- who else, if anyone,

4    at Cornerstone do you recall supported you in your

5    work in this case?

6              MR. PIXTON:  Object to the form.

7              THE WITNESS:  There were -- at times there

8    were analysts who were involved.  I don't recall their

9    full names, but people I met along the way.

10   BY MR. MCNAMARA:

11        Q.  Can you give me any of the first names or

12   last names, whatever part of the name you remember?

13        A.  I think one of the analysts was Levi

14   Monihume, I believe, if I'm getting that correctly.

15        Q.  Anyone else?

16             MR. PIXTON:  Same objection.

17             THE WITNESS:  There were others, but I don't

18   recall.  I don't recall their names right now.

19   BY MR. MCNAMARA:

20        Q.  Can you give me a number of people at

21   Cornerstone that assisted you along the way on your

22   expert report in this case?

23             MR. PIXTON:  Object to form.

24             THE WITNESS:  Not until I can -- I recall

25   perhaps two or three more people that I interacted

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 17

1      with at some point, but that wouldn't be -- that's an

2      estimate.  That's not a hard number.

3      BY MR. MCNAMARA:

4          Q.  You've worked with Cornerstone over the years

5      in expert work; correct?

6          A.  Yes.

7          Q.  How long have you worked with Cornerstone

8      doing expert work in support -- sorry, in supporting

9      your expert work litigation?

10         A.  20 -- approximately 20 to 22 years, something

11     like that.

12         Q.  And is Mr. -- well, let's try it this way:

13     Did you work with anyone on this project who you've

14     worked with in the past?

15             MR. PIXTON:  Object to form.

16             THE WITNESS:  Yes.

17     BY MR. MCNAMARA:

18         Q.  Who is that?

19         A.  Samid.

20         Q.  And I think -- go ahead.  Sorry.

21         A.  Samid, Anna.  I believe Levi had been

22     involved in a previous case as an analyst.  Oh,

23     actually, I forgot somebody.  Todd Kumar was involved

24     in this too, and I've worked with him a fair amount in

25     the past.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 21

1    the 8-speed transmissions?

2         A.  I believe it was within a few months before,

3    but I don't really recall.  I don't believe I have a

4    record of when that was.

5         Q.  Fair to say you didn't do any work on this

6    matter before October 5, 2021?

7              MR. PIXTON:  Object to form.

8              THE WITNESS:  Yes, that's correct.  Other

9    than review the Complaint, I didn't do any billed work

10   on this case.  It is possible I reviewed the Complaint

11   before I discussed it with the Cornerstone folks, but

12   no active work on it.

13   BY MR. MCNAMARA:

14        Q.  Do you know -- fair enough.  Do you know if

15   Cornerstone had begun work on this matter before

16   October 5, 2021?

17             MR. PIXTON:  Objection.  Form.

18             THE WITNESS:  That, I don't know.  I think --

19   I suspect I interacted with them and -- you know, sort

20   of understanding the case.  I don't know if they were

21   actively doing anything else.

22   BY MR. MCNAMARA:

23        Q.  When did you start working on your report in

24   this case?

25        A.  Mid-October, shortly after the retainer

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 23

1     to go back going off only this -- the first time I had

2     a discussion with Cornerstone on this was the 15th,

3     anything other than scheduling.

4     BY MR. MCNAMARA:

5          Q.   Okay.  Do you know what, if anything, had

6     been done by Cornerstone with respect to this case by

7     the time they sent you the materials that you just

8     described?

9               MR. PIXTON:  Object to form.

10              THE WITNESS:  No.  I don't know what they

11    might have been doing.

12    BY MR. MCNAMARA:

13         Q.   Well, you said they worked with you at your

14    direction.  What did they do before you started

15    directing?  Do you know?

16              MR. PIXTON:  Object to form.

17              THE WITNESS:  That, I don't know.  The only

18    thing I'm aware of was the preliminary discussion that

19    I mentioned before that might have occurred several

20    months before and, you know, collecting the materials

21    and making them available.

22    BY MR. MCNAMARA:

23         Q.   For the work on this case, did Cornerstone

24    work solely at your direction, or do you know if they

25    did additional work that you may not have directed?

Page 24

1          MR. PIXTON:  Objection to form.

2          THE WITNESS:  I don't know.

3    BY MR. MCNAMARA:

4       Q.  Do you know if Cornerstone has done any

5    analysis, simulations, hedonic regressions that

6    they've done on their own and not at your direction?

7          MR. PIXTON:  Object to the form.

8          THE WITNESS:  I don't know the scope of

9    Cornerstone's involvement beyond my own report.

10   BY MR. MCNAMARA:

11      Q.  Okay.  Are there any analyses that were done

12   by Cornerstone that you're aware of, whether you

13   directed or not, that are not reflected in your

14   report?

15         MR. PIXTON:  Object to the form.

16         THE WITNESS:  So I asked them to do a variety

17   of things.  The ones that are relevant got

18   incorporated in the report.

19   BY MR. MCNAMARA:

20      Q.  Okay.  All right.  We'll get to your report

21   in a second.  I just want to find out, though, are

22   there any things they did that you may not have asked

23   them to do that you became aware of that are not in

24   your report?

25         MR. PIXTON:  Object to form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 25

1              THE WITNESS:  Not that I'm aware of.  I don't

2      know if they did other things related to my report or

3      not.  I do understand they're supporting another

4      expert, but I wasn't involved in that in any way.

5              MR. MCNAMARA:  Okay.  Let me -- with respect

6      to Exhibit 316 -- why don't I just show you.  Just to

7      finish out, can I ask you to look at Exhibit 317.

8              (Deposition Exhibit 317 was marked for

9              identification.)

10     BY MR. MCNAMARA:

11         Q.  The first line where it says, "Discussed

12     Hedonic/follow up," can you tell me who you discussed

13     it with?

14             MR. PIXTON:  Object to form.

15             THE WITNESS:  Again, I don't recall.  I would

16     suspect it would be Fang, but I'm not sure.  That

17     would most likely be the case.

18     BY MR. MCNAMARA:

19         Q.  Can you tell me what you mean by "Worked with

20     Eichmann simulation, 3.4 hours"?

21             MR. PIXTON:  Object to form.

22             THE WITNESS:  That may have been some of my

23     running the simulation and working through the code on

24     my own.

25     BY MR. MCNAMARA:

Page 37

1    BY MR. MCNAMARA:

2        Q.  Well, let me ask the question your way then.

3    In the 37 times you've testified, can you tell me how

4    many times you've responded to a damages model in a

5    class action?

6        A.  I can go through it.

7            (The witness reviewed the document(s).)

8            THE WITNESS:  I count somewhere around 18.

9    BY MR. MCNAMARA:

10       Q.  In those 18 times you responded to a class

11   action model, did you ever agree that a class action

12   damages model was sufficient?

13           MR. PIXTON:  Object to the form.

14           THE WITNESS:  So I don't think it's generally

15   my assignment to make the final determination, but in

16   all those cases I was asked to evaluate damages

17   models, and I found issues with them that I described

18   in the reports I provided.

19   BY MR. MCNAMARA:

20       Q.  When you say "found issues," what do you

21   mean?

