UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENNIS SPEERLY, JOSEPH SIERCHIO, DARRIN
DEGRAND, DANIEL DRAIN, RICHARD FREEMAN,
LOUIS RAY, RICHARD SULLIVAN, JAMES               Case Number 19-11044
NORVELL, MICHAEL BANKS, GUY CLARK,               Honorable David M. Lawson
MARIA BARALLARDOS, CARY SHERROW,
JASON KEVIN SINCLAIR, KIMBERLY COULSON,
TROY COULSON, ANDRE MCQUADE, DONALD
DYKSHORN, TAIT THOMAS, JAMES PAUL
BROWNE, WILLIAM FREDO, DONALD SICURA,
JON ELLARD, RHIANNA MEYERS, RANDALL
JACOBS, MICHAEL PONDER, PHILIP WEEKS,
KARINA FREDO, JIMMY FLOWERS, STEVEN
BRACK, KEVIN WESLEY, BRIAN LLOYD,
GREGORY BUTSCHA, JERRY CARROLL,
KIMBERLY CARROLL, DOMINIC EATHERTON,
THOMAS EDMONDSON, RICHARD FILIAGGI,
ROBERT HIGGINS, and DAVID THOMPSON,

                    Plaintiffs,

v.

GENERAL MOTORS, LLC,

                    Defendant.

_____/

**OPINION AND ORDER GRANTING PLAINTIFFS' MOTION TO CERTIFY CLASS
ACTION, CERTIFYING SUBCLASSES, AND SETTING DEADLINES FOR
SUBMISSION OF PROPOSED NOTICE**

The plaintiffs have moved to certify 26 statewide classes in this product defect litigation

involving alleged "shudder" and "hard shift" problems in the defendant's 8L45 and 8L90 8-speed

automatic transmissions used in various models of its cars sold in the 2015 through 2019 model

years.  Each of the named plaintiffs own a class vehicle and have testified that they have

experienced those problems when driving them.  And some have recounted that the flaws amount

to safety hazards.  Defendant General Motors, LLC (GM) opposes the motion on several grounds.

However, the parties' extensive briefs and arguments demonstrate that the plaintiffs have satisfied all the requirements of Federal Rule of Civil Procedure 23(a), and they have shown that, on a state-by-state basis, the common issues predominate over any individual questions of fact, and that class adjudication is superior to any other method for the fair and efficient determination of the dispute. The Court will grant the motion.

## I.

The facts of the case are familiar by now to the parties and were discussed at length in the Court's prior opinions on the defendant's pleading challenges to the amended class action complaint, *Francis v. General Motors, LLC*, 504 F. Supp. 3d 659, 667 (E.D. Mich. 2020), and the motions challenging the expert witnesses, *Won v. General Motors, LLC*, No. 19-11044, 2022 WL 3010886, at *1 (E.D. Mich. July 28, 2022). The plaintiffs allege that the automatic transmissions in their vehicles occasionally will "slip, buck, kick, jerk and harshly engage." They say that, when the transmission causes the vehicle to perform erratically, such as with sudden or delayed acceleration, the vehicles may be unsafe to drive. All of the car and truck models implicated by this suit were made by defendant General Motors, LLC. The plaintiffs filed several suits on behalf of putative classes, including the owners of thousands of vehicles that, they claim, have defective transmissions, which GM has refused to fix or replace under its express warranty. The cases were consolidated in this Court in the nature of a multidistrict litigation and have been managed as such.

### A. Parties and Claims

In a 2,920-paragraph consolidated amended class action complaint (CACAC), which spans more than 900 pages (including attached exhibits), the plaintiffs pleaded causes of action sounding in breaches of express and implied warranties; common law fraudulent omissions and statutory consumer fraud; violations of various state laws governing consumer sales, deceptive marketing, and unfair trade practices; and unjust enrichment under the laws of 30 states. The putative classes

that have been proposed for certification consist of domestic buyers and lessors of GM cars and trucks equipped with its Hydra-Matic 8L90 and 8L45 transmissions. The class vehicles include the 2015 through 2019 model year Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2019 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac ATS, ATS-V, CTS, CT6, and CTS-V; 2015-2019 GMC Sierra, Yukon, Yukon XL, and Yukon Denali XL; and 2017-2019 GMC Canyon.

The consolidated amended complaint aggregates claims brought by individuals in five separately filed civil actions (file numbers 19-11044, 19-11802, 19-11808, 19-11875, and 19-12371), which were assigned or reassigned to this Court and consolidated for all pretrial proceedings. The parties stipulated to dismiss many of the originally named individual plaintiffs, and the plaintiffs, with leave granted, also have filed two addendums to the amended complaint naming replacement plaintiffs from most states.

The consolidated actions presently comprise claims brought by 39 plaintiffs who hail from the following 30 states:

- Alabama (Brian Lloyd)
- Arizona (Maria Barallardos)
- Arkansas (James Browne)
- Colorado (Daniel Drain)
- Connecticut (Kevin Wesley)
- Delaware (Richard Filiaggi)
- Florida (Rhianna Meyers, Michael Ponder, Richard Sullivan, Tait Thomas)
- Georgia (Jimmy Flowers, Richard Freeman, Philip Weeks)
- Idaho (Carry Sherrow) (**)
- Illinois (Dennis Speerly)
- Indiana (Thomas Edmondson)
- Kansas (Guy Clark)
- Kentucky (James Norvell)
- Louisiana (Donald Dykshorn)
- Maine (Robert Higgins)
- Michigan (Louis Ray)
- Minnesota (Troy and Kimberly Coulson)

- New Hampshire (Michael Banks)
- New Jersey (Randall Jacobs, Joseph Sierchio)
- New York (Andre McQuade)
- North Carolina (Steven Brack)
- Ohio (Gregory Butscha)
- Oklahoma (John Ellard)
- Oregon (Carry Sherrow) (**)
- Pennsylvania (Karina and William Fredo)
- South Carolina (Donald Sicura, Jason Sinclair)
- Tennessee (David Thompson)
- Texas (Darrin Degrand)
- Washington (Jerry and Kim Carroll)
- Wisconsin (Dominic Eatherton)

One named plaintiff, Cary Sherrow, initially was identified as a lead plaintiff and class representative for claims and classes in more than one jurisdiction — both Idaho (where she bought her vehicle) and Oregon (where she presently resides).  However, it appears that the plaintiffs no longer seek to proceed on a class-wide basis with any claims under Oregon law.

The consolidated amended complaint also pleaded claims by named plaintiffs in California, Missouri, and South Dakota, but the plaintiffs from those states later stipulated to dismiss their claims without prejudice, and the Court then dismissed all of the counts under the laws of those three states.  Although the pleadings as they stand include claims under the law of 30 states, the plaintiffs have moved for certification of classes embracing only 26 of those jurisdictions (omitting Connecticut, Indiana, Ohio, and Oregon).

### B. Proposed Classes

The plaintiffs propose the certification of 26 classes, state-by-state.  The respective states, class representatives, and causes of action for each proposed class are as follows:

1.      Alabama (Brian Lloyd) for claims under the Alabama Deceptive Trade Practices Act ("ADTPA"), Ala. Code § 8-19-1 *et seq.* and breach of express warranty, § 7-2-313.

2.      Arizona (Maria Barallardos) for claims under the Arizona Consumer Fraud Act.

3.      Arkansas (James Paul Browne) for claims under the Arkansas Deceptive Trade Practices Act, Ark. Stat. § 4-88-107 *et seq.*, and breach of implied warranty, § 4-2-314.

4.      Colorado (Daniel Drain) for claims under breach of express warranty, Colo. Rev. Stat. § 4-2-313, and breach of implied warranty, § 4-2-314.

5.      Delaware (Richard Filiaggi) for claims under the Delaware Consumer Fraud Act ("DCFA"), Del. Code Ann. tit. 6, § 2511, breach of express warranty, § 2-313, and breach of implied warranty, § 2-314.

6.      Florida (Rhianna Meyers Richard Sullivan, and Tait Thomas) for claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.*

7.      Georgia (Philip Weeks) for claims under breach of express warranty, Ga. Code. Ann. § 11-2-313, and breach of implied warranty, § 11-2-314.

8.      Idaho (Cary Sherrow) for claims under the Idaho Consumer Protection Act ("ICPA"), Idaho Code § 48-601 *et seq.*, and breach of express warranty, § 28-2-313.

9.      Illinois (Dennis Speerly) for claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. § 505/1 *et seq.*, breach of express warranty, 810 Ill. Comp. Stat. § 5/2-313, breach of implied warranty, § 5/2-314, and fraudulent concealment.

10.     Kansas (Guy Clark) for claims under the Kansas Consumer Protection Act ("KCPA"), Kan. Stat. Ann. § 50-623 *et seq.*, breach of express warranty, § 84-2-313, and breach of implied warranty, § 84-2-314.

11.     Kentucky (James Norvell) for claims under the Kentucky Consumer Protection Act ("KCPA"), Ky. Rev. Stat. § 367.110 *et seq.*, and breach of express warranty, § 335.2-313.

12.     Louisiana (Daniel Dykshorn) for claims under the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), La. Stat. Ann. § 51:1401 *et seq.*, and fraudulent concealment.

13.     Maine (Robert Higgins) for claims under the Maine Unfair Trade Practices Act ("MUTPA"), Me. Stat. tit. 5, § 205-A *et seq.*, breach of express warranty, § 2-313, and breach of implied warranty, § 2-314.

14.     Michigan (Louis Ray) for claims under the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903 *et seq.*, and breach of implied warranty, § 440.2313.

15.     Minnesota (Troy and Kimberly Coulson) for claims under the Minnesota Consumer Fraud Act ("MCFA"), Minn. Stat. 325F.68 *et seq.*, breach of express warranty, § 336.2-313, and breach of implied warranty, § 336.2-314.

16.     New Hampshire (Michael Banks) for claims under the New Hampshire Consumer Protection Act ("NHCPA"), N.H. Rev. Stat. Ann. § 358-A:1 *et seq.*, breach of express warranty, § 382-A:2-313, and breach of implied warranty, § 382-A:2-314.

17.     New Jersey (Randall Jacobs and Joseph Sierchio) for claims under the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-1 *et seq.*, breach of express warranty, § 12A:2-313, and breach of implied warranty, § 12A:2-314.

18.     New York (Andre McQuade) for claims under the New York General Business Law § 349, breach of express warranty, N.Y. U.C.C. § 2-313, breach of implied warranty, § 2-314, and fraudulent concealment.

19.     North Carolina (Steven Brack) for claims under the North Carolina Unfair and Deceptive Acts and Practices Act ("NCUDPA"), N.C. Gen. Stat. § 75-1.1 *et seq.*

20.     Oklahoma (John Ellard) for claims under the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15, § 751 *et seq.*, breach of express warranty, Okla. Stat. tit. 12A, § 2-313, and breach of implied warranty, Okla. Stat. tit. 12A, § 2-314.

21.     Pennsylvania (Karina and William Fredo) for claims under the Pennsylvania Unfair Trade Practices and Consumer Protection law.

22.     South Carolina (Donald Sicura and Jason Sinclair) for claims under breach of express warranty, S.C. Code Ann. § 36-2-313, and breach of implied warranty, § 36-2-314.

23.     Tennessee (David Thompson) for claims for the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*, and fraudulent concealment.

24.     Texas (Darrin DeGrand) for claims under the Texas Deceptive Trade Practices Act ("TDTPA"), Texas Bus. & Com. Code § 17.41 *et seq.*, and breach of express warranty, § 2.313.

25.     Washington (Jerry and Kim Carroll) for claims under the Washington Consumer Protection Act ("WCPA"), Wash. Rev. Code § 19.86.010 *et seq.*, breach of express warranty, § 62a.2-313, and fraudulent concealment.

26.     Wisconsin (Dominic Eatherton) for claims under the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18.

In most jurisdictions, the proposed classes would consist of "all original purchasers who purchased

(in the respective state) new class vehicles from authorized GM dealers before March 1, 2019."

However, for some states (Arizona, Arkansas, Michigan, New York, Pennsylvania, Tennessee,

Wisconsin) the proposed classes would consist of "all used purchasers and current owners who purchased class vehicles from authorized GM dealers in (in the respective state) before March 1, 2019." For all purposes the "class vehicles" are defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon.

### C. Alleged Defects

Each of the named plaintiffs asserts that the 8L45 and 8L90 transmissions share a common design except for certain components that vary in inconsequential respects between different vehicles. They further allege that the class transmissions have a duo of common defects: (1) a defective Automatic Transmission Fluid (ATF), which lacks "robustness to moisture," and fails to "maintain a positive friction curve over time," leading to "shudder" problems, and (2) an "inability to purge trapped air due to an insufficient valve body architecture," which causes problems with "harsh shifts." The "harsh shifts" were categorized in GM documents summarizing customer complaints as "harsh garage shifts" (e.g., "after shifting into gear in the morning, there is a delay and then a harsh shift"); "first shift of the day" issues, (e.g., "pulling out of my driveway I feel a bump on the first shift at 5 mph"); and "rough coast downs" (e.g., "coming to a stop it feels like I was rear-ended").

The plaintiffs say that GM developed a different ATF formulation known as "Mod1a," which was deployed in March 2019. However, GM chose only to replace the ATF in class vehicles that then remained unsold on dealer lots, and it elected not to deploy the new Mod1a formula to all previously sold class vehicles. The plaintiffs say that the new formula cures "shudder" issues, but it has not been made available by GM to class vehicle owners who bought their cars before

March 1, 2019.  The plaintiffs also allege that GM developed various hardware and software refinements to address the "harsh shift" problems, but GM internal correspondence reveals the defendant's conclusion that "[u]ltimately, some of the issues could not be resolved without a major redesign of the transmission, which was approved in early 2018 (8RWD Gen2)."  The "Gen2" design improvements have been slated by GM for deployment only in Model Year 2023 and later vehicles, and those improvements have not been deployed for the class vehicles.  Further correspondence reveals that GM considered retrofit packages to bring the Gen 2 improvements to class vehicles, with associated costs of $1,550 for valve body replacement and $4,450 for transmission replacement in each class vehicle.  However, GM decided not to proceed with offering those fixes due to the cost to deploy fixes to all class vehicles.

The plaintiffs allege that the pervasive commonality of the alleged defects is illustrated by GM's own warranty service statistics.  The plaintiffs say that GM established target defect rates for the class models ranging from 5 to 9.8 "Incidents Per Thousand Vehicles" ("IPTV").  Those rates correspond to between 0.5% and 0.98% — less than 1% of vehicles sold for all models.  However, a February 2018 warranty data analysis produced by GM showed that predicted warranty service rates for various models exceeded 155 IPTV (15.5%) within 60,000 miles of service, with a predicted "repeat claims rate" of 8%.  A follow-up analysis in August 2018 found that the actual service rate was 25% within 32 months after sale.  Another GM analysis in 2019 found that the observed IPTV for class vehicles was 30-fold higher than the target defect rate established for Model Year 2023 and later vehicles with the new Gen 2 design.  GM's engineer Tim Anguish testified that the warranty claim rate for class vehicles eventually exceeded 50%.  Another engineer, Max Burgmann, attested that the claim rate for vehicles sold with the "Mod1a" ATF retrofit was "10-fold lower" than vehicles sold previously.

GM employees also initiated multiple internal reviews of the 8L transmission problems, which were instigated through the use of "Open Investigation Reports" ("OIRs").  Through the OIR process, GM employees collected complaints about an issue and prepared a report of findings for presentation to GM executives.  Under the OIR reporting scheme, issues were classified with an "occurrence rating" ("OR") based on how frequently the issue occurred in the field.  In one OIR report, the "shudder" defect was classified with an OR of "5," indicating that it occurred at an IPTV of 111, or 11.1%, which was denoted as "occurs at an extremely high rate," or "certain to occur."  The "harsh shift" defect was rated in a June 2021 OIR with an OR of "4," corresponding to an IPTV rate of 30 to 110 (3.0% to 11.0%), denoted as a "high rate."  GM's own warranty service data expert, Robert Lange, compared class models with the 8L transmission to the same models with other transmission options, and he concluded that the warranty claim rate for 8L-equipped vehicles was 90 times higher — 109 repairs per 1,000 for 8L-equipped vehicles vs. 1.2 repairs per 1,000 for class models with other transmissions.  A GM "cost recovery specialist" testified that the amount of money spent by GM addressing warranty claims for 8L-equipped models was more than $131 million, noting that it was the highest he had ever seen.  GM's Chief Engineer Clyde Bulloch also affirmed that none of the 8L-equipped class models ever met GM's warranty service targets.

The plaintiffs' expert, Alice Wachs, reviewed warranty service data produced by GM through discovery and predicted that warranty claim rates among 8L-equipped class models eventually would range from 61% to 100% for various models within the expected vehicle lifetime of 10 years or 120,000 miles.  Wachs also reported that a similar review conducted internally by GM predicted future warranty claim rates matching her figures.

Finally, the plaintiffs' expert William McVea conducted an engineering review of the transmission design that included review of GM correspondence about the design and problems exhibited by it, inspections of class vehicles owned by some of the named plaintiffs, and teardowns of several exemplar transmissions supplied by the defendant. He concluded that an inappropriate combination of ATF and clutch friction material in the "Torque Converter Clutch" ("TCC") assembly, as well as defects in the design or function of certain valve components, contributed to both the "shudder" and "harsh shift" issues. McVea opined that, due to the defective design, the problems would be expected to occur inevitably in all class vehicles sold.

### D. Named Plaintiffs

All of the named plaintiffs pleaded certain common allegations: (1) their cars all are equipped with 8L45 or 8L90 transmissions, (2) they repeatedly have presented their cars to the respective dealers for repairs (as noted further below), (3) despite the repeated repair attempts, the vehicles all continue to exhibit problems with "shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating," (4) the plaintiffs were not informed about any transmission defects either by GM or its dealers before buying their cars, and (5) if they had known about the transmission problems, they would not have bought the vehicles.

The named plaintiffs further testified that they understand that the role of a class representative involves interacting with class counsel, appearing for depositions, supplying information during discovery, consulting with counsel about the litigation and prospects for settlement, and that their duties have involved significant time investments since the case commenced. *E.g.*, Michael Banks dep., ECF No. 224-29, PageID.15722-23 (attesting that he has spent approximately 40 hours on case-related tasks).

The various plaintiffs further alleged and testified about their experiences with the class vehicles, uniformly describing "shuddering" while driving that occurs "daily" when driving at

-10-

speeds between 30 to 50 mph, "extremely hard shifts," "banging," "jolting," and "popping" into gear when slowing down and starting off from traffic signals. Many characterized the defects as safety concerns. The specific complaints described in the plaintiffs' testimony is summarized in Part A of the attached Appendix.

### E. Proceedings

The complaint under the leading file number 19-11044 was filed on April 10, 2019. On September 16, 2019, the Court consolidated the related cases and established initial deadlines for filing and challenging consolidated pleadings. The consolidated amended class action complaint was filed on September 30, 2019. On November 30, 2020, the Court granted in part the defendant's first motion to dismiss and dismissed a limited slate of claims, while allowing most of the pleaded causes to proceed. On June 10, 2021, after several rounds of agreed partial dismissals and the filing of two addendums to the complaint to add new plaintiffs, the Court granted a second motion to dismiss and dismissed certain claims by one surviving plaintiff. On December 16, 2021, the Court granted a motion by the plaintiffs to file a second addendum adding one more plaintiff. After the discovery period relating to class certification issues closed, the plaintiffs filed their class certification motion. The parties also previously filed motions challenging six of their respective experts. Those motions were denied in the Court's opinion issued July 28, 2022.

### II.

A party seeking class certification under Federal Rule of Civil Procedure 23 must satisfy all four items under subparagraph (a) of the rule and at least one provision of subparagraph (b). *Clemons v. Norton Healthcare Inc. Retirement Plan*, 890 F.3d 254, 278 (6th Cir. 2018). The "(a)" requirements are numerosity, commonality, typicality, and adequate representation. The plaintiffs

maintain that they have shown compliance with all of the (a) criteria and that 26 subclasses should be certified under Rule 23(b)(3).  The defendant asserts multiple arguments in opposition.

### A.  Rule 23(a)

#### 1.  Numerosity

Numerosity is shown when the number of potential plaintiffs is too large to make joinder practicable but not so large as to make administration impossible.  *Senter v. General Motors Corp.*, 532 F.2d 511, 523 (6th Cir. 1976).  There is no strict numerical test to determine when the class is large enough or its members too numerous to be joined under the Federal Rules of Civil Procedure. *Id.* at 523 n.24.

This requirement is easily satisfied here, where the case implicates a defect allegedly present in approximately 800,000 class vehicles.  Moreover, two of the states proposed for certification (Florida and Texas) are among the most populous in the nation, and it may be presumed that many tens of thousands of class models were sold there.  The plaintiffs further represent that at least 1,000 class vehicles were sold in every jurisdiction proposed for certification, and the record presents no reason to question that assertion.

#### 2.  Commonality

Commonality simply means that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  Not all questions of law and fact raised in the complaint need be common. *Olden v. LaFarge Corp.*, 203 F.R.D. 254, 269 (E.D. Mich. 2001), *aff'd*, 383 F.3d 495 (6th Cir. 2004).  "The standard is not [that] demanding. 'Rule 23(a) simply requires a common question of law or fact.'"  *Rockey v. Courtesy Motors, Inc.*, 199 F.R.D. 578, 583 (W.D. Mich. 2001) (quoting *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884 (6th Cir. 1997)).

This requirement is satisfied as well.  Although the plaintiffs have alleged a variety of legal theories under the laws of 26 different states, all of them assert some form of warranty and consumer fraud claims in each of the states proposed for class litigation, and all of those claims demand proof of a defect in the vehicles' transmission design.  That is enough.  "'[F]or purposes of Rule 23(a)(2), even a single common question will do.'"  *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 355 (N.D. Cal. 2018) (quoting *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1053 (9th Cir. 2015); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)).

The defendant points out several aspects of proof on which it believes its evidence will defeat the plaintiffs' claims on the merits, either by negating crucial elements or successfully establishing an affirmative defense to liability.  But the prospect that the answer to a common question may favor the defendant rather than the plaintiffs certainly does not mean that class litigation of the issue is barred.  In fact, it weighs in favor of addressing the issue expeditiously in a single proceeding to avoid the needless expense of adjudicating the same question in thousands of individual cases that might be doomed to founder on the same common shoal.  "[T]he 'common contention need not be one that will be answered, on the merits, in favor of the class'"; "'for purposes of Rule 23(a)(2), even a single common question will do.'"  *Arris* , 327 F.R.D. at 355 (quoting *Alcantar*, 800 F.3d at 1053; *Dukes*, 564 U.S. at 359).

### 3.  Typicality

Typicality requires that a "sufficient relationship exists between the injury to the named plaintiff and conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct."  *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000) (internal quotes omitted).  Although the named plaintiffs' claims must fairly encompass the class members'

claims, they need not always involve the same facts or law.  *See Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998); *Senter*, 532 F.2d at 525 n.31.