22       A.  So either they were inconsistent with

23   economics or did not lead to the conclusions that they

24   were trying to draw or could not be used to give an

25   individualized number for damages given the way that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 38

1    they were set up.  Those are some examples.

2         Q.  Have you ever testified on behalf of

3    consumers in a class action case where you found a

4    model that answered all the questions and didn't

5    reach, as you call it, an individual number for

6    damages that were acceptable to your understanding of

7    economics?

8              MR. PIXTON:  Object to the form.

9              THE WITNESS:  So I evaluated the models in

10   these cases.  I think I raised issues with all of

11   them.  There are portions of the reports that I may

12   have disagreed with, but in general, I think the

13   models that I've seen and have been asked to address

14   did not, in general, demonstrate a common method that

15   could be used to assign individual damages in the ones

16   I was asked to evaluate.

17   BY MR. MCNAMARA:

18        Q.  Have you ever been asked to put forward a

19   damage model for consumers in a class action?

20        A.  I've never developed the damages model in a

21   consumer class action.

22        Q.  Have you ever affirmatively put forth a

23   damages model in any case?

24             MR. PIXTON:  Object to form.

25             THE WITNESS:  I have some -- in some of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 54

1       Q.  Sure.  My question --

2           I'll do it, Nancy --

3           -- is would you agree with me that this was a

4       report you made to respond to a damage model that

5       Dr. Eichmann had proffered -- Mr. Eichmann had

6       proffered regarding a price premium damage model for

7       purchases of ATVs with a heat defect?

8               MR. PIXTON:  Object to form.

9               THE WITNESS:  Yes, I believe I reference it

10      as an overcharge.  I can look through it and see if a

11      price premium language is also used, but that would be

12      consistent.

13      BY MR. MCNAMARA:

14      Q.  Would you agree with me that some of the same

15      statements you make about differentiated products and

16      differentiated consumer preferences and price

17      variation that you made in this expert report

18      regarding Mr. Eichmann's model in Polaris you make

19      again here in this case regarding GM?

20              MR. PIXTON:  Object to the form.

21              THE WITNESS:  I'd have to align the

22      statements up generally, but yes, price dispersion

23      does exist for both the ATV in the new and used

24      vehicle market.  And, you know, prices are negotiated

25      and individualized due to some similar factors because

Page 55

1      they're negotiated with a dealer.  And I think those

2      points would be potentially common, although the

3      details of them are a bit different.

4      BY MR. MCNAMARA:

5          Q.  Would that point be potentially common in

6      any -- purchase of any consumer product that there be

7      individual negotiation price?

8              MR. PIXTON:  Objection form.

9              THE WITNESS:  Generally, no.  So, for

10     example, retail price -- you go to Walmart.  You pay

11     whatever Walmart charges.  But if we're talking about

12     things that are subject to individual negotiation,

13     yes, that's the case.  So that would be -- many

14     different kinds of vehicles would be subject to

15     individual negotiation, at least at the time when you

16     could negotiate.

17     BY MR. MCNAMARA:

18         Q.  So basically -- I'm sorry.  Go ahead.

19         A.  ATVs, automobiles I think certainly would be

20     the case.  There's a lot of consumer products where

21     there's little or no negotiation or where there's

22     negotiation -- where negotiation isn't necessarily the

23     norm.

24         Q.  So -- I'm sorry.  I didn't mean to cut you

25     off.  Mattresses, beds, would those also be one where

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 56

1      you'd have individual negotiation price?

2              MR. PIXTON:  Objection.  Form.

3              THE WITNESS:  So that might be a situation

4      where you're blending -- again, I haven't fully

5      evaluated the mattress market, but that may be a

6      situation where you're blending both negotiated and

7      non-negotiated prices together.

8      BY MR. MCNAMARA:

9          Q.  And trucks I think is another one you've

10     testified.  When you're purchasing large diesel

11     trucks, there would also be price negotiation there

12     too; right?

13         A.  Yes.  And a few different kinds as well

14     because you're dealing with different kinds of market

15     participants.

16         Q.  Can I ask you -- well, first of all, so if

17     that's the case that there's going to be, because of

18     the differentiation of products and price

19     negotiations, wouldn't that be the case that you can

20     never have a class action involving automobiles?

21             MR. PIXTON:  Object to the form.

22             THE WITNESS:  I don't know if I'd reach that

23     conclusion, but I can't evaluate the all possible ways

24     of going at this.  But it does certainly make it more

25     challenging when you have preferences and individual

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 57

1    negotiations, that combination makes it more

2    challenging to evaluate individual impact because you

3    are in a situation where consumers can -- if they have

4    different preferences, they actually can act on them,

5    which is not the case for all goods.  I don't know

6    what methods would be appropriate.  But that's

7    certainly going to be a problem that you're going to

8    have to overcome in some way.

9    BY MR. MCNAMARA:

10        Q.  Well, let me ask, Dr. Hitt, having done this

11   now for several years, what, if any, automobile case

12   would you ever see could have a damage model given

13   that there's always going to be different

14   heterogeneity in preference and different prices

15   because customers can negotiate?

16            MR. PIXTON:  Object to the form.

17            THE WITNESS:  So I can't anticipate the way

18   one might develop a damages model in here, but damages

19   models predicated on one or small sets of market

20   prices I think in a negotiated market with individual

21   preferences I think are less likely to be plausible.

22   I evaluated a specific one here.  There might be

23   circumstances where that is not a strong a criticism.

24            But, again, I can't know all the possible

25   ways one might go about doing so, but it's certainly a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 58

1      problem with the method to try to assign either one,

2      for example, diminution in value or a very small set

3      of changes in market prices when you know there's

4      customer heterogeneity.

5      BY MR. MCNAMARA:

6          Q.  Can you think of one method that could be

7      used for determining damages to consumers of

8      automobiles that would meet your standard?

9              MR. PIXTON:  Object to the form.

10             THE WITNESS:  So I don't think I have a

11     standard.  I'm pointing out the economic property of

12     these markets that would have to be incorporated or

13     should be incorporated in a model unless it could be

14     demonstrated that it's not sufficiently large to

15     matter.  In these cases I think it does.  I don't know

16     and I wasn't asked to determine is there an

17     alternative model.  So I can't say.

18     BY MR. MCNAMARA:

19         Q.  What do you mean "not sufficiently large to

20     matter"?  What did you mean by that?

21         A.  So if, for example, there was -- as an

22     empirical matter there was uniformity in price despite

23     heterogeneity in preference, that would be more

24     plausible.  In general, that's not the case here, but

25     there could be, for example, negotiated markets within

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 59

1      some segments that had more uniformity in price.  But

2      that does not appear to be the case here, and it's not

3      been the case in other situations that I've evaluated.

4           Q.  Is it ever the case that there's uniformity

5      of price for automobiles?

6                MR. PIXTON:  Object to the form.

7                THE WITNESS:  Not that I personally observed.

8      But, again, with a small enough sub segment there

9      could be more uniformity with the sub segments.  But,

10     again, it would be these very, very broad large

11     numbers of purchasers, multiple vehicles.  It's

12     certainly less likely.

13     BY MR. MCNAMARA:

14          Q.  Let me ask you if you could look at

15     Exhibit 319, Paragraph 25, of the report you did in

16     the Polaris case starting with "These types of

17     conditions."