The typicality requirement also is satisfied.  When focusing on the common issue of vehicle defect, the claims of the class representatives are identical to claims that could be raised by absent class members.  As reviewed in detail above, each of the named plaintiffs alleges that their vehicles have either "shudder" or "harsh shift" issues, or both, which have not been cured despite repeated presentation of the vehicles for repair.  All of the plaintiffs seek the same relief in the form of either compensation for alleged overpayment for defective cars at the point of sale, or recovery of the cost of replacing defective components or their entire transmissions.  Those are the same claims, and the same remedies sought, on behalf of all class members.  The named plaintiffs' interests are well "'aligned with those of the represented group.'"  *Sprague*, 133 F.3d at 399 (quoting *In re American Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996)).

### 4. Adequacy of Representation

Under Rule 23(a)(4), the Court must "measure the adequacy of the class members' representation based upon two factors: '1) the representatives must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'"  *In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013) (quoting *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 757 (6th Cir. 2013)).  "The Rule requires that 'the class members have interests that are not antagonistic to one another.'"  *Ibid.*  "Thus, 'the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class.'"  *Ibid.* (quoting *Dewey v. Volkswagen AG*, 681 F.3d 170, 183 (3d Cir. 2012)).

The named plaintiffs who have been nominated as class representatives have shown that they have common interests with absent class members and are likely to vigorously prosecute the

litigation.  Every plaintiff testified that they understand the role of a class representative, and each attested that they have invested significant time in the case, including producing discovery materials, conferring with class counsel, and sitting for depositions.  The sole ground of the defendant's objection to the nominated representatives is that other (former) plaintiffs have "dropped out of the case" after they sold their vehicles, or for other reasons.  That criticism has no apparent bearing on the qualifications of any surviving plaintiff to continue the litigation as class representatives.  The defendant has not suggested any reason to question the experience or qualifications of Mr. Theodore Leopold and his team to proceed as class counsel.

## B.  Rule 23(b)

Rule 23(b) identifies three types of class actions, and a plaintiff must meet the requirements of at least one of them.  The plaintiffs seek certification of 26 state-by-state subclasses under Rule 23(b)(3), which authorizes class certification when common questions of law or fact "predominate over any questions affecting only individual members," and the collective approach is "superior" to other methods of adjudicating the controversy.  *Sandusky Wellness Center, LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017).

"In discerning whether a putative class meets the predominance inquiry, courts are to assess 'the legal or factual questions that qualify each class member's case as a genuine controversy,' and assess whether those questions are 'subject to generalized proof, and thus applicable to the class as a whole.'"  *Id.* at 468 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 594 (1997); *Bridging Communities, Inc. v. Top Flite Fin., Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016)).  "'If the same evidence will suffice for each member to make a *prima facie* showing, then it becomes a common question.'"  *Ibid.* (quoting *Sandusky Wellness Center, LLC v. Medtox Scientific, Inc.*, 821 F.3d 992, 998 (8th Cir. 2016)).  The plaintiffs "need not prove that every

-15-

element can be established by class-wide proof," but "the key is to identify the substantive issues that will control the outcome." *Ibid.* (quotations omitted).

"In addition, Rule 23(b)(3) classes must also meet an implied ascertainability requirement." *Ibid.* (citing *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016)). That is because, "unlike (b)(1) and (b)(2) classes, (b)(3) class members are entitled to notice and are able to opt-out of the class." *Cole*, 839 F.3d at 541. "In the Rule 23(b)(3) context, ascertainability aids the inherent efficiencies of the class device by ensuring administrative feasibility, and . . . ascertainability is a requirement tied almost exclusively to the practical need to notify absent class members and to allow those members a chance to opt-out and avoid the potential collateral estoppel effects of a final judgment." *Ibid.* "[T]he ascertainability requirement . . . necessitate[s] 'a class description [that is] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *Ibid.* (quoting *Young v. Nationwide Mutual Insurance Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012)).

### 1. Predominance

The plaintiffs have met their burden to demonstrate predominance of issues subject to common proofs on their warranty and consumer fraud claims in each of the state classes. The defendant's general objections to the proposed certification scheme are not tied to any peculiarities of state law, but merely assert that certain elements common to all of the various causes are not amenable to common proofs. The Court disagrees. As explained below, those objections do not undermine a finding of predominance.

Before certifying any claim for class treatment, the Court must conduct a rigorous analysis, examining the elements of each cause of action proposed for certification. *Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 278-79 (6th Cir. 2018); *Sandusky Wellness Center*, 863

F.3d at 466.  The plaintiffs need not show that every element of every claim can be sustained by common proofs, but they must identify the elements of each pleaded cause so that the Court can weigh the balance of common and individualized issues.  "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 452, (2016).

There are three readily discernible common questions that are crucial to the pleaded causes of action in every jurisdiction where class certification has been sought.  Those are (1) whether the 8L45 and 8L90 transmission design has one or more defects that render the class vehicles unsuitable for the ordinary use of providing safe and reliable transportation, (2) whether the defendant knew about the defects and concealed its knowledge from buyers of class models, and (3) whether the information withheld would have been material to a reasonable car buyer.  Those issues all are amenable to proof by common evidence on a class-wide basis, some of which already has been presented in the record.  The answers to each of those questions will feature prominently in the disposition of this case, outweighing the importance of any ancillary individualized issues.

The elements of pleaded causes are discussed in turn state-by-state in Part B of the Appendix.  The plaintiffs have identified several problematic elements that typically complicate common litigation of claims on a class-wide basis where certain jurisdictions may require: (1) proof that formal pre-suit notice was given by individual claimants for warranty claims, (2) contractual privity between manufacturer and purchaser, (3) proof of individualized reliance on alleged misstatements or omissions, and (4) proof on an individualized or subjective basis of elements such as causation for injuries allegedly sustained.  But the plaintiffs have demonstrated

-17-

that any individualized proofs either are not required or will not predominate over the common issues in each state.

### i. Common Elements of Warranty Claims

The question whether the 8L transmission design has a defect is an inherent element of the claims for breach of express and implied warranty in every jurisdiction where those claims were pleaded.  The parties have not highlighted any peculiarities in the respective states' enactments of the Uniform Commercial Code, which governs those claims in every relevant jurisdiction.  The State of Illinois's iterations of the pertinent rules of decision are exemplary.

"To state a claim for breach of express warranty under Illinois law, a plaintiff must allege that a seller: '(1) made an affirmation of fact or promise; (2) relating to the goods; (3) which was part of the basis for the bargain; and (4) guaranteed that the goods would conform to the affirmation or promise.'"  *Rudy v. Fam. Dollar Stores, Inc.*, No. 21-CV-3575, 2022 WL 345081, at *6 (N.D. Ill. Feb. 4, 2022) (quoting *O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 714 (N.D. Ill. 2020)).  Typically such a warranty is held to "warrant[] . . . that the dealer will repair, replace, or adjust defects if parts of the [vehicle] . . . malfunction."  *Cosman v. Ford Motor Co.*, 285 Ill. App. 3d 250, 257, 674 N.E.2d 61, 66, 220 Ill. Dec. 790, 795 (1996).  "To prevail on [a claim for breach of implied warranty], Plaintiff must establish: (1) a sale of goods, (2) that the seller of the goods is a merchant with respect to those goods, and (3) that the goods were not of merchantable quality."  *Walker v. Macy's Merchandising Group, Inc.*, 288 F. Supp. 3d 840, 868 (N.D. Ill. 2017).  "Goods are not of 'merchantable quality' if they are 'unfit for their intended purpose.'"  *Ibid.* (quoting *Maldonado v. Creative Woodworking Concepts, Inc.*, 342 Ill. App. 3d 1028, 1034, 796 N.E.2d 662, 666 (2003)).

-18-

It is undisputed that the class vehicles were covered by GM's "New Vehicle Limited Warranty," which "covers repairs to correct any vehicle defect," and which also affirms and limits "[a]ny implied warranty of merchantability or fitness for a particular purpose . . . to the duration of [the] written warranty."  CACAC, ECF No. 41, PageID.2265-67.  The warranty covers the vehicles "bumper to bumper" for four years or 50,000 miles and extends coverage of "powertrain components" for seven years or 70,000 miles. *Ibid.*

There is no dispute that under those terms there was an express warranty of limited duration in effect covering all class vehicles and that the defendant sold and impliedly warranted the merchantability of the vehicles.  Those elements therefore are subject to universal proofs in each of the subclasses.  It is undisputed that the vehicles are "goods," that there was a "sale" of the vehicles, and that the defendant and its authorized dealers are "merchants" within the ambit of the U.C.C.  It also is undisputed that the limited warranty terms were part of the "basis of the bargain" for sales of the class vehicles, and that the warranty comprises certain promises to repair vehicle "defects."  Those elements, therefore, also are subject to common proofs and present no individualized issues.  Whether the particular "defect" is covered by the express warranty may be subject to some debate, but federal courts considering the same warranty language at issue here have concluded that it may cover defects in both "workmanship" and "design." *In re Gen. Motors Air Conditioning Mktg. & Sales Pracs. Litig.*, 568 F. Supp. 3d 837, 839-40 (E.D. Mich. 2021) ("The Court concludes that GM's reading of the warranty is not the only plausible one.  Indeed, it would not necessarily be unreasonable to conclude that the warranty could apply to design defects.") (citing *McKee v. General Motors*, 376 F. Supp. 3d 751 (E.D. Mich. 2019); *Francis v. General Motors, LLC*, 504 F. Supp. 3d 659, 673 (E.D. Mich. 2020)).  Moreover, if the defendant contends that the "defect" at issue here is not covered by the express warranty, the defendant

"should welcome class certification," because by so proving it "can obtain a judgment binding all class members who do not opt out of the class."  *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013).  In any event, whether or not the defect is "covered" is yet another matter subject to common and universal proofs, since it either is covered for all owners, or it is not covered for any.

ii. Common Elements for Proving Existence of a Defect

As noted above, it is elemental that to prevail under either warranty theory, the plaintiffs must prove that the transmission has some "defect" that either is covered by the express warranty to repair or renders the class vehicles unfit for their ordinary or intended purpose, or both. The question whether the transmissions have such a defect will be the centerpiece of this litigation.

Under the laws of the several states, the implied warranty cause of action (variously identified under other labels in some jurisdictions) requires the plaintiffs to prove that a product is not "merchantable," meaning that it is unsuitable for its ordinary or intended use.  Arkansas: *Ctr. v. Conagra Foods, Inc.*, 2015 WL 4106473, at *6 (W.D. Ark. July 6, 2015) ("[T]he product sold to him was not merchantable, i.e., fit for the ordinary purpose for which such goods are used.")); Colorado: *Simon v. Coppola*, 876 P.2d 10, 15 (Colo. App. 1993) ("[T]he product was not suitable for the purpose warranted."); Delaware: *Paolini v. Snyder's Furniture, LLC*, 2022 WL 951346, at *4 (Del. Com. Pl. Mar. 30, 2022) ("To be merchantable, a good must be fit for the ordinary purpose for which such goods are used."); Georgia: *Simmons v. Augusta Aviation, Inc.*, 2022 WL 837772, at *11 (S.D. Ga. Mar. 21, 2022) ("Under Georgia law to be merchantable, goods must meet several criterion including being fit for the ordinary purposes for which such goods are used."); Illinois: *Walker v. Macy's Merchandising Group, Inc.*, 288 F. Supp. 3d 840, 868 (N.D. Ill. 2017) ("Goods are not of merchantable quality if they are unfit for their intended purpose."); Kansas: *Marksberry*

*v. FCA US LLC*, 2022 WL 2072717, at *7 (D. Kan. June 9, 2022) ("Pursuant to K.S.A. § 84-2-314(2)(c), a good is merchantable if it is fit for the ordinary purposes for which such goods are used."); Maine: *Atkinson Trucking & Logging, Inc. v. Blanchard Mach. Co.*, 2016 WL 5660288, at *4 (D. Me. Sept. 30, 2016) ("Goods to be merchantable must be fit for the ordinary purposes for which such goods are used."); Michigan: *City of Livonia v. Aquatic Renovation Sys., Inc.*, 2022 WL 1651655, at *12 (E.D. Mich. May 24, 2022) ("Under implied warranty theory, a defect is established by proof that a product is not reasonably fit for its intended, anticipated, or reasonably foreseeable use."); Minnesota: *Hammerschmidt v. Gen. Motors LLC*, 2022 WL 329403, at *6 (D. Minn. Feb. 3, 2022) ("An implied warranty of merchantability requires that the goods be fit for the ordinary purposes for which the goods are used."); New Hampshire: *P.C. Hoag & Co. v. Man Lift Mfg., Co.*, 2018 WL 4298343, at *4 (D.N.H. Jan. 10, 2018) ("New Hampshire Rev. Stat. 382-A:2-314 generally provides that a seller impliedly warrants his goods are merchantable or generally fit for the ordinary purposes for which the goods are used."); New Jersey: *Scattaglia v. Mercedes-Benz USA, LLC*, 2021 WL 5918475, at *11 (D.N.J. Dec. 15, 2021) ("To be merchantable, the goods must be fit for the ordinary purposes for which such goods are used."); New York: *Anderson v. Unilever United States, Inc.*, 2022 WL 2181575, at *9 (S.D.N.Y. June 16, 2022) ("To be merchantable, goods must be fit for the ordinary purposes for which such goods are used."); Oklahoma: *Mears v. Astora Women's Health, LLC*, 2019 WL 1590592, at *4 n.5 (W.D. Okla. Apr. 12, 2019) ("A good is 'merchantable' if it is fit for the ordinary purposes for which such goods are used."); South Carolina: *Grubbs v. Wal-Mart Stores, Inc.*, 514 F. Supp. 3d 820, 824 (D.S.C. 2021) ("S.C. Code of Laws 36-2-314 provides that goods are 'merchantable' if they are fit for the ordinary purposes for which such goods are used.").

"'[T]he decisions on point in implied warranty cases concerning defective cars have recognized that merchantability implies not only that a vehicle can provide transportation, but that it can do so in a reasonably safe and controlled manner.'" *Reynolds v. FCA US LLC*, 546 F. Supp. 3d 635, 650 (E.D. Mich. 2021) (quoting *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1015 (E.D. Mich. 2017)); *see also Sasso v. Tesla, Inc.*, 2022 WL 363850, at *5 (E.D.N.C. Feb. 7, 2022) ("A car's ordinary purpose is to provide transportation. Where a car can provide safe, reliable transportation, it is generally considered merchantable.") (collecting cases); *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 297 (4th Cir. 1989) ("GM's diesel-equipped cars have served the traditionally recognized 'purpose' for which automobiles are used. Since cars are designed to provide transportation, the implied warranty of merchantability is simply a guarantee that they will operate in a safe condition and substantially free of defects.") (collecting cases); 3 Anderson U.C.C. § 2-314:77, Content of implied warranty of merchantability — Safety (3d. ed.) ("The element of 'quality' within the implied warranty of 'merchantability' embraces the element of 'safety' for use. Thus, if a product is deemed unsafe due to some defect at the time of sale, there will be a breach of the implied warranty of merchantability.").

The weight of authoritative commentary and contemporary court decisions from numerous jurisdictions hew consistently to the view that "merchantability" of an automobile requires a showing that the vehicle operates in a "safe condition" or provides "safe transportation."  The principle that a product must be reasonably safe for its ordinary or intended use also has been recognized expressly by decisions in the overriding majority of state jurisdictions where implied warranty claims were pleaded in this case.  *E.g.*, Arkansas: *Wawak v. Stewart*, 247 Ark. 1093, 1097, 449 S.W.2d 922, 924 (1970) ("We apprehend it to be the rule that, when a vendor-builder sells a new house to its first intended occupant, he impliedly warrants that the foundations

supporting it are firm and secure and that the house is structurally safe for the buyer's intended purpose of living in it."); Colorado: *O'Connor v. BMW of N. Am., LLC*, 2020 WL 2309617, at \*9 (D. Colo. Jan. 7, 2020), *R&R adopted*, 2020 WL 1303285 (D. Colo. Mar. 19, 2020) ("In the vehicle context, since cars are designed to provide transportation, the implied warranty of merchantability is simply a guarantee that they will operate in a safe condition and substantially free of defects."); Georgia: *Haynes v. Cyberonics, Inc.*, 2011 WL 3903238, at \*9 (N.D. Ga. Sept. 6, 2011) ("[T]he implied warranty of merchantability under Georgia law would require plaintiff to persuade a jury that the Device was not merchantable, safe, and generally fit for its intended use, or, in other words, somehow defective."); Illinois: *Overland Bond & Inv. Corp. v. Howard*, 9 Ill. App. 3d 348, 354, 292 N.E.2d 168, 172-73 (1972) ("Fitness for the ordinary purpose of driving implies that the vehicle should be in a safe condition and substantially free of defects. It should be obvious that any car without an adequate transmission and proper brakes is not fit for the ordinary purpose of driving."); Michigan: *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 785 (E.D. Mich. 2019) ("[C]ars are not merchantable merely because they are able to provide transportation. Rather, to be fit for its ordinary purpose, a standard road vehicle must be able to provide safe and reliable transportation and be substantially free of defects."); Minnesota: *Tellinghuisen v. Chrysler Grp., LLC*, 2014 WL 4289014, at \*3 (Minn. Ct. App. Sept. 2, 2014) ("Although the Minnesota caselaw addressing implied-warranty claims based on vehicle sales does not state a clear definition of merchantability in that context, courts in other jurisdictions have held that a vehicle is merchantable if it provides safe, reliable transportation."); New Jersey: *Kearney v. BMW*, No. 17-13544, 2018 WL 4144683, at \*15 (D.N.J. Aug. 29, 2018) ("In New Jersey, the implied warranty that comes with the purchase of a car is simply a guarantee that it will operate in a safe condition and substantially free of defects and, therefore, where a car can provide safe, reliable

transportation, it is generally considered merchantable."); Kansas: *Butterfield v. Pepsi-Cola Bottling Co. of Wichita*, 210 Kan. 123, 128, 499 P.2d 539, 544 (1972) ("The bottlers of a carbonated soft drink such as Diet Pepsi-Cola impliedly warrant that a bottle of Diet Pepsi-Cola is reasonably fit for the purpose for which it is intended and is reasonably safe."); New York: *Vuksanovich v. Airbus Americas, Inc.*, 2022 WL 2274543, at \*15 (S.D.N.Y. June 23, 2022) ("Mrs. Vuksanovich alleges that Defendants breached both an express warranty and the implied warranty of merchantability by designing, marketing, and selling defective aircraft that were not reasonably safe for their intended use. As discussed below, Mrs. Vuksanovich [has] stated a claim for breach of the implied warranty of merchantability."); Oklahoma: *Northrip v. Montgomery Ward & Co.*, 1974 Ok. 142, 529 P.2d 489, 497 (Okla. 1974) ("Plaintiff alleged the battery was not fit and safe for use as a source of electrical power; he alleged a breach of warranty."); South Carolina: *Thomas v. Ford Motor Co.*, 2014 WL 1315014, at \*4 (D.S.C. Mar. 31, 2014) ("In the vehicle context, the implied warranty of merchantability is a guarantee that vehicles will operate in a safe condition and substantially free of defects. Thus, where a car can provide safe, reliable transportation, it is generally considered merchantable.").  The parties have not cited any decisions holding to the contrary on the point.

Under the prevailing rule, the question whether the class vehicles are suitable for their ordinary or intended purpose of providing safe, reliable transportation is an entirely objective inquiry which is "susceptible to generalized, class-wide proof," *Tyson*, 136 S. Ct. at 1045, on a common basis applicable to all class vehicles, without regard to the individual circumstances of the buyers.  The evaluation of common facts about the transmission design and the determination by objective criteria whether it renders the vehicles unfit to supply safe reliable transportation does not implicate any individualized issues, and the question is common to all of the implied warranty

-24-

causes of action. Absent proof of a defect making the vehicles unsuitable for ordinary use the plaintiffs cannot prevail on any implied warranty claims. Proof of a "defect" covered by the limited warranty also is essential to all the express warranty claims.

iii. Common Proofs for the Existence of a Defect

There is ample evidence already in the record from which a jury reasonably could find that (1) the alleged defects are inherent in universal aspects of the design of the 8L transmissions, (2) the defendant identified the "root causes" of the defects early in the lifespan of the class models — and according to some accounts even before the earliest models were sold — along with known solutions to cure the problematic shifting behavior, and (3) the defect poses a significant safety risk to drivers of the class vehicles.

First, as the Court observed in its previous opinion on the admissibility of the parties' experts' testimony, there is ample support in the record for the claim that a universal design flaw caused both "shudder" and "hard shift" issues in the class vehicles. In GM internal correspondence from 2018, a writer involved with the investigation of the transmission warranty problems characterized both "shudder" and "hard shift" (a.k.a. "TCC control") as being positively associated and commonly occurring in problem vehicles with the 8L45 and 8L90 transmissions. Email dated Apr. 26, 2018, ECF No. 201-6, PageID.10821 ("*We repeatedly observed that shuddering vehicle returns had bad TCC control and bad feeling shifts.* . . . In many recent meetings, the TCC integration team . . . have been postulating that the benefits of positive friction curves should extend beyond shudder robustness to also improve both TCC control and shifting control. *We have been offering this advice in part because the shuddering vehicles we have been testing generally have horrible TCC control and horrible shift feel / shift control — a consistent observation from multiple parties over a 3 year investigation.*"); *see also* Email dated Jan. 23,

-25-

2017, ECF No. 201-5, PageID.10817 ("I'm pretty sure the glazing [of the friction surface] is occurring *as a result of shudder and loss of control*.") (emphases added).  Also, in a GM internal slide presentation from October 2017, the defendant characterized the issue as "A Recurring Problem" affecting all rear-wheel drive models using the 8L45 and 8L90 transmissions — notably also concluding that "*TCC shudder/control is the fuse for many types of system integration failures*."  Presentation dated Oct. 2017, ECF No. 201-13, PageID.10963 (emphasis added).  The same presentation also included a timeline indicating that through "warranty data analytics" GM had identified the "root cause" of the problem by "Fall of 2017, 2 years into 8-speed shudder investigation." *Id.* at 10965.