18          A.  Paragraph 25?

19          Q.  Yeah.  It's on page 13 of 152.

20                (The witness reviewed the document(s).)

21                THE WITNESS:  Okay.

22     BY MR. MCNAMARA:

23          Q.  And do you see where you write in the second

24     sentence, "A differentiated product is one that has a

25     variety of attributes (or 'features') intended to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 60

1    appeal to consumers with different preferences"?

2         A.  Yes.

3         Q.  And can I ask you to look at your report that

4    you have in front of you?  I think you brought it with

5    you.  But it's Exhibit 318, paragraph 132, page 61 of

6    193, if you're looking at the PDF.

7         A.  I'm sorry.  What page?

8         Q.  Page 61 of 193.

9         A.  Got it.  Thank you.  Okay.

10        Q.  Do you see in paragraph 132 where you're

11   talking about non-differentiated products that you

12   state in the third sentence, "A differentiated product

13   is one that has a wide variety of attributes (or

14   'features') intended to appeal to consumers with

15   different tastes and preferences"?

16        A.  Yes.  I like that phrase because I think it's

17   a compact treatment of what a differentiated product

18   is.

19        Q.  Right.  And given that we're not dealing with

20   the Model T, all cars are differentiated products;

21   correct?

22             MR. PIXTON:  Object to form.

23             THE WITNESS:  I think cars generally could be

24   considered differentiated products, so they would have

25   these potentials.  They could have -- they would have

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 65

1    transmissions.  That's one of the difficulties of

2    identifying the issue of transmissions, and I discuss

3    that also in my report.

4          But, yes, you can -- in general, with

5    differentiated products you get to observe what

6    consumers pay.  They negotiate over what they pay.

7    What comprises the components that add up to what they

8    pay can vary across consumers.

9           So when faced with, for example, a

10   disclosure, there may be some consumers who react a

11   lot and some consumers who react very little because

12   they're not as concerned about it.  That's just a

13   characteristic of differentiated products that you

14   need to accommodate in any attempt to try to value a

15   feature in a complex product.

16        Q.  We'll do one more, and then we'll take a

17   break.

18          Can I ask you to look at the Polaris report,

19   paragraph 61.

20        A.  Okay.

21        Q.  In paragraph 61 when you're talking about the

22   transaction prices -- the actual transaction prices

23   vary even for similarly identical vehicles, and you

24   write in paragraph 61, "This price variation

25   establishes that there are individual characteristics

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 66

1    specific to each transaction that determine the

2    transaction price, which are difficult or impossible

3    to capture by a uniform or common model that would

4    apply to all Sportsman ATVs."

5         Did I read that correctly?

6    A.  Yes.

7    Q.  Could I ask you to look at paragraph 160 in

8    your current report in the GM case.  The almost

9    penultimate sentence in your report that begins, "This

10   price variations establishes that there are individual

11   characteristics specific to each transaction that

12   determine the transaction price of a given putative

13   Class Vehicle, which are difficult to capture by

14   common model that would apply to all putative Class

15   Vehicles or even all putative Class Vehicles of the

16   same model model year"; correct?

17   A.  Yes.  That's an empirical fact with these

18   markets that I'm summarizing in this paragraph and the

19   following several pages of charts that basically

20   illustrate this in both reports.

21   Q.  So it's your opinion in Johannessohn, as it

22   is in this case, that differences between customer

23   knowledge, customer prices paid, and customer

24   preference make a class-wide damages model -- preclude

25   a class-wide damages model; is that fair?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 67

1          MR. PIXTON:  Object to the form.

2          THE WITNESS:  So I wouldn't say it that way.

3     I'd say that -- so a couple things.  First of all,

4     preferences and information and transaction

5     circumstances yield prices.  So the price variation is

6     observable.  The preferences and information may be

7     less though because they're connected, but they're

8     not, by themselves, acting independently.

9          But the second point is that I think in both

10    these cases the idea that there is one or a very

11    limited number of price changes that can be -- that

12    accurately characterize any shift in demand in a world

13    which has all these properties is not likely to

14    capture the market properly.

15    BY MR. MCNAMARA:

16        Q.  Let me try it this way:  Fair to say, in both

17    the Johannessohn case and in the GM case, you cited to

18    the differentiation of the products, the preferences

19    of buyers, the differences in price, and the

20    differences in customer knowledge as a basis to oppose

21    the damage model set out by Mr. Eichmann?

22         MR. PIXTON:  Object to form.

23         THE WITNESS:  Again, subject to the

24    discussion I had earlier about some of these things

25    are based on graphs and some of these are based on

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 68

1    theory, but the -- but, yes, in both cases I identify

2    differentiation -- factors that affect differentiation

3    and price dispersion as issues that would affect the

4    plausibility of the models put forth by Mr. Eichmann

5    because they have -- they reduce the change in prices

6    to one or a very limited set of possible reactions.

7    BY MR. MCNAMARA:

8        Q.  With regards to the opinion you just recently

9    testified on in Takata, did you also cite to

10   differentiation in the products, the customer

11   preferences, price variation, and customer knowledge

12   as a basis to oppose the damage model put forth by

13   that plaintiff's expert?

14           MR. PIXTON:  Object to the form.

15           THE WITNESS:  So I believe, again, Takata --

16   the Takata case is a vehicles case.  It has the same

17   properties that would lead to that.  And I did both --

18   there's both a theoretical and empirical discussion on

19   price dispersion and why that makes it challenging to

20   assign a single market price change.

21   BY MR. MCNAMARA:

22       Q.  And in every automobile case you've been

23   involved with have you cited to price variation,

24   differentiation of products, differentiation of

25   customer preferences and customer knowledge as a basis

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 69

1    to oppose the damage model proffered by the

2    plaintiff's expert?

3              MR. PIXTON:  Same objection.

4              THE WITNESS:  I'd have to look back and see

5    all of these reports, but certainly those factors in

6    the auto cases -- are present in the auto cases that

7    I've been involved in, and they would lead to a

8    conclusion that a single or very small subset of

9    market price changes would not accurately capture

10   changes in behavior.

11             But, again, the details of each circumstance

12   are different.  The analysis I did did vary across all

13   these reports.  But as a general rule, differentiation

14   and product dispersion are features of these markets

15   that make it difficult to limit any kind of market

16   price reaction to a single or small set.

17             MR. MCNAMARA:  Five minutes okay, Allen?

18             MR. PIXTON:  Yeah.  That's fine by me so long

19   as you're actually here in five.

20             MR. MCNAMARA:  Yeah.  I'm trying to get us

21   going for Nancy's sake.  So five.

22             THE VIDEOGRAPHER:  Please stand by.  The time

23   is 11:35 a.m.  We're going off the record.

24             (WHEREUPON a recess was taken from 11:35 a.m.

25             to 11:44 a.m.)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 95

1          Q.   What do you mean by corporate surveys?

2          A.   Asking people factual questions about what

3     they do.

4          Q.   Can I ask you to look at paragraph 8?  You

5     mention your experience in the automobile industry.

6          A.   Yes.

7          Q.   Is it fair to say that the experience you

8     mention here is solely as a defense expert opposing

9     class actions as they pertain to automobiles, diesel

10    trucks, and ATVs?