Second, the plaintiffs also have offered the opinion of their mechanical engineering expert, William McVea.  McVea was engaged by the plaintiffs "to determine if the design and/or architecture [of the defendant' 8L transmission] had a common defect causing NVH (Noise Vibration Harshness) or handling issues including in lower gears, surging, lurching, jerking, lunging, rough coast downs, and at higher gears, shuddering or shaking at steady state speeds." Expert Report of Dr. William McVea, ECF No. 180-1, PageID.8298.  His report indicates that he reviewed numerous materials during his analysis, including "GM documents and test data," "NHTSA complaints," "GM's inspections of the Plaintiffs' vehicles," "testimony of witnesses," "GM's warranty data, summed up by Plaintiffs' expert [Alice Wachs]," and "[his] own inspections of Plaintiffs' vehicles, where possible."  *Ibid.*

McVea also reported that he inspected and test-drove many of the named plaintiffs' vehicles, and during his inspections he verified the "hard shift" and "shudder" problems about which most of the drivers complained. *Id.* at 8337-43.  He also reviewed reports of GM inspections of plaintiffs' vehicles, including data recorded by in-car accelerometers employed for the

inspections, which verified the vibration and abrupt movement. *Id.* at 8346-47. Finally, McVea also disassembled four 8L transmissions supplied by GM (which likely were removed from class vehicles), and he found that "[t]he friction material had been adversely affected by the ATF and caused debris in the filter," and the "ATF had burnt and oxidized" remnants, corroborating his assessment that degradation of the materials had occurred, resulting in excessive slippage and heat. *Id.* at 8348. McVea noted that "no other observed sources for this [degradation]" were evident, and that other components "(bearings, seals, valve body, etc.) were fine." *Ibid.*

McVea's report included an extensive discussion of general principles of automatic transmission "torque converter clutch" ("TCC") assemblies. He explained that two components of the TCC unit interact to transmit power and allow coupling and decoupling of the driveline for gear shifts, which are the friction material of the clutch, and the automatic transmission fluid ("ATF") that circulates within and around the clutch and other transmission systems. McVea explained that the primary engineering concern when designing these two components is to select a friction material and an ATF with suitable complementary qualities, to ensure that adequate frictional behavior is maintained throughout the useful life of the vehicle. *Id.* at 8303-10. McVea explained that in an automatic transmission, the selection of appropriate and complementary ATF and friction material is essential to ensure that, as the clutch is brought into contact with the driving face of the steel flywheel, the "slippage" created by a thin film of ATF initially permits a gradual synchronization of speed between the two components, and that the ATF also then rapidly will dissipate through channels in the surfaces, to allow direct contact between clutch and flywheel, for maximum drive efficiency with minimum slippage. *Id.* at 8309-10.

McVea explained that the phenomenon of "shudder" is caused when the materials are not appropriately matched and fail to perform the intended function of providing a smooth engagement

followed by direct lockup of clutch and flywheel, leading to the clutch and flywheel slipping against each other rather than moving tightly in direct contact.  When that occurs, excess heat is produced, which can damage both the friction material and ATF, which in turn leads to further degradation of the system over time, with increasing shudder.  *Id.* at 8306, 8310.

McVea cited internal GM documents from the defendant's study of the transmission problem that showed that GM selected an ATF designated as "212B" and a friction material known as "LuK WFP6300."  Other documents showed that GM's engineers found this combination to be problematic because the 212B fluid was unusually sensitive to moisture, and because the WFP6300 material had poor friction characteristics.  *Id.* at 8304-05.  McVea cited GM presentations highlighting the inappropriate combination, noting that the fluid selected originally was intended to be used with a "carbon fiber" friction material, but the fluid was not changed when GM decided, in 2012, to switch to the "paper based" WFP6300 material, ostensibly citing a $2 per unit savings due to a discount from the supplier that had proposed to produce both the clutch material and torque converter assemblies.  *Ibid.*  The problematic combination was referred to contemporaneously by GM engineer Randy Melanson as "the worst friction system we got, and it's only going to get worse with mileage, no matter what we do."  *Id.* at 8305.  Melanson recommended that to avoid the problems produced by the 212B/WFP6300 combination, the company should "soften 212B and go to a better friction material such as BW6100 that improves with age, regardless of oil."  *Ibid.*

McVea also highlighted slides from a presentation by GM engineer Peter Radecki, which illustrated that the degradation of the friction material and ATF in the 8L transmissions led to a "death spiral" of ever worsening engagement behavior, which caused the problems with heavy shudder and poor engagement.  *Id.* at 8312.  McVea cited other GM internal studies concluding

that the warranty service rate for class vehicles with 8L transmissions was "extremely high," and attributing the problems to known issues caused by the poor selection of friction material and ATF. *Id.* at 8314-15. Further, McVea pointed out that problems with the combination became immediately apparent when class vehicles entered the market, citing GM correspondence from June 2013 reporting that "shudder is terrible" in the 2014 Corvette — one of the first class models to incorporate the 8L90 transmission — and noting that the "root cause . . . is believed to be the flat/negative friction slope of the LuK WFP friction material." *Id.* at 8317. Similar concerns were reported about the 8L45 design. *Id.* at 8317-18. GM's investigation of the transmission problems continued as the rate of warranty problems escalated throughout 2016, 2017, and 2018, with various fixes proposed such as changing the transmission fluid, which only partly solved the problems. *Id.* at 8319-21. Other solutions such as changing the shifting behavior of the transmission also were only partly successful in mitigating the shudder problem, because the basic problem of poor friction with the 212B/WF6300 combination could not be mitigated entirely by calibration of the shift curve. *Id.* at 8391.

Finally, McVea cited 2018 GM correspondence in which Melanson explained that the problems with the poor selection of friction material and ATF were noticed in "bench testing" as early as 2013, and it also had been determined that problems due to the combination inevitably would develop in all 8L transmissions over time, with some vehicles in high moisture environments developing problems sooner due to the degradation of the ATF from exposure to water. *Id.* at 8324. McVea also highlighted that instead of notifying customers when it developed the "Mod1a" fix (replacing the problematic ATF), GM opted instead only to replace the fluid in around 6,800 unsold vehicles. *Id.* at 8325.

McVea also discussed a second problem with "hard shifts," which he said meant shifts so abrupt that drivers frequently described them as "like being rear ended." *Id.* at 8328-31.  GM also knew about the "hard shift" issues immediately upon the entry of class models into the market, when GM correspondence reported that "Even before launching the Corvette in 2014, GM test riders complained that the downshift to 1st gear was a 'neck snapper,' and that 'tap shift no throttle 4-5, 5-6, 6-7, 7-8 kicks you in the butt really bad.'"  *Id.* at 8333.  McVea noted that GM had achieved some reduction in the "hard shift" behavior by replacing certain valve components in the transmission, but the deployment of that and other hardware fixes proposed by GM engineers were rejected due to the high cost (between $1,500 and $4,500 per vehicle).  *Id.* at 8331-32.  In addition, McVea cited "numerous" internal GM employee reports (via the "Speak Up for Safety" or "SUFS" program) between 2017 and 2021, which "noted problems with lurching, hesitation, and surging," in the class vehicles due to "hard shift" behavior.  *Id.* at 8337.  Other reports from GM's testing of class vehicles noted such problems as a "3-second delay" engaging from neutral to drive when drivers attempted to accelerate, and in one instance, a vehicle that "lurched right off of rollers into a post" when engaged in drive.  *Id.* at 8333-34.  McVea opined that the "hard shift" behavior was caused fundamentally by the same frictional interface problems that caused "shudder" complaints, citing GM correspondence from Brand Manager Mark Gordon, who reported that "shift quality issues" were "most likely clutch-related."  *Id.* at  8330-31.

For model year 2023 vehicles, GM correspondence shows that a "major redesign" of the 8L transmission was undertaken, incorporating numerous "Gen 2" improvements, to solve the shudder and hard shift issues.  *Id.* at 8332-33.  McVea opined that two fixes were available and should be offered by GM to customers, (1) replacing ATF in all class vehicles with the "Mod1a"

formulation, to reduce shudder, and (2) retrofitting hardware and software components of the "Gen 2" redesign to cure hard shift issues. *Id.* at 8352-54.

Third, the plaintiffs also have offered the testimony of their expert, Dr. Alice Wachs, who conducted an analysis of warranty service records produced by the defendant. The plaintiffs engaged Wachs in this case to "review and analyze GM warranty data as it pertains to warranty repairs for 'shudder' and 'harsh shift/drive quality' on Class Vehicles associated with the defect alleged in this lawsuit," "to review GM documents related to transmission issues," and "to identify, review, and analyze information needed to perform a warranty forecast." Expert Report of Dr. Alice Wachs, ECF No. 182-1, PageID.8773. Wachs's report identifies voluminous materials that she considered including warranty and service data produced by the defendant, internal correspondence from GM relating to a years-long investigation of 8L transmission warranty problems, the pleadings and testimony in this case, and information produced by individual plaintiffs in this case concerning their owned vehicles.

Wachs compiled the voluminous sales and warranty data produced by the defendant to classify and collate vehicle and service records by month of sale and month of repair, and also to exclude data about non-class vehicles. *Id.* at 8790-91. Wachs noted among her baseline assumptions that she "use[d] warranty claims data as a proxy for occurrence of the defect that Plaintiffs allege in this case," and that "[i]n [her] opinion, a warranty claims rate is a conservative proxy for the actual occurrence of a problem, as not all drivers with a problem have their vehicles serviced under warranty, and not all dealers code their warranty repairs correctly." *Id.* at 8777. She also noted that documents disclosed by the defendant indicated that "GM has also recognized that warranty claims may undercount the actual incidence of the problem." *Ibid.* She also noted that GM internal documents indicated that the defendant assigns a "target" for warranty claims for

its vehicles, expressed in terms of "Incidents Per Thousand Vehicles" or "IPTV," which during the relevant time frame ranged from 4.9 to 9.8 IPTV. *Id.* at 8779. She also noted that GM disclosed an "occurrence framework" for "safety categorization" of defects in which an issue was identified as "less frequently" occurring between 2.0 and 9.0 IPTV, at a "high rate" between 30.1 and 110.0 IPTV, and at an "extremely high rate" over 111.0 IPTV. *Id.* at 8780. Wachs explained that, to put it in more common terms, GM classified a defect as occurring at a "high rate" when the return or service rate for a problem exceeded 3%, and at an "extremely high rate" with a return or service rate higher than 11.1%. *Ibid.*

Wachs's report includes a discussion about general principles of quality and reliability forecasting via statistical methods, and she explained that a common method of forecasting product reliability is to determine, based on observed return or service rates, the probability that a product will fail within a forecasted service lifetime (e.g., forecasting that based on 97% of piston rings surviving for 150,000 miles of service, 3% are expected to fail within that same span). Wachs explained that different statistical models may be used to estimate probability of product failure, and the method chosen may be subjected to conventional tests to determine if it reliably predicts failure rates based on available historical data. The statistical methods on which she settled for various class vehicle segments included the "Weibull," "Gamma," and "Logistic" analytical techniques. *Id.* at 8796.

Wachs analyzed the warranty data produced by GM and selected records relating to class vehicles subjected to service under a range of "service codes" which she learned were used by GM to select service data for its internal study of the transmission problem. She noted that in her initial analysis each vehicle involved was counted once if it had any number of complaints for "shudder" issues, and once if it had any number of complaints for "hard shift" problems, and that if the vehicle

exhibited both problems then it would be counted twice, indicating a degradation of the problem. However, she also performed a second analysis where each vehicle was counted once at most regardless of how many complaints it had for the same or different issues.  *Id.* at 8793.

Wachs summarized her statistical findings in a table showing that warranty service rates among the various class models ranged from 4% to 10% within the first 12 months of service, and for all segments reached between 80-100% at 120 months in service.  She concluded that these rates were "extreme" and greatly exceeded even the "extremely high" target for safety related defect occurrences assigned by GM.  *Id.* at 8796.  Wachs also noted that her predictive model forecasted similar (slightly lower) repair rates for the class vehicles compared with projections that had been produced internally by GM.  *Id.* at 8798.  Wachs extended her analysis further by breaking down "cumulative failure rates" for various class models month by month over the relevant time period, to illustrate, based on the record of GM's documented internal study of the transmission problem over several years, what could be inferred that it would have known about the severity and occurrence of the defect at different points in time.  She determined, based on the high and consistently rising service rates, that GM knew at least by January 2017, both that the 8L equipped vehicles had extremely high service rates, and that the options identified by GM for addressing the problem had failed to cure the issues.  *Id.* at 8803.

Wachs also presented summary tables showing that among all class models, the historical proportion of problematic vehicles ranged from 5% to more than 20% for cars of the most recent class vintage (2019), and that the ongoing and forecasted problem rates escalated consistently for older models, ranging from 65-75% for most 2015 models, with the 2015 Chevrolet Corvette having the lowest rate of 37%.  *Id.* at 8811.  She also noted that the occurrence of problems was

widely distributed across different jurisdictions, with the problem rate exceeding 10% of class

vehicles in every involved state, ranging up to 30% in half of states.  *Id.* at 8817.

Wachs finally summarized her findings as follows:

The Class Vehicles suffer from transmission problems that appear to manifest commonly as shudder and/or poor drive quality.  Like the Class Representatives, many of the Class Vehicle owners required repeated servicing for both problems. This resulted in cumulative claims rates that were higher than the number of vehicles that went to get serviced (meaning there was more than one claim per vehicle), and in certain models eventually exceeded 100%. Since this information comes from GM's own warranty data, GM knew the magnitude of these cumulative claims rates for shudder and/or drive quality issues for any given month/year in any given month/year. GM also kept track of cumulative claims rates, and could have assessed the extent of the warranty impact at any point.

Expert Report of Dr. Alice Wachs at PageID.8821.

Fourth, the testimony by the named plaintiffs, which is recounted in Part A of the

Appendix, amply suggests that the defective shifting behavior creates a significant safety risk.  The

named plaintiffs all described in similar terms the dramatic, sudden, and distracting up and down

shifts that they experience routinely while driving their vehicles.  Those shifts were described

almost universally as feeling "like the car was struck from behind."  Plaintiffs attested that they

frequently were distracted by hard shifts that prompted them to check mirrors to confirm that an

accident had not occurred.  They also reported frequently having alarming difficulties stopping

their vehicles when hard shifts would cause the cars to "surge" forward at low speeds.  Some

reported near-miss accidents with other cars or nearby pedestrians resulting from the "surging"

and "lurching."  Others reported that they or family members were so put off by the unpredictable

behavior of the vehicles that they feared to drive them or stopped driving them entirely.  The

plaintiffs also frequently reported problems overtaking or merging at highway speeds when

vehicles failed to accelerate as expected, due to the transmissions "slipping" or "losing power."

Other evidence in the record bolsters the plaintiffs' concerns that the distracting and hazardous behavior of their cars creates a safety risk. GM Field Service Engineer Stephan Mohr testified that a harsh shift resulting in a vehicle lurching after it is put into gear potentially could create a safety issue, for example, to any nearby pedestrians. Stephan Mohr dep., ECF No. 202-18, PageID.11322 ("Q. Okay. And do you think that a vehicle slamming into gear and barking the tires is what it should — is that what a transmission should be doing for a consumer? A. Probably not. Q. And do you think that could potentially create a safety risk if a child is walking behind a vehicle that slams into gear, in this situation it would be reverse gear, and barks the tires, could that be a potential safety issue? A. It has the potential to be. Q. All right. Would you want your family members to drive a vehicle that intermittently slams into gear and barks the tires after delaying four seconds to go into gear? A. I would suppose not.").

The plaintiffs' expert Mark McVea also reviewed GM records of customer and dealer complaints about the harsh shift problems and found records indicating that (1) a dealer had complained to a GM engineer that "all of the vehicles on his lot with an eight-speed transmission are dangerous because when started they lurch or jump," McVea Report, ECF No. 180-1, PageID.8349, (2) initial drafts of a report of a 2019 safety investigation stated that the "3-1 downshift" in class vehicles could cause a "surge" with a "startling effect," but those terms were edited out of the final report, *id.* at PageID.8350, and (3) the report of a subsequent safety investigation in 2021 classified the harsh shift problem as having a safety risk rated "C1," meaning that during an incident as many as 1 in 100 of typical drivers would be unable to maintain control of the vehicle and avoid an accident, *id.* at PageID.8351. When considered along with the testimony by the plaintiffs that hard shifts occurred both frequently and randomly, the prospect that 1 in 100 drivers might find the vehicles uncontrollable, where more than 800,000 class

vehicles have been sold to drivers around the nation, prompts serious safety concerns.  In his report,

McVea further elaborated on his own experience test driving the plaintiffs' vehicles:

> In addition, the issues addressed in this report are sporadic in nature, which means for example the hard shift/lurch issue may manifest itself during an attempt by the driver to pull out into traffic. If it happens during one attempt and then does not happen during the next, the driver may attempt to anticipate the surge and when it does not happen, react in a manner not coincident with safe driving. I can state that when I drove many of these vehicles, beyond becoming familiar with each specific vehicle, I was 'caught off guard' and did not always correctly anticipate how the vehicle was going to respond to my commanded input.

McVea Report at PageID.8348-49.

All of that evidence adequately suggests that one or more universal defects in the 8L

transmission design exist, that both "shudder" and "hard shift" issues were identified by the

defendant as having a common cause or causes, and that the problems are pervasive and reasonably

expected to occur sooner or later in all class vehicles sold.  The common evidence also amply

suggests that the defect rendered the class vehicles unfit for their ordinary or intended purpose of

providing safe, reliable transportation.  In similar automobile defect cases, the Sixth Circuit has

affirmed class certification of warranty claims.  *E.g.*, *Daffin v. Ford Motor Co.*, 458 F.3d 549, 554

(6th Cir. 2006) ("[T]he district court did not abuse its discretion when certifying the class under

Rule 23(b)(3) because common issues predominate and class treatment is the superior method of

adjudication. The issues that predominate include: (1) whether the throttle body assembly is

defective, (2) whether the defect reduces the value of the car, and (3) whether Ford's express

'repair or replace' warranty covers the latent defect at issue in this case. . . . The class members'

claims do not differ based on whether there has been actual accelerator sticking because they all

allege that Ford delivered a good that did not conform to Ford's written warranty.").

iv. Common Elements and Proofs of Concealment

The predominant elements of claims for consumer fraud (a/k/a deceptive or unfair trade practices) are consistent across all jurisdictions.  Again, the law in Illinois on such statutory and common law claims is exemplary.  "The elements of a claim under [the Illinois Consumer Fraud & Deceptive Business Practices Act] are (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, and (3) the occurrence of the deception during a course of conduct involving trade or commerce."  *Mosier v. Village of Holiday Hills*, 2019 IL App (2d) 180681, ¶ 19, 128 N.E.3d 1210, 1217 (Ill. Ct. App. May 3, 2019).  "The elements needed to prove fraudulent concealment are (1) concealment of a material fact, (2) intent to induce a false belief where there exists a duty to speak, (3) that the other party could not have discovered the truth through reasonable inquiry and relied upon the silence as an indication that the concealed fact did not exist, (4) that the other party would have acted differently had it known of the concealed information, and (5) that its reliance resulted in its injury."  *Vandenberg v. Brunswick Corp.*, 2017 IL App (1st) 170181, ¶ 31, 90 N.E.3d 1048 (Ill. Ct. App. 2018).

At least two elements of those claims will predominate over any individualized inquiries in this case, which are (1) proof of intentional concealment or deception by the defendant concerning its knowledge of the alleged defects, and (2) the significance of the information withheld to a reasonable consumer.  There is no dispute that the vehicle sales here were "consumer transactions" or occurred in the case of "commerce" within the purview of the several states' consumer protection laws.  Such elements therefore categorically are amenable to establishment by common proofs.  Whether the defendant had a "duty to disclose" information about the defects also is susceptible to common proofs, because, with the proofs discussed above suggesting that the

defect is universal among all class vehicles sold, either it had such a duty respecting all buyers or it had no duty at all.

The consumer protection statutes in every proposed class jurisdiction generally prohibit "deceptive" or "misleading" acts and practices in the marketing and sales of goods and services. Alabama: *Jones v. Coty Inc.*, 362 F. Supp. 3d 1182, 1212 (S.D. Ala. 2018); Arizona: *Watts v. Medicis Pharm. Corp.*, 239 Ariz. 19, 28, 365 P.3d 944, 953 (2016); Arkansas: *Pleasant v. McDaniel*, 2018 Ark. App. 254, 7, 550 S.W.3d 8, 12 (2018); Delaware: *Teamsters Loc. 237 Welfare Fund v. AstraZeneca Pharms. LP*, 136 A.3d 688, 693 (Del. 2016); Florida: *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d 207, 212 (Fla. Dist. Ct. App. 2019); Idaho: *State ex rel. Kidwell v. Master Distributors, Inc.*, 101 Idaho 447, 453, 615 P.2d 116, 122 (1980); Illinois: *Mosier v. Village of Holiday Hills*, 2019 IL App (2d) 180681, ¶ 19, 128 N.E.3d 1210, 1217 (Ill. Ct. App. May 3, 2019); Kansas: *In re Motor Fuel Temperature Sales Pracs. Litig.*, 867 F. Supp. 2d 1124, 1141 (D. Kan. 2012); Kentucky: *Corder v. Ford Motor Co.*, 285 F. App'x 226, 227-28 (6th Cir. 2008); Louisiana: *Landry v. Legacy Hous. Corp.*, 2021 WL 5830646, at *3 (W.D. La. Dec. 8, 2021); Maine: *State v. Weinschenk*, 2005 ME 28, ¶ 11, 868 A.2d 200, 205 (2005); Michigan: *Flynn v. FCA US LLC*, 327 F.R.D. 206, 220 (S.D. Ill. 2018) (citing Mich. Comp. Laws § 445.903(1)(s)); Minnesota: *Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*, 2021 WL 6127880, at *18 (D. Minn. 2021); New Hampshire: *Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 561 F. Supp. 3d 114, 120 (D.N.H. 2021); New Jersey: *Pisack v. B & C Towing, Inc.*, 455 N.J. Super. 225, 240, 188 A.3d 1088, 1097 (App. Div. 2018); New York: *JD&K Assocs., LLC v. Selective Ins. Grp., Inc.*, 143 A.D.3d 1232, 38 N.Y.S.3d 658, 660 (N.Y. App. Div. 2016); North Carolina: *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 372 N.C. 260, 286, 827 S.E.2d 458, 478 (2019); Oklahoma: *Watson v. Vici Cmty. Dev. Corp.*, 2021 WL 1394477, at *12 (W.D. Okla. Apr.

-38-

12, 2021); Pennsylvania: *Corsale v. Sperian Energy Corp.*, 374 F. Supp. 3d 445, 459 (W.D. Pa. 2019); Tennessee: *Cabinets to Go, LLC v. Qingdao Haiyan Real Est. Grp. Co.*, LTD, 2022 WL 1976602, at *5 (M.D. Tenn. June 6, 2022); Texas: *Universal Baptist Church of Fort Worth v. Lexington Ins. Co.*, 346 F. Supp. 3d 880, 889 (N.D. Tex. 2018); Washington: *Young v. Toyota Motor Sales, USA*, 9 Wash. App. 2d 26, 33, 442 P.3d 5, 9 (2019); Wisconsin: *MBS-Certified Pub. Accountants, LLC v. Wisconsin Bell Inc.*, 346 Wis. 2d 173, 189, 828 N.W.2d 575, 583 (Wis. Ct. App. 2013). Typically, the element of "deception" may be supported by proof of either affirmative falsehoods or deliberate omissions. *E.g.*, *Pisack*, 455 N.J. Super. at 240, 188 A.3d at 1097 ("An 'unlawful practice' contravening the [New Jersey Consumer Fraud Act] may arise from (1) an affirmative act; (2) a knowing omission; or (3) a violation of an administrative regulation."); *Flynn*, 327 F.R.D. at 220 (MCPA claim requires the plaintiff to prove "fail[ure] to reveal a material fact, the omission of which tends to mislead or deceive the consumer, [and that the] fact could not reasonably be known by the consumer" (citing Mich. Comp. Laws § 445.903(1)(s)). Proof of the defendant's omission or concealment of information about the alleged transmission defects in its customer-facing communications therefore will be common in every one of the states where certification of consumer fraud claims is proposed.