11              MR. PIXTON:  Object to the form.

12              THE WITNESS:  So I don't view that

13    characterization as opposing necessarily, but these --

14    I think these are -- yeah.  This paragraph is

15    specifically about litigation matters.  I have done

16    other work that's related to auto industry, advising

17    students and such on their Ph.D. dissertations, for

18    example.  But this paragraph is related specifically

19    to litigation.

20    BY MR. MCNAMARA:

21         Q.   And the work you've done in the automobile

22    industry, you've always appeared on behalf of an OEM,

23    a manufacturer; is that fair?

24         A.   I think I've been -- I don't know if I've

25    been retained by, but Bosch has been available.  So

Page 96

1       they're a parts supplier.  I think other than that

2       exception it's been auto manufacturers or ATV

3       manufacturers, Polaris, if you count that as the auto

4       industry, and truck manufacturers if you're --

5       depending on how you define the boundary.

6            Q.  Can you give me an estimate of the total

7       number of hours you've worked on cases involving

8       automobiles?

9            A.  I have no idea.

10           Q.  Is it in the hundreds?  In the thousands?

11           A.  Over the last 20-something years certainly

12      hundreds.  I don't know whether it would creep into

13      thousands or not.

14           Q.  Okay.  Let me ask -- I'm going to be brief on

15      this one, I promise.  Can I take you to paragraph 19

16      where you write, "I am being assisted in this matter

17      by staff at Cornerstone Research who are working at my

18      direction."

19                Is that the people we've already talked

20      about?

21           A.  Yes.

22           Q.  Okay.  Do you know collectively how many

23      hours they have worked on this project?

24                MR. PIXTON:  Object to form.

25                THE WITNESS:  No.  As I mentioned before, I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 106

1      defect.  You need to establish that that is indeed

2      common if you're going to assign everybody the same

3      number, because if they're not common, the same number

4      will overcompensate some people and undercompensate

5      others.

6      BY MR. MCNAMARA:

7          Q.  And this paragraph you have here right

8      afterwards -- sorry, several sentences right after, I

9      just read it, that "automobiles are differentiated"

10     and it ends with "This makes any assumption of a

11     uniform impact or any assumption that all putative

12     Class members were damaged by some average amount (if

13     any) invalid, and thus individualized inquiry will be

14     necessary to determine whether each putative Class

15     member was impacted and separate damages."

16             That would apply to every single automobile

17     class action, would it not?

18             MR. PIXTON:  Object to the form.

19             THE WITNESS:  I think we discussed this

20     earlier.  I think the differentiated product

21     characteristics do make it more plausible than not

22     that they're individualized.  That may very well

23     extend to other automobile class actions, but I can't

24     speak for every one that could ever occur.

25     BY MR. MCNAMARA:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 107

1      Q.  And you've made this point in every

2    automobile class action you've been involved with; is

3    that fair?

4              MR. PIXTON:  Form.

5              THE WITNESS:  Yes.  I've done the analysis in

6    the context that I've been asked to review, both

7    theoretically and empirically, and reached that

8    conclusion.

9    BY MR. MCNAMARA:

10     Q.  That also includes the truck cases you're

11   involved with; correct?

12     A.  I'd have to look through all the reports to

13   see if it's always there.  The same principles apply.

14   I don't recall whether I did the empirical analyses in

15   some cases.

16     Q.  You made the same point in the Johannessohn

17   versus Polaris case; correct?

18     A.  That's correct.  We were just looking at

19   that.

20     Q.  Let me take you to page 11 of your report

21   now, the hedonic regression starting with Roman

22   numeral 6.  Did you write this portion of your report

23   by yourself, or did you have any assistance from folks

24   at Cornerstone?

25             MR. PIXTON:  Objection.  Form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 174

1      Q.  And did you -- this reply, did you work on it

2    with folks at Cornerstone?

3      A.  Yes.  Same research team.

4      Q.  When you say "same," are they the same four

5    or five names before, or were there any ones in

6    particular?

7      A.  It's the same general group.  Again, I don't

8    know who did all -- you know, some of the analysis

9    might have been directed by the Cornerstone folks to

10   somebody else, but it was the same group that worked

11   with me on my original report.

12     Q.  Okay.  Then you see in paragraph 3 -- well,

13   just so I know, is this -- is there anything else that

14   you were preparing in response to Mr. Eichmann's

15   response, or is this it?

16     A.  So I don't have any plans to prepare anything

17   else.  Things could come up today, but I have no

18   active work right now other than this deposition.

19     Q.  Fair enough.  In paragraph 3 where you write,

20   "As just one example, for 2016, 2017, 2018 and

21   Cadillac CTS vehicles with 8 cylinder 6.2L,

22   supercharged induction engines, the additional data

23   show that all vehicles were sold with an at-issue

24   transmission, whereas Eichmann classified no vehicles

25   as being part of the Class."

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 175

1            Do you see that?

2       A.  Yes.

3       Q.  Do you know how many of those vehicles, the

4   raw number we're talking about?

5            MR. PIXTON:  Object to form.

6            THE WITNESS:  I can find it out.  I don't

7   have it off the top of my head.

8   BY MR. MCNAMARA:

9       Q.  Does 810 sound about right?

10      A.  Let's find out.

11      Q.  Sure.  Just so I know, what are you looking

12  at?

13      A.  My report.

14           (The witness reviewed the document(s).)

15  BY MR. MCNAMARA:

16      Q.  Do we need to go off the record?

17      A.  Maybe.  Hang on a second here.  I can't

18  remember whether I redlined it in the report or in the

19  appendix.  It's taking a bit of time.  I can't find it

20  right this second.

21      Q.  Well, I'd say two things:  One, you can

22  accept as a hypothetical the 810, or we should go

23  offline and you could --

24      A.  Let's accept -- I have yet to find the page.

25  I'll accept it as a hypothetical and carry on.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 176

1        Q.  I think we talked earlier in terms of the

2    number of impressions were 5,548,082?

3        A.  Something like that, yes.

4        Q.  Would you agree that 810 out off 5,548,000

5    impressions, that's going to be a -- that's

6    .015 percent of the vehicles in the analysis?

7             MR. PIXTON:  Object to the form.

8             THE WITNESS:  If the calculation's -- if the

9    810 is correct.  Yeah, about .015.

10   BY MR. MCNAMARA:

11       Q.  Would you think that's a consequential issue

12   regarding the 810 vehicles that you point out here

13   would still be classified as not being part of the

14   class?

15            MR. PIXTON:  Objection.  Form.

16            THE WITNESS:  So the point of this is not to

17   say how large these errors are.  It's just to point

18   out these corrections do not address the fact that

19   some class vehicles are improperly classified.

20   BY MR. MCNAMARA:

21       Q.  Okay.  Let me ask you about the statement a

22   little further down.  Do you see where you write in

23   paragraph 3 that, regarding the Chevy -- the 2019

24   Chevrolet Silverados, that even though the additional

25   data indicate that nearly 25,000 2019 Silverado

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 177

1    vehicles were sold with the at-issues, he did not

2    update his code to include that?

3          A.   I'm not sure that's exactly what that says.

4    It just says he continues to -- the summary is he

5    continues to misclassify that particular make and

6    model year as --

7                MR. PIXTON:  Objection.  Form.

8                THE WITNESS:  -- as entirely non-class

9    vehicles.  But that's not correct, at least according

10   to the other data set.