Similarly, concealment of a material fact from another party to a transaction is a foundational element of fraudulent concealment in every jurisdiction where that cause was pleaded. Illinois: *Vandenberg v. Brunswick Corp.*, 2017 IL App (1st) 170181, ¶ 31, 90 N.E.3d 1048, 1056, 418 Ill. Dec. 559, 567 (Ill. Ct. App. 2018); Louisiana: *Tri-state Bancshares, Inc. v. Scott*, 2016 WL 4098604, at *5 (W.D. La. July 28, 2016); New York: *JGK Indus., LLC v. Hayes NY Bus., LLC*, 145 A.D.3d 979, 980, 45 N.Y.S.3d 479, 481 (N.Y. App. Div. 2016); Tennessee: *Dixon v. Chrisco*, 2018 WL 4275535, at *4 (Tenn. Ct. App. Sept. 7, 2018); Washington: *In re*

*Mastro*, 2017 WL 2889659, at *23 (Bankr. W.D. Wash. July 6, 2017) (citing *Adams v. King Cty.*, 164 Wash. 2d 640, 662, 192 P.3d 891, 902 (2008)).

The defendant contends that the question of what it concealed cannot be resolved on a class-wide basis because public knowledge about the defect varied throughout the relevant class period. But that argument is disingenuous considering the defendant's recent efforts to conceal from public disclosure vast portions of the record offered by the plaintiffs to show the existence of the defect and the defendant's historical knowledge of the same. "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. [But i]f the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, No. 16-02709, 2019 WL 1418292, at *15 (W.D. Mo. Mar. 21, 2019) (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)).

The record so far presented discloses ample proofs that could be offered in every instance to establish concealment. Most conspicuously, the defendant repeatedly argued in its motions to seal that hundreds of pages of reports produced by GM covering engineering investigations of the transmission problems and compilations of warranty service data were its "confidential information." The defendant further insisted that it had made concerted efforts to keep the information private, and that none of the documents previously had been disclosed by the defendant to the public. Whether the defendant disclosed the substance or conclusions of the hundreds of pages of investigative reports and engineering diagnoses of the transmission issues is a question that can be addressed by proofs common to the entire subclasses. The defendant insists that none of the information from its defect investigations ever was seen by the public prior to this

litigation.  Based on the record before this Court, it appears to be beyond dispute that none of that information ever came to light publicly until it was disclosed as part of the recent filings in this litigation.  The defendant's determined efforts to maintain the "confidentiality" of the information defies any suggestion that any of the relevant information previously was disclosed by GM or its dealers to any buyers of class vehicles.

Contrary to the defendant's position, class certification of consumer fraud claims in federal courts is not impractical or impossible but ready and routine.  *E.g.*, *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 507 (6th Cir. 2015) ("P&G has failed to identify a single false-advertising case where a federal court has denied class certification because of a lack of commonality."); *see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) ("Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."); *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("By definition, all class members were exposed to such representations and purchased AriZona products, creating a common core of salient facts. Courts routinely find commonality in false advertising cases that are materially indistinguishable from the matter at bar.").

v. Common Elements and Proof of Materiality

In every jurisdiction proposed for certification, the typical proof of "materiality" of a misstated or omitted fact for fraudulent concealment and statutory consumer fraud claims turns on consideration of the mindset of an objectively reasonable consumer deciding whether to buy the defendant's product.  That rule uniformly has been adopted either by codification in the relevant consumer protection statutes, incorporation of relevant federal authority, or express construction by case law of the various states. Alabama: *Weidman v. Ford Motor Co.*, 2022 WL 1071289, at *13 (E.D. Mich. Apr. 8, 2022) ("Materiality is an objective standard that is readily subject to class-

wide proof.") (applying Alabama law); Arizona: *Meredith v. BankUnited*, 2011 WL 13233483, at *12 (D. Ariz. May 6, 2011) ("A matter is material if it is one to which a reasonable person would attach importance in determining his choice of action in the transaction in question."); Delaware: *Lincoln v. Ford Motor Co.*, 2020 WL 5820985, at *6 (D. Md. Sept. 29, 2020) ("An omission is considered material if a significant number of unsophisticated consumers would attach importance to the information in determining a choice of action. It is very plausible that consumers would find it important that a truck's steering system can unexpectedly malfunction.") (certifying claims under consumer protection laws of Maryland and Delaware); Florida: *Philip Morris USA, Inc. v. Duignan*, 243 So. 3d 426, 445 (Fla. Dist. Ct. App. 2017) ("Materiality is generally evaluated under an objective test — inquiring whether a misrepresented or omitted fact would have taken on significance in the mind of a reasonable person."); Idaho (Consumer Protection Act): "This act is to be construed uniformly with federal law and regulations." Idaho Code § 48-618; "Section 5 of the FTC Act broadly prohibits 'unfair or deceptive acts or practices in or affecting commerce.' 15 U.S.C. § 45(a)(1). To establish liability under Section 5 based on a particular representation the FTC must show that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances; and (3) the representation was material." *FTC v. Fleetcor Techs., Inc.*, 2022 WL 3273286, at *6 (N.D. Ga. Aug. 9, 2022). "As to the third element, materiality, a representation or omission is material if it is the kind usually relied on by a reasonably prudent person." *Id.* at *7; Illinois: *Smith v. NVR, Inc.*, 2018 WL 6335051, at *4 (N.D. Ill. Dec. 5, 2018) ("It is plausible that reasonable consumers would rely on NVR's pre-sale representations regarding the natural wood cabinets and 30-year shingles and then not realize that they had received 25-year shingles and veneer cabinets."); Kansas: *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1231 (10th Cir. 2000) ("Kansas law defines materiality under an objective standard in

a state fraud action."); Louisiana: *Reed v. Receivable Recovery Servs., LLC*, 2017 WL 1399597, at *9 (E.D. La. Apr. 19, 2017) ("[I]n the context of the February 17 exchange, as it must, the Court finds that an unsophisticated consumer would not perceive the communication as false, deceptive, or misleading."); Kentucky (Consumer Protection Act): "[T]he words false, misleading and deceptive [as used Ky. Rev. Stat. Ann. § 367.170] have meanings which are generally well understood by those who want to understand them. The terms are certainly no less broad than the language used in 15 U.S.C s 45(a)(1) which forbids 'unfair or deceptive acts or practices in commerce.'" *Dare To Be Great, Inc. v. Com. ex rel. Hancock*, 511 S.W.2d 224, 227 (Ky. 1974); *Fleetcor*, *supra.*; Maine: *McGahey v. FNMA*, 266 F. Supp. 3d 421, 435 (D. Me. 2017) ("PHH's allegedly false representations that McGahey did not qualify for a HAMP modification were material representations that were likely to mislead a reasonable consumer, and therefore qualify as deceptive under the UTPA."); Michigan (Consumer Protection Act): "Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." Mich. Comp. Laws § 445.903(1)(s); *Zine v. Chrysler Corp.*, 236 Mich. App. 261, 284, 600 N.W.2d 384, 398 (1999) ("Subsection (1)(s) prohibits making an omission that tends to mislead or deceive any consumer [if] the omitted fact could not reasonably be known by that consumer. Thus, the issue is [] whether the consumer could reasonably be expected to discover the omission at issue."); Minnesota: *Song v. Champion Petfoods USA, Inc.*, 27 F.4th 1339, 1343 (8th Cir. 2022) ("It's well settled that a label is not deceptive as a matter of law when the plaintiff's interpretation is so facially illogical, implausible, or fanciful that no reasonable consumer would think it."); New Jersey: *Hussain v. Citizens Fin. Grp., Inc.*, 2019 WL 490091, at *5 (N.J. Super. Ct. App. Div. Feb. 8, 2019) ("A fact is material [for purposes of the Consumer Fraud Act] when . . . such fact would be important to the decision

of a reasonable buyer."); New Hampshire (Consumer Protection Act): "It is the intent of the legislature that in any action or prosecution under this chapter, the courts may be guided by the interpretation and construction given Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), by the Federal Trade Commission and the federal courts." N.H. Rev. Stat. § 358-A:13; *Fleetcor*, *supra.*; New York: *Porsche v. LLR, Inc.*, 2019 WL 2062845, at *7 (S.D.N.Y. Apr. 30, 2019) ("LLR's practices are likely to mislead a reasonable consumer and were thus materially misleading."); North Carolina: *City of High Point, N. Carolina v. Suez Treatment Sols. Inc.*, 485 F. Supp. 3d 608, 634 (M.D.N.C. 2020) ("[I]n determining whether a particular act or practice is deceptive, its effect on the average consumer is considered. An act is deceptive if it has a tendency or capacity to deceive."); Oklahoma (Consumer Protection Act): "'Deceptive trade practice' means a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person." Okla. Stat. tit. 15, § 752.13; Pennsylvania: *Kline v. EDS Relocation & Assignment Servs.*, 2008 WL 4822026, at *5 (M.D. Pa. Nov. 4, 2008) ("A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so."); Tennessee: *Vanderbilt Univ. v. Scholastic, Inc.*, 382 F. Supp. 3d 734, 763 (M.D. Tenn. 2019) ("Fraudulent concealment, also known as constructive fraud, is essentially fraud without the element of intent . . . . [Constructive frauds] are acts, statements, or omissions that entail as an attribute of fraud, conduct which reasonably can be expected to influence the conduct of others."); Texas: *Whittington v. Mobiloil Fed. Credit Union*, 2018 WL 6582824, at *4 (E.D. Tex. Oct. 26, 2018) ("[F]raud requires a material representation and 'material' means that a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question."); Washington: *Young v. Toyota*

*Motor Sales*, USA, 2019 WL 2223161, at *3 (Wash. Ct. App. May 23, 2019) ("Implicit in the definition of 'deceptive' is the understanding that the actor misrepresented something of material importance. Deception exists [under the Consumer Protection Act], if there is a representation, omission or practice that is likely to mislead a reasonable consumer."); Wisconsin: *AVL Powertrain Eng'g, Inc. v. Fairbanks Morse Engine*, 178 F. Supp. 3d 765, 773 (W.D. Wis. 2016) ("A misrepresentation is material when it is likely to induce a reasonable person to manifest his assent by the misrepresentation.").

Because the materiality inquiry is based uniformly on the application of an objective standard, it is susceptible to class-wide proofs independent of the circumstances or preferences of individual car buyers. This common proof of materiality, along with the common elements noted above, will dominate the case on all the statutory and common law consumer fraud claims.

## 2. Superiority

In similar auto defect litigations, the Sixth Circuit has found class proceedings superior to individual litigation of defects. *E.g.*, *Daffin*, 458 F.3d at 554 ("The threshold issue of whether Ford's warranty promise can reasonably be read to cover the alleged defect at issue in this case, regardless of manifestation during the warranty period, is better litigated in the class context. Permitting individual owners and lessees of 1999 or 2000 Villagers to litigate their cases is a vastly inferior method of adjudication when compared to determining threshold issues of contract interpretation that apply equally to the whole class. Additionally, the difference in value between conforming and non-conforming goods is better litigated in a class-wide context."). The defendant has established no good grounds to deviate from the same finding here.

## 3. Ascertainability

It is evident from the record that the classes are reasonably ascertainable from the detailed sale and warranty records and other associated public record information that disclose the

ownership, service record, and state of registration of all class vehicles. Moreover, the parties apparently already have exchanged substantial discovery disclosures identifying with reasonable precision the population of class vehicles sold and their distribution among the various jurisdictions where certification has been proposed.

### C. Defendant's Counterarguments

The defendant interposes a number of arguments against class certification. For the reasons discussed below, none of them provide reasons why class certification should be refused.

#### 1. Standing

The defendant argues that no classes can be certified because there is no proof that "all class members were injured" or that "the defect has manifested" in every class vehicle. The record does not support that argument.

First, every named plaintiff testified that their vehicles "manifested" one or both alleged defects, repeatedly and continuously, despite multiple presentments and failed repairs. Second, Dr. Wachs's testimony — and the defendant's own investigations and warranty data analyses — amply suggest that the defect is caused by a common design failure and can be expected to afflict every class vehicle sold within its useful lifetime.

To establish standing, a plaintiff must allege three well-known elements: an injury; traceable to the defendant's actions; and the likelihood of redress by a favorable ruling. *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 488 (6th Cir. 2021). "Yet just because a plaintiff's claim might fail on the merits does not deprive the plaintiff of standing to assert it." *Id.* at 489. "If that were the test, every losing claim would be dismissed for want of standing." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1092 (10th Cir. 2006) (*en banc*).

Whether the plaintiffs recouped any part of their lost benefit of the bargain — e.g., by selling their vehicles — is a merits issues that is immaterial to the Rule 23 analysis. *Hicks v. State*

*Farm Fire & Cas. Co.*, 965 F.3d 452, 463 (6th Cir. 2020) ("Ultimately, whether some Plaintiffs are unable to prove damages because they eventually recouped the withheld depreciation . . . is a merits question, and the district court has the power to amend the class definition at any time before judgment.").

Moreover, the appropriate opportunity to address claims of absent class members whose vehicles never have manifested any defect is a Rule 56 motion for summary judgment. *See, e.g.*, *Tershakovec v. Ford Motor Co.*, 546 F. Supp. 3d 1348, 1357-58 ("[The Court] grants Ford summary judgment on . . . the express warranty claims of any class members who did not fulfill their presentment and notice obligations."). At this preliminary stage, it is sufficient that the plaintiffs have *alleged* that every class member suffered a loss due to overpaying for defective vehicles at the point of sale. *See In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013) ("[N]ot all class members must demonstrate manifestation of [the alleged defect] before those individuals may be included in the certified class."). The comprehensive records of sales, registration, and warranty service data already produced by the defendant can be expected to suffice to identify and cull at the merits phase — or during claims administration for a settlement class — any claimants who never had any problems with their vehicles or never sought repairs. *Aberin v. Am. Honda Motor Co.*, Inc., 2021 WL 1320773, at *6 (N.D. Cal. Mar. 23, 2021) ("Under each of these claims, the alleged injury is one of overpayment. Overpayment injury is sufficient to establish Article III standing. Contrary to Honda's contention, Plaintiffs need not show that the alleged defect manifested before they can bring a claim. . . . Proof of the manifestation of a defect is not a prerequisite to class certification.") (citations omitted).

### 2. Manifestation

The defendant also argues that lack of "manifestation" of the defect in less than every single class vehicle sold precludes certification. For the same reasons discussed above, that is incorrect.

As the Sixth Circuit explained in the *Whirlpool* litigation: "In *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168, 1173 (9th Cir. 2010), a car manufacturer successfully argued before the district court that class certification was inappropriate because the named class plaintiffs did not prove that an alignment geometry defect causing premature tire wear manifested in a majority of the class members' vehicles. The Ninth Circuit reversed and remanded for class certification, holding that 'proof of the manifestation of a defect is not a prerequisite to class certification[,]' and that 'individual factors may affect premature tire wear, [but] they do not affect whether the vehicles were sold with an alignment defect.'" *In re Whirlpool*, 722 F.3d 838, 857.

### 3. Average Damages

The defendant also argues that the proposal by plaintiffs to compute damages on an "average" basis precludes certification because their "actual damages" suffered will vary in accordance with the prices paid by them and other factors. It is settled, of course, that any "model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory," and "[i]f the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). "Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case." *Ibid.*

The plaintiffs have satisfied that standard here. They plausibly postulate that all class members were affected by the same omissions, since the information about the alleged defects allegedly was not disclosed to any of them. They also have put forth proofs suggesting that the defects either have surfaced or inevitably will manifest in all or nearly all class vehicles over their useful lifetime. At trial, they will seek to recover the difference in price paid by them as a result of overpaying for defective cars at the point of sale. The plaintiffs' experts have proffered reliable

statistical means for estimating the overpayment.  Such a showing has been held sufficient to warrant certification of a damages class under Rule 23(b)(3) in similar auto defect cases.  *In re Myford Touch Consumer Litig.*, No. 13-03072, 2016 WL 7734558, at \*17 (N.D. Cal. Sept. 14, 2016) ("Ford contends that 'absent individualized injury, Plaintiffs have no idea how much the putative class members paid for their vehicles.' But the Supreme Court has confirmed that the use of averages is proper in some cases.") (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 461 (2016)).  "[T]he presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3) . . . . At the class certification stage, [the plaintiffs need only] show that damages can 'feasibly and efficiently be calculated once the common liability questions are adjudicated." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013); *see also Aberin*, 2021 WL 1320773, at \*11.

The cases cited by the defendant on this point are inapposite because they involved problems of proof and calculation of damages not pertinent here, where, for example, plaintiffs proposed to distribute an entire pool of "aggregate" damages based on assumed overpayment incurred by *all* ascertained class members regardless of how many claimants actually presented proofs of claims at the administrative phase.  *E.g.*, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008) ("The distribution method at issue would involve an initial estimate of the percentage of class members who were defrauded (and who therefore have valid claims). The total amount of damages suffered would then be calculated based on this estimate (and, presumably, on an estimate of the average loss for each plaintiff). But such an aggregate determination is likely to result in an astronomical damages figure that does not accurately reflect the number of plaintiffs actually injured by defendants and that bears little or no relationship to the amount of economic harm actually caused by defendants. This kind of disconnect offends the Rules Enabling Act,

which provides that federal rules of procedure, such as Rule 23, cannot be used to 'abridge, enlarge, or modify any substantive right.'" (quoting 28 U.S.C. § 2072(b)); *id.* at 232 ("Given that any residue would be distributed to the class's benefit on the basis of cy pres principles rather than returned to defendants, defendants would still be paying the inflated total estimated amount of damages arrived at under the first step of the fluid recovery analysis. Thus, even if defendants were able to avoid overcompensating individual plaintiffs, they would still be overpaying in the aggregate.").  As noted above, the detailed sales and warranty records available will make it feasible to screen out claimants and compensate only those who have in fact incurred losses due to manifestation of the defect in their vehicles.  And the evidence presented indicates that nearly all the class vehicles will manifest the problem eventually.

Moreover, the *McLaughlin Tobacco* case involved a claim of "overpayment" based on comparison to a hypothetical product which the court of appeals observed was unlikely even to exist. *Id.* at 229 (2d Cir. 2008).  The plaintiffs' hypothetical alternative of a car with a transmission design that reliably and safely shifts, accelerates, and decelerates as intended is hardly such a chimerical creature.

The case also is distinguishable from those in which courts found that there was no plausible model for estimating average damages, because the type of damages alleged, such as lost profits of a franchised restaurant, inherently would depend on a variety of individualized factors germane to the situation of the business in its local market.  *E.g.*, *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342-43 (4th Cir. 1998).  No such hazard is presented in this case, where the damages estimates have been modeled using reliable, systematic, statistical methods that have been accepted as proof in numerous consumer class action cases.

The defendant also contends that class members' "subjective preferences" preclude certification because, if a person "did not care about the defect," then they "suffered no loss." However, as other courts have observed, "[a] class member's subjective sophistication or knowledge is irrelevant [in the consumer fraud context] because the liability inquiry states objective elements." *Carriuolo*, 823 F.3d at 990.

### 4. Arbitration Clauses

The defendant argues that certification is precluded because an unidentified but substantial minority of absent class members may have bought their vehicles under purchase agreements that included arbitration clauses. That argument is ineffective at this stage of the case, however, because the defendant has waived any right to compel arbitration by engaging in this litigation and seeking dispositive rulings from the Court on the plaintiffs' claims — some of which were forthcoming in its favor. "Waiver [] 'is the intentional relinquishment or abandonment of a known right.'" *Morgan v. Sundance, Inc.*, --- U.S. ---, 142 S. Ct. 1708, 1713 (2022) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). "The Supreme Court recently held 'prejudice is not a condition of finding that a party waived its right to compel arbitration under the Federal Arbitration Act.' So the test for waiver now has only two elements. Thus, 'a party waives its contractual right to arbitration if it [1] knew of the right; [and] [2] acted inconsistently with that right.'" *Roman v. Jan-Pro Franchising Intl., Inc.*, No. 16-05961 WHA, 2022 WL 3046758, at *6 (N.D. Cal. Aug. 2, 2022) (quoting *Morgan*, 142 S. Ct. at 1709). "If, before moving to compel arbitration, a party moves to dismiss on a key merits issue, then the party's action is inconsistent with the right to arbitrate." *Ibid.* (citing *Newirth ex rel. Newirth v. Aegis Senior Communities, LLC*, 931 F.3d 935, 942 (9th Cir. 2019) ("Aegis intentionally withdrew the motion and proceeded to take advantage of the federal forum by filing a motion to dismiss Newirth's arbitrable claims, with prejudice, for failure to state a claim.")).

### 5. Presentment and Repairs

The defendant also argues that issues concerning whether the vehicles were "presented for repair" or in fact repaired under warranty preclude certification.  As discussed above respecting "notice" or lack thereof, these are merits issues that are irrelevant at this stage.  Moreover, all of the named plaintiffs testified that their vehicles have *not* been repaired despite multiple presentments, and the correspondence and warranty analyses already offered in the record suggest that GM long ago recognized that the problems with the 8L design cannot be fixed, or avoided for good, absent service actions that GM deemed too costly to deploy.

### 6. Design Variations

The defendant argues that "design variations" among class models preclude class certification.  However, the plaintiffs have argued persuasively that the problematic elements of the 8L design are universal and inherent despite any such variations.  The question is not whether every single aspect of the design is common — only those aspects that allegedly caused the problems.  *Quackenbush v. Am. Honda Motor Co., Inc.*, No. 20-05599, 2021 WL 6116949, at *4 (N.D. Cal. Dec. 27, 2021); *Brummett v. Skyline Corp.*, 1984 WL 262559, at *3 (W.D. Ky. 1984) ("As to meeting the prerequisites of Fed. R. Civ. P. 23(a), the plaintiffs assert that their claim is typical of that of the class.  The basic design defect claimed by the plaintiffs is allegedly present in all of the defendant's mobile homes. The fact that different models are involved is of no consequence here.  The plaintiffs' claim for economic harm is typical of the claim of any other purchasers of these mobile homes.").