11   BY MR. MCNAMARA:

12         Q.   And do you know how many -- from the data

13   set, how many 2019 Silverados were gas-powered

14   8-cylinder 5.3 liter engines?

15               MR. PIXTON:  Object to form.

16               THE WITNESS:  Again, not off the top of my

17   head.

18   BY MR. MCNAMARA:

19         Q.   Do you know, of the count of them that were

20   gas-powered, 8-cylinder 5.3 liter engines, that had

21   either an AL45 or AL90?

22               MR. PIXTON:  Object to form.

23               THE WITNESS:  Again, I could look up the

24   numbers in the source data sets, but I don't have

25   those off the top of my head.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 178

1    BY MR. MCNAMARA:

2         Q.  Could it be 212,000?

3         A.  I don't know the number.  I could take your

4    word for it.  I could potentially look it up to find

5    the page that I was hunting for before, but I don't

6    have that number off the top of my head.

7         Q.  So if it turns out about 212,000 of these

8    Silverados were the 8 cylinder 5.3L -- 8L transmission

9    and 113 were the 2019 Silverados without the 8L

10   transmissions, would you agree with me that about

11   35 percent or so of the Silverados in this particular

12   model did not have the at-issue transmission, 113,326?

13            MR. PIXTON:  Object to form.

14            THE WITNESS:  So I don't know.  I'd have to

15   take your representation of the input numbers.  I'm

16   not even sure I follow your calculation.  I think the

17   statement simply says that there exists 25,000

18   vehicles that are misclassified that we were unable to

19   identify even after the correction.

20   BY MR. MCNAMARA:

21        Q.  Okay.

22        A.  If you want me to work through the math, I

23   can.

24        Q.  Let me try to make it simpler because I think

25   this one you can work through.  Even my feeble brain

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 179

1    can do it.

2          If we're talking about 12,000 vehicles,

3    again, out of 5.5 million vehicles in regression, is

4    that about a .22 percent number of impression we're

5    talking about?

6          MR. PIXTON:  Objection.  Form.

7          THE WITNESS:  12,000 out of 5.5 million?

8    BY MR. MCNAMARA:

9      Q.  Yeah.

10     A.  It's going to have a leading 2, and it's

11   going to be a small number.  It's possible.

12     Q.  Sitting here today, how do you think, if at

13   all, that the reclassification of the 12,209 vehicles

14   out of 505 million observations would affect, if at

15   all, the regression results?

16         MR. PIXTON:  Object to form.

17         THE WITNESS:  I don't know.  The objective is

18   not to say -- is not to identify the effect on a

19   regression.  The analysis in this paragraph is simply

20   to document ongoing misclassification errors that were

21   reduced -- or result from the changes Mr. Eichmann

22   made in his classification code.

23   BY MR. MCNAMARA:

24     Q.  It kind of sounds like Cornerstone were going

25   "You screwed up.  You screwed up, and you screwed up."

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 181

1            THE WITNESS:  Not on these two.  Sorry.  Not

2      on these two.

3      BY MR. MCNAMARA:

4            Q.  Let me go back to your report, and I'm on

5      page 25, paragraph 62 where we're talking about I

6      think depreciation.

7            A.  Page 25?

8            Q.  Yeah.

9            A.  Okay.

10           Q.  Page 25.

11           A.  In what paragraph?

12           Q.  Well, in the sentence you're talking about I

13     think price depreciation and then compared to

14     benchmark vehicles.

15           A.  Okay.

16           Q.  Can you tell me what method you're using to

17     analyze alternative depreciation here?

18           MR. PIXTON:  Object to the form.

19           THE WITNESS:  So the method is just -- first

20     I depict the data, and I depicted both for this

21     particular one and all the others so you can see, just

22     from the simple presentation of the data, that these

23     vehicles are not consistently at the bottom of their

24     group, and then it bounces around over time.  So there

25     doesn't seem to be any systematic relationship

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 182

1   apparent when you compare these against the relevant

2   control groups.

3   BY MR. MCNAMARA:

4        Q.  Are you using a multivariant regression

5   analysis?

6        A.  No.  I'm presenting the data as is available

7   just looking at the depreciation for each model

8   individually.  And there's like 40 others in the

9   appendix that -- where we do each one individually.

10       Q.  Right.  And for these -- the analysis that

11   you're doing here, is it fair to say you don't control

12   for mileage.  Fair?

13            MR. PIXTON:  Object to form.

14            THE WITNESS:  It's presenting it -- there's

15   no controls in here.  It's looking at the population

16   of these vehicles relative to other vehicles at the

17   time and showing that they're within -- sometimes

18   high, sometimes low, sometimes at the bottom,

19   sometimes at the top, and it doesn't seem to be

20   particularly related to the share of at-issue

21   transmission.

22   BY MR. MCNAMARA:

23       Q.  And you said there's no control here.  It

24   says you don't have control here for -- I'll wait for

25   it -- geographic location of sale, sale month and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 183

1    year, sale type, body type, engine cylinders, engine

2    liters, trim attributes like extended cab, induction

3    type, dealer sale or sale type repossession, none of

4    those are controlled for in here?

5              MR. PIXTON:  Object to form.

6              THE WITNESS:  So I believe certain

7    vehicles -- let's see.  So certain vehicles are --

8    certain portions of the data set are removed, salvaged

9    vehicles, so forth.  But it's a presentation of the

10   average values of these vehicles over time relative to

11   their stated MSRP.  It's a different kind of analysis.

12   BY MR. MCNAMARA:

13        Q.  Okay.  In terms of answering my question,

14   because you threw in things I didn't ask, the items I

15   listed that weren't controlled -- mileage, geography,

16   sale months, sale type, body type, engine cylinders,

17   engine liters, trim attributes like extended cab --

18   would you agree none of those are controlled for in

19   the analysis you're doing here or discussing here on

20   page 25?

21             MR. PIXTON:  Object to form.

22             THE WITNESS:  I'd have to go through that

23   list very specifically, but I can tell you what this

24   is is simply a presentation of the average values of

25   each at-issue vehicle compared to its benchmarks.  And

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 184

1    so in that sense there are no controls and there's no

2    intention of putting in controls because it's a

3    presentation of the data so you can see how these

4    vehicles behave relative to others in the similar

5    segment.

6    BY MR. MCNAMARA:

7        Q.  Did you do this, or did someone at

8    Cornerstone do it?

9            MR. PIXTON:  Object to form.

10           THE WITNESS:  So I requested that they

11   present the data, just show a simple data presentation

12   of how these vehicles compared.  The implementation of

13   that was done by Cornerstone.

14   BY MR. MCNAMARA:

15       Q.  And who at Cornerstone?

16           MR. PIXTON:  Same objection.

17           THE WITNESS:  I don't know.

18   BY MR. MCNAMARA:

19       Q.  Can I take you back a little bit to page --

20   well, let me ask you the question because we talked

21   about omitted variable bias earlier.

22           In light of what you discussed, aren't you

23   omitting a ton of variables in this analysis?

24           MR. PIXTON:  Objection.  Form.

25           THE WITNESS:  Omitted variables bias is a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 267

1    involved in were particularly narrow, but I don't

2    know out of all possible situations.