### 7. Knowledge of Defect

The defendant argues that variations in GM's and class members' "knowledge of the defect over time" preclude certification.  However, as discussed above, there is substantial evidence in the record that GM had knowledge of the defect from even before the class models were launched,

that it rapidly accumulated irrefutable evidence of a widespread defect as a result of a years-long — and apparently still ongoing — investigation, and that it never disclosed any of its findings to prospective purchasers before this litigation was well underway.  Moreover, the determination of the materiality of that information will turn on objective rules that are unconcerned with individual knowledge or preferences.  *See In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Pracs. Litig.*, 422 F. Supp. 3d 194, 255 (D.D.C. 2019) ("Even though plaintiffs' deposition testimony indicates that not all purchasers would find the alleged deception to be material, . . . materiality [is] judged by an objective standard, [and] materiality to a reasonable consumer does not mean it has to be material to every consumer."); *Cardenas v. Toyota Motor Corp.*, 2021 WL 5811741, at *13 (S.D. Fla. Dec. 6, 2021) ("[I]n view of the revision of the class definition to only those who purchased a class vehicle from an authorized dealer, 'a permissible inference of common exposure may be drawn.' Thus, whether Plaintiffs were exposed to the same omission is indeed susceptible to class wide proof. As other district courts have aptly put it: 'all class members received the same information from defendant regarding the purported defect —which is to say, no information.'" (quoting *Salas v. Toyota Motor Sales, U.S.A., Inc.*, 2019 WL 1940619, at *9 (C.D. Cal. Mar. 27, 2019)).

The fact that the alleged defect has "not yet" (according to the defendant) caused any serious accidents similarly is immaterial to the assessment of whether it poses a safety *risk* for drivers.  *See Quackenbush*, 2021 WL 6116949, at *5.  Moreover, there already is some evidence in the record suggesting that GM *has* received reports of accidents caused by shifting problems, which it elected to ignore.  For example, the plaintiffs' expert William McVea discussed portions of a GM "safety assessment" report about shift problems.  He observed that a preliminary version of the report stated that an unexpected downshift could be perceived by some drivers as a "surge"

-53-

with a "startling effect," but those terms were dropped from a final version of the report.  The assessment further indicted that GM had concluded that as many as 1 in 100 drivers would be unable to maintain control of their vehicles during such an incident.  Finally, McVea also noted that the safety investigation was "closed with no further action" despite the identification of 34 accidents associated with the effect.  Expert Report of William McVea, ¶ 96-97, PageID.8350.

### 8. Vehicle Sales

The defendant argues that the fact that some class members may have sold their vehicles precludes certification.  However, for the reasons discussed above, the proposed assessment of class-wide point-of-sale damages on a representative basis is proper notwithstanding such individual circumstances, and as other courts have observed, the fact of resale is immaterial because the injury occurred when class members paid a price premium at the time of lease or purchase."  *Carriuolo*, 823 F.3d at 990.

### 9. Dominic Eatherton (Wyoming)

The defendant objects that Eatherton is not a viable plaintiff or class representative because he bought his vehicle in May 2019, after the class cutoff date of March 1, 2019, when the new "Mod1a" fluid remedy was deployed.  However, the plaintiffs respond that his vehicle was sold with the old 212B/Option B fluid, and it has exhibited severe "hard shift" problems which have not been cured.  The plaintiffs also offer a revised class definition for Wisconsin class to cover "used purchasers/current owners who purchased in [State] Class Vehicles from authorized GM dealers *manufactured* before March 1, 2019."  That revision to the class definition will moot the defendant's objection and allow the Wisconsin class to proceed.

### III.

All of the requirements have been satisfied for Rule 23(b)(3) certification of the 26 proposed state-by-state classes.  Any logistical challenge posed by the state-by-state structure will

be addressed by appropriate trial scheduling. *E.g.*, *Tershakovec*, 546 F. Supp. 3d at 1371; *see also In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, No. 16-02709, 2019 WL 1418292, at *16-17 (W.D. Mo. Mar. 21, 2019) ("Variances of state law may also be overcome through the use of subclasses to allow common issues of fact or law to predominate over individual issues of state law.").

Accordingly, it is **ORDERED** that the motions to certify 26 statewide subclasses (ECF No. 222, 223) are **GRANTED**.

It is further **ORDERED** that the following subclasses are **CERTIFIED**:

1.  All original purchasers who purchased in Alabama new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

2.  All purchasers and current owners who purchased in Arizona class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers in Arizona before March 1, 2019.

3.  All purchasers and current owners who purchased in Arkansas class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers in Arkansas before March 1, 2019.

4.  All original purchasers who purchased in Colorado new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC

Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

5.    All original purchasers who purchased in Delaware new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

6.    All original purchasers who purchased in Florida new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

7.    All original purchasers who purchased in Georgia new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

8.    All original purchasers who purchased in Idaho new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

9.    All original purchasers who purchased in Illinois new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

10.    All original purchasers who purchased in Kansas new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-

2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

11.   All original purchasers who purchased in Kentucky new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

12.   All original purchasers who purchased in Louisiana new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

13.   All original purchasers who purchased in Maine new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

14.   All purchasers and current owners who purchased in Michigan class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers in Michigan before March 1, 2019.

15.   All original purchasers who purchased in Minnesota new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

16.  All original purchasers who purchased in New Hampshire new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

17.  All original purchasers who purchased in New Jersey new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

18.  All purchasers and current owners who purchased in New York class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers in New York before March 1, 2019.

19.  All original purchasers who purchased in North Carolina new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

20.  All original purchasers who purchased in Oklahoma new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

21.  All purchasers and current owners who purchased in Pennsylvania class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6;

2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers in Pennsylvania before March 1, 2019.

22.  All original purchasers who purchased in South Carolina new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

23.  All purchasers and current owners who purchased in Tennessee class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers in Tennessee before March 1, 2019.

24.  All original purchasers who purchased in Texas new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

25.  All original purchasers who purchased in Washington new class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers before March 1, 2019.

26.  All purchasers and current owners who purchased in Wisconsin class vehicles (defined as: General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon) from authorized GM dealers, where the vehicle purchased was manufactured before March 1, 2019.

It is further **ORDERED** that the plaintiffs named in the Consolidated Amended Class Action Complaint are **DESIGNATED** as class representatives for their respective jurisdictional subclasses.

It is further **ORDERED** that Theodore J. Leopold, Esquire, of Palm Beach Gardens, Florida is appointed as lead class counsel.

It is further **ORDERED** that counsel for the parties must meet and confer and present to the Court **on or before April 20, 2023** a proposal for a notice to class members for each subclass that complies with Federal Rule of Civil Procedure 23(c)(2)(B), and a method of delivering the notice to absent class members.

s/David M. Lawson        
DAVID M. LAWSON
United States District Judge

Dated:   March 20, 2023

**APPENDIX PART A**

The plaintiffs identified below testified to the following complaints concerning the respective class vehicles:

Brian Lloyd (Alabama)

Lloyd purchased a new 2016 Chevrolet Camaro from Chevrolet of Boaz in Boaz, Alabama. He presented the car for repair in June 2017, when it had around 10,000 miles in service.  He testified that his car exhibits "shuddering" while driving that feels like someone "shaking the back of the seat."  Brian Lloyd dep., ECF No. 225-13, PageID.16062.  The shuddering occurs "daily" when driving at speeds between 30 to 50 mph, lasting from several seconds up to 15 minutes in one instance.  *Id.* at PageID.16065-67.  He also has experienced "extremely hard shifts" where "out of the blue" the car shifts with a "loud bang" and a feeling "like you got hit by something." *Id.* at PageID.16062-63.

Maria Barallardos (Arizona)

Barallardos bought a used 2015 Cadillac Escalade ESV from Coulter Cadillac in Phoenix, Arizona.  She presented the car for repair three times between August 2017 and December 2018, when it had between 63,000 and 82,000 miles in service.  She testified that the shudder issues were repaired after several attempts, but it continues to have delayed engagement when shifting from park to drive or reverse, as well as "banging," "jolting," and "popping" into gear when slowing down and starting off from traffic signals.   Maria Barallardos dep., ECF No. 224-30, PageID.15729-30.

James Browne (Arkansas)

Browne bought a used 2017 GMC Sierra from Central Buick GMC in Jonesboro, AR on November 5, 2018.  He presented the car for repair in December 2018, when it had around 32,000 miles in service.  He testified that his truck hesitates and fails to accelerate while merging into

traffic, which he described as "definitely a safety concern," and he also reported "shuddering" causing the truck to speed up and slow down, feeling like a "backward and forward motion," as if the vehicle is "trying to accelerate" but unable to maintain power, despite a steady throttle setting. James Browne dep., ECF No. 224-32, PageID.15747-49.

### Daniel Drain (Colorado)

Drain bought a new 2018 GMC Sierra from Alpine Buick GMC in Denver, Colorado on June 29, 2018.  He presented the car for repair twice in August 2018, when it had less than 3,800 miles in service.  He testified that his truck frequently "shakes" at typical highway and neighborhood driving speeds, "jerks into gear" when backing out of parking spots, and when decelerating or accelerating the shifts are so hard that they "jerk you forward" or "jerk you back." Drain dep., ECF No. 225-4, PageID.15882.  The "shudder" at highway speeds feels "like driving over rumble strips." *Id.* at PageID.15883.  He further testified that the shuddering and jerking have continued and gotten worse after the truck was serviced several times and he was told by the dealer that it was fixed.  *Id.* at PageID.15885.

### Richard Filiaggi (Delaware)

Filiaggi bought a new 2019 Chevrolet Colorado ZR2 from I.G. Burton Chevrolet in Seaford, Delaware.  He presented the car for repair twice in March 2019 and October 2020, when it had between 4,200 and 22,000 miles in service.  He testified that he is concerned about safety while driving his truck because it would hesitate when accelerating, such as starting from a stop sign. Richard Filiaggi dep., ECF No. 225-10, PageID.15976.  He also said that the truck will "slam into gear" when slowing down.  *Ibid.*  In one incident, while driving on a back road, the car downshifted and would not change gears until he stopped, shifted to neutral, then shifted back to drive.  *Ibid.*

-2A-

<u>Rhianna Meyers, Michael Ponder, Richard Sullivan, Tait Thomas (Florida)</u>

Meyers bought a New 2017 Chevrolet Camaro from Castriota Chevrolet in Hudson, FL. She presented the car for repair five times in October 2017, when it had around 14,000 miles in service. She testified that her car "shudders upon acceleration," "jerks forward when between gears or idling at low speed," and after accelerating to pass, the engine RPM does not come back down promptly. Rhianna Meyers dep., ECF No. 225-15, PageID.16087. Ponder bought a new 2018 Chevrolet Camaro from Jack Wilson Chevrolet in St. Augustine FL. He presented the car for repair in October 2018, when it had around 5,300 miles in service. The plaintiffs' presentation did not include any testimony by Ponder. However, like other plaintiffs, he alleged that his car exhibits "shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating." Sullivan bought a new 2015 Chevrolet Corvette from Schumacher Chevrolet in Lake Worth, Florida. He presented the car for repair five times in July 2016, when it had around 8,700 miles in service. Sullivan testified that, when driven for the first time each day, his car "shudders" and "shakes" before reaching the end of his driveway, and then "clunks and sputters into gear." Richard Sullivan dep., ECF No. 225-23, PageID.16221. At highway speeds around 55 mph, the car also exhibits shudder which he described as like "driving over railroad tracks." *Id.* at PageID.16222. The car also shifts between seventh and eight gear "all the time." *Ibid.* Also, at low speeds, like driving around a parking lot, the car exhibits hard shifts that feel "like somebody is slamming into you from behind with another vehicle." *Ibid.* Sullivan attested that it feels like the car has a manual transmission, but is being driven by someone who "doesn't know how to drive a manual transmission." *Id.* at 16223. Thomas bought a new 2015 Chevrolet Corvette from Lorenzo Bomnin Chevrolet in Miami, FL on September 28, 2014. He presented the car for repair in April 2017, when it had around 6,300 miles in service. He testified that when started in the morning and shifting from reverse to drive, his car "feels like it skips a gear" and "slams into first."

-3A-

Tait Thomas dep., ECF No. 225-24, PageID.16236.  He said that he also experienced noticeable delays with gears engaging and then slamming into gear.  *Id.* at PageID.16237.  He also reported that his car "shudders" when driven at a steady speed.  *Id.* at PageID.16238.

<u>Jimmy Flowers, Richard Freeman, Philip Weeks (Georgia)</u>

Flowers bought a new 2018 Chevrolet Colorado from Paul Thigpen Chevrolet Buick GMC in Vidalia, Georgia.  He presented the car for repair three times in October 2018, when it had around 5,400 miles in service.  The plaintiffs' presentation did not include any testimony by Flowers.  However, like other plaintiffs, he alleged that his car exhibits "shuddering, jerking, and vibrating, and transmission slips and hesitating while accelerating."  Freeman bought a new 2017 GMC Canyon from Walker Cadillac Buick GMC (now known John Thornton Buick GMC) in Carrollton, Georgia.  He presented the car for repair three times between February and November 2018, when it had between 3,900 and 11,000 miles in service.  The plaintiffs' presentation did not include any testimony by Freeman.  However, like other plaintiffs, he alleged that his car exhibits "shuddering, jerking, and vibrating, and exhibiting transmission slips and hesitating while accelerating."  Weeks bought a new 2018 Cadillac CT6 from Hennessy Cadillac in Duluth, Georgia on December 18, 2018.  He presented the car for repair twice in January and August 2019, when it had around 5,600 miles in service.  Weeks testified that his car has exhibited hard shifts when pulling into a parking lot that caused the car to "lurch forward," forcing him to "slam on the brakes so that the car wouldn't hit the curb in front of me."  Philip Weeks dep., ECF No. 225-26, PageID.16270.

<u>Carry Sherrow (Idaho)</u>

Sherrow bought a new 2017 GMC Sierra from Dave Smith Motors in Kellogg, Idaho.  He presented the car for repair in April 2018, and on several subsequent occasions when he brought the car in for routine maintenance.  He testified that his car exhibits "shuddering" which feels like

the transmission is "slipping" while driving down the road.  Carry Sherrow dep., ECF No. 225-18, PageID.16132.  He also has experienced "jerking" when the car shifts gears, accompanied by a "loud noise" that he described as "like the transmission is falling right out from underneath the truck."  *Id.* at PageID.16133.  He also said that he has experienced hesitation while accelerating, like "a big pause before it starts to take off."  *Ibid.*

### Dennis Speerly (Illinois)

Speerly bought a new 2017 GMC Canyon from Dekalb Sycamore Chevrolet Cadillac GMC in Sycamore, Illinois.  He presented the car for repair fives times in December 2017, when it had around 12,000 miles in service.  He testified that his car exhibits "vibration" from the transmission while "cruising" at highway speeds.  Dennis Speerly dep., ECF No. 225-22, PageID.16198-99.  The problem occurs "around 90 percent of the time" when driving.  *Id.* at PageID.16201.  The vibrations lessened after an ATF change, but "returned with a vengeance" within three to four months.  *Id.* at PageID.16205-206.  He said that the car also exhibits a "kick" or "jerk" that he described as "like a light punch in the arm" when upshifting during acceleration from a stop.  *Id.* at PageID.16210.

### Guy Clark (Kansas)

Clark bought a new 2017 GMC Sierra from Robert Brogden Buick GMC in Olathe, Kansans.  He presented the car for repair four times in September 2017, when it had around 10,000 miles in service.  He testified that he frequently experiences an "extremely hard shift" between first and second gear that "in the right situation could be a safety hazard."  Guy Clark dep., ECF No. 224-35, PageID.15795-96.

### James Norvell (Kentucky)

Norvell bought a new 2018 Chevrolet Colorado from Patriot Chevrolet in Hopkinsville, Kentucky.  He presented the car for repair in June 2019, when it had around 6,100 miles in service.

He testified that his car has exhibited "shuddering" which he described "like going over rumble strips," as well as "jerking" or "lunging" into gear.  James Norvell dep., ECF No. 225-16, PageID.16106.  He also said that the transmission "slips" and "hesitates" while accelerating.  *Id.* at PageID.16107.

### Donald Dykshorn (Louisiana)

Dykshorn bought a new 2016 Chevrolet Camaro SS from Bryan Chevrolet in Kenner, Louisiana.  He presented the car for repair twice, first in July 2017, when it had around 7,200 miles in service, and again in March 2019, at around 27,000 miles.  He testified that his car often vibrates in a way that feels like driving over rumble strips.  He also testified that when shifting from first to second gear the transmission "slips" or hesitates, and then jerks or lurches forward in a way that is "hard to control" and "kind of scares" him when in closely spaced rush-hour traffic or navigating tight spaces as in a parking garage.  Donald Dykshorn dep., ECF No. 225-5, PageID.15894-95.  He further testified that the jerking and lurching he would rate as a "9" or "10" in terms of severity, because it had "almost resulted in an accident a few times."  *Id.* at PageID.15900.

### Robert Higgins (Maine)

Higgins bought a new 2017 Chevrolet Camaro from Goodwin Chevrolet Buick in Oxford, Maine.  He presented the car for repair twice in September 2017 and July 2019, when it had between 5,100 and 14,000 miles in service.  He testified that in "a lot of instances" the "1-to-2 shift has been overly violent," and he also has had problems where the car "surged" when braking to a stop, which he said required harder pressure on the brake pedal to halt the "unexpected" surge and stop the car.  Robert Higgins dep., ECF No. 225-11, PageID.15992-93.  He also had two instances when the car refused to shift out of first gear until he pulled over and shifted into neutral and back into drive, and on other occasions the transmission would "slip" and the car would refuse to accelerate at highway speeds when he changed lanes to pass other vehicles.  *Id.* at

PageID.15993-94.  He reported that the shuddering he experienced, like "driving over rumble strips," has not recurred since "the second flush" service that was performed on the truck, but the "erratic shifting" persists.  *Id.* at PageID.15994.  Higgins said that during a recent drive, the car exhibited hard shifts while in "bumper-to-bumper traffic" that happened three times within 10 minutes.  *Id.* at PageID.15996.

### Louis Ray (Michigan)

Ray bought a used 2015 Cadillac Escalade from Vyletel Buick GMC in Sterling Heights, Michigan on August 14, 2017.  He presented the car for repair in November 2018, when it had around 44,000 miles in service.  He testified that his car "hesitates" or "delays" before accelerating when the gas pedal is pressed, and then "lurches forward."  Louis Ray dep., ECF No. 225-17, PageID.16117.  He also said that at highway speeds the transmission will "clunk" when downshifting, and that it also "hesitates" when put into reverse, and "you never know when it's going to move.  *Id.* at PageID.16119.  He said that the problems occur "very frequently."  *Ibid.*  He said that the car also "shakes" when driving around 40 mph and 1,500 engine RPM, but the shaking was somewhat lessened by an ATF change.  *Id.* at PageID.16121-22.  However, the hesitation and lurching issues persist.  *Id.* at PageID.16122.

### Troy and Kimberly Coulson (Minnesota)

The Coulsons bought a new 2017 GMC Sierra 1500 from Luther Brookdale Chevrolet Buick GMC in Brooklyn Center, Minnesota on June 16, 2017.  The car was presented for repair three times between October 2017 and April 2019, when it had between 5,600 and 27,000 miles in service.  Troy Coulson testified that "lots of times" while decelerating or accelerating in "rush-hour" stop-and-go traffic, his truck will "clunk" and "drop out of gear," and then "lunge forward." This would occur "once or twice" during typical daily trips to pick up his daughter from school. Coulson testified that it is "nerve-wracking" to drive his truck due to the unpredictable lurching,

and he has had to "change his driving habits" and drive with "one foot on the gas" and "one on the brake" any time when in close proximity to other cars or pedestrians.  Troy Coulson dep., ECF No. 225-1, PageID.15811-13.  Coulson further testified that at times the shifts have been so abrupt and loud that he looked in the rearview mirror to see if another car had struck his.  *Id.* at PageID.15818.  Coulson also described an incident in a store parking lot where he nearly struck a pedestrian while moving at low speed because the truck lunged forward, forcing him to slam on the brakes.  *Id.* at PageID.15819-20.  Coulson testified that the lurching is, on a scale of 1 to 10, a 10 in terms of how startling it is when it occurs.  *Id.* at PageID.15822-23.  He said that the worst lurches occur about 20-30% of the time when the truck has a hard shift, around once or twice each week of typical driving.  *Id.* at PageID.15824-25.  Accompanying the hard shifts would be a loud sound, "like dropping a boat anchor on the road."  *Ibid.*  On one occasion, the shift felt so hard while simply turning a corner that Coulson's daughter said, "Dad, you ran over the curb."  *Id.* at PageID.15828.  Kimberly Coulson testified that she experienced similarly hard shifts and lurching when driving the truck.  Kimberly Coulson dep., ECF No. 225-2, PageID.15837-38.  Coulson further testified that she did not believe the truck could be sold due to the transmission problems.  *Id.* at PageID.15848.

### Michael Banks (New Hampshire)

Banks bought a new 2017 GMC Sierra Denali from Holloway Buick GMC in Portsmouth, New Hampshire.  He presented the car for repair twice in April and October 2018, when it had between 15,000 and 20,000 miles in service.  He testified that his car feels like it is "convulsing" when upshifting and downshifting, feeling like it is "about to run out of gas," and that it also "lunges ahead" when shifting in a manner that is "very uncontrollable."  Michael Banks dep., ECF No. 224-29, PageID.15721.

<u>Randall Jacobs, Joseph Sierchio (New Jersey)</u>

Jacobs bought a new 2016 Cadillac CT6 from Brogan Cadillac in Totowa, New Jersey.  He presented the car for repair in November 2016, when it had around 3,100 miles in service.  Jacobs testified that he has not experienced "shuddering" with his car.  Randall Jacobs dep., ECF No. 225-12, PageID.16018.  He said, however, that he experienced "banging" and "lurching forward" when accelerating from a stop, at the first gear change.  *Id.* at PageID.16019.  He said that when he reported the "lurching" to his dealer he stated that it was "dangerous."  *Id.* at PageID.16023.  He said that on at least one incident the car "surged forward at least a full car length" when he was trying to brake, which "scared his wife."  *Id.* at PageID.16029-30.  He said the lurching when it occurred was "very unexpected," and "if you were sitting in the front seat like my wife was, you would be screaming like she was."  *Id.* at PageID.16031.  The lurching occurred at least once a week, but unpredictably, and not every time the car was driven.  *Id.* at PageID.16033-34.  Sierchio testified that when driving at low speeds, like in a parking lot, his car will "bang" into gear, feeling like it was hit from behind.  Joseph Sierchio dep., ECF No. 225-20, PageID.16157.  He also reported than when accelerating to get on the highway the car "just does nothing for about a second and then all of a sudden lunges forward."  *Id.* at PageID.16158.  He also has experienced "major shudder" when driving around 60 mph, but that problem was fixed after an ATF change.  *Ibid.*

<u>Andre McQuade (New York)</u>

McQuade bought a certified pre-owned 2017 Cadillac CTS from Bob Johnson Chevrolet Cadillac Buick GMC in Rochester, New York on May 4, 2018.  He presented the car for repair twice in October 2018 and June 2019, when it had between 30,000 and 36,000 miles in service.  He testified that his car "surges" or "jerks" from a "full stop," and also when slowing down "refuses to downshift," when braking for traffic or a stop sign.  *Id.* at PageID.16077.  He described the hard shifts as "intermittent," and noted that they are less common after a change of transmission

fluid, but soon return.  *Id.* at PageID.16078.  The "weirdness" in shifting is unnerving enough that his wife is afraid to drive the car.  *Ibid.*  McQuade also said that his car "shudders" at highway speeds which feels like a "pulsation" through the steering wheel.  *Id.* at PageID.16079.