3    BY MR. McNAMARA:

4        Q.   Tell me the narrowest class action you

5    could think of here that would not have the same

6    issues regarding customer preference.

7             MR. PIXTON:  Object to the form.

8             THE WITNESS:  You would have to have

9    something that is pretty limited, basically

10   purchased in the same channels and similar channels

11   with similar vehicles, and I can't think of any

12   class actions that have had that characteristic

13   but, again, my experience is limited to the ones

14   I've been involved in.

15   BY MR. McNAMARA:

16       Q.   I'm going to dare to try.  Let's

17   assume you could buy a Tesla model A.  It's the

18   only version of Tesla they have.  There's no

19   differences in trim.  There's no difference in

20   model year.  It's all the same componentry and

21   you can only buy it directly from Tesla but it

22   has a defect.  Is that a class action that

23   Lorin Hitt would say you could do a damages

24   model for?

25            MR. PIXTON:  Object to form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 268

1              THE WITNESS:  So I don't know if I -- if

2     I would characterize it that way.  I can say, you

3     know, in a world where one dealer, one vehicle, no

4     price negotiation, you're more in a world there --

5     in general, Tesla doesn't negotiate.  So you might

6     be in a world where it's more possible to put all

7     those vehicles in the same market and, therefore,

8     you could do something more general but, you know,

9     without having seen the model and the approach, I

10    can't be sure.

11    BY MR. McNAMARA:

12         Q.   Wouldn't you still have heterogeneity

13    in the preference of the customers?  Some would

14    still value, you know, the pick some parts of

15    that one model Tesla differently than others?

16              MR. PIXTON:  Form.

17              THE WITNESS:  Potentially.  That could be

18    an empirical question.

19    BY MR. McNAMARA:

20         Q.   Let me get you now to the other issue

21    you mentioned here in terms of differences in

22    the customers that Mr. Eichmann -- I'm on 63

23    now -- incorrectly assumes that all punitive

24    class members would place significant value on

25    the transmission feature.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 281

1  question?

2  BY MR. McNAMARA:

3       Q.   This is dated October of 2018.

4       A.   Yes.  That is correct.

5       Q.   And you also mention in the paragraph

6  we just read, 146, that customers may get

7  information based upon online forums -- forum

8  comments, that they may have had some

9  information about the transmission issues from

10  those online forums.  Is that fair?

11       A.   Let me go back to my report and I'll

12  look.  What paragraph?

13       Q.   146.

14       A.   Okay.

15       Q.   Actually, before we go there, let me

16  go to Exhibit 220.  It's also already in your

17  Exhibit Share.  Do you see --

18       A.   Yes.  There it is at the bottom.

19       Q.   This is a reference to another TSB

20  16-NA-361.

21       A.   That's what it appears to be.

22       Q.   And it says, also from Mark Gordon,

23  "Steve, 16-NA-361 applies only to the 8-speed

24  transmission.  The first 1-2 shift of the day is

25  influenced by air within the clutch at startup

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 282

1   after the vehicle sits for an extended period,

2   typically overnight."

3           "The harshness is even worse" -- "is

4   worse on vehicles that are driven at slow speeds

5   (subdivision) driving during that first shift."

6           Do you see where it says below that

7   "Engineering has attempted different strategies

8   with calibration to mask/improve the shift.

9   Unfortunately, none of these strategies have been

10  effective and customers continue to experience

11  harsh 1-2 shift."

12          Do you see that?

13      A.   Yes.

14      Q.   And then he continues, "Hardware and

15  calibration changes for the second generation 8

16  speed will address this and other 8-speed

17  issues."

18          Did I read that right?

19          MR. PIXTON:  Object to the form.

20          THE WITNESS:  I believe so.

21  BY MR. McNAMARA:

22      Q.   And then it states, "Unfortunately,

23  these changes will not take place until model

24  year 2022 for the midsized truck and model 23

25  for the remaining 8-speed applications."

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 283

1           Do you see that?

2                MR. PIXTON:  Form.

3                THE WITNESS:  Yes, I think that's what it

4     says.

5     BY MR. McNAMARA:

6        Q.   And then it says "GM confidential"

7     next to that, right?

8                MR. PIXTON:  Object to the form.

9                THE WITNESS:  That's in parenthesis

10    following the passage you just read.

11    BY MR. McNAMARA:

12       Q.   Okay.  And can do you know what GM

13    confidential means?

14               MR. PIXTON:  Same objection.

15               THE WITNESS:  I don't have any knowledge

16    other than the plain language meaning.

17    BY MR. McNAMARA:

18       Q.   I'm going to share screen with you.

19    Can you -- whoever can, can you change it so

20    that I can share screens?  Can the concierge do

21    that?

22               THE VIDEOGRAPHER:  You can try now.

23               MR. McNAMARA:  Thank you.  While we're

24    chatting, I went on line and you know what I could

25    actually find 16-NA-361.  This one's dated April of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 284

1   2017.  Let me just make sure it's not too far off

2   from this email.  Let me see if I can find a later

3   one.  Oh, that one is from August of 2021.

4   Terrible version of it.  This is what happens when

5   you do this on the fly, huh?

6           This is from the Corvette center.  It

7   says 16-NA-361.  And I'm scrolling it down with

8   you.  I could be wrong here but let me see, does it

9   mention anything about we'll have a fix with model

10  year '23?

11          MR. PIXTON:  Object to the form.

12  BY MR. McNAMARA:

13      Q.   It doesn't appear, correct?

14          MR. PIXTON:  Object to the form.

15          THE WITNESS:  At least in the portion

16  that I can see now, it doesn't.  Well, let's see,

17  what does it say up at the top?  Keep going down.

18  BY MR. McNAMARA:

19      Q.   It looks like it hasn't been revised

20  in quite some time?

21      A.   Yep.

22      Q.   So if -- as of today, do you know if

23  any current or potential GM buyers of the model

24  year '15 to oh, heck, '22 vehicles know that a

25  generation 2 redesign to address harsh shifts is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 285

1    forthcoming?

2              MR. PIXTON:  Object to the form.

3              THE WITNESS:  I don't know one way or the

4    other.  I think there are places where they're

5    discussing issues broadly.  I don't know if that

6    particular fact is included in them.

7    BY MR. McNAMARA:

8         Q.  So if customers looked at TSBs that

9    will mention a problem, they will not

10   necessarily get very much information about the

11   frequency of the problem, the cause of the

12   problem and whether -- and when GM will have a

13   permanent solution to the problem.  Is that

14   fair?

15             MR. PIXTON:  Object to the form.

16             THE WITNESS:  So this isn't something I

17   have done an analysis of, about what the content

18   and what people can infer but in the documents you

19   showed me, at least within those, they didn't --

20   none of those specifics were not present on some of

21   the documents.

22   BY MR. McNAMARA:

23        Q.  And you mentioned in your report that

24   customers -- one of the flaws that Mr. Eichmann

25   did, is he didn't -- he didn't take into account

Page 286

1    that persons could get information about these

2    defects from TSBs, correct?

3              MR. PIXTON:  Object to the form.

4              THE WITNESS:  So that's a little more

5    narrow reading of my report.  My report describes

6    is that customers could become aware of these

7    issues from information in the public domain, of

8    which TSBs is one, and which there were others as

9    well, and I believe plaintiffs identified the

10   number of the places where you could find

11   information.