### Steven Brack (North Carolina)

Brack bought a new 2018 Chevrolet Silverado from Parks Chevrolet in Charlotte, North Carolina.  He presented the car for repair four times in March 2019, when it had around 12,000 miles in service.  He testified that when he started his truck and put it in gear, as he accelerated it would "hesitate and jerk back and forth," and it also subsequently developed shudder.  Steven Brack dep., ECF No. 224-31, PageID.15738.

### John Ellard (Oklahoma)

Ellard bought a new 2016 GMC Sierra from Bob Moore Auto Group in Oklahoma City, Oklahoma.  He presented the car for repair in September 2016, when it had around 8,500 miles in service.  He testified that the defect with his truck is "monotonous" in the sense that it happens every time he drives, and consists of "jerking" and "hesitating while accelerating" where it seems that the transmission "does not know how to shift correctly."  John Ellard dep., ECF No. 225-7, PageID.15927-28.  He said that he has not experienced shuddering or vibration while driving.  *Id.* at PageID.15929.  He testified that he experiences these issues "every time" he drives the truck. *Id.* at PageID.15932.

### Katrina and William Fredo (Pennsylvania)

The Fredos bought a used 2015 Cadillac Escalade from Faulkner Cadillac in Trevose, Pennsylvania.  The car was presented for repair in July 2018, when it had around 68,000 miles in service.  Katrina Fredo testified that her car exhibits "shaking" or "vibrating" at highway speeds and "jerking back and forth" at low speeds.  Katrina Fredo dep., ECF No. 225-8, PageID.15941. She said that the "jerking" occurred during gear changes and "would be almost like somebody had

-10A-

kind of hit you from the back and you're jerked forward and backward." *Id.* at PageID.15943. She also said that the transmission feels like it is "slipping" at times, which occurs around half the times she drove the car. *Id.* at PageID.15947-48. William Fredo testified that he feels a "hard vibration" while driving the car at highway speeds around 55-60 mph. William Fredo dep., ECF No. 225-9, PageID.15958. He said that the car also "jerks" or "throws you into gear" when shifting up and down at low speeds. *Id.* at PageID.15960-61. Along with the "jerking" he also would hear a "loud clunk" noise like "slinging two full cans of beans together." *Id.* at 15961. He said that he notices the hard shifts "all the time" and that it "is getting worse." *Id.* at PageID.15962-63.

<u>Donald Sicura, Jason Sinclair (South Carolina)</u>

Sicura bought a new 2015 Chevrolet Corvette from Palmetto Chevrolet in Conway, South Carolina. He presented the car for repair three times in September 2016 and April 2019, when it had between 7,000 and 12,000 miles in service. Sicura's proffered testimony does not elaborate on the problems with the car other than a passing reference to "the problems with the transmission," evidently meaning those alleged in the amended complaint. Donald Sicura dep., ECF No. 225-19, PageID.16146. Sinclair bought a new 2017 GMC Sierra from Team Chevrolet Buick GMC Cadillac in Salisbury, North Carolina. He presented the car for repair five times in May 2017, when it had less than 1,000 miles in service. Sinclair testified that his car exhibits a "constant shake" which he described as "like driving over rumble strips." Jason Sinclair dep., ECF No. 225-21, PageID.16180-81. The problem occurs every time he drives the car. *Id.* at 16181. He also has experienced the car "jerking" into gear when shifting throughout the range of gears. *Id.* at PageID.16183-84. The car also "hesitates" when upshifting and "tends to lose power." *Id.* at PageID.16184. He said that when he tries "to pass a vehicle and try to accelerat[e] past the vehicle, it has some delay between the time I push the pedal and the time it actually starts to accelerat[e] to where it should be." *Id.* at PageID.16185.

-11A-

David Thompson (Tennessee)

Thompson bought a used 2017 GMC Sierra from Russell Barnett Chevrolet-GMC in Winchester, Tennessee.  He presented the car for repair six times between December 2018 and September 2019, when it had between 21,000 and 35,000 miles in service.  He testified that his truck "shudders" when driving, and the shuddering is more pronounced on cold mornings.  David Thompson dep., ECF No. 225-25, PageID.16260.  He said that the shudder happens "every day if you don't let it warm up ahead of time," and that the shuddering "can be really bad."  *Ibid.*  He also said that when pulling out of his driveway the car "will sometimes surge forward when it goes into second gear before it gets to the end of the driveway," and, when he "start[s] to pull out on the highway, when [mashing] the accelerator, sometimes it hesitates about going into second gear [when] out in the middle of the highway."  *Id.* at PageID.16260-61.  He also said that when pulling up to a stoplight sometimes the truck will "downshift [] real hard."  *Id.* at PageID.16261.

Darrin Degrand (Texas)

Degrand bought a new 2018 GMC Canyon from James Wood Chevrolet in Denton, Texas.  He presented the car for repair three times in October 2018, when it had around 5,000 miles in service.  He testified that the transmission problems were serious enough that he would avoid driving the truck and take another vehicle when the truck was not specifically needed.  Darrin Degrand dep., ECF No. 225-3, PageID.15857.  Degrand testified that after the truck sits for several days, when it is started and put in gear, it would not move under its own power for "two and a half to five minutes" until the transmission finally would engage.  *Id.* at PageID.15858.  He also said that when coming to a hard stop the transmission would produce a "loud bang" which feels like the truck was hit from behind.  *Id.* at PageID.15859.  He also experiences shudder or vibration frequently while driving at low speeds.  *Id.* at PageID.15862-63.  He described the vibration felt during shudder incidents as feeling "like a tire is out of balance."  *Id.* at PageID.15867.  When the

-12A-

shudder sets in, it usually does not stop until the car is pulled over and put into park and back into drive, which Degrand has had to do "25 to 30 times." *Id.* at PageID.15868.

### Jerry and Kim Carroll (Washington)

The Carrolls bought a new 2016 Cadillac Escalade from Carr Auto Group in Vancouver, Washington. The car was presented for repair five times between December 2016 and December 2019, when it had between 19,000 and 59,000 miles in service. Kimberly Carroll testified that she has experienced shuddering, "jerking," and hesitation when trying to accelerate, including "shaking" that she can feel through the driver seat, which occurs "randomly" between six and seven times during each outing. Kimberly Carroll dep., ECF No. 224-33, PageID.15757-61. Jerry Carroll testified that he experienced similar issues while driving the car, and he also stated that he has experienced delays of several seconds between pressing the accelerator and the car starting to move. Jerry Carroll dep., ECF No. 224-34, PageID.15777-81. Mr. Carroll further testified that while he was riding in the car as a passenger he felt shifts so hard that it felt like the car was struck from behind, but his wife commented "that's [the] transmission." *Id.* at PageID.15784. He added that "hard shift" issues would occur four out of five times the car was driven, while the shudder would occur less often. *Id.* at PageID.15785.

### Dominic Eatherton (Wisconsin)

Eatherton bought a used 2017 GMC Sierra from Koehne Chevrolet Buick GMC in Marinette, Wisconsin. He presented the car for repair twice in February and August 2020, when it had between 45,000 and 50,000 miles in service. He testified that when slowing to approach a traffic sign or roundabout, his truck "jerks forward quite violently" which he likened to the feeling of being "struck by another vehicle." Dominic Eatherton dep., ECF No. 225-6, PageID.15916. He reported that when he first gets in the car, approaching a stop sign initially, he anticipates that the truck will not slow when he presses the brake pedal due to the "jerk jolt slamming sensation,"

-13A-

and that it also fails to accelerate on demand when the throttle pedal is applied.  *Id.* at

PageID.15917-18.

**APPENDIX PART B**

The elements of pleaded causes of action state by state are summarized as follows:

<u>Alabama (Deceptive Trade Practices Act, Express Warranty)</u>

"Among other things, the ADTPA declares unlawful the act or practice of '[e]ngaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.'" *Jones v. Coty Inc.*, 362 F. Supp. 3d 1182, 1212 (S.D. Ala. 2018) (quoting Ala. Code § 8-19-5(27)). Federal courts have found claims under the ADTPA amenable to class certification, notwithstanding a state level prohibition on collective litigation. *E.g.*, *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1334 (11th Cir. 2015) ("If this case were pending in an Alabama state court, the statute would preclude presentation of the ADTPA claims in a private class action. But the case is in federal court. Federal Rule of Civil Procedure 23 allows class actions and makes no exception for cases of this kind.").

Privity and notice are not obstacles for the warranty claim because "under Alabama law, a manufacturer's express warranty, like any contractual obligation, may run in favor of a third-party beneficiary," and "Alabama law does not require third-party beneficiaries of a contract to give notice to a seller of a breach of warranty before bringing suit." *Freeman v. NIBCO, Inc.*, 526 F. Supp. 3d 1112, 1129 (N.D. Ala. 2020). In order to "adequately state[] a claim for relief as a third-party beneficiary of an express warranty under Alabama law, . . . . a complainant must show that the contracting parties intended to bestow a direct benefit on a third party, that the complainant was the intended beneficiary, and that the contract was breached." *Harman v. Taurus Int'l Mfg., Inc.*, 2022 WL 479139, at *7 (M.D. Ala. Feb. 16, 2022).

<u>Arizona (Consumer Fraud Act)</u>

"[T]o succeed on a claim of consumer fraud, [under the ACFA] a plaintiff must show (1) a false promise or misrepresentation made in connection with the sale or advertisement of

'merchandise,' and (2) consequent and proximate injury resulting from the misrepresentation." *Watts v. Medicis Pharm. Corp.*, 239 Ariz. 19, 28, 365 P.3d 944, 953 (2016) (quoting Ariz. Rev. Stat. § 44-1522(A)). Federal courts have found claims under the ACFA amenable to class certification, notwithstanding a state level prohibition on collective litigation. *E.g.*, *In re Arizona Theranos, Inc., Litig.*, No. 16-2138, 2020 WL 5435299, at *8 (D. Ariz. Mar. 6, 2020), *aff'd in part, rev'd in part on other grounds B.P. v. Balwani*, No. 20-15974, 2021 WL 4077008 (9th Cir. Sept. 8, 2021) ("Walgreens' arguments in opposition to class certification are, by and large, founded upon the contention that some of the plaintiffs and putative class members received accurate test results, and that not all blood testing was done at a Theranos lab or done by the Edison device. These arguments are flawed because plaintiffs' claims are based upon the contention that they have been damaged because of unreliable tests. Plaintiffs aptly point out that reliability is not the same thing as accuracy. Plaintiffs' theory of liability is not based upon allegations that the blood tests were not accurate.").

<u>Arkansas (Deceptive Trade Practices Act, Implied Warranty)</u>

"To establish a claim under the ADTPA . . . a plaintiff need only prove (1) a deceptive consumer-oriented act or practice which is misleading in a material respect, and (2) injury resulting from such act." *Pleasant v. McDaniel*, 2018 Ark. App. 254, 7, 550 S.W.3d 8, 12 (2018) (citing Ark. Code Ann. § 4-88-113(f)). "To recover for breach of implied warranty of merchantability, [the plaintiff] must prove: (1) that he has sustained damages; (2) that the product sold to him was not merchantable, i.e., fit for the ordinary purpose for which such goods are used; (3) that this unmerchantable condition was a proximate cause of his damages; and (4) that he was a person whom the defendant might reasonably expect to use or be affected by the product." *Ctr. v. Conagra Foods, Inc.*, No. 14-05248, 2015 WL 4106473, at *6 (W.D. Ark. July 6, 2015). Individualized reliance need not be proved. *In re Pharm. Indus. Average Wholesale Price Litig.*,

252 F.R.D. 83, 98-99 (D. Mass. 2008) ("The parties [] agree that the following state statutes do not require the element of reliance." (citing Arkansas (Ark. Code § 4-88-101)).

Federal courts have certified classes for both ADTPA and implied warranty claims under Arkansas law, and held that reliance and causation can be established by common proofs for both. *E.g.*, *Murphy v. Gospel for Asia, Inc.*, 327 F.R.D. 227, 243 (W.D. Ark. 2018) ("GFA again argues that individual proof of reliance and proof of damages would defeat predominance as to the Arkansas subclass. The Court rejects those arguments for the same reason it rejected their arguments as to the nationwide class. In short, the common questions of law and fact predominate over any of these individual questions and putative members can establish proof of reliance by class-wide proof given the nature of the alleged misrepresentations.") (ADTPA); *In re Dial Complete Mktg. & Sales Pracs. Litig.*, 312 F.R.D. 36, 60 (D.N.H. 2015) ("[T]he plaintiffs' implied warranty claim is capable, under Arkansas law, of classwide proof, employing the 'reasonable person' standard to determine the elements of reliance and causation.").

<u>Colorado (Express and Implied Warranty)</u>

"To recover for breach of express warranty under Colorado law, a plaintiff must prove that (1) a warranty existed; (2) the defendant breached the warranty; (3) the breach proximately caused the losses claimed as damages; and (4) timely notice of the breach was given to defendant." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 988 (C.D. Cal. 2015), *aff'd*, 674 F. App'x 654 and 844 F.3d 1121 (2017).   "[T]he elements of an implied warranty of merchantability claim under [California's] Song-Beverly Act are essentially identical to the elements of such a claim under Colorado law." *O'Connor v. BMW of N. Am., LLC*, 2020 WL 2309617, at *10 n. 7 (D. Colo. Jan. 7, 2020), *R&R adopted*, 2020 WL 1303285 (D. Colo. Mar. 19, 2020); *see Dean-Adolph v. Mercedes-Benz USA, LLC*, 2022 WL 815856, at *3 (C.D. Cal. Mar. 17, 2022) ("The elements of a claim for breach of implied warranty under section 1792 of the Song-Beverly Act are: (1) the

plaintiff bought a consumer good (i.e., a good used primarily for personal, family or household purposes) that was manufactured or distributed by the defendant; (2) the defendant was in the business of manufacturing or distributing the particular good to retail buyers; and (3) the consumer good . . . was not fit for the ordinary purposes for which such goods are used."). Privity is not required for warranty claims under Colorado law. *Am. Safety Equip. Corp. v. Winkler*, 640 P.2d 216, 221 (Colo. 1982) ("An action based upon an express warranty, [does] not requir[e] contractual privity in this state."). Federal courts have held that certification of warranty claims under Colorado law is appropriate and that common issues predominate. *E.g.*, *Steigerwald v. BHH, LLC*, No. 15-741, 2016 WL 695424, at *9 (N.D. Ohio Feb. 22, 2016) (granting class certification for express warranty claims under Alaska, California, Colorado, Iowa, Maine, Minnesota, New Hampshire, New Jersey, Ohio, Oklahoma, and Texas law).

<u>Delaware (Consumer Fraud Act, Express and Implied Warranty)</u>

"[T]o bring a private cause of action for damages under the [DCFA], a plaintiff must allege three elements: (1) a defendant engaged in conduct which violated the statute; (2) the plaintiff was a 'victim' of the unlawful conduct; and (3) a causal relationship exists between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Campagna v. TD Bank, N.A.*, 2021 WL 3661293, at *6 n. 6 (D.N.J. Aug. 18, 2021) (citing *Teamsters Loc. 237 Welfare Fund v. AstraZeneca Pharms. LP*, 136 A.3d 688, 693 (Del. 2016)). Individualized reliance need not be proved. *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 98-99 (D. Mass. 2008) ("The following state statutes [] do not require that plaintiff prove individual reliance as a separate element under all prongs of the statute." (citing 6 Del. Code § 2511)); *see also Teamsters*, 136 A.3d at 693 ("We have noted before the three ways in which the Delaware Consumer Fraud Act differs from traditional legal and equitable actions for fraud, misrepresentation, and deceit. First, the only intent requirement of the Act is that in omitting or concealing a material fact, the

-4B-

defendant must have intended that others rely on the omission or concealment. Second, an unlawful practice . . . is committed regardless of actual reliance by the plaintiff. And third, any misrepresentation had to be made with the intent to induce action or inaction by the plaintiff, but the statute does not require proof of such intent.").

"Under Delaware law, to prevail on a breach of express warranty claim, the buyer must prove: (1) the existence of an express warranty, (2) a breach of the defendant's express warranty, (3) a causal connection between the defendant's breach and the plaintiff's injury or damage, and (4) the extent of loss proximately caused by the defendant's breach." *Godreau-Rivera v. Coloplast Corp.*, 2022 WL 1120371, at *15 (D. Del. Apr. 14, 2022). "A successful claim for the implied warranty of merchantability must prove: (1) that a merchant sold the goods; (2) which were defective at the time of sale; (3) causing injury to the ultimate consumer; (4) the proximate cause of which was the defective nature of the goods; and (5) that the seller received notice of the injury." *Abbate v. Werner Co.*, 2012 WL 1413524, at *2 (Del. Super. Ct. Jan. 19, 2012). The enactment of Delaware's iteration of section 2-318 of the U.C.C. abrogated the requirement of contractual privity for express and implied warranty claims. *Martin v. Ryder Truck Rental, Inc.*, 353 A.2d 581, 583 (Del. 1976) (citing 6 Del. Code § 2-318 ("A seller's warranty whether express or implied extends to any natural person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section.")).

### Florida (Deceptive and Unfair Trade Practices Act)

"To bring a [claim for damages under Florida's Unfair & Deceptive Trade Practices Act (FUDTPA)], a plaintiff must establish three elements: 1) a deceptive act or unfair practice; 2) causation; and 3) actual damages." *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d 207, 212 (Fla. Dist. Ct. App. 2019). Proof of individualized reliance is not necessary, and all

elements of the FDUTPA claim are subject to objective standards of proof. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985-86 (11th Cir. 2016) ("As the district court correctly observed, these arguments simply seek a reliance inquiry by another name. Instead, under FDUTPA, the plaintiff must only establish three *objective* elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."). "[T]he first FDUTPA element is amenable to class-wide resolution: the factfinder must only determine whether [an alleged misrepresentation would] deceive an objectively reasonable observer." *Id.* at 986. "[B]ecause the injury is not determined by the plaintiffs' subjective reliance on the alleged inaccuracy, causation and damages may also be amenable to class-wide resolution. FDUTPA damages are measured according to 'the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.'" *Ibid.* (quoting *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984)). Common proofs will suffice where all class members were exposed to the same misrepresentations or omissions and the class definition includes only those who purchased vehicles from the defendant's network of authorized dealers. *Cardenas v. Toyota Motor Corp.*, 2021 WL 5811741, at *13 (S.D. Fla. Dec. 6, 2021) ("[I]n view of the revision of the class definition to only those who purchased a class vehicle from an authorized dealer, 'a permissible inference of common exposure may be drawn.' Thus, whether Plaintiffs were exposed to the same omission is indeed susceptible to class wide proof. As other district courts have aptly put it: 'all class members received the same information from defendant regarding the purported defect — which is to say, no information.'" (quoting *Salas v. Toyota Motor Sales, USA, Inc.*, 2019 WL 1940619, at *9 (C.D. Cal. Mar. 27, 2019)). "Reliance is not an element of a claim for damages under the FDUTPA." *Gundel v. AV Homes, Inc.*, 290 So. 3d 1080, 1087 n.5 (Dist. Ct. App. 2020).

<u>Georgia (Express and Implied Warranty)</u>

"When the purchaser returns the product to the dealer and makes the product available for repair, refusal to repair, unsuccessful repair, or repeated failures of the repair constitute a breach of the express warranty." *Hines v. Mercedes-Benz USA, LLC*, 358 F. Supp. 2d 1222, 1229 (N.D. Ga. 2005). "To prove an implied breach under Georgia law, a plaintiff must prove four elements: (1) that the goods were subject to the warranty; (2) that the goods were defective; (3) that the injury was caused by the defective goods; and (4) that damages were incurred as a result." *Simmons v. Augusta Aviation, Inc.*, 2022 WL 837772, at *11 (S.D. Ga. Mar. 21, 2022). Georgia's warranty law generally requires contractual privity, but an exception applies where the manufacturer extends a written warranty to the ultimate purchaser. *Carder v. Graco Children's Prod., Inc.*, 558 F. Supp. 3d 1290, 1322 (N.D. Ga. 2021) ("Plaintiffs [] argue that Georgia recognizes an exception to the privity requirement when the manufacturer has made direct representations to the consumer. The Court agrees.") (citing *Lee v. Mylan Inc.*, 806 F. Supp. 2d 1320, 1326 (M.D. Ga. 2011) ("If the manufacturer expressly warrants to the ultimate consumer that the product will perform in a certain way or that it meets particular standards, privity with that ultimate consumer is deemed to exist . . . . Thus, under Georgia law, privity of contract between the manufacturer and ultimate consumer is established when the manufacturer extends an express warranty to the ultimate consumer. Once privity is established, a plaintiff may bring claims for breach of the implied warranties of merchantability and fitness for a particular purpose.") (collecting cases)).

<u>Idaho (Consumer Protection Act, Express Warranty)</u>

"The Idaho Consumer Protection Act, Idaho Code §§ 48-601 to -619, prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce within the State of Idaho." *State ex rel. Kidwell v. Master Distributors, Inc.*, 101 Idaho 447, 453, 615 P.2d 116, 122 (1980). "Idaho Code §§ 48-603 and -603A specify certain prohibited

practices," and "Idaho Code § 48-603(17) further forbids 'engaging in any act or practice which is otherwise misleading, false or deceptive to the consumer' where a person knows or in the exercise of due care should know that he has been or is engaging in such an act or practice." *Ibid.* "An act or practice is unfair if it is shown to possess a tendency or capacity to deceive consumers. The law is settled that a finding of tendency and capacity to mislead is sufficient and that actual deception need not be shown. Likewise, proof of intention to deceive is not required for finding that an act is unfair or deceptive." *Id.* at 453-54, 615 P.2d 116, 122-23  Individualized proof of reliance is not required. *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 98-99 (D. Mass. 2008) ("The parties [] agree that the following state statutes do not require the element of reliance.") (citing Idaho (Idaho Code Ann. § 48-601)).  Federal courts have certified class claims under Idaho law where the proposed class includes only purchases from a defendant's authorized dealers. *Siqueiros v. Gen. Motors LLC*, No. 16-07244, 2021 WL 3291837, at *2 (N.D. Cal. Aug. 2, 2021) ("[T]he ICPA claim is [] suitable for class-wide adjudication because the class definition can be narrowed to include only putative class members who purchased Class Vehicles from a GM-authorized dealer.").