12   BY MR. McNAMARA:

13      Q.   Right.  We identified forums and TSBs

14   and public information and complaints that says

15   it's a problem, which probably affects

16   diminution of value but we didn't know what.

17              So do you see there's a material

18   difference between knowing that, hey, there's

19   transmission issues and exactly what it is and

20   whether there's a fix and when it might come?  Do

21   you see the difference between those things?

22              MR. PIXTON:  Object to the form.

23              THE WITNESS:  They could potentially be.

24   That's not something I tried to evaluate in this

25   case, as to what specific information, beyond the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 287

1    fact that it was in the public domain was there.

2    So I can't say.

3              You know, from plain language, they are

4    different information but how consumers react, that

5    I did not fully investigate except to identify that

6    it was -- that there was information out there.

7    BY MR. McNAMARA:

8         Q.   Okay.  Can I ask you to look at

9    Exhibit 77?

10             And while he's doing that, Solomon, can

11   you give me a time check?

12             THE VIDEOGRAPHER:  One second, please.

13             6:15.

14   BY MR. McNAMARA:

15        Q.   Good to know.  We will be done by

16   6:45, if not sooner, my time.

17             So have you looked at Exhibit 77 before?

18        A.   Still waiting for the spinning circle.

19        Q.   I'm sorry.  It should have been in

20   your folder already.  I already put it in there.

21        A.   Exhibit?

22        Q.   It should say Exhibit 0077.  It should

23   be towards the top.

24        A.   There it is, yes.

25             MR. PIXTON:  Doug, are you planning to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 303

1    pick back up over here where Mr. Goodrich

2    conveyed to Tadge and Ms. Briedis, "Due to the

3    extremely high rate with the midsized truck, we

4    are expediting the fix in the 238 millimeter

5    converter for model year '19.  However, we have

6    the supplier working to implement a similar fix

7    in the larger 258 converter for the Corvette and

8    other performance vehicles, as well as

9    full-sized trucks.  Timing is still being worked

10   out but the plan would be to back service all

11   previous model years once implemented for

12   production.  My expectation is this will likely

13   a running change for model year '19."

14           Can I now take you to Exhibit 84?  It

15   should be in there but just -- to, again, move

16   things along, if you want to look at it, you can.

17   It is in your exhibit share but I'm also sharing it

18   on the screen.

19           MR. PIXTON:  Object to the form.

20           THE WITNESS:  Let me look at it briefly.

21   Sorry.  I got -- 84?

22   BY MR. McNAMARA:

23       Q.   Yeah.

24       A.   Let me look through it and then I'll --

25   okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 304

1      Q.   And if you can, can you review the

2   answer that Al gives to the question we looked

3   at in the email, "Al, can you please shed some

4   light on what's going on with our cars in the A8

5   torque converter shudder issue and whether there

6   is any permanent fix to the issue?"   Thank you.

7           MR. PIXTON:   Object to the form.

8           THE WITNESS:   Okay.   Got it.

9   BY MR. McNAMARA:

10     Q.   Would you agree with me the answer

11   that's posted here in the forum, there is no

12   reference to the extremely high warranty rates

13   that Mr. Goodrich had mentioned?

14          MR. PIXTON:   Object to the form.

15          THE WITNESS:   So I don't see anything

16   specifically about warranty rates.   I think it's

17   just describing the fix and the conditions under

18   which they think the fix is appropriate.

19   BY MR. McNAMARA:

20     Q.   Well, is there any mention of the --

21   the fix that was intended to be in place for

22   model year 2019 in this post?

23          MR. PIXTON:   Object to the form.

24          THE WITNESS:   I don't see any -- well,

25   it's hard to say because I don't know what fluid

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 305

1   they would be using.  I don't see any reference to

2   a 2019 fix, though.

3   BY MR. McNAMARA:

4       Q.   Well, would you agree with me that, in

5   fact -- you see here where it says -- not so

6   much.  "Since we started using Dexron HP

7   transmission fluid in March of 2017, both in

8   production and for service, we believe we have

9   basically eliminated the shudder.  When used for

10  service, it only requires a single flush and

11  fill."

12            Do you see that?

13            MR. PIXTON:  Object to the form.

14            THE WITNESS:  Yeah.  That appears to be

15  what the text says.

16  BY MR. McNAMARA:

17      Q.   And based upon what you know and what

18  you just read, is that accurate?

19            MR. PIXTON:  Object to the form.

20            THE WITNESS:  So I'm not in a position to

21  assess that.  I understand they were working on a

22  solution and they came up with a more permanent fix

23  later on.  That's all I understand.  I don't know

24  what they're specifically referring to here, and

25  I'm not really in a position to evaluate the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 306

1    efficacy of their various fixes.  I only know

2    broadly what the history was.

3    BY MR. McNAMARA:

4        Q.   Okay.  Do you think Mr. Goodrich was

5    in a position to estimate whether this

6    information conveyed here was accurate?

7              MR. PIXTON:  Object to the form.

8              THE WITNESS:  I can't -- I understand

9    Mr. Goodrich was quite knowledgeable of these

10   issues, but I can't ex post evaluate what he would

11   and wouldn't know.

12   BY MR. McNAMARA:

13       Q.   My computer just froze.

14            Well, let me take you back to an exhibit

15   we looked at a little earlier, that of

16   Mr. Goodrich's testimony.  It was Exhibit 3, Tab 3,

17   and I will try to move this along as quick as

18   possible.  And I'm going to take you there and

19   we're going to go to page 220 of his testimony.

20   It's on page 56 of 22 of his transcript.

21       A.   Which exhibit number is that?

22       Q.   It's Exhibit 3, Tab 3.

23       A.   Got it.  I see it.  Thanks.  What page?

24       Q.   It looks like it's page 57 of 22 of

25   his -- of the document.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 307

1          A.    Oh, okay.  Got it.  Not the deposition

2     page?

3          Q.    Right.  It's 220 of the deposition

4     page.  And do you see here where some guy asks:

5                "In the -- in Al's answer in Exhibit 84.

6     If you look at the third paragraph."

7                "It eliminate most of the shudder

8     concerns."

9                "Now, if you go a little further down, do

10    you see" -- it is the second to last sentence --

11    "Since we started using Dexron HP transmission

12    fluid in March 2017, both in production and for

13    service, we believe we have basically eliminated

14    the shudder.  When used for service, it only

15    requires a single flush and fill."  It looks like I

16    stuttered there.  Some guy objected.  He's not

17    important.

18                And then the answer says "I think, um, I

19    don't know what basically eliminate is.  It, it we

20    know it didn't.  It wasn't 100 percent.  I think

21    the frequency went down considerably, especially,

22    um, with the newer vehicles, but that's -- that's

23    not how I would have worded it."

24                And I asked "Well, if that were true,

25    there wouldn't have been a need for Mod.1.A, right?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 308

1    You could have followed up shop on the meetings

2    with Mr. Baran and Mr. Nitz a long time ago,

3    correct?"

4            Objection to form.

5            "Yeah, basically eliminated may be a

6    little, a little optimistic.  Again, Camaro was not

7    seeing a high frequency anyway.  But maybe that was

8    his understanding.  I can't speak for Al."