"In Idaho, breach of warranty claims for the recovery of purely economic losses are governed by the law of contracts. An express warranty is created by the seller when any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." *Amos v. Brew Dr. Kombucha, LLC*, 2020 WL 9889190, at *3 (D. Or. Mar. 23, 2020). To prevail on an express warranty claim, the plaintiff also must prove breach of the warranty and notice of the same. *Ibid.* "[P]rivity is not always necessary for a UCC-based warranty claim under Idaho law." *In re Allergan Biocell Textured Breast Implant Prod. Liab. Litig.*, 537 F. Supp. 3d

679, 744-45 (D.N.J. 2021) (noting that plaintiffs can proceed on an express warranty theory either

as third party beneficiaries, or in cases where "certain direct contacts" between manufacturer and

consumer were shown, such as individual warranty registrations).

<u>Illinois (Consumer Fraud and Deceptive Business Practices Act, Fraudulent Concealment,<br>Express and Implied Warranty)</u>

The elements of a claim under [the ICFDBPA] are (1) a deceptive act or practice by the

defendant, (2) the defendant's intent that the plaintiff rely on the deception, and (3) the occurrence

of the deception during a course of conduct involving trade or commerce.  *Mosier v. Village of*

*Holiday Hills*, 2019 IL App (2d) 180681, ¶ 19, 128 N.E.3d 1210, 1217 (Ill. Ct. App. May 3, 2019).

"'[W]here the representation being challenged was made to all putative class members, Illinois

courts have concluded that causation is susceptible of classwide proof and that individualized

inquiries concerning causation do not predominate if plaintiffs are able to adduce sufficient

evidence that the representation was material.'"  *Rikos v. Procter & Gamble Co.*, 799 F.3d 497,

514 (6th Cir. 2015) (quoting *In re ConAgra Foods, Inc.*, 90 F. Supp.3d 919, 997 (C.D. Cal. 2015),

*aff'd* 674 F. App'x 654 (9th Cir. 2017)); *see also In re Pharm. Indus. Average Wholesale Price*

*Litig.*, 252 F.R.D. 83, 98-99 (D. Mass. 2008) ("The parties agree that the following state statutes

. . . do not require that plaintiff prove individual reliance as a separate element." (citing Illinois

(815 Ill. Comp. Stat. § 505/1)).

"To state a claim for breach of express warranty under Illinois law, a plaintiff must allege

that a seller: '(1) made an affirmation of fact or promise; (2) relating to the goods; (3) which was

part of the basis for the bargain; and (4) guaranteed that the goods would conform to the affirmation

or promise.'"  *Rudy v. Fam. Dollar Stores, Inc.*, No. 21-3575, 2022 WL 345081, at *6 (N.D. Ill.

Feb. 4, 2022) (quoting *O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 714 (N.D. Ill. 2020).

Typically such a warranty is held to "warrant[] . . . that the dealer will repair, replace, or adjust

defects if parts of the [vehicle] . . . malfunction[s]." *Cosman v. Ford Motor Co.*, 285 Ill. App. 3d 250, 257, 674 N.E.2d 61, 66 (1996). "To prevail on [a claim for breach of implied warranty], Plaintiff must establish: (1) a sale of goods, (2) that the seller of the goods is a merchant with respect to those goods, and (3) that the goods were not of merchantable quality." *Walker v. Macy's Merchandising Group, Inc.*, 288 F. Supp. 3d 840, 868 (N.D. Ill. 2017). "Goods are not of 'merchantable quality' if they are 'unfit for their intended purpose.'" *Ibid.* (quoting *Maldonado v. Creative Woodworking Concepts, Inc.*, 342 Ill. App. 3d 1028, 1034, 796 N.E.2d 662, 666 (2003)). "Illinois recognizes various exceptions to the privity requirement [including the] 'direct relationship' exception, which applies when there are direct dealings between the manufacturer and the remote customer." *Elward v. Electrolux Home Prod., Inc.*, 214 F. Supp. 3d 701, 704-05 (N.D. Ill. 2016). That exception applies where a customer has presented a defective product to the defendant's dealer-agent for repair under the manufacturer's warranty, and all attempts at warranty repairs have failed. *Id.* at 705.

Kansas (Consumer Protection Act, Express and Implied Warranty)

"To prevail on their unconscionable acts [or] practices claim, plaintiffs must show that (1) plaintiffs were consumers under the KCPA, (2) defendants were suppliers under the KCPA, (3) defendants committed unconscionable acts or practices and (4) plaintiffs and class members were aggrieved by defendants' unconscionable acts [or] practices." *In re Motor Fuel Temperature Sales Pracs. Litig.*, 867 F. Supp. 2d 1124, 1141 (D. Kan. 2012). "The KCPA does not specifically define what constitutes an unconscionable act or practice, but it does provide substantial guidance. It provides that courts shall liberally construe the KCPA to promote the policy of protecting consumers from suppliers who commit deceptive and unconscionable practices." *Ibid.* (citing Kan. Stat. § 50-623(b)). Individualized reliance need not be proved. *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 98-99 (D. Mass. 2008) ("The parties agree that the

following state statutes do not require that plaintiff prove individual reliance as a separate element under all prongs of the statute.") (citing Kan. Stat. Ann. § 50-623)).  Federal courts have found class certification of Kansas Consumer Protection Act claims appropriate where it is alleged that auto defects were concealed by a manufacturer via a "uniform material omission." *Aberin v. Am. Honda Motor Co., Inc.*, No. 16-04384, 2021 WL 1320773, at *10 (N.D. Cal. Mar. 23, 2021).

"When advancing [a theory of] implied warranty of merchantability . . . the plaintiff must prove three elements[:] (1) There must be a defective product; (2) the defect must have existed at the time the product left the manufacturer's possession or control; and (3) the defect must have caused the injury sustained by the plaintiff." *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1468, 1475-76 (D. Kan.), *aff'd*, 43 F.3d 1484 (10th Cir. 1994).  "In contrast, on an express warranty claim, the plaintiff is not required to prove that a specific defect exists in the product or that this defect existed when the product left the defendant's control. In showing that the product did not perform as expressly warranted, the plaintiff is not required to provide a technical explanation of how the product failed its warranty. [However], the express warranty claim still requires proof that the breach was the cause of the plaintiff's injuries." *Id.* at 1476.  The Kansas enactment of the U.C.C. "eliminates any requirement that suppliers be in direct privity with consumer-buyers to be bound by the implied UCC warranties." *Golden v. Den-Mat Corp.*, 47 Kan. App. 2d 450, 492, 276 P.3d 773, 800 (2012) (citing Kan. Stat. Ann. § 50-639).

<u>Kentucky (Consumer Protection Act, Express Warranty)</u>

"The KCPA prohibits '[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce.' The words unfair, false, misleading or deceptive are defined in terms generally understood and perceived by the public." *Corder v. Ford Motor Co.*, 285 F. App'x 226, 227-28 (6th Cir. 2008) (quoting Ky. Rev. Stat. § 367.170(1)).

"To succeed on an express warranty claim, a plaintiff must prove: (1) the existence of an express warranty; (2) reliance upon the warranty as one of the inducements for purchasing the product; (3) breach of the express warranty; and (4) such breach was the proximate cause of the plaintiff's injuries [or] losses." *State Farm Fire & Cas. Co. v. Car X-Assocs. Corp.*, 2010 WL 11520049, at *3 (E.D. Ky. Sept. 28, 2010), *aff'd*, 507 F. App'x 575 (6th Cir. 2012).  Plaintiffs in U.C.C. warranty cases under Kentucky law generally must establish privity to prevail, but "a plaintiff [may] sue a manufacturer absent privity 'where the manufacturer has expressly made warranties directly to the intended consumer of the product.'"  *Garvin v. Ethicon, Inc.*, 2022 WL 2910024, at *8 (W.D. Ky. July 22, 2022) (quoting *Levin v. Trex Co., Inc.*, 2012 WL 7832713, at *3 (W.D. Ky. Mar. 5, 2012)) *see also Naiser v. Unilever U.S., Inc.*, 975 F. Supp. 2d 727, 740 (W.D. Ky. 2013) ("The Court anticipates that Kentucky state courts would hold that an express warranty action can be maintained in cases such as this, where Unilever's alleged written, express warranties were clearly intended for the product's consumers.").

Federal courts have certified claims under Kentucky's Consumer Protection Act and warranty claims under its iteration of the U.C.C.  *E.g.*, *Brummett v. Skyline Corp.*, 1984 WL 262559, at *3 (W.D. Ky. 1984) ("As to meeting the prerequisites of Fed. R. Civ. P. 23(a), the plaintiffs assert that their claim is typical of that of the class. The basic design defect claimed by the plaintiffs is allegedly present in all of the defendant's mobile homes. The fact that different models are involved is of no consequence here. The plaintiffs' claim for economic harm is typical of the claim of any other purchasers of these mobile homes.").

Louisiana (Unfair Trade Practices and Consumer Protection Law, Fraudulent Concealment)

"The elements of a cause of action under LUTPA are: (1) an unfair or deceptive trade practice declared unlawful; (2) that impacts a consumer, business competitor, or other person who the statute grants a private right of action; and (3) which has caused ascertainable loss." *Landry*

*v. Legacy Hous. Corp.*, 2021 WL 5830646, at *3 (W.D. La. Dec. 8, 2021). "To succeed on a claim for fraudulent misrepresentation, the plaintiff must prove the following three elements by a preponderance of the evidence: (1) a misrepresentation, suppression or omission of true information; (2) the intent to obtain an unjust advantage or to cause to damage or inconvenience to the other party; and (3) the resulting error must relate to a circumstance substantially influencing the other party's contractual consent." *Tri-state Bancshares, Inc. v. Scott*, 2016 WL 4098604, at *5 (W.D. La. July 28, 2016). Individualized reliance is not an element of either claim.

<u>Maine (Unfair Trade Practices Act, Express and Implied Warranty)</u>

"Maine's UTPA, 5 Me. Rev. Stat. §§ 205-A to 214 (2002), provides protection for consumers against unfair and deceptive trade practices. It declares unlawful 'unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.'" *State v. Weinschenk*, 2005 ME 28, ¶ 11, 868 A.2d 200, 205 (2005) (quoting 5 Me. Rev. Stat. § 207). "The UTPA does not contain a definition of either the term 'unfair' or 'deceptive.' Determination of whether an act or practice is 'unfair or deceptive' in violation of the UTPA must be made by the fact-finder on a case-by-case basis." 2005 ME 28, ¶ 15, 868 A.2d at 206. "An act or practice is deceptive if it is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances." *Ibid.* Individualized reliance need not be shown. *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 98-99 (D. Mass. 2008) ("The parties agree that the following state statutes do not require the element of reliance.") (citing 5 Me. Rev. Stat. § 205-A)).

To prevail on a claim for breach of express warranty under Maine law, the plaintiff must prove "(1) that [the defendant] made promises amounting to an express warranty; (2) breach of the warranty; (3) causation; and (4) damages." *Maine Energy Recovery Co. v. United Steel Structures, Inc.*, 1999 ME 31, ¶ 7, 724 A.2d 1248, 1250 (Me. 1999). The elements of an implied warranty

claim under Maine law are (1) that the defendant is a "merchant" within the definition of the U.C.C., (2) that it sold the product in question, (3) that the product is defective, and (4) that the defect caused loss to the plaintiff. *Acadia Ins. Co. v. Fluid Mgmt., Inc.*, 2015 WL 3869696, at *8 (D. Me. June 23, 2015). Maine's enactment of the U.C.C. eliminated the privity requirement for implied warranty claims. *Ouellette v. Sturm, Ruger & Co.*, 466 A.2d 478, 482 (Me. 1983) ("By the time of defendant's 1971 sale of the gun involved in this case, the Maine legislature had expanded significantly the scope of warranty liability. In a series of enactments the legislature eliminated the requirement of privity and extended warranty protection to those persons who might reasonably be expected to use, consume or be affected by the goods."). Federal courts have held that certification of express warranty claims under Maine law is appropriate and that common issues predominate over individual issues on such claims. *E.g.*, *Steigerwald*, *supra.*

<u>Michigan (Consumer Protection Act, Implied Warranty)</u>

To prevail on a claim under Michigan's Consumer Protection Act (MCPA), the plaintiff must establish the following elements: "'fail[ure] to reveal a material fact, the omission of which tends to mislead or deceive the consumer, [and that the] fact could not reasonably be known by the consumer.'" *Flynn v. FCA US LLC*, 327 F.R.D. 206, 220 (S.D. Ill. 2018) (citing Mich. Comp. Laws § 445.903(1)(s)). An MCPA "claim premised on a failure to disclose material facts does not require a consumer to prove reliance or a duty to disclose." *Ibid.*; *see also In re Gen. Motors Air Conditioning Mktg. & Sales Pracs. Litig.*, 406 F. Supp. 3d 618, 642 (E.D. Mich. 2019) ("Steketee specifically alleges that he viewed and relied upon the window sticker of his vehicle prior to purchasing it, that the window sticker touted the vehicle's air conditioning system without disclosing the AC Defect, and that the functioning air conditioning system was central to his purchasing decision. The Court therefore rejects GM's argument that, as a matter of law, Steketee does not plausibly allege reliance.").

-14B-

"A plaintiff seeking to recover on a claim against a retailer for breach of implied warranty must establish two elements: (1) that the product was sold in a defective condition, and (2) that the defect caused her injury." *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 737 (6th Cir. 2000). "'Under Michigan law, plaintiffs 'are not required to allege privity to successfully state a claim' for breach of the implied warranty of merchantability.'" *Yachera v. Westminster Pharm., LLC*, No. 18-2463, 477 F. Supp. 3d 1251, 1270 n.2 (M.D. Fla. 2020) (quoting *Travelers Indem. Co. v. Air King Am., Inc.*, No. 08-12263, 2009 WL 10680607, at *4 (E.D. Mich. Mar. 26, 2009)); *see also Montgomery v. Kraft Foods Glob., Inc.*, 822 F.3d 304, 309 (6th Cir. 2016) ("Montgomery's claim for breach of the implied warranty of merchantability [under Michigan law] survives the . . . lack of contractual privity."); *Bossart v. Gen. Motors LLC*, No. 20-11057, 2021 WL 5278191, at *8 (E.D. Mich. May 19, 2021).

At oral argument, the Court questioned whether it would have subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), over claims brought by a statewide sub-class of Michigan purchasers of class vehicles, given the obvious fact that the defendant holds corporate citizenship in the State of Michigan. The parties subsequently submitted supplemental briefs on that point, which have allayed the Court's jurisdictional concerns about certification of a sub-class of Michigan purchasers and owners of class vehicles.

The Class Action Fairness Act relaxed the complete diversity requirement for certain qualifying cases, conferring federal court jurisdiction upon those class actions in which "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A); *Roberts v. Mars Petcare US, Inc.*, 874 F.3d 953, 955 (6th Cir. 2017). "Under § 1332(a)(1), the traditional grant of diversity jurisdiction, all plaintiffs must be citizens of States different from all defendants." *Ibid.* (citing *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed.

435 (1806)).  "But under CAFA, federal courts may hear class actions with minimal diversity, such that only one plaintiff and one defendant need be citizens of different States, so long as there are 100 or more class members and an aggregate amount in controversy of at least $5,000,000."  *Ibid.* (citing 28 U.S.C. §§ 1332(d)(2)(A), (d)(5), (d)(6)).  It is undisputed here that the proposed Michigan sub-class includes at least 10,000 purchasers of class vehicles and that the potential amount in controversy for the claims of that sub-class would exceed $5 million.

As the plaintiff points out, federal courts have held that CAFA jurisdiction may be lacking where a proposed class is limited to "citizens" or "residents" of a state.  *E.g.*, *Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d 383, 389 (6th Cir. 2016).  However, where the class is defined as comprising "purchasers" or "owners" of a product sold in a jurisdiction, it is a fair inference for jurisdictional purposes that when a product is sold to thousands or tens of thousands of persons within a state, at least one of those customers likely was a citizen of a different state.  *E.g.*, *Potts v. Westside Chrysler Jeep Dodge, LLC*, No. 21-502, 2021 WL 4129626, at *2 (W.D. Okla. Sept. 9, 2021) (citing *Mondragon v. Cap. One Auto Fin.*, 736 F.3d 880, 884 (9th Cir. 2013)); *see also Mondragon*, 736 F.3d at 884 (vacating order remanding case to state court as improvidently removed under CAFA).  Moreover, it strains credulity to presume — as the Court would have to in order to conclude that CAFA jurisdiction necessarily is lacking — that not one of the allegedly nearly 10,000 Michigan purchasers of class vehicles has moved out of the state and became domiciled in another state in the more than eight years since the class vehicles first went to market.  *See Martin v. Trott Law, P.C.*, No. 15-12838, 2017 WL 9325508, at *1 (E.D. Mich. Sept. 22, 2017).  The Court finds that similar reasonable inferences about the alternative domicile of the population of Michigan "purchasers" and "owners" of class vehicles are sufficient in this instance

to allay any concerns about the existence of CAFA minimal diversity, particularly in the absence of any proof to the contrary.

Minnesota (Consumer Fraud Act, Express and Implied Warranty)

"The MCFA prohibits the 'act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby.'" *Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*, 2021 WL 6127880, at *18 (D. Minn. 2021) (quoting Minn. Stat. § 325F.69(1)). "Although plaintiffs must still prove a causal nexus between the allegedly wrongful conduct of the defendants and their damages, this proof need not include direct evidence of reliance by individual consumers of defendants' products. Instead, other direct or circumstantial evidence may be used. For example, a defendant's intent to influence consumers can be important and relevant evidence. This relaxed showing is especially relevant in cases where the defendant engaged in a lengthy course of prohibited conduct that affected a large number of consumers." *Ibid.*; *see also Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 13 (Minn. 2001) ("[T]he legislature has eliminated the requirement of pleading and proving traditional common law reliance as an element of a statutory misrepresentation in sales action."). Causation is subject to common proof where all purchasers allegedly were exposed to the same misrepresentations. *Khoday v. Symantec Corp.*, 2014 WL 1281600, at *31 (D. Minn. Mar. 13, 2014) ("[T]he customers' awareness here of the misrepresentations — automatically placing a product in a consumer's cart, a misleading title, and a misleading 'What's this link' — can constitute the causal nexus required for violation of the CFA. Digital River has not refuted the common sense inference that its representations may have successfully persuaded class members that download insurance was a required purchase at the point of sale in order to later redownload Norton products.").

-17B-

"Under Minnesota law, to state a claim for breach of express warranty, a plaintiff must allege (1) the existence of a warranty, (2) breach, and (3) a causal link between the breach and the alleged harm." *Cleveland v. Whirlpool Corp.*, 550 F. Supp. 3d 660, 668 (D. Minn. 2021). "The standard for prevailing on an implied warranty claim is the same as for an express warranty: a plaintiff must prove (1) the existence of a warranty, (2) a breach, and (3) a causal link between the breach and harm." *McDougall v. CRC Indus., Inc.*, 523 F. Supp. 3d 1061, 1074 (D. Minn. 2021). Minnesota cases hold that a defense that insufficient pre-suit notice was given is unavailing unless the defendant shows that it was prejudiced by the lack of notice. *City of Wyoming v. Procter & Gamble Co.*, 210 F. Supp. 3d 1137, 1158 (D. Minn. 2016) ("[E]ven if Plaintiffs' should have attempted notice earlier than they did, Defendants have failed to demonstrate that they suffered any prejudice by the delay. Defendants have been locked in litigation over the flushability of their 'flushable' wipes in courts all across the country; it could hardly be said that Plaintiffs' complaint was the first time Defendants' received notice of the kind and type of claims raised by Plaintiffs. The Court therefore will not dismiss Plaintiffs' warranty claims for failure to comply with Minn. Stat. § 336.2-607(3)(a)."). Minnesota law does not require privity where warranty coverage extends to an ultimate purchaser. *Kavon v. BMW of N. Am., LLC*, 2022 WL 1830797, at *10 n.15 (D.N.J. June 3, 2022) ("[A]s the Minnesota Supreme Court noted in *Minnesota Min. & Mfg. Co. v. Nishika Ltd.*, third parties 'who purchase, use, or otherwise acquire warranted goods have standing to sue for purely economic losses' under Minnesota law." (citing Minn. Stat. § 336.2-318; 565 N.W.2d 16, 21 (Minn. 1997)); *see also Gruenwald v. Toro Co.*, 2019 WL 6524894, at *2 (D. Minn. Dec. 4, 2019) ("Under Minnesota law, . . . an[] express or implied warranty 'extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty.'"). Federal courts have held that certification of express

warranty claims under Minnesota law is appropriate and that common issues predominate over individual issues on such claims.  *E.g.*, *Steigerwald*, *supra.*

<u>New Hampshire (Consumer Protection Act, Express and Implied Warranty)</u>

"The CPA provides that it is unlawful to use an 'unfair method of competition or . . . unfair or deceptive act or practice in the conduct of any trade or commerce within this state.'" *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 561 F. Supp. 3d 114, 120 (D.N.H. 2021) (quoting N.H. Rev. Stat. 358-A:2).  "The statute sets forth a non-exhaustive list of seventeen unfair methods of competition and deceptive acts or practices. If the challenged conduct does not fall within one of the violations specifically enumerated in RSA 358-A:2, it is nonetheless actionable if it satisfies the 'rascality' test." *Ibid.*  "Under the rascality test, the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Estes v. ECMC Grp., Inc.*, 565 F. Supp. 3d 289, 307 (D.N.H. 2020).  "[P]roof of individual reliance or causation is not required under the New Hampshire CPA." *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 516 (6th Cir. 2015).

"With the enactment of RSA 382-A:2-318 (1992), the New Hampshire Legislature removed both horizontal and vertical privity as defenses to implied warranty claims." *Dalton v. Stanley Solar & Stove, Inc.*, 137 N.H. 467, 470, 629 A.2d 794, 797 (1993); *see also Ortiz v. Sig Sauer, Inc.*, 2022 WL 1008340, at *8 (D.N.H. Apr. 1, 2022) ("The parties agree that Arizona law, unlike New Hampshire law, imposes a privity requirement for breach of warranty claims.") (citing N.H. Rev. Stat. § 382-A:2-318 ("Lack of privity shall not be a defense in any action brought against the manufacturer, seller or supplier of goods to recover damages for breach of warranty, express or implied, . . . if the plaintiff was a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume[,]or be affected by the goods.")).

-19B-

"Breach of warranty claims are governed by New Hampshire's version of the Uniform Commercial Code. Express warranties are created by the seller's factual representations or promises, any description of the goods, or a sample or model of goods that becomes a basis of the bargain." *Slocum v. Alexander Schleicher, GmbH & Co. Segelflugzeugbau*, 2012 DNH 055, 2012 WL 893420, at *3 (D.N.H. Mar. 15, 2012) (citing *Kelleher v. Marvin Lumber & Cedar Co.*, 152 N.H. 813, 853, 891 A.2d 477, 508 (2005); N.H. Rev. Stat. § 382-A:2-313). "An implied warranty of merchantability exists 'if the seller is a merchant with respect to goods of that kind,' requiring the goods to meet certain minimum standards." *Ibid.* (citing N.H. Rev. Stat. § 382-A:2-314). Federal courts have held that certification of express warranty claims under New Hampshire law is appropriate and that common issues predominate over individual issues on such claims. *E.g.*, *Steigerwald*, *supra*.