9            So while you're not in a position to

10   evaluate whether this information put in this

11   public forum that said that GM had basically

12   eliminated shudder in 2017 and early 2018, would

13   you agree that Mr. Goodrich's assessment of that

14   would be one that it was overly optimistic to say

15   that after changing the new transmission fluid in

16   March of 2017, they had basically eliminated

17   shudder?

18           MR. PIXTON:  Object to the form.

19   Misstates.

20           THE WITNESS:  I think -- what does he say

21   specifically?  I think he says he wouldn't have

22   worded it that way.  I think that's his actual

23   language.  I don't have any reason to dispute that.

24   BY MR. McNAMARA:

25      Q.   So let me go back to your report in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 309

```
 1   paragraph 147.

 2              And, again, this is where you mentioned

 3   the different sources where customers may have

 4   gotten potentially information, different

 5   information about the -- the shudder issues that

 6   could affect -- or the shift or shudder issues that

 7   could affect the vehicles.

 8              If it turns out that GM did not publicly

 9   disclose that it didn't have a fix for the shift

10   quality until 2023 and that the information in the

11   TSBs and the forums did not include factual

12   information about TCC shudder -- TCC shudder, then

13   what is the point of the individualized inquiry

14   you're mentioning here in paragraph 147?

15              MR. PIXTON:  Object to the form.

16              THE WITNESS:  So while we reviewed some

17   certain specific communications, the issue is you

18   don't know what consumers knew and what opinions

19   they may have formed about this.  Consumers who are

20   more informed about this were especially concerned

21   about it could respond by, for example, buying

22   something else or negotiating harder for these

23   vehicles.

24              And so the question is, when faced with a

25   variety of sources of information, some incomplete,
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 310

1   maybe some were more complete and from different

2   sources, consumers individually access different

3   amounts of the information and then they may

4   respond to them in different ways.

5          And so consumers who saw, for example,

6   that there might have been an issue and decided to

7   pursue that further and came to the conclusion that

8   this might be a problem for them, might be willing

9   to either -- might be more concerned and pay less

10  and consumers who are indifferent to it or collect

11  this information may not be -- may not have been as

12  affected.

13         But that evaluation is something that

14  can't be done broadly without looking at what, you

15  know, consumers know, what they accessed and

16  different -- this could impact different consumers

17  in different ways.  That's the point.

18  BY MR. McNAMARA:

19     Q.   Right.  My point is if the actual

20  information about the defects and if and when

21  any repairs was never released to the public,

22  there is no point to do an inquiry to find out

23  what would have happened to this consumer in the

24  but-for world if GM did tell the information?

25  If GM has never publicly disclosed what it knows

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 311

1    about the ATF, that there is a fix out there.

2    If customers show up for it, we have the root

3    cause and we have the solution if you come on

4    down, and if GM still has not disclosed to the

5    public shift quality problems persist and

6    they're going to until we make a major redesign

7    in model year '23, what are you talking about

8    this individual inquiring except maybe they

9    picked up fragments of information about

10   transmission issues from different sources?

11            MR. PIXTON:  Object to the form.

12            THE WITNESS:  The question is what

13   information they had when they were making their

14   decisions, and certainly this information was being

15   communicated on forums, which is why GM presumably

16   responded to it in various ways.

17            And the issue becomes if one were trying

18   to make it, for example, a comparison of a

19   disclosure and what was in the public domain for

20   doing some kind of -- for using this information

21   event as an event, for example, in a difference in

22   difference, that contrast would be something that

23   would be, you know, important to investigate.

24            What I'm stating here is simply that some

25   of this information was in the public domain.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 312

1    There are examples of it.  Maybe conflicting

2    information, maybe incomplete information, but how

3    consumers react to that is going to affect what the

4    prices are that are paid and that may be different

5    across consumers because different consumers engage

6    in different seeking information.

7    BY MR. McNAMARA:

8         Q.   I think this information is doing a

9    lot of work here.  No information about what GM

10   had, about its specific defects that it knew,

11   did it convey to the customers.  It gave -- it

12   has a TSB out there that says, if you have

13   shudder, come on down.  Actually, it doesn't

14   even go to the customers, it goes to the

15   dealers.  And it has information that's GM

16   confidential about a major redesign.

17             What you're talking about is fragments of

18   information customers may have about problems and

19   if they go on a forum, they're told, we've

20   eliminated it back three years ago before they had.

21   Isn't that true?

22             MR. PIXTON:  Object to the form.

23             THE WITNESS:  I think that -- again, some

24   of the things that you showed me would be of the

25   forum where they've made specific statements about

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 313

1    the likelihood that it would be fixed, but there is

2    information, you know, for example, customers

3    clearly were discussing this on these forums, and

4    so it is not required that GM initiate this kind of

5    information in order for customers to become aware

6    that there could be an issue, for example.

7            And my statement is simply that

8    consumers -- you know, there was discussion of this

9    in the public domain that would have affected

10   consumers decision-making and that could affect

11   some consumers differently than others and the only

12   way to know is to get an understanding of what

13   consumers actually knew.

14   BY MR. McNAMARA:

15       Q.   The only question I have for you about

16   what you just said is about "GM's obligation."

17   What did you mean by that?

18           MR. PIXTON:  Object to the form.

19           THE WITNESS:  I'm not sure I said "GM's

20   obligation."  I think GM communicated information.

21   BY MR. McNAMARA:

22       Q.   Right.

23       A.   I wouldn't -- again, I'm not attempting

24   to assess what an appropriate disclosure would be

25   and whether the communications that they have made

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 324

1              C E R T I F I C A T E

2         I do hereby certify that the aforesaid testimony

3    was taken before me, pursuant to notice, at the time

4    and place indicated; that said deponent was by me duly

5    sworn to tell the truth, the whole truth, and nothing

6    but the truth; that the testimony of said deponent was

7    correctly recorded in machine shorthand by me and

8    thereafter transcribed under my supervision with

9    computer-aided transcription; that the deposition is a

10   true and correct record of the testimony given by the

11   witness; and that I am neither of counsel nor kin to

12   any party in said action, nor interested in the

13   outcome thereof.

14

15   _____

     Nancy J. Martin, RMR, CSR

16

17

18   Dated:  December 28, 2021

19

20

21   (The foregoing certification of this transcript does

22   not apply to any reproduction of the same by any

23   means, unless under the direct control and/or

24   supervision of the certifying shorthand reporter.)

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 325

1                    C E R T I F I C A T E

2           I, Monice K. Campbell, a duly

3      commissioned and licensed court reporter, do hereby

4      certify:  That I reported Volume 2 of the

5      deposition of the witness, Lorin Moultrie Hitt,

6      Ph.D., commencing on Wednesday, December 22, 2021,

7      at 10:10 a.m.;

8                That prior to being examined, the witness

9      was sworn to testify to the truth.  That I

10     thereafter transcribed my said shorthand notes into

11     typewriting and that the typewritten transcript of

12     said deposition is a complete, true, and accurate

13     transcription of said shorthand notes.

14          I further certify that I am not a relative or

15     employee of an attorney or counsel or any of the

16     parties, nor a relative or employee of an attorney or

17     counsel involved in said action, nor a person

18     financially interested in the action.

19

20

21     _____

22                    Monice K. Campbell, CCR, RPR, CRR

23

24

25