<u>New Jersey (Consumer Fraud Act, Express and Implied Warranty)</u>

"[T]o obtain relief under the [NJCFA], a consumer must prove: '1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss.'" *Pisack v. B & C Towing, Inc.*, 455 N.J. Super. 225, 240, 188 A.3d 1088, 1097 (App. Div. 2018) (quoting *Manahawkin Convalescent v. O'Neill*, 217 N.J. 99, 121, 85 A.3d 947, 960 (2014)). "'An "unlawful practice" contravening the CFA may arise from (1) an affirmative act; (2) a knowing omission; or (3) a violation of an administrative regulation.'" *Ibid.* (quoting *Dugan v. TGI Fridays, Inc.*, 231 N.J. 24, 51, 171 A.3d 620, 636 (2017)). Federal courts have endorsed the certification of class claims under the NJCFA where it is alleged that all class members overpaid for defective goods. *Dzielak v. Whirlpool Corp.*, No. 12-89, 2017 WL 6513347, at *9 (D.N.J. Dec. 20, 2017) ("[B]enefit-of-the-bargain class actions [] remain viable [under the NJCFA. A benefit-of-the-bargain claim, by contrast with fraud on the market, is contract-like. We look to the injuries that resulted from the defendants having not lived up to the

-20B-

misrepresentation, and the goal is to place the plaintiffs in the position that they would occupy if the misrepresentation were true. A benefit-of-the-bargain class action logically does not entail proving that all class members were induced to pay extra (a reliance-based theory) or even that the defendant was empowered to charge them all extra (the price-inflation theory). Instead, it entails proving that class members all reasonably expected more from the bargain than what they received.").  "As noted in *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84 (D.N.J. 2011), the New Jersey Supreme Court has repeatedly and explicitly endorsed the benefit-of-the-bargain theory under the NJCFA." *Ibid.*

"Under New Jersey law, 'to state a claim for breach of express warranty, Plaintiffs must properly allege: (1) that Defendant made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description.'" *Argabright v. Rheem Manufacturing Co.*, 258 F. Supp. 3d 470, 477 (D.N.J. 2017) (quoting *Francis E. Parker Memorial Home, Inc. v. Georgia-Pacific LLC*, 945 F. Supp. 2d 543, 568 (D.N.J. 2013)).  "To state a claim for breach of the implied warranty of merchantability. . ., a plaintiff must allege (1) that a merchant sold goods, (2) which were not 'merchantable' at the time of sale, (3) injury and damages to the plaintiff or its property, (4) which were [] caused proximately and in fact by the defective nature of the goods, and (5) notice to the seller of injury." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 601 n.8 (3d Cir. 2012) (quoting *In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, 66 UCC Rep. Serv. 2d 726, 2008 WL 4126264, at *19 (D.N.J. Sept. 2, 2008) (citing N.J. Stat. § 12-A:2-314)).  Privity is not required.  *Spring Motors Distributors, Inc. v. Ford Motor Co.*, 98 N.J. 555, 561, 489 A.2d 660, 663 (1985) ("We hold that a commercial buyer seeking damages for economic loss resulting from the purchase of defective

goods may recover from an immediate seller and a remote supplier in a distributive chain for breach of warranty under the U.C.C., but not in strict liability or negligence. We hold also that the buyer need not establish privity with the remote supplier to maintain an action for breach of express or implied warranties.").  Federal courts have held that certification of express warranty claims under New Jersey law is appropriate and that common issues predominate over individual issues on such claims.  *E.g.*, *Steigerwald*, *supra*.

New York (General Business Law § 349, Fraudulent Concealment, Express and Implied Warranty)

"Pursuant to [New York] General Business Law § 349, '[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state' are unlawful, and the statute provides an injured party with a private right of action to enjoin such unlawful acts or practices and to recover for violations of the statute."  *JD&K Assocs., LLC v. Selective Ins. Grp., Inc.*, 143 A.D.3d 1232, 38 N.Y.S.3d 658, 660 (N.Y. App. Div. 2016) (quoting N.Y. Gen. Bus. Law § 349(h)).  "A plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."  *Ibid.* "'Deceptive acts' are defined objectively [under section 349] as acts likely to mislead a reasonable consumer acting reasonably under the circumstances.'"  *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009).  Proof of individualized reliance on deceptive omissions is not required.  *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) ("Unlike a private action brought under § 350, a private action brought under § 349 [governing deceptive practices] does not require proof of actual reliance.").

Under New York law, "[t]o state a claim for breach of an express warranty, a plaintiff must allege an affirmation of fact or promise by the seller, the natural tendency of which was to induce

the buyer to purchase and that the warranty was relied upon the plaintiff's detriment." *Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 567 (S.D.N.Y. 2016). "A party asserting a claim based upon a breach of the implied warranty of merchantability must come forth with evidence establishing (1) a breach of the warranty and (2) proximate causation between the alleged breach and the party's damages." *Cosy Goose Hellas v. Cosy Goose USA. Ltd.*, 581 F. Supp. 2d 606, 625 (S.D.N.Y. 2008). "New York has long since dispensed with the privity requirement for express warranty claims." *Anderson v. Unilever United States, Inc.*, 2022 WL 2181575, at \*10 (S.D.N.Y. June 16, 2022). New York law generally holds to a strict privity requirement for implied warranty claims, *see ibid.*, but "there is an exception to the general privity rule, which permits implied warranty claims if the plaintiff alleges that she is a third-party beneficiary of a contract to which the defendant is party." *Kyszenia v. Ricoh USA, Inc.*, 2022 WL 326981, at \*8 (E.D.N.Y. Feb. 3, 2022). "Under New York law, a plaintiff claiming rights as a third-party beneficiary must demonstrate: (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." *Ibid.* Federal courts have found the third-party beneficiary exception applies where a written warranty is extended to ultimate purchasers who bought cars through defendant's authorized dealers. *E.g.*, *O'Connor v. Ford Motor Co.*, 567 F. Supp. 3d 915, 946 (N.D. Ill. 2021) ("The court in *Johnson v. Nissan North America, Inc.*, 272 F. Supp. 3d 1168 (N.D. Cal. 2017), which applied New York law . . . concluded that the New York plaintiff's 'implied warranty claim . . . survives because 'Nissan's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were designed

for and intended to benefit only the ultimate purchasers and lessees of the Class Vehicles, i.e., Plaintiffs and the New York Class Members. . . . Plaintiff and the New York Class Members are intended third-party beneficiaries of contracts between Nissan and its dealers, franchisees, representatives, and agents,' *id.* at 1180-81.").

Federal courts have certified both express and implied warranty claims under New York law. *E.g.*, *Testone v. Barlean's Organic Oils, LLC*, 2021 WL 4438391, at *15 (S.D. Cal. Sept. 28, 2021) ("Defendant further contends that Plaintiffs must show materiality for their express warranty claims, and materiality and likelihood of deception for their UDBP and NY FAL claims. However, for the reasons already stated, the Court finds that Plaintiffs have shown these issues can be resolved through common proof.") (express warranty); *Tait v. BSH Home Appliances Corp.*, 2012 WL 6699247 (C.D. Cal. 2012) ("Because an implied warranty claim requires an objective standard and because Plaintiffs' theory here is grounded in a defective design common to all Washers, the breach of implied warranty claim is therefore susceptible of common proof . . . . and courts routinely certify implied warranty classes for this reason.") (applying New York law).

<u>North Carolina (Unfair and Deceptive Acts and Practices Act)</u>

"To establish a prima facie case of unfair and deceptive trade practices, a plaintiff must show that (1) the defendant committed an unfair or deceptive act or practice, (2) the act was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 372 N.C. 260, 286, 827 S.E.2d 458, 478 (2019). Federal courts have found that NCUDPA claims may be pursued on a class basis when founded on claims that all purchasers were exposed to the same deceptive omissions. *E.g.*, *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 518 (6th Cir. 2015) ("P&G undertook a comprehensive marketing strategy with a generally uniform core message such that all class members were likely exposed to the alleged misrepresentation. At a minimum, all class members saw P&G's advertising on Align's

packaging. Although a somewhat closer call, we believe that this class-wide proof — that the alleged misrepresentation is material and was made in a generally uniform manner to all class members — would also suffice in North Carolina to show actual reliance such that individual issues would not predominate."); *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 161 (D.S.C. 2018) ("While it is true that reliance as an element of proof typically forecloses class treatment because of the individualized questions it raises, courts have presumed class-wide reliance and certified Rule 23(b)(3) classes under the statutes at issue where the alleged misrepresentation or omission (1) is material or likely to deceive a reasonable consumer and (2) was uniformly made to the putative class.") (citing *Rikos*; applying North Carolina law).

<u>Oklahoma (Consumer Protection Act, Express and Implied Warranty)</u>

"The four elements of a consumer's private action under the OCPA are: (1) defendant engaged in an unlawful practice as defined at 15 Okla. Stat. § 753; (2) the challenged practice occurred in the course of defendant's business; (3) plaintiff, as consumer, suffered an injury in fact; and (4) the challenged practice caused plaintiff's injury." *Watson v. Vici Cmty. Dev. Corp.*, 2021 WL 1394477, at *12 (W.D. Okla. Apr. 12, 2021). The statutes "declares unlawful the commission of any 'unfair or deceptive trade practice as defined in 15 Okla. Stat. § 752." *Ibid.* "A deceptive trade practice is defined as 'a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person.'" *Ibid.* (quoting 15 Okla. Stat. § 752(13)).

"Under Oklahoma law, '[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." A breach of this 'warranty of description' entitles the buyer to certain remedies." *Boehmke v. Stuart Pontiac-Cadillac, Inc.*, 2022 WL 1321553, at *4 (W.D. Okla. May 3, 2022) (quoting 12 Okla. Stat. § 2-313(b)). "Under the UCC (12 Okla. Stat. § 2-314), to recover for a breach of the implied

-25B-

warranty of merchantability a plaintiff must prove: (1) a sale of goods by a merchant, (2) the goods were not 'merchantable' at the time of sale, (3) injury and damage to the plaintiff or his property proximately caused by the defective nature of the goods, and (4) appropriate notice of breach to the seller." *Wells v. Johnson & Johnson*, 554 F. Supp. 3d 1207, 1213 (W.D. Okla. 2021).  Notice requirements are not strictly applied in consumer transactions, and notice may be provided by filing suit.  *Sisemore v. Dolgencorp, LLC*, 212 F. Supp. 3d 1106, 1111 (N.D. Okla. 2016) ("Dollar General does not cite — nor is the court aware of — any authority requiring a plaintiff to allege notice was provided under [Okla. Stat. tit. 12A, § 2-607(3)(a)]. Furthermore, as this court has previously observed, the notice requirement 'should be viewed under a more relaxed standard' when applied to retail customers, and can be satisfied by the filing of a lawsuit within the statute of limitations." (quoting *Buzadzhi v. Bexco Enterprises, Inc.*, No. 10-247, 2011 WL 43086, at *1 (N.D. Okla. Jan. 4, 2011) (collecting cases)).  Privity is not required.  *Old Albany Ests., Ltd. v. Highland Carpet Mills, Inc.*, 1979 OK 144, 604 P.2d 849, 852 (Okla. 1976) ("[Under Oklahoma law] a manufacturer may be held liable for breach of implied warranty of merchantability or fitness for particular purpose under the Uniform Commercial Code without regard to privity of contract between the manufacturer and the ultimate buyer.").  Federal courts have held that certification of express warranty claims under Oklahoma law is appropriate and that common issues predominate over individual issues on such claims.  *E.g.*, *Steigerwald*, *supra*.

<u>Pennsylvania (Unfair Trade Practices and Consumer Protection Law, Express and Implied Warranty)</u>

*NOTE: Although plaintiffs briefed the warranty claims, their enumeration of proposed classes indicated that they propose to certify only for the UTPCL claim in this state.*

"A plaintiff establishes a claim under the 'deceptive' portion of [the UTPCPL] by showing (1) a deceptive act, that is conduct that is likely to deceive a consumer acting reasonably under

similar circumstances; (2) the plaintiff['s] justifiable reliance on that deceptive act; and (3) that the plaintiff's justifiable reliance resulted in ascertainable loss." *Corsale v. Sperian Energy Corp.*, 374 F. Supp. 3d 445, 459 (W.D. Pa. 2019).  Proof of individual reliance is not required.  *Greene v. Sears Prot. Co.*, 2018 WL 3104300, at *6 (N.D. Ill. June 25, 2018) ("Where, as here, the purported fraud is based on alleged conduct that was uniform as to all class members, it is well established that individual issues of reliance do not thwart class actions.").

Under Pennsylvania law, "[t]o prevail on [a] breach of express warranty claim [the plaintiff must] establish that [the defendant] breached or failed to meet its warranty promise . . ., that the breach was the proximate cause of the harm to the [plaintiff], and the amount of the ensuing damages." *Samuel-Bassett v. Kia Motors Am., Inc.*, 613 Pa. 371, 428, 34 A.3d 1, 35 (2011). "[Where the plaintiff has] already accepted tender, [she must] show that [she] notified [the defendant] of the breach within a reasonable time." *Ibid.* (quoting 13 Pa. Stat. § 2607(c)(1)).  The notice requirement is flexible and may be satisfied by showing that the defendant had a reasonable opportunity to cure.  *Martin v. Ford Motor Co.*, 765 F. Supp. 2d 673, 683 (E.D. Pa. 2011) ("Plaintiff has done more than allege Defendant had 'notice' of the defect. Plaintiff is alleging that class members took the affirmative step of 'notifying' Defendant of the breach by complaining 'about this very issue to Defendant.' This 'notification' allowed Defendant, as the seller, the opportunity to cure prior to Plaintiff initiating the lawsuit. Consequently, Plaintiff has satisfied the 'notification' requirement of 13 Pa. Stat. and Cons. Stat. Ann. § 2607.").  Under Pennsylvania law, "[t]o prove a breach of the warranty of merchantability, a plaintiff must show that the equipment obtained from the supplier was defective." *Visual Communications, Inc. v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 611 F. Supp. 2d 465, 470 (E.D. Pa. 2009).  "This requires showing (1) that the product malfunctioned; (2) that the plaintiff used the product as intended or reasonably expected

by the manufacturer; and (3) the absence of other reasonable secondary causes." *Ibid.* "'The law of Pennsylvania is clear that, for recovery for breach of implied warranties, a party need not prove 'privity of contract.'" *Montgomery Cnty. v. MicroVote Corp.*, 152 F. Supp. 2d 784, 799 (E.D. Pa. 2001), aff'd, 320 F.3d 440 (3d Cir. 2003) (quoting *Moscatiello v. Pittsburgh Contractors Equip. Co.*, 407 Pa. Super. 378, 390, 595 A.2d 1198, 1203-04 (1991)).

<u>South Carolina (Express and Implied Warranty)</u>

"The elements of breach of an express warranty are (1) the existence of an express warranty, (2) breach of an express warranty, and (3) damages proximately caused by the breach." *Hinkle v. Cont'l Motors, Inc.*, 2017 WL 4776992, at *3 (D.S.C. Oct. 20, 2017). "The elements of breach of the implied warranty of merchantability are (1) a merchant sold goods; (2) the goods were not 'merchantable' at the time of sale; (3) the plaintiff or his property were injured by such goods; (4) the defect or other condition amounting to a breach of the implied warranty of merchantability proximately caused the injury; and (5) the plaintiff so injured gave timely notice to the seller." *Ibid.* Privity is not required. *Gasque v. Eagle Mach. Co.*, 270 S.C. 499, 502-03, 243 S.E.2d 831, 832 (1978) ("The plain language of [S.C. Code § 36-2-318] dispenses with the necessity of privity as to any natural person who may be expected to use, consume or be affected by the product, and extends third party beneficiary protection to this class of person with respect to both injury and damage to 'person or property.' The statute, therefore, clearly allows appellant to sue respondent . . . for damages to property resulting from breach of warranty, 'whether express or implied,' notwithstanding any lack of privity."). Federal courts have certified class claims for both express and implied warranty under South Carolina law. *E.g.*, *Thomas v. Louisiana-Pac. Corp.*, 246 F.R.D. 505, 513 (D.S.C. 2007) ("[T]he court finds no individualized inquiry necessary with respect to either the implied warranty of merchantability or the implied warranty of fitness for a particular purpose.").

-28B-

<u>Tennessee (Consumer Protection Act, Fraudulent Concealment)</u>

"In order to recover under the TCPA, the plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an ascertainable loss of money or property." *Cabinets to Go, LLC v. Qingdao Haiyan Real Est. Grp. Co., Ltd.*, 2022 WL 1976602, at *5 (M.D. Tenn. June 6, 2022). For a plaintiff to establish a claim for fraudulent concealment, the plaintiff must show "(1) the defendant had knowledge of a material existing fact or condition, and that (2) the defendant had a duty to disclose the fact or condition." *Dixon v. Chrisco*, 2018 WL 4275535, at *4 (Tenn. Ct. App. Sept. 7, 2018). Federal courts have found common law fraudulent misrepresentation and claims under the TCPA amenable to class certification. *E.g.*, *Sharp v. Easy Money Title Pawn, Inc.*, 128 F. App'x 513, 514 (6th Cir. 2005); *Tershakovec v. Ford Motor Co.*, 546 F. Supp. 3d 1348, 1381 (S.D. Fla. Aug. 20, 2021).

<u>Texas (Deceptive Trade Practices Act, Express Warranty)</u>

"The elements of a [claim under the DTPA] are: '(1) the plaintiff is a consumer; (2) the defendant engaged in false, misleading, or deceptive acts; and (3) these acts constituted a producing cause of the consumer's damages.'" *Universal Baptist Church of Fort Worth v. Lexington Ins. Co.*, 346 F. Supp. 3d 880, 889 (N.D. Tex. 2018) (quoting *Hugh Symons Group, PLC v. Motorola, Inc.*, 292 F.3d 466, 468 (5th Cir. 2002)). "[A]lthough reliance is an element of the statutory [deceptive conduct] claim, '[t]his does not mean, of course, that reliance or other elements of their causes of action cannot be proved class-wide with evidence generally applicable to all class members; class-wide proof is possible when class-wide evidence exists.'" *Tershakovec*, 546 F. Supp. 3d at 1381 (quoting *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 693 (Tex. 2002)).

Under Texas law, "[t]o recover damages under the theory of an express warranty, a buyer must prove (1) an affirmation of fact or promise made by the seller to the buyer relating to the goods; (2) such affirmation of fact or promise became a part of the basis of the bargain; (3) that the injured party, in making the purchase, relied on the representations, affirmation of fact or promise; (4) that the goods sold by the seller failed to comply with the affirmation of fact or promise made by the seller; (5) that the buyer was financially injured; and (6) that such failure to comply was a proximate cause of the financial injury suffered by the buyer." *Minsa Corp. v. SFTC, LLC*, 540 S.W.3d 155, 161 (Tex. Ct. App. 2017). "[P]rivity of contract is not required in order to sustain a breach of express-warranty claim for purely economic losses." *U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 198 (Tex. App. 2003). Federal courts have held that certification of express warranty claims under Texas law is appropriate and that common issues predominate over individual issues on such claims. *E.g.*, *Steigerwald*, *supra.*

Washington (Consumer Protection Act, Fraudulent Concealment, Express Warranty)

"In a private cause of action, the [WCPA] requires a plaintiff to prove five elements: (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Young v. Toyota Motor Sales, USA*, 9 Wash. App. 2d 26, 33, 442 P.3d 5, 9 (2019), *aff'd*, 196 Wash. 2d 310, 472 P.3d 990 (2020). Federal courts have found class certification appropriate in cases alleging common law fraudulent concealment and statutory consumer fraud where the claims are based on the concealment of material information about product defects in a uniform manner impacting all members of the class, and proof of individualized reliance is not required. *Tershakovec*, 546 F. Supp. 3d at 1382 ("Both statutory and common law [consumer fraud] classes can be certified. While the Court has not found Washington case law directly addressing a presumption of reliance in common law fraudulent concealment cases, the Supreme Court of Washington has expressly

approved a rebuttable presumption of reliance in omission cases because 'it is virtually impossible to prove reliance in cases alleging nondisclosure of material facts.'" (quoting *Morris v. Int'l Yogurt Co.*, 107 Wash. 2d 314, 328, 729 P.2d 33, 41 (1986); citing *Vernon v. Qwest Commc'ns Int'l, Inc.*, 643 F. Supp. 2d 1256, 1268 (W.D. Wash. 2009) ("Washington courts do not require a plaintiff to allege individual reliance on Defendants' conduct, particularly where the non-disclosure of a material fact is alleged.")).

"[T]he elements of proof as related to breach of warranty are the same whether the claim is made under the Magnuson-Moss Act or under the [Washington] code." *McLaughlin v. Watercraft Int'l, Inc.*, 87 Wash. App. 1051, 1997 WL 537862, at *9 (1997) (citing *Universal Motors, Inc. v. Waldock*, 719 P.2d 254, 257 (Alaska 1986)).  Under either theory, the plaintiff bears "the burden of proving four essential elements . . . against [an automobile] dealer [or] manufacturer: (1) the existence of a defect in the operation of the vehicle, (2) the defect resulted from factory materials or workmanship, (3) the plaintiff presented the vehicle to the automobile dealer with a request that the defect be repaired, and (4) the dealer failed or refused to repair the defective parts." *Universal Motors*, 719 P.2d at 257.  Federal courts have certified express warranty claims under Washington state law.  *E.g.*, *Grays Harbor Adventist Christian Sch. v. Carrier Corp.*, 242 F.R.D. 568, 574 (W.D. Wash. 2007).

<u>Wisconsin (Deceptive Trade Practices Act)</u>

"Wisconsin's Deceptive Trade Practices Act, Wis. Stat. § 100.18(1), [] generally prohibits false, deceptive, or misleading representations or statements of fact in public advertisements or sales announcements." *Mueller v. Harry Kaufmann Motorcars, Inc.*, 359 Wis. 2d 597, 610, 859 N.W.2d 451, 457 (Wis. Ct. App. 2014).  "There are three elements in a § 100.18 cause of action: (1) the defendant made a representation to the public with the intent to induce an obligation, (2) the representation was untrue, deceptive or misleading, and (3) the representation materially

induced (caused) a pecuniary loss to the plaintiff." *MBS-Certified Pub. Accountants, LLC v. Wisconsin Bell Inc.*, 346 Wis. 2d 173, 189, 828 N.W.2d 575, 583 (Wis. Ct. App. 2013).  Federal courts have certified claims under the WDTPA and found that class-wide common proof of reliance may be offered where a defendant's deceptive conduct allegedly affected all class members in a uniform manner.  *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, No. 16-02709-MD-W-GAF, 2019 WL 1418292, at *26 (W.D. Mo. Mar. 21, 2019) ("Predominance is likewise satisfied in states that do not require reliance in a prima facie consumer fraud claim. The substantially similar labeling and product placement practices utilized by Defendants can be used as evidence common to all members in the proposed subclasses to prove to make a prima facie showing of consumer fraud.") (applying Wisconsin law